ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
  *rzur@elkinskalt.com*
LAUREN N. GANS, State Bar No. 247542
  *lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Nicole A. Sullivan (pro hac vice)
  *sullivann@whiteandwilliams.com*
Thomas E. Butler (pro hac vice)
  *butlert@whiteandwilliams.com*
WHITE AND WILLIAMS LLP
7 Times Square - Suite 2900
New York, New York 10036
Telephone: (212) 631-4420

*Attorneys for Creditor Multiple Energy Technologies, LLC*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>SETH HALDANE CASDEN,<br><br>Debtor. | Case No. 2:23-bk-16904-BR<br><br>Chapter 11<br><br>Hon. Barry Russell<br><br>**DECLARATION OF NICOLE A. SULLIVAN IN SUPPORT OF MULTIPLE ENERGY TECHNOLOGIES, LLC'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, CONVERSION TO CHAPTER 7**<br><br>[*Motion for Appointment and Declaration of Roye Zur filed concurrently herewith*]<br><br>**Hearing Date & Time:**<br>Date:     November 4, 2025<br>Time:     10:00 a.m.<br>Place:    Courtroom 1668<br>          255 E. Temple St.<br>          Los Angeles, CA 90012 |

*[sidebar]* ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

5733672

## DECLARATION OF NICOLE A. SULLIVAN

I, Nicole A. Sullivan, declare as follows:

1. I am an individual over 18 years of age and competent to make this Declaration in support of the foregoing *Motion For Appointment of a Chapter 11 Trustee, or Alternatively, Conversion to Chapter 7* (the "Motion").

2. I am an attorney admitted *pro hac vice* to practice before this Court.

3. I am a partner in the law firm of White and Williams, LLP ("Firm"), counsel for Multiple Energy Technologies, LLC.

4. If called as a witness, I could and would competently testify to the following.

5. A true and correct copy of the Reformed and Restated Trust Agreement Created by Katherine Stuart Stibbs, dated July 19, 1934, is attached hereto as **Exhibit A**.

6. A true and correct copy of the non-confidential portions of the transcript from Debtor's 2004 Examination is attached hereto as **Exhibit B**.

7. A true and correct copy of the December 16, 2024 letter of direction to distribute $450,000 to Danning, Gill, Isreal & Krasnoff, LLP is attached hereto as **Exhibit C.**

8. A true and correct copy of the correspondence concerning the February 25, 2025 initial capital call to Interplay Venture Fund III, LP in the amount of $23,976.69 is attached hereto as **Exhibit D**.

9. A true and correct copy of the August 21, 2025 e-mail from Gregory Salvato, Debtor's bankruptcy counsel, to the undersigned providing supplemental discovery concerning distributions from the Seth Casden Resulting Trust is attached hereto as **Exhibit E.**

10. A true and correct copy of Hologenix, LLC's Monthly Operating Report for the month ending June 29, 2025 (Hologenix Doc. 1078 in Case No. 2:20-bk-13849-BR) is attached hereto as **Exhibit F**.

11. A true and correct copy of Hologenix, LLC's Monthly Operating Report for the month ending April 30, 2025 (Hologenix Doc. 1068 in Case No. 2:20-bk-13849-BR) is attached hereto as **Exhibit G**.

12. A true and correct copy of Hologenix, LLC's Monthly Operating Report for the

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

month ending July 31, 2025 (Hologenix Doc. 1080 in Case No. 2:20-bk-13849-BR) is attached hereto as **Exhibit H**.

13.     A true and correct copy of the transcript of the 2004 Examination of Alan Terry Leavitt is attached hereto as **Exhibit I**.

14.     True and correct copies of the Letters of Direction signed by Alan Terry Leavitt for distributions to or on behalf of Seth Casden are attached hereto as **Exhibit J**.

15.     True and correct copies of the Letters of Direction signed by Alan Terry Leavitt sent by Seth Casden to Northern Trust via email are attached hereto as **Exhibit K**.

16.     A true and correct copy of the January 26, 2024 email from Alan Levitt to Natalie Schiavone is attached hereto as **Exhibit L**.

17.     A true and correct copy of the Post-Trial Order referenced in the Motion is attached hereto as **Exhibit M**.

18.     A true and correct copy of the Final Judgment referenced in the Motion is attached hereto as **Exhibit N.**

I declare under penalty of perjury that the foregoing is true and correct. Executed this October 6, 2025.

_/s/ Nicole A. Sullivan_
Nicole A. Sullivan

# EXHIBIT A

**REFORMED AND RESTATED TRUST AGREEMENT OF THE TRUST
CREATED BY KATHERINE STUART STIBBS UNDER TRUST
AGREEMENT DATED JULY 19, 1934, AS DIVIDED FOR THE BENEFIT
OF THE LINDA H. PASCOTTO AND DESCENDANTS**

LEAVITT0000069

THIS REFORMED AND RESTATED TRUST AGREEMENT (sometimes hereinafter referred to as the "trust agreement" or the "agreement") reforms and restates, in its entirety, the trust agreement (the "Original Trust Agreement") made the 19th day of July, 1934 between Katherine Stuart Stibbs, then residing at 971 Palm Avenue, San Mateo, California, hereinafter called the "Donor," and the Wilmington Trust Company, a corporation organized and existing under and by virtue of the laws of the State of Delaware, having its principal place of business at Tenth and Market Streets, Wilmington, Delaware, hereinafter together with its successors called the "Trustee," as amended by the Donor on August 18, 1934, as amended and restated by the Donor on December 6, 1935, as further amended by the Donor on February 3, 1936, and as further amended by Orders of the Court of Chancery of the State of Delaware in and for New Castle County granted May 10, 2004, April 13, 2006 and July 31, 2006; provided, however, that this Reformed and Restated Trust Agreement shall only be effective as to the Linda Trust (as defined in subsection NINE (9) of Section THIRD hereof) and any trust(s) divided or succeeded therefrom. This Reformed and Restated Trust Agreement shall be binding and effective upon entry of an Order of the Court of Chancery of the State of Delaware In and For New Castle County approving this trust agreement.

W I T N E S S E T H:

That the Donor has transferred and delivered to the Trustee Two Thousand Four Hundred Ninety (2490) shares of the common stock of E. A. Stuart Company, a Washington corporation, and Five Thousand (5000) shares of the common stock of Carnation Company, a Delaware corporation, receipt whereof has been acknowledged, TO HAVE AND TO HOLD such stock and such other properties as may be added thereto from time to time, in accordance

- 1 -

LEAVITT0000070

herewith, to the Trustee, its successors and assigns, IN TRUST NEVERTHELESS for the uses and purposes as follows, to-wit:

FIRST:        (1)        During the life of the Donor, the Trustee shall collect the rents, income, issues and profits of the said trust estate, hereinafter referred to as "income", and shall pay over to the Donor the said income during her lifetime as and when received, after payment of such charges of the Trustee as are provided for herein.  The payment of the income during the life of the Donor may be made by depositing the same to her credit in her checking account with the Wilmington Trust Company, or by depositing such income to her credit in any other bank or trust company which the Donor may from time to time designate in writing.

(2)        During the life of the Donor, she shall act in the capacity of "Adviser" to the Trustee.  In the aforesaid capacity she shall have power to direct the carrying into effect of the provisions of this trust, and directions so given shall always be in writing and binding on the Trustee.  The Trustee shall not be liable to the Donor, or to any beneficiaries under the provision of the trust, for any act by the Trustee made under the direction of the Adviser to the Trustee.

SECOND:        During the lifetime of Ethelmae Stuart Haldan ("Ethelmae"), with respect to each Resulting Trust (as defined in subsection TEN (10) of Section THIRD hereof) held hereunder, the Trustee shall exercise certain powers as hereinafter provided, only upon the written direction of the Adviser (hereinafter the "Adviser" or "Advisers" without regard to the number of persons then serving as Adviser hereunder).  The initial Adviser of the initial three Resulting Trusts held hereunder shall be RONALD D. ALLING and STUART E. LUCAS. Upon the death of Ethelmae, with respect to The Linda H. Pascotto Resulting Trust:  (i) the then serving Adviser shall continue to serve in such capacity until such Adviser resigns, is removed, or otherwise ceases to serve; (ii) the Trustee shall continue to serve thereafter at the written

- 2 -

LEAVITT0000071

direction of the Adviser; and (iii) the Primary Beneficiary shall thereafter have the power to remove any Adviser for any reason, with or without cause, and in such event, shall appoint as successor Adviser any person other than a beneficiary of the trust or a related or subordinate party within the meaning of Section 672(c) of the Internal Revenue Code of 1986, as amended (the "Code"), with respect to any beneficiary of any trust hereunder.   Upon the death of Ethelmae, with respect to each Resulting Trust other than The Linda H. Pascotto Resulting Trust: (i) the then serving Adviser shall cease to serve; (ii) the Primary Beneficiary of such trust shall thereafter have the power to appoint any one or more persons other than a beneficiary of such trust or a related or subordinate party within the meaning of Section 672(c) of the Code, with respect to any beneficiary of any trust hereunder, to serve as the Adviser for such trust; (iii) if an Adviser is appointed and is serving at any time thereafter, the Trustee of such trust shall act with the written consent of the Adviser rather than upon the written direction of the Adviser; and (iv) the Primary Beneficiary shall thereafter have the power to remove any Adviser then serving for any reason, with or without cause, and, at any time after such removal, may appoint any person other than a beneficiary of the trust or a related or subordinate party within the meaning of Section 672(c) of the Internal Revenue Code of 1986, as amended (the "Code"), with respect to any beneficiary of any trust hereunder, to serve in place of such Adviser.   The following shall apply to each Resulting Trust during the lifetime of Ethelmae and after her death:

(1)    As provided in Section 3313(b) of Title 12 of the Delaware Code, in no event shall any Trustee hereunder be liable for any matter with respect to which he, she or it is directed by the Adviser except in cases of the Trustee's own willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust.   As provided in Section 3313(c) of Title 12 of the Delaware Code, whenever the Trustee is acting

LEAVITT0000072

hereunder with the consent of the Adviser, then except in cases of willful misconduct or gross negligence on the part of the Trustee, the Trustee shall not be liable for any loss resulting directly or indirectly from any act taken or omitted as a result of such Adviser's failure to provide such consent after having been requested to do so by the Trustee.  At any time when the Trustee is to be acting at the direction of the Adviser hereunder, the Trustee shall be under no duty to inquire into or monitor the investment of the trust assets or the directions of the Adviser.  If at any time during the continuance of the trust there shall be no Adviser of such trust, or if the Adviser of the trust shall fail to communicate in writing to the Trustee his, her or its direction or consent, as the case may be, as to the exercise of any of the powers for which exercise the direction or consent of such Adviser shall be necessary, within twenty (20) days after the Trustee shall have sent to such Adviser, by certified mail (or by any other means for which the sender shall have evidence of receipt by the addressee), at his, her or its last known address, a written request for such direction or consent (notwithstanding that the Trustee shall be under no obligation to request any such direction or consent unless it otherwise wishes to act without the consent or direction of an Adviser in accordance with this sentence), then the Trustee alone is hereby authorized and empowered to exercise all fiduciary powers hereunder subject to the general standard of care applicable to the Trustee when acting hereunder.

(2)    Notwithstanding any other provision of this trust agreement, at any time when an Adviser is to be acting as a direction adviser, the Adviser shall have sole responsibility (and the Trustee shall have no responsibility) for the investment, voting and management of the assets of the trust.  Whenever the Trustee is to be acting at the direction of an Adviser, the Trustee shall make only such sales and investments as the Adviser directs and the Trustee shall be under no obligation to review the trust assets, make any investment recommendation with

LEAVITT0000073

respect to them, solicit any direction from the Adviser, value the assets if they are non-marketable, or insure the assets.

(3)    Each Adviser may resign at any time, upon thirty (30) days written notice to the Trustee and to the trust's then living adult competent beneficiaries and the parents and/or guardians of the then living minor and incompetent beneficiaries.  Additional Advisers and successor Advisers may be appointed to serve immediately or at some future specified time by one or more writings delivered to the Trustee and executed by all of the Advisers then serving; provided, however, that no more than two Advisers shall serve at any one time.  If, at any time when the Trustee is to be acting at the direction of the Adviser, no Adviser is serving and no effective provision has been made for the appointment of a successor Adviser, the Trustee may appoint a successor Adviser.

(4)    At any time when two Advisers are serving hereunder, the Trustee shall act only at the written direction or with the consent, as the case may be, of both Advisers unless both Advisers provide otherwise in a writing delivered to Trustee which writing may direct the Trustee to act upon the written direction or with the consent, if such Advisers are then acting as consent Advisers pursuant to the terms of this agreement, of one Adviser with respect to one or more matters described in the writing or with respect to all matters as to which the Trustee acts hereunder at direction or with the consent of the Adviser.

(5)    No person shall be eligible to serve as an Adviser if such person is a beneficiary of any trust hereunder or if such person is a related or subordinate party within the meaning of Section 672(c) of the Code with respect to any beneficiary of any trust hereunder.

(6)    To qualify, any person or entity designated as Adviser hereunder, other than the initial Adviser, shall deliver a written instrument to the Trustee indicating acceptance

- 5 -

LEAVITT0000074

and agreement that all powers conferred upon such Adviser will be exercised on a fully discretionary basis for the exclusive interest of the beneficiaries.

(7)    Each Adviser shall be entitled to reasonable compensation for services rendered hereunder and reimbursement for reasonable expenses incurred in the performance of such services.  Notwithstanding the foregoing, the Adviser and the person appointing the Adviser may determine the Adviser's compensation and entitlement to reimbursement hereunder by a written agreement.  In no event shall any Adviser be entitled to compensation in excess of the compensation that would, at the time the Adviser's services are rendered, be then payable to a trustee exercising discretionary investment authority over the trust assets pursuant to Subchapter V of Chapter 35 of the Delaware Code and Rule 132 of the Delaware Chancery Court Rules, as such Delaware Code provisions and Court Rule may hereafter be amended, supplemented or replaced from time to time.

(8)    At any time or times when the Trustee is exercising the powers theretofore exercised upon the direction or with the consent, as the case may be, of the Adviser, the Trustee shall be under no duty to examine the actions of any Adviser that served theretofore or to inquire into the acts or omissions of any such Adviser and shall not be liable for any act or omission of any such Adviser and shall not be liable for any failure to seek redress for any act or omission of any such Adviser.

(9)    The Adviser need not inquire into the Trustee's performance of its duties.

(10)    The Adviser shall be held liable hereunder in accordance with the standard of care applicable to the Trustee when making investment or distribution decisions.

LEAVITT0000075

THIRD:        Upon the death of the Donor, but subject to the provisions hereinafter set forth, the Trustee shall divide and distribute the income and principal of the trust estate in the following manner:

(1)    To the Donor's husband, HARRY GLENN STIBBS, the sum of Ten Thousand Dollars ($10,000.00) to be paid within five (5) years after the death of the Donor.

(2)    To the Donor's brother, ELBRIDGE H. STUART, of Seattle, Washington, the sum of Five Thousand Dollars ($5,000.00) and to each of the Donor's nephews, ELBRIDGE HADLEY STUART, JR., REGINALD FULLERTON STUART and DWIGHT LYMAN STUART, the sum of One Thousand Dollars ($1000.00), to be paid within five (5) years after the death of the Donor, with the understanding that each such gift shall lapse in the event of the death of the beneficiary prior to receipt thereof.

(3)    To ST. PAULS EPISCOPAL CHURCH of Burlingame, California, the sum of Fifteen Thousand Dollars ($15,000.00) to be used toward the repair, alteration or upkeep of its church edifice or the construction of a new church, or for the current expense or maintenance of said church organization, said sum of money to be kept and safely invested by the Trustee until needed and requested by the trustees of said church.

(4)    To the Donor's sister-in-law, MRS. ETHEL N. RIEHLE, of Cleveland, Ohio, and/or the heirs of her body, the sum of Twenty-five Thousand Dollars ($25,000.00), but in the event that said MRS. ETHEL N. RIEHLE shall predecease the Donor and leave no child or children the issue of her body, said gift shall lapse and remain a part of the trust estate.

(5)    To the Donor's very good friend, MRS. MAY GILLESPIE, of Berkeley, California, if she shall survive the Donor, and if she shall not survive the Donor, then to the issue of said MRS. MAY GILLESPIE, if any, by right of representation the sum of Ten Thousand

- 7 -

LEAVITT0000076

Dollars ($10,000.00), but this gift specifically exempts and/or bars the husband of MRS. MAY GILLESPIE and is made for the benefit of said beneficiary and her children and her children's children, and, in default of all these, shall be and remain a part of the trust estate.

The gifts hereinabove mentioned in this Section THIRD shall be paid by the Trustee from the income or principal of the trust estate at such time as the Trustee and the Adviser to the Trustee may in their discretion deem advisable within five (5) years from the time of the Donor's death and said Trustee shall in no event be forced to make payments to any beneficiary hereunder at a time prior to the expiration of said five (5) year period.

(6)    After the Donor's death, if and when all of her children shall have died, leaving no issue surviving, the Trustee shall give one-half (1/2) of the trust estate to the Donor's brother, ELBRIDGE H. STUART, and/or the heirs of his body, and one-half (1/2) of said trust estate to the BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR UNIVERSITY as a permanent trust fund to be known as "THE KATHERINE STUART STIBBS SCHOLARSHIP FUND" and to be kept invested with any unexpended income therefrom in such securities as the Board of Trustees of said University may desire to select; and the income from said fund shall be used to provide free scholarships in the University for women students registered in said University, to be chosen by the Faculty of said University because of their character and intellectual promise, to such number and in such manner as the Faculty shall prescribe; PROVIDED, that in the event of the prior death of the Donor's brother, ELBRIDGE H. STUART, and in default of heirs of his body, the share going to the TRUSTEES OF LELAND STANFORD JUNIOR UNIVERSITY shall be all of said trust estate instead of the portion previously set forth herein.

LEAVITT0000077

(7)    After the Donor's death, in the event that the Donor shall die leaving child or children surviving her, then, the income from the trust estate shall be available to said child or children of the Donor, in equal parts, as long as any one of said children shall live, and such part thereof up to but not in excess of Three Thousand Dollars ($3,000.00) per annum as the Trustee, with the consent and approval of the Adviser to the Trustee, in their uncontrolled discretion, determine to be proper for the support, maintenance, education, use or benefit of such child or children, shall be paid and distributed periodically to such child or children, or to his or her guardian, as the Trustee and Adviser shall direct, until such child or children shall have reached the age of thirty (30) years, and, until otherwise provided as of May 10, 2004 by Order of the Court of Chancery of the State of Delaware, the entire interest of any child or children in the income of the trust estate, but in no event to exceed his or her proportionate share of such income as long as other child or children of the Donor be living or shall have died leaving issue surviving, shall be paid over periodically to such child or children, as long as such child or children shall live, and, at the end of each calendar year, that portion of the income which has not been paid over by the Trustee during the year to the beneficiary entitled thereto shall thereupon become a part of the principal or corpus of the trust estate.

(8)    By Order of the Court of Chancery of the State of Delaware, in and for New Castle County dated May 10, 2004, C.A. No. 19548-NC, the trust estate was divided into two separate trusts, (the "Rogers Family Trust" and the "Haldan Family Trust"), equal in value as of December 31, 2001.

(9)    By Order of the Court of Chancery of the State of Delaware, in and for New Castle County dated April 13, 2006, C.M. No. 11878-NC, the Trustee was authorized to, and subsequently did, further divide the trust estate of the Haldan Family Trust into four parts,

LEAVITT0000078

with one such part to be held as a separate trust for Ethelmae and each of her four children and their respective issue.  The separate trust so divided for the benefit of Ethelmae, Linda H. Pascotto ("Linda") and Linda's issue is herein referred to as the "Linda Trust."

(10)    Effective upon entry of an Order of the Court of Chancery of the State of Delaware approving this Reformed and Restated Trust Agreement, the Linda Trust shall be further divided into three separate trusts (each a "Resulting Trust" and together, the "Resulting Trusts"), in the following amounts and proportions:

| The Linda H. Pascotto Resulting Trust | 55% |
|---|---|
| The Seth Casden Resulting Trust | 22.5% |
| The Graham Casden Resulting Trust | 22.5% |

The initial Trustee of each such Resulting Trust shall be The Northern Trust Company of Delaware.  The Resulting Trusts shall be held, administered and disposed of in accordance with the foregoing terms and conditions of this Reformed and Restated Trust Agreement to the extent applicable but only to the extent such applicable terms and conditions are not inconsistent with the following terms and conditions:

(a)    The person whose name identifies the Resulting Trust shall be known as the "Primary Beneficiary" of the trust.

(b)    The Resulting Trusts shall be separate trusts, and each shall be held, managed, administered and disposed of by its own Trustee and Adviser, in accordance with the provisions set forth in this subsection TEN (10) and the other applicable provisions of this trust agreement except to the extent any such other provisions are inconsistent with the provisions of this subsection TEN (10).  The persons serving as the Trustee and the Adviser for each Resulting Trust may be different from or

LEAVITT0000079

the same as those persons serving in such capacities for the other Resulting Trusts. Any person serving as a Trustee or an Adviser of a Resulting Trust shall have no duties, liabilities, rights, powers, responsibilities or obligations with respect to any Resulting Trust other than the Resulting Trust(s) for which that person is serving.

(c)     During the lifetime of Ethelmae:

(i)     Any reference herein to the Haldan Family Trust shall mean all of the trusts then in existence divided therefrom and divided from the Linda Trust, collectively.

(ii)     The income from each Resulting Trust shall be paid to Ethelmae during her lifetime.

(iii)     Anything herein contained to the contrary notwithstanding, the Trustee, at the direction of the Adviser to the Trustee, is hereby authorized and directed at any time and from time to time during the continuance of each Resulting Trust to expend such principal of the Resulting Trust as the Adviser to the Trustee, in its uncontrolled discretion, shall deem proper for the support, maintenance, education, use and benefit of the Primary Beneficiary and/or pay the same to the Primary Beneficiary without being liable to see to the application thereof.

(iv)     If the Primary Beneficiary of the Resulting Trust shall predecease Ethelmae, then upon such Primary Beneficiary's death, the principal of the Resulting Trust shall be divided into per stipital shares for the Primary Beneficiary's then living issue. Each such share shall be set aside as a separate trust and shall be identified as a Resulting Trust bearing the issue's name for

- 11 -

LEAVITT0000080

whom such share is created.  Such issue shall be the Primary Beneficiary of the Resulting Trust set aside for his or her benefit, which shall be held in accordance with the terms and conditions set forth in this subsection TEN (10) and the other provisions of this trust agreement.  In default of any then living issue of the Primary Beneficiary should he or she predecease Ethelmae, the principal of the Resulting Trust shall be divided among the then living issue of Linda, per stirpes; provided, however, that the Trustee shall add the share so divided for an issue of Linda to any existing Resulting Trust for such issue then held under this trust agreement, thereafter to be held, administered and disposed of as a part of such trust.  In default of any then living issue of the Primary Beneficiary and any then living issue of Linda should the Primary Beneficiary predecease Ethelmae, the principal such deceased Primary Beneficiary's Resulting Trust shall be divided equally among the then existing separate trusts that were created upon the division of the Haldan Family Trust pursuant to Court Order dated April 13, 2006 or shall be divided equitably among those trusts, if any, and such further trusts then existing and created subsequent to April 13, 2006 upon the further division of any of those trusts.

(d)     Upon the death of Ethelmae:

(i)     Each Resulting Trust shall be held in further trust for the benefit of the Primary Beneficiary, subject to any assignment of interests with respect to such property executed prior to the effective date of this Reformed and Restated Trust Agreement.

- 12 -

LEAVITT0000081

(ii)    For a period of one (1) year following the death of Ethelmae, each Primary Beneficiary of a Resulting Trust shall have the right to withdraw up to Four Percent (4%) of the value of the principal of such Resulting Trust, valued as of the date of Ethelmae's death, by delivering a written notice of the exercise of such right to the then serving Trustee of the Resulting Trust.

(iii)    During the lifetime of the Primary Beneficiary of each Resulting Trust other than The Linda H. Pascotto Resulting Trust, with the consent of the Adviser, the Trustee of the applicable Resulting Trust may distribute so much, including all, of the net income and principal of the Resulting Trust to or for the benefit of the Primary Beneficiary thereof, as the Trustee and Adviser, in their uncontrolled discretion, shall determine.

(iv)    During the lifetime of the Primary Beneficiary of The Linda H. Pascotto Resulting Trust, at the direction of the Adviser, the Trustee of the applicable Resulting Trust may distribute so much, including all, of the net income and principal of the Resulting Trust to or for the benefit of the Primary Beneficiary thereof, as the Adviser, in its uncontrolled discretion shall determine.

(v)    Notwithstanding any other provision in this Agreement to the contrary, upon attaining the age of sixty (60) years, each Primary Beneficiary of a Resulting Trust other than The Linda H. Pascotto Resulting Trust shall thereafter have the power to appoint any person other than a beneficiary of such trust or a related or subordinate party within the meaning of Section 672(c) of the Code, with respect to any beneficiary of any trust hereunder, as the "Special Distribution Adviser" for such trust, who may direct the Trustee of such Resulting

- 13 -

LEAVITT0000082

Trust to make distributions to such Primary Beneficiary in the Special Distribution Adviser's sole discretion; provided, however, that in any given year the distributions directed by such Special Distribution Adviser shall not exceed Four Percent (4%) of the value of the principal of the Resulting Trust, valued as of January 1st of that year. The Special Distribution Adviser may direct such distributions without the consent or approval of any other Adviser then serving. Each Special Distribution Adviser may resign from office at any time and for any reason upon thirty (30) days written notice to the Trustee and to the Primary Beneficiary of the trust. The Primary Beneficiary of a Resulting Trust shall have the power to remove the Special Distribution Adviser of such trust for any reason, with or without cause. At any time after the Special Distribution Adviser's resignation, removal or failure to serve for any other reason, the Primary Beneficiary of such trust may appoint as successor Special Distribution Adviser any person other than a beneficiary of the trust or a related or subordinate party within the meaning of Section 672(c) of the Code with respect to any beneficiary of any trust hereunder.

(vi) No other provision of this trust agreement shall be construed so as to permit any distributions from a Resulting Trust to anyone other than the Primary Beneficiary thereof after the death of Ethelmae and during the remainder of such Primary Beneficiary's lifetime.

(e) Upon the death of the Primary Beneficiary of a Resulting Trust, if Ethelmae is no longer living:

- 14 -

LEAVITT0000083

(i)    All undistributed income of the Resulting Trust shall immediately, on receipt of the Trustee, become principal or corpus of such trust.

(ii)    The Trustee shall distribute the principal of the Resulting Trust:

1.    to such of the creditors of the Primary Beneficiary's estate, in such amount or amounts and upon such terms and conditions as that Primary Beneficiary shall have appointed, with specific reference to this power of appointment, by his or her duly probated Will; and/or

2.    to such of the Primary Beneficiary's issue, or if that Primary Beneficiary is not survived by issue, then to such of the issue of Ethelmae, in such amount or amounts and upon such terms and conditions, whether in trust or otherwise, as that Primary Beneficiary shall have appointed by the last instrument in writing which he or she shall have executed and delivered to the Trustee during his or her lifetime, or, to the extent not so appointed, then by an express reference to this particular power of appointment in his or her Will; and/or

3.    to such charitable organizations described in Sections 170(c), 501(c)(3) and 2055 of the Code, in such amount or amounts and upon such terms and conditions, whether in trust or otherwise, as that Primary Beneficiary shall have appointed by the last instrument in writing which he or she shall have executed and delivered to the Trustee during his or her lifetime, or, to the extent not so appointed,

- 15 -

LEAVITT0000084

then by an express reference to this particular power of appointment in his or her Will; and/or

4.      to a trust providing an income interest to the Primary Beneficiary's surviving spouse for his or her lifetime or for any shorter period, if the Primary Beneficiary shall have so appointed with the prior written consent of the Adviser, by the last instrument in writing which he or she shall have executed and delivered to the Trustee during his or her lifetime, or, to the extent not so appointed, then by an express reference to this particular power of appointment in his or her Will; provided, however, that the interest of such surviving spouse in any such trust shall not exceed what is expressly permitted by this subparagraph 4; and provided, further, that any trust created by the power of appointment set forth in this subparagraph 4 shall provide for a disposition of the remainder upon the death of the Primary Beneficiary's surviving spouse in a manner that would be permissible under the exercise of a power set forth in subparagraph 2, 3 or 5 of this paragraph (e)(ii), or that would be in accordance with the default provisions set forth in paragraphs (e)(iii) through (e)(v) below.  If the remainder interest of any such trust is not disposed of as required by this subparagraph 4, then such trust shall not fail but upon the death of the Primary Beneficiary's surviving spouse, the trustee of such trust shall be required to distribute the remainder thereof in accordance with paragraphs (e)(iii) through (e)(v) below, as if such trust were a part of a Continuing Resulting Trust hereunder; and/or

LEAVITT0000085

5.      to any person other than the Primary Beneficiary, his or her creditors, or his or her estate, in such amount or amounts and upon such terms and conditions, whether in trust or otherwise, as that Primary Beneficiary shall have appointed by the last instrument in writing which he or she shall have executed and delivered to the Trustee during his or her lifetime, or, to the extent not so appointed, then by an express reference to this particular power of appointment in his or her Will; provided, however, that the power set forth in this subparagraph 5 shall only be effective if the Primary Beneficiary is not survived by issue and if the Primary Beneficiary so exercises such power with the prior written consent of the Adviser.

Prior to exercising any of the foregoing powers of appointment, it is recommended that the Primary Beneficiary consider the generation-skipping transfer tax consequences that may result therefrom.

(iii)    Any property of the Resulting Trust not effectively disposed of by the Primary Beneficiary's powers of appointment granted in the foregoing paragraph (e)(ii) shall be distributed, free of trust, among the Primary Beneficiary's then living issue, per stirpes.  If the Primary Beneficiary is not survived by issue, such property of the Resulting Trust shall be divided among the then living issue of Linda, per stirpes, provided, however, that if a trust already exists under this trust agreement of which such issue is the Primary Beneficiary, the Trustee shall instead add the share to that existing trust, thereafter to be held, administered and disposed of as a part thereof.

- 17 -

LEAVITT0000086

(iv)     If there shall be no issue of Linda living upon the death of the Primary Beneficiary, any property of the Resulting Trust not effectively disposed of by the Primary Beneficiary's powers of appointment in the foregoing paragraph (e)(ii) shall be distributed among the then living issue of Ethelmae, per stirpes.

(v)     If there shall be no issue of Ethelmae living upon the death of the Primary Beneficiary, any property of the Resulting Trust not effectively disposed of by the Primary Beneficiary's powers of appointment in the foregoing paragraph (e)(ii) shall be distributed among the then living issue of the Donor, per stirpes.

(vi)     If there shall be no issue of the Donor living upon the death of the Primary Beneficiary, any property of the Resulting Trust not effectively disposed of by the Primary Beneficiary's powers of appointment in the foregoing paragraph (e)(ii) shall be distributed to the then living issue of the Donor's brother, ELBRIDGE H. STUART, per stirpes and not per capita, and in default of all these to the Trustees of LELAND STANFORD JUNIOR UNIVERSITY in the same manner as provided for in subsection SIX (6) of this Section THIRD.

(11)     Income, as the term is used in the trust agreement, shall be construed to mean gross income after deducting such costs and/or charges as are provided for herein.

FOURTH:     No payment as provided for in any of Section THIRD, immediately preceding, shall be paid by the Trustee to any person or persons entitled thereto until such time as all federal estate taxes assessed against the Donor's estate and all state

- 18 -

LEAVITT0000087

inheritance taxes levied and imposed on any of the beneficiaries under this trust agreement or the Donor's will shall have been definitely established and fully paid.

FIFTH:        The Donor directs that the Trustee and Advisers and the Executors of her will shall cooperate to the end that none of the assets, especially the stockholdings of the Donor in the Carnation Company and the E. A. Stuart Company, be sacrificed for the purpose of paying estate or inheritance taxes or any other indebtedness of her estate, but that the Trustee and Advisers and said Executors under her will be, and they are authorized, empowered and instructed to borrow such sums as may be necessary to pay such indebtedness and taxes rather than to sell said securities at a price which would not be satisfactory to said Trustee and Advisers and Executors of her will.

SIXTH:        The Donor directs that, in the event there are not sufficient funds in her personal estate to pay all her just debts and other lawful claims against her estate, and all taxes, local assessments and other public charges against the estate and every part thereof, and all inheritance and estate taxes of her estate and of any devisee or legatee or cestui que trust taking under her will, then the Trustee, with the consent and approval of the Advisers to the Trustee, shall pay out of this trust estate such amounts as may be necessary to pay all the obligations of the Donor's personal estate as are designated in this Section SIXTH.

SEVENTH:     In every instance in which the Trustee is required by the terms of this agreement to pay any sum periodically or to turn over any share to or create any trust for any person or institution to whom or for whose benefit this agreement directs payment to be made or his share to be turned over or a trust be created, unless otherwise specified herein, each such person or institution, if such person or institution shall have died or ceased to exist, or from any cause have become incapable of taking, either before or after payments have begun to be made,

- 19 -

LEAVITT0000088

then the amount or share so directed to be paid or turned over or any part thereof unpaid, shall revert to and become a part of the trust estate unless otherwise provided herein.

EIGHTH:    No beneficial interest in any Resulting Trust, whether in income or in principal, shall be subject to anticipation, assignment, pledge, mortgage, sale or transfer in any manner whether voluntary or involuntary, and no beneficiary of any such trust or other person interested therein shall have the power to anticipate, encumber or charge his or her interest therein, and no trust hereunder shall be liable for or subject to the debts, contracts, obligations, liabilities or torts of any beneficiary of any such trust or other person interested therein; provided, however, that nothing contained herein shall be construed as preventing any beneficiary from making a qualified disclaimer within the meaning of Section 2518 of the Code with respect to interests herein.  Furthermore, if and to the extent that a Primary Beneficiary of a Resulting Trust is deemed to have made a transfer of property to any trust hereunder, notwithstanding any other provision of this trust agreement, the Primary Beneficiary intends such deemed transfer to constitute a "qualified disposition" within the meaning of Section 3570(7) of Title 12 of the Delaware Code and accordingly the portion of the trust as is attributable to such deemed transfer may not be transferred, assigned, pledged or mortgaged, whether voluntarily or involuntarily, and such provision shall be deemed to be a restriction on the transfer of the Primary Beneficiary's beneficial interest in such trust that is enforceable under applicable nonbankruptcy law within the meaning of Section 541(c)(2) of the Bankruptcy Code.

NINTH:    All transfer, estate and inheritance taxes which may be properly assessed or imposed upon this trust estate, or upon the Trustee thereof, or on any beneficiary with respect to any property passing to such beneficiary hereunder, for which provision has not otherwise been made by the Donor, shall, after the death of the Donor, be paid out of the trust

LEAVITT0000089

estate and prior to the division thereof as if it were one of the expenses of the administration of the trust estate.

TENTH:    The Donor expressly reserves the power, either by will or by an instrument in writing signed by her and delivered to the Trustee, from time to time and as often as she may desire, to amend this instrument and the trust hereby created and to change or cancel any of the provisions herein contained, and to appoint new and other beneficiaries than those herein specified to whom the principal or income of the trust estate, or any part thereof, shall be paid and transferred, or for whose benefit the principal of the trust estate or any part thereof shall be held, or to cancel any of the provisions herein contained for the benefit of any of the beneficiaries hereinbefore named.  Any instrument signed by the Donor and delivered to the Trustee, and in effect directing the Trustee after the Donor's death to pay any money to any person or persons therein named, shall be deemed to be an apportionment to the persons therein named of a part of the trust estate to the extent of the sum directed to be paid to such person, and, to that extent, an amendment to this instrument and any amount or amounts so directed to be paid shall be first charged against and deemed to be in reduction of the "entire trust estate" (that is, without regard to any divisions or subdivisions thereof occurring on or after May 10, 2004), with each trust or share so divided therefrom bearing only its proportionate share of any such reduction; provided, however, that any such instrument or instruments signed by the Donor, if they direct the payment to one or more beneficiaries of a total sum greater than Ten Thousand Dollars ($10,000.00), shall not be deemed a valid exercise of the power of amendment and appointment reserved to the Donor, unless such instrument or instruments are duly executed in the manner of a deed to real property in the State of Delaware.  Any gift made by the Donor in her will, to the extent that the assets of her estate are insufficient to satisfy in full, shall be an

LEAVITT0000090

exercise of the power of appointment hereby reserved to the Donor, and the legatee or legatees named in the will of the Donor shall, to the extent that the assets of the estate of the Donor are insufficient to satisfy the bequests in full, be deemed to be named as beneficiaries of the trust estate hereby created in the same manner as if the Trustee was, by the will of the Donor, specifically directed to pay such legatees out of this trust estate.  The amounts so paid to such legatees shall be charged against and deemed to be in reduction of the entire trust estate, with each trust or share so divided therefrom bearing only its proportionate share of any such reduction.  No amendment shall be made of this instrument which shall in any way increase the obligation of the Trustee or diminish its compensation without the written consent of the Trustee thereto first having been obtained.

ELEVENTH:  The Donor expressly reserves the power, by an instrument in writing executed by her in the manner of a deed for real property in the State of Delaware and delivered to the Trustee to revoke the trust herein provided for, and thereupon the Trustee shall assign, transfer and pay over to her all moneys of the trust estate remaining in its hands after deducting its expenses and compensation, and any sum for which it is liable by way of taxes or otherwise.  The Donor shall also have the right from time to time to withdraw from the trusts hereunder any part of the whole of the property at any time constituting the  trust funds in the hands of the Trustee, and the receipt therefor of said Donor delivered to said Trustee shall be sufficient to discharge the Trustee from all further liability or responsibility with relation thereto. Upon the withdrawal of any part of the property constituting the trust estate, the trusts shall be deemed to be revoked pro tanto.  In case the whole of such property shall at any time be withdrawn by the Donor, this instrument shall thereupon be considered as revoked.

- 22 -

LEAVITT0000091

TWELFTH:    The Donor shall have the right to deposit additional securities or property of any kind with the Trustee from time to time upon the trusts hereunder and at the time of deposit shall give written instructions to the Trustee over her own signature indicating her wish that the securities or property deposited be held subject to the trusts hereunder or she may do so by testamentary disposition, or the Donor may deposit additional securities by means of her will and testament.

THIRTEENTH:        Subject to the provisions hereinbefore and hereinafter set forth and without in any way limiting, by implication or otherwise, the powers herein conferred upon the Trustee or those conferred upon the Trustee by law, the Trustee and the Adviser are hereby expressly granted the following powers, authorities and discretions with relation to any and all property at any time constituting all or part of any trust held hereunder.

(1)    The Trustee shall hold any and all property, either real or personal, at any time forming a part or the whole of the trust fund or estate herein created for the uses and purposes herein set forth.

(2)    At the direction or with the consent, as the case may be, of the Adviser, the Trustee shall sell at public or private sale, exchange, or otherwise dispose of any property, either real or personal, at any time held by it hereunder at such time or times and in such manner and on such terms as to the Adviser may seem desirable.

(3)    At the direction or with the consent, as the case may be, of the Adviser, the Trustee shall invest and reinvest any money at any time received by the Trustee and constituting part of the principal or income of the trust hereby created in such securities as the Adviser may deem advisable.  Such investments shall not be restricted to the investments for Trustees as fixed by any State or rule of law of the State of Delaware, or any other State, nor

- 23 -

LEAVITT0000092

shall the Trustee or the Adviser be liable for any loss which may occur by reason of the depreciation in value of any security in which they may invest or which it has retained as an investment in good faith.

(4)    Except as otherwise provided in subsections EIGHT (8) and TEN (10) of this Section THIRTEENTH, the Trustee, at the direction or with the consent, as the case may be, of the Adviser, shall determine how all receipts and disbursements (such as, but not limited to, Trustee fees, custody fees, investment advisory fees and management fees) shall be credited, charged or apportioned as between principal and income, provided the Trustee shall not charge against the income of the trust estate any sums which as a matter of law are chargeable only against the principal of the trust estate.

(5)    The Trustee, at the direction or with the consent, as the case may be, of the Adviser, shall deposit any of the securities at any time forming a part of the trust estate held by it hereunder under any plan of reorganization that may commend itself to the Adviser, and shall accept the new securities which may be offered to it under any such plan in exchange for such original securities, and shall pay any and all assessments levied or imposed under such plan of reorganization and charge the amount thereof against the trust estate.

(6)    The Trustee, at the direction or with the consent, as the case may be, of the Adviser, shall deposit any securities at any time held by it hereunder with any protective or reorganization committee, and shall delegate to such committee such power and authority with relation to such securities as the Adviser (and the Trustee, when acting with the consent of the Adviser) may, in its discretion, deem appropriate, and shall agree to pay and pay out of the trust estate such proportionate share or part of the expenses of said committee as the Adviser (and the Trustee, when acting with the consent of the Adviser) deems proper.

LEAVITT0000093

(7)    Upon the division or distribution of any portion or all of the trust hereby created, the Trustee, at the direction or with the consent, as the case may be, of the Adviser, shall make such distribution or division in kind by transferring or conveying any securities or property held by the Trustee at such reasonable valuation as the Adviser may determine to be appropriate, and for the purpose of making such distribution in kind to determine the value of any property held by said Trustee.  Any payment or distribution shall be made by the said Trustee at the direction or with the consent, as the case may be, of the Adviser either wholly or partly in kind as aforementioned, or wholly or partly in cash.

(8)    If any dividend shall be declared upon the stock of any corporation at any time held by the Trustee hereunder, which dividend shall be payable in stock of the corporation declaring or authorizing the same, such dividend shall become a part of the principal of said trust fund.  In the event of the receipt of any extraordinary dividends, payable in cash or otherwise than in the stock of the corporation or association declaring or authorizing the same, and declared or authorized in respect of any stock composing in whole or part the principal of the trust created by this instrument, the Trustee, at the direction or with the consent, as the case may be, of the Adviser, shall determine what part, if any, of said dividend is principal and what part is income, and shall pay out and distribute as income such part of such extraordinary dividend as the Adviser may determine to be income, and shall continue to hold the remaining part of the principal, until it is judicially determined that some part thereof is income, and upon such judicial determination the part so determined to be income shall be distributed as such in accordance herewith.  The determination that any part of any such extraordinary dividend is income and not principal shall be binding and conclusive upon all persons interested hereunder.

LEAVITT0000094

(9)     The Trustee shall not be required to maintain from the income of any securities at any time forming a part of the principal of the trust estate a sinking fund to guard against the diminution or amortization of the premium on said securities.

(10)     The Trustee may hold all of the corpus of the trust estate in one common or undivided fund in which all beneficiaries shall have undivided interest without making a physical division of the corpus or principal of the trust estate; and to apportion, at the direction or with the consent, as the case may be, of the Adviser, any losses to principal or income as the Adviser shall deem best.

(11)     The Trustee, at the direction or with the consent, as the case may be, of the Adviser, is authorized to compromise, adjust, settle or submit to arbitration, upon such terms as the Adviser may deem desirable, all claims in favor of or against any interest created hereunder.

(12)     The Trustee, with the consent of the Adviser, may employ such agents, advisers and other counsel including but not limited to entities affiliated with the Trustee, and pay out of income or principal or both the reasonable charges and fees of such agents, advisers and counsel; provided, however, that whenever the Trustee is acting at the direction of the Adviser hereunder, the Trustee may exercise the foregoing power as it shall in its sole discretion determine, except with respect to actions directed by the Adviser, in which case the Adviser shall have the sole power to direct the Trustee to employ agents, advisers and other counsel including but not limited to entities affiliated with the Trustee, and to direct the Trustee with regard to the payment of the reasonable fees of such agents, advisers and other counsel.

(13)     The Trustee, at the direction or with the consent, as the case may be, of the Adviser, is authorized to borrow money for the trust estate at such rate of interest as the Adivser may deem to be appropriate, to pledge either the whole or any part of the property or any

LEAVITT0000095

security at any time held by the Trustee hereunder as security for the repayment thereof, or it may advance its own funds to the trust estate and hold as security for the repayment thereof any or all property and securities at any time held by it as Trustee hereunder, and may pay to itself out of the income of the trust estate, interest on the monies so advanced and until they are repaid, at such reasonable rate as in general it is, during a like period, lending its funds to other persons on like security.

(14)    The Trustee may at its option and its own risk, transfer and hold any securities hereunder in the name of a nominee without adding any words showing fiduciary capacity, or unregistered or in such form as will pass by delivery, or use a central depository, such as The Depository Trust Company or any Federal Reserve Bank, and permit the registration of registered securities in the name of its nominee; provided, however, a declaration of trust shall be attached to any such security physically held as a trust asset hereunder and physically delivered to a nominee, executed by the nominee, showing the capacity in which such security is held by such nominee; provided, however, that the Trustee may detach such declaration of trust when and if a physical transfer of the security is made only upon the direction or with the consent, as the case may be, of the Adviser.

(15)    The powers enumerated in subsections ONE (1) to FIFTEEN (15) inclusive of this Section THIRTEENTH are given upon the express condition that during the life of the Donor and unless and until she should be judicially declared to be incompetent, the Donor reserves to herself and she is also hereby given and granted the right to vote at all stockholders meetings any and all stock of E. A. Stuart Company and Carnation Company, or their successors in interest, which may be deposited hereunder, and the Donor is hereby given and granted the right to direct, nominate or appoint in writing any person or persons to whom proxies for the

- 27 -

LEAVITT0000096

voting of said stock shall issue, and the Trustee shall join with the Donor in her request for the issuance of such proxies, as the Donor may from time to time request.  All sales, exchanges, investments or reinvestments of trust funds during the life of the Donor shall be made as the Donor directs in writing, and only with her written consent, such written direction or consent to be signed by the Donor and delivered to the Trustee, and the Trustee shall not be liable for any loss which may occur by reason of any investments or reinvestments or changes of investment made in accordance with such written instructions; and, provided further, that should the Donor be judicially declared to be incompetent, the Trustee shall thereafter have the powers herein conferred upon it in the same manner as if the Donor were then deceased; and provided further, that no person or corporation whatsoever having any transactions with the Trustee with reference to any property constituting a part or the whole of the trust estate hereby created shall be required to ascertain whether the written consent or direction of the Donor or the Adviser has been secured or that the Trustee has power to dispose of the securities and property subject to the trust created hereunder.

FOURTEENTH:    The Trustee shall place at interest all moneys in its hands at the best possible rate obtainable consistent with safety and shall submit to the Donor, monthly, during her lifetime, written financial statements showing in full all transactions with respect to the trust funds, and, in addition, the Trustee shall deliver to the Donor on or before the first day of February of each year an annual statement for the calendar year preceding showing in detail all information necessary to enable the Donor to prepare her income tax return.

FIFTEENTH: Any Trustee may resign from office without leave of court at any time and for any reason by a duly acknowledged writing, delivered in person or by registered mail to the remaining Trustee or Trustees, or, if there is no other Trustee then in office, to the

LEAVITT0000097

Adviser or, if there is no Adviser then in office or if the Adviser is the Trustee, to the adult

beneficiaries of the trust then eligible to receive distributions from the trust and the parents and

guardians of the minor beneficiaries then eligible to receive distributions from the trust.  During

the lifetime of Ethelmae, any Trustee acting hereunder may be removed at any time, with or

without cause, by the Adviser.  After the death of Ethelmae, any Trustee acting hereunder may

be removed at any time, with or without cause, by either the Adviser of such trust or the Primary

Beneficiary of such trust.  Upon the removal of a Trustee hereunder, the person who removed

such Trustee shall, within (30) days thereafter, select as successor Trustee a bank or trust

company having, together with its affiliates, at least Five Billion Dollars (US $5,000,000,000),

adjusted for inflation (as defined in Section TWENTY-FIRST), in personal trust and/or estate

assets under discretionary management.  If any Trustee resigns or otherwise ceases to serve as

Trustee hereunder, the Adviser, or if there is no Adviser then serving, the Primary Beneficiary,

shall, within thirty (30) days thereafter, select as successor Trustee a bank or trust company

having, together with its affiliates, at least Five Billion Dollars (US $5,000,000,000), adjusted for

inflation, in personal trust and/or estate assets under discretionary management.

If the person having power to select a successor Trustee pursuant to the foregoing

paragraph fails to appoint a successor Trustee within thirty (30) days after the Trustee is

removed, resigns or otherwise ceases to serve, then a majority of the then adult and competent

beneficiaries of such trust shall appoint a bank or trust company having, together with its

affiliates, at least Five Billion Dollars (US $5,000,000,000), adjusted for inflation, in personal

trust and/or estate assets under discretionary management, as successor Trustee within thirty (30)

days following the end of the initial thirty (30) day period.  If a successor Trustee shall not be

appointed within such second thirty (30) day period, any interested party (including the

LEAVITT0000098

predecessor Trustee) may petition a court of competent jurisdiction for the appointment of a successor Trustee; provided, however, that to qualify to serve hereunder, any such successor Trustee shall be a bank or trust company having, together with its affiliates, at least Five Billion Dollars (US $5,000,000,000), adjusted for inflation, in personal trust and/or estate assets under discretionary management.

Notwithstanding the foregoing, the Five Billion Dollar (US $5,000,000,000) in personal trust and/or estate assets under discretionary management threshold set forth in this Section FIFTEENTH is intended to insure that only institutional fiduciaries of the highest standing, reputation, skill, and experience within the industry are selected as successor Trustees. With the passage of time such threshold may cease to serve as an effective means of assuring the selection of only those institutional fiduciaries of the type described in the foregoing sentence and, accordingly, it is recommended that only institutional fiduciaries that, in the view of the person(s) appointing a successor Trustee, are of the highest standing, reputation, skill, and experience within the industry are selected to serve as successor Trustees even if the $5,000,000,000 threshold imposed above no longer mandates the selection of such successor Trustees.

Notwithstanding the foregoing, unless the Adviser has determined to change the situs of the trust from Delaware in accordance with Section EIGHTEENTH hereof, at all times, the Trustee then serving must also be a "qualified trustee" within the meaning of Section 3570(8) of Title 12 of the Delaware Code, or any successor provision thereto.

Notwithstanding any other provision of this trust agreement, neither any beneficiary of any trust hereunder, nor any person or entity that is related or subordinate to any

LEAVITT0000099

such beneficiary within the meaning of Section 672(c) of the Code shall ever be eligible to serve as a Trustee.

Upon the delivery of the trust property to a successor Trustee, the predecessor Trustee shall have no further liability or responsibility with respect thereto. A successor Trustee shall have no duty to examine, or inquire into, and shall in no way be responsible for the acts or omissions of its immediate predecessor Trustee or immediate and more remote predecessor Trustees (including without limitation the results of any judicial proceeding in which a prior Trustee participated or any judicial relief to which a prior Trustee consented), and any successor shall have responsibility only with respect to the property actually delivered to it by its predecessor Trustee.

In addition to its other duties as Trustee, the Trustee shall hold in its possession the properties of the trust, shall receive all monies and disburse them in accordance with the terms hereof, shall keep a complete record of all receipts and disbursements, shall prepare and furnish to the Adviser monthly and annually reports of all transactions of the trust, shall prepare and file all tax returns required by law to be filed on behalf of the trust, shall keep a record of all business transacted by the Trustee and the Adviser and shall take all steps necessary for the trust to comply with the laws of the State of Delaware and of the United States.

SIXTEENTH:    Whenever, in this trust agreement, provision is made for the Trustee, at the direction of the Adviser, to appoint another or further trustee or trustees to carry out the provisions of some specific benefit or benefits, permission is hereby given that the Trustee herein, may be appointed as such trustee or as one of such trustees for the purpose of carrying out such specific benefit or benefits.

- 31 -

LEAVITT0000100

SEVENTEENTH:    Except as otherwise provided in its instrument of appointment, each Trustee shall be entitled to compensation for its services in any fiduciary capacity hereunder, including with respect to any fund held for the benefit of a minor, as provided in its regularly published schedule of compensation in effect at the time such compensation is paid, including minimum fees and additional compensation for special investments and services, notwithstanding that such stipulated compensation shall be greater than that now in effect or than that provided from time to time under applicable law, and such compensation may be paid at any time without court approval; provided, however, that in the event that the Trustee and the Adviser shall have agreed to a different schedule of compensation to be paid to the Trustee for its services as Trustee hereunder, the Trustee shall instead be entitled to compensation for such services as set forth in such agreement, and such compensation may be changed at any time by mutual agreement between the Trustee and the Adviser.

Notwithstanding any other provision of this trust agreement, the Trustee, at the direction or with the consent, as the case may be, of the Adviser, is authorized to invest in and retain any securities managed, issued, underwritten or distributed by the Trustee or by any of its affiliates, any participation in any investment company registered under the Investment Company Act of 1940, or any investment fund exempt from registration under the Investment Company Act of 1940, for which the Trustee or its affiliate is an adviser or agent, and any "affiliated investment" within the meaning of Section 3312 of Title 12 of the Delaware Code, notwithstanding the fact that such Trustee or affiliate may receive separate fees, commissions or other costs directly from such security, fund or "affiliated investment."

EIGHTEENTH:    The original situs of the initial three Resulting Trusts created hereunder shall be Delaware.  The situs of any trust hereunder may be maintained in any

LEAVITT0000101

jurisdiction (including outside the United States), as the Adviser, in the exercise of sole and absolute discretion, may determine, and may thereafter be changed at any time or times to any jurisdiction selected by the Adviser in accordance with the provisions of this Section EIGHTEENTH.  Notwithstanding the foregoing, the Adviser may only change the situs of any trust hereunder with the consent of the Trustee, which consent may be granted or withheld in the Trustee's sole and absolute discretion.  Upon any such change of situs, the trust estate of said trust may thereafter, at the election of the Adviser, with the consent of the Trustee, be administered exclusively under the laws of (and subject, as required, to the exclusive supervision of the courts of) the jurisdiction to which it has been transferred.  Accordingly, if the Adviser of any trust hereunder elects to change the situs of any such trust, the Trustee of said trust is hereby relieved of any requirement of having to account in any court of such other jurisdiction.

NINETEENTH:        If any of the provisions hereof should for any reason be held to be invalid, then and in such event, such provision so held to be invalid shall be deemed to be expunged from this instrument, and the property given or transferred by such invalid provision is hereby assigned and transferred to the Trustee, and shall be held and disposed of in the same manner as if said invalid provision had not been incorporated in this instrument.

TWENTIETH:        The validity, construction and effect of the provisions of this agreement in all respects shall be governed and regulated according to and by the laws of the State of Delaware.  Except as otherwise provided in Section EIGHTEENTH, each trust created hereunder shall be administered in accordance with the laws of Delaware, and the Trustee shall not be required to account in any court other than one of the courts of Delaware.

TWENY-FIRST:        Any amount under this agreement that is to be "adjusted for inflation" shall be adjusted as follows: in the event that the United States Department of Labor,

LEAVITT0000102

Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers for the U.S. City Average for All Items (1982-1984 = 100) or a successor or substitute index appropriately adjusted (hereinafter the "CPI"), reflects an increase in the cost of living in December of the year immediately preceding the year in which the amount to be adjusted occurs over and above the cost of living as reflected by the CPI for December of one year prior, the amount shall be increased by an amount (if any) determined by multiplying the applicable dollar amount of such amount by a fraction, the numerator of which shall be the CPI for December of the year immediately preceding the year in which the amount to be adjusted occurs and the denominator of which shall be the CPI for December of the year immediately preceding the year in which this Reformed and Restated Trust Agreement became effective.

2493373.5

- 34 -

# EXHIBIT B

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1          UNITED STATES BANKRUPTCY COURT FOR THE:

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                 LOS ANGELES DIVISION

 4

 5

 6    IN RE                        ) CASE NO.
                                   ) 2-23-bk-16904-BR
 7    SETH HALDANE CASDEN,         )
                                   )
 8        Debtor and Debtor in     )
          Possession.             )
 9                                 )
                                   )
10                                 )
      _____)
11

12

13

14                  VOLUME I

15           (PAGES 1-82 and 103-395)

16       2004 EXAMINATION AS AN INDIVIDUAL
      AND AS CORPORATE REPRESENTATIVE OF HOLOGENIX:
17
                     SETH CASDEN
18
             FRIDAY, APRIL 26, 2024
19

20

21

22

23
      Reported by:
24
      Kelli C. Norden
25    CSR No. 7200
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1              UNITED STATES BANKRUPTCY COURT FOR THE:

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                    LOS ANGELES DIVISION

 4

 5

 6   IN RE                      ) CASE NO.
                                ) 2-23-bk-16904-BR
 7   SETH HALDANE CASDEN,       )
                                )
 8        Debtor and Debtor in  )
          Possession.           )
 9                              )
                                )
10                              )
     _____)
11

12

13                    VOLUME I

14              (PAGES 1-82 and 103-395)

15

16        The 2004 EXAMINATION as an INDIVIDUAL and as

17   CORPORATE REPRESENTATIVE of HOLOGENIX of SETH

18   CASDEN, taken on behalf of Multiple Energy

19   Technologies, before Kelli C. Norden, Certified

20   Shorthand Reporter 7200, for the State of

21   California, commencing at 10:14 a.m., Friday, April

22   26, 2024, at Danning Gill Israel & Krasnoff, 1901

23   Avenue of the Stars, Suite 450, Los Angeles,

24   California.

25
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    APPEARANCES OF COUNSEL:


 2


 3    FOR DEBTOR and DEBTOR IN POSSESSION SETH CASDEN AS
      AN INDIVIDUAL:
 4
          DANNING, GILL, ISRAEL & KRASNOFF, LLP
 5        BY:  JOHN N. TEDFORD, IV
              ATTORNEY AT LAW
 6        1901 AVENUE OF THE STARS
          SUITE 450
 7        LOS ANGELES, CALIFORNIA 90067-6006
          (310) 277-0077
 8        JTEDFORD@DANNINGGILL.COM

 9

10    FOR HOLOGENIX, LLC:

11        LEVENE, NEALE, BENDER, YOO & GOLUBCHIK, LLP
          BY:  KURT RAMLO
12            ATTORNEY AT LAW
          2818 LA CIENEGA AVENUE
13        LOS ANGELES, CALIFORNIA 90034
          (310) 229-1234
14        KR@LNBYG.COM

15

16    FOR MULTIPLE ENERGY TECHNOLOGIES:

17        WHITE AND WILLIAMS, LLP
          BY:  NICOLE A. SULLIVAN
18            ATTORNEY AT LAW
          7 TIMES SQUARE
19        SUITE 2900
          NEW YORK, NEW YORK 10036
20        (212) 631-4420
          SULLIVANN@WHITEANDWILLIAMS.COM
21

22

23

24

25
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 4

```
 1                     I N D E X

 2

 3   WITNESS:               EXAMINED BY:              PAGE:

 4   SETH CASDEN            MS. SULLIVAN               10

 5                          CONFIDENTIAL TRANSCRIPT   83-102

 6                          (AFTERNOON SESSION)        117

 7

 8

 9

10   EXHIBITS FOR IDENTIFICATION:

11   MULTIPLE ENERGY TECHNOLOGIES:

12   EXHIBIT 1   -    OFFICIAL FORM 410 PROOF OF
                      CLAIM FILED 2-2-24              123
13
     EXHIBIT 2   -    HOLOGENIX, LLC, EMPLOYMENT
14                    AGREEMENT, CHIEF EXECUTIVE
                      OFFICER, DATED MAY 1, 2019      129
15
     EXHIBIT 3   -    LEASE RE LINCOLN
16                    CONDOMINIUM, DATED 2-22-22      131

17   EXHIBIT 4   -    OWNED PROPERTY SUMMARY
                      SHEET                           145
18
     EXHIBIT 5   -    DECLARATION BY DEBTOR(S) AS
19                    TO WHETHER INCOME WAS
                      RECEIVED FROM AN EMPLOYER
20                    WITHIN 60 DAYS OF THE
                      PETITION DATE, FILED
21                    10-31-23                        147

22

23

24

25
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1   INDEX (CONTINUED):

 2

 3   EXHIBITS FOR IDENTIFICATION:

 4   MULTIPLE ENERGY TECHNOLOGIES:

 5   EXHIBIT 6    -    REFORMED AND RESTATED TRUST
                      AGREEMENT OF THE TRUST
 6                    CREATED BY KATHERINE STUART
                      STIBBS UNDER TRUST
 7                    AGREEMENT DATED JULY 19,
                      1934, AS DIVIDED FOR THE
 8                    BENEFIT OF THE LINDA H.
                      PASCOTTO AND DESCENDANTS    163
 9
     EXHIBIT 7    -    DEBTOR'S NOTICE OF
10                    OPPOSITION AND OPPOSITION
                      TO MOTION OBJECTING TO
11                    CLAIMS OF EXEMPTION;
                      MEMORANDUM OF POINTS AND
12                    AUTHORITIES; DECLARATION OF
                      SETH CASDEN AND REQUEST FOR
13                    JUDICIAL NOTICE IN SUPPORT
                      THEREOF, FILED 1-16-24      170
14
     EXHIBIT 8    -    OFFICIAL FORM 101,
15                    VOLUNTARY PETITION FOR
                      INDIVIDUALS FILING FOR
16                    BANKRUPTCY, FILED 10-17-23  176

17   EXHIBIT 9    -    PROMISSORY NOTE DATED AS OF
                      SEPTEMBER 1, 2023           182
18
     EXHIBIT 10   -    PROMISSORY NOTE DATED AS OF
19                    NOVEMBER 12, 2019           184

20   EXHIBIT 11   -    TONY DEVOTO LOAN DATED
                      11/12/19                    188
21
     EXHIBIT 12   -    SERIES OF E-MAILS; TOP
22                    E-MAIL FROM LAURIE FOSTER
                      TO JOCELYN MARGOLIN
23                    BOROWSKY DATED 2/3/2024     191

24

25
```

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salgado of Page 46 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 6

```
 1    INDEX (CONTINUED):

 2

 3    EXHIBITS FOR IDENTIFICATION:

 4    MULTIPLE ENERGY TECHNOLOGIES:

 5    EXHIBIT 13  -    SERIES OF E-MAILS; TOP
                       E-MAIL FROM JOCELYN
 6                     MARGOLIN BOROWSKY TO SETH
                       CASDEN DATED 3-4-24          195
 7
       EXHIBIT 14  -    E-MAIL FROM ALAN LEAVITT TO
 8                     NATALIE SCHIAVONE DATED
                       1-26-24                      201
 9
       EXHIBIT 15  -    SERIES OF E-MAILS; TOP
10                     E-MAIL FROM NAI-TE J WATSON
                       TO SETH CASDEN DATED 9-15-21 204
11
       EXHIBIT 16  -    SERIES OF E-MAILS; TOP
12                     E-MAIL FROM NAI-TE J WATSON
                       TO SETH CASDEN DATED 2-2-22  206
13
       EXHIBIT 17  -    DECLARATION CONCERNING
14                     DEBTORS AMENDED SCHEDULES,
                       FILED 12-19-23               211
15
       EXHIBIT 18  -    OFFICIAL FORM 106SUM,
16                     SUMMARY OF YOUR ASSETS AND
                       LIABILITIES AND CERTAIN
17                     STATISTICAL INFORMATION
                       FILED 10-31-23               215
18
       EXHIBIT 19  -    OFFICIAL FORM 410, PROOF OF
19                     CLAIM FILED 6-19-20          218

20    EXHIBIT 20  -    DEBTOR'S SUPPLEMENTAL
                       OPPOSITION TO MULTIPLE
21                     ENERGY TECHNOLOGIES, LLC'S
                       MOTION OBJECTING TO CLAIMS
22                     OF EXEMPTION; SUPPLEMENTAL
                       DECLARATION OF SETH CASDEN
23                     AND DECLARATION OF JAMES
                       WONG IN SUPPORT THEREOF,
24                     FILED 4-9-24                 303

25
```

```
 1    INDEX (CONTINUED):

 2

 3    EXHIBITS FOR IDENTIFICATION:

 4    MULTIPLE ENERGY TECHNOLOGIES:
```

```
 5    EXHIBIT 21   -   SUMMARY OF INVESTMENTS
                      LISTED UNDER ANGEL FUND        300
 6
      EXHIBIT 22   -   CHECKING ACCOUNT STATEMENT
 7                     DATED OCTOBER 31, 2023        334

 8    EXHIBIT 23   -   SERIES OF E-MAILS; TOP
                      E-MAIL FROM LESLIE MAROOLIN
 9                     TO JULIEN BORN DATED JULY
                      12, 2023                       342
10
      EXHIBIT 24   -   E-MAIL FROM SETH CASDEN TO
11                     BOARD DATED JULY 12, 2023;
                      ATTACHMENTS                    348
12
      EXHIBIT 25   -   WRITTEN UNANIMOUS CONSENT
13                     OF THE BOARD OF MANAGERS OF
                      HOLOGENIX, LLC DATED JULY
14                     12, 2023                       353

15    EXHIBIT 26   -   DOCUMENT HEADED
                      "CAPITALIZATION TABLE
16                     10.31.2021 - PRE CONVERSION
                      OF CLASS C"                    356
17
      EXHIBIT 27   -   DOCUMENT HEADED "PERSONAL
18                     FINANCIAL STATEMENT
                      7(A)1504 LOANS AND SURETY
19                     BONDS AS OF MARCH 17, 2020    358

20    EXHIBIT 28   -   ARIA FORM FILLED OUT
                      REGARDING MR. CASDEN, DATED
21                     1-21-17                        363

22    EXHIBIT 29   -   DOCUMENT HEADED "ARIA - MTL
                      HISTORY FOR: SETH HALDANE
23                     CASDEN                         365

24

25
```

1   INDEX (CONTINUED):

2

3   EXHIBITS FOR IDENTIFICATION:

4   MULTIPLE ENERGY TECHNOLOGIES:

5   EXHIBIT 30  -    SERIES OF E-MAILS; TOP
                     E-MAIL FROM SETH CASDEN TO
6                    SARAH STETSON DATED MARCH
                     19, 2023                         366
7
    EXHIBIT 31  -    ARIA DOCUMENT REGARDING
8                    ROOM DETAILS FOR SETH
                     CASDEN AND LUCAS TYSON           372
9
    EXHIBIT 32  -    ARIA DOCUMENT REGARDING
10                   SETH CASDEN                       373

11  EXHIBIT 33  -    DOCUMENT HEADED "MGM
                     RESORTS INTERNATIONAL
12                   WIN/LOSS (TAX) INFORMATION
                     STATEMENT - ITEMIZED BY DAY
13                   OCT 17, 2016 TO MAR 12,
                     2024, SETH CASDEN, MGM
14                   REWARDS: 3687300"                 375

15  EXHIBIT 34  -    DOCUMENT HEADED CENTRAL
                     CREDIT, LLC GAMING REPORT
16                   01 004 777 921, FULL"             375

17  EXHIBIT 35  -    HOLOGENIX, LLC FIFTH
                     AMENDED AND RESTATED
18                   LIMITED LIABILITY COMPANY
                     AGREEMENT                         377
19
    EXHIBIT 36  -    EXHIBIT B, LIST OF ASSETS
20                   AND LIQUIDATION ANALYSIS,
                     FILED 1-23-24                     378
21
    EXHIBIT 37  -    MONTHLY OPERATING REPORT
22                   FILED 4-19-24 IN UNITED
                     STATES BANKRUPTCY COURT           387
23

24

25

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

```
 1   INDEX (CONTINUED):

 2

 3   EXHIBITS FOR IDENTIFICATION:

 4   MULTIPLE ENERGY TECHNOLOGIES:

 5   EXHIBIT 38   -    ORDER ON STIPULATION RE
                       MOTION FOR RULE 2004
 6                     EXAMINATION OF HOLOGENIX,
                       LLC BY MULTIPLE ENERGY
 7                     TECHNOLOGIES, LLC            391

 8   EXHIBIT 39   -    PROTECTIVE ORDER FILED
                       3-15-22                      391
 9

10

11

12

13        QUESTIONS UNANSWERED BY THE WITNESS:

14                     (NONE)

15

16

17

18             INFORMATION REQUESTED:

19                     (NONE)

20

21

22

23

24

25
```

1            LOS ANGELES, CALIFORNIA, FRIDAY

2                  APRIL 26, 2024

3                   10:00 A.M.

4

5                   SETH CASDEN,

6        called as a witness and sworn in by

7           the court reporter, was examined

8               and testified as follows:

9

10            THE COURT REPORTER:  Would you raise

11    your right hand.

12            Do you solemnly affirm that the

13    testimony you are about to give in the following

14    proceedings will be the truth, the whole truth, and

15    nothing but the truth?

16            THE WITNESS:  I do.

17            THE COURT REPORTER:  Thank you.

18

19                  EXAMINATION

20    BY MS. SULLIVAN:

21        Q.   Morning, Mr. Casden.  I know you've been

22    deposed before.  But just go over the ground rules

23    again.

24            If you don't understand a question,

25    please let me know and I will rephrase it.  If you

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/06/25   Entered 06/06/25 18:39:07   Desc
Declaration of Nicole A. Sodie – A. Page 12 of Page 51 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 11

 1   answer a question, we will presume that you

 2   understood it.

 3            Is that fair?

 4       A.   Yes.

 5       Q.   So any time you want to take a break,

 6   just let me know.  As long as you answer the

 7   pending question, we can take that break.

 8            Okay?

 9       A.   Yes.

10       Q.   And just for the court reporter, please

11   keep all your answers verbal so that she can take

12   everything down.

13            Can you provide your name and address,

14   please.

15       A.   Seth Casden, 25406 1/2 Malibu Road,

16   Malibu, California 90265.

17       Q.   And how long have you lived at

18   25406 1/2 Malibu Road?

19       A.   About twenty years.

20       Q.   So in or around 2004?

21       A.   I think my lease was signed in 2006.

22       Q.   What was the term of that lease?

23       A.   I don't recall.

24       Q.   Do you still have a lease for the

25   apartment at Malibu -- the home at Malibu, I should

1    say?

2        A.    I might have an electronic version.

3        **Q.    When was the last time that you renewed**

4    **the lease for 254- -- 406 Malibu Road?**

5        A.    I've never signed another lease, to the

6    best of my knowledge.

7        **Q.    And you mean you never signed another**

8    **lease since 2006 when you first moved in; correct?**

9        A.    I honestly don't recall.  I believe

10    that's correct.

11        **Q.    Did you ever sign a lease for the**

12    **rental?**

13        A.    When I moved in.

14        **Q.    Yes.**

15        A.    Yes.  I believe we produced that in

16    discovery.

17        **Q.    I never saw the lease.**

18            **Is your current lease term month to**

19    **month or something else?**

20        A.    Month to month.

21        **Q.    And is there any provision that you have**

22    **if you wanted to terminate the lease, any steps you**

23    **have to take to terminate the lease?**

24        A.    I would assume a thirty-day notice.  I

25    haven't looked into it.

Page 13

1      Q.  What does the monthly rental cost?

2      A.  4,500 dollars.

3      Q.  When was the last time that was raised?

4      A.  In the last twelve months.

5      Q.  What was it raised from?

6      A.  4,200.

7      Q.  How many bedrooms and baths is the -- is

8  the home?

9      A.  It's an apartment.  It has one bedroom,

10  one bath.

11      Q.  Does anyone else live there with you?

12      A.  My son.

13      Q.  How often is your son with you there?

14      A.  About half the time.

15      Q.  When you say "about half the time," what

16  do you mean?

17      A.  180 days.

18      Q.  Per year?

19          Yes or no?

20      A.  Yes.

21      Q.  Okay.  Have you ever missed a rental

22  payment?

23      A.  I don't believe so.

24      Q.  What are your monthly utilities for

25  25406 1/2 Malibu Road?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 14

```
 1        A.    I would refer to you what's been
 2   submitted to the court.  I don't have these
 3   memorized.
 4        Q.    Do you know how much you pay for
 5   electricity for your apartment?
 6        A.    It changes every month.
 7        Q.    What did you pay last month?
 8        A.    I don't know.
 9        Q.    How do you pay your utility bills?
10        A.    It's direct debited from my checking
11   account.
12        Q.    What checking account?
13        A.    I don't know the number.
14        Q.    Okay.  I didn't mean the number.  I'm
15   sorry.  Like what bank is it --
16        (Unreportable cross-talk.)
17             THE WITNESS:  I only have one checking
18   account.  It's the DIP account.
19   BY MS. SULLIVAN:
20        Q.    Okay.
21        A.    So it's direct deposited from that
22   account -- or direct debited.
23        Q.    Do you have any savings accounts?
24        A.    Not at a bank, no.
25        Q.    Where do you have savings accounts?
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1      A.    There's one Acorns account.

2            THE COURT REPORTER:  And that was

3   "Acorns"?

4            THE WITNESS:  That's correct.

5            THE COURT REPORTER:  Thank you.

6   BY MS. SULLIVAN:

7      **Q.    Where is your Acorns account?**

8      A.    With Acorns.

9      **Q.    Is it in California?**

10     A.    It's an electronic account.  So I

11  don't --

12     **Q.    What is Acorns?**

13     A.    It's a savings account.

14     **Q.    How much money is in that account?**

15     A.    Whatever the last statement said.

16  Approximately 65,000.

17     **Q.    When you say "last statement," what do**

18  **you mean?**

19     A.    I don't have -- I don't check it

20  regularly.

21           All of this was produced as part of the

22  discovery, so I refer you to the Acorn statement

23  for the balance of that account.  I did not attempt

24  to memorize any numbers for this deposition.

25     **Q.    If I understand correctly, sitting here**

Page 16

```
 1    today, you don't know how much money is in your

 2    Acorns savings account?

 3         A.    That's correct.  I don't have that

 4    memorized.  It would be a different amount today

 5    than it was yesterday.

 6         Q.    Why is that?

 7         A.    Because it changes every day.

 8         Q.    Why does it change every day?

 9         A.    Market fluctuations.

10         Q.    What is the interest that you accumulate

11    in your Acorns savings account?

12         A.    It's not an interest account.

13         Q.    How does it -- how does it fluctuate

14    day-to-day based on the market?

15         A.    It's tied to investments in mutual

16    funds.

17         Q.    What mutual funds is it tied to?

18         A.    I'd have to refer you to the account.

19         Q.    When did you first open the Acorns

20    account?

21         A.    Maybe five years ago.

22         Q.    How did you fund it?

23         A.    Through an ad.

24         Q.    Through an ad?  What does that mean?

25         A.    An ad on my phone.
```

1      Q.    Where did the money come -- did you have
2   to deposit money into the Acorns account?
3      A.    Correct.
4      Q.    Okay.  Where did the money that you
5   deposited into the Acorns account come from?
6      A.    The Acorns account is a way of saving
7   that takes any money you spend in other accounts
8   that you link and it rounds them.
9          So if I buy something for a dollar
10  eighty-nine and I have it round up to the nearest
11  dollar, it will take eleven cents out of the
12  account this it's tied to and deposit it into the
13  Acorns account.
14     Q.    So what accounts is your Acorns account
15  tied to?
16     A.    Right now it's turned off.
17     Q.    When did you turn it off?
18     A.    When I filed bankruptcy.
19     Q.    Why did you turn it off when you filed
20  bankruptcy?
21     A.    Because the account was closed.
22     Q.    What account was closed?
23     A.    All -- that it was tied to.
24     Q.    What account was it tied to before you
25  filed bankruptcy?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 18

1       A.   It was tied to several accounts.

2       Q.   Can you name those several accounts?

3       A.   I cannot.

4       Q.   Can you name any of the several

5   accounts?

6       A.   My primary checking account at Wells

7   Fargo.

8       Q.   Was it tied to any accounts you had at

9   Chase Bank?

10      A.   I don't believe so.

11      Q.   Was it tied to any accounts you have

12  with American Express?

13      A.   It might have been.

14      Q.   Was it tied to any of your brokerage

15  accounts?

16      A.   I don't believe so.

17      Q.   Was there any other bank account that it

18  may have been tied to?

19      A.   Not to my recollection.

20      Q.   Okay.  So --

21      A.   I'd like to -- I'd like to pause for a

22  second.

23           You asked -- you asked me a question

24  about --

25           MR. TEDFORD:  Are you --

```
 1          (Unreportable cross-talk.)

 2          MR. RAMLO:  You need her to be able to

 3   say that we're off the record.

 4          THE WITNESS:  No, I don't need to be off

 5   the record, but I just -- I need to say something.

 6          MR. TEDFORD:  Okay.

 7          THE WITNESS:  You asked me what my rent

 8   was.  I told you it was 4,500 dollars.  You asked

 9   me if -- what the previous amount was?

10   BY MS. SULLIVAN:

11      Q.   Correct.

12      A.   Yeah, and I think I said 4,200 dollars.

13      Q.   Correct.

14      A.   I think it was 4,400 dollars.

15      Q.   Okay.  Was your Acorn account tied to

16   any account at Citibank?

17      A.   I don't believe I had a Citibank

18   account.

19      Q.   Was your Acorns account tied to any

20   account you have with Discover?

21      A.   Over what time period?

22      Q.   Over the five years.

23      A.   So there were different times I had

24   different accounts tied to that, and the links

25   would break at different times.  And sometimes they
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 20

```
 1   got set up again; sometimes they didn't.  I don't
 2   know over times what accounts were linked.
 3           All of that information is available by
 4   going through the statements.  So I would just --
 5   anything that the financial statements can show
 6   you, I would refer to the statements.
 7           Q.   And when you say "statements," are you
 8   referring to the Acorn statements or something
 9   else?
10           A.   The Acorn statements.
11           Q.   And you believe those have been produced
12   in discovery; correct?
13           A.   I don't know.
14           Q.   Did you provide those to your counsel?
15           A.   I don't know.
16           Q.   Do you have any other savings accounts
17   besides the Acorns account?
18           A.   I don't think so.
19           Q.   Is there anything that you could check
20   to make a definitive answer that you do not have
21   any other savings accounts?
22           A.   No.
23           Q.   Is there a penalty if you terminate your
24   month-to-month lease tomorrow?
25           A.   I don't know.
```

Page 21

```
 1        Q.   And your father's name is Ronald Casden;
 2   correct?
 3        A.   Yes.
 4        Q.   And where does he reside?
 5        A.   He lives in the same building as me.
 6        Q.   Is his address the same, 25406 1/2
 7   Malibu Road, or is it different?
 8        A.   It's a different address.
 9        Q.   Okay.  What's his address?
10        A.   25408 Malibu Road.
11        Q.   And how long has your father lived at
12   25408 Malibu Road?
13        A.   About five years.
14        Q.   And does he have a lease?
15        A.   He does.
16        Q.   When did he first enter into that lease?
17        A.   It's my lease.  I entered into the
18   lease, I believe, in December of 2017.
19        Q.   Have you renewed that lease since you
20   first entered into it?
21        A.   Yes.
22        Q.   And when was it first renewed?
23        A.   A couple years ago.
24        Q.   Have you renewed it since then?
25        A.   No.
```

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration of Nicole A. Sadler    Page 62 of 1079

Page 22

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1       Q.   Is your -- is there a specific term on

2   the lease for your father's apartment, or is it

3   month to month as well?

4       A.   It's month to month.

5       Q.   Is there any penalty if your father

6   terminates the month-to-month lease?

7       A.   I don't know.

8       Q.   And what is your father's rent?

9       A.   6,500 dollars a month.

10      Q.   Why is your father's lease in your name?

11      A.   Because my father doesn't have credit to

12  secure a lease in his own name.

13      Q.   When was the last time his rent was

14  raised?

15      A.   I think it's been a couple years.

16      Q.   And what was it before it was

17  6,500 dollars?

18      A.   I believe it was 6,250.

19      Q.   When you say your father doesn't have

20  credit to obtain a lease, what do you mean by that?

21      A.   He would not qualify or be approved if

22  he applied on his own.

23      Q.   Is he a co-tenant on the lease?

24      A.   He is.

25      Q.   And how many bedrooms and baths is your

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 23

1    father's apartment?

2         A.   One bedroom, one bath.

3         Q.   Does anyone else live there with your

4    father?

5         A.   No.

6         Q.   And who pays your father's monthly rent?

7         A.   I do.

8         Q.   And when did you start paying his rent?

9         A.   I don't recall.  Maybe 2000.

10        Q.   Where did your father live in 2000?

11        A.   I don't recall.

12        Q.   Where did he live before he moved to

13   25408 Malibu Road?

14        A.   He lived in Los Angeles.

15        Q.   What was his rental income before he

16   moved -- I mean -- sorry -- what was his monthly

17   rent -- let me rephrase that.

18             Did your father rent before he moved to

19   25408 Malibu Road?

20        A.   Yes.

21        Q.   And what was his monthly rent before he

22   relocated to Malibu?

23        A.   I don't remember.

24        Q.   Was it less than 6,500 dollars a month?

25        A.   Yes.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 24

1      Q.    And were you paying the rental --

2    monthly rental payment for him before he moved to

3    Malibu in the couple years before he moved to

4    Malibu Road?

5      A.    I've been paying for his rent since

6    approximately 2000.  There might be a very short

7    gap in the last twenty-five years at some point,

8    but my brother and I have been supporting my father

9    for the last twenty-five years.

10      Q.    How does your brother support your

11    father financially?

12      A.    He deposits 4,000 dollars a month into

13    my father's checking account.

14      Q.    And what does your father do with the

15    4,000 dollars a month he receives from your

16    brother?

17      A.    I would refer you to the analysis we

18    submitted to the court.

19      Q.    When you say "analysis submitted to the

20    court," what are you specifically referring to?

21      A.    We submitted his last six months'

22    expenses to the court.

23      Q.    Are you referring to the declaration of

24    Mr. Wong and its attachments or something else?

25      A.    I'm referring to us producing the

Page 25

```
 1   itemization of his expenses over the last six

 2   months.  If you want to show me a document, I can

 3   confirm that.

 4           THE COURT REPORTER:  That was Wong,

 5   W-O-N-G?

 6           MS. SULLIVAN:  Yes.

 7           THE COURT REPORTER:  Thank you.

 8   BY MS. SULLIVAN:

 9       Q.   Do any other family members provide any

10   financial support to your father?

11       A.   No.

12       Q.   Besides your father's rent -- monthly

13   rental payment for his apartment, what other

14   expenses do you pay for your father?

15       A.   I pay for his medical bills that aren't

16   covered by insurance.  I contribute towards his

17   groceries.  I pay for his cleaning and his assisted

18   care.

19           And I pay out-of-pocket for other things

20   that might come up, car expenses, other expenses

21   that aren't normally budgeted for.

22       Q.   What car expenses do you cover for your

23   father?

24       A.   Whatever expenses, service-related,

25   tires, registration.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 26

```
 1         Q.    Does your father have a car?

 2         A.    It's my car.

 3         Q.    What car is that?

 4         A.    It's a 2014 or 2015 Hyundai Sonata.

 5         Q.    If it's your car, why did you say that

 6    you pay the car expenses for your father?

 7         A.    Because I don't use the car.

 8         Q.    So --

 9         A.    It's for -- it's for his use.  I have my

10    own car.

11         Q.    So the car is titled and registered in

12    the name of Seth Casden?

13         A.    I believe so.

14         Q.    How often does your father use the car?

15         A.    My father can't drive, so it's for other

16    people to drive him if he has to go somewhere.

17         Q.    Do you pay for a driver for your father?

18         A.    I do.

19         Q.    How much does that cost on average each

20    month?

21         A.    I don't know.

22         Q.    Is there one specific driver or do you

23    have multiple people that you pay to drive your

24    father?

25         A.    Multiple.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 27

1      Q.   Do you have a -- do you pay them an

2   hourly rate or something else?

3      A.   It depends.

4      Q.   What does it depend on?

5      A.   Sometimes it's hourly; sometimes it's a

6   fixed price.

7      Q.   When you pay the driver hourly, how much

8   do you pay?

9      A.   It depends.

10      Q.   What does it depend on?

11      A.   Who the driver is.

12      Q.   What's -- what -- what hourly rates have

13   you paid any driver in 2024?

14      A.   I think between 25 dollars and

15   60 dollars an hour.

16      Q.   And when do you pay people -- drivers

17   fixed -- a fixed rate?

18      A.   If it's a day rate, if he has multiple

19   doctors' appointments, sometimes I think they set a

20   day rate.

21      Q.   And what is the day rate?

22      A.   I don't know.

23      Q.   Do you keep records about the payments

24   that you make for drivers for your father?

25      A.   I have records of the money that's spent

Page 28

1    from the account.  So yes.  There's records of it.

2    I don't have a separate category for that.

3           Q.    How do you pay the drivers?

4           A.    Usually Venmo or Zelle or PayPal or

5    cash.

6           Q.    How often do you pay the drivers in

7    cash?

8           A.    I'd say that's the least common.

9           Q.    When you say you pay for your father's

10   assisted care, what are you referring to?

11          A.    He needs help with his daily tasks.  So

12   there's different people that I pay to help support

13   him, keep him company, help him get throughout his

14   day.

15          Q.    You're talking about, like, a health

16   aide or something else?

17          A.    I don't know what the -- what the

18   definition of a health aide is; but it's for his

19   physical and mental health, yes.

20          Q.    Do you have a specific person that

21   assists your father with this care?

22          A.    It's been different people over the

23   years.

24          Q.    Is there a specific person currently

25   giving assisted care to your father?

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/09/25   Entered 06/09/25 18:39:07   Desc
Declaration Exhibit A. Page 30 of 42   Page 69 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 29

1        A.    There's several people that come and
2  help him.
3        Q.    Who are those people?
4        A.    Just friends, neighbors.
5        Q.    Do you pay the friends and neighbors to
6  help your father?
7        A.    Occasionally.  Some just help out.
8  Sometimes do things for them or trade things with
9  them.
10        Q.    What kinds of things would you do for
11  them in order to compensate them for caring for
12  your father?
13        A.    Cook meals for them, provide use of my
14  space for them.  Just try and be a good neighbor.
15        Q.    When you say provide use of your space,
16  what do you mean?
17        A.    One of my neighbors lives in a very
18  small apartment, so he uses my garage to work out
19  and just have another place to -- to hang out.
20        Q.    Why did your father move from
21  Los Angeles to the Malibu apartment?
22        A.    I moved him there so he could be close
23  to me because his health was deteriorating and he
24  needed more and more care.
25        Q.    How do you care for your father on a

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    day-to-day basis?

 2         A.   Check in with him in the morning.  Check

 3    in with him in the evening.  I put his medicine --

 4    I apply his medicine on his back for him.

 5              I help run errands, pick up groceries,

 6    go to the pharmacy, go to the post office box,

 7    whatever errands he has, when I can.

 8         Q.   And who takes care of your father when

 9    you're out of town?

10         A.   The friends and the neighbors and the

11    acquaintances and -- today there's someone there

12    helping him.

13         Q.   Who's there today?

14         A.   A lady that comes every Friday.

15         Q.   What's her name?

16         A.   Irma.

17         Q.   Does she have a last name?

18         A.   I'm sure she does.

19         Q.   Do you know her last name?

20         A.   I don't.

21         Q.   Do you pay Irma?

22         A.   I do.

23         Q.   How much do you pay her?

24         A.   150 dollars a day.

25         Q.   She comes every Friday?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1    A.   Correct.

2         Q.   Is there anyone else that comes every

3    week?

4    A.   Yes.

5         Q.   Who else comes?

6    A.   Her two sisters.

7         Q.   What are their names?

8    A.   Rafaela and Christina.

9         Q.   Do you know their last names?

10   A.   No.

11        Q.   How much do you pay Rafaela to help take

12   care of your father?

13   A.   150 dollars a day.  They each get

14   150 dollars a day.

15        Q.   And what day --

16   A.   And they help in my apartment, and they

17   help my dad in his apartment.

18        Q.   Okay.  What day of the week does Rafaela

19   come?

20   A.   They all come today, Friday.

21        Q.   Oh.  All three of them come on Friday?

22   A.   Yes.

23        Q.   Do you have anyone that comes Monday to

24   Thursday to take care of your father?

25   A.   He's had other people at different

 1   times.

 2          Right now, there isn't anyone set up

 3   that's being paid to come on other days.  His

 4   neighbor's really helping a lot right now.

 5          Q.    Who's that?

 6          A.    His neighbor's name?

 7          Q.    Yeah.

 8          A.    Paul.

 9          Q.    What's Paul's last name?

10          A.    Ruffin.

11          Q.    Do you pay Paul Ruffin to help your

12   father?

13          A.    Not a set amount.

14          Q.    How much -- how much have you paid Paul

15   Ruffin to help with your father in 2024?

16          A.    Less than a couple hundred dollars.  I

17   don't usually pay him.

18          Q.    Do you give him any, like, services or

19   anything else in kind for his assisting with your

20   father?

21          A.    He's the person I was referring to when

22   I said I give him space to hang out, use the gym in

23   the garage, cook him meals, offer to pick things up

24   for him if I can.

25          Q.    And the three women that you have come

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1  on Fridays, what do they specifically do to help in

2  your apartment?

3       A.   They help with the plants, cleaning the

4  apartment.  Same with my father.  The laundry,

5  general housekeeping tasks, fixing things that are

6  broken.

7       Q.   They do your laundry?

8       A.   They do.

9       Q.   They do your father's laundry?

10      A.   They do.

11      Q.   And they do housekeeping for both your

12 apartment and your father's apartment?

13      A.   Yes.

14      Q.   Do you have anyone else come and do

15 housekeeping for your apartment during the week?

16      A.   No.

17      Q.   Do you have anyone else come and do

18 housekeeping for your father's apartment?

19      A.   No.

20      Q.   Do you have anyone else come and do

21 laundry for either you or your father?

22      A.   No.

23      Q.   When you said that you pay for your

24 father's medical expenses that aren't covered by

25 insurance, what -- what is included therein?

1        A.   He's had a lot of dental work in the

2    last few years.  That's the main one that I can

3    think of.  Some of his co-pays don't kick in until

4    a certain amount's been spent each year, so I cover

5    that.

6        **Q.   Has your brother offered to provide more**

7    **financial support for your father -- father since**

8    **you filed for bankruptcy?**

9        A.   Not to my knowledge.

10       **Q.   Have you asked your brother to**

11   **contribute more money to your father's care and**

12   **financial expenses since you filed for bankruptcy?**

13       A.   No.

14       **Q.   Do you have any other siblings?**

15       A.   Not to my knowledge.

16       **Q.   Where does your -- what's your brother's**

17   **name?**

18       A.   Graham.

19       **Q.   And where does Graham live?**

20       A.   In Colorado.

21       **Q.   What does Graham do for a living, if**

22   **anything?**

23       A.   He has three different companies.

24       **Q.   Can you identify those companies,**

25   **please.**

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1  A. They're related to education, ocean

2 conservation, and scuba diving.

3  Q. Do you know the names of the companies?

4  A. He's changed the names of them.  Ocean

5 First is, I believe, the name of the primary

6 company.

7  Q. Does your father have a significant

8 other?

9  A. No.

10  Q. Besides you, does your father have any

11 other family in the Los Angeles area?

12  A. No.

13  Q. Before you began paying for your

14 father's expenses in 2020 -- I mean -- sorry -- in

15 2000, how did he pay for his own expenses?

16  A. Through his earnings.

17  Q. What did your father do for a living?

18  A. He's in the entertainment business.

19  Q. What specifically did he do?

20  A. He's a writer and a director.

21  Q. Does your -- when was the last time that

22 your father worked?

23  A. I think if you asked him that, he would

24 say he still works; he just isn't earning money.

25  Q. How does your father still work?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1        A.   He still writes.

 2        Q.   **What was the last time your father**

 3   **earned money?**

 4        A.   I believe in 2008, maybe, 2007.

 5        Q.   **Does your father receive any residual**

 6   **income from his work in the entertainment industry?**

 7        A.   I think he sold his pension.  I'm not

 8   sure.

 9        Q.   **When do you think he sold his pension?**

10        A.   I don't know.

11        Q.   **Is this something he did in the last few**

12   **years?**

13        A.   I don't know.

14        Q.   **Why do you think your father sold his**

15   **pension?**

16             MR. TEDFORD:  Are -- are you asking --

17   sorry -- why Mr. -- why Seth --

18             MS. SULLIVAN:  Yes.

19             MR. TEDFORD:  -- thinks that his dad did

20   it --

21             MS. SULLIVAN:  Yeah.

22             MR. TEDFORD:  -- or are you asking why

23   his dad did it?

24             MS. SULLIVAN:  No.  Why does he think

25   his dad sold it.

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 37

```
 1                MR. TEDFORD:  There we go.  That's what
 2    I thought.
 3                Thank you.
 4                THE WITNESS:  Because there's no income
 5    from that coming in that I see.
 6    BY MS. SULLIVAN:
 7         Q.    When was the last time you saw income
 8    from your father's pension?
 9         A.    I don't know.
10         Q.    Was it last year?
11         A.    No.  This would have been maybe ten
12    years ago.
13         Q.    Have you ever asked your father about
14    his pension?
15         A.    I recall vaguely one conversation about
16    it and getting in an argument about it.  That's why
17    I said I think that happened.  But I don't remember
18    the specifics.
19         Q.    Does your father have any other
20    retirement accounts?
21         A.    I think he gets a Social Security check
22    every two weeks or once a month, however often
23    that's deposited.
24         Q.    Does he have any IRA accounts or any --
25    or a 401(k) or something like that?
```

```
 1        A.   No, not to my knowledge.

 2        Q.   Does your father have any brokerage

 3  accounts?

 4        A.   Not to my knowledge.

 5        Q.   Would you have knowledge if your father

 6  had a retirement account?

 7        A.   I don't know.

 8        Q.   Have you ever asked your father if he

 9  has a retirement account?

10        A.   I've asked him of all the money he has,

11  and this is what he's told me, so --

12        Q.   What has he told you about the money he

13  has?

14        A.   That he doesn't have any.

15        Q.   He has zero dollars?

16        A.   Correct.

17        Q.   When did your father tell you he had

18  zero dollars?

19        A.   Twenty years ago when he came to me,

20  asking to support him.

21        Q.   And how were you able twenty years ago

22  to financially support yourself and your father?

23        A.   You're asking the source of my income?

24        Q.   Yeah.

25        A.   Through work and through trusts that
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

```
 1    were established for my benefit.
 2          Q.    When you say "trusts," what are you
 3    referring to?
 4          A.    Trusts that my family set up for me.
 5          Q.    What specific trusts are you referring
 6    to?
 7          A.    My grandfather and grandmother set up a
 8    trust for me.
 9          Q.    Any other trusts?
10          A.    My mom -- my mom's family has set up a
11    number of trusts.
12          Q.    When you say your grandfather and your
13    grandmother set up a trust for you, is that your
14    maternal or your paternal grandparents?
15          A.    My maternal.
16          Q.    And when was that set up?
17          A.    I believe in the 1970s.
18          Q.    What was the name of that trust?
19          A.    I think it was called the Grandchildrens
20    Trust.
21          Q.    How many grandchildren were there?
22          A.    Seven.
23          Q.    There were seven beneficiaries of the
24    trust?
25          A.    I believe they set up twelve.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 40

1      Q.   Did you have your own trust, or was it a

2  shared trust?

3      A.   We had our own.

4      Q.   Do you still have that trust today?

5      A.   Yes.

6      Q.   What is the name -- what is the name of

7  that trust today?

8      A.   I think it's called -- it's an agency

9  account.  It's at Whittier Trust.

10      Q.   How is that trust funded?

11      A.   How is it -- I'm sorry.  It's -- it's

12  not funded anymore.

13      Q.   How was it originally funded?

14      A.   From my grandparents.

15      Q.   Does the trust earn money today?

16      A.   Yes.

17      Q.   Has the -- I'm just going to call it

18  "the Whittier Trust."

19           Is that fair?

20      A.   Yes.

21      Q.   Okay.  How does the Whittier Trust earn

22  money today?

23      A.   Just whatever holdings it has.  It's

24  very little.

25      Q.   Where -- when you say "holdings," what

Page 41

```
 1    do you mean?

 2         A.   I believe it has around 50,000 dollars

 3    in equities.

 4         Q.   When you say "in equities," what are you

 5    referring to?

 6         A.   Stocks.

 7         Q.   What specific stocks?

 8         A.   You'd have to look.  I -- at the

 9    statement.

10         Q.   And how do you receive distributions, if

11    at all, from the Whittier Trust?

12         A.   I request them as needed.  It's no

13    longer a trust.  At thirty-five, it distributed to

14    the beneficiary.  It's akin to a brokerage account

15    now.

16         Q.   So there's no trustee or anybody else

17    that has to approve --

18         A.   Correct.

19         Q.   And if it was at thirty-five, that was

20    approximately fifteen years ago that it was

21    distributed to you?

22         A.   Correct.

23         Q.   How much money did you receive, if any,

24    from the Whittier Trust account in 2023?

25         A.   I don't believe any.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 42

1      Q.    When was the last time you received or

2  took money out of the Whittier Trust account?

3      A.    I don't recall.

4      Q.    Sometime in the last four years?

5      A.    Probably.

6      Q.    What would you need to look at to

7  refresh your memory?

8      A.    The statements from Whittier Trust.

9      Q.    How often do you receive statements from

10  Whittier Trust?

11      A.    I believe they generate monthly

12  statements, but it's all electronic, so I don't log

13  into that account very often.

14      Q.    And does your brother also have a trust

15  that your grandparents set up that was distributed

16  to him at age thirty-five?

17      A.    Yes.

18      Q.    And then you said your mom's family has

19  set up a number of trusts.

20            What are you referring to?

21      A.    I don't know.  They haven't really

22  shared all of that with me, so I can't answer that.

23            I know that my mom's family set up a

24  trust in the 1930s, I believe, that's been

25  decanted.  That's the only trust that I have any

 1  visibility into.

 2      Q.    What do you mean when you say the trust

 3  was decanted?

 4      A.    I think that's a legal term.  I don't

 5  know.  Just --

 6      Q.    What do you understand it to mean?

 7      A.    That it's passed down.

 8      Q.    Like passed down through the

 9  generations, you mean, or something else?

10      A.    Correct.

11      Q.    Are you -- how many of those trusts that

12  your mother's family set up are you the beneficiary

13  of?

14      A.    I don't know.

15      Q.    Who would you have to ask to know?

16      A.    I guess my family.

17      Q.    Who in your family would you

18  specifically have to ask?

19      A.    I -- I don't know.  I don't -- I can't

20  be aware of something I don't know about, so I'm

21  not -- the only trust I know about is the one that

22  they have shared with me.

23      Q.    And that's the -- what's been referred

24  to as the Seth Casden Resulting Trust; correct?

25      A.    Yes.  At Northern Trust.

Page 44

1        Q.    Okay.  If you wanted to know if there

2   were any other trusts that were set up by your

3   mother's family where you were a beneficiary, could

4   you ask your mother?

5        A.    My mother has asked that we don't

6   discuss finances in our family.  So I would be

7   violating that request by asking her.

8        Q.    So if you can't ask your mother, who

9   else could you ask to determine if you were a

10  beneficiary of another trust that was funded by

11  your mother's family?

12       A.    I don't know.  I don't know anyone else

13  to ask.

14       Q.    Could you ask her husband, Alvaro

15  Pascotto, if there were any other trusts set up by

16  your mother's family where you're the beneficiary?

17       A.    He has the same request that he's made.

18       Q.    Is that a request for everyone in the

19  family or just for you in the family?

20       A.    My brother and I.

21       Q.    So your mother and her husband requested

22  that neither you nor your brother discuss

23  financials with them?

24       A.    That's correct.

25       Q.    When was the last time you had any

Page 45

 1    discussion with your mother about financials?

 2         A.   I discussed financials -- I don't know.

 3    I don't know.  My mom has really tried to not be

 4    involved.

 5         Q.   So your mom has tried not to be

 6    involved.  What are you referring to?

 7         A.   In any kind of discussions around

 8    finances.

 9         Q.   Are you referring to your bankruptcy or

10    something else?

11         A.   Everything.

12         Q.   Have you had a conversation with your

13    mother in the last year about financials?

14         A.   No.

15         Q.   Did you have a conversation with your

16    mother in the last two years about financials?

17         A.   No.

18         Q.   How about the last five years?

19         A.   I don't know.  I talk to Alvaro if I

20    have a question about finances.

21         Q.   When was the last time you talked to

22    Mr. Pascotto about financials?

23         A.   Around the time of the filing of the

24    bankruptcy.

25         Q.   You mean in October of 2023?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 46

1    A.    Yes.

2        Q.    And what did you discuss with

3    Mr. Pascotto?

4        A.    I discussed with him how to post a bond

5    for the judgment in the MET v. Casden matter.

6        Q.    What specifically did you and

7    Mr. Pascotto discuss about posting a bond?

8        A.    I wanted to post a bond so I could stay

9    enforcement of the judgment pending appeal and

10    avoid having to file bankruptcy.

11        Q.    And what did you ask Mr. Pascotto about

12    concerning that?

13        A.    For his help to have that bond posted.

14        Q.    What specifically did you ask him to do?

15        A.    There's nothing more specific than what

16    I just said.

17        Q.    How did Mr. Pascotto respond?

18        A.    He declined.

19        Q.    Why did Mr. -- did he explain why he

20    declined?

21        A.    He said he didn't have the money.

22        Q.    Did you ask Mr. Pascotto to put up the

23    money for the bond?

24        A.    No, not in so many words.

25        Q.    Did you imply to Mr. Pascotto that you

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

 1   wanted him to put up the money for --

 2          (Unreportable cross-talk.)

 3          THE WITNESS:  I don't -- I don't want

 4   any money from him.  I didn't ask him to do

 5   anything with his money.  I wanted help to figure

 6   out how to get a loan to post the money for the

 7   bond.

 8   BY MS. SULLIVAN:

 9      Q.   And did Mr. Pascotto give you any

10   direction or advice about how to obtain a loan to

11   post the bond?

12      A.   His advice was to file bankruptcy.

13      Q.   Did you ever attempt to get a loan to

14   post a bond for the judgment pending appeal?

15      A.   I talked to three -- I think three

16   bondsmans about securing a bond.  The highest

17   amount of bond I could have secured was, I believe,

18   around 650,000 dollars, which we submitted to the

19   court.

20      Q.   When you "we submitted to the court,"

21   what are you referring to?

22      A.   The lawyer representing me submitted a

23   request, I believe, to set bond in the matter, and

24   stipulated what amount of bond I could afford.

25      Q.   And did you get a ruling from the Court

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 48

1    on that request to set the bond at no more than

2    650,000 dollars before you filed for bankruptcy?

3         A.   No.

4         Q.   Okay.  Why didn't you wait for a ruling

5    from the Court about whether you could have a

6    reduced bond amount of 650,000 dollars before

7    filing for bankruptcy?

8         A.   Well, there's a few factors.

9              One, I was told that there was basically

10   zero percent chance of having a bond of less than a

11   hundred percent of the value of the judgment.

12             Two --

13             MR. TEDFORD:  All right.  Let me -- let

14   me step in.

15             Just as a reminder, only answer to the

16   extent that it doesn't involve the privileged

17   communication with counsel.  So --

18             THE WITNESS:  Well, this is all about

19   talking to lawyers, so --

20             MR. TEDFORD:  Right.  So only -- so only

21   answer to the extent that you can do so without

22   disclosing advice or -- advice provided to you by

23   counsel.

24             THE WITNESS:  Sure.

25             The other reason was the judge in the

1    case ignored the thirty-day grace period and issued

2    the subpoena for the ORAP.

3    BY MS. SULLIVAN:

4        Q.   Anything else?

5        A.   No.

6        Q.   Why did you file a motion to have the

7    bond amount reduced if you didn't think it was

8    going to be successful?

9        A.   It's advice of counsel.

10       Q.   How much did you pay for the motion to

11   have a reduced bond?

12       A.   I have no idea.

13       Q.   Did you pay Theodora Oringher to prepare

14   the motion for a reduced bond?

15       A.   We make payments on our invoices.  How

16   they allocate those payments, I don't know.

17       Q.   When you say "We make payments on our

18   invoices," what are you referring to?

19       A.   Myself and Hologenix.

20       Q.   How much money have you personally paid

21   to Theodora Oringher?

22       A.   I want to say 50,000 dollars.

23       Q.   And that was a payment you made in

24   October of 2023; correct?

25       A.   That sounds right.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        Q.   And how much money has Hologenix paid to

 2   Theodora Oringher for your defense in the MET verse

 3   Seth Casden action?

 4        A.   I'd have to estimate.

 5        Q.   Okay.

 6        A.   250-, 350,000.  Somewhere in that range.

 7        Q.   And Hologenix had agreed to indemnify

 8   you for the defense costs with respect to MET verse

 9   Casden; correct?

10        A.   That's correct.

11        Q.   Okay.  That's why they were paying

12   Theodora Oringher's legal bills related to that

13   case; correct?

14        A.   Yes.

15        Q.   Why did you make the 50,000 dollar

16   payment personally in October 2023 when Hologenix

17   had been indemnifying and paying the defense costs

18   from that -- from before that point?

19        A.   Because Hologenix didn't have any money.

20        Q.   Why did you have to make a 50,000 dollar

21   payment to Theodora Oringher in October of 2023?

22        A.   So is that privileged or what?  I

23   mean --

24             MR. TEDFORD:  Sorry.  Can you repeat the

25   question?  Not that it's wrong; I just don't --
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 51

1           MS. SULLIVAN:  No.

2         (Unreportable cross-talk.)

3           MR. TEDFORD:  -- remember what the

4     question is.

5           MS. SULLIVAN:  No, she -- I thought you

6     meant for her to read back.

7           MR. TEDFORD:  One of you.

8           MS. SULLIVAN:  Yeah, if you could read

9     it back.

10          THE COURT REPORTER:  Sure.

11        (The record was read as follows:

12        Q.   Why did you have to make a

13        50,000 dollar payment to Theodora

14        Oringher in October of 2023?)

15          MR. TEDFORD:  All right.  Well, if you

16    can answer that question without disclosing advice

17    or confidential discussions that you had with the

18    firm, then go ahead.

19          THE WITNESS:  But it's all -- I mean,

20    I --

21          MS. SULLIVAN:  Privilege only extends to

22    legal advice.  You know that, John.

23          MR. TEDFORD:  I know.

24          MS. SULLIVAN:  So it only extends to

25    legal advice.  I don't know if why you paid them

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/06/25    Entered 06/06/25 18:39:07    Desc
Declaration Exhibit A. Page 58 of 402    Page 92 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 52

1   back extends to -- paid them that money when you

2   hadn't made a payment before extends to legal

3   advice.

4           THE WITNESS:  I mean, I'm happy to

5   answer it.  I don't --

6           MR. TEDFORD:  All right.  Go ahead.

7           THE WITNESS:  He wouldn't work on the

8   case without additional payment.

9   BY MS. SULLIVAN:

10      Q.   What did you -- what did you need

11  Theodora Oringher to work on that prompted you to

12  make the 50,000 dollar payment?

13      A.   There was a number of post-trial motions

14  that had to be filed.

15      Q.   Do you know if those post-trial motions

16  were filed before or after you made the 50,000

17  dollar payment?

18      A.   I don't recall.

19      Q.   And you said that Hologenix didn't have

20  any money in October of 2023; correct?

21      A.   In reference to making a legal payment

22  that wasn't scheduled.  Correct.

23      Q.   Okay.  What did you mean by that?

24           Like, why didn't Hologenix have the

25  money to pay the 50,000 dollars when they were

Page 53

 1    agreed -- had agreed to indemnify you?

 2         A.    Because the company was losing money.

 3         Q.    What was going on in October 2023 that

 4    caused Hologenix to lose money?

 5         A.    Nothing specific to October.  Hologenix

 6    lost money last year.

 7         Q.    How much money did Hologenix lose last

 8    year?

 9         A.    Well, the financials are still being

10    finalized, but all of that is submitted to the

11    court, so I would just refer you to the MORs.

12         Q.    And you're the -- you are the CEO of

13    Hologenix; correct?

14         A.    Yes.

15         Q.    And you've been the CEO on and off since

16    2002; correct?

17         A.    Since 2005.  Correct.

18         Q.    And in your current role as CEO, you've

19    been in that role since 2019?

20         A.    Correct.

21         Q.    So as the CEO of Hologenix, why did

22    Hologenix lose money in 2023?

23         A.    Because our expenses exceeded our

24    revenue.

25         Q.    Okay.  And what caused Hologenix's

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 54

1   expenses to exceed its revenue in 2023?

2        A.   Ongoing litigation.

3        Q.   And what are you referring to?

4        A.   The bankruptcy litigation, the

5   litigation in Hologenix and the litigation of

6   MET v. Casden.

7             I think without one-time extraordinary

8   legal fees, we were break-even, or slightly

9   positive last year.

10       Q.   Is there anything other than

11  extraordinary -- what you referred to as

12  extraordinary legal expenses that caused Hologenix

13  to be close to breaking even or making a slight

14  profit in 2023?

15       A.   Well, our largest account, Under Armour,

16  was off by -- I want to say thirty percent on a

17  year-over-year basis.  So that impacted our revenue

18  negatively.

19       Q.   Did anything other than the legal

20  expenses impact the revenue in addition to Under

21  Armour?

22       A.   We were under budget outside of the

23  legal expenses, so no other expenses that were

24  unanticipated.

25       Q.   Did Hologenix lose any other revenue

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1  that it expected in 2023?

2         A.   There are a few other accounts that were

3  below budget, and there are some that were above.

4  But Under Armour had the biggest impact.

5         Q.   Why was Under Armour's revenue to

6  Hologenix off by thirty percent year over year in

7  2023?

8         A.   I think it's mostly macroeconomic

9  factors, not specific to our business with them.

10        Q.   Does Hologenix still do business with

11  Under Armour in 2024?

12        A.   Yes.

13        Q.   Is Under Armour Hologenix's largest

14  client or source of revenue?

15        A.   Yes.

16        Q.   That's true in 2023 as well?

17        A.   Yes.

18        Q.   Prior to 2023, since it filed

19  bankruptcy, had Hologenix had any other years where

20  its expenses exceeded its revenue?

21        A.   Yes.

22        Q.   Okay.  When was that?

23        A.   I don't have the years memorized.

24        Q.   So sometime between April of 2020 when

25  Hologenix filed for bankruptcy and January of 2023,

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 56

 1   Hologenix had a period of time where, for its

 2   fiscal year, the -- its expenses exceeded its

 3   revenue; correct?

 4        A.   Sorry.  I thought you were asking since

 5   the company was founded.

 6             You're saying from --

 7        Q.   Oh, I'm sorry.

 8        A.   -- April of 2020 -- well, I can just try

 9   and be as explicit as possible.

10             2021, we were profitable.  In 2022 and

11   2023, we lost money.

12        Q.   And what about in 2020?

13        A.   I believe we made a small amount of

14   money.

15        Q.   Okay.  And what do you attribute

16   Hologenix losing money in 2022 to?

17        A.   Our legal expenses.  We've spent over

18   three million dollars in legal expenses since MET

19   filed the lawsuit against Hologenix.  I think it's

20   closer to four million now.

21        Q.   What legal expenses are you -- do you

22   include in the four million dollar number?

23        A.   The legal expenses related to defending

24   Hologenix and to defending myself and to the costs

25   of filing the bankruptcy and the related appeals.

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 58 of 432   Page 97 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 57

 1       Q.   Does that include the debt that

 2   Hologenix owed to Polsinelli when it filed for

 3   bankruptcy?

 4       A.   If you include that debt, I believe the

 5   number is closer to five million.

 6       Q.   Okay.  I just want to make sure I

 7   understand, Mr. Casden.

 8            So since Hologenix filed bankruptcy in

 9   April of 2020, it's incurred close to four million

10   dollars in legal expenses related to the bankruptcy

11   proceeding, its appeals, and the defense of you in

12   the MET verse Casden action; correct?

13       A.   And my personal bankruptcy and the

14   related costs associated with that.

15       Q.   What are -- what are Hologenix's costs

16   related to your personal bankruptcy?

17       A.   None.  I was talking about how much

18   money has been spent defending these lawsuits.

19       Q.   Does the four million dollar number

20   include the money that you had to spend for your

21   personal bankruptcy?

22       A.   Yes.  When I am giving that number, yes.

23       Q.   Can we --

24       A.   It's a -- it's an estimate.  So I would

25   refer you to the MORs.  All of the legal fees are

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 58

1   listed in the MORs.

2       Q.   How much have you spent on your personal

3   bankruptcy that you're including in that estimated

4   four million dollars?

5       A.   It's probably a quarter of a million

6   dollars now.  It's -- I mean, the trust has had to

7   hire a lawyer.  I include that money as well.  So

8   it's actually closer to 400,000, 500,000.

9       Q.   You paying for the trust's lawyer?

10      A.   Through my trust.

11      Q.   What do you mean, through the trust?

12      A.   The trust is paying the trust's lawyer.

13      Q.   Just want to go back to what happened

14  after there was a judgment against you in the MET

15  verse Casden case when you said the judge had

16  ignored the thirty-day grace period and issued an

17  ORAP lien.

18           Correct?

19      A.   Correct.

20      Q.   Okay.  What did you mean by "ignored the

21  thirty-day grace period"?

22      A.   My understanding is that after a

23  judgment has been entered, you have thirty days as

24  a standard time before the ORAP is issued, and it

25  can be issued on an expedited basis --

Page 59

1        (Telephonic interruption.)

2              MS. SULLIVAN:  Sorry.

3              THE WITNESS:  -- if requested, I guess,

4   by the plaintiff or the prevailing party.

5              MS. SULLIVAN:  Sorry about that.  My

6   phone -- my computer hit the phone.

7              Sorry.  Can you just read back the

8   answer?

9              THE COURT REPORTER:  Sure.

10             MS. SULLIVAN:  Or did you catch it all?

11  Because -- totally distracted.

12             THE COURT REPORTER:  Yes.

13       (The record was read as follows:

14       A.   My understanding is that after

15       a judgment has been entered, you

16       have thirty days as a standard time

17       before the other app [sic] is

18       issued and it can be issued on an

19       expedited basis --

20       Telephonic interruption.

21       A.   -- if, I guess, requested by

22       the plaintiff or the prevailing

23       party.)

24  BY MS. SULLIVAN:

25       **Q.   Okay.  And what did the ORAP order have**

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 60

1  to do with you filing for bankruptcy, if anything?

2        A.   I guess that's attorney-client

3  communication.

4        Q.   If the ORAP did not come out, would you

5  have filed for bankruptcy in October 2023?

6        A.   No.

7        Q.   What assets were you trying to prevent

8  MET from getting a lien on by filing for bankruptcy

9  in October 2023?

10        A.   All of them.

11        Q.   What specific- -- what specific

12  personal assets?

13        A.   Everything that's listed in my statement

14  of assets.  My understanding is an ORAP is a

15  blanket lien on all of your possessions.

16        Q.   Does your father have a life insurance

17  policy?

18        A.   I don't know.

19        Q.   Did you ask your father if he had a life

20  insurance policy?

21        A.   No.

22        Q.   Why?

23        A.   I don't have an answer to that.

24        Q.   Is there something that would prevent

25  you from asking your father if he had a life

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    insurance policy?

 2         A.   I don't think it's any of my business.

 3         Q.   You mentioned earlier your son; correct?

 4              Yes?

 5              You have a son; correct?

 6         A.   Yes.

 7         Q.   Okay.  What is your son's name?

 8         A.   Charles.

 9         Q.   Do you have any other children?

10         A.   Not to my knowledge.

11         Q.   What's your son's birth -- date of

12    birth?

13         A.   12-22-14.

14         Q.   You said your son lives with you

15    180 days a year.

16              Where does he live the other 180 days?

17         A.   With his mother.

18         Q.   Who's his mother?

19         A.   Kelly.

20         Q.   What's Kelly's last name?

21         A.   Osterholt.

22         Q.   Where does Ms. Osterholt live?

23         A.   In Sherman Oaks.

24         Q.   What is your relationship, if any, with

25    your son's mother?
```

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Butler Exhibit A   Page 102 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 62

```
 1        A.   I co-parent -- we co-parent our son

 2   together.

 3        Q.   Were you ever married to your son's

 4   mother?

 5        A.   No.

 6        Q.   Were you ever in a relationship with

 7   your son's mother?

 8        A.   I don't -- I don't know how to answer

 9   that, John.

10             I mean, we -- we have a child together,

11   so it wasn't artificial insemination, if that's

12   what you're asking.

13        Q.   Did you date his mother?

14        A.   Yes.

15        Q.   How long did you date her?

16        A.   We -- we -- we didn't have -- what do

17   you mean, how long did I date?

18             We weren't -- we weren't in a committed

19   relationship.

20        Q.   Did you ever live in the same house with

21   Ms. Osterholt before you had your son?

22        A.   No.

23        Q.   Have you ever lived in the same home as

24   Ms. Osterholt?

25        A.   No.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 63

1      Q.   Do you have any agreements with

2   Ms. Osterholt to provide support for your son?

3      A.   They're oral agreements.

4      Q.   Okay.  What are those agreements?

5      A.   That I'm going to support her as best I

6   can to help with raising our son.

7      Q.   Is there anything more specific about

8   the agreements -- agreements to support your son?

9      A.   The current agreement is that I pay her

10  rent and I give her 4,000 dollars a month, and we

11  discuss other charges on a case-by-case basis.

12     Q.   How did you and Ms. Osterholt discuss

13  other charges on a case-by-case basis?

14     A.   She'll ask me for help for something

15  that might come up.

16     Q.   Do you communicate over text?  E-mail?

17  Telephone?

18     A.   Try and keep it to e-mail.  We meet once

19  a week with a counselor to discuss our son and do

20  our best to not talk about it outside of that

21  meeting.

22     Q.   Okay.

23          MR. TEDFORD:  Can we take a break so I

24  can tell my neighbors to keep it down?

25          MS. SULLIVAN:  Yeah.  Thank you.

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 64

 1          (Brief pause in the proceedings.)

 2   BY MS. SULLIVAN:

 3          Q.   You said you -- you and Ms. Osterholt

 4   meet with a counselor; correct?

 5          A.   Yes.

 6          Q.   Okay.  What's the name of the counselor?

 7          A.   Dr. Lori.

 8          Q.   How do you spell that?

 9          A.   L-O-R-I.

10          Q.   Is that her first name or --

11          A.   Her first name.

12          Q.   What's her last name?

13          A.   Baudino, B-A-U-D-I-N O.

14          Q.   And who pays for the sessions with

15   Dr. Lori?

16          A.   I do.

17          Q.   How much is that a week?

18          A.   I think a single session is 350.

19          Q.   And why do you and Ms. Osterholt meet

20   with Dr. Lori once a week?

21          A.   To discuss our son's schedule.

22          Q.   Why do you and Ms. Osterholt need a

23   counselor to discuss your son's schedule?

24          A.   Because it's preferable than court.

25          Q.   What do you mean by that?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.   We do that so we don't have to go to
 2   court and end up in a nasty fight over our son.
 3        Q.   Is there a reason you and Ms. Osterholt
 4   can't just have a conversation without a counselor
 5   and discuss your son's schedule?
 6        A.   Yeah.  It doesn't work.  We try --
 7        Q.   Why doesn't it work?
 8        A.   Because we end up in an argument.
 9        Q.   Why do you and Ms. Osterholt end up in
10   an argument if you try to discuss your son's
11   schedule without a counselor?
12        A.   Because we have different ideas of what
13   we want.
14        Q.   What specifically do you mean by that?
15        A.   Everything.  From the schedule, the
16   finances, the -- everything that parents can have
17   with children, all the issues that come up.
18        Q.   What do you and Ms. Osterholt disagree
19   about finances?
20        A.   I think she would like more money.
21        Q.   Has she asked you for more money?
22        A.   Yes.
23        Q.   When was the last time she asked you for
24   more money?
25        A.   She asked for more money yesterday.
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 66

```
 1        Q.   How much more money did she ask for?

 2        A.   550 dollars, I think it was.

 3        Q.   For what?

 4        A.   For clothes for Charlie.

 5        Q.   How did she make that request?

 6        A.   Through SMS.

 7        Q.   Is that text messaging?

 8        A.   Yes.

 9        Q.   And how did you respond, if at all?

10        A.   I approved it.

11        Q.   And that 550 dollars is in addition to

12   the 4,000 dollars a month you give Ms. Osterholt?

13        A.   Correct.

14        Q.   Okay.  What do -- what do you give

15   Ms. Osterholt 4,000 dollars a month for?

16        A.   I would say the same answer about my

17   dad.  We submitted six months of her bank

18   statements and we have that itemized, so I refer

19   you to that.

20        Q.   But when you made the agreement with

21   Ms. Osterholt to pay for her rent and give her

22   4,000 dollars a month, what did you understand the

23   4,000 dollars a month would be spent on?

24        A.   Her utilities, her living expenses,

25   basic necessity items, gas, food, household
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 67

```
 1   expenses.
 2        Q.   So you did not understand that the -- or
 3   you did not intend for the 4,000 dollars a month to
 4   cover other expenses for your son such as his
 5   clothes, shoes, sporting goods, music lessons, or
 6   something like that?
 7        A.   Correct.
 8        Q.   So is it fair to say that the 4,000
 9   dollars a month is so that Ms. Osterholt can pay
10   the expenses on the apartment and for herself
11   personally, rather than specifically for your son?
12        A.   I think the majority of that is correct.
13   There are things that she pays for our son out of
14   that 4,000 dollars, but the majority of those costs
15   are the rent and the costs associated with owning
16   or living in a house and having a car, putting food
17   on the table.
18        Q.   The 4,000 dollars a month would include
19   groceries for Ms. Osterholt's home?
20        A.   Correct.
21        Q.   Anything else?
22        A.   There's a lot of expenses that come up.
23        Q.   I just meant anything else that would be
24   included in that 4,000 dollars a month?
25        A.   Yeah.  It has to come -- she doesn't
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 68

1  really have any other income, so it has to include

2  every expense that she would incur.

3          So whether it's a babysitter because she

4  wants to go out or a plane ticket to go see her dad

5  or getting her hair cut or any -- any expense.

6      Q.   Before you had a son with Ms. Osterholt,

7  how did she support herself?

8      A.   She's a photographer.

9      Q.   Was she a working photographer?

10     A.   During what time period?  Sorry.

11     Q.   I'm sorry.  Before you had your son, was

12  she a working photographer who -- who received

13  money for photographer?

14     A.   Correct.  That's how she supported

15  herself.

16     Q.   And when did she stop supporting herself

17  with her photography?

18     A.   I think it was about seven or eight

19  months into her pregnancy.

20     Q.   And why was that?

21     A.   Because she was about to have a child

22  and it was hard to work.

23     Q.   Is there any reason that Ms. Osterholt

24  has not returned to photography to earn money since

25  her son was born?

 1        A.   We decided that she would stay at home

 2   and help raise our son.

 3             When we did the calculation of how much

 4   money she could earn in photography or was earning,

 5   it was barely more than what it would cost to have

 6   someone watch our son.

 7             So rather than have her work full time

 8   and use that money to pay for someone to watch our

 9   son, we decided to just have her at home to be with

10   our son.

11        Q.   Is the agreement -- oh, sorry.  You said

12   they were all oral agreements; correct?

13        A.   Yes.  We've had some mediation

14   agreements and -- but none -- nothing legal --

15   legally binding.

16        Q.   When you say "mediation agreements,"

17   what are you referring to?

18        A.   We worked in mediation to come up with

19   different solutions that evolved over time.

20        Q.   Were any of those agreements reduced to

21   writing?

22        A.   Yes.

23        Q.   When -- when was the last written

24   agreement?

25        A.   Maybe six years ago.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1    Q.   Okay.  Is that agreement still in place

2    today?

3    A.   No.

4    Q.   Why not?

5    A.   Because Charlie's older and we've

6    changed the visitation, how we share time with him,

7    and she receives less money now than she did

8    originally.

9    Q.   Your son's nine; correct?

10   A.   Yes.

11   Q.   Six years ago when you had a written

12   agreement with Ms. Osterholt, he was three;

13   correct?

14   A.   That's around right.  This is going off

15   my memory, so ...

16   Q.   And when did the visitation agreement --

17   what was -- sorry.

18   What was the original visitation

19   agreement between you and Ms. Osterholt?

20   A.   That I would go over there -- I think it

21   was four days a week and on the weekends.  I think

22   his first overnight at my house was when he was

23   about two.

24   Q.   And when did that change, the visitation

25   terms change?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.   It evolved probably every six months or
 2   so.  Maybe less.
 3        Q.   Does your son go to school?
 4        A.   He does.
 5        Q.   Where does he go to school?
 6        A.   Westland.
 7        Q.   What is Westland School?
 8        A.   It's just that.  It's a K through six
 9   school.
10        Q.   Is it a private school?  Is it a public
11   school?
12        A.   It's a private school.
13        Q.   Where is it located?
14        A.   On Mulholland in Los Angeles.
15        Q.   How many days a week does he go to
16   Westland School?
17        A.   Monday through Friday.
18        Q.   What are the hours of his schooling?
19        A.   It depends on the day, but 8:45 to 3:30.
20        Q.   Does he do extracurricular activities
21   after school?
22        A.   He does.
23        Q.   What does he do?
24        A.   It changes with the semesters.
25   Currently, he has a bunch of ones he does every day
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 72

```
 1   after school.
 2         Q.   Can you walk through them?
 3         A.   How is that relevant?
 4         Q.   Do you pay for those extracurricular
 5   activities?
 6         A.   Yes.
 7         Q.   It's relevant.
 8         A.   He has drums on Monday and chess club on
 9   Tuesday.  He also has cooking on Monday.  On
10   Wednesday, he has older school sports.  On
11   Thursday, he has drama.  And on Fridays, he has
12   escape room.
13         Q.   Does he do anything on the weekends?
14         A.   He does flag football.  He has capoeira,
15   and he has jujitsu.
16         Q.   What was the second thing?
17         A.   Capoeira.
18         Q.   What is that?
19         A.   Brazilian martial arts.
20         Q.   Can you spell that?
21         A.   I can't.
22         Q.   I can't pronounce it.
23         A.   It's C- -- C-A-P-O-E-I-R-A.  Something
24   like that.
25         Q.   Does Ms. Osterholt use any of the 4,000
```

1    dollars you give her per month to pay for any of

2    these extracurricular activities?

3         A.   No.

4         Q.   When did the visitation change where you

5    had your son 180 days a year?

6         A.   I think there was a point during COVID

7    where I had him every weekend and for -- it was,

8    like, basically fifty out of fifty-two weekends,

9    and I didn't want to just be a weekend dad.

10        And so we switched to week-on, week-off

11   for a little while, and then we switched to the

12   current schedule, I don't know, two or three years

13   ago.

14        Q.   What's the current schedule?

15        A.   Two, two, and then alternating every

16   other weekend.  So Monday, Tuesday, he's with her.

17   Wednesday, Thursday, he's with me.  And then

18   Friday, Saturday, Sunday flips.

19        Q.   How much does his extracurriculars right

20   now cost you per month?

21        A.   I don't -- I don't know off the top of

22   my head.

23        Q.   Just to be clear, there's no court order

24   requiring you to give Ms. Osterholt any support;

25   correct?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 74

1       A.    That's correct.

2       Q.    **Does anyone else provide any financial**

3    **support to Ms. Osterholt?**

4       A.    I think she's borrowed money from her

5    parents at different times, but I -- I don't know.

6    I haven't -- I don't know the details.  I haven't

7    asked her.

8       Q.    **Does she have -- does she have a**

9    **significant other?**

10      A.    Not to my knowledge.

11      Q.    **Does anyone else live in the home with**

12   **her and your son?**

13      A.    No.

14      Q.    **Have you had any discussions with**

15   **Ms. Osterholt about her returning to work since**

16   **your son started school?**

17      A.    Yes.

18      Q.    **And what happened?**

19      A.    She's trying.  She gets freelance gigs

20   when she can.

21      Q.    **Has she tried to do work other than**

22   **photography?**

23      A.    I think at one point she was working

24   with an MLM company.  I don't know what else she's

25   tried.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1        Q.    When you had a discussion with

2   Ms. Osterholt about her returning to work once he

3   started school, what was the sum and substance of

4   that conversation?

5        A.    That she would do her best to bring in

6   money, but that her focus was really on raising our

7   son.

8        Q.    How did you react to that?

9        A.    I've continued to support her.

10        Q.    Were you frustrated when she said that?

11        A.    It would be great if she could support

12   herself, but I don't think being frustrated at her

13   situation would help me, so it is what it is.

14        Q.    When was the last time you had a

15   discussion with Ms. Osterholt about her supporting

16   herself?

17        A.    The last couple weeks.

18        Q.    And how did that go?

19        A.    She said she's doing everything she can.

20        Q.    What specifically is she doing?

21        A.    Trying to book photography gigs.

22        Q.    How does she try to book photography

23   gigs?

24        A.    I don't know.  I don't have any insight

25   into what her efforts are, how she does that or ...

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 76

1      Q.   Why did you have this discussion with

2   Ms. Osterholt a couple weeks ago?

3      A.   Because she understands the financial

4   pressure I'm under and wants to do everything she

5   can to help.

6      Q.   Has she earned any money since you filed

7   for bankruptcy in October 2023?

8      A.   I think she's earned a few hundred

9   dollars here and there.

10      Q.   Have you ever told Ms. Osterholt that

11   you will no longer be able to support her in

12   addition to your son financially?

13      A.   No.

14      Q.   Why not?

15      A.   Because that's not my intention.

16      Q.   What is your intention?

17      A.   To continue to support her.

18      Q.   Do you pay for Ms. Osterholt to have

19   vacations?

20      A.   I have.

21      Q.   What vacations?

22      A.   I paid for her I think to go to the

23   Cayman Islands, to Mexico, to Morocco, to Hawai'i,

24   to France.

25          Those are the ones that come to mind.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1     Q.    When was the last time you paid for

2    Ms. Osterholt to have a vacation?

3          A.    She went to Hawai'i, I think, last fall.

4    I think -- I think she paid for that herself.  I'm

5    not sure who paid for that.  I mean, she's paying

6    that from the money that I get her.

7                I guess you could say I'm paying for it

8    either way.

9          Q.    When you say "last fall," do you mean

10   this past fall --

11         A.    Yes.

12         Q.    -- 2023?

13         A.    Yes.

14         Q.    And when you say that she paid that out

15   of the money you already give her, were the other

16   trips paid for in addition to the money you give

17   her?

18         A.    That's correct.

19         Q.    Did your son go to Hawai'i with her last

20   fall?

21         A.    No.

22         Q.    Who did she go with, if you know?

23         A.    A friend.

24         Q.    Did Ms. Osterholt also pay for her

25   friend to go to Hawai'i?

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Baliva   Page 118 of 1079

Page 78

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1      A.   I don't believe so.  I believe her

2   friend invited her to stay at her friend's house.

3      **Q.   Do you pay for any hobbies of**

4   **Ms. Osterholt?**

5      A.   Indirectly.  I mean, anything she does,

6   if I'm her -- pretty much her sole source of

7   income.  So if she does anything, then I think you

8   could make the argument I'm paying for it.

9      **Q.   Does she have any hobbies?  Does she**

10  **play tennis?  Something else?**

11     A.   She -- I know she goes to yoga,

12  SoulCycle.  I don't know if those are hobbies.

13          I don't -- I don't really -- we don't

14  talk about our personal lives.  So that's one of

15  the agreements we have.

16     **Q.   You mean you have an agreement not to**

17  **discuss your personal lives together?**

18     A.   Correct.

19     **Q.   Does she belong to any clubs?**

20     A.   Not to my knowledge.

21     **Q.   Does she belong to any pools?**

22     A.   Not to my knowledge.

23     **Q.   Your son -- how much is your son's**

24  **tuition at Westland School?**

25     A.   It's close to 40,000 dollars annually.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 79

1     Q.   Are there additional expenses in

2   addition to the 40,000 dollars in tuition?

3     A.   The aftercare programs that we

4   discussed.

5     Q.   Anything else?

6     A.   Not -- nothing that's coming to mind.

7     Q.   The extracurriculars that we discussed,

8   are those all hosted by Westland?

9     A.   No.

10     Q.   Which ones are at the school?

11     A.   The cooking, the chess club, the older

12   sports, the drama, and the escape room.

13     Q.   When you pay those, do you pay those

14   directly to Westland School?

15     A.   Yes.

16     Q.   When you say "older sports," what do you

17   mean?

18     A.   It's available -- it's an after-school

19   program available for kids in third grade and up.

20     Q.   Do you pay the Westland tuition in

21   addition to the money that you give Ms. Osterholt

22   every month?

23     A.   Correct.

24     Q.   Have you discussed with Ms. Osterholt

25   sending your son to public school instead of

```
 1   Westland?

 2        A.   Yes.

 3        Q.   When was the last time you had that

 4   discussion?

 5        A.   When we picked Westland.

 6        Q.   When was that?

 7        A.   He started in kindergarten there.

 8        Q.   So three and a half years ago?

 9        A.   Yes.  Four years.

10        Q.   And what was the sum and substance of

11   that discussion?

12        A.   Based on the public school in Malibu and

13   the public school where she lived at the time, we

14   felt that it would be very challenging for him to

15   go to public school based on his medical needs.

16        Q.   What are his medical needs?

17        A.   I'm not comfortable discussing that.

18        Q.   I don't think you have a choice.  You're

19   free to mark it confidential or attorneys' eyes

20   only if you want, but you have to discuss it.

21        A.   There's no privacy laws for his medical

22   condition?

23        Q.   Unfortunately, no.

24             I'll ask again.  What are your son's

25   medical needs?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1      A.   I'd like to take a break.

 2      Q.   There's a pending question, Mr. Casden.

 3      A.   Huh?

 4      Q.   There's a pending question.

 5           MR. RAMLO:  I think he's asking for

 6  legal advice.

 7           MS. SULLIVAN:  There's counsel --

 8  personal counsel is sitting right here.  He's not

 9  saying anything.

10           MR. TEDFORD:  I would ask you to come

11  back to the question.  Let's take a break or come

12  back to it after lunch.

13           MS. SULLIVAN:  Okay.

14           MR. TEDFORD:  Unless --

15           MS. SULLIVAN:  You can take your break,

16  but I -- I think he should answer it.

17           I mean, I understand there are

18  sensitivities and stuff, and I'm not looking to

19  intrude.  But, you know, he's in -- he's in

20  personal bankruptcy and he's seeking exemptions and

21  other things, and I think it's relevant to all --

22  all the issues involved.

23           MR. TEDFORD:  All right.

24           MR. RAMLO:  We're off the record?

25           THE COURT REPORTER:  Off the record.
```

Page 82

1          (Whereupon, a recess was held

2          from 11:40 a.m. to 11:55 a.m.)

3                MR. TEDFORD:  Pursuant to the offer of

4     counsel prior to the break, we are agreeable to

5     having the portions of the transcripts relating to

6     his son's medical issues and conditions deemed

7     confidential.

8                MS. SULLIVAN:  That's fine.  Thank you.

9                MR. TEDFORD:  Thank you.

10         (Whereupon, pages 83 - 102 have

11         been designated confidential and

12         are bound under separate cover.)

13    / / /

14    / / /

15    / / /

16

17

18

19

20

21

22

23

24

25

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 104

```
 1   him that week.  The plan was for him to be with his

 2   mother that week.

 3           Q.    Nobody else could take care of your son?

 4           A.    Nope.

 5           Q.    Does your son spend time with any of

 6   your family members?

 7           A.    Well, he sees his grandpa every day that

 8   he's with me.

 9           Q.    Does he spend time with your mother?

10           A.    Yes.

11           Q.    How often does he see your mother?

12           A.    Kelly takes him pretty regularly when my

13   mother's in town, and she takes him to see my

14   mother other times.

15           Q.    Do you have a relationship with your

16   mother?

17           A.    I mean, she's my mother, so yes.

18           Q.    Why does Ms. Osterholt take your son to

19   see your mother instead of you taking him?

20           A.    I'm -- I'm not speaking to my mother.

21           Q.    When did you stop speaking to your

22   mother?

23           A.    A few months ago.

24           Q.    Why is that?

25           A.    Because she didn't want to meet with me.
```

Page 105

1      Q.   Why didn't she want to meet with you?

2      A.   You'd have to ask her.

3      Q.   When did you ask her to meet with you?

4      A.   I asked her to meet with me a couple of

5  times in October and then again in November and

6  then in January.

7           And then most recently I was trying to

8  set up a meeting to meet with her in April, but she

9  told the mediator that she wasn't willing to

10 discuss any of the topics that I needed to discuss

11 with her, so I haven't spoken to her.

12     Q.   What topics did you want to discuss with

13 your mother?

14     A.   Hologenix; my personal bankruptcy; the

15 relationship with my stepfather, Mr. Pascotto.

16     Q.   Anything else?

17     A.   Those were the main topics.

18     Q.   What did you want to discuss with your

19 mother about Hologenix?

20     A.   Just related to the bond, posting the

21 bond for the bankruptcy.

22     Q.   Anything else?

23     A.   Not -- no.

24     Q.   What did you want to talk to your mother

25 about personal bankruptcy?

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 106

```
 1              (No audible response by the witness.)

 2              THE COURT REPORTER:  Oh, pardon me.

 3              Did we go off confidential after we were

 4    done talking about Charlie?

 5              MR. TEDFORD:  Yes.

 6              MS. SULLIVAN:  Yes.

 7              THE WITNESS:  Do you mind -- sorry --

 8    reading back that question.

 9              (The record was read as follows:

10         Q.   What did you want to talk to

11         your mother about personal

12         bankruptcy?)

13              THE WITNESS:  Oh, so just posting the

14    bond so I could exit bankruptcy or not have to be

15    in bankruptcy in the -- in the first place.

16    BY MS. SULLIVAN:

17         Q.   How did you communicate to your mother

18    what you wanted to discuss with her?

19         A.   Through the mediator.

20         Q.   Who's the mediator?

21         A.   He's actually a child development

22    specialist that we have worked with.  His name's

23    Lenny, and he had offered to mediate with my mother

24    and I.

25              So I reached out to Lenny to set up the
```

Page 107

```
 1   time, and Lenny replied back that my mother wasn't

 2   willing to meet with me unless I agreed to those

 3   conditions.

 4        Q.   What conditions?

 5        A.   The ones I shared previously, sort of

 6   the topics of conversation.

 7        Q.   That you not discuss financials?

 8        A.   Correct.

 9        Q.   I see.

10             Just so I'm clear, your mother said she

11   would meet with you as long as the two of you did

12   not discuss anything related to your finances?

13        A.   Or Hologenix or --

14        Q.   Or Hologenix.

15        A.   -- my current situation or --

16        Q.   What did you want to discuss with your

17   mother about your relationship with your

18   stepfather?

19        A.   That I feel he's -- I'm still trying to

20   formulate the right words, but I guess there's a

21   forty-year history that I want to go over the

22   timeline with her and a series of events.

23        Q.   Something about your relationship with

24   your stepfather that upset you?

25             MR. TEDFORD:  I do think that at this
```

1   point we're well beyond questions about assets,

2   liabilities, financial history, and financial

3   condition, so if you wouldn't mind, if you can move

4   on.

5            Thank you.

6            MS. SULLIVAN:  Was it -- I just want to

7   clean something up.

8   BY MS. SULLIVAN:

9        Q.   Was it one of your mother's conditions

10  that you not discuss your relationship with your

11  stepfather with her?

12       A.   Not specifically, to my knowledge.

13       Q.   Had you used -- you and your mother used

14  Lenny to act as a mediator between you before?

15       A.   We had not had a formal meeting yet.  We

16  had -- had, like, some group chat communications

17  and I had -- had a meeting with Lenny and Alvaro,

18  but not with Lenny and my mother.

19       Q.   When you met with Lenny and Alvaro, was

20  that to discuss the bond or something else?

21       A.   We met in January to just discuss my

22  situation in general.

23       Q.   What specifically did you, Lenny, and

24  Alvaro discuss in January?

25       A.   My life, my situation of where I'm at,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salher-19 of 402   Page 128 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 109

 1   what I'm trying to do.

 2         Q.   **What did you tell them you were trying**

 3   **to do?**

 4         A.   Get out of bankruptcy.

 5         Q.   **How are you planning on doing that?**

 6         A.   By either getting a plan confirmed or

 7   posting a bond to stay enforcement of the judgment

 8   pending appeal.

 9         Q.   **Did you ask Alvaro at that time in**

10   **January to give you the money to post the bond?**

11         A.   I don't know that it -- we don't really

12   get that far.  But, I mean, that's -- either for

13   him to facilitate that or -- yeah.  Yes.  I mean,

14   that's -- that's the ask, definitely.

15         Q.   **How did Mr. Pascotto respond to the ask?**

16         A.   Declined.

17         Q.   **If you were able to -- if he had said**

18   **yes and you were able to post the bond, would you**

19   **have withdrawn the bankruptcy?**

20         A.   Yes.

21         Q.   **You said Lenny was a child development**

22   **specialist.**

23              Is that someone you worked with -- with

24   **your son or somebody from your childhood or**

25   **something else?**

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 110

1       A.   For help with our son.

2       Q.   **Do you still retain Mr. -- Lenny's**

3   **services for your son today?**

4       A.   No.

5       Q.   **Do you have a copy of the -- the lease**

6   **related to Ms. Osterholt's residence?**

7       A.   Yes, it exists.  Like, are you saying

8   do -- do -- did we send a copy?  Like, I don't --

9   we would have provided it in the bankruptcy.

10      Q.   **And I believe that you said in one of**

11  **your declarations that you were a guarantor of**

12  **Ms. Osterholt's lease.**

13           **Is that correct?**

14      A.   Yes.

15      Q.   **How are you a guarantor?**

16      A.   I'm the sign- -- you know, the signing

17  on the -- the lease is in my name.

18      Q.   **Oh.  Is Ms. Osterholt a co-tenant?**

19      A.   Yes.

20      Q.   **Did she also sign the lease?**

21      A.   I don't know if they required her or

22  not, off the top of my head.

23      Q.   **Okay.  So you're a guarantor because you**

24  **are the leaseholder, not because you had signed a**

25  **personal guarantee in support of the lease;**

```
 1   correct?

 2        A.   That's correct.

 3        Q.   How many bedrooms is Ms. Osterholt's

 4   home?

 5        A.   Two.

 6        Q.   How many bathrooms?

 7        A.   One and a half.

 8        Q.   What's the school year for your son?  Is

 9   it September to June or August to May or something

10   else?

11        A.   September to June.

12        Q.   Have you ever applied to Westland's

13   reduced tuition program?

14        A.   I have not.

15        Q.   Why not?

16        A.   Because I wouldn't qualify.

17        Q.   Why wouldn't you qualify?

18        A.   Because my income is greater than I

19   think what is required to show a financial need.

20        Q.   What income are you referring to?

21        A.   My salary from Hologenix.

22        Q.   That's the 300,000 dollars a year?

23        A.   Correct.

24        Q.   Do you have any other source of income?

25        A.   I receive distributions from my trust.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 112

 1       Q.   Anything else?

 2       A.   I resell the season tickets I have for

 3   the Lakers and the Kings.  But that's not, you

 4   know, income per se, I guess.

 5       Q.   **Did you have to renew the season tickets**

 6   **for the Lakers and the Kings this year?**

 7       A.   I've renewed them, yes.

 8       Q.   **When did you do the renewal?**

 9       A.   In the last sixty days or so.

10       Q.   **How much was the season renewal for the**

11   **Lakers tickets?**

12       A.   I don't know off the top of my head.

13   I -- it's around 30,000 dollars a year.

14       Q.   **And how much was the season renewal for**

15   **the Kings tickets?**

16       A.   Around the same amount.

17       Q.   **And where are your seats for the Lakers**

18   **tickets?**

19       A.   I think it's section -- I don't have it

20   memorized.  I think it's section 102.

21       Q.   **Where are your seats for the Kings**

22   **tickets?**

23       A.   I think that's section 101 or 110.

24       Q.   **How did you pay for the season renewal?**

25       A.   It's -- they're on payment plans.  I'm

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 113

1    not sure I paid anything for the Lakers.

2              I think for the Kings, I paid one

3    installment.

4         Q.   How long have you been a season ticket

5    holder for Laker games?

6         A.   Twenty-five years.

7         Q.   How long have you been a season holder

8    for Kings games?

9         A.   I think four years.  Three years.

10        Q.   When your son is at school, what does

11   Ms. Osterholt do to take care -- take care of him?

12        A.   I think when he's at school, her needs

13   are based around just maintaining the house and

14   getting, you know, his -- his schedule and whatever

15   else needs to be done, to get caught up on the

16   e-mails with all the -- coordinating all the

17   different people and setting all of his

18   appointments and ...

19        Q.   Are you involved in scheduling his

20   appointments?

21        A.   Very, very -- just from the sense that I

22   confirm.  She'll ask me, "Can you take him here on

23   this day?"  And I'll say yes or no.  You know,

24   she -- she does all the scheduling.

25        Q.   Do you pay for a housekeeper to clean

**IN RE SETH HALDANE CASDEN**
*Seth Casden, Vol. 1 on 04/26/2024*

```
 1   Ms. Osterholt's home?

 2        A.   Yes.

 3        Q.   How much do you pay for that?

 4        A.   300 a week.

 5        Q.   Is it the same housekeeper you have in

 6   Malibu?

 7        A.   Yes.

 8        Q.   And how does Ms. Osterholt care for your

 9   son when he's with you?

10        A.   Just to the extent that there's anything

11   that needs to be organized or scheduled or errands

12   or she -- she doesn't assist with my care of my son

13   when he's with me.

14        Q.   And do you pay for Ms. Osterholt's

15   vehicle?

16        A.   Yes.

17        Q.   And how much is that?

18        A.   Just main- -- the vehicle's owned free

19   and clear of title, but just, you know, if there's

20   a problem with the car outside of gas, I usually

21   get the bill for it.

22        Q.   What kind of car does she drive?

23        A.   It's a 2015 Hyundai Santa Fe.

24        Q.   Do you pay for Ms. Osterholt's medical

25   expenses?
```

1        A.    She pays for that out of the

2   4,000 dollars a month.

3        **Q.    Do you have medical insurance?**

4        A.    I do.

5        **Q.    Is Ms. Osterholt covered under your**

6   **medical insurance?**

7        A.    No.

8        **Q.    Is your son covered under your medical**

9   **insurance?**

10       A.    Yes.

11            MR. TEDFORD:  Nicole, the food is

12   apparently here, so when you feel comfortable to

13   take a break --

14            MS. SULLIVAN:  Okay.

15            MR. TEDFORD:  -- we can take a short

16   break.

17   BY MS. SULLIVAN:

18       **Q.    Other than the counselor that you and**

19   **Ms. Osterholt see together every week, do you**

20   **attend therapy otherwise?**

21       A.    I attend my son's appointment with his

22   psychiatrist, and I have other therapists that I

23   work with privately on a non-regular basis.

24       **Q.    What kind of therapist is that?**

25       A.    Family, life, marriage, you know,

Page 116

1   therapy counsel- -- you know, counselors.

2        Q.   How often do you do counseling for

3   yourself?

4        A.   In the last twelve months, maybe a half

5   a dozen or a dozen times.

6        Q.   Does your son spend time with any of

7   Ms. Osterholt's family members?

8        A.   Yes.

9        Q.   How often does he do that?

10       A.   Charlie's maternal grandmother usually

11   comes out to Los Angeles for the month of December.

12            Charlie's maternal grandfather comes out

13   less regularly, but also comes out.  He's coming

14   out this summer, and she takes Charlie to see them.

15            They're separated, divorced.  One lives

16   in Florida.  The other one lives in Indiana.  So

17   she tries to take Charlie out there a couple of

18   times a year.

19            MS. SULLIVAN:  Want to take a break?

20            MR. TEDFORD:  All right.

21            THE COURT REPORTER:  Off the record.

22        (Whereupon, a luncheon recess was

23        held from 12:22 p.m. to 12:54 p.m.)

24   / / /

25   / / /

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 117

```
 1                 LOS ANGELES, CALIFORNIA, FRIDAY

 2                      APRIL 26, 2023

 3                       12:54 P.M.

 4

 5                 EXAMINATION (RESUMED)

 6   BY MS. SULLIVAN:

 7        Q.   Do you own any real property,

 8   Mr. Casden?

 9        A.   I have a townhome in Santa Monica.

10        Q.   And what's the address for the townhome?

11        A.   718 Lincoln Boulevard, Unit 1.

12        Q.   When did you purchase the townhome?

13        A.   1998.

14        Q.   What was the purchase price?

15        A.   600,000 dollars, a little over 600,000.

16        Q.   How did you pay for that?

17        A.   With a down payment and a mortgage.

18        Q.   Who was the mortgage with?

19        A.   I don't recall.

20        Q.   Did you pay off that mortgage?

21        A.   Yes.

22        Q.   When did you pay it off?

23        A.   I don't recall.

24        Q.   Sometime earlier than ten years ago?

25        A.   I don't --
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 118

```
 1        Q.    Before your son was born?

 2        A.    Yes.

 3        Q.    Did you ever live in the condo?

 4        A.    Yes.

 5        Q.    When did you live there?

 6        A.    From the time I purchased it until about

 7   2005.

 8        Q.    Why did you move out in 2005?

 9        A.    I moved to Nevada for a couple of years.

10        Q.    When did you return to California?

11        A.    Around 2006, '7.

12        Q.    When you returned to California, why

13   didn't you [inaudible] --

14              THE COURT REPORTER:  I'm sorry.  "Why

15   did you"?

16   BY MS. SULLIVAN:

17        Q.    Why didn't you move back into the

18   townhome?

19              THE COURT REPORTER:  Thank you.

20              THE WITNESS:  Because I could rent it

21   out for more than the rent that I'm paying.

22   BY MS. SULLIVAN:

23        Q.    Is it currently rented?

24        A.    Yes.

25        Q.    Who is it rented to?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

```
 1          A.   A couple that had been there a few

 2     years.

 3          Q.   Do you currently have a mortgage on the

 4     townhome?

 5          A.   Yes.

 6          Q.   When did you first apply for that

 7     mortgage?

 8          A.   I want to say around 2020.

 9          Q.   Why did you apply for a mortgage?

10          A.   I needed liquidity.

11          Q.   Why did you need liquidity?

12          A.   For just ongoing expenses.

13          Q.   Why --

14          A.   I wanted to have -- there's a lot of

15     uncertainty around the legal -- the Hologenix, and

16     I think I was trying to avoid bankruptcy.

17               I wanted to see if I could get -- there

18     was a 1.4 million dollar payment that was owed to

19     MET in April of 2020, and I was doing everything I

20     could to make those funds available.

21               And I asked Mr. Pascotto to make

22     distribution of my assets that were held in trust

23     so that I could pay the payment, and he refused.

24               And I had funding for Hologenix lined

25     up, but when COVID hit and Under Armour stopped
```

Page 120

1   paying the receivable that they owed us, we had no

2   source of funds to make the payment.

3          And I didn't really know anything about

4   bankruptcy and it just -- was very ashamed of

5   having to file bankruptcy, and I was afraid of

6   losing my company.

7          And so I was very desperate to come up

8   with a way to pay the 1.4 million, and I basically

9   tried everything I could.

10          But there wasn't enough time to get that

11   loan, I don't think, and Mr. Pascotto wouldn't make

12   an advance, and so we ended up in bankruptcy.

13     **Q.   Why did you ask Mr. Pascotto for**

14   **distribution from the trust?**

15     A.   I just answered that.

16     **Q.   No.  Why Mr. Pascotto instead of the**

17   **trustee or the trust advisor?**

18     A.   Because he controls all of the

19   investments in the trust.

20     **Q.   How does he control all the investments**

21   **in the trust?**

22     A.   My mom put him in charge.

23     **Q.   Do you ordinarily ask Mr. Pascotto for**

24   **distributions from your trusts?**

25     A.   I have to ask him for liquidity.  He

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 121

1    doesn't have any say in the distributions.

2          **Q.    Okay.  Why do you have to ask**

3    **Mr. Pascotto for the liquidity?**

4          A.    Because he manages the assets.

5          **Q.    How do you make the request to**

6    **Mr. Pascotto?**

7          A.    By phone or e-mail.

8          **Q.    Just to be clear, when you were**

9    **testifying about bankruptcy in your last answer,**

10   **you were referring to Hologenix's bankruptcy, not**

11   **your personal bankruptcy; correct?**

12         A.    Yes.

13         **Q.    How did Mr. Pascotto tell you he**

14   **wouldn't fund the liquidity request to pay MET's**

15   **settlement payment in 2020?**

16         A.    We had a -- I had a phone call with him,

17   and I was really adamant that I needed that money

18   and that it was being held in trust for me and that

19   I was almost fifty years old and it should be my

20   decision to be able to get a distribution so that I

21   could keep my company going.

22              And we had a very contentious argument,

23   and he basically said he wasn't going to do it.

24         **Q.    Did he tell you why he wouldn't do it?**

25         A.    He doesn't ever say why.  No.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1     Q.   Did you apply for a mortgage on the

2  townhome in or around the same time in April 2020?

3     A.   Yes.

4     Q.   What happened with that application?

5     A.   I was able to get a hard money loan, and

6  then that got converted to or sold to the

7  current -- might have been sold a few times --

8  whoever the mortgage holder is on the property.

9     Q.   Who did you get the hard money loan

10  from?

11     A.   I think they're called Macoy Capital.

12     Q.   How much was the loan?

13     A.   I want to say around a million, a

14  million-three.

15     Q.   When did you receive the money?

16     A.   Sometime over the summer of 2020.

17     Q.   What did you do with the money?

18     A.   Just went to fund my ongoing expenses.

19     Q.   When you say "ongoing expenses," do you

20  mean the same monthly expenses that you listed in

21  your schedules in the bankruptcy?

22     A.   Yes.

23     Q.   Did you use it for anything else?

24     A.   Not that I recall.

25     Q.   When you received the one --

Page 123

```
 1    approximately one million dollars from Macoy

 2    Capital in the summer of 2020, was there a mortgage

 3    on your condo at that time?

 4         A.   There -- no, not a formal mortgage.

 5         Q.   When did the hard money loan become a

 6    mortgage?

 7         A.   They sold it maybe a year -- a little

 8    over a year after.  If I recall, the terms of the

 9    loan was it had to be refinanced within a year or

10    there's a penalty.

11         Q.   How did you refinance it?

12         A.   Macoy found someone to sell it to.

13              MS. SULLIVAN:  Let's mark this as, I

14    guess, Exhibit 1.

15              (Whereupon, MET's Exhibit Number

16              1 was marked for identification

17              by the deposition officer and is

18              attached hereto.)

19    BY MS. SULLIVAN:

20         Q.   I'm showing you, Mr. Casden, what we

21    marked as Exhibit 1 today.

22              Do you recognize this document?

23         A.   It's a bankruptcy document.  It says

24    "Proof of Claim."

25         Q.   Have you seen it before today?
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 124

1      A.   I've seen a lot of these, so I just want

2  to see which one this is.

3           It says it was filed in February, so is

4  this an amended claim or ...

5      **Q.   If we turn to page Bates stamped**

6  **Casden 10668 --**

7      A.   Yeah.

8      **Q.   -- it appears to be a [inaudible] claim**

9  **related from Shellpoint --**

10          THE COURT REPORTER:  I'm sorry.  Can you

11  repeat that?

12  BY MS. SULLIVAN:

13     **Q.   From Shellpoint Mortgage Servicing in**

14  **your personal bankruptcy; correct?**

15     A.   Yes.

16     **Q.   And that's who your mortgage is with**

17  **now?**

18     A.   Yes.

19     **Q.   What is your monthly mortgage payment?**

20     A.   They take out the property tax with the

21  payment, so it's around 8,000 with both of those.

22     **Q.   Can you look on that page Casden 10668.**

23          In the first box on the left, it has the

24  total payment, 8,861 dollars and 31 cents.

25          Do you see that?

Page 125

1        A.    Yes.

2        Q.    Is that a correct amount?

3        A.    They were withholding money for

4   insurance, but I -- the amounts changed a little

5   bit, but that's about right.  I think it's slightly

6   less now.

7        Q.    If you -- I want to just go back and say

8   what we've marked as Exhibit 1 is Bates stamped

9   Casden 10662 through Casden 10703.

10            If you turn to Casden 10663, in the

11  proof of claim, they list the total amount claimed:

12  1,402,481 dollars and 63 cents.

13            Do you see that?

14       A.    Yes.

15       Q.    That's -- is that the correct amount

16  that's still owed on the mortgage?

17       A.    Well, it would be less now, but I guess

18  it was a correct amount at that time.

19       Q.    If we turn to Casden 107- -- 670.  70.

20  We have a note, and it's dated March 25th, 2021.

21            Do you see that?

22       A.    Yes.

23       Q.    It says the lender is Capital Alliance,

24  LLC.

25            See that?

Page 126

1        A.    Yes.

2        Q.    Is that who bought the -- the hard money

3    loan from Macoy Capital?

4        A.    It's possible.

5        Q.    Is March 25th, 2021 when -- when this

6    mortgage with Shellpoint went into effect?

7        A.    I don't know.

8        Q.    Did obtaining this mortgage have

9    anything to do with MET bringing a lawsuit against

10   you personally in February of 2021?

11       A.    I don't believe so.

12       Q.    Have you used any of the funds that you

13   received through the hard money loan or this

14   mortgage to fund the defense that your -- you had

15   in MET verse Casden?

16       A.    Well, all the money goes into the same

17   pot, so how you bifurcate it is subjective.

18       Q.    We talked earlier about how Hologenix

19   agreed to defend you in the MET verse Casden case.

20            Did Hologenix also agree to indemnify

21   you from any judgment in that case?

22       A.    I'm not clear on that.

23       Q.    Do you have any written agreement with

24   Hologenix about the indemnity for you in the MET

25   verse Casden case?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 127

1         A.    Nothing beyond what's in my employment

2    contract.

3         Q.    Did you ever have any discussions with

4    the board of Hologenix about indemnifying you from

5    the judgment in the MET verse Casden action?

6         A.    No.

7         Q.    Did you ever have any discussions with

8    the board of Hologenix about indemnifying your

9    defense costs in the MET verse Casden litigation?

10        A.    Yes.

11        Q.    What were those discussions?

12        A.    The board confirmed that Hologenix would

13   pay for the defense.

14        Q.    How was that confirmed?

15        A.    Through a board meeting, you know,

16   verbally.

17        Q.    Was there any writing that the board

18   issued confirming that?

19        A.    I'm not sure.  The board spoke to the

20   law firm directly, I think.  I don't know if -- if

21   there's minutes from that or how that was

22   confirmed.

23        Q.    Are you on the board?

24        A.    Yes.

25        Q.    And are there minutes from the board

1  meetings?

2        A.   Yes, generally, not -- the board meets

3  every month.  We take minutes at the quarterly

4  meetings and as needed at other times.

5        Q.   **Was the discussion about your indemnity**

6  **in the MET verse Casden case in the quarterly**

7  **meeting or monthly meeting?**

8        A.   I don't -- we would have had an ad hoc

9  meeting for -- for this type of conversation, I

10  would guess.  I don't -- I don't remember.  This is

11  three years ago.

12        Q.   **And your monthly real estate taxes are**

13  **combined into your mortgage payment; correct?**

14        A.   Yes.

15        Q.   **Do you have any other expenses**

16  **associated with the townhouse?**

17        A.   Yes.

18        Q.   **What are those?**

19        A.   HO- -- HOA dues.

20        Q.   **How much is that per month?**

21        A.   It's 5,000 dollars annually.

22        Q.   **Do you have to pay them annually, or do**

23  **you pay them monthly?**

24        A.   I'm paying them quarterly this year.

25        Q.   **Is that a special payment arrangement**

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 129

```
 1   you made with the condo?

 2        A.    Yes.

 3        Q.    When did you make that?

 4        A.    In January.

 5        Q.    What are the terms?

 6        A.    To pay quarterly.

 7        Q.    In even amounts?

 8        A.    Yes.

 9        Q.    Is that agreement only for 2024 or going

10   forward?

11        A.    It's just been made for this year.

12             MS. SULLIVAN:  This is Exhibit 2.

13        (Whereupon, MET's Exhibit Number

14        2 was marked for identification

15        by the deposition officer and is

16        attached hereto.)

17             MR. TEDFORD:  Are you done with

18   Exhibit 1?

19             MS. SULLIVAN:  I am.

20   BY MS. SULLIVAN:

21        Q.    Showing you, Mr. Casden, what we're

22   marking as Exhibit 2 today.

23             Do you recognize this document?

24        A.    Yes.

25        Q.    What is this?
```

Page 130

```
 1        A.   It's my employment agreement with

 2   Hologenix.

 3        Q.   Is this agreement still in effect today?

 4        A.   Parts of it.

 5        Q.   Which parts of it?

 6        A.   I'm not a lawyer.  I know that the

 7   bankruptcy court has stayed certain parts of it

 8   or --

 9        Q.   Oh.  Aside from -- you have filings for

10   bankruptcy -- aside from the bankruptcy filings, is

11   this agreement still in place today?

12        A.   Yes.

13        Q.   Where in this agreement does it talk

14   about the indemnity that you received for the MET

15   verse Casden case?

16        A.   It wouldn't.

17        Q.   Why not?

18        A.   Because we -- I don't think we even knew

19   about that at this time.  Wasn't something we had

20   anticipated.

21        Q.   You testified that you received

22   indemnity from Hologenix for the MET verse Casden

23   case because you had an employment agreement with

24   them.

25             If it's not in your employment
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1  agreement, why does Hologenix indemnify you for the

2  MET verse Casden case?

3      A.   Because that's the law in California, is

4  my understanding, and it's in the LLC operating

5  agreement of Hologenix.

6      Q.   What's in the LLC operating agreement?

7      A.   The indemnification of officers and

8  directors of the company.

9           MS. SULLIVAN:  Mark this as Exhibit 3,

10  please.

11          MR. TEDFORD:  Are we done with 2?

12          MS. SULLIVAN:  I think so, yeah.

13      (Whereupon, MET's Exhibit Number

14      3 was marked for identification

15      by the deposition officer and is

16      attached hereto.)

17  BY MS. SULLIVAN:

18      Q.   I'm showing you, Mr. Casden, what we

19  marked as --

20      A.   Sorry.

21      Q.   -- Exhibit 3.

22           Do you recognize that document?

23      A.   Yes.

24      Q.   What do you recognize it to be?

25      A.   It's a rental agreement.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        Q.   Is that -- to Suzie Carr; correct?

 2        A.   Yes.

 3        Q.   Is that your current tenant?

 4        A.   Yes.

 5        Q.   What does Ms. Carr pay for rent every

 6   month?

 7        A.   6,500.

 8        Q.   Why does Ms. Carr's --

 9        A.   Sorry.  I'm confusing my dad's rent with

10   her rent.

11             She's -- yeah.  8- -- 8,000 a month.

12        Q.   Why does Ms. Carr's rent not match the

13   amount you have to pay your mortgage company every

14   year -- every month?

15        A.   I don't understand how those would be

16   correlated.  One has nothing to do with the other.

17        Q.   So you pay 8,800 and change to the

18   mortgage company; correct?

19        A.   Yes.  On that statement you showed me,

20   that was the amount.

21        Q.   And Ms. Carr's rent is 8,000; correct?

22        A.   Yes.

23        Q.   You also pay 5,000 annually in HOAs;

24   correct?

25        A.   Yes.
```

Page 133

```
 1        Q.   Do you have any other costs associated

 2   with the condo, like repairs or something else?

 3        A.   Sure.

 4        Q.   What does that cost on average each

 5   year?

 6        A.   Just depends.  It's very inconsistent.

 7        Q.   More than a hundred dollars?

 8        A.   A year?

 9        Q.   Yeah.

10        A.   I think that's fair.

11        Q.   Is it more --

12        (Unreportable cross-talk.)

13             THE WITNESS:  I mean, something --

14   something breaks usually once a year.  If I have

15   the place painted every five years, that's

16   expensive, or have to replace the washer and dryer

17   or refrigerator.

18             There's some big ticket items

19   occasionally.

20   BY MS. SULLIVAN:

21        Q.   Does Ms. Carr's rent cover the total

22   expenses you have on the condo annually?

23        A.   No.

24        Q.   Why don't you charge Ms. Carr rent that

25   covers the cost to you for the condo every year?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 134

```
 1          A.   I didn't want the condo to be vacant, so

 2   I got the best rent I could without having it sit

 3   on the market.

 4          Q.   How long has Ms. Carr been your tenant?

 5          A.   About two years.

 6          Q.   And her lease was up in March of 2024;

 7   correct?

 8          A.   That sounds about right.

 9          Q.   Did you renew the lease?

10          A.   No.

11          Q.   Is Ms. Carr still living in the condo?

12          A.   Yes.

13          Q.   Is she on a month-to-month rental now?

14          A.   Yes.

15          Q.   Are you intending to renew the lease?

16          A.   I -- not -- no.  I mean, I'm -- I'm

17   happy with the current arrangement.

18          Q.   Could you give Ms. Carr a certain amount

19   of notice and ask her to vacate the premises?

20          A.   I believe that's my right.

21          Q.   Have you discussed with Ms. Carr that

22   you might do that?

23          A.   No.

24          Q.   Have you ever thought about doing that?

25          A.   No.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1      Q.   Why not?

2      A.   Because then I'd have to find a new

3    tenant to replace her.

4      Q.   How many bedrooms is the townhouse?

5      A.   Two bedrooms.

6      Q.   How many bathrooms?

7      A.   Two and a half.

8      Q.   Why couldn't you -- why couldn't you and

9    your father replace Ms. Carr in the condo and then

10   not have the rentals in Malibu anymore?

11     A.   Well, my dad can't really go up or down

12   stairs.  The townhouse is five stories, and it

13   would mean I'm living with my father.

14     Q.   What does that mean?

15     A.   I don't live with my father.  He lives

16   in my building.  That's a lot different than

17   inviting your parents to live with you under the

18   same roof.

19     Q.   But it would cost you less if you and

20   your father lived in the same unit; correct?

21     A.   It costs me less for a lot of things.  I

22   could move in to a lot of places that would cost

23   less.

24     Q.   Have you ever considered doing something

25   that would decrease the amount of money that you

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 136

```
 1    spend every month on housing --

 2         A.   Yes.

 3         Q.   -- for you and your father?

 4         A.   Yes.

 5         Q.   What are your -- what have you thought

 6    about doing?

 7         A.   Leaving the country.

 8         Q.   With your father?

 9         A.   Yes.

10         Q.   All right.  When would you do that?

11         A.   I've thought about it.  I'm not going to

12    do it.

13         Q.   Why not?

14         A.   Because I'm not going to leave my son

15    and my father has -- tied here because of his

16    medical care.

17         Q.   So have you thought of any solutions to

18    decreasing your housing costs every month that

19    aren't fantasy?

20         A.   I'm not aware of any.

21         Q.   Have you discussed the possibility of

22    you and your father -- sharing an apartment with

23    your father?

24         A.   That's not something I want to do.

25         Q.   Why not?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 137

```
 1        A.   Because I value my privacy.  It's kind

 2   of hard to meet someone and bring them home with

 3   your dad in the house.

 4        Q.   Is there any other reason?

 5        A.   Yeah.  I don't want to live with my

 6   father.

 7        Q.   Other than wanting to have your own

 8   privacy for bringing home people, why else don't

 9   you want to live with your father?

10        A.   I like the arrangement that we have.  I

11   like having my father close and being able to help

12   him; and at the same time, I have my own space.

13        Q.   And --

14        A.   I looked at moving my father into a

15   home, and that's going to end up costing more and

16   he wouldn't get the same level of care.  But I

17   haven't looked at moving into a house with my

18   father.

19        Q.   Where did you look into moving your

20   father -- when did you look into moving your father

21   into a home?

22        A.   I've looked at it off and on over the

23   years, just kind of do a little Google research.

24        Q.   When was the last time?

25        A.   Couple months ago.
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 138

```
 1        Q.   What research did you do?

 2        A.   Just online.

 3        Q.   Did you go visit any places?

 4        A.   No.

 5        Q.   If you didn't visit the places, how do

 6   you know that they wouldn't provide the same level

 7   of care?

 8        A.   Because they're not his family.

 9        Q.   Meaning you?

10        A.   Correct.

11        Q.   Other than running errands for your

12   father and putting medicine on his body, what else

13   do you do for his care that a home would be unable

14   to do?

15        A.   Nothing.

16        Q.   Is it fair to say you just don't want to

17   put your father in a home?

18        A.   No.  It would be a lot easier for me if

19   he was in a home.

20        Q.   Which homes did you research and

21   determine that the cost was more than what you're

22   paying for your father now per month?

23        A.   I don't -- I don't remember the names.

24             I did some basic research about average

25   assisted living costs.  I looked at a few.  I don't
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 139

```
1    remember any of the details.

2         Q.   What was the average assisted living

3    cost?

4         A.   I think nationally, it's right around

5    5,000 a month, but it's much higher in California.

6         Q.   What is it in California?

7         A.   I don't remember the number.  I think

8    some of them cost more than 10,000 dollars,

9    15,000 dollars a month.

10        Q.   Have there been any discussions about

11   your father moving to Colorado with your brother?

12        A.   Yes.

13        Q.   When was -- when was the last time that

14   discussion happened?

15        A.   I think my dad talked to my brother

16   about it sometime last year.

17        Q.   And what was the outcome?

18        A.   My brother said no.

19        Q.   Why?

20        A.   You'd have to ask my brother.

21        Q.   Do you know why?

22        A.   I don't.

23        Q.   Why did your dad ask your brother to

24   move to Colorado?

25        A.   He wanted to spend time with him before
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

```
 1   he passed.
 2        Q.   Any other reason?
 3        A.   You'd have to ask my dad.
 4        Q.   Have you asked your brother to allow
 5   your dad to move to Colorado to ease your financial
 6   burden?
 7        A.   I talked to my brother about what that
 8   arrangement would look like, but my brother made it
 9   clear he had no interest in doing that.
10        Q.   How did he make it clear that he had no
11   interest in doing that?
12        A.   By saying he didn't want to do it and
13   that it was a bad idea and he wasn't -- he wasn't
14   open to it.
15        Q.   Did he explain to you why he thought it
16   was a bad idea?
17        A.   Not beyond that.  He just doesn't want
18   to be involved in the care of my dad beyond the
19   financial support.
20             My dad asked to go visit him, and he
21   told him to stay in a hotel.
22        Q.   And when you asked your brother to
23   consider moving your dad to Colorado and he said
24   no, did you then ask him to increase his financial
25   contribution to your dad's care?
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1      A.   I have asked him to reconsider his

2   contribution.

3      Q.   **When was the last time you asked him to**

4   **reconsider his contribution?**

5      A.   Maybe a little over a year ago.

6      Q.   **Have you asked him since you filed for**

7   **bankruptcy?**

8      A.   I haven't spoken to my brother since I

9   filed for bankruptcy, no.

10      Q.   **Were you speaking to your brother before**

11   **you filed for bankruptcy?**

12      A.   Not very often.

13      Q.   **Do you have a strained relationship with**

14   **your brother as well?**

15      A.   Yes.

16      Q.   **And how long --**

17      A.   As well as who?

18      Q.   **Your mother.**

19      A.   Yes.

20      Q.   **Is that a fair characterization, that**

21   **you have a strained relationship with your mother?**

22      A.   I mean, I'm at peace with it as best as

23   I can be.  But of course, it's disappointing to not

24   be able to talk to your family.

25      Q.   **Do you talk to anyone on your mother's**

Page 142

```
 1    side of the family?

 2         A.   I talk to my cousins.

 3         Q.   When was the last time --

 4         A.   My uncles and aunts.

 5         Q.   When was the last time you raised

 6    Ms. Carr's rent?

 7         A.   I don't think it's -- I don't think it

 8    was raised.

 9         Q.   Have you considered raising it this

10    year?

11         A.   I haven't thought about it much.  I have

12    a feeling she's going to be leaving soon.

13         Q.   Why do you have that feeling?

14         A.   Because she lives in the U.K. and she's

15    here on an employment contract.  And her original

16    intent was to leave, but she stayed on -- or I'm

17    not really sure, but I don't know how much longer

18    they're going to be there.

19         Q.   Have you discussed selling your condo

20    with any realtor?

21         A.   Not recently.

22         Q.   When was the last time you had a

23    conversation with a realtor about selling your

24    condo?

25         A.   There's a realtor that lives in the
```

Page 143

1    building that I've talked to about -- about it from

2    time to time.

3         Q.   When was the last time you had a

4    conversation with the realtor who lives in your

5    building?

6         A.   About selling my condo?  I don't -- I

7    don't recall.

8         Q.   Since you filed for bankruptcy?

9         A.   No.

10        Q.   In the year prior to filing for

11   bankruptcy?

12        A.   I haven't looked at selling the condo.

13   I'm not interested in selling it, so no, I

14   haven't -- I haven't researched that or looked into

15   it very seriously.

16        Q.   What is the realtor's name in your

17   building?

18        A.   She's the agent on this lease.  I think

19   it's Susan Kaster [sic].

20        Q.   Okay.  And the lease is Exhibit 3;

21   correct?

22        A.   Yes.

23        Q.   Why don't you have any interest in

24   selling your condo?

25        A.   Well, it's sort of a fallback if I --

Page 144

```
 1   everything else goes, I have that place that I can
 2   at least live in.
 3         Q.   A fallback for what?
 4         A.   For life.
 5         Q.   What fallback are you expecting that you
 6   need to have a townhouse available to you to move
 7   into?
 8         A.   Well, if I needed somewhere to live and
 9   I had no other options and I couldn't afford rent,
10   I could live in my home.
11         Q.   If you couldn't afford rent for the
12   Malibu apartment, you would move into the
13   townhouse?
14         A.   Well, the mortgage would have to be paid
15   on the townhouse.  If the mortgage was paid off and
16   the townhouse was free and clear, then I could do
17   that.
18         Q.   Who's your landlord for your apartment
19   in Malibu?
20         A.   His name is Jeff Mohr.
21         Q.   Is your lease with a -- with Mr. Mohr or
22   with a company?
23         A.   I think it's with his company.
24         Q.   Has Mr. Mohr been your landlord the
25   entire duration of your rental?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 145

```
1       A.    Yes.

2             Q.    And who is your father's landlord?

3       A.    Mary Rubenstein.

4             Q.    Is your father's rent -- when was the

5     last time your father's rent was increased?

6       A.    You asked me that before.  I think it

7     was about a year ago.

8             Q.    Have you had a valuation done of your

9     townhouse?

10      A.    There was an appraisal done when the

11    mortgage was taken out.

12            Q.    Other than that?

13      A.    No.

14            MS. SULLIVAN:  Mark this as Exhibit 4,

15    please.

16            (Whereupon, MET's Exhibit Number

17            4 was marked for identification

18            by the deposition officer and is

19            attached hereto.)

20    BY MS. SULLIVAN:

21            Q.    I'm showing you, Mr. Casden, what we

22    marked as Exhibit 4.

23            Do you recognize this document?

24      A.    Yes.

25            Q.    What do you recognize it to be?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1          A.    It says it's an Owned Property Summary

 2     Sheet.

 3          Q.    Is that your signature at the bottom?

 4          A.    My electronic signature, yes.

 5          Q.    And it's dated October 23rd, '23;

 6     correct?

 7          A.    Yes.

 8          Q.    And you -- you signed this under the

 9     penalty of perjury; correct?

10          A.    Yes, I believe that's correct.

11          Q.    So are the statements contained in what

12     we've marked as Exhibit 4 true and accurate, to the

13     best of your knowledge?

14          A.    Yes, it looks correct.

15          Q.    If you look at the first page in

16     Exhibit 4, it's Casden 10886 to Casden 10888.

17                It lists:

18                "Fair market value on real

19          estate:  2,144,300 dollars."

20                Do you see that?

21          A.    Yes.

22          Q.    Where does that number come from?

23          A.    I think the law firm here prepared that

24     based on just a Google search.  Like, I'm not sure.

25          Q.    Did you have any valuation done of the

1    condo in Santa Monica, the townhouse?

2        A.   No.

3        Q.   If we look at the next page, there's the

4    lessor and lessor's address for your two rentals in

5    Malibu.

6             Those are correct; correct?

7        A.   Well, the -- yes.

8        Q.   Is there something that's not correct on

9    this page?

10       A.   I was looking at -- the address of the

11   leasee was the same, not the address of the

12   property.  The property addresses are correct.

13       Q.   And the two apartments that you and your

14   father rent in Malibu, are those on the ocean?

15       A.   Yes.

16            MS. SULLIVAN:  Mark this as Exhibit 5,

17   please.

18            (Whereupon, MET's Exhibit Number

19            5 was marked for identification

20            by the deposition officer and is

21            attached hereto.)

22            (Whereupon, a discussion was held

23            off the record.)

24   BY MS. SULLIVAN:

25       Q.   I'm showing you what we marked as

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1   Exhibit 5.

 2            Do you recognize this document?

 3       A.   Uh-huh.

 4       Q.   And what is this document?

 5       A.   It says a:

 6            "Declaration by debtor as to

 7       whether income was received from an

 8       employer within sixty days of the

 9       petition date."

10       Q.   And is that your signature on the

11   bottom?

12       A.   Yes.

13       Q.   It's dated October 31st, 2023?

14       A.   Yes.

15       Q.   And you made this declaration under the

16   penalty of perjury that the information was true

17   and correct?

18       A.   Yes.

19       Q.   You checked the box:

20            "I was not paid by an employer

21       because I was either self-employed

22       or not employed."

23            Do you see that?

24       A.   Yes.

25       Q.   At the time that you made this
```

Page 149

 1   statement, you were employed by Hologenix; correct?

 2         A.   Not in this context of this checking of

 3   the box, no.

 4         Q.   Okay.  What do you mean by that?

 5         A.   You're conflating employer as in the

 6   where-do-you-work sense versus California or

 7   federal tax code.

 8              As a tax matter, I'm not an employee.

 9   I'm an owner in the company, and I have to report

10   as self-employed.

11         Q.   So you report as self-employed on your

12   taxes too?

13         A.   Correct.

14         Q.   Can you pull up -- sorry -- Exhibit 2

15   again, please.

16              Showing you again, Mr. Casden, what we

17   marked as Exhibit 2.

18         A.   Do you have that --

19         (Unreportable cross-talk.)

20              THE WITNESS:  -- marked as 2, and

21   that's -- that's maybe 1.

22              Yes.

23   BY MS. SULLIVAN:

24         Q.   Can you turn to paragraph 3.3.

25              We talked about class A shares that you

Page 150

```
 1   were granted that vest from 2020 through 2023;
 2   correct?
 3        A.   Yes.
 4        Q.   What are class A shares in Hologenix?
 5        A.   They are, like, phantom equity.
 6        Q.   What does that mean?
 7        A.   I would ask a lawyer.  I mean, that's --
 8   it's --
 9        Q.   What's your -- I'm just asking for your
10   understanding of what it means.
11        A.   It's a phantom equity arrangement.
12        Q.   Did you own equity in Hologenix?
13        A.   Yes.
14        Q.   How much equity do you own in Hologenix?
15        A.   I'd refer you to the cap table.  I don't
16   know how many shares or membership units.
17        Q.   Did the shares listed here in
18   paragraph 3.3 actually vest already?
19        A.   It looks like they would have based on
20   the dates listed there and today's date.
21        Q.   Have you received any other shares from
22   Hologenix other than the ones listed in this
23   agreement since you signed this agreement?
24        A.   None that have been issued.
25        Q.   What does that mean?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.   It means I made an equity investment,

 2   but we don't know the value yet, so the shares

 3   haven't been issued.  Or the units.

 4             I keep saying "shares," but they're

 5   units.

 6        Q.   When did you make the equity investment?

 7        A.   I believe there were three investments

 8   made in 2023.

 9        Q.   What was the total value of your

10   investment?

11        A.   I believe it was around 7- or 800,000.

12        Q.   Where did you get the funds to make the

13   equity investment into Hologenix?

14        A.   From my bank account.

15        Q.   Did you use your Hologenix earnings to

16   fund that equity investment or something else?

17        A.   I don't know how to bifurcate the money

18   in my check accounting.  I didn't earn that much

19   money from Hologenix over that time period, so it

20   couldn't have all been from Hologenix.

21        Q.   Is it fair to say that you used

22   distributions from your trust to cover some or all

23   of the equity investment into Hologenix?

24        A.   Yes.

25        Q.   And what did you receive from Hologenix
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 152

```
 1    in exchange for your equity investment in 2023?

 2          A.   It hasn't been determined.

 3          Q.   But you said it was an equity

 4    investment.

 5          A.   Yes.

 6          Q.   What's the equity?

 7          A.   It hasn't been determined.

 8          Q.   What specific equity?  Are you getting

 9    additional units or something else?

10          A.   It'll be additional membership units.

11          Q.   But the total number of additional

12    membership units you will receive in exchange for

13    your equity investment has not been determined yet?

14          A.   Correct.

15          Q.   Is there anything else, other than

16    additional membership units, that you would receive

17    from Hologenix for this equity investment in 2023?

18          A.   I don't believe so, no.

19          Q.   And why haven't the number of additional

20    units been determined yet?

21          A.   Because Hologenix is in bankruptcy and

22    it's impossible to come up with a valuation.

23          Q.   Why is it impossible to come up with a

24    valuation while Hologenix is in bankruptcy?

25          A.   Because it's not clear what the outcome
```

 1   is of that litigation.

 2       **Q.   What do you mean by that?**

 3       A.   Well, there's litigation -- is it

 4   litigation or a complaint pending against Hologenix

 5   in the bankruptcy matter.

 6       **Q.   Do you mean that you can't determine the**

 7   **valuation until the bankruptcy is resolved --**

 8       A.   Correct.

 9       **Q.   -- or something within the bankruptcy?**

10       A.   No.  Bankruptcy.  Until -- until

11   they're -- bankruptcy is discharged, we cannot

12   determine the valuation of Hologenix.

13       **Q.   Why do you believe that you can't**

14   **determine Hologenix's value until the bankruptcy is**

15   **discharged?**

16       A.   Because the -- I guess I would ask it

17   the other way.

18            How would you determine the valuation?

19       **Q.   Is your -- is your answer that -- is**

20   **that you don't think it's feasible to value a**

21   **company that's in bankruptcy?**

22       A.   With pending litigation where there's an

23   order or request to have the bankruptcy either

24   dismissed or converted to Chapter 7, yes.

25            Until that issue is resolved, I don't

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   see how you would value the company.

2      Q.   So is it feasible that you made an

3   equity investment into Hologenix in 2023 and you

4   will receive nothing in exchange for that?

5      A.   No.  It's not feasible unless the

6   company is dissolved.  But I'd get something at

7   some point.  Just of question of when and how much.

8      Q.   When you say you'll "get something at

9   some point," what do you mean?

10              What do you mean?

11      A.   At some point -- I don't know how to be

12  more specific.  At some point the company will

13  either emerge from bankruptcy or it won't and I'll

14  be issued some units based on whatever that

15  valuation is.

16      Q.   And if the company doesn't merge [sic]

17  from bankruptcy, what will you receive in exchange

18  for your equity investment in 2023?

19      A.   If the company doesn't exist anymore,

20  then I'm not going to receive anything.

21      Q.   Did anyone else make an equity

22  investment into Hologenix in 2023?

23      A.   No.

24      Q.   Why did you make an equity investment

25  into Hologenix in 2023?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 155

 1         A.    So that the company would continue to

 2    operate.

 3         Q.    **What do you mean by that?**

 4         A.    The company needed money to cover its

 5    expenses.

 6         Q.    **What expenses?**

 7         A.    Its operating expenses.

 8         Q.    **When did Hologenix first need money to**

 9    **cover -- outside money to cover its operating**

10    **expenses?**

11         A.    During what time period?

12         Q.    **Well, since Hologenix filed for**

13    **bankruptcy, has it needed outside money before you**

14    **made your equity investment to cover its operating**

15    **expenses?**

16         A.    No.

17         Q.    **So what prompted Hologenix to need**

18    **outside -- an equity investment from you to cover**

19    **its operating expenses in 2023?**

20         A.    The combination of the litigation

21    expenses that have occurred over the previous three

22    years and the softening of the sales.

23         Q.    **What softening of the sales?**

24         A.    What we discussed with Under Armour.

25         Q.    **What operating expenses did Hologenix**

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 156

```
 1   need your investment to cover?
 2          A.   The -- a balance was going to be zero.
 3   So I think we have about 300,000 dollars a month in
 4   operating expenses.
 5          Q.   When was the balance going to be zero?
 6          A.   On those three occasions, I think, the
 7   impetus was usually to cover payroll.
 8          Q.   How much is Hologenix's payroll each
 9   month?
10          A.   Around 150,000.
11          Q.   Is your equity investment used to cover
12   anything else, other than payroll?
13          A.   Yes.
14          Q.   What was that?
15          A.   All the operations of the company.  So
16   whether that's building products or covering vendor
17   costs, all -- all of the expenses, I would refer
18   you to the monthly operating report for the company
19   for those time periods.
20          Q.   How can I tell from the monthly
21   operating report where your equity investment was
22   spent?
23          A.   Well, that's just the point.  Right?
24               The money goes into the company bank
25   account and it gets mixed with the other money
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 157

```
1    that's coming in from sales and it gets used to pay

2    expenses of the company.

3            So you could try and make subjective

4    arguments, but it's all in the same account.  So

5    the money is used to continue the ongoing

6    operations of the company.

7        Q.    When was the first month that Hologenix

8    was concerned about paying its payroll?

9        A.    July of last year.

10       Q.    That was the month after MET got a

11   verdict against you in the MET verse Casden case;

12   correct?

13       A.    Yes.

14       Q.    And in July of 2023, how much money did

15   you invest, if any, into Hologenix?

16       A.    I think it was around 200,000.

17       Q.    Is it your testimony that MET's verdict

18   against you had nothing to do with your investment

19   into Hologenix?

20       A.    Yes.  They were not related.  MET's

21   litigation against Hologenix is the reason why

22   Hologenix needed money.

23       Q.    I said that wrong.  I didn't mean to.

24            There was a jury verdict on liability

25   against you in the MET verse Casden action in or
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1   around June 23, 2023; correct?

2        A.   Yes.

3        Q.   And then a couple weeks later, you

4   invested -- or a few weeks later in July 2023, you

5   invested 300,000 dollars into Hologenix; correct?

6        A.   Yes.  That's -- that -- the timing

7   sounds correct and I'd want to confirm the amount,

8   but yes.

9        Q.   Okay.  And then you invested another 4-

10  to 500,000 dollars before you filed bankruptcy in

11  October 2023 into Hologenix; correct?

12       A.   Yes.  I think September and October.

13       Q.   And that -- the equity investment into

14  Hologenix had nothing to do with the fact that MET

15  had gotten a liability verdict against you in June

16  of 2023?

17       A.   Correct.  Hologenix's cash flow issues,

18  other than the cost of defending me, so I guess

19  from that standpoint, you could say is part of the

20  issue.

21       Q.   Were you using the equity investment

22  into Hologenix to protect your money from MET

23  collecting it on a judgment?

24       A.   No, because MET has a judgment in the

25  Hologenix case of 2.4 million.  So I guess I'm

 1   transferring MET's asset of the judgment against me

 2   to the judgment against Hologenix.

 3          The reason why Hologenix received cash

 4   from you is because I wanted to continue to operate

 5   the company.  And without additional cash, would

 6   not have been able to operate.

 7          I let go of a third of our team and made

 8   all the cost cutting I could to keep the expenses

 9   down.  I foregoed [sic] my salary or delayed

10   payment on my salary a couple of months and did

11   everything I could to minimize the cash needed to

12   run Hologenix.

13          But despite all of that, it was still

14   going to be short last year.

15      **Q.   When did -- when did you let go of a**

16   **third of Hologenix's team?**

17      A.   In July, the same time I put the money

18   in.

19      **Q.   How large was Hologenix's team as of**

20   **July 1, 2023?**

21      A.   We went from thirteen people down to

22   ten.

23      **Q.   Who did you let go?**

24      A.   You want the positions or their names?

25      **Q.   Give both.**

Page 160

```
 1          A.    I let go a supply chain support role.  I
 2    let go a business development role.  And I let go a
 3    testing role.
 4          Q.    What were the salaries of those three
 5    roles?
 6          A.    The three of them saved about a half a
 7    million dollars on an annual basis.
 8          Q.    Half a million?  500,000?
 9          A.    Correct.
10          Q.    Does Hologenix have office space?
11          A.    Yes.
12          Q.    And where is the office space?
13          A.    In the Pacific Palisades.
14          Q.    How much is the office space's rent?
15          A.    It's around 25,000 a month.
16          Q.    How large is the office?
17          A.    Around 2,000 square feet.
18          Q.    And how many people work there?
19          A.    Varies from a few to this week we had
20    the whole team in, so twelve.  Ten.
21          Q.    How many employees does Hologenix have
22    today?
23          A.    Ten full time and a few other part time.
24          Q.    Are all those employees based in the
25    Los Angeles area?
```

```
 1        A.    No.

 2        Q.    How many employees does Hologenix have

 3   in Los Angeles?

 4        A.    Eight.

 5        Q.    Where are the two other employees?

 6        A.    New York and Boston.

 7        Q.    Who are they?

 8        A.    Supply chain, marketing, and sales.

 9   There's three people that aren't based in L.A.

10        Q.    Are they all based in New York and

11   Boston?

12        A.    Yes.

13        Q.    Do you have office space in New York and

14   Boston for Hologenix?

15        A.    No.

16        Q.    Does Hologenix have any other office

17   space than the one in Pacific Palisades --

18   Palisades?

19        A.    No.

20        Q.    Does Hologenix have any overseas

21   employees?

22        A.    Not on payroll, but yes.

23        Q.    Okay.  Were there -- what -- what do you

24   mean when you say "not on payroll?

25        A.    They're consultants.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 162

1    Q.   How much does Hologenix pay a year for

2    its overseas consultants?

3    A.   There are one, two, three, four, five,

4    six.  And I'd have to look at the budget to be

5    exact, but somewhere between 350,000.  Maybe around

6    that number.

7    Q.   Do you have any overseas office space?

8    A.   No.

9    Q.   By "you," I meant Hologenix.

10   Does Hologenix owe you any additional

11   money today, other than the cure payment and the

12   money you have as a creditor in the bankruptcy?

13   A.   I don't think so.  I mean, maybe a

14   hundred or couple hundred dollars from an expense

15   report, but nothing beyond that.

16   Q.   Did you earn a bonus from Hologenix in

17   2023?

18   A.   No.

19   Q.   Did anyone earn a bonus at Hologenix in

20   2023?

21   A.   No.

22   Q.   Has Hologenix made any promise to you to

23   make nay future payment for bonus earned in 2023?

24   A.   No.

25   Q.   Has Hologenix made a promise to anyone

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 163

```
 1   to make a future payment for services rendered in

 2   2023?

 3        A.   No.

 4             MR. TEDFORD:  I think this is

 5   technically the one that originally was marked too

 6   before it was given to you, because it's

 7   double-sided.

 8             Okay.  There we go.

 9        (Whereupon, MET'S Exhibit number

10        6 was marked for identification

11        by the deposition officer and is

12        attached hereto.)

13   BY MS. SULLIVAN:

14        Q.   Showing you, Mr. Casden, what we marked

15   as Exhibit 6.

16             Do you recognize this document?

17        A.   Yes.

18        Q.   What do you recognize it to be?

19        A.   It's a trust agreement.

20        Q.   Okay.  Is this the trust agreement you

21   talked about earlier that your mother's family set

22   up?

23        A.   Yes, it's one of them.

24        Q.   Okay.  Who's Katherine Stuart Stibbs?

25        A.   She was my grandmother's mother.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1      Q.    So your great grandmother?

2      A.    Yes.

3      Q.    And who's Linda Pascotto?

4      A.    My mother.

5      Q.    And other than you and your brother

6   Graham, does your mother have any other

7   descendants?

8      A.    My grand- -- or her grandson, my son.

9      Q.    Other than that.

10     A.    No.

11     Q.    Does your brother have any children?

12     A.    No.

13     Q.    When did you become a beneficiary of

14   this trust?

15     A.    It's a great question.  I -- I'd have to

16   ask a lawyer what the -- there -- there seems to be

17   a pretty big gulf between the legal and the

18   practical.

19     Q.    From when -- when did you first receive

20   a distribution from this trust?

21     A.    You'd have to ask someone else that, but

22   I -- I know that the first distribution that I was

23   made aware of was, I believe, in 2008.

24     Q.    Did you have to make a request for that

25   distribution?

1     A.   Yes.

2     Q.   **Who did you make that request to?**

3     A.   To Alvaro.

4     Q.   **Earlier you said you had to make**

5   **requests for liquidity to Mr. Pascotto and then**

6   **request for distributions to someone else; correct?**

7     A.   That's correct.

8     Q.   **What -- what is a request for liquidity?**

9     A.   What is a request for liquidity?

10    Q.   **What's the difference between the**

11  **request for liquidity and a request for**

12  **distribution?**

13    A.   So I'll give you a long answer

14  unintentionally, but this is how I understand it.

15         So hypothetically, I have a trust that

16  has ten million dollars in it.  It's a -- the ten

17  million dollars, the assets are managed in this

18  hypothetical by Alvaro.

19         So if the trust advisor -- again, I'm

20  trying to make it as accurate as possible -- in

21  this case, Alan Leavitt, issues a letter of

22  direction to Northern Trust to execute, Northern

23  Trust can only comply with that request to the

24  extent that there's liquidity.

25         So if they go into the trust and the

1   assets of the trust in this hypothetical situation

2   are illiquid assets, real estate, private equity

3   investments, things that are not cash negotiable

4   instruments, then Northern Trust would say, "I'm

5   sorry, Mr. Leavitt.  We have your letter of

6   direction.  We're ready to act on it, but there is

7   insufficient liquidity in the trust.  Please have

8   your investment advisor raise the cash so that we

9   can honor the letter of direction."

10          I hope that helped.

11      **Q.    All right.  Have you ever received**

12  **notification from Northern Trust that there isn't**

13  **enough liquidity to honor a distribution?**

14      A.   I think they just -- I would not receive

15  that.  My trust advisor would.  And I -- I think

16  that issue just happened for the first time

17  recently.

18      **Q.    What is that situation?**

19      A.   That there is a request for distribution

20  and there was insufficient cash.

21      **Q.    No.  What happened recently?  What --**

22  **what request for distribution was there?**

23      A.   I think the trust advisor was trying to

24  pay the law firm representing him.  They had a

25  hundred thousand dollar retainer.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1      I don't -- I -- I don't really know.

2  But --

3          **Q.   Have you --**

4          A.   -- I -- I would never submit a letter --

5  I would never -- Mr. Leavitt would never submit a

6  letter of direction to the trust and I would not

7  ask Mr. Leavitt to have a conversation about a

8  distribution if there wasn't cash there.

9          I would first go to Mr. Pascotto and

10  say, "I want to have a letter of direction

11  submitted to the trust.  I need cash.  I need

12  liquidity made available."  And then we would have

13  that discussion.

14          **Q.   How did you communicate that with**

15  **Mr. Pascotto?**

16          A.   Usually by phone or in person.

17          **Q.   So before you send the letter**

18  **instruction to Mr. Leavitt, the trust advisor, you**

19  **first ask Mr. Pascotto if there's enough liquidity**

20  **to fund the distribution?**

21          A.   Not exactly.

22          I would log online and look at Northern

23  Trust and see what the assets are.  And if there

24  wasn't cash, I would get ahold of Alvaro and ask

25  him what his plan was for liquidity, and then I

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   would go from there.

2        Q.    When was the last time you logged into

3   the Northern Trust account?

4        A.    I don't -- I don't know.  It's --

5        Q.    Well, you received a distribution from

6   the trust before you filed for bankruptcy in

7   October 2023; correct?

8        A.    Yes.

9        Q.    Did you log in at that time?

10        A.    Yes.

11        Q.    Okay.  How much money was in the trust

12   at that time?

13        A.    Are you asking the value of the trust or

14   the cash?

15        Q.    I'm asking the cash.

16        A.    I think around 500,000.

17        Q.    What's the value of the trust?

18        A.    I think around fifteen million.

19        Q.    And the trust operates in a way where it

20   earns more money on an ongoing basis on itself;

21   correct?

22        A.    The trust operates at the discretion of

23   Mr. Pascotto.  So whatever investments he makes, if

24   they don't pan out, it loses money.

25        Q.    Okay.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 169

```
 1        A.   If they pan out, then they make money.
 2        Q.   Fine.  I just meant it's not a stagnant
 3   amount?
 4        A.   Correct.
 5        Q.   And Northern Trust is the trustee of
 6   your trust?
 7        A.   They're the custodian of the trust.
 8   Mr. Leavitt is my trustee.
 9        Q.   Okay.  How long has Northern Trust been
10   the custodian of the trust?
11        A.   I think Alvaro moved the trust there
12   around 2008.  2006.  Somewhere in that timeframe.
13        Q.   And who was your trust advisor before
14   Mr. Leavitt?
15        A.   His name is Ron Aling.
16        Q.   And who is that?
17        A.   He is a -- an estate lawyer that's been
18   my family's lawyer for a long time.
19        Q.   And what is your relationship with
20   Mr. Leavitt?
21        A.   He's my uncle and just a friend.
22        Q.   Is he your uncle on your mother's or
23   your father's side?
24        A.   My father's side.  He's my dad's
25   sister's husband.
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1       Q.    So Mr. Leavitt doesn't have a trust

2    funded by anything that your mother's family set

3    up; correct?

4       A.    That's correct.

5       Q.    Was your brother ever your trust

6    advisor?

7       A.    No.  I believe he's my trust protector.

8       Q.    What does that mean?

9       A.    I don't know.  You'd have to ask the

10   lawyer.

11      Q.    What's your understanding of what that

12   means?

13      A.    I -- I -- I don't really have a good

14   understanding of it.  It's just another layer of

15   administration.

16          MS. SULLIVAN:  Going to mark this as

17   Exhibit 7.

18          (Whereupon, MET's Exhibit Number

19          7 was marked for identification

20          by the deposition officer and is

21          attached hereto.)

22          MS. SULLIVAN:  We're probably going to

23   come back to this one more than once, so don't take

24   it away from him.

25   / / /

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1          (Whereupon, a discussion was held

2          off the record.)

3          (Whereupon, a recess was held

4          from 2:00 p.m. to 2:05 p.m.)

5     BY MS. SULLIVAN:

6          Q.   I'm just going to show you Exhibit 7,

7     Mr. Casden.

8               Do you recognize this document?

9          A.   Yes.

10         Q.   Okay.  And what do you recognize it to

11    be?

12         A.   Debtor's Notice of Opposition and

13    Opposition to Motion Objecting to Claims of

14    Exemption, Memorandum of Points and Authorities,

15    Declaration of Seth Casden, and Request For

16    Judicial Notice in Support Thereof.

17         Q.   You've reviewed this document before

18    today; correct?

19         A.   Yes.

20         Q.   Can you turn to page 126 of 135, please.

21              That may not be the right page.  Sorry.

22              102.  Sorry.

23         A.   Okay.

24         Q.   Do you recognize this document?

25         A.   Yes.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 172

```
 1      Q.   What is it?

 2      A.   It's the Seth Casden Resulting Trust.

 3      Q.   This is the trust we've been discussing

 4   today?

 5      A.   Yes.

 6      Q.   Okay.  And if you turn to page 121,

 7   please.

 8           MR. TEDFORD:  Are you --

 9   BY MS. SULLIVAN:

10      Q.   I'm sorry.  127 of 135.

11           MR. TEDFORD:  Yeah.  So I was going to

12   say I think you --

13           MS. SULLIVAN:  I'm going to use the

14   top --

15           MR. TEDFORD:  I think you used the

16   bottom number a moment ago.  So why don't you redo

17   your authentication.

18           MS. SULLIVAN:  Okay.  That's fair.

19   Earlier -- I'll just start over again.

20   BY MS. SULLIVAN:

21      Q.   Turning you to page 108 of 135 in

22   Exhibit 7, and that's -- that's the Seth Casden

23   Resulting Trust that we've been talking about

24   today; correct?

25      A.   The Northern Trust.
```

```
1          Q.    Yes.

2          A.    Yes.

3          Q.    And you turn to page 127 of 135, signed

4    the 8th day of July 2016 by Northern Trust;

5    correct?

6          A.    Yes.

7          Q.    And it's notarized on the next page;

8    correct?

9          A.    Yes.

10         Q.    Okay.

11         A.    Twelve pages, another -- yep.

12         Q.    And this is the operative trust

13   agreement; correct?

14         A.    Yes.

15         Q.    No -- there's been no further amendments

16   or anything since this document in Exhibit 7;

17   correct?

18         A.    Not to my knowledge.

19         Q.    If you turn to the next page, 129 of 135

20   in Exhibit 7, it shows that:

21               "Graham Casden hereby

22         acknowledges receipt of this

23         declaration and agrees to the terms

24         and conditions and hereby accepts

25         the position of advisor with
```

Page 174

1         respect to the trust."

2              Do you see that?

3         A.   Yes.

4         Q.   Does that refresh your memory about

5    whether Mr. -- your brother Graham had ever been a

6    trust advisor for you?

7         A.   Yes.  But I'm not sure what context that

8    was in.  But yes.  It's the next page.  Yeah.

9         Q.   If you turn to 132 of 135 in Exhibit 7,

10   has the Seth Casden Resulting Trust Instrument of

11   Appointment of Successor Advisor.

12              Do you see that?  132, 135.

13        A.   Yes.

14        Q.   Okay.  And this is -- turn to the next

15   page.

16              It says Mr. Leavitt replacing your

17   brother Graham as your trust advisor; correct?

18        A.   Yes.

19        Q.   Okay.  Why did Mr. Leavitt replace

20   Mr. -- your brother Graham as the trust advisor?

21        A.   As I recall, Ron Aling resigned as trust

22   advisor.  And so to bridge that gap between finding

23   another trust advisor and Ron Aling resigning, my

24   brother stepped in in that role until I was able to

25   have Mr. Leavitt take over.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 175

 1              It was never my intention to have my

 2   brother be my trust advisor for any length of time.

 3   It was a stopgap.  We weren't expecting Ron Aling

 4   to resign.

 5         Q.    Where is the trust corpus maintained?

 6   Is it in a bank in Delaware where Northern Trust is

 7   or somewhere else?

 8         A.    I believe it's in Delaware.

 9         Q.    And other than receiving K-1s, do you

10   receive any other trust-reporting documents?

11         A.    They used to send a CD on the monthly

12   statement, and I think now it's all electronic.

13         Q.    When you say "a CD," what do you mean?

14   Like, an actual CD with the monthly statement on

15   it?

16         A.    Yeah.

17         Q.    Was there anything else on the CD other

18   than the monthly statement?

19         A.    I don't believe so.

20         Q.    In addition to the K-1s, there's monthly

21   trust statements.

22              Is there anything else?

23         A.    Not to my knowledge.

24              MS. SULLIVAN:  Mark this Exhibit 8.

25   / / /

```
 1            (Whereupon, MET's Exhibit Number

 2            8 was marked for identification

 3            by the deposition officer and is

 4            attached hereto.)

 5     BY MS. SULLIVAN:

 6         Q.    Showing you, Mr. Casden, what we've

 7     marked as Exhibit 8.

 8            Do you recognize this document?

 9         A.    Yes.

10         Q.    What do you recognize it to be?

11         A.    It's the petition for bankruptcy.

12         Q.    For yourself; right?

13         A.    Yes.

14         Q.    Includes the schedules we filed with

15     your petition; correct?

16         A.    It does.

17         Q.    Did you review these documents before

18     you signed and filed them with the court?

19         A.    Yes.

20         Q.    And these were also signed under the

21     penalty of perjury that the contents were true and

22     accurate; correct?

23         A.    Yes.

24         Q.    If you can turn to page six of seventeen

25     in Exhibit 8, please.  It's part six in question
```

 1    16(B).

 2              Do you see that?

 3         A.   16(B):

 4              "Are your debts primarily

 5         business debts?"

 6         Q.   Yeah.

 7         A.   Yes.

 8         Q.   And you checked "Yes."

 9              Why did you check "Yes"?

10         A.   Because of the claim from -- awarded to

11    MET.

12         Q.   Why do you consider that a business

13    debt?

14         A.   Because it was in my capacity as CEO of

15    the company that I incurred that liability.

16         Q.   If you could turn to page eight of

17    seventeen of Exhibit 8.

18              "For individual Chapter 11

19         cases, list of creditors who have

20         the twenty largest unsecured claims

21         against you and are not insiders."

22              Do you see that?

23         A.   Yes.

24         Q.   And did you review this list of

25    creditors before you filed it?

Page 178

```
 1        A.    Yes.

 2        Q.    And it was correct?

 3        A.    To the best of my knowledge.

 4        Q.    Okay.  And the first creditor is

 5   Multiple Energy Technologies; correct?

 6        A.    Yes.

 7        Q.    And that's for the judgment we were

 8   talking about earlier that was issued in June of

 9   2023 -- I mean in September of 2023; correct?

10        A.    Yes.

11        Q.    And you checked off of the debt for

12   Multiple Energy Technologies is contingent;

13   correct?

14        A.    Yes.

15        Q.    Why did you check off that it's

16   contingent?

17        A.    On advice of counsel.

18        Q.    And you also checked that the debt owed

19   to Multiple Energy Technologies is disputed.

20              Why did you check that?

21        A.    On advice of counsel.

22        Q.    Then the second debtor is Aria Resort

23   and Casino.

24              Do you see that?

25        A.    Yes.
```

1      Q.   And the total amount of that debt is

2   300,000 dollars; correct?

3      A.   Yes.

4      Q.   Do you still owe Aria 300,000 dollars?

5      A.   I haven't made any payments against that

6   debt in bankruptcy.

7      Q.   Has anyone made any payments to Aria on

8   your behalf?

9      A.   Not to my knowledge.

10      Q.   And then if we turn to the next page,

11   page nine of seventeen in Exhibit 8, the next

12   creditor is Alan Terry Leavitt.

13           Do you see that?

14      A.   Yes.

15      Q.   That's your uncle; correct?

16      A.   Yes.

17      Q.   And nature of the claim is a loan in the

18   amount of hundred thousand dollars?

19      A.   Yes.

20      Q.   What was the loan for?

21      A.   The loan was to -- big part of it was to

22   pay Scott's firm the 50,000 dollars, and part of it

23   was to put into the company.

24           I put 50,000 dollars to help cover

25   payroll.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 180

1     Q.   When did -- do you still owe the 100,000

2  dollars to Mr. Leavitt?

3     A.   Yes.

4     Q.   And the fourth creditor is Juan Antonio

5  Devoto?

6     A.   Yes.

7     Q.   Who is Mr. Devoto?

8     A.   He's a friend.

9     Q.   It says you have a personal loan and you

10  owe 45,581 dollars and 57 cents; correct?

11     A.   Yes.

12     Q.   Do you still owe Mr. Devoto that money

13  today?

14     A.   Yes.

15     Q.   How long have you been friends with

16  Mr. Devoto?

17     A.   I met him in 2001 or 2002 and we became

18  friends a few years after that.

19     Q.   And then the fifth creditor on page nine

20  of seventeen, Exhibit 8, is Golden1 Credit Union.

21        And that's for your car; correct?

22     A.   Yes.

23     Q.   And that's a lease?

24     A.   Yes.

25     Q.   And what's the monthly lease payment?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1       A.   Around 1,100 dollars.

2            Q.   And the sixth creditor is Goldman Sachs.

3   Says the nature of the claim is credit card,

4   457.84.

5                 You see that?

6       A.   Yes.

7            Q.   Is that a credit card in your own name?

8       A.   It was.  It was an Apple card.

9            Q.   Is it closed now?

10      A.   Yes.

11           Q.   Do you still owe the 457 dollars and 84

12  cents?

13      A.   To the extent that bankruptcy approves

14  it.

15           Q.   And then the seventh creditor on page

16  ten of seventeen in Exhibit 8 is American Express.

17                Do you see that?

18      A.   Yes.

19           Q.   That's also a credit card; correct?

20      A.   Yes.

21           Q.   Is that a credit card in your own name?

22      A.   It was.

23           Q.   Is it closed now?

24      A.   All of the credit cards were closed when

25  I filed bankruptcy.

Page 182

1      Q.   Who closed them?  You or the credit card

2   companies?

3      A.   The credit card companies.

4      Q.   And then we have Chase Bank, another

5   credit card.

6           Well, was -- the American Express was in

7   your own name; correct?

8      A.   Yes.

9      Q.   And the Chase credit card that's listed

10  on number eight is in your own name too; correct?

11     A.   Yes.

12     Q.   And the same for the Discover card?

13     A.   Yes.

14     Q.   And you had a Chase Bank Amazon credit

15  card as well?

16     A.   Yes.

17     Q.   Was that in your own name?

18     A.   Yes.

19          MS. SULLIVAN:  Mark this as Exhibit 9,

20  please.

21        (Whereupon, MET's Exhibit Number

22        9 was marked for identification

23        by the deposition officer and is

24        attached hereto.)

25   / / /

 1   BY MS. SULLIVAN:

 2        Q.   Let me show you, Mr. Casden, what we

 3   marked as Exhibit 9.

 4             Do you recognize this document?

 5        A.   Yes.

 6        Q.   What do you recognize it to be?

 7        A.   Promissory note with Alan Leavitt.

 8        Q.   Okay.  This is the 100,000 dollar debt

 9   listed on your schedules; correct?

10        A.   Yes.

11        Q.   Okay.  And the promissory note is dated

12   September 1st, 2023; correct?

13        A.   Yes.

14        Q.   Okay.  Is that the day the loan was

15   made?

16        A.   That -- you know, they're around that

17   day.

18        Q.   When did you ask Mr. Leavitt for the

19   loan?

20        A.   Around that time.

21        Q.   Has Mr. Leavitt called in payment on the

22   note?

23        A.   You're asking if he's asked to be

24   repaid?

25        Q.   Yeah.  Called in the note.

Page 184

1      A.   No.  I -- no.

2          Q.   The -- this Alan Terry Leavitt is the

3    same person we spoke about earlier who's your uncle

4    and trust advisor; correct?

5      A.   Yes.

6          Q.   And this says on the first page, page

7    one of four, and the second page, page two of four.

8              Do you know what pages three and four

9    are?

10     A.   It's just a typo.  There is no page

11   three or four.

12             MS. SULLIVAN:  Mark this Exhibit 10,

13   please.

14         (Whereupon, MET's Exhibit Number

15         10 was marked for identification

16         by the deposition officer and is

17         attached hereto.)

18             MS. SULLIVAN:  I'm sorry.  I don't have

19   another copy.  I don't know why, Kurt.

20             You can have mine when I'm done with it.

21   It just has my --

22             MR. RAMLO:  Okay.

23             MS. SULLIVAN:  -- notes on it.

24   BY MS. SULLIVAN:

25         Q.   Showing what you we marked as Exhibit

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 185

```
 1    10.

 2              Do you recognize --

 3              MR. TEDFORD:  You gave me two copies.

 4              MS. SULLIVAN:  Oh, is that why?

 5              Thank you.

 6    BY MS. SULLIVAN:

 7         Q.   Do you recognize what we've marked as

 8    Exhibit 10, Mr. Casden?

 9         A.   Yes.

10         Q.   And what is that?

11         A.   It's a promissory note with Mr. Devoto.

12         Q.   Okay.  It's dated November 12th, 2019;

13    correct?

14         A.   Yes.

15         Q.   Is that in or around the time that you

16    received the money from Mr. Devoto?

17         A.   Yes.

18         Q.   Okay.  It's a loan total of 300,000

19    dollars; correct?

20         A.   Yes.

21         Q.   When did you ask Mr. Devoto to loan you

22    300,000 dollars?

23         A.   Around that time.

24         Q.   How did you ask him for the loan?

25         A.   I think it would have come up in just
```

Page 186

1   discussing the company and what was going on at the

2   time.

3        Q.   By "company," you mean Hologenix?

4        A.   Yes.

5        Q.   And what was going on in around November

6   12, 2019?

7        A.   We were in the middle of preparing for

8   trial in the MET v. Hologenix case.

9        Q.   What did you need the 300,000 dollars

10  from Mr. Devoto for?

11       A.   For the operations of the company.

12       Q.   What did you do with the 300,000 dollars

13  after you received it?

14       A.   Deposited it into the company.

15       Q.   The company guaranteed the loan?

16       A.   No.

17       Q.   Did you ask Mr. Devoto to invest 300,000

18  dollars into the company, rather than loan you the

19  money?

20       A.   No.

21       Q.   Did you ask Mr. Devoto to have the loan

22  be to Hologenix instead of you personally?

23       A.   No.

24       Q.   Did you receive anything from Hologenix

25  in exchange for -- in placing this 300,000 dollars

1     into its bank account?

2          A.   Yes.

3          Q.   What did you receive?

4          A.   It's a convertible promissory note.

5          Q.   What's the amount of the convertible

6     promissory note?

7          A.   I would refer you to the Hologenix

8     bankruptcy case.  I think it's around 1.7 million.

9          Q.   And that 1.7 million includes this

10    300,000 dollars?

11         A.   Correct.

12         Q.   And was that promissory note ever

13    converted?

14         A.   No.

15         Q.   Do you have a claim in Hologenix's

16    bankruptcy for that convertible promissory note?

17         A.   Yes.

18         Q.   What were the terms of the convertible

19    promissory note?

20         A.   I'd have to review the note.

21         Q.   Has Mr. Devoto called in the note?

22         A.   I started paying him back a couple years

23    ago.  That's why the outstanding balance is what it

24    is.

25         Q.   How did you pay him back?

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1       A.   Either through cash or making payments

2   on his behalf.

3       Q.   When you say "making payments on his

4   behalf," what do you mean?

5       A.   If he had a large item that he had to

6   pay for, I'd put it on my credit card and pay it

7   and then credit that against the note.

8            MS. SULLIVAN:  Mark this as Exhibit 11,

9   please.

10           (Whereupon, MET's Exhibit Number

11           11 was marked for identification

12           by the deposition officer and is

13           attached hereto.)

14  BY MS. SULLIVAN:

15       Q.   Showing you what we marked as Exhibit --

16           THE COURT REPORTER:  11.

17  BY MS. SULLIVAN:

18       Q.   -- 11.

19           Do you recognize this document?

20       A.   Yes.

21       Q.   What is it?

22       A.   It's a payment -- repayment history for

23  the 300,000 dollar loan.

24       Q.   You made all those payments from your

25  own personal account?

1          A.   Yes.

2          Q.   If you look at the top of Exhibit 11,

3   Casden 142, says 11-12-19, loan's dated; correct?

4          A.   Yes.

5          Q.   Then 1-21-20, loan into Hologenix,

6   300,000; correct?

7          A.   Yes.

8          Q.   So the money was deposited into

9   Hologenix's account on July -- sorry -- January

10  21st, 2020?

11         A.   Correct.

12         Q.   Okay.  And you made your first repayment

13  on October 25th, 2022?

14         A.   Correct.

15         Q.   And the most recent payment was March

16  5th, 2023; correct?

17         A.   No.

18         Q.   What's the --

19              MR. TEDFORD:  You said the wrong date.

20  BY MS. SULLIVAN:

21         Q.   Was the most recent payment October

22  25th, 2023?

23         A.   Yes.

24         Q.   And then on the -- on the side, it says

25  "via."

Page 190

```
 1                 Do you see that?

 2        A.    Yes.

 3        Q.    Sometimes it says "wire"; sometimes it

 4   says "AmEx."

 5                 What's -- what's the difference?

 6        A.    Wire would be a bank wire and AmEx is on

 7   my credit card.

 8        Q.    It says that the total repaid was

 9   254,418 dollars; correct?

10        A.    Yes.

11        Q.    And that leaves the balance that's

12   listed on your initial schedules of 45,582;

13   correct?

14        A.    Yes.

15        Q.    And what is the typed writing in the

16   middle of the page?  Do you know?

17        A.    Should have been deleted.  I didn't know

18   that that was on that.

19        Q.    What is it?

20        A.    That's -- those look like copies from my

21   bank register.

22        Q.    Copies of what?

23        A.    Transactions.

24        Q.    Related to Mr. Devoto or something else?

25        A.    I -- I don't -- I don't know.  Like I
```

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Sauer 171 of 462   Page 210 of 1079
**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 191

1    said, it should have been deleted.

2         **Q.   Why would it be on this page?**

3         A.   Because I was trying to calculate

4    payments I had made to him.  But I don't -- I don't

5    know.  There's -- I guess I deleted the other ones

6    and not those too.

7         **Q.   Is there any specific operation costs**

8    **that the 300,000 dollars from Mr. Devoto paid for**

9    **Hologenix?**

10        A.   Well, helped pay our legal bills heading

11   into trial and helped about the operations,

12   payroll, and all the usual use of funds.

13             MS. SULLIVAN:  This is Exhibit --

14             THE COURT REPORTER:  12.

15             (Whereupon, MET's Exhibit Number

16             12 was marked for identification

17             by the deposition officer and is

18             attached hereto.)

19   BY MS. SULLIVAN:

20        **Q.   Showing you, Mr. Casden, what we marked**

21   **as Exhibit 12.**

22             **Do you recognize this document?**

23        A.   Yes.

24        **Q.   What is it?**

25        A.   It's an e-mail from the bookkeeper to

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 192

```
 1    the owners -- well, it's a chain, I guess.  This --

 2    it's a capital call for Pine Rock.

 3         Q.   This is -- Exhibit 12 is Bates stamped

 4    L -- LEAVITT 112 to 113.

 5              And it was a capital call for what?

 6         A.   For Pine Rock.

 7         Q.   What's Pine Rock?

 8         A.   A home.

 9         Q.   Where is the home?

10         A.   In Nevada.

11         Q.   There's a -- there's three trusts listed

12    there.

13              Do you see that?

14              Or four trusts listed.

15              Do you see that?

16         A.   Yes.

17         Q.   Are those the owners of the property?

18         A.   Yes.

19         Q.   I should say the first one says Reffus

20    and Sarah Resulting Trust.

21              THE COURT REPORTER:  I'm sorry.  Says

22    what?

23              MS. SULLIVAN:  Reffus, R-E-F-F-U-S.

24    BY MS. SULLIVAN:

25         Q.   Do you see that?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    A.    Yes.

 2    Q.    Says 29.2 percent each.

 3          Is that two trusts or one trust?

 4    A.    Two.

 5    Q.    And who is Reffus and Sarah?

 6    A.    They're different family members.

 7    Q.    On your mother's side?

 8    A.    Yes.

 9    Q.    And then there's the Greg Resulting

10   Trust and Rachel Resulting Trust, 14.55 percent

11   each.

12          Are those one trust or two trusts?

13    A.    Two.

14    Q.    Who are Greg and Rachel?

15    A.    Cousins.

16    Q.    On your mother's side?

17    A.    Yes.

18    Q.    And then there's a Seth Resulting Trust.

19          That's you; correct?

20    A.    Yes.

21    Q.    At 12.5 percent?

22    A.    Yes.

23    Q.    And then there's certain monetary

24   amounts listed below for each trust that -- which I

25   assume is the amount of each respective capital
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   call; correct?

2       A.   Yes.

3       Q.   So your -- your ownership was -- capital

4   call was 25,000; correct?

5       A.   Yes.

6       Q.   Okay.  And did you make that payment?

7       A.   My understanding, it's been made.  I did

8   not make it.

9       Q.   And this capital call was on February

10  3rd, 2024?

11      A.   Yes.

12      Q.   Why are you -- what do you base your

13  understanding that it's been paid for?

14      A.   I had asked Mr. Leavitt to authorize the

15  trust to pay the capital call, and I believe that

16  that was done.

17      Q.   When did you first become an owner of

18  Pine Rock?

19          MR. TEDFORD:  I believe that is --

20  assumes facts not in evidence.

21  BY MS. SULLIVAN:

22      Q.   When did your trust become an owner of

23  Pine Rock?

24          MR. TEDFORD:  There you go.

25          Thanks.

Page 195

```
 1                THE WITNESS:  Maybe fifteen years ago.

 2   BY MS. SULLIVAN:

 3        Q.   Was it always owned by the trust?

 4        A.   No.

 5        Q.   When did it change from -- was it owned

 6   by you personally at any point?

 7        A.   No.

 8        Q.   When you became an owner, was it always

 9   owned by you through your trust?

10        A.   My ownership has always been in --

11   through the trust.

12                Is that your question?

13        Q.   Yes.

14                Going to mark this as Exhibit 13.

15             (Whereupon, MET'S Exhibit number

16             13 was marked for identification

17             by the deposition officer and is

18             attached hereto.)

19   BY MS. SULLIVAN:

20        Q.   We're marking as Exhibit 13 Leavitt 130

21   to 133.

22             Do you recognize this document?

23        A.   Yes.

24        Q.   What do you recognize it to be?

25        A.   This is an e-mail from Mr. Levitt's
```

Page 196

1  lawyer to me.

2      Q.   So Jocelyn Borowsky is Mr. Levitt's

3  lawyer?

4      A.   Yes.

5      Q.   And it's referencing a capital call for

6  SDV Digital Asset Fund due March 23rd, 2024;

7  correct?

8      A.   Yes.

9      Q.   This e-mail chain is in and around March

10  4th, 2024; correct?

11      A.   Yes.

12      Q.   What is SDV Digital Asset Fund?

13      A.   It's a private equity investment that I

14  had a 300,000 dollar commitment to and 200,000 had

15  been paid.  There's a balance of 100,000,

16  approximately.

17      Q.   When did you invest the 200,000 into the

18  private investment SDV Digital Asset Fund?

19      A.   It was done in two tranches, once when I

20  made the original commitment; and then on the first

21  anniversary, the second amount was due.

22          And then on the third anniversary -- I

23  guess the second anniversary, the third

24  installment's due.

25      Q.   When did you make the first tranche

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   payment?

2        A.   It would have been around January of

3   2022.

4        **Q.   Did you personally invest money or did**

5   **you have the trust invest money on your behalf?**

6        A.   I personally invested in this.

7        **Q.   Were you able to make the capital**

8   **payment in March of 2024?**

9        A.   No.

10       **Q.   Why not?**

11       A.   My understanding is I can't -- on advice

12   of counsel.

13       **Q.   Which counsel advised you?**

14       A.   My bankruptcy counsel.

15       **Q.   Did you have any discussions with**

16   **Ms. Borowsky about having the trust make the**

17   **payment for you while you were in bankruptcy?**

18       A.   That's what this e-mail was for.

19       **Q.   Did you have any phone calls with**

20   **Ms. Borowsky?**

21       A.   I've had a couple of phone calls with

22   her.

23       **Q.   What did you and Ms. Borowsky discuss on**

24   **those calls?**

25       A.   I think the first call was just to be

1   introduced to her and understand what her role was

2   going to be.

3           And the second call was to understand my

4   rights a little bit better.  But I learned that I

5   have to get my own trust lawyer, so I'm in the

6   process of doing that.

7       Q.    What -- what did you and Ms. Borowsky

8   discuss about your rights?

9       A.    About?

10      Q.    Your rights.

11      A.    That she can't represent them.

12      Q.    Did she give you any response to your

13  question about the trust continuing to make

14  investments while you're in personal bankruptcy?

15      A.    We did talk about that.

16      Q.    What did she tell you?

17      A.    She said she didn't have an answer.  She

18  realizes this is going to go on possibly a very

19  long time and that we'll have to come back to that

20  once I have a lawyer that she can talk to.

21      Q.    Have you hired a lawyer?

22      A.    I found a lawyer that's agreed to

23  represent me, but we have to, as you know, submit

24  an employment app and get that approved by the

25  court.  So I think that's being done this week or

Page 199

1  next week.

2       Q.   Did you have a discussion with -- with

3  Mr. Leavitt about whether the trust can continue to

4  make investments while you're in personal

5  bankruptcy?

6       A.   I mean, nothing beyond him telling me

7  that his lawyer can't allow that or doesn't allow

8  that or advises against that, and I think it's best

9  for him at this point if we just have lawyers talk

10  to each other.

11       Q.   Did you have -- excuse me.

12            Did you have any conversations with

13  Mr. Pascotto about the trust continuing to make

14  investments on your behalf while you were in

15  bankruptcy?

16       A.   I made him aware of this commitment that

17  I had made and I asked him to help, you know, fund

18  it one -- one way or another, and he declined.

19       Q.   How did you make that request?

20       A.   When I had the mediation with him and

21  Lenny.

22       Q.   Was there any writings accompanying that

23  request?

24       A.   I don't think so.  He's a lawyer, so I

25  think he called me and said he wasn't going to do

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1   it or left me a message or something.

 2        Q.   What happened to your investment, if

 3   anything, in SDV Digital Asset Fund when you

 4   couldn't make the capital call payment?

 5        A.   I think it's unclear what's going to

 6   happen.  I talked to one of the managing partners,

 7   I think is his title, and he's talking to his

 8   lawyers to understand what -- what happens now.

 9        Q.   Did you have any e-mail communication

10   with SDV Capital about the situation?

11        A.   No.

12        Q.   Did you have any text messages with SDV

13   Capital about the situation?

14        A.   No.  I just -- I e-mailed the managing

15   director and asked to have a phone call and talk to

16   him about my situation as of bankruptcy and I

17   wouldn't be able to make the third commitment.

18        Q.   What does S- -- what is the SDV Digital

19   Asset Fund?

20        A.   It's a private equity fund that's

21   focused on digital investments.

22        Q.   Do they invest in -- is your 300,000

23   dollars into one company or something else?

24        A.   I think it's maybe twenty companies.

25        Q.   Did you talk to anyone else about

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 201

 1   assisting you in funding that hundred thousand

 2   dollar capital call?

 3       A.   I don't believe so.

 4            MS. SULLIVAN:  We'll mark this as

 5   Exhibit 14, please.

 6            (Whereupon, MET's Exhibit Number

 7            14 was marked for identification

 8            by the deposition officer and is

 9            attached hereto.)

10   BY MS. SULLIVAN:

11       Q.   I'm showing you, Mr. Casden, what we

12   marked as Exhibit 13, Leavitt 134.

13            Do you recognize this document?

14       A.   No.

15       Q.   Showing you what we marked as Exhibit

16   14.

17            Right?

18            THE COURT REPORTER:  That's correct.

19   BY MS. SULLIVAN:

20       Q.   Who's Natalie Schiavone?

21       A.   She is a trust administrator at Northern

22   Trust.

23       Q.   And this is an e-mail between

24   Mr. Leavitt and Ms. Schiavone dated April 26, 2024

25   where Mr. Leavitt tells her:

1              "When the time comes and I

2         give the okay, the trust has to pay

3         the twenty-five percent" --

4              THE COURT REPORTER:  Sorry?

5              "The trust has to pay" --

6    BY MS. SULLIVAN:

7         Q.   (Reading):

8              -- "the trust has to pay the

9         twenty-five percent of Seth's

10        expenses for his share of the

11        property."

12             Is it your understanding that would be

13   referring to Pine Rock?  Or is there another

14   property that you have twenty-five percent share of

15   the expenses?

16        A.   It says "for Pine Rock" in the subject.

17   Yeah, this is for Pine Rock.

18        Q.   And then he copies in a statement from

19   Jocelyn, who I believe is Ms. Borowsky that we were

20   just discussing, addressed to you.

21             It says:

22             "Seth, my advice to Terry

23        would be to refrain from making any

24        discretionary distributions to you

25        at this point."

 1              Do you see that?

 2      A.   Yes.

 3      Q.   Okay.  Do you recall receiving that

 4   e-mail from Ms. Borowsky?

 5      A.   Vaguely.

 6      Q.   Did you have any discussions with

 7   Ms. Borowsky about that advice?

 8      A.   No.

 9           Sorry.  You asked me how did I find out

10   that Alvaro declined to make the capital call

11   investment?  I think that was your question.

12           You said:  Did he send you an e-mail?

13           I found out through my attorney.  His

14   attorney contacted my attorney and told me when

15   he'd be doing that.

16      Q.   Contacted your bankruptcy attorney or a

17   different --

18      A.   Yes.

19           I don't want to be going to sleep

20   tonight remembering things that I forgot.

21      Q.   Do you still have a copy of the e-mail

22   with Ms. Borowsky where she gave this advice?

23      A.   I mean, I haven't deleted anything.  So

24   I think just as a general comment, I -- I thought

25   that these e-mails were attorney-client privileged,

1   so that's why they weren't produced.

2          And then it was explained to me that I

3   don't have any privilege with her.

4          **Q.   Uh-huh.**

5          A.   So I sent the two that I had, the two

6   chains.  So it should be on that chain.

7          MS. SULLIVAN:  Mark this as Exhibit 15,

8   please.

9          (Whereupon, MET's Exhibit Number

10          15 was marked for identification

11          by the deposition officer and is

12          attached hereto.)

13   BY MS. SULLIVAN:

14          **Q.   Showing you what we marked as Exhibit**

15   **15, Leavitt 169 to 171.**

16          **Do you recognize this document?**

17          A.   It's few years old, but okay.

18          **Q.   Do you recognize it?**

19          A.   Yes.

20          **Q.   What is CPNG?**

21          A.   It's a publicly traded company.

22          **Q.   What is your relationship, if anything,**

23   **with CPNG?**

24          A.   Alvaro made an investment in that

25   company, and when it went public we were issued

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 205

```
 1   shares.
 2        Q.   Okay.  Are you still a shareholder of
 3   CPNG?
 4        A.   No.
 5        Q.   When did you stop being a shareholder of
 6   CPNG?
 7        A.   October of last year.
 8        Q.   Of 2023?
 9        A.   Yes.
10        Q.   And what did you do with those shares?
11        A.   Deposited them into my checking account,
12   the proceeds from the shares.
13        Q.   What was the proceed for the share --
14   from the share?
15        A.   I want to say it was around 300,000.
16        Q.   Did you sell the shares?
17        A.   Yes.
18        Q.   Why did you do that?
19        A.   I needed money to pay the retainers for
20   the law firms and I had an inaccurate understanding
21   of bankruptcy.  I thought all of my brokerage
22   accounts had to be closed.
23        Q.   What do you mean by that?
24        A.   Just that.  I thought that brokerage
25   accounts had to be liquidated as part of a
```

Page 206

```
 1   bankruptcy filing.
 2        Q.   Do you mean that if you didn't have that
 3   misunderstanding, you wouldn't have cashed in these
 4   shares and you --
 5        (Unreportable cross-talk.)
 6             THE WITNESS:  That's correct.
 7   BY MS. SULLIVAN:
 8        Q.   -- your brokerage account?
 9        A.   That's correct.
10             Sorry for not letting you finish your
11   question.
12             THE COURT REPORTER:  It wasn't complete
13   on the record, if you wanted to restate it.
14   BY MS. SULLIVAN:
15        Q.   Okay.  If you understood that you didn't
16   have to close your brokerage account, you wouldn't
17   have cashed in the shares of CPNG?
18        A.   That's correct.
19             MS. SULLIVAN:  Can you mark this as
20   Exhibit 16, please.
21        (Whereupon, MET's Exhibit Number
22        16 was marked for identification
23        by the deposition officer and is
24        attached hereto.)
25   / / /
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 207

```
 1    BY MS. SULLIVAN:

 2         Q.   Showing you, Mr. Casden, what we marked

 3    as Exhibit 16, Leavitt 215, 218.

 4              Do you recognize this document?

 5         A.   Yes.

 6         Q.   What is this document?

 7         A.   It's an e-mail between myself and my

 8    representative at Northern Trust at the time,

 9    Nai-te.

10         Q.   On February 2nd, 2022; correct?

11         A.   Yes.

12         Q.   The subject line says:

13              "Re:  670K promissory note

14         extension."

15         A.   Yes.

16         Q.   Do you see that?

17         A.   Yes.

18         Q.   What -- what is that referring to?

19         A.   That was a note that the trust -- a loan

20    that the trust had made to me as an individual.

21              MR. TEDFORD:  While you're doing that,

22    may I go take a break?

23              MS. SULLIVAN:  Oh, yes.  Sorry.

24              Thank you.

25              MR. TEDFORD:  That's fine.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 208

```
 1              THE COURT REPORTER:  Off the record.

 2         (Whereupon, a recess was held

 3         from 2:45 p.m. to 2:48 p.m.)

 4   BY MS. SULLIVAN:

 5         Q.   When did the trust make a loan to you

 6   for 670,000 dollars?

 7         A.   I don't recall.  It was some years

 8   before.  This e-mail is an extension for that loan,

 9   so...

10         Q.   Do you still owe any money on that loan

11   today?

12         A.   I believe the loan is still outstanding.

13         Q.   Do you have a copy of the note?

14         A.   Somewhere.  I would think the trust has

15   a copy.

16         Q.   Do you still pay interest on the note?

17         A.   It would be paid annually.  I don't know

18   the last time it was paid.

19         Q.   Who pays the interest on it?

20         A.   I would.

21         Q.   When was the last -- did you pay in

22   2023?

23         A.   I don't recall.

24         Q.   You did have to sign a -- a note

25   associated with the 670,000 dollar loan; correct?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 209

```
 1       A.    Yes.

 2       Q.    This seems to be referencing that it was

 3   replacing an old note.

 4             Did you sign a second note for it?

 5       A.    I think that's an extension.

 6       Q.    Okay.  But you signed an extension, I

 7   mean?

 8       A.    That's my understanding.

 9       Q.    And what were the payment terms on the

10   note?

11       A.    I don't recall, but the interest was due

12   annually.

13       Q.    What did you need that 670,000 dollar

14   loan for?

15       A.    I think it was a combination of a couple

16   of loans that got rolled together.  It would have

17   been money that went into Hologenix.

18       Q.    Then did you receive anything from

19   Hologenix in exchange for that 670,000 dollar

20   investment?

21       A.    I would have either received equity or

22   convertible note.

23       Q.    Do you know which one it was?

24       A.    It could be a combination.  I --

25       Q.    What would you have to look at to
```

1   refresh your memory?

2          A.   Of how this was invested in Hologenix?

3          **Q.   Of what you received in exchange -- from**

4   **Hologenix in exchange for making the investment.**

5          A.   So I've made over fifty investments in

6   Hologenix since it's been founded, so I -- I would

7   have to do a lot of digging to figure out what the

8   timing of this was and what the corresponding

9   investments in Hologenix was and how -- what

10  benefit I received.

11          I could tell you I've never put money

12  into the company without some type of agreement.

13          **Q.   What agreement did you have with**

14  **Hologenix for the investment you made from July to**

15  **October of 2023?**

16          A.   There's a term sheet which we produced

17  in discovery.

18          **Q.   Anything other than the term sheet?**

19          A.   No.

20          MS. SULLIVAN:   Would you mark this,

21  please.

22          THE COURT REPORTER:   Okay.

23          MS. SULLIVAN:   18.

24          No.   17.

25  / / /

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 211

```
 1            (Whereupon, MET's Exhibit Number

 2            17 was marked for identification

 3            by the deposition officer and is

 4            attached hereto.)

 5     BY MS. SULLIVAN:

 6            Q.   Okay.  Showing you, Mr. Casden, what we

 7     marked as Exhibit 17.

 8                 Do you recognize this document?

 9            A.   Yes.

10            Q.   What do you recognize it to be?

11            A.   It is a Declaration Concerning Debtor's

12     Amended Schedules.

13            Q.   This was in your personal bankruptcy;

14     correct?

15            A.   Yes.

16            Q.   And it's dated and signed December 18,

17     2023?

18            A.   Yes.

19            Q.   That's your signature?

20            A.   Yes.

21            Q.   And, again, this was submitted under the

22     penalty of perjury that the contents are true and

23     accurate?

24            A.   Yes.

25            Q.   If you turn to the next page in Exhibit
```

1    17, it says:

2              "Schedule E-dash-F Creditors

3         Who Have Unsecured Claims."

4              Do you see that?

5    A.   Yes.

6    Q.   Okay.  And it lists Armanino, LLP --

7              THE COURT REPORTER:  I'm sorry?

8              MS. SULLIVAN:  A-R-M-A-N-I-N-O, LLP.

9    BY MS. SULLIVAN:

10   Q.   -- for 11,786 dollars and 58 cents.

11   A.   Yes.

12   Q.   And it says that that was incurred in

13   October of 2023.

14              What does that represent?

15   A.   Preparing my personal tax return.

16   Q.   Is there a reason that debt wasn't

17   included on your original schedules?

18   A.   I believe they hadn't given me the bill

19   yet.

20   Q.   How long have you used Armanino for your

21   taxes?

22   A.   Well, I used a firm that Armanino

23   purchased and I got folded into that.  So I think

24   Armanino came on maybe five, six, seven -- ten

25   years ago.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 213

```
 1              THE COURT REPORTER:  Did you say you got
 2    "filed" into that?
 3              THE WITNESS:  Folded.
 4              THE COURT REPORTER:  Folded.
 5              Thank you.
 6    BY MS. SULLIVAN:
 7         Q.   If you turn to the next page, three of
 8    five in Exhibit 17, it lists Northern Trust Company
 9    of Delaware.
10              You see that?
11         A.   Yes.
12         Q.   That's the -- I don't remember what you
13    called them -- the custodian of your -- the Seth
14    Casden Resulting Trust; correct?
15         A.   Yes.
16         Q.   Okay.  And it lists 2,070,000 dollars as
17    the amount of the claim; correct?
18         A.   Yes.
19         Q.   And then it states when the debt was
20    incurred was April 4th, 2013 and August 1st, 2015;
21    correct?
22         A.   Yes.
23         Q.   Why wasn't this debt included on your
24    original schedules?
25         A.   I just think there's a lot of moving
```

```
 1   parts and it was an oversight.
 2        Q.   What -- what portion of the 2,070,000
 3   was incurred in April of 2013?
 4        A.   I believe 1.4 million was April of 2013
 5   and the 670 was August of 2015.
 6        Q.   So this two million dollars includes the
 7   170,000 note we were just discussing?
 8        A.   Yes.  It's --
 9        (Unreportable cross-talk.)
10   BY MS. SULLIVAN:
11        Q.   -- still out today?
12        A.   Yes.
13        Q.   Do you have any documentation with the
14   trust for the remaining amount of the 2,070,000
15   that's listed here?
16        A.   There should be another loan agreement
17   for the 1.4 million, yes.
18        Q.   And what did you do with the 1.4 million
19   that was loaned from the trust?
20        A.   That was used to pay off the loan
21   against the Lincoln property at the time.
22        Q.   You mean the original mortgage?
23        A.   I don't think it was the original one.
24        Q.   So in or around April of 2013, you paid
25   off any money owed on a mortgage related to the
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 215

```
 1   townhouse?

 2        A.   Correct.

 3        Q.   And the 670,000 was deposited into

 4   Hologenix; correct?

 5        A.   Yes.  I don't know if all of it.  Like I

 6   said, I'm not trusting my memory from ten years

 7   ago.  But yes.

 8        Q.   Then if you look down at part four,

 9   under 6(A), it says "Domestic Support Obligations,"

10   and you list zero; correct?

11        A.   Yes.

12        Q.   Was that a true statement?

13        A.   There's no legal obligation.  Correct.

14   Yes.

15             MS. SULLIVAN:  Mark this as Exhibit

16   Number 18.

17             (Whereupon, MET's Exhibit Number

18             18 was marked for identification

19             by the deposition officer and is

20             attached hereto.)

21   BY MS. SULLIVAN:

22        Q.   Showing you, Mr. Casden, what we marked

23   as Exhibit 18.

24             Do you recognize this document?

25        A.   It's a summary of your assets and
```

Page 216

```
 1   liabilities.

 2         Q.    And you reviewed this document before it

 3   was filed with the bankruptcy court; correct?

 4         A.    Yes.

 5         Q.    And this document was submitted, signed

 6   by you under the penalties of perjury that it was

 7   true and accurate; correct?

 8         A.    Yes, to the best of my knowledge and

 9   ability.

10         Q.    Do you have any life insurance policies?

11         A.    No.

12         Q.    Are you aware of any additional

13   amendments to the schedule that should be made

14   today so that they are complete and accurate?

15         A.    I'd ask my lawyer.

16               MR. TEDFORD:  Just testify as to what

17   you know or believe as of today.

18               THE WITNESS:  I believe this is as

19   accurate as possible.

20               MR. TEDFORD:  Okay.

21   BY MS. SULLIVAN:

22         Q.    If you turn to page 15 of 59 in Exhibit

23   18.

24         A.    Okay.

25         Q.    Schedule E, "Creditors Who Have
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    Unsecured Claims."

 2              Do you see that?

 3       A.    Yes.

 4       Q.    And then turn to page 17 of 59.

 5       A.    Yes.

 6       Q.    Under 4.4, it says "BRE" --

 7              THE COURT REPORTER:  It says?

 8    BY MS. SULLIVAN:

 9       Q.    "BRE Sunset Coast, LLC."

10              Says:

11              "Unknown value of office

12       space."

13              Is that related to Hologenix's office

14    lease?

15       A.    Yes.

16       Q.    Okay.  Why is that listed as a creditor

17    for you?

18       A.    Because I guaranteed the lease.

19       Q.    How did you guarantee the lease?

20       A.    I gave a personal guarantee.

21       Q.    Did you sign a personal guarantee?

22       A.    Yes.

23       Q.    Has BRE Sunset Coast called in that

24    guarantee?

25       A.    They haven't asked -- you mean to prepay
```

1   the rent or what --

2       Q.   I guess the first question should be:

3   Has Hologenix not been able to pay its office rent?

4       A.   It has paid its office rent.

5       Q.   Then if you turn to page 19 of 59, under

6   4.9, it lists "Fora Financial West, LLC."

7            Do you see that?

8       A.   Yes.

9       Q.   And what does that represent?

10      A.   That was a line of credit granted to

11  Hologenix.

12      Q.   How much was the line of credit for?

13      A.   I don't recall.  I think it was around

14  300 or 330,000.

15           MS. SULLIVAN:  Mark this as Exhibit --

16           THE COURT REPORTER:  19.

17       (Whereupon, MET'S Exhibit number

18       19 was marked for identification

19       by the deposition officer and is

20       attached hereto.)

21           THE WITNESS:  I'm going to run to the

22  restroom.

23           THE COURT REPORTER:  Off the record.

24       (Whereupon, a recess was held

25       from 3:01 p.m. to 3:03 p.m.)

Page 219

 1   BY MS. SULLIVAN:

 2        Q.   Showing you, Mr. Casden, what we marked

 3   as Exhibit 19.  It's a Fora Financial Advance Proof

 4   of Claim in your bankruptcy.

 5             Have you seen this document before?

 6             MR. TEDFORD:  Can I correct you?  Just

 7   [inaudible].

 8             THE COURT REPORTER:  What?  I couldn't

 9   hear.

10             MS. SULLIVAN:  I'm sorry.  You're right.

11             THE COURT REPORTER:  I didn't hear.

12             MS. SULLIVAN:  I'll correct it.

13             MR. TEDFORD:  All right.

14   BY MS. SULLIVAN:

15        Q.   I'm showing you, Mr. Casden, what we

16   marked as Exhibit 19 is the Fora Financial Advance,

17   LLC proof of claim --

18             THE COURT REPORTER:  Can you repeat that

19   for me?

20             MS. SULLIVAN:  Fora, F-O-R-A, Financial

21   Advance, LLC Proof of Claim filed in Hologenix.

22   It's Casden 10636 to Casden 10661.

23             Have you seen this document before

24   today?

25        A.   Yes.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 220

1        Q.    And what is this document, besides -- I

2   mean, what's behind the proof of claim?

3        A.    This is the Fora line of credit that we

4   discussed.

5        Q.    If we turn to Casden 10639, it's in the

6   amount of 350,000 dollars; correct?

7        A.    Yes.

8        Q.    And on the bottom, it says, "Initial

9   here," and there's an S.C. and a G.C.

10             Is that for you and your brother,

11  Graham?

12       A.    Yes.

13       Q.    Were you both personal guarantees on

14  this line of credit?

15       A.    It looks that way, yes.

16       Q.    Does Hologenix still have that line of

17  credit today?

18       A.    No.

19       Q.    What happened to it?

20       A.    We filed bankruptcy.

21             MR. TEDFORD:  May I ask you to clarify

22  please, as to who you mean when you say, "We

23  filed" --

24        (Unreportable cross-talk.)

25             THE WITNESS:  Hologenix filed

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1    bankruptcy.

2    BY MS. SULLIVAN:

3        **Q.    When Hologenix filed bankruptcy, did it**

4    **still have the 350,000 dollar line of credit?**

5        A.    So to clarify, it wasn't a line of

6    credit.  It was an advance based on your historical

7    receivables.  So if you look at page one of 23 --

8        **Q.    Yeah.**

9        A.    -- we purchased 350,000 dollars of our

10    forward receivables for a price of 486,500.  Once

11    they deducted their fee, they deposited 341,000

12    dollars into our bank.  And then every week, we had

13    a payment that was due.

14            And at the time of the bankruptcy, the

15    amount of the claim, what was the unpaid portion on

16    the advance.

17        **Q.    Had Hologenix made payments on the**

18    **advance before it filed for bankruptcy?**

19        A.    The total amount due was 486,500.  So

20    the difference between that and the claim amount is

21    the payments that we had made.

22        **Q.    And if you turn to page three of 23,**

23    **does that refresh your memory about whether you and**

24    **your brother became guarantors of it?**

25        A.    Yes.  I wasn't aware that my brother was

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 222

1   also guarantor.  But yes, I see that on page three

2   of 23, it says that we are both guarantors.

3        Q.    And has Fora Financial called in payment

4   on these guarantees?

5        A.    No.

6        Q.    And if you turn to Casden 10643, at the

7   top it says section 1.1(A).

8              It says:

9              "Seller hereby agrees to

10        deposit all future sale proceeds

11        into the bank account."

12             Do you see that?

13        A.    Can you repeat that?

14        Q.    Just is the deposit all -- it says:

15             "In exchange for the

16        foregoing, seller hereby agrees to

17        deposit all future sales proceeds

18        into bank account."

19        A.    Identifying Exhibit A.  Yes.

20        Q.    And that's Hologenix as the seller.

21             So did Hologenix deposit all its future

22   sale proceeds into bank accounts identified in

23   Exhibit A, as stated in section 1.1(A)?

24        A.    It did until the bank account was

25   closed.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 223

1      Q.   So Hologenix, prior to filing

2  bankruptcy, was -- put all its receivables into one

3  account in order to ensure payment to Fora

4  Financial?

5      A.   Correct.

6      Q.   Did Fora Financial have a lien on

7  Hologenix's receivables?

8      A.   I don't know.  I think in the

9  bankruptcy, that's -- I don't know how that works.

10     Q.   Have you had any discussions with Fora

11 Financial since Hologenix filed for bankruptcy?

12     A.   Yes.

13     Q.   Okay.  When were those discussions?

14     A.   Would have been right around the time we

15 filed bankruptcy.

16     Q.   What was the sum and substance of those

17 conversations?

18     A.   I think, because it was COVID and they

19 had happened -- this was pretty common.  I think

20 they declined to -- to proceed -- to proceed with

21 collecting further on it.

22     Q.   You had any conversations with Fora

23 Financial about those debts since then?

24     A.   I have not.

25     Q.   Can you turn to Casden 10658, please.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 224

1            Is this the list of transactions for the
2  deal funded on 8-13-2019?
3            Correct?
4      A.   A list of payments, yes.
5            MS. SULLIVAN:  Transactions for deal
6  funded on 8-13-2019.
7            THE COURT REPORTER:  Thank you.
8  BY MS. SULLIVAN:
9      Q.   And when you turn to the next page on
10  November 12th, 2019, it says 390,674.14 sold.  And
11  right above it, it says 781,348.28 purchased.
12            What is that referencing?
13      A.   No idea.
14      Q.   If you can turn back to docket -- not --
15  Exhibit 18, please.  And turn to page 21 of 59.
16            If you look at the second entry, 4.15,
17  Theodora Oringher as a creditor, unknown amount,
18  incurred July 2021, and then it say "Legal
19  representation."
20            What is that referring to?
21      A.   Monies owed to Theodora Oringher for
22  legal representation.
23      Q.   In the MET verse Casden matter?
24      A.   They represented us in other matters as
25  well.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1      Q.   What other matter did they represent

2   Hologenix in?

3      A.   MET v. U.A., and that might have been

4   the only two.

5      Q.   Why is the amount listed as unknown?

6      A.   Because it's unknown.

7      Q.   You don't know, sitting here today, how

8   much you owe to Theodora Oringher?

9      A.   I don't think the unknown was related to

10   the amount, necessarily.  I'd have -- you'd have to

11   ask counsel.

12      Q.   Is this representing money that

13   Hologenix owes to Theodora Oringher or you

14   personally owe?

15      A.   I think it's unknown.

16      Q.   You don't know what the -- what -- why

17   Theodora Oringher is listed as a creditor on your

18   schedules?

19      A.   I didn't say that.

20      Q.   Is it for debt owed by Hologenix to

21   Theodora Oringher?

22      A.   It's unknown.

23      Q.   What's unknown?

24      A.   Can you help me out here?  I don't know

25   what to say.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 226

```
 1              The lawyers don't know.  So the lawyers

 2   haven't figured out who's liable for the debt and

 3   who owes what and what representations and -- they

 4   don't know.  So it's unknown.

 5         Q.   Do you know, sitting here today, how

 6   much money you personally have been billed by

 7   Hol- -- by Theodora Oringher that's not been paid?

 8         A.   I don't have it memorized, but there is

 9   a bill that says, "You owe this amount of money"

10   somewhere, yes.

11         Q.   And do you have a document that would

12   show you how much money Hologenix was charged, but

13   did not pay to Theodora Oringher?

14         A.   It would be the same document.

15         Q.   The same document.

16              Did Theodora Oringher represent

17   Hologenix?

18         A.   Hologenix and Seth Casden are listed on

19   the engagement agreement with Theodora Oringher.

20   So they both have liability for the bills incurred.

21         Q.   Why was Hologenix listed on the

22   engagement agreement with Theodora Oringher?

23         A.   That's a question for the attorney.

24         Q.   By "attorney," you mean Theodora

25   Oringher?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 227

1        A.   Yes.

2        Q.   You don't have an understanding why the

3   company was on the engagement letter and what it

4   was agreeing to do?

5        A.   I mean, my understanding is they wanted

6   to have multiple parties responsible for the bills.

7        Q.   Who signed the engagement letter on

8   behalf of Hologenix?

9        A.   I don't recall.

10       Q.   Was anyone other than you authorized to

11  sign engagement letters with law firms for

12  Hologenix?

13       A.   At various times, yes.

14       Q.   Who was -- who else was authorized in

15  July of 2021?

16       A.   Could have been our head of finance

17  or -- or our COO.

18       Q.   Could you turn to page 34 of 59 in

19  Exhibit 18, please.

20            And then there's a gift to Valentino

21  Devoto for 15,000 dollars.

22            Do you see that?

23       A.   Yes.

24       Q.   Did you use any portion of the 300,000

25  from -- loan from his father to give that gift?

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/06/25   Entered 06/06/25 18:39:07   Desc
Declaration of Nichole A. Sadler Page 247 of 1079
Exhibit A. Page 208 of 462

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 228

 1      A.    No.

 2      Q.    Can I have you turn to the next page.

 3  Under 19, it lists the trust that -- SHC 2018

 4  U-slash-I-slash-D, August 24, 2018.

 5            Do you see that?

 6      A.    Yes.

 7      Q.    What is that trust?

 8      A.    That's a trust that I set up.

 9      Q.    What was the purpose of that trust?

10      A.    To have my assets held in trust.

11      Q.    What assets are held in that trust?

12      A.    I think currently, the only trust is the

13  condo, the townhouse.

14      Q.    Can you turn back to page 21 of 59 in

15  Exhibit 18, please.

16            Under 4.16, it lists Wells Fargo Bank as

17  a creditor in the amount of 11,799 dollars and 41

18  cents, and it says the details as company credit

19  cards.

20            Do you see that?

21      A.    Yes.

22      Q.    That's for Hologenix credit cards?

23      A.    Yes.  That's --

24      Q.    Okay.

25      A.    -- my understanding.

```
 1      Q.   Why is that listed on your schedules?

 2      A.   Because I was a personal guarantor on

 3  those.

 4      Q.   Do you have a personal -- a written

 5  personal -- sorry -- a written agreement

 6  memorializing the personal guarantee with Wells

 7  Fargo?

 8      A.   I believe I -- when -- on the credit

 9  card application that I signed.

10      Q.   And when did Hologenix obtain a credit

11  card from Wells Fargo?

12      A.   I obtained it and authorized use for

13  Hologenix.

14      Q.   Go back to Exhibit 7, please.

15           MR. TEDFORD:  Done with 18?

16           MS. SULLIVAN:  I am, yes.

17  BY MS. SULLIVAN:

18      Q.   If you can turn to page nine of Exhibit

19  7, please.  That's, I believe, your declaration.

20      A.   Yes.

21      Q.   And you reviewed this declaration before

22  it was signed; correct?

23      A.   Yes.

24      Q.   And the statements made in that

25  declaration are true and correct?
```

Page 230

1      A.   I don't know how voluntary it was, but

2   yes, I guess legally.

3      **Q.   I said "are true and correct."**

4      A.   Hopefully not true, but correct.

5      **Q.   The statements aren't true in your**

6   **declaration?**

7      A.   Move on.

8      **Q.   Just -- no, I'd like you to answer so**

9   **it's clear.**

10         **Are the statements contained in your**

11  **declaration in Exhibit 7 --**

12     A.   I didn't think it was very voluntary is

13  the point I'm making, but I think legally, I have

14  to say that it was.

15     **Q.   Sitting here today, would you make any**

16  **changes or amendments to the declaration that's in**

17  **Exhibit 7?**

18     A.   Not that I can make legally.

19     **Q.   What does that mean?**

20     A.   It didn't feel very voluntary.

21     **Q.   Why not?**

22     A.   Because I would have chosen to postpone

23  it.

24     **Q.   But you chose not to wait for the**

25  **court's decision on your request to either waive a**

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 231

1   bond or reduce the bond amount; correct?

2       A.   On the advice of counsel.

3       Q.   If we look at paragraph nine on the next

4   page in the declaration, page ten of 135 in Exhibit

5   7.

6            It states:

7            "It's my understanding that my

8       interest in the trust is a mere

9       expectancy and not a property right

10      under Delaware law."

11           Do you see that?

12      A.   Yes.

13      Q.   What is that understanding based on?

14      A.   It's language the lawyers put in.

15      Q.   You said, "It's my understanding."

16           So what is your understanding about your

17  interest in the trust, if you have one?

18      A.   Nothing beyond I'm not entitled to the

19  trust from a legal standpoint.

20      Q.   Prior to -- prior to having a

21  conversation with your counsel, did you have an

22  understanding of whether your interest in the trust

23  was a mere expectancy or not?

24      A.   I think that language has been used by

25  Alvaro when I asked for money and he denies it.

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1          So when I asked for the 1.4 million back

2    in 2020 to pay the judgment owed to MET, I think

3    that's the language he used in denying my request.

4          Q.   Do you have an understanding of what

5    mere expectancy means?

6          A.   No.

7          Q.   Did you have an understanding sitting

8    here today what mere expectancy means?

9          A.   No.

10          Q.   Do you understand what it means when it

11    says your interest in the trust is not a property

12    right under Delaware law?

13          A.   No.

14          Q.   In paragraph ten of your declaration,

15    Exhibit 7, you stated:

16               "I am not receiving any

17          distributions from the trust at

18          this time."

19               Correct?

20          A.   Yes.

21          Q.   Have you requested that the trust

22    distribute money to you, other than the capital

23    calls we discussed, since you filed bankruptcy?

24          A.   No.

25          Q.   Why not?

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 233

 1      A.   I haven't needed to.

 2      Q.   You mean you haven't needed to get a

 3   distribution to cover your monthly expenses?

 4      A.   I haven't needed a distribution.

 5      Q.   Have you been able to cover your monthly

 6   expenses without a distribution from the trust?

 7      A.   Yes.

 8      Q.   Back to paragraph ten in your

 9   declaration, Exhibit 7, you then say:

10           "I am informed that the trust

11      cannot be compelled and is not

12      available to make distributions to

13      my creditors under Delaware law."

14      Correct?

15      A.   Yes.

16      Q.   Who informed you of that?

17      A.   Alvaro.

18      Q.   What else did Mr. Pascotto tell you

19   about compelling the trust to make distributions to

20   pay your creditor?

21      A.   What else?

22      Q.   Yeah.

23      A.   I don't think he said anything else.

24           He had another lawyer, I think, as well

25   tell me the same information.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 234

```
 1         Q.    What lawyer was that?

 2         A.    Paul Frimmer.

 3               THE COURT REPORTER:  How do you spell

 4    that?

 5               THE WITNESS:  F-R-I-M-M-E-R.

 6               THE COURT REPORTER:  Thank you.

 7    BY MS. SULLIVAN:

 8         Q.    Had you had any discussions with

 9    Mr. Frimmer before that?

10         A.    Yes.

11         Q.    And then if we look at paragraph 14 of

12    your declaration, Exhibit 7, you say that:

13               "The family members who depend

14         on me for support are my child,

15         Charlie Casden, age nine, and my

16         father, Ron Casden, age 77."

17               Correct?

18         A.    Yes.

19         Q.    You did not list Ms. Osterholt as a

20    family member who you support; correct?

21         A.    She's not family.  That's correct.

22         Q.    Paragraph 15 of your declaration, you

23    list out the expenses you provide for your child;

24    correct?

25         A.    Some of them, yes.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 235

1          Q.    And so the first one is the rent for the

2    Sherman Oaks home he lives in with his mother,

3    4,716 dollars and 49 cents; correct?

4          A.    Yes.

5          Q.    Okay.  And then you say:

6                "Also provide approximately

7                6,000 dollars per month of

8                additional financial support

9                directly to my child's mother."

10               Is that correct?

11         A.    Yes.

12         Q.    You said:

13               "Includes therapy and medical

14               care for my child."

15               Correct?

16         A.    Yes.

17         Q.    Earlier we talked about you depositing

18    4,000 dollars into Mr. -- Ms. Osterholt every month

19    [as spoken].

20               How do you pay her the additional 2,000

21    a month?

22         A.    Through other deposits.

23         Q.    To Ms. Osterholt directly or to the

24    providers of the therapy or the medical care for

25    your child?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 236

 1      A.    Combination of both.

 2      **Q.    Do you pay anything more to**

 3   **Ms. Osterholt per month, other than the rental**

 4   **payment and the 6,000 dollars listed in your**

 5   **declaration?**

 6      A.    Well, it's an approximate number, so

 7   some months, it's higher; other months, it might be

 8   lower.

 9      **Q.    Does your son incur medical expenses**

10   **that are not covered at all by insurance?**

11      A.    Yes.

12      **Q.    What are those medical expenses?**

13      A.    The people that he works with are not

14   covered by medical insurance and his medication is

15   not covered by -- fully covered by medical

16   insurance and ...

17      **Q.    Anything else?**

18      A.    Well, I mean, just his medical care is

19   out-of-pocket as well.  Portion's covered by

20   insurance, but not all of it.

21      **Q.    How much is out-of-pocket that's not**

22   **covered by insurance?**

23      A.    I don't have an exact number, but it's

24   thousands of dollars a month.

25      **Q.    Is it fair to say that without the**

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 237

```
 1    distributions from the Seth Casden Resulting Trust,

 2    you wouldn't have been able to pay the support that

 3    you pay your father and your son and his mother

 4    every year?

 5         A.   Yes.

 6         Q.   You describe in paragraphs 20 and 21 of

 7    your declaration in Exhibit 7 your father's medical

 8    conditions.

 9              Are those statements true and accurate?

10    I guess it starts in paragraph 18.  So from 18 to

11    21.  Page 11 of 135.

12         A.   Well, I'm on page seven of 135 and it's

13    describing his medical condition there.

14         Q.   I'm talking about your father.

15         A.   I am too.

16         Q.   Oh.

17              MR. TEDFORD:  He was referring to the

18    body of the document, as opposed to the

19    declaration.

20              THE WITNESS:  Okay.

21              MS. SULLIVAN:   Thanks.

22    BY MS. SULLIVAN:

23         Q.   Mr. Casden, looking at page 11 of 135 in

24    Exhibit 7, your declaration, paragraphs 18 to 21,

25    you describe your father's medical conditions;
```

 1   correct?

 2         A.   Yes.

 3         Q.   Are those statements true and accurate?

 4         A.   He's a little shorter now, but yes.

 5         Q.   Is there anything else about your

 6   father's medical condition that is not stated here?

 7         A.   It doesn't say that I have to apply his

 8   medication, but this lists most of the challenges

 9   he has.

10         Q.   And in paragraph 23, you state:

11              "Other than the exempted

12         funds, I do not have any other

13         significant exempt assets to

14         provide the necessary support for

15         me and my family."

16              Do you see that?

17         A.   Yes.

18         Q.   Is that still true today?

19         A.   Yes.

20         Q.   And then you also state:

21              "All my other assets are

22         either nonexempt and property of my

23         bankruptcy estate or not sufficient

24         to provide for my support and the

25         support of my family."

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1              Is that still true and correct today?

2       A.    Yes.

3       Q.    And then you finish that paragraph 23 in

4    Exhibit 7 of your declaration:

5              "I also do not have any exempt

6       retirement funds."

7              Is that true and correct?

8       A.    Yes.

9       Q.    And then you state:

10             "I have been actively trying

11      to lower my expenses."

12             In paragraph 24 of your declaration.

13             How have you been doing that?

14      A.    It's by reducing costs wherever I can.

15      Q.    What specific costs have you reduced?

16      A.    I've cancelled travel.  I've cancelled

17   some services that I had.  Stopped getting my car

18   washed as often.  Stopped having help with the meal

19   prep.

20             Stopped working with some of the people

21   that helped Charlie as often as we were.  Stopped

22   for the most part, you know, buying clothes, or

23   just trying to cut back as much as possible.

24      Q.    What -- what travel did you cancel?

25      A.    I had a trip with my brother that was

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 240

```
 1    scheduled for this year.

 2         Q.    Where was that scheduled to be?

 3         A.    Indonesia.

 4         Q.    When was it scheduled?

 5         A.    For my birthday this year.

 6         Q.    When is that?

 7         A.    November.

 8         Q.    And that -- you cancelled that for

 9    financial reasons or because you're not really

10    speaking to your brother?

11         A.    Financial reasons.

12         Q.    When did you cancel the trip?

13         A.    When they asked for the next payment

14    sometime towards the end of last year.

15         Q.    And who asked for what payment?

16         A.    The trip was booked through a company

17    and the deposit had been paid and the next

18    installment was due.  And so I told my brother I

19    wouldn't be able to make that payment.

20         Q.    When was that?

21         A.    Towards the end of last year.

22         Q.    After you filed bankruptcy or before?

23         A.    After.

24         Q.    What services have you cancelled?

25         A.    I had a chef preparing meals.  I no
```

1   longer use her.  And like I said, I cut back on

2   having the car washed and cleaned, detailed,

3   just ...

4        **Q.   When did you stop having a chef prepare**

5   **your meals?**

6        A.   Sometime towards the end of last year.

7        **Q.   After you filed for bankruptcy?**

8        A.   Yes.

9        **Q.   And who was the chef?**

10       A.   Just a personal chef that would

11   deliver -- drop off food, drop off meals.

12       **Q.   How much did that cost you per month?**

13       A.   It's about 1,500 a month.  She was

14   delivering food for my dad and I.

15       **Q.   In addition to the grocery shopping you**

16   **did?**

17       A.   Correct.

18       **Q.   What was her name or the name of her**

19   **company?**

20       A.   Her name is Christina.  I think her last

21   name is K-O-C-H.

22       **Q.   She had a company?**

23       A.   I don't know.

24       **Q.   Let's turn to Exhibit 1 to your**

25   **declaration.  It's page 15 of 135 in Exhibit 7.**

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 242

```
 1        A.   Uh-huh.

 2        Q.   This is all -- that's your signature on

 3   the second page?

 4             Is that your signature at the bottom?

 5        A.   Yes.

 6        Q.   Okay.  Is this also made under the

 7   penalty of perjury; correct?

 8        A.   Yes.

 9        Q.   It says you get expense reimbursements

10   or -- I'm sorry -- ticket sales; correct?

11             That's for the sale of the Laker and

12   Kings tickets?

13        A.   Yes.

14        Q.   Okay.  Have you been able to sell them

15   every month that your -- that you have seats?

16        A.   Almost every one.  There might be one or

17   two games where the tickets didn't sell or reduced

18   them or gave them to an employee or a friend.

19        Q.   Have you gone to any Laker or Kings

20   games since you filed for bankruptcy?

21        A.   I'm sure I have.  I can't -- I can't

22   think of one recently, but I know I've gone to a

23   couple.

24        Q.   If you look at the page 16 of 135 in

25   Exhibit 7.
```

Page 243

1          In part of your financial statement you

2   say that your father has other income of 7,074

3   dollars; correct?

4          A.   Yes.

5          Q.   I believe that's made up of his Social

6   Security pension and family contributions?

7          Turn to -- I'll come back to it.  I know

8   I have it somewhere.  It's just a long document.

9          Do you know how much money your father

10  receives from Social Security?

11         A.   Not exactly.  I believe it's around a

12  thousand dollars a month.  A little less, a little

13  more.

14         Q.   And other than the 4,000 he receives

15  from your brother, does he receive any other family

16  contributions?

17         A.   Not to my knowledge.

18         Q.   Earlier I thought you said your father

19  had sold his pension and -- yeah, in his 7,047,

20  part of that is the pension.

21         A.   He sold one of them.

22         Q.   Multiple pensions?

23         A.   Yep.

24         Q.   How much is his pension per month?

25         A.   I don't know.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1    Q.    How did you come up with a number of

2    7,047?

3        A.    From looking at his bank statements.

4        Q.    Have you tried to get a less expensive

5    rental for your father near you?

6        A.    I look when places come up, but they're

7    usually much more expensive.

8        Q.    Have you asked Ms. Osterholt to look for

9    a less expensive rental to help you out?

10       A.    She moved into a less expensive place

11   now.

12       Q.    When was that?

13       A.    January of 2023.

14       Q.    How much was her rent before that?

15       A.    Around 6,000.

16       Q.    And the expense reimbursement listed

17   here, that's expense reimbursement you received

18   from Hologenix; correct?

19       A.    Can you point to where it's -- what

20   number you're looking at, please?

21       Q.    Sure.

22            It was on the second page of your

23   financial statement.  Page 16 of 135.

24            No, no.  Maybe it's page 15.  Sorry.

25            Page 15 says:

1          "Other money I get each month:

2          Expense reimbursement, ticket

3          sales, rental income."

4          A.   Okay.

5          Q.   What does the expense reimbursement

6     represent?

7          A.   I guess things that were paid for on my

8     personal card that related to the company.  I think

9     it's a pretty small amount.  Generally don't put

10    business expenses on my personal card.

11               It's probably just a lawyer wanting to

12    make sure nothing got left off.

13         Q.   If you turn to what's numbered 19 on the

14    bottom right corner.

15         A.   19 of 135?

16         Q.   I can't see the number of 135 anymore.

17               The -- on page 17 of 135, you see the

18    attachment to financial statement?

19         A.   Yes.

20         Q.   So the next one is Schedule A/B

21    property?

22         A.   Yes.

23         Q.   Then you have the -- you have your

24    townhome and then vehicles on the next page.  And

25    then it lists other property -- personal property,

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1   household items.

 2          Do you see that?

 3      A.   Yes.

 4      Q.   Turn to the next page, which is number

 5   19 on the bottom.  You list 150,000 dollars and

 6   then you describe coin collection and some other

 7   items.

 8          So let's just go through those.

 9          How much is the coin collection valued

10   at?

11      A.   I don't have individual amounts.  It

12   was -- I was advised to just try and come up with

13   my best estimate of all of those things.

14      Q.   What did you -- what's your best

15   estimate of what the coin collection is valued at?

16      A.   I honestly have no idea.  I'd be

17   guessing.

18      Q.   What's your best estimate of what the

19   artwork is valued at?

20      A.   I don't -- I don't have -- I don't -- I

21   can't give you a better answer than what I -- what

22   I gave initially with just a ballpark guess made in

23   an hour or so of trying to fill these forms out and

24   get the bankruptcy filed.

25          And I just did a mental inventory and
```

Page 247

```
 1   came up with that number.
 2        Q.   What was your best estimate of what the
 3   value of the books and memorabilia was?
 4        A.   I -- I didn't break them out.  We just
 5   came up with a number and we listed what it
 6   covered.
 7        Q.   You said you filled this out in an hour.
 8             Why were you rushed to fill it out?
 9        A.   I don't know.  It's an estimate of how
10   much time because they were trying to file it
11   before I got served for the ORAP.
12        Q.   Were you trying -- you were trying --
13   trying to serve -- file the bankruptcy before you
14   got served with the ORAP?
15        A.   Correct.  I think this was filled out
16   over the phone with somebody at the law firm asking
17   me these questions.
18        Q.   Did you take any steps to avoid getting
19   served by the process server with the ORAP?
20        A.   Filing bankruptcy.
21        Q.   Other than that, did you try to, like,
22   go out of town or hide or anything else?
23        A.   I was here.  No, I did not go out of
24   town.
25        Q.   What does the coin collection represent?
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 248

1   What is -- what is the coin collection?

2       A.   Some coins my mom's given me.  Some

3   coins I've bought, purchased.

4       Q.   How many coins would you estimate are in

5   the collection?

6       A.   Between fifty and a hundred.

7       Q.   What is represented under "Artwork"?

8       A.   I collect vintage movie posters.  So I

9   have maybe half a dozen of those.  I have, like, a

10  Picasso print.  I have a Matisse wood carving,

11  linoleum carving.

12      Q.   When you say you have a Matisse, you

13  mean an actual Matisse painting?

14      A.   It's a linoleum print.  I think I paid

15  1,200 dollars for it.

16      Q.   And what about the Picasso print?

17      A.   I paid 20,000.

18      Q.   When did you pay 20,000 for the Picasso

19  print?

20      A.   I think 2006.

21      Q.   And how much did you pay for the vintage

22  movie posters?

23      A.   In aggregate, maybe 20- or 30,000

24  dollars.  Maybe a little more.

25      Q.   When you reference book -- books, what

1    are you including there?

2          A.    I have about 5,000 books.

3          Q.    Do you have, like, collector books?

4    Like, first edition books?  Is there something of

5    value there or just books in general?

6          A.    I don't think I have any collectible

7    books or valuable books or first edition books.

8          Q.    They're just, like, you know, paper

9    backs or hard covers of ordinary books?

10         A.    Yes.

11               MR. TEDFORD:  Do you have the bankruptcy

12   code?

13               THE WITNESS:  No.

14               MR. TEDFORD:  Because that would -- that

15   would increase the cost -- the price by at least a

16   thousand dollars.

17               THE WITNESS:  I think that would

18   decrease the value.

19               Starting to get slap-happy over here.

20   BY MS. SULLIVAN:

21         Q.    When you say "memorabilia," what's

22   included there?

23         A.    Just odds and ends.  Baseball from a

24   game.

25               Again, I think my -- the advisor who's

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

1  helping me fill this out just wanted to be able to

2  avoid a situation where somebody thought I withheld

3  something or didn't list something or wasn't being

4  forthright about my possessions.

5            So I think that's kind of boilerplate.

6        **Q.  Who was the advisor helping you?**

7        A.  Someone at John's firm.

8        **Q.  When you say you have baseballs, were**

9  **any of them signed or anything like that?**

10       A.  No.

11       **Q.  What are you referring to as the stamp**

12  **collection?**

13       A.  I have some stamps that my mom gave me

14  and I've collected stamps off and on.

15       **Q.  Have you ever had --**

16       A.  I don't think they're very valuable.

17       **Q.  Have you ever had them valued?**

18       A.  No.

19       **Q.  Have you ever had any of your artwork**

20  **valued?**

21       A.  I think for insurance, I had it

22  appraised at some point.

23       **Q.  The Picasso or something else?**

24       A.  Just, like, the movie pos- -- all of it.

25  But --

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 251

1      Q.   Do you recall what the appraisals value

2   was?

3      A.   I don't.

4      Q.   And what's the baseball card collection?

5      A.   I have baseball cards from the 1980s and

6   '90s when I was growing up.  I don't think they're

7   worth much because whenever I've looked to sell

8   them, it's not very promising.

9      Q.   Have you ever had them appraised or

10  valued?

11     A.   Nothing other -- no, other than looking

12  online to see what similar cards are selling for.

13     Q.   And then under "Jewelry," you list three

14  watches and family ring; correct?

15     A.   Yes.

16     Q.   Okay.  What are the watches?

17     A.   There is a -- a Rolex that I was given

18  and an IWC that I was given.  And then I think I

19  have a Cartier watch that was given to me.

20     Q.   What's a family ring?

21     A.   It's a platinum ring with a stone

22  setting.

23     Q.   What's the value of the Rolex?

24     A.   I -- I -- I don't know.  I have no idea.

25     Q.   What about the IWC watch?

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 252

1        A.   I didn't have any of them appraised.

2        Q.   Do you have any of them insured?

3        A.   I have a blanket insurance policy for

4   jewelry and fine art.  I don't think it -- it lists

5   them itemized.  I'm not sure.  I --

6        (Unreportable cross-talk.)

7   BY MS. SULLIVAN:

8        Q.   Did you have to provide any appraisals

9   to the company to insure the jewelry?

10       A.   No.

11       Q.   Do you know the value of the Cartier

12  watch?

13       A.   No.

14       Q.   Do you know the value of the family

15  ring?

16       A.   No.

17       Q.   So how did you come up with 52,500

18  dollars?

19       A.   I don't know.  That's a very specific

20  number.  I'm not sure how that got rolled together.

21       Q.   Have you ever tried to sell any of these

22  personal belongings since you filed the bankruptcy?

23       A.   No.

24       Q.   Do you have any intention of selling any

25  of these personal belongings to fund any plan or

Page 253

```
 1   otherwise in the bankruptcy?

 2        A.   Not without a court order.

 3        Q.   Why not?

 4        A.   Because I don't want to sell them.

 5        Q.   Why not?

 6        A.   Because I like them.

 7        Q.   And then you list the value of 2,500

 8   dollars for a dog and the salt water reef tank.

 9             Where did that value come from?

10        A.   The dog -- I think it was a rescue dog,

11   so I think the 2,500 dollars was just based on

12   what -- this is supposed to be the value they can

13   be sold for.  Right?  I think.  Not the cost.

14             So it was just a guess.  I think I paid

15   10- or 15,000 dollars for the tank, and I bought it

16   used as it was.  So I don't -- I don't think

17   there's a lot of resale value there.

18        Q.   If we go to the next page, you have the

19   checking account, which I believe is your debit

20   account at Wells Fargo; correct?

21        A.   Yes.

22        Q.   And then you have other checking and

23   savings accounts listed there as well; correct?

24        A.   Yes.

25        Q.   Do you still have those accounts?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 254

1    A.   I believe they've all been closed.

2    **Q.   What happened to the funds that was in**

3    **the American Express, Capital One Bank, and Bank of**

4    **America accounts?**

5    A.   Any liquidation of funds would have been

6    deposited into the DIP account.

7         THE COURT REPORTER:  The --

8         MS. SULLIVAN:  The DIP account.

9         THE COURT REPORTER:  Thank you.

10   BY MS. SULLIVAN:

11   **Q.   And then under 19, you list Hologenix**

12   **and you say you have 54.97 percent ownership;**

13   **correct?**

14   A.   Yes.

15   **Q.   Is that still true?  Is that still your**

16   **percentage ownership today?**

17   A.   Well, the equity that I've invested

18   hasn't been established, a value yet.  So I guess

19   it's that amount plus whatever I get with the new

20   equity I put in.

21   **Q.   So for the shares that you would get for**

22   **the new equity invested in 2023, does that mean**

23   **that someone else has to give up their shares or it**

24   **just increased the number of shares?**

25   A.   Everyone would be diluted that didn't

1    participate in the --

2         (Unreportable cross-talk.)

3    BY MS. SULLIVAN:

4         Q.    In the --

5         A.    -- the --

6         Q.    -- equity raise?

7         A.    Yeah.

8         Q.    Did you ask everyone who owns a share to

9    participate in the equity round?

10        A.    Yes.

11        Q.    Okay.  And what did they respond?

12        A.    There was no one interested in

13   participating.

14        Q.    Did anyone explain to you why they

15   weren't interested in participating?

16        A.    I don't recall any conversations.

17        Q.    How did they communicate to you that

18   they weren't interested in participating?

19        A.    By not replying to the offer.

20        Q.    Nobody affirmatively told Hologenix that

21   they didn't want to participate in the equity

22   raise?

23        A.    I don't think so.

24        Q.    Then you have Stoneybrooke Films, LLC.

25              You have ninety percent ownership.  The

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    value is 926.62.

 2            Where did you come up with that?

 3        A.   I believe that was the amount of money

 4    in the checking account.

 5        Q.   Still own Stoneybrooke Films today?

 6        A.   Yes.

 7        Q.   Does it -- is it an active business?

 8        A.   No.

 9        Q.   When was the last time it was an active

10    business?

11        A.   Maybe fifteen years.

12        Q.   And then you list Cazden Bros,

13    K-A-Z-D-E-N.  Say:

14            "Defunct.  Owns with brother

15        fifty percent."

16            What is that referring to?

17        A.   Another LLC I'd started with my brother

18    some years back.

19        Q.   When was the last time it was an active

20    business?

21        A.   I don't recall.  It's -- I don't think

22    we ever really did anything with it.  The value

23    listed there is the amount in the checking account.

24        Q.   And then under 25, you list the Seth

25    Casden Resulting Trust, and then you say "Unknown."
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 257

```
 1              Why did you say "Unknown"?

 2         A.   The lawyer's counsel.

 3         Q.   Can you turn to the next page,

 4    Mr. Casden, in Exhibit 7, paragraph 33.  And you

 5    list claims against third parties.

 6              Unsecured claim in Hologenix, LLC

 7    bankruptcy of 1,666,333 dollars.

 8              Do you see that?

 9         A.   Yes.

10         Q.   What is that referring to?

11         A.   The convertible promissory note.

12         Q.   Is that separate and distinct from the

13    2,070,000 that we discussed earlier?

14         A.   Those are unrelated.  The 2,070,000 is a

15    note owed to Northern Trust.  This is money that's

16    owed to me by Hologenix.

17         Q.   Did you loan money to Hologenix?

18         A.   Convertible promissory note.

19         Q.   Okay.

20         A.   So the 300,000 dollars from Mr. Devoto

21    is part of this 1.66, as well as other monies that

22    I put in that total that amount.

23         Q.   And are those -- those are -- a

24    convertible note means when it's converted, you get

25    additional shares in Hologenix; correct?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 258

```
 1      A.   Yes.

 2      Q.   So when that's converted, it would

 3   further dilute the other owners' shares percentage?

 4      A.   Yes.

 5      Q.   If you turn to the next page, it lists

 6   unsecured claim in Hologenix of 47,406 dollars.

 7           What is that claim for?

 8      A.   These are claims related to the

 9   bankruptcy.

10      Q.   How does Hologenix owe you 47,406

11   dollars?

12      A.   I would refer you to the bankruptcy

13   documents.

14      Q.   When you say "bankruptcy documents,"

15   you're referring to something in Hologenix?

16      A.   Yes.

17      Q.   Then it reference a cure payment due

18   from Hologenix for 434,536 dollars and 50 cents.

19           Do you see that?

20      A.   Yes.

21      Q.   What is that referring to?

22      A.   The cure payment that Hologenix owes me.

23      Q.   What do they owe you a cure payment for?

24      A.   I would refer you to the Hologenix

25   bankruptcy case.
```

Page 259

1          Q.    You don't understand, sitting here

2     today, why Hologenix owes you 434,000 dollars --

3     534 -- 434,536 dollars and 50 cents?

4          A.    It's not for one thing.

5          Q.    Do you know what's subsumed in there?

6          A.    I know part of it is back pay.  Part of

7     it is a bonus.  And I'm not sure what else.

8          Q.    Can you turn to page 38 of 135 of

9     Exhibit 7.  It's marked 37 at the bottom.

10              Before I get there, Mr. Casden, how

11    often do you go into Hologenix's offices in Pacific

12    Palisades?

13         A.    Varies.  Couple times a week.  This week

14    I was in every day except for today.

15         Q.    On average, how often do you go in every

16    week?

17         A.    Couple times.

18         Q.    Couple two or three times?

19         A.    One or two.

20         Q.    Has Hologenix considered reducing its

21    office space?

22         A.    Once our lease is up, yes.

23         Q.    When's the lease up?

24         A.    May of next year.

25         Q.    Turning back to page 38 of 135 in

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 260

```
 1    Exhibit 7, it's listed "Monthly Expenses."

 2              Do you see that?

 3         A.   Yes.

 4         Q.   Who prepared this?

 5         A.   The accountant that's doing the

 6    bankruptcy work.

 7         Q.   Was that Mr. Wong or someone else?

 8         A.   Mr. Wong's firm.

 9         Q.   Someone at Mr. Wong's firm.

10              Did you participate in preparing this

11    document?

12         A.   No.

13         Q.   Do you know if these are actual expenses

14    or monthly estimates?

15         A.   My understanding, these are actuals

16    based on bank statements.

17         Q.   Why do you have that understanding?

18         A.   Because that's what I provided to him to

19    prepare them.

20         Q.   So it lists under "Accounting and Tax

21    Services," 1,667 dollars.

22              What is that for?

23         A.   Accounting and tax services.

24         Q.   Is that to prepare your taxes?  Is that

25    the same 11,000 that was listed on your amended
```

Page 261

```
 1   schedules?

 2        A.   It would have been that and the

 3   bookkeeper I have.

 4        Q.   Who is the bookkeeper you have?

 5        A.   Her name's Lisa Hanson.

 6        Q.   She work for you personally or for

 7   Hologenix?

 8        A.   For me personally.

 9        Q.   How much do you pay Ms. Hanson every

10   month?

11        A.   It's just hourly.

12        Q.   How much do you pay her per hour?

13        A.   Around a hundred dollars.

14        Q.   How many hours does she work for you a

15   month?

16        A.   It's not consistent.  The majority -- if

17   you saw the bill from Armanino, I think it was --

18   what?  16,000.

19        Q.   It was -- the claim is listed --

20        A.   14 --

21        Q.   -- 11,000 and change.

22        A.   11.  So I think the majority of that is

23   just one-twelfth of what he gets on an annual

24   basis.

25        Q.   I don't understand what that means.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 262

1              How much do you pay her per year?

2        A.   I pay Armanino about 20,000 dollars a

3   year, 16,000 dollars a year.

4        Q.   She gets one-twelfth of 20,000?

5        A.   No.  She has nothing to do with them.

6   I'm saying she's a very small expense.  She's maybe

7   a couple thousand dollars a year.

8        Q.   And that lists auto expenses, 530

9   dollars.

10             Do you know what that references?

11        A.   That would be the average monthly

12   expense for my auto.

13        Q.   For which auto?

14        A.   For both of mine.

15        Q.   Okay.  What expenses do you have

16   associated with the -- is it Honda?  Or Hyundai?

17        A.   So there's -- there's two Hyundais.

18   Right?  There's the Hyundai that Kelly owns and

19   then there's Hyundai that's in my name that my dad

20   uses.  And then I have a Kia.

21        Q.   Is any of the 530 dollars for your Kia?

22        A.   Yes.

23        Q.   What portion of it?

24        A.   I don't know.  Just looking at what I

25   spend over that time and aggregating it.

Page 263

```
 1        Q.    Have you had to do repairs on your

 2   father's vehicle?

 3        A.    Not in a while.

 4        Q.    And what is the value of your father's

 5   vehicle?

 6        A.    I think we estimated it around 4,000.

 7        Q.    Have you had to do any repairs on

 8   Ms. Osterholt's vehicle?

 9        A.    Yes.

10        Q.    Okay.  How much is that?

11        A.    A lot.

12        Q.    Why -- why is does it need a lot of

13   repairs?

14        A.    I don't know.

15        Q.    What is the value of her vehicle?

16        A.    I don't know.

17        Q.    How much do you spend a month to repair

18   her vehicle?

19        A.    It's just on an as-needed basis.  It

20   needed a new engine earlier this year, which was

21   very expensive.  Before that, I don't think it had

22   any problems for a few years.

23        Q.    How much was the new engine?

24        A.    I think it was around 6,000 or 8,000

25   dollars.
```

Page 264

```
 1      Q.   Did you consider getting a new car?

 2      A.   Yes.

 3      Q.   Why didn't you?

 4      A.   On advice of counsel.

 5      Q.   Your bankruptcy counsel or somebody

 6  else?

 7      A.   Bankruptcy counsel.

 8      Q.   Then it lists under "Dining," 2,675

 9  dollars.

10           What does that represent?

11      A.   Food expenses.

12      Q.   Is that, like, dining out at restaurants

13  or something else?

14      A.   It would be that, and I guess meals.

15  Anything that's not groceries.

16      Q.   Under "Groceries," it lists a thousand

17  dollars.  What does -- who does that pay for

18  groceries for?

19      A.   For myself.

20      Q.   Does that include groceries for your

21  father or your son?

22      A.   It would include groceries that I buy

23  for my son when he's with me.  It would include

24  groceries for my father that he didn't pay himself.

25      Q.   Then you have housekeeping at 3,000
```

1   dollars.

2               **What does that represent?**

3        A.    That represents the cleaning at my dad's

4   house, my house, and Kelly's house.

5        **Q.    Is the housekeeping for all three**

6   **households 3,000 every month?**

7        A.    Yes.

8        **Q.    And then you list business**

9   **entertainment, L.A. Kings, business entertainment,**

10  **Lakers; correct?**

11       A.    Yes.

12       **Q.    Those are the tickets we talked about**

13  **earlier, the season tickets you have; correct?**

14       A.    Yes, but I think that is -- I don't know

15  exactly how we calculated that.  Like, the Laker

16  tickets are not 60,000 a year.

17            I think the -- I have five monthly

18  payments of that amount.  So five of the twelve

19  amounts, it's that amount, and the other seven

20  months, it's zero.

21            And for the Kings tickets, I think

22  they're on a ten-month plan.  So ten of the months,

23  that's the amount; and then the other two months,

24  it's zero.  Something like that.

25       **Q.    Why are they categorized as business**

1    entertainment?

2         A.   For tax reasons.

3         Q.   **What do you mean?**

4         A.   I think there's a tax reason.  I don't

5    know if part of it's deductible.

6         Q.   **Do you use those tickets to entertain**

7    **Hologenix clients?**

8         A.   Yes.

9         Q.   **Has Hologenix ever paid for the season**

10   **tickets?**

11        A.   No.

12        Q.   **And then under the Lincoln Townhouse,**

13   **you have the mortgage, HOA, and repairs; correct?**

14        A.   Yes.

15        Q.   **And are those numbers generally the same**

16   **every month?**

17        A.   No.

18        Q.   **What's different?**

19        A.   Well, the HOA is paid quarterly for this

20   year and the repairs are on as-needed basis.  So

21   there might not be any repairs for a year and then

22   something needs to be replaced or repaired.

23        Q.   **What is included in the 1,650 under**

24   **"Medical"?**

25        A.   That's my -- I believe that's my medical

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 267

1    premium and any expenses.  Eye doctor -- you know,

2    there's a lot of things that aren't covered by my

3    insurance.

4          **Q.   Those for you or somebody else?**

5          A.   For me and for Charlie.

6          **Q.   Do they include medical for your father**

7    **or no?**

8          A.   No.

9          **Q.   And then you have under "Occupancy**

10   **Repairs" -- that's referring to your own personal**

11   **rental; correct?**

12         A.   Yes.

13         **Q.   What does the 500 dollars for repairs**

14   **represent?**

15         A.   Well, as you can probably surmise, I

16   have a below market rental rate.  And so I'm

17   responsible for any things that break in the

18   building, and the building's almost a hundred years

19   old.  So it -- there's things that break down all

20   the time.

21         **Q.   So you're responsible in your own**

22   **apartment or the entire fourplex?**

23         A.   I -- anything that I want fixed in the

24   building, I have to pay for.

25              So I've redone the driveway.  I've

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 268

```
 1   repainted the house, the building.  I've fixed the

 2   decks, water problems, plumbing problems, shower,

 3   toilet.  I've replaced plumbing.

 4           I've probably spent over a hundred

 5   thousand dollars over the twenty years on that

 6   building, besides my rent.

 7       Q.   Under "Miscellaneous," it lists 2,115

 8   dollars.

 9           What does that represent?

10       A.   Miscellaneous expenses.

11       Q.   What would be included under

12   "Miscellaneous"?

13       A.   Things that aren't covered in these

14   other sections.  I don't have an example off the

15   top of my head.

16       Q.   And then under "Personal Expenses,

17   comma, Fitness," it says 2,200.

18           See that?

19       A.   Yes.

20       Q.   What does that represent?

21       A.   That would be physical therapy, yoga,

22   any kind of gym membership, any training expenses,

23   any of my triathlon expenses, equipment related to

24   my bicycle.

25       Q.   Do you have a personal trainer?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.   Not currently.

 2        Q.   When was the last time you had a

 3   personal trainer?

 4        A.   I think the last sessions I had were in

 5   August of last year.  Maybe August/September.

 6        Q.   Do you have a gym membership?

 7        A.   Not currently.

 8        Q.   When was the last time you had a gym

 9   membership?

10        A.   It's been a few years.

11        Q.   Where do you attend yoga?

12        A.   Different places.  Recently, I've been

13   going to a place called The Mindry.

14        Q.   How much does the yoga cost you out of

15   the 2,200 dollars?

16        A.   Not very much.  The majority of that is

17   for physical therapy.

18             My physical therapy, I think he's 350

19   dollars for an hour and a half.  I've tried to cut

20   back on him, but I have a lot of back pain, so he

21   helps with that.

22        Q.   How long have you been going to physical

23   therapy?

24        A.   He comes to my house.  For years, I've

25   been going to different people.  The guy I'm
```

Page 270

```
1   working with now, it's been about two years.
2        Q.   Is it -- are you -- have, like,
3   prescription for physical therapy or just something
4   you prefer to do?
5        A.   I had a prescription at one point, but
6   insurance didn't really cover any of it with the
7   providers I wanted to use so I didn't get it
8   renewed.
9        Q.   Was there a different provider that you
10  could have used that would have been covered by
11  your insurance?
12       A.   I think at different points there's
13  certain things the insurance covered, but the
14  procedure the doctor was suggesting was very
15  invasive and I didn't want to get that, so I ended
16  up going to a different, like, homeopathic
17  approach.
18       Q.   And is there a physical therapist that
19  you could go to that your insurance would cover?
20       A.   I don't know.
21       Q.   Have you inquired of your insurance
22  company about that?
23       A.   No.
24       Q.   And then under "Pets," you list 2,300
25  dollars.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1              What is included in that?

 2         A.   The majority of that is the maintenance

 3   of the fish tank.  And then the food for the dog.

 4         Q.   How much is the fish tank maintenance?

 5         A.   About 500 a week.

 6         Q.   Why is it 500 dollars a week?  What does

 7   that include?

 8         A.   It includes a service visit with the

 9   water and chemicals and supplements needed to

10   maintain the fish in the tank.

11         Q.   How many fish are in the salt water

12   tank?

13         A.   Maybe twenty.

14         Q.   What kind of fish are they?

15         A.   It's a salt water reef tank.

16         Q.   Does that mean they're -- I don't

17   understand.  What kind of fish are they?

18         A.   You -- you want the types of fish in my

19   tank?

20         Q.   How much do the fish cost?

21         A.   The fish cost anywhere from fifty

22   dollars to 200 dollars.

23         Q.   What type of fish are they?

24         A.   So a salt water reef tank means

25   everything in the tank is alive.  So there's live

 1  coral, there's live rock, and there's fish.

 2            The fish are clown fish, damsels, angel

 3  fish.  There's sea urchins, sea snails, hermit

 4  crabs, soft coral, hawkfish, cobia.

 5            Is that enough?

 6       **Q.   It's enough.**

 7            **Then you have listed taxes, income,**

 8  **3,333 dollars.**

 9            **What does that represent?**

10       A.   I don't -- I -- I don't know why that

11  says "income."  I think it means income taxes.  So

12  it's the taxes I pay.

13       **Q.   Okay.  Is that back --**

14       (Unreportable cross-talk.)

15            THE WITNESS:  It's very confusing --

16  BY MS. SULLIVAN:

17       **Q.   -- dollars you earned from Hologenix?**

18       A.   Sorry.  Could you say that again?

19       **Q.   Is that the income -- taxes you pay on**

20  **the income you receive from Hologenix?**

21       A.   It's taxes that I owe for unemployment

22  tax and Social Security tax and the taxes

23  associated with being self-employed.

24       **Q.   How much is the dog food every month?**

25       A.   Few hundred dollars.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1    Q.   And then travel and related

2    entertainment, a thousand dollars.

3          What is included there -- in there?

4    A.   Any kind of events I want to go to, any

5    trips I want to take.  Travel and

6    entertainment-related expenses.

7    Q.   Have you gone on any trips since you

8    filed for bankruptcy?

9    A.   Yes.

10   Q.   Where have you gone?

11   A.   I've gone to Cancun, Mexico and to

12   Austin, Texas.

13   Q.   When did you go to Cancun?

14   A.   Cancun trip was bought with a package I

15   paid for in June of 2023, and that trip was in

16   February of 2024.

17   Q.   And Austin, Texas?

18   A.   I took my son for the solar eclipse.

19   That was first week of April, I believe.

20   Q.   How much did that cost?

21   A.   Maybe around 5,000 dollars.

22   Q.   You taken any other trips?

23   A.   I took my son camping.

24   Q.   How much did camping cost?

25   A.   Maybe 2- or 300 dollars.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 274

```
 1          Q.    So the bottom of this monthly expense

 2    list on page 37 of 38 of 135 in Exhibit 7, it says,

 3    "Full expenses, 69,463 dollars."

 4                Do you see that?

 5          A.    Yes.

 6          Q.    Is that generally accurate number for

 7    your expenses every month?

 8          A.    The reduced number, yes.

 9          Q.    What do you mean, "the reduced number"?

10          A.    It was much higher before I filed

11    bankruptcy.

12          Q.    Is 69,463 dollars the same amount of

13    money that you're spending every month since you

14    filed for bankruptcy, or is this prebankruptcy

15    number?

16          A.    This is the bankruptcy number, is my

17    understanding.

18          Q.    What was -- what was your prebankruptcy

19    total monthly expenses?

20          A.    I think it was more than that because

21    the travel was much higher.

22          Q.    How much was the travel pre-bankruptcy?

23          A.    I think I probably spent a hundred

24    thousand dollars on travel a year.

25          Q.    How much did you say?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 275

```
 1        A.    A hundred thousand.
 2        Q.    And then we turn to the next page, page
 3   39 of 135 in Exhibit 7.
 4              It says:
 5              "Ron Casden expenses paid
 6        directly by Ron Casden."
 7              Do you see that?
 8        A.    Yes.
 9        Q.    Who prepared this sheet?
10        A.    Armory.
11        Q.    That's Mr. Wong?
12        A.    Yes.
13        Q.    And this represents the list of expenses
14   paid directly by your father and not you; correct?
15        A.    Yes.
16        Q.    And under "Other" for the payments
17   directly by your father for himself, it says:
18              "Assisted care, 2,100
19        dollars."
20              What does that represent?
21        A.    The portion that he would pay directly
22   to the people that were helping him, you know,
23   paying cash.
24        Q.    In addition to what you pay them?
25        A.    Correct.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 276

```
 1        Q.   And then at the top, says:

 2             "Food and household supplies,

 3        2,400."

 4             And then 366 dollars.

 5             Do you see that?

 6        A.   Yes.

 7        Q.   What does that represent?

 8        A.   His grocery and household items.  I

 9   don't know why it's listed twice.  That's --

10        Q.   That's in addition to the groceries that

11   you buy for your father?

12        A.   Yes.

13        Q.   And that lists forty dollars under

14   "Laundry/Cleaning."

15             What does that represent?

16        A.   We have a quarter machine.  So it's the

17   quarters for the machine and any dry cleaning that

18   he has.

19        Q.   And Hammond and Hammond is the --

20             THE COURT REPORTER:  I'm sorry.  Do

21   you mind repeating that?

22   BY MS. SULLIVAN:

23        Q.   Hammond and Hammond, H-A-M-M-O-N-D, is

24   the lessor for Ms. Osterholt's apartment; correct?

25        A.   Yes.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 277

1      Q.   We can look at what we previously marked

2   as Exhibit 18.

3           John, you probably took it from him.

4           THE COURT REPORTER:  What was that?

5           MS. SULLIVAN:  I said:  John, you

6   probably took it from him.

7           MR. TEDFORD:  Yes.

8   BY MS. SULLIVAN:

9      Q.   Turn to page 27, 28 of 59, please.

10          This is your Schedule J list of your

11  expenses, and it's filed October 31st, 2023.

12          Do you see that?

13     A.   Yes.

14     Q.   Do you agree with that?

15     A.   Agree with what?

16     Q.   That this is your Schedule J, your

17  expenses that you filed in the bankruptcy on

18  October 31st, 2023.

19     A.   Yes.

20     Q.   Okay.  And you attested to the accuracy

21  of this schedule under the penalties of perjury;

22  correct?

23     A.   Yes.  To the best of my ability, yes.

24     Q.   If we turn to the second page, it

25  calculates your total monthly expenses at 59,947

Page 278

1   dollars; correct?

2          A.    Yes.

3          Q.    And this number would include the money

4   that you spend on behalf of your father, your son,

5   and your son's mother; correct?

6          A.    Yes.

7          Q.    Okay.  Why is this 10,000 dollars less,

8   or approximately 10,000 dollars less than the

9   monthly expenses we were just discussing in Exhibit

10  7?

11         A.    I'd have to compare them side by side

12  and see where the differences are.

13         Q.    Okay.  Go ahead.

14         A.    What's the other -- where's the other

15  one?

16         Q.    It's on ...

17         A.    I've got it.

18         Q.    Okay.  Sorry.

19         A.    You're fine.

20               Well, there's nothing under "Taxes."

21  There's nothing under -- let's see.  Where is

22  the -- there's nothing for an accountant that I

23  see.

24               I don't see anything for travel.

25  They're not -- they're not an apples-to-apples

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 279

```
 1    comparison.  They have different categories.
 2           Q.    Is there any reason you didn't put any
 3    number in your Schedule J under "Taxes"?
 4           A.    I have no idea why that says there -- it
 5    says:
 6                  "Do not include taxes deducted
 7           from your pay or included in line
 8           items four through 20."
 9                  And then under 20 -- yeah.  It looks
10    like my taxes.
11                  Maybe when they prepared this, they saw
12    I hadn't paid taxes for a period of time.  I don't
13    know.  I have taxes due every year, but if I have a
14    loss, it offsets them.
15                  It's a question for my accountant.
16           Q.    If you look at paragraph 17, it says:
17                  "Car payment for vehicle two."
18                  Under 17(B), it says zero.
19           A.    Yes.
20           Q.    Why does it say zero when the other
21    monthly expenses included payments there?
22           A.    That's not accurate.  There's no car
23    payment for any of the other cars.  They're owned.
24                  There are car expenses for those cars.
25           Q.    And then here in Schedule J in Exhibit
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 280

1    18, under 19, you list other payments you make to

2    support others who don't live with you.

3            You say, "See attachment."

4            You list 2,195 dollars a month; correct?

5    A.    Yes.

6    Q.    Okay.  Is that -- that number still true

7    today?

8    A.    It looks pretty accurate.

9    Q.    You can go back to Exhibit 7, please.

10   And turn to what's marked as page 70 on the bottom

11   right.

12           At the top of the page, you list here

13   growth income for 2022 as 361,545 dollars.

14           Do you see that?

15   A.    Yes.

16   Q.    And what was the source of that income?

17   A.    Well, Hologenix would have been 300,000.

18   I'm not sure what the balance is made of.

19   Q.    And for 2021, you list your income as

20   363,112 dollars.

21           What does that represent?

22   A.    The same.

23   Q.    300,000 dollar for Hologenix and you

24   don't know where the remainder came from?

25   A.    Yeah.  The other one could be phantom

Page 281

```
 1   income from K-1 statements.  Basically, taken from

 2   my tax return, is my understanding.

 3          Q.   And then in the next section, five, you

 4   list 2.8 million in distributions that you received

 5   in 2023 from the Seth Casden Resulting Trust.

 6               Is that correct?

 7          A.   Yes.

 8          Q.   And what did you use that 2.8 million

 9   dollars for?

10          A.   Investments, living expenses, savings.

11          Q.   What types of investments?

12          A.   I had a couple of different brokerage

13   accounts and a -- private equity investments.

14          Q.   What private equity investment did you

15   make in 2023?

16          A.   I'd have to look at the schedule.  I

17   don't --

18          Q.   [Unintelligible.]

19               THE COURT REPORTER:  What was that?

20               MS. SULLIVAN:  I said, "That's fine.

21   I'll show it to you later."

22               THE COURT REPORTER:  Thank you.

23   BY MS. SULLIVAN:

24          Q.   And then in 2022, you stated that you

25   received 1.7 -- 1,719,000 dollars from the Seth
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1    Casden Resulting Trust.

2              Is that correct?

3        A.   Yes.

4        Q.   And what did you use those distributions

5    for?

6        A.   The same answer.

7        Q.   Did you also make private equity

8    investments in 2022?

9        A.   I think you mean 2021?

10       Q.   No.  2022.

11       A.   Yes.

12       Q.   And then for calendar year 2021, on this

13   page you list a gift of 25,300 dollars.

14             Who did you receive that from?

15       A.   It's probably multiple gifts.

16       Q.   From who?

17       A.   My parents might have made a gift to me.

18       Q.   You don't remember what the gift was?

19       A.   No.  I believe these were taken from tax

20   returns.  So I -- I -- I don't know how things are

21   categorized or qualified and what constitute gift

22   income or gift.

23       Q.   Okay.  If you turn to the next page, it

24   lists various credit cards and payment that you

25   made.

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Saulnier   Page 263 of 492   Page 302 of 1079
**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 283

1          See that?

2     A.    Yes.

3     Q.    And says "American Express," the total

4  amount paid, 179,324 dollars.

5          Do you see that?

6     A.    Yes.

7     Q.    Those payments were made between August

8  and October 16, 2023; correct?

9     A.    Yes.

10    Q.    Why did you make those payments?

11    A.    Those were the amounts owed on the card.

12    Q.    It's a credit card, not some other kind

13  of account; correct?

14    A.    Yes.

15    Q.    Was there a payment due to American

16  Express on October 3rd, 2023 and October 16, 2023?

17    A.    Yes, to the extent I wanted to pay the

18  balance off.

19    Q.    Did you want to pay the balance off

20  before you filed bankruptcy?

21    A.    Yes.

22    Q.    Why?

23    A.    Because I didn't want to owe creditors

24  money.

25    Q.    Because you didn't want to owe credit

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 284

```
 1   card creditors money?

 2        A.   Didn't want to owe anyone money.

 3        Q.   Is that true for the remaining payments

 4   that you made to Discover, Chase, Chase Amazon, and

 5   Apple?

 6        A.   All of these were -- I -- all my credit

 7   cards, I keep current.  So I had about an 800 and

 8   850 credit score before I filed bankruptcy.  So I

 9   paid my credit card statements in full every month.

10             So these were the -- I think you have to

11   list the payments you made in the ninety days

12   prior, whatever it is.

13        Q.   Uh-huh.

14        A.   So these are the payments to those

15   cards.

16        Q.   And then at the bottom, it lists

17   Mr. Devoto and 50,000 dollars on October 5th, 2023?

18        A.   Yes.

19        Q.   And then it says the amount that you

20   still owe, 70,582; correct?

21        A.   Yes.

22        Q.   Where did that number come from?

23        A.   I don't know.  Looks like it's an error.

24        Q.   In actuality, you only owe Mr. Devoto

25   40,000 and change; correct?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 285

1        A.    Yes.

2        Q.    Did you review this before it was

3    submitted to the court?

4        A.    Yes.

5        Q.    Then you go to the next page,

6    Mr. Casden.

7              It says "Discover personal loans," total

8    amount paid, 32,076 dollars and 60 cents.

9              What is that?

10       A.    That was the payments that I made to pay

11   off the loan.

12       Q.    What was the -- what was the loan you

13   had from Discover personal loans?

14       A.    I took out a loan.

15       Q.    When did you take out that loan?

16       A.    I don't recall.

17       Q.    Okay.

18       A.    It was ...

19       Q.    Was it in 2023 or some other time?

20       A.    I don't recall.

21       Q.    Do you have any documentation concerning

22   that loan?

23       A.    It's all done electronically.

24       Q.    Do you have anything that you can go on

25   the computer and print out that --

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 286

1          (Unreportable cross-talk.)

2               THE WITNESS:  I can't --

3    BY MS. SULLIVAN:

4          Q.    -- loan?

5          A.    I can't log -- all those accounts are

6    closed.  Once I close them, I lose access.  I can't

7    log in to any of these accounts.

8          Q.    What was the amount of the loan you

9    received from Discover?

10         A.    I think it was around 35- or 40,000

11   dollars.

12         Q.    And what did you use that money for?

13         A.    To pay Mr. Devoto back.  To partially

14   pay him back.

15         Q.    Was that the 50,000 or something else?

16         A.    What 50,000?

17         Q.    That you paid him in October of 2023.

18         A.    No.  That doesn't match up.

19         Q.    So you didn't use the loan from

20   Discovery to make that 50,000 dollar payment for a

21   different payment to Mr. Devoto?

22         A.    Yes.  If you look at the payment

23   schedule to Mr. Devoto, you'll find the payment on

24   there.

25         Q.    Was Mr. Devoto asking for repayment?

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 287

1    That's why you took the loan out?

2         A.   Yes.

3         Q.   How did he make the request for the

4    repayment?

5         A.   By the -- by phone.

6         Q.   And if you go to page 73, under "List

7    Certain Losses," you have a list at the bottom for

8    gambling incurred Jan- -- late January 2023, value

9    of property loss, 420,000 dollars.

10             Is that correct?

11        A.   Yes.

12        Q.   And that's 420,000 dollars that you

13   gambled and lost at Aria Resort and Casino in

14   January 2023 and early February 2023?

15        A.   Yes.

16        Q.   Can you turn to page 75 on the bottom

17   right in Exhibit 7.  It says "Public Storage."

18             Do you pay monthly for public storage?

19        A.   Yes.

20        Q.   How much did that cost?

21        A.   It's around 500 dollars, I think.  Maybe

22   a little more.

23        Q.   What do you store there?

24        A.   It's a combination of personal effects

25   and stuff for the company.  Hologenix pays the

Page 288

```
 1   monthly rent, but I'm the guarantee on the lease,

 2   or the rental agreement.

 3          Q.    Then if you look at page 77, on the

 4   bottom right of Exhibit 7, please.  List at the

 5   top, "Stoneybrooke Films, LLC."

 6              And then it has:

 7              "Name of accountant or

 8   bookkeeper:  Lisa Johnson."

 9              Do you see that?

10   A.    Yes.

11          Q.    What does Ms. Johnson do for

12   Stoneybrooke Films?

13          A.    Just submit to my accountant the bank

14   balance.  It's a dead entity, so there's really

15   nothing that happens.

16          Q.    Do you pay her any money?

17          A.    Just hourly.

18          Q.    Turn to page 79 of Exhibit 7 on the

19   bottom right, please.

20              You list your gross wages as 21,666

21   dollars.

22              Is that accurate?

23          A.    It's accurate when you take into account

24   that I didn't receive money for one month, so it

25   lowered the average.  But the monthly amount
```

Page 289

1    normally is 25,000.

2         Q.   But you received that -- the -- the

3    salary that you waived or delayed, you received

4    back again; correct?

5         A.   Yes.

6         Q.   Can you turn back to page 67 in Exhibit

7    7, the bottom right, please.

8              If you look at paragraph 20(A) and (B),

9    it lists mortgage on other property, 9,126 dollars.

10             What does that represent?

11        A.   That was the -- the mortgage payment for

12   Lincoln.

13        Q.   Why is it 9,126 dollars?  I thought we

14   discussed earlier it was 8,800 something.

15        A.   That's related to the impounding for

16   insurance that they were withholding.  And once we

17   got that sorted out, they lowered the amount to the

18   number that it currently is.

19        Q.   And then under "Real Estate Taxes," it

20   says 974.

21             I thought the real estate taxes were

22   included in the mortgage payment.

23        A.   It is.  They were charging over, I

24   think, a thousand dollars a month for insurance.

25   So once they backed that out, you add in the real

Page 290

```
 1   estate taxes to get to the 8,800.

 2        Q.   Could you turn back to page 79, please,

 3   of Exhibit 7.

 4             In the bottom left, paragraph six, it

 5   says:

 6             "Net income from rental and

 7        other real property."

 8             Do you see that?

 9        A.   Yes.

10        Q.   It says gross receipts is 8,000 a month.

11   Ordinary, necessary operating expenses is 11,548

12   dollars.

13             What did that represent?

14        A.   The mortgage payment and the HOA dues

15   and the maintenance.

16        Q.   So every month that you rent your

17   townhouse, you lose three -- you have to pay 3,548

18   dollars towards it?

19        A.   I think that's before this was maybe

20   adjusted.  But yes, that's what that says.

21        Q.   But it's true that every month you have

22   to pay additional money towards the townhouse

23   because the rent doesn't cover the total cost;

24   correct?

25        A.   Yes.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 291

```
 1        Q.    And then you turn to page 80, please.

 2              On ten, it says:

 3              "Income from all other sources

 4        not listed above."

 5              Says "Distributions," 175,000 dollars.

 6              Do you see that?

 7        A.    Yes.

 8        Q.    What does that represent?

 9        A.    I don't know.

10        Q.    That distributions from your Seth Casden

11        Resulting Trust or something else?

12        A.    I have no idea what that's for.

13        Q.    Turn to the next page.

14              You saw that's your signature again;

15        correct?

16        A.    Yes.

17        Q.    And you -- again, you signed this under

18        the penalty of perjury; correct?

19        A.    Yes.

20        Q.    Is there any document that you could

21        review that would refresh your memory as to what

22        that 175,000 dollar distribution is for?

23        A.    I'd have to ask Armory.

24        Q.    Did Armory fill out this form?

25        A.    I don't know if they filled it out or my
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   attorneys filled it out.

2       Q.   If we turn to page 82 of Exhibit 7, it's

3   your list of investments, bonds from number 18 in

4   Schedule A/B; correct?

5       A.   Yes.

6       Q.   What is The Lending Club?

7       A.   That was something that you could pay it

8   to or invest it to, and it made loans to creditors

9   and it was a way to participate in that type of

10  market.  It's been closed for a long time.

11      Q.   Is that why it has a zero value?

12      A.   Yes.

13      Q.   And what is Interactive Brokers?

14      A.   That was a --

15      (Unreportable cross-talk.)

16          THE COURT REPORTER:  -- I'm sorry?

17          MS. SULLIVAN:  Interactive Brokers.

18          THE WITNESS:  That was a brokerage

19  account.

20  BY MS. SULLIVAN:

21      Q.   Do you still have that brokerage

22  account?

23      A.   Yes, although they've asked me to close

24  it.

25      Q.   When did they ask you to close it?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 293

```
 1        A.   I got to do a little more research on

 2   it.  I'm not sure.  I just have an e-mail saying

 3   that they -- they won't -- I have to call them.

 4             It's -- it's -- has a freeze on it, I

 5   think because I sold all of the shares and

 6   deposited them into my checking account.

 7             There hasn't been any activity.  So I

 8   don't know if it's an inactivity issue or what.

 9        Q.   Is that related to the CP- --

10        A.   CPNG.

11        Q.   CPNG.  Thank you.

12             Is that what that value is, the 7,333

13   dollars?

14        A.   That was cash that was in the account at

15   the time of this.

16        Q.   Is that cash still in the account today?

17        A.   I think there's about 18,000 in there.

18        Q.   What happened to the other 15,000?

19        A.   It was used to -- it was used for

20   expenses while I filed bankruptcy and I didn't have

21   any credit cards or any way to pay for anything.

22             So the brokerage account had an ATM or

23   debit card associated.  So my dad was using it for

24   his bills, his food, his prescriptions.

25             I was using it to pay for my living
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 294

1  expenses for a few weeks while we got the new

2  account set up and up and running.

3      Q.    What is the Merrill Lynch line item for

4  114,357 dollars and 11 cents?

5      A.    The brokerage account.

6      Q.    Do you still have that brokerage

7  account?

8      A.    Yes.

9      Q.    Does it still have the same amount of

10  money in it?

11      A.    No money's been withdrawn.  Its value is

12  whatever the market securities are.

13      Q.    And what is Robinhood Brokerage for

14  164,901 dollars and 36 cents?

15      A.    It's a brokerage account.

16      Q.    Has any money been withdrawn from it

17  since you filed for bankruptcy?

18      A.    No.

19      Q.    What is Think of Swim account, Charles

20  Schwab?

21      A.    I think that's a typo.  Think or Swim.

22      Q.    Okay.

23      A.    It's a brokerage account.

24      Q.    And has any money been withdrawn from

25  that account?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 295

```
 1      A.   No.

 2      Q.   And is Acorn Securities what we talked

 3  about earlier this morning?

 4      A.   Yes.

 5      Q.   And what is Tasty Trade?

 6      A.   Another brokerage account.

 7      Q.   And is that money -- has any money been

 8  withdrawn from that account?

 9      A.   No.

10      Q.   And Whittier Trust is the trust we

11  talked about earlier?

12      A.   Yes.

13      Q.   Okay.  What do the notes mean?

14      A.   It's the cash balance, the equity

15  balance, and the loan balance.

16      Q.   What are -- it's 1.8 million in

17  uncollectible loans?

18      A.   Yes.

19      Q.   What does that represent?  What does

20  that mean?

21      A.   Loans to my dad and to Stoneybrooke

22  Films and to Hologenix.

23      Q.   How much money did you loan to Hologenix

24  from the Whittier Trust?

25      A.   Maybe 1.2 million.
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 296

1        Q.    And how much money did you loan from

2    Whittier Trust to Stoneybrooke Films?

3        A.    Maybe 200,000.

4        Q.    How much money did you loan to your

5    father?

6        A.    About 500,000.

7        Q.    When did you loan 500,000 dollars to

8    your father?

9        A.    2008.

10        Q.    And when did you make the 1.2 million

11    dollar loan to Hologenix?

12        A.    It was a few loans from 2003 to 2008.

13        Q.    So is the value of the Whittier Trust

14    1.894 million or it's 20,192 dollars plus 65,064

15    dollars?

16        A.    I would say not all of that 65,000 is --

17    has value.  There's some shares that I think

18    have -- they're not redeemable.  But yes, the value

19    is around 80,000.

20        Q.    What is Crypto @ Kraken?

21        A.    That was for cryptocurrency.

22        Q.    Is that something you turned into the

23    U.S. trustee?

24        A.    Yes.

25        Q.    And what is Charles Schwab?

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 297

```
 1        A.    That was the checking account that paid

 2   Kelly's 4,000 dollars a month.  So I would fund

 3   that account once a year and then that account

 4   would pay her -- direct deposit her money.

 5        Q.    And it says -- has there been any money

 6   withdrawn from Charles Schwab since you filed for

 7   bankruptcy?

 8        A.    Yes.

 9        Q.    How much?

10        A.    About 4,000 dollars a month until we

11   switched over to having it paid directly.  I think

12   the first month I paid directly, it was February or

13   March.

14        Q.    And then you have the Angel List Private

15   Equity Investment, 409,000.

16              What does that represent?

17        A.    That represents maybe six or seven

18   different investments in private equity.

19        Q.    When were those investments made?

20        A.    From 2020 through sometime maybe last

21   year.

22        Q.    And how did you derive the value of

23   409,000?

24        A.    That's the amount of the investments I

25   made.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 298

```
 1          Q.    What is -- what is AKIDO?

 2          A.    It's a health care provider.

 3          Q.    Did you make an investment into AKIDO?

 4          A.    Yeah.  All of these here are private

 5    equity investments that I've made and the values

 6    are all based on the amount of the investment I

 7    made.

 8          Q.    What is Splinterland?

 9          A.    It's an online gaming platform.

10          Q.    What is Universal Hydrogen?

11          A.    They are a company that's trying to

12    convert commercial airplanes to run on liquid

13    hydrogen.

14          Q.    What is Interplay Opp Fund?

15          A.    Interplay Opp Fund and Interplay Early

16    Stage Fund is private equity investing in sort of

17    speculative early stage companies.

18          Q.    You turn to page 87 to 95.  Those are

19    the charitable contributions you made; correct?

20                THE COURT REPORTER:  "Prior" --

21                MS. SULLIVAN:  Charitable.

22                THE COURT REPORTER:  Ah.

23                THE WITNESS:  From 87 to 95, yes.

24    BY MS. SULLIVAN:

25          Q.    Now, you look at 94, 95.  There's a
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1   bunch of payments to Westland School.

 2            **What are those for?**

 3        A.   Those are contributions to the school.

 4        **Q.   Are they charitable contributions or**

 5   **something else?**

 6        A.   Charitable.

 7        **Q.   Are you required to make those payments?**

 8        A.   Am I required to make a charitable

 9   contribution?  Like, is that even legal?

10            No, I don't think so.

11        **Q.   I mean, does the school require parents**

12   **to make certain payments in addition to tuition**

13   **that are reflected here?**

14        A.   No, I don't think you can do that.  I

15   don't know about that.  The only requirement is the

16   tuition and for any other aftercare that I sign him

17   up for.

18            MS. SULLIVAN:  Let's take a

19   couple-minute break.  I don't need to, but I don't

20   want to ...

21            MR. TEDFORD:  Sure.  Just a stretch

22   break would be nice.

23        (Whereupon, a recess was held

24        from 4:39 p.m. to 4:51 p.m.)

25   / / /

1   BY MS. SULLIVAN:

2        Q.   Mr. Casden, I'm going to show you what's

3   marked as Exhibit 21, which is the single page

4   sheet.

5        (Whereupon, MET's Exhibit Number

6        21 was marked for identification

7        by the deposition officer and is

8        attached hereto.)

9   BY MS. SULLIVAN:

10       Q.   Do you recognize that document?

11       A.   I do.

12       Q.   It's Bates stamped Casden 10897.

13            What is it?

14       A.   It is summary of the investments that

15   are listed under the Angel Fund.

16       Q.   Okay.  Which Angel Fund?

17            I can show you again, if you want.

18       A.   Yeah.  So it's a summary of the

19   investments listed.  I don't know what exhibit this

20   is.  Sorry.

21       Q.   That's Exhibit 7.

22       A.   Exhibit 7 on page --

23       Q.   Is it a summary of which -- which

24   private equity fund?  Is it Angel List?

25       A.   Yes.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 301

```
1        Q.   AKIDO?

2        A.   No.  Angel List.

3        Q.   So this --

4        A.   I said Angel Fund.  It's Angel List.

5        Q.   So this is all of the investments that

6   are within the Angel List that's listed on page 82

7   of Exhibit 7; correct?

8        A.   Yes.  I think on page 82 of Exhibit 7

9   it lists a value of 490?

10       Q.   409.

11       A.   409?

12       Q.   Uh-huh.

13       A.   So this is -- I don't know if there's a

14  typo -- oh, I can explain that as we go through

15  this.

16       Q.   Okay.  Why don't you explain it to me

17  now.

18       A.   Okay.  So there's eleven investments

19  here.

20       Q.   Uh-huh.

21       A.   And the amount invested is listed with

22  the invest state.

23            One of the investments was a -- a zero

24  farmstead.

25       Q.   Uh-huh.
```

Page 302

1      A.    They've gone bankrupt.

2      Q.    Okay.

3      A.    And then the rest of the investments are

4   still pending.

5      Q.    What does it mean when it says under

6   "Net Value," "Locked"?

7      A.    I don't know.

8      Q.    And then under the "Invested" column, it

9   says eleven investments, 489,759 dollars and 98

10   cents.

11         Do you see that?

12      A.    Yes.

13      Q.    Okay.  Why -- why is that 80,000 and

14   change more than the 409,000 listed in your

15   schedules?

16      A.    Well, there's 50,000 that's a zero.  So

17   that would make it 440.

18         I don't know if there is a typo in the

19   list on Exhibit 7 or if there's something missing

20   or -- I'd have to add these up and see.

21         There's about a 40,000 dollar or 30,000

22   dollar discrepancy, it sounds like.

23      Q.    Show you what we previously marked just

24   now as Exhibit 20.

25   / / /

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 303

```
 1          (Whereupon, MET's Exhibit Number

 2          20 was marked for identification

 3          by the deposition officer and is

 4          attached hereto.)

 5     BY MS. SULLIVAN:

 6          Q.   See that?

 7          A.   I have Exhibit 20, yes.

 8          Q.   Do you recognize that document?

 9          A.   Yes.

10          Q.   What is it?

11          A.   It's the Debtor's Supplement Opposition

12     to MET's Motion Objecting to Claims of Exemption

13     and the Supplemental Declaration of Seth Casden and

14     James Wong in Support Thereof.

15          Q.   Okay.  And what -- what involvement did

16     you have, if any, in preparing this document?

17          A.   I would have given information to James

18     and reviewed my declaration.

19          Q.   Did Mr. Wong ever do any business with

20     Hologenix?

21          A.   No.

22          Q.   Did you ask Ms. Osterholt to submit a

23     declaration in support of this submission?

24          A.   I don't think she was asked to.  I think

25     it was determined it wasn't necessary.
```

Page 304

1          Q.   Without revealing any legal advice, do

2    you know why it was determined it wasn't necessary

3    for Ms. Osterholt to submit a declaration?

4          A.   I think because of legal advice.

5          Q.   Did you ask your father to submit a

6    declaration in support of your submission?

7          A.   It's the same answer.

8          Q.   Can you turn to page two of Exhibit 20,

9    please.

10              Counsel states in the Memorandum of

11   Points and Authorities:

12              "The debtor's monthly income

13         alone does not cover his monthly

14         expenses."

15              You see that?  It's on the bottom of the

16   page.

17         A.   Yes.

18         Q.   Is that a true statement?

19         A.   Yes.

20         Q.   Is it also true that your monthly income

21   has never covered your monthly expenses?

22         A.   I don't think that's true.

23         Q.   Your monthly income from Hologenix of

24   25,000 dollars covers your monthly expenses?

25         A.   You said "ever."  So I'm fifty years

Page 305

1   old.  So I don't --

2          Q.   Fair enough.

3               Is it true that your monthly income for

4   the last four years has not covered your monthly

5   expenses?

6          A.   Yes.

7          Q.   You were able to cover the difference

8   between your monthly income and expenses with the

9   distributions from your trust; correct?

10         A.   Yes.

11         Q.   Let's turn to your supplemental

12  declaration on page four of Exhibit 20.

13              Are the statements in your declaration

14  true and accurate?

15         A.   To the best of my knowledge, yes.

16         Q.   Paragraph six -- I'm sorry -- paragraph

17  four, you state that you provide Ms. Osterholt's

18  approximately 6,000 per month of additional

19  financial support; correct?

20         A.   Yes.

21         Q.   Is that a direct payment to her in one

22  lump sum?

23         A.   No.

24         Q.   When did you first open the brokerage

25  account that used to use funds to pay Ms. Osterholt

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

```
 1   4,000 a month [as spoken]?

 2         A.   2016, maybe.  Guessing.

 3         Q.   And how was that brokerage account

 4   funded?

 5         A.   I fund it once a year.

 6         Q.   With money from where?

 7         A.   From my checking account.

 8         Q.   Why did you close that brokerage account

 9   in February 2024?

10         A.   I didn't.

11         Q.   Why did you stop using the brokerage

12   account to pay Ms. Osterholt the 4,000 dollars a

13   month?

14         A.   On the advice of counsel.

15         Q.   Do you pay Ms. Osterholt's rent directly

16   to her or to the landlord?

17         A.   I paid directly to the landlord.

18         Q.   In paragraph four, you state that her

19   rent is 4,617 dollars and 49 cents; correct?

20         A.   Yes.

21         Q.   And it used to be 4,395 dollars;

22   correct?

23         A.   I think that's right.

24         Q.   When was her rent increased?

25         A.   I believe in January of this year.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 307

1     Q.   So if we add the monthly rent of 4,617

2  dollars and 49 cents and the 4,000 you deposit

3  directly into Ms. Osterholt's account, that leaves

4  a discretionary 1,382 dollars and 51 cents.

5         Take you to 10,000 dollars of -- let me

6  see if I -- strike that question.

7         Do you know what the total you pay

8  Ms. Osterholt on a -- a monthly basis is?

9     A.   Approximately 6,000 dollars.

10     Q.   So you pay her 6,000 dollar plus the

11  rent.  So around 10,617 dollars and 49 cents?

12     A.   Is the amount she receives the benefit

13  of.  Correct.  And 6,000 of that would go to her

14  and 4,600 would go directly to the landlord.

15     Q.   How did you keep track of the money that

16  you pay to Ms. Osterholt at all, if at all?

17     A.   Just by reconciling my bank statements.

18     Q.   In paragraph six you state that you do

19  not control how Ms. Osterholt uses the funds you

20  provide for your son's care or otherwise.

21         Is that correct?

22     A.   Well, I mean, we agree on who -- who

23  he's gonna see and have help, but I -- she has

24  freedom to spend that money however she sees.

25  That's correct.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 308

1      Q.   Then you state in paragraph seven:

2           "Absent this arrangement with

3      my son's mother, I would be

4      required to pay third parties for

5      additional care and treatment for

6      my son that I believe would exceed

7      the amounts I pay to my son's

8      mother."

9           Correct?

10     A.   Yes.

11     Q.   On what basis do you make that

12  statement?

13     A.   Just my understanding of what that type

14  of care costs.

15     Q.   What -- what's -- where do you have an

16  understanding of what that type of care costs?

17     A.   Just talking to people, people that have

18  full-time help.  It's an estimate.  That's why it

19  says "I believe."

20     Q.   Have you -- have you researched

21  specifically any third parties and the costs

22  associated therewith?

23     A.   In the beginning, yes.  Not recently.

24     Q.   When you say "the beginning," do you

25  mean when your son was first born?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1      A.    Yes.

2           Q.    Since your son's been attending school,

3    have you researched the cost of having a third

4    party provide care and treatment for your son?

5           A.    Well, I know from talking to agencies

6    that place these type of positions, it's anywhere

7    from hundred, 120,000, to over 200,000 a year for

8    this type of care.

9           Q.    What type of care are you referring to

10   for that?

11          A.    Full-time specialized care for a son

12   with -- for a person with my son's diagnosis.

13          Q.    Why would your son need full-time

14   specialized care if he's in school five days a week

15   for eight or nine hours?

16          A.    He would need it for outside of the

17   school time.  Is -- that's a hypothetical you're

18   asking me?  Or maybe I didn't understand the

19   question.

20          Q.    Does your son need full-time specialized

21   care for while he's in school?

22          A.    No.

23          Q.    Okay.  When you say you spoke to

24   agencies, what agencies are you referring to?

25          A.    I think it's called The Rose Agency.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1    Going off memory.

2        Q.    And this is an agency you spoke to when

3    your son was born or --

4        A.    Yes.

5        Q.    Have you spoken to anyone about the cost

6    associated with providing care for your son since

7    he entered school?

8        A.    Just anecdotally.

9        Q.    Would it be possible for any family

10   members to assist you and Ms. Osterholt with caring

11   for your son?

12       A.    None that I know of.

13       Q.    Have you ever asked any family members

14   to assist you with caring for your son?

15       A.    Well, sure.  My dad watches Charlie for

16   fifteen or twenty minutes at a time sometimes.  But

17   my dad can't drive.  My mother stopped driving.  So

18   I don't have any other family that could help.  So

19   there's no one to ask.

20       Q.    Has Ms. Osterholt asked anyone in her

21   family to assist with the care of your son?

22       A.    She considered moving back to Indiana,

23   but her family doesn't live here.

24       Q.    When did she consider moving back to

25   Indiana?

1        A.    You'd have to ask her.  I think we've --

2    she's thought about it off and on at different

3    times.

4        Q.    Have you had discussion with

5    Ms. Osterholt about her moving to Indiana since you

6    filed for bankruptcy?

7        A.    No.

8        Q.    State in paragraph ten, Mr. Casden, that

9    you paid 4,200 dollars per month in additional

10   expenses for your father for medical, grocery, and

11   other expenses?

12       A.    Yes.

13       Q.    How much of the 4,200 dollars is for

14   groceries?

15       A.    Probably pretty close to half.

16       Q.    And how -- how much of the 4,200 is for

17   medical?

18       A.    It's just an average.  So it depends.

19   He had a 10,000 dollar dental bill a couple years

20   ago.  So it's just an average.

21       Q.    So you pay about 2,000 dollar a month

22   for your hus- -- for -- sorry, not -- father's

23   groceries?

24       A.    I think that's what it's been.  Yeah.

25   That's about right.  He has to have them delivered

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 312

1    and -- yes.

2         Q.   That's in addition to the 2,756 that we

3    talked about earlier that he pays for groceries

4    himself?

5         A.   Yes.

6         Q.   Does your father have Medicare or

7    Medicaid?

8         A.   Yes.

9         Q.   Does he have any other medical

10   insurance?

11        A.   Yes.

12        Q.   And you stated that you purchased a

13   2,200-dollar-per-month reef tank during COVID to

14   help your son with his stress and anxiety; correct?

15        A.   Yes.

16        Q.   Why don't we turn to Mr. Wong's

17   declaration.  It's the next document, on page

18   seven.

19             Do you see that?

20        A.   Yes.

21        Q.   In paragraph six, Mr. Wong states that

22   he's been assisting in the preparation of your

23   monthly operating reports.

24             We talked about that; correct?

25        A.   Yes.

Page 313

```
1        Q.    And he said he assisted the debtor, you,

2   with preparing financial projections.

3              Is that correct?

4        A.    Yes.

5        Q.    And what is -- what financial

6   projections is that?

7        A.    Whatever the court required.

8        Q.    You say "whatever the court required."

9              What are you referring to?  You mean the

10  documents you submitted in support of a plan or

11  something else?

12       A.    Everything.  This document.  Whatever

13  the court has asked for, he's helped prepare.

14       Q.    Did --

15       A.    I don't have a list committed to memory.

16       Q.    And Mr. Wong said he assisted with the

17  liquidation analysis.

18             Is that correct?

19       A.    Yes.

20             THE COURT REPORTER:  "And Mr. Wong

21  is" --

22  BY MS. SULLIVAN:

23       Q.    Mr. Wong said he sist- -- assisted with

24  the liquidation analysis.

25             Is that correct?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 314

1      A.   Yes.

2           Q.   Mr. Wong also states that he spoke with

3   Ms. Osterholt.

4                Did you participate in those

5   communications?

6      A.   No.

7           Q.   And he also communicated with your

8   father; correct?

9      A.   I don't know if they ever talked or not.

10          Q.   Were you ever involved in any phone

11  discussions between your father and Mr. Wong?

12     A.   No.

13          Q.   Have you had any discussions with

14  Mr. Wong about the valuation of your shares in

15  Hologenix?

16     A.   Maybe.

17          Q.   What does that mean?

18     A.   Means I don't remember.

19          Q.   Turn to Exhibit 1 to Mr. Wong's

20  declaration.  Starts on page nine of 32.

21               If we look at December, it says

22  "Housekeeping."  It says 5,000 dollars.

23               Do you see that?

24     A.   Yes.

25          Q.   And it's 2,000 more than the 3,000

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1    dollars a month that's budgeted; correct?

2        A.    Yes.

3        Q.    Why is that?

4        A.    Because this is a cash basis, I guess,

5    of the withdrawal I took out.  And then some of

6    that balance is used to go towards the next month.

7    It's just to have less trips to the bank.

8        Q.    All right.  Mr. Wong in this Exhibit 1

9    has a chart of your Cash Flows, Budget to Actual

10   Variance Report from October 17, 2023 to February

11   29, 2024; correct?

12       A.    Yes.

13       Q.    Do you know why it stopped on February

14   29, 2024?

15       A.    I think that's all the information he

16   had.

17       Q.    And that's a four-month period of time;

18   correct?

19       A.    Sounds like it.

20       Q.    And then if we look on the next page

21   under "January," and under "Travel," it says 2,628

22   dollars.

23             Do you see that?

24       A.    Yes.

25       Q.    What does that represent?

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 316

1        A.   Probably my flight to Cancun and any

2   other fees I had or -- I'm not sure beyond that.

3        Q.   You testified earlier that you paid for

4   the chet -- that Cancun trip in January 2023.

5             Why were there still additional expenses

6   for flights and other things?

7        A.   I paid for the package.  It did not

8   include the flight.

9        Q.   Who went to Cancun?

10       A.   I went by myself.

11       Q.   How much did the trip cost?

12       A.   I gave an estimate of that earlier.

13            I guess it's around 2,600 dollars, not

14   counting what I paid last year.

15       Q.   How long were you in Cancun for?

16       A.   I think about a week, five days.

17       Q.   Then if we look at February of 2024

18   under "Travel," it says 4,893 dollars.

19            What does that represent?

20       A.   Probably the airfare for the trip to

21   Austin.

22       Q.   The airfare for you and your son to

23   Austin was almost 5,000 dollars?

24       A.   Part of it.

25            It might also be the trip I paid the

Page 317

```
 1   airfare for my son to go visit his grandmother.

 2   It's probably in there as well.

 3       Q.    Where did he go visit his grandmother?

 4       A.    In Florida.

 5       Q.    Go back to December, Mr. Casden, and

 6   page nine of Exhibit -- sorry -- page ten of

 7   Exhibit 20.

 8             Look towards the bottom.  It says:

 9             "Paid directly by debtor."

10             And it has:

11             "Child's

12   birthday-slash-Christmas."

13             And it says 5,890 dollars.

14             Do you see that?

15             Towards the bottom below that.

16             Below that.

17             Yeah.  Says "Paid" [unintelligible] --

18   (Unreportable cross-talk.)

19             THE WITNESS:  Yes.

20             THE COURT REPORTER:  It says what?

21   BY MS. SULLIVAN:

22       Q.    (Reading):

23             "Paid directly by debtor.

24   Child's birthday-slash-Christmas."

25       A.    5,890 dollars.
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 318

```
 1        Q.    Yeah.  What does that represent?

 2        A.    His birthday party and Christmas gifts.

 3        Q.    And how much did his birthday party

 4   cost?

 5        A.    A few thousand dollars.

 6        Q.    Where was his birthday party?

 7        A.    At a park.

 8        Q.    Why did it cost a few thousand dollars?

 9        A.    So we had a maze set up, a caterer, and

10   a dessert truck.

11              And we had somebody doing air brushing,

12   t-shirts and basketballs, park fees, some arts and

13   crafts.

14        Q.    Did you buy your son a gift?

15        A.    Yes.

16        Q.    What did you get him?

17        A.    I gave him -- God, I can't remember

18   right now.

19              I got him an hour glass to help with

20   time.  I got him, I think, a chess board.

21              And I can't think of anything else right

22   now.

23        Q.    Did you buy him a Nerf gun?

24        A.    I think he already had one.  His mom

25   might have bought him one.  It was a -- the party
```

1  that we hosted had a Nerf gun maze set up, but I

2  don't know that we bought him a Nerf gun or not.  I

3  can't remember.

4      **Q.   Did you consider not taking the 5,000**

5  **dollar trip to Austin, given that you were in**

6  **personal bankruptcy?**

7      A.   Yes.

8      **Q.   Okay.  Why did you take the trip anyway?**

9      A.   Because it was a solar eclipse and it

10  was an educational trip I wanted my son to be able

11  to experience.  So I took him out of school and

12  took him to see that.

13     **Q.   Could you see the solar eclipse in**

14  **Los Angeles?**

15     A.   Excuse me?

16     **Q.   Could you see the solar eclipse in**

17  **Los Angeles?**

18     A.   No.

19     **Q.   Could you see the solar eclipse that was**

20  **somewhere driving distance from Los Angeles?**

21     A.   No.

22     **Q.   There was nowhere driving distance from**

23  **Los Angeles to see the solar eclipse?**

24     A.   No.  The path of totalitary -- the path

25  of total- --

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 320

```
1              MR. TEDFORD:  Totality.

2              THE WITNESS:  -- totality is a band

3    that's maybe less than 200 miles wide, going

4    through Austin --

5              (Unreportable cross-talk.)

6              MR. RAMLO:  It started in Texas.

7              THE WITNESS:  Yeah.

8              MR. RAMLO:  That was the westernmost

9    point.

10             (Brief interruption.)

11             (Whereupon, a discussion was held

12             off the record.)

13   BY MS. SULLIVAN:

14        Q.   So you had to see the solar eclipse

15   in -- in totality, not just a sol- -- solar

16   eclipse; correct?

17        A.   I didn't have to do anything.  I chose

18   to take my son to experience the totality of the

19   solar eclipse, which is completely different than

20   something where there is no totality.  There is no

21   comparison between the two.

22        Q.   If you look at the next line under "Paid

23   Directly By Debtor" on the second page, 1132, it

24   says "Education," 11,659; correct?

25        A.   11,659.  Correct.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 321

1        Q.   And that's money you paid directly to

2    Westland School or something else?

3        A.   Westland.

4        Q.   And there's a note on the next page --

5    where is that -- if we look at that same page for

6    the total expenses, it was 250,586 dollars;

7    correct?

8        A.   Where?

9        Q.   Sorry.  Looking under "Cumulative."

10       A.   Okay.

11       Q.   Then the "Actual" column --

12       A.   Okay.

13       Q.   -- towards the bottom, it says "Total

14   Expenses," 250 --

15       (Unreportable cross-talk.)

16            THE WITNESS:  Yes.

17   BY MS. SULLIVAN:

18       Q.   -- -86?

19       A.   Yes.

20       Q.   If you look above, on "Total Income"

21   under "Cumulative" and "Actual," it says 308,828

22   dollars; correct?

23       A.   Yes.

24       Q.   So that's a positive income to you for

25   58,242 dollars; correct?

1       A.   Yes.  They're not -- it's not all

2   income, though.  It's not accurate.

3       Q.   Well, it's how it's been documented by

4   Mr. Wong.  I'm just using the language Mr. Wong has

5   in this chart.

6       A.   There's a footnote to explain it because

7   those are the only categories that are used.

8       Q.   So two is -- footnote two:

9            "Other income, primarily the

10           liquidation of brokerage accounts."

11           What does that reference?

12      A.   Liquidating my brokerage account.

13      Q.   Does that not count as -- as money that

14  goes -- goes into your bank account?

15      A.   That's not income.  It's the sale of an

16  asset.

17      Q.   That you --

18      A.   It's non-recurring income.  To make a

19  conclusion that I have positive cash flow is

20  inaccurate and not correct.

21           I had a one-time receipt of a sale of an

22  asset that allowed me to be cash flow positive over

23  those four and a half months.

24      Q.   What -- what brokerage account was that

25  for?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 323

```
 1        A.    I'm not sure.

 2        Q.    You received 105,000 from a brokerage

 3   account you sold and you don't know, sitting here

 4   today, which brokerage account?

 5        A.    Out of the four we went over, no, I'm

 6   not sure.  It could have been liquidation of the

 7   crypto assets, money from the other accounts as

 8   well.

 9              This isn't a memorization test.  So

10   trying to characterize it like I don't know is

11   unfortunate.

12        Q.    So note three says:

13              "Budgeted amount did not

14         include certain direct expenses

15         paid by debtor, including education

16         expenses."

17              Correct?

18        A.    Yes.

19        Q.    Okay.  And then note three is next to

20   the -- the line item "Total Expenses For

21   Child-Slash-Mom"; correct?

22        A.    Yes.

23        Q.    Then look at the cumulative actual

24   expenses for child-slash-mom was 83,415 dollars;

25   right?
```

1      A.   Yes.

2           Q.   And then if we take the note, we would

3      have to add the 11,659 dollars under "Education"

4      for your child for the total support that you

5      provided for your child during those four months.

6                Is that correct?

7      A.   It would be more than that.

8           Q.   Okay.  What's the purpose of having note

9      three there?

10     A.   To explain that not all of the expenses

11     for my child are paid by my -- by Ms. Osterholt.

12          Q.   Is there any reason that you can't

13     liquidate your other brokerage accounts to provide

14     you additional cash to cover your complete

15     expenses?

16     A.   I have to ask legal advice.  I don't

17     know.

18          Q.   Well, you liquidated one account,

19     correct, during the bankruptcy --

20     A.   I --

21          (Unreportable cross-talk.)

22     BY MS. SULLIVAN:

23          Q.   -- 105,000 --

24     A.   -- to liquidate the crypto.

25                And the other brokerage account was

Page 325

```
 1  already liquidated, but it didn't hit until after I

 2  filed bankruptcy.

 3       Q.   The 20,554 dollars was the liquidation

 4  of the crypto account that the U.S. trustee, not

 5  the court, made you liquidate?

 6       A.   Correct.

 7       Q.   When did you liquidate the other

 8  brokerage account that hit your -- your bank

 9  account in October of 2023 after you filed

10  bankruptcy?

11       A.   No.  Before.

12       Q.   No.  When?

13       A.   In the days before.

14       Q.   Why did you liquidate it?

15       A.   I answered that before.

16       Q.   Okay.  Can you say it again?

17       A.   I was misinformed and I thought that

18  part of filing bankruptcy, I had to liquidate my

19  brokerage accounts.  So they were all liquidated

20  except for, I guess, two, when I learned that

21  they -- that that wasn't the case.

22       Q.   If you look under the "Total Expenses

23  For Child-Slash-Mom," it says "Budget," 53,085;

24  "Actual," 83,415; the variance of 30,330 dollars.

25            Do you see that?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1        A.   Yes.

 2        Q.   Okay.  Why is there such a discrepancy

 3   between the budgeted amount and the actual amount?

 4        A.   I'd have to see the supporting

 5   documents.  I -- I don't know off the top of my

 6   head.

 7        Q.   And in the notes, there's one, two,

 8   three, and then C, D, and A and B seem to be

 9   missing.

10             Do you know what A and B had said?

11        A.   I don't.

12        Q.   Okay.  And then if you can turn to page

13   14, please.  15 of 32 in Exhibit 20.

14             MR. TEDFORD:  Would you like me to

15   answer the question that you just asked?  The --

16             MS. SULLIVAN:  Okay.

17             MR. TEDFORD:  All right.  So looking on

18   page 11 of 32.

19             MS. SULLIVAN:  Okay.

20             MR. TEDFORD:  Okay.  You see where it

21   says "A" next to "Paid Directly By Debtor"?

22             MS. SULLIVAN:  Yeah.  Are you saying

23   it's below?  It's those notes --

24             MR. TEDFORD:  Pulled from info below.

25             MS. SULLIVAN:  Okay.  Fair enough.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 327

```
 1                MR. TEDFORD:  That's why it doesn't show
 2   up on the form.
 3                MS. SULLIVAN:  Okay.  That's fine.
 4   BY MS. SULLIVAN:
 5       Q.   Okay.  Mr. Casden, if you can look back
 6   at Exhibit 20, it's page 15 of 32.
 7            Are you there?
 8       A.   Okay.
 9       Q.   And you look at the travel and
10   accommodations, and it lists Indigo Airlines,
11   Tata Sia Airlines, Indian Hotels, all for November
12   of 2023.
13            Did you go to India in 2023?
14       A.   Yes.
15       Q.   Okay.  Who paid for that trip?
16       A.   I paid for the personal part and the
17   company paid for the work part.
18       Q.   So the -- a little bit over a thousand
19   dollars listed here on page 15 of 32 of Exhibit 20,
20   that's the personal part?
21       A.   Yes.
22       Q.   And what is Be Hive of Healing?
23       A.   It's a holistic doctor.
24       Q.   Is that your physical therapist or
25   something else?
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 328

1       A.    Something else.

2       Q.    Do you go to Be Hive Healing every

3  month?

4       A.    No.  About every two months.

5       Q.    And every time you go, is it

6  approximately 355 dollars?

7       A.    Sometimes it's more than that.

8       Q.    If you can turn to page 21 of 32 in

9  Exhibit 20, please.

10             If you look towards the bottom, there's

11  two payments to the mortgage payment to Shell

12  Point.

13             Do you see that?

14       A.    Yes.

15       Q.    The first one's on January 10 for

16  17,722.62.  The second one's for 8,861 dollars and

17  31 cents; correct?

18       A.    Yes.

19       Q.    Okay.  Why did you make a 17,000

20  dollar -- why did you make a 17,000 dollar payment

21  on January 10th and then the ordinary mortgage

22  payment six days later?

23       A.    Because when the bankruptcy was filed

24  and my checking account was closed, I neglected to

25  give them the updated bank draft information from

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1   the new account, so it was in arrears for two

2   months.

3        Q.   If you turn to page 25, which is page 26

4   of 32 in Exhibit 20, please.

5        A.   Yes.

6        Q.   And look at the Delta Airline.  There's

7   two line items for 1,499.11.

8             Is that for plane tickets for you and

9   your son for the Austin trip?

10       A.   I think so.

11       Q.   Did you and your son sit in business or

12   first class for that trip?

13       A.   It would have been business, yes.

14       Q.   Is there a reason why you didn't buy

15   economy seats for you and your son to go to Austin?

16       A.   Because I'm six-five and it's painful.

17       Q.   How long is the flight from Los Angeles

18   to Austin?

19       A.   About three hours.  Two and a half

20   hours.

21       Q.   And then there's the United flight,

22   479.10, 368.10.

23            Is that for the same trip?

24       A.   No.  That would have been for my son to

25   go see his grandmother.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 330

```
 1       Q.   Then you bought him economy seats?  Or
 2   are those business class as well?
 3       A.   Those are economy.
 4       Q.   Look at Exhibit 2, which is Mr. Wong's
 5   summary of Ms. Osterholt's cash flows.
 6       A.   Sorry.  What?
 7       Q.   Look at Exhibit 2 --
 8       A.   Oh.
 9       Q.   -- which is --
10       A.   Exhibit 20, but Exhibit 2 of --
11       Q.   Sorry.  It's Exhibit 2 of Mr. Wong's
12   declaration.
13       A.   Yeah.  Sorry.  I just got thrown.
14       Q.   Ms. Osterholt's cash flow summaries from
15   October 17 to February 9, 2024.
16       A.   Yes.
17       Q.   You paid her 7,223 dollars in December.
18            Why such an increase in December?
19       A.   Probably for things related to
20   Christmas.
21       Q.   What specific things?
22       A.   I didn't hear a question.
23            MR. TEDFORD:  Oh, sorry.
24            THE WITNESS:  Was there a question
25   pending?
```

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nibula A. Sullivan   Page 301 of 462   350 of 1079
**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 331

```
 1              MR. TEDFORD:  Yes.

 2              THE WITNESS:  I'm sorry.  Could you

 3     repeat the question?

 4     BY MS. SULLIVAN:

 5         Q.    And what was -- what was the increase

 6     for in Christmas?  Like, in December.  Says for

 7     Christmas, but --

 8         A.    Christmas gifts.  Christmas presents.

 9     Things related to Christmas.  People celebrating

10     Christmas.

11         Q.    Under the detailed expenses here, can

12     you identify which ones relate to your son?

13         A.    Well, I guess it really depends how you

14     look at it.

15              I mean, the car -- she needs a car to

16     drive my son.

17              The books and education would be my son.

18              The charitable contribution would not

19     be.

20              The clothing, I'd have to see if some of

21     that's for her or she bought my son clothing.

22              Dining is gonna be for her and eating

23     with my son.

24              I'd have to see the dues and

25     subscriptions to know which one of those relate to
```

1   my son.

2              Groceries would be for both of them.

3              Health and fitness, I would think that's

4   mostly for Kelly.

5              Household supplies for the home,

6   insurance would be for Kelly.

7              Medical would be for Kelly.

8              I don't know what office expenses she

9   has.

10             Personal I would think is for her.

11             The pet, they have a dog separate from

12  the dog I have with Charlie.

13             Her phone bill, repair and maintenance

14  and travel.

15         Q.   And then the phone is for Ms. Osterholt.

16              Does your son have a phone?

17         A.   No.

18         Q.   What does the office expense represent?

19         A.   I don't know.

20              MS. SULLIVAN:  Mark this Exhibit 22,

21  please.

22              THE WITNESS:  We're finished with this

23  one?

24  BY MS. SULLIVAN:

25         Q.   Yes.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 333

```
 1        A.    I have, like, a procedure question.

 2        Q.    Yes.

 3        A.    Is there a separate set of questions for

 4   Hologenix or are they mixed in here or --

 5        Q.    A lot have been mixed in already.

 6        A.    Remind me if you're asking me

 7   something --

 8        Q.    Well, whenever I ask about Hologenix's

 9   business, it's --

10        (Unreportable cross-talk.)

11            THE WITNESS:  No, I'm saying -- yeah.

12   Just say for Hologenix.

13   BY MS. SULLIVAN:

14        Q.    I don't -- your counsel both agreed that

15   you'd kind of be answering for both under both

16   circumstances because you are the CEO and --

17        (Unreportable cross-talk.)

18            THE WITNESS:  Yeah.  It just gets

19   confusing sometimes to go back and forth, as you've

20   noted when I said "bankruptcy" and you have to

21   clarify which one and --

22        (Unreportable cross-talk.)

23   BY MS. SULLIVAN:

24        Q.    Showing you what we've marked as Exhibit

25   22.
```

1          Do you recognize this document?

2          MR. TEDFORD:  He doesn't have it yet.

3          MS. SULLIVAN:  Oh, sorry.  I thought --

4    I thought you were done.

5          THE COURT REPORTER:  People were

6    talking.

7          (Whereupon, MET's Exhibit Number

8          22 was marked for identification

9          by the deposition officer and is

10         attached hereto.)

11         THE COURT REPORTER:  There you go.

12   BY MS. SULLIVAN:

13      Q.   Showing you what we marked as Exhibit

14   22.

15         Do you recognize this document?

16      A.   I do.

17      Q.   What is it?

18      A.   It's a bank statement.

19      Q.   Is it your Wells Fargo Bank statement as

20   of October 31st, 2023?

21      A.   It looks like this is for my old bank

22   account before the bankruptcy.

23      Q.   The money that you transferred into the

24   bank account; correct?

25      A.   Yes.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 335

```
 1        Q.    And October 2nd, there's a Zelle to

 2   Farida Negeen, Farida, F-A-R-I-D-A, N-E-G-E-E-N.

 3              Notation "For Charlie."

 4              Who's Ms. Negeen?

 5        A.    Can you repeat the date?

 6        Q.    October 2nd.

 7        A.    That's Charlie's speech and reading

 8   therapist.

 9        Q.    And Ms. Bronson is the bookkeeper for

10   Stoneybrooke Films; correct?

11        A.    Yes.

12        Q.    And then there's a withdrawal, 15,000

13   dollars.

14              What does that represent?

15        A.    I'm not sure.  It looks like a wire.

16        Q.    Says "City National Bank."

17        A.    Yeah.

18        Q.    And then the Westland School Facts for

19   7,050, that's your son's tuition?

20        A.    Yes.

21        Q.    Then American Express for 15,991

22   dollars, that's a credit card payment?

23        A.    Yes.

24        Q.    What is the check on October 4 for 4,500

25   dollars for?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.    That would have been my rent check.

 2        Q.    And then on October 4th, received a

 3   deposit of 2,000 dollars from your trust; correct?

 4        A.    Yes.

 5        Q.    And were the trust distributions always

 6   deposited into your Wells Fargo account?

 7        A.    Yes.

 8        Q.    And then the Bank of America payment,

 9   Juan A. Devoto on 10-5 is for the 50,000 dollars

10   you repaid to him; correct?

11        A.    Yes.

12        Q.    What is the 10-5 payment for 5,000

13   dollars?

14        A.    That is to Aria.

15        Q.    And then on the next page you have

16   October 6th, Department Education, student loan for

17   a thousand dollars.

18              What is that?

19        A.    That is a loan that my goddaughter had

20   taken out for school that I was helping to repay

21   back.

22        Q.    Who's your goddaughter?

23        A.    Isabella Devoto.

24        Q.    Are you still paying back that student

25   loan?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1        A.    No.

 2        Q.    When did you stop paying it?

 3        A.    Once I filed bankruptcy.

 4        Q.    On October 12, there's a transfer to

 5   Hologenix for 50,000 dollars.

 6              Is that part of the equity investment we

 7   discussed earlier?

 8        A.    Yes.

 9        Q.    And then October 12th, there's a

10   transfer to Ms. Osterholt, 150 dollars for

11   Halloween costume and Charlie room; correct?

12        A.    Sorry.  What date?

13        Q.    October 12th.  It's right under the

14   50,000 dollar payment.  Apologize.

15        A.    Yes.  Sorry.

16        Q.    How much was -- of the 150 dollars was

17   for his Halloween costume?

18        A.    I don't know.

19        Q.    And there was also a 300 dollar payment

20   to Ms. Osterholt for a photo shoot for Halloween

21   with your son; correct.

22              I don't have it here.  I'm just asking

23   in general.

24        A.    That sounds right.

25        Q.    Does your son have a Halloween photo
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 338

```
 1    shoot every year?

 2         A.   I -- we get a picture of him every year

 3    on Halloween.  I don't know how formal it is.

 4         Q.   Is there a reason that his mother didn't

 5    do the photo shoot, rather than pay 300 dollars to

 6    somebody else to do it?

 7         A.   Sorry.  Where do you see this?

 8         Q.   It's not on here.

 9         A.   Well, where -- where are you getting

10    that I paid 300 dollars --

11         Q.   From one of the expense forms.  I could

12    find it if you want.

13         A.   Was it money paid to her or was it money

14    paid to someone else?

15         Q.   Honestly, sitting here right now, I

16    don't know if paid to her or somebody else, but it

17    was 300 dollars marked "Halloween shoot for

18    Charlie."

19         A.   I don't know.

20         Q.   Okay.  And then there's a few payments

21    here on October 12th for demo.

22              What do those represent?

23         A.   I -- I don't have the -- I can't -- I

24    can't -- I mean, you have to go and -- and look --

25         Q.   Where would you go and look to determine
```

Page 339

1    what they're for?

2         A.    Log in to Venmo.  There's -- some of

3    that is my dad's driver, Dr. Lori, or the

4    neurotherapist that my son goes to.

5              I give the itemized detail to James and

6    he categorizes it according -- according to what

7    they were used for.

8         Q.    October 16th, there's a 350,000 dollar

9    deposit from Interactive Brokerage.

10             Is that the brokerage account you

11   testified earlier you liquidated?

12        A.    Yes.

13        Q.    What did you use the money for?

14        A.    I mean, all the withdrawals are itemized

15   on this statement, so ...

16        Q.    Well, when we looked at the statements

17   that Mr. Wong provided concerning your income,

18   there's only about 70,000 and change related to

19   liquidating a brokerage account as of October 2023.

20             So what happened to the other

21   270-something-thousand dollars?

22        A.    I think you're misunderstanding.

23             That statement that Mr. Wong prepared

24   only looks at everything from the DIP account

25   forward.  So the brokerage account amount that

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

```
 1   Mr. Wong is rec- -- referring to would be on the

 2   DIP account statement for October.

 3        Q.   And then on October 16th, American

 4   Express made two deposits to your account.

 5             What does those represent?

 6        A.   Liquidation of my savings accounts.

 7        Q.   And then you have a Zelle to Lisa

 8   Johnson on October 16th for 5,000 dollar.

 9             What does that represent?

10        A.   Bookkeeping fees.

11        Q.   For what?

12        A.   For her helping with --

13        Q.   With the inactive company that you own?

14        A.   With -- with all of -- with all of my

15   expenses.

16        Q.   Does she do personal bookkeeping for

17   you?

18        A.   Yes.

19        Q.   Were you paying her in advance for work

20   she was going to do in 2024 or for past services

21   rendered?

22        A.   Both.

23        Q.   How much was for past services rendered?

24        A.   I don't know what my balance was, if it

25   was close to zero or if it was a prepayment,
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 341

```
 1   because I knew in bankruptcy I -- you know, so I
 2   wouldn't be able to pay her for a while.
 3        Q.   Do you think -- is it possible for you
 4   just not to have a personal bookkeeper and to take
 5   care of your own accounting?
 6        A.   You can see the complexity of the
 7   financials that you've been going through.  I don't
 8   have the bandwidth for that.
 9        Q.   In October of -- 17, there's a transfer
10   of 300,000 dollars to Hologenix.
11             That, again, the equity investment we
12   talked about earlier?
13        A.   Yes.
14        Q.   Does she still handle that account?
15        A.   Yes.
16        Q.   When you send the Venmo, do you make a
17   notation of what it's for?
18        A.   Yes.
19        Q.   Has Hologenix ever made any loans to
20   you?
21        A.   No.
22        Q.   Does the Seth Casden Resulting Trust own
23   any shares of Hologenix?
24        A.   No.
25        Q.   Has the Seth Casden Resulting Trust ever
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 342

```
 1    loaned any money to Hologenix?

 2         A.   The -- which trust are we speaking of?

 3         Q.   Seth Casden Resulting Trust.

 4         A.   At Northern Trust?

 5         Q.   Yes.

 6         A.   Yes.

 7         Q.   What -- what are the terms of that loan

 8    from the Seth Casden Resulting Trust?

 9         A.   It's all suspended because of the

10    Hologenix bankruptcy.

11         Q.   But what were the terms before the

12    bankruptcy?

13         A.   Annual interest payment and a balloon

14    payment on maturity.

15         Q.   Has Hologenix ever paid any money to

16    Ms. Osterholt?

17         A.   Has Hologenix ever paid -- possibly.  I

18    believe Hologenix hired her to do corporate

19    portraits one time.

20              MS. SULLIVAN:  Exhibit 23.

21         (Whereupon, MET's Exhibit Number

22         23 was marked for identification

23         by the deposition officer and is

24         attached hereto.)

25    / / /
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1    BY MS. SULLIVAN:

2         Q.    Showing you, Mr. Casden, what we marked

3    as Exhibit 23.

4              Do you recognize this document?

5         A.    Yes.

6         Q.    What do you recognize it to be?

7         A.    It's an e-mail chain between myself and

8    the Hologenix board of managers.

9         Q.    Other than what we discussed earlier,

10   was there anything else that prompted you to send

11   the originating e-mail to the board, July 7, 2023?

12   July -- the page Bates stamp HGX 200 -- 2004 MET 4.

13        A.    Sorry.  The way your questions were,

14   you're just confusing me.

15             You're asking me why I sent this e-mail

16   to the board?

17        Q.    I'm asking:  Is there any reason other

18   than what we already discussed about why you made

19   it -- the call for equity investment into Hologenix

20   that prompted you to send this e-mail?

21        A.    I think I covered everything, but I'm

22   not going to rely on my memory of what I've said

23   here today.

24        Q.    You noted in the e-mail that:

25             "Despite this, we have been

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 344

```
 1          able to go without outside

 2          funding-slash-financing for

 3          three-plus years, and have even

 4          been profitable for periods

 5          therein."

 6              Correct?

 7      A.   Yes.

 8      Q.   That's a true statement?

 9      A.   Yes.

10      Q.   And you delayed your July 2023 salary;

11   correct?

12      A.   Yes.  Deferred it.  Correct.

13      Q.   And you suspended four payments?

14      A.   Correct.

15      Q.   And did the board approve suspension of

16   their payments?

17      A.   Yes.

18      Q.   Have you restarted paying the board?

19      A.   Not at this time.

20      Q.   Have there been any other times since

21   July 2023 where your salary was not paid?

22      A.   Yes.

23      Q.   And when was that?

24      A.   January.

25      Q.   Has that money been repaid to you, or
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1    partially repaid?

 2          A.    Partially.

 3          Q.    When you state:

 4                "If we were not in bankruptcy,

 5          we could factor our receivables or

 6          borrow against our sizable

 7          inventory of over 1.5 million

 8          dollars."

 9                Do you see that?

10          A.    Yes.

11          Q.    Okay.  What inventory is valued at over

12    1.5 million dollars?

13          A.    I don't know if that's the value.

14    That's our cost, our sum cost in building

15    inventory.

16          Q.    Have you had your inventory valued?

17          A.    We just keep it at book value, what we

18    paid for the inventory.

19          Q.    When you say:

20                "If we weren't in bankruptcy,

21          we could factor our receivables."

22                What does that mean?

23          A.    It would be similar to the Flora --

24    Fiora [sic] loan that we looked -- we reviewed

25    earlier.
```

Page 346

1     Q.   And did Hologenix pay payroll on July

2     15th?

3          A.   It did.

4          Q.   And how did it do that?

5          A.   The payroll is deducted from the

6     Hologenix checking account.

7          Q.   Was it able to do that because you made

8     an equity investment in July 2023?

9          A.   Yes.

10         Q.   On the next page, you said:

11              "In order to provide

12         sufficient cash reserves for the

13         next twelve to eighteen months, I

14         am recommending that we raise up to

15         1.5 million, with a valuation of

16         five million."

17              Do you see that?

18         A.   Yes.

19         Q.   Okay.  How did you arrive at the five

20    million dollar valuation?

21         A.   It was a shot in the dark.  And I

22    realize that it wasn't possible to come up with

23    that.  But that was based on, basically, one-time

24    sales.

25         Q.   What do you mean, "one-time sales"?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 347

```
 1        A.   One X are trailing twelve-month sales.

 2        Q.   And what was your trailing twelve-month

 3   sales?  Five million dollars?

 4        A.   About five million.

 5        Q.   And why did you recommend raising 1.5

 6   million dollars?

 7        A.   Based on the projections at the time of

 8   how short we would be on cash.

 9        Q.   And you didn't -- Hologenix did not

10   raise 1.5 million dollars; correct?

11        A.   No.

12        Q.   Has it been able to meet its operating

13   expenses with the equity you invested and its

14   normal income that it receives since July 2023?

15        A.   Yes.

16        Q.   What would have happened if Hol- -- if

17   you hadn't made the equity investment into

18   Hologenix in July 2023?

19        A.   I don't know.  It's a hypothetical.

20             I guess a lot of people would have been

21   laid off and we would have tried to get through it

22   the best we could.

23        Q.   And then at the end of that e-mail on

24   the last page, you said:

25             "We have so much incredible
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 348

```
 1           opportunity in front of us."

 2                 What did you mean by that?

 3       A.    That I still very much believe in the

 4   business and what we're doing in the mission.

 5                 MS. SULLIVAN:   Mark this as 24, please.

 6           (Whereupon, MET's Exhibit Number

 7           24 was marked for identification

 8           by the deposition officer and is

 9           attached hereto.)

10           (Whereupon, a recess was held

11           from 5:49 p.m. to 5:57 p.m.)

12   BY MS. SULLIVAN:

13       Q.    Mr. Casden, has Hologenix done any

14   financial projections in 2023?

15       A.    In 2023?

16       Q.    Yeah.

17       A.    Yes.

18       Q.    Okay.   What were those projections?

19       A.    Can you be more specific?

20       Q.    What financial projections did Hologenix

21   do in 2023?

22       A.    So we prepare a budget every year.

23       Q.    Who prepares that?

24       A.    I do with the CFO and the V.P. of

25   finance.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1          Q.   Are those projections reduced to

 2    writing?

 3          A.   Yes.

 4          Q.   And what were the revenue projections

 5    for Hologenix in 2023?

 6          A.   Around five million.

 7          Q.   And what was the actual revenue in 2023?

 8          A.   It hasn't been finalized.  We're still

 9    trying to finalize it.  But right around there.

10          Q.   Is it fair to say that Hologenix has

11    been averaging about five million dollars in

12    revenue since it filed -- annually since it filed

13    for bankruptcy?

14          A.   That's fair.

15          Q.   Showing you what we marked as Exhibit

16    24.

17               Do you recognize this document?

18          A.   Yes.

19          Q.   And what is it?

20          A.   It's an e-mail from me to the board.

21          Q.   And you referenced thanking them for

22    their time, consideration, candor on the call

23    today.

24               What call are you referencing?

25          A.   We had a board call.
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

1       Q.   Who was on the call?

2       A.   Myself, Francis, Laetitia, and the

3  board.

4       Q.   What was discussed on the call?

5       A.   The need for investment in Hologenix to

6  maintain the operating.

7       Q.   Was the call recorded?

8       A.   No.

9       Q.   How long was the call?

10      A.   Maybe around an hour.

11      Q.   You mentioned unknown outcomes and

12  permutations.

13           Were any of those discussed during the

14  call?

15      A.   We discussed many scenarios.

16      Q.   What specifically?

17      A.   We would have discussed what happens if

18  money isn't put in the company and what happens if

19  money's put in and who would have reviewed the

20  different permutations of the legal situation.

21      Q.   Did you discuss what would happen to

22  Hologenix if there wasn't an equity investment?

23      A.   Yes.

24      Q.   And what was that discussion about?

25      A.   Without an equity investment, we

Page 351

```
 1    wouldn't have been able to make payroll on the
 2    15th.
 3         Q.    Would the company have shut down?
 4         A.    It's hard to say.  Luckily, we were able
 5    to get the equity investment.
 6         Q.    Is Hologenix still in financial
 7    distress?
 8         A.    We've projected we'll have positive cash
 9    flow for the rest of this year.
10         Q.    Is that because of your equity
11    investment?
12         A.    And an improvement in sales.
13         Q.    What's the improvement in sales?
14         A.    We're seeing a -- we're expecting an
15    increase in sales this year versus last year.
16         Q.    Why?
17         A.    We just expect our business to grow on a
18    year-over-year basis.
19         Q.    Is there any specific new revenue or
20    client customers that Hologenix has gotten that
21    gives it that hope for 2024?
22         A.    We've seen an increase in raw material
23    orders and the revenue from those raw material
24    orders trails by anywhere from twelve to eighteen
25    to twenty-four months.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 352

```
 1              So that's the biggest reason for our

 2   optimism.

 3         Q.   When you reference their candor, what

 4   were you referencing?

 5         A.   Their ability to speak open and honestly

 6   and frankly.

 7         (Whereupon, a discussion was held

 8         off the record.)

 9         (Whereupon, a recess was held

10         from 6:01 p.m. to 6:05 p.m.)

11   BY MS. SULLIVAN:

12         Q.   When you said that the board spoke

13   openly, honestly and frankly, what specifically are

14   you referring to?

15         A.   That they were candid -- candid in their

16   thoughts.

17         Q.   What specific thoughts did they share

18   with you?

19         A.   Everybody was very concerned, for the

20   most part, concerned about my mental health,

21   concerned about the company.  They were very

22   compassionate.  And I just remember them -- I

23   remember being very grateful for -- for their

24   support.

25         Q.   Was there any vote on that call?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 353

```
 1        A.    I think we agreed to have the funding

 2   come in.  And then it was done -- signed through

 3   Docusign.

 4        Q.    Was it a unanimous vote?

 5        A.    Yes.

 6              MS. SULLIVAN:  Mark this as Exhibit 25,

 7   please.

 8              (Whereupon, MET's Exhibit Number

 9              25 was marked for identification

10              by the deposition officer and is

11              attached hereto.)

12   BY MS. SULLIVAN:

13        Q.    I'm showing you, Mr. Casden, what we

14   marked as Exhibit 25.

15              Do you recognize this document?

16        A.    Yes.

17        Q.    What is this document?

18        A.    The written unanimous consent of the

19   board of managers of Hologenix, dated July 12th,

20   2023.

21        Q.    And this is the term sheet that you

22   referenced earlier for the equity investment in

23   July to October of 2023?

24        A.    No.

25        Q.    Okay.  What is this?
```

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 354

```
 1        A.   This is the unanimous consent.

 2        Q.   Meaning the approval of the board to

 3   take the investment?

 4        A.   Correct.  The approval of the term

 5   sheet.

 6        Q.   Okay.  Can you go back to Exhibit 24,

 7   please.

 8             Did you take it from him, John?

 9             MR. TEDFORD:  Sorry?

10             MS. SULLIVAN:  Did you take Exhibit 24?

11             MR. TEDFORD:  Yes, I did.

12             There you go.

13   BY MS. SULLIVAN:

14        Q.   Is the term sheet in Exhibit 24?

15        A.   Yes.

16        Q.   And what were the terms of the equity

17   investment?

18        A.   Do you want me to read it from the term

19   sheet?

20        Q.   No.  I just want you to explain in --

21   what you understood the terms of the Super

22   AA-dash-1 Units to be in exchange for the equity

23   commitment.

24        A.   So this is a draft of the term sheet.

25   This is not the final term sheet.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 355

```
 1        Q.   Do you have the final term sheet?

 2        A.   Yes, we have it.  I don't know if I have

 3   it in front of me.

 4        Q.   Was the term related to the A shares

 5   changed?

 6        A.   The valuation was changed because

 7   there's a valuation unknown.

 8        Q.   Other than that, was the actual terms

 9   changed?

10        A.   I don't believe so, no.

11        Q.   What does it mean when it says:

12             "Super Super AA-dash-1 Unit

13             shall have a 1.0 X liquidation

14             preference over all other

15             securities issued by the company"?

16        A.   That that money gets paid back first.

17        Q.   Before what?

18        A.   Before anyone else receives money.

19        Q.   Including creditors of Hologenix?

20        A.   No.  This is just in event of a -- of a

21   sale of the company.  It's how income would be

22   distributed to the owners.

23             (Whereupon, a discussion was held

24             off the record.)

25   / / /
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 356

```
 1   BY MS. SULLIVAN:

 2        Q.   If you look at the next page, Hologenix

 3   or whatever, the Bates number is 63.

 4             You see that next page?

 5        A.   Yes.

 6        Q.   Is that -- that's the final term sheet?

 7        A.   Yes, I believe so.

 8        Q.   And that was ultimately executed by the

 9   board?

10        A.   Yes.

11        (Whereupon, a discussion was held

12        off the record.)

13   BY MS. SULLIVAN:

14        Q.   I'm showing what you we marked as

15   Exhibit 26.

16             Do you recognize that document?

17        A.   I don't have it yet.

18        (Whereupon, MET'S Exhibit number

19        26 was marked for identification

20        by the deposition officer and is

21        attached hereto.)

22             THE COURT REPORTER:  There you go.

23             THE WITNESS:  Yes.

24   BY MS. SULLIVAN:

25        Q.   And is that the current cap table for
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1    Hologenix?

 2          A.    Yes.

 3          Q.    So sitting here today, you don't know

 4    how many shares you've been awarded from Hologenix

 5    for your equity investment in 2023; correct?

 6          A.    Correct.  They have not been awarded

 7    yet.

 8          Q.    Has Hologenix been able to pay anyone

 9    else's salary in 2023?

10          A.    No.

11          Q.    Hologenix has not paid anyone else's

12    salary, other than you, in 2024?

13          A.    No.

14          Q.    And for the salary that you didn't get

15    paid in January of 2024, you've been receiving

16    monthly payments of 5,000 dollars a month for that;

17    correct?

18          A.    Yes.

19          Q.    What is Hologenix's total monthly

20    operating costs?

21          A.    Around 300,000.

22                MS. SULLIVAN:  I'll mark this as Exhibit

23    27.

24    / / /

25    / / /

Page 358

```
1              (Whereupon, MET's Exhibit Number

2         27 was marked for identification

3         by the deposition officer and is

4         attached hereto.)

5    BY MS. SULLIVAN:

6         Q.   Showing you what we're marking as

7    Exhibit 27, Mr. Casden.

8              Do you recognize this document?

9         A.   Yes.

10        Q.   What is it?

11        A.   It's a personal financial statement.

12        Q.   And why -- why did you fill out this

13   personal financial statement?

14        A.   Looking for credit.  A lot of

15   applications -- or all applications require

16   personal financial statement.

17        Q.   And you filled this out in March -- on

18   March 17, 2020; correct?

19        A.   Yes.

20        Q.   And the applicant for the loan was

21   Hologenix?

22        A.   No.  This, I think, was used for my

23   mortgage application.  It's just a template I had.

24        Q.   Can I see that, please.

25             Under "Business Name, Applicant," it
```

 1   says "Hologenix, LLC."

 2           Why does it say that?  Hologenix wasn't

 3   the applicant.

 4       A.   Like I said, this is a template.  So

 5   maybe it was used at one point.  Might have been

 6   used -- that -- yeah.  I don't remember who -- I

 7   remember filling this out for my personal mortgage.

 8           But I see it says "U.S. Small Business

 9   Admin Template," so ...

10       Q.   Okay.  And under "Other Assets," it

11   lists 5,585,000 dollars, and then says "Describe in

12   section five."

13           Do you see that?

14       A.   Yes.

15       Q.   The left-hand side.

16           Then if we turn to the next page, under

17   section five, it says:

18           "Hologenix equity and notes,

19       personal property."

20       A.   Yes.

21       Q.   Okay.  How much of the 5,585,000 was

22   Hologenix equity?

23       A.   I don't recall.

24       Q.   How much of the 5.585 million was

25   Hologenix notes?

Page 360

```
 1        A.   I don't recall.  I don't have the
 2   breakdown.
 3        Q.   Okay.  How much of that other assets was
 4   personal property?
 5        A.   The same answer.
 6        Q.   What personal property was included in
 7   your application?
 8        A.   I think that's just a catchall for the
 9   types of things that's listed on my bankruptcy
10   schedule.
11        Q.   And if we turn to the "Liabilities"
12   section on the first page, it says "Installment
13   Account, Auto," and 22,298 dollars.
14             Do you see that?
15        A.   Yes.
16        Q.   And then under "Other Liabilities," you
17   listed zero.
18             Do you see that?
19        A.   Yes.
20        Q.   Is there a reason that you didn't
21   include the money you pay for your son, his mother,
22   and your father under "Other Liabilities"?
23        A.   That's not a liability.
24        Q.   Meaning it's not something you're
25   obligated to pay every month?
```

Page 361

```
 1        A.    Liability is an existing debt, not a

 2   future debt.

 3        Q.    Did you ever submit that application to

 4   the Small Business Administration?

 5        A.    I don't recall.

 6        Q.    Let's talk about the Aria debt.

 7              How did you incur 420,000 dollar loss at

 8   Aria in January 2023?

 9        A.    At the casino.

10        Q.    Was it only at the Aria casino or

11   another casino?

12        A.    Only at Aria.

13        Q.    And what game were you playing, or

14   games?

15        A.    I played blackjack, roulette, craps,

16   baccarat, and maybe some slots.

17        Q.    And was anyone else with you on the

18   trip?

19        A.    Yes.  It was scheduled around a trade

20   show that we had in Las Vegas.

21        Q.    You say "A trade show we have."

22              You mean Hologenix; correct?

23        A.    A trade show we attend, yes.

24        Q.    How were you able to obtain a 420,000

25   dollar marker from Aria?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 362

 1        A.    That's a question for Aria.

 2        Q.    **Did you have to fill out an application**

 3   **for them?**

 4        A.    There's an application that was filled

 5   out, yes.

 6        Q.    **Okay.  When was that filled out?**

 7        A.    I don't recall.

 8        Q.    **Was it filled out in or around the time**

 9   **you received the 420,000 dollar marker in January**

10   **2023?**

11        A.    Yes, that sounds about right.

12        Q.    **Did you have to provide information to**

13   **Aria about your assets and liabilities?**

14        A.    Not that I recall.

15        Q.    **Who is Lucas Tyson?**

16        A.    He is our senior business developer.

17        Q.    **Did you share a room with Mr. Lucas at**

18   **the Aria?**

19        A.    No.

20        Q.    **Did Mr. Lucas gamble with you?**

21        A.    I don't think he gambled.  He might have

22   been present when I was gambling.

23              MS. SULLIVAN:  We'll mark this as 28,

24   please.

25   / / /

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 363

```
 1          (Whereupon, MET's Exhibit Number

 2          28 was marked for identification

 3          by the deposition officer and is

 4          attached hereto.)

 5   BY MS. SULLIVAN:

 6          Q.   Showing you what we marked as Exhibit

 7   28.

 8               Was this -- do you recognize this

 9   document?

10          A.   Yes.

11          Q.   What do you recognize it to be?

12          A.   This looks like some type of form that

13   Aria had me fill out.

14          Q.   It's dated January 21st, 2017?

15          A.   Yes.

16          Q.   Is that your signature?

17          A.   Yes.

18          Q.   And it says:

19               "Marker limit requested, a

20          hundred K."

21               Do you see that?  Here (indicating).

22          A.   Yes.

23          Q.   Did Aria give you the marker of a

24   hundred thousand in 2017?

25          A.   So it's -- it's a credit line, so I
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 364

 1   believe they gave me that credit limit, yes.  That

 2   sounds right.

 3        Q.   Have you repaid some of the debt to

 4   Aria?

 5        A.   Yes.

 6        Q.   How did you do that?

 7        A.   With payments from my bank account.

 8        Q.   Did Aria give you any documentation in

 9   2023 when they gave you a marker?

10        A.   You sign a -- a check for each marker.

11        Q.   What does that mean?  Like, a Wells

12   Fargo check for your checking account?

13        A.   Aria generates a check and you sign that

14   check.  It's a check for them to deposit against

15   your account.

16        Q.   Against your Wells Fargo Bank account?

17        A.   Correct.

18        Q.   What was the amount of the check that

19   you had from Aria in 2023?

20        A.   I'd have to look at the schedule.  There

21   were multiple checks.

22             MS. SULLIVAN:  Let's mark this as

23   Exhibit 29.

24   / / /

25   / / /

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 365

```
 1            (Whereupon, MET's Exhibit Number

 2            29 was marked for identification

 3            by the deposition officer and is

 4            attached hereto.)

 5     BY MS. SULLIVAN:

 6            Q.   Showing you what we marked as Exhibit

 7     29.

 8                 Is this what you're talking about?

 9            A.   This looks like the schedule of the

10     checks, yes.

11            Q.   So those were the checks that you signed

12     at Aria and then they deposited into your Wells

13     Fargo account?

14            A.   Yes.

15            Q.   Okay.  Did you have any discussions with

16     Aria about repayment of your debt from January

17     2023?

18            A.   Yes.

19            Q.   What were those conversations?

20            A.   I agreed to make them payments of 5,000

21     dollar a month on the first and 15th of every

22     month.

23                 MS. SULLIVAN:  Mark this as 20- -- I

24     mean as 30.

25     / / /
```

Page 366

```
 1              (Whereupon, MET's Exhibit Number

 2              30 was marked for identification

 3              by the deposition officer and is

 4              attached hereto.)

 5     BY MS. SULLIVAN:

 6         Q.    Showing what you we marked as Exhibit

 7     30.

 8              Do you recognize this e-mail chain,

 9     Mr. Casden?

10         A.    Yes.

11         Q.    This is between you and Aria; correct?

12         A.    Yes.

13         Q.    Who is Sarah Stetson?

14         A.    She was an account executive there.

15         Q.    Who is Jennifer McEwin?

16         A.    She was the person I was directed to

17     discuss my balance with.

18         Q.    If we turn to the next page, Bates

19     stamped Casden 146, it's an e-mail from you to

20     Ms. Stetson on March 17th, 2023; correct?

21         A.    Yes.

22         Q.    And you asked her to forward your e-mail

23     below to Jennifer McEwin; correct?

24         A.    Yes.

25         Q.    And then you mentioned that you met
```

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 367

 1   Sarah at the high limit baccarat table on February

 2   1st.

 3             Is that true?

 4       A.   That sounds correct.

 5       Q.   And is the high -- what's the high limit

 6   baccarat table?

 7       A.   It's an area of the casino.

 8       Q.   No.  How much is the high limit of the

 9   baccarat table?  How much do you have to bet to sit

10   there?

11       A.   I don't know.  Maybe a hundred dollars a

12   hand.  It changes.

13       Q.   Then you relayed to Ms. McEwin that you

14   had already told Ms. Stetson on February 1st that

15   you were concerned about their markers being

16   deposited to your account and that it would receive

17   a non-sufficient funds.

18             Why was that?

19       A.   Because the cash in my checking account

20   was not enough to cover that amount.

21       Q.   Were you able to get a distribution from

22   your trust at the time to cover the amount?

23       A.   I don't know.  I didn't ask for one.

24       Q.   Why not?

25       A.   Wasn't something I was interested in

1   doing.

2         Q.   Why not?

3         A.   I don't have a better answer than that.

4         Q.   When you state you're a good client of

5   MGM for many years, what did you mean by that?

6         A.   That I've been going to their properties

7   for a long time.

8         Q.   Have you gambled anywhere outside of

9   Las Vegas?

10        A.   Yes.

11        Q.   Where else have you gambled?

12        A.   In my life or what --

13        Q.   In the last four years.

14        A.   No.

15        Q.   How much money have you lost at MGM in

16   total?

17        A.   I don't know.

18        Q.   You mentioned a track record of paying

19   your debts to MGA -- MGM.

20             What were you referencing?

21        A.   That any time I had a debt, I always

22   paid it in full.

23        Q.   And then you state:

24             "With this information

25        disclosed, I was extended

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 369

1       additional credit."

2              What was the additional credit you had

3   been extended?

4       A.   It would have just been an increase in

5   whatever the credit line was at the time.

6       Q.   Do you know what the original credit

7   line had been?

8       A.   I want to say it was 250,000.

9       Q.   Then you only received one additional

10  extension of credit?  Or were there multiple

11  extensions on that credit?

12      A.   I don't recall.

13      Q.   Then the next page, Casden 147, you

14  state in the sec- -- in the first -- the new

15  paragraph:

16              "I further explained that

17              while I had no recollection of the

18              markers taken from the evening of

19              February 1st onwards, it is and was

20              my intent to pay the amount owed in

21              full."

22              See that?

23      A.   Yes.

24      Q.   Why do you have no recollection of the

25  markers taken from you the evening of February 1st?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1        A.    I don't know.  I was concerned that I

2   had been drugged.  I asked them about video

3   camera -- you know, video feeds.

4             I was served a drink that tasted weird

5   and I sent it back.  And I had just a complete

6   blackout during that time.

7        Q.    How many drinks had you consumed that

8   day?

9        A.    I was drinking club soda and lemon.

10       Q.    You didn't have any alcoholic beverages?

11       A.    I had -- I had a couple of beers, I

12   remember, but nothing that would have caused me

13   to -- to have that happen.

14       Q.    And then you said:

15             "I'm willing, able, and

16             prepared to offer almost all of my

17             after tax pay of payments towards

18             this debt."

19             Correct?

20       A.    Yes.

21       Q.    How were you able to do that if you were

22   also giving so much money to your son, his mother,

23   and your father?

24       A.    Well, I was using assets that I had to

25   support my expenses for that period of time.

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 371

```
 1        Q.   Did you take any drugs on February 1st?

 2        A.   No.

 3        Q.   Did you consume any marijuana or

 4   cannabis on February 1st?

 5        A.   No, not to my knowledge or recollection.

 6        Q.   And was your hotel, food and beverages

 7   comped by Aria during this trip?

 8        A.   Yes.

 9        Q.   Why was it comped?

10        A.   You could ask Aria that.  I guess based

11   on my play.

12        Q.   Have you gone gambling since you went to

13   Aria in January and February of 2023?

14        A.   No.

15        Q.   Before the trip in 2023, when was the

16   last time you had gambled in Las Vegas in the last

17   four years?

18        A.   I don't recall.  Couple of years.  I'm

19   not -- hadn't been out there recently that I

20   recall.

21        Q.   Did anyone stay with you at the Aria

22   during this trip?

23        A.   No.  Not in my room.

24             MS. SULLIVAN:  Mark this as Exhibit 31.

25   / / /
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 372

```
 1            (Whereupon, MET's Exhibit Number

 2            31 was marked for identification

 3            by the deposition officer and is

 4            attached hereto.)

 5     BY MS. SULLIVAN:

 6         Q.   Showing you a document that was produced

 7     to us by Aria pursuant to the Rule 20- -- 2004

 8     order, and it says "Room Details."

 9            Do you see that?

10         A.   Yes.

11         Q.   And that lists share reservation details

12     on Seth Casden, Lucas Tyson, and it says on your

13     line that there were two adults in the room.

14            Is that correct?

15         A.   What you're reading is correct.  That's

16     not how we stayed at the hotel.

17         Q.   How did you stay at the hotel?

18         A.   He had his own room.

19         Q.   How much total have you lost gambling at

20     Aria?

21         A.   I don't know.

22            MS. SULLIVAN:  Let's mark this as 32,

23     please.

24     / / /

25     / / /
```

Page 373

```
 1           (Whereupon, MET's Exhibit Number

 2           32 was marked for identification

 3           by the deposition officer and is

 4           attached hereto.)

 5   BY MS. SULLIVAN:

 6        Q.   Showing you what we've marked as Exhibit

 7   32.  This is another document produced to us by

 8   Aria.

 9             On 10-17-2023, there's a note from

10   Ms. McEwin where she says:

11             "LTD losing 838,075 dollars."

12             Does that refresh your memory how much

13   you've lost at Aria?

14        A.   Where does it say that?

15        Q.   Here (indicating).

16        A.   I see that, yes.

17        Q.   Does that refresh your memory about how

18   much you lost at Aria?

19             MR. RAMLO:  Objection; vague.

20             You may answer.

21             THE WITNESS:  Yeah.  I don't know what

22   time period that's for.  I guess that's since I

23   stepped foot.  And I don't know if that's their

24   whole MGM or -- or what -- his properties or -- but

25   yes, I see that.
```

```
1    BY MS. SULLIVAN:

2        Q.   Did you offer to give Aria 50,000

3    dollars on October 17th to settle your 300,000

4    dollar debt?

5        A.   No.  I made the offer before that, but

6    it looks like that's the day they told me they

7    would not accept that offer.

8        Q.   If you go a couple of pages later to the

9    notes from October -- not October; sorry -- March

10   16th, 2023, on the page where it says March 15th,

11   2023.

12            Do you see that?

13       A.   Yes.

14       Q.   And then it says on the second line:

15            "Claims he was overserved and

16   overextended."

17       A.   Yes.

18       Q.   What does that mean?  Were you

19   overserved or do you think you were drugged and you

20   were just drinking club soda?

21       A.   The overserved refers to the first night

22   that I was there.  The overextended there refers to

23   the increase in credit.

24       Q.   When you say you were overserved in

25   reference to the first night, what do you mean?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 375

```
 1        A.    The first night that I was there, I was
 2   drinking.
 3        Q.    Did you black out that night too?
 4        A.    No.
 5              MS. SULLIVAN:  I'll mark this as Exhibit
 6   33.
 7              (Whereupon, MET's Exhibit Number
 8              33 was marked for identification
 9              by the deposition officer and is
10              attached hereto.)
11              MS. SULLIVAN:  And this one is Exhibit
12   34.
13              (Whereupon, MET's Exhibit Number
14              34 was marked for identification
15              by the deposition officer and is
16              attached hereto.)
17   BY MS. SULLIVAN:
18        Q.    Showing you what we marked as 33.
19              You recognize this document?
20        A.    No.
21        Q.    It's the MGM Resorts win/loss statement
22   from October 17th, 2016 to March 12, 2024 for Seth
23   Casden.
24              It was produced to us by Aria in
25   response to the 2004 order, and shows a total loss
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1   of 678,620 dollars during that time period.

 2           Is there any reason to think that number

 3   is inaccurate?

 4       A.   No.

 5       Q.   Looking at what we marked as Exhibit 34.

 6           If you'll look at what we marked as

 7   Exhibit 34.  This is other MGM or other casinos

 8   where you gambled.

 9           Is that correct?

10       A.   It looks like that, yes.

11       Q.   Have you gambled in Las Vegas at any

12   other hotels that aren't listed here in the last

13   four years?

14       A.   I don't think so.

15       Q.   Do you have any win/loss reports from

16   any other casinos?

17       A.   No.

18       Q.   Do you only gamble at MGM casinos in

19   Las Vegas?

20       A.   That's been where I've gone, yes.  I

21   won't say only.  I -- you go to other casinos when

22   you're there sometimes.

23       Q.   Have you ever gone to Gamblers

24   Anonymous?

25       A.   Yes.
```

Page 377

1    Q.   When was that?

2    A.   1996.

3         No.  1992, maybe.  It's been a long

4    time.

5    Q.   What prompted you to go to Gamblers

6    Anonymous then?

7    A.   I incurred a gambling debt and wanted to

8    avail myself of that therapy.

9    Q.   Have you considered going back to

10   Gamblers Anonymous since this Aria debt was

11   incurred in 2023?

12   A.   No.

13        MS. SULLIVAN:  Mark this as Exhibit 35.

14        (Whereupon, MET's Exhibit Number

15        35 was marked for identification

16        by the deposition officer and is

17        attached hereto.)

18        MS. SULLIVAN:  Sorry.  I don't have

19   copies of this.  I'm sorry.  I only have the one.

20   But it's just --

21        Off the record.

22        (Brief pause in the proceedings.)

23        MS. SULLIVAN:  And this will be Exhibit

24   36.

25   / / /

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 378

```
 1            (Whereupon, MET's Exhibit Number

 2            36 was marked for identification

 3            by the deposition officer and is

 4            attached hereto.)

 5   BY MS. SULLIVAN:

 6       Q.   Showing you, Mr. Casden, what we marked

 7   as Exhibit 35.

 8            Do you recognized it?

 9       A.   Yes.

10       Q.   Is that the -- what is -- what do you

11   recognize it to be?

12       A.   It's the Hologenix Fifth Amended and

13   Restated Operating Agreement.

14       Q.   And that's the current operating

15   agreement for Hologenix today as well?

16       A.   It is.

17       Q.   If I could direct you to Exhibit 36,

18   please.

19            This is Exhibit B to the Plan and

20   Disclosure Statement that you submitted to the

21   court in Exhibit C, filed in docket 98, January

22   23rd, 2024.

23            Have you seen this document before

24   today?

25       A.   Yes.
```

Page 379

1     Q.   Okay.  And when you submitted a plan to

2     the court, you had submitted the plan fund would be

3     a million dollars; correct?

4     A.   Yes.  I believe that's what my lawyer

5     submitted.

6     Q.   Okay.  Did you approve the funding of a

7     million dollar plan before your lawyer submitted

8     it?

9     A.   Yes.

10    Q.   And what steps, if any, have you taken

11    to secure funding for the one million dollars to

12    fund the proposed plan?

13    A.   Just engaged with my network of people

14    that might be able to facilitate that.

15    Q.   Have you actually applied for any loans

16    to fund the plan?

17    A.   No.

18    Q.   Who specifically in your network have

19    you discussed securing funding for the one million

20    dollars?

21    A.   Family and friends.

22    Q.   What family?

23    A.   Cousins, my mother's; you know, through

24    lawyers, I guess, Alvaro.

25    Q.   Anybody else?

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 380

 1          A.    Not specifically, no.

 2          Q.    **What cousin?**

 3          A.    I just sort of put out that this is

 4    happening, but I haven't made any kind of formal

 5    request.

 6          Q.    **How did you put that out there?**

 7          A.    By talking about the situation I'm in.

 8          Q.    **Turning back to Exhibit 36, you list**

 9    **your assets and then their liquida- -- or net value**

10    **and liquidation value; correct?**

11          A.    Yes.

12          Q.    **How did you determine these values?**

13          A.    The accountant did.

14          Q.    **Who's the accountant?**

15          A.    Armory.

16          Q.    **Is it Mr. Wong specifically or somebody**

17    **else?**

18          A.    He -- him and his team.

19          Q.    **Who -- who calculated the recovery rate?**

20          A.    That -- that firm.

21          Q.    **Did you work with Armory on preparing**

22    **this asset list and liquidation analysis?**

23          A.    Yes.

24          Q.    **What specifically was your involvement?**

25          A.    To provide the list of assets.

Page 381

```
 1        Q.    Did you do anything else with respect to
 2   this liquidation analysis?
 3        A.    Just answered any questions he might
 4   have had.
 5        Q.    What questions did he ask you?
 6        A.    I don't know.  I didn't know what he
 7   would have asked.  But we just went through this.
 8   I wanted to make sure it was everything and
 9   accurate.
10        Q.    Did you agree with the liquidation
11   values that he assigned to each asset?
12        A.    Not in a position to know otherwise.  A
13   very specialized area of practice.  So that's why I
14   hired him.
15        Q.    Did you agree with his recovery rate
16   associated with each asset?
17        A.    I have the same answer.  I'm not
18   qualified to know.  They prepared this.
19              I said, "Okay.  If that's what it is,
20   that's what it is."
21        Q.    And if we look at the real property,
22   your condo in Santa Monica has an estimated value
23   of two million dollars.
24              Do you see that?
25        A.    Yes.
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 382

1      Q.    And then it has a footnote after it,

2   too.

3            When we look at the footnote two pages

4   later, says:

5                 "Valuation per broker's price

6         opinion less secured claims and

7         seven percent selling costs."

8            Do you see that?

9      A.    Yes.

10     Q.    Okay.  What broker's price opinion is

11   that referencing?

12     A.    I think that's just, like, on the

13   internet, type in your address.

14     Q.    Do you know where on the internet it was

15   derived from?

16     A.    No.

17     Q.    And when you look at season tickets for

18   the Lakers and Kings, this has a net value of

19   39,000 dollars.

20           Does that refresh your memory what they

21   cost you annually?

22     A.    Yes.

23     Q.    So the -- the season tickets for Lakers

24   and Kings cost you 39,000 dollars a year?

25     A.    I don't know if that's what the

Page 383

1  remaining value of the games I had was at that time

2  or the total costs, but that's about right.  That's

3  what I referenced earlier.  That matches up.

4       **Q.   And you put the zero percent recovery**

5  **rate?**

6       A.   Uh-huh.

7       **Q.   Is there any reason to believe that you**

8  **couldn't sell the season tickets for the Lakers and**

9  **Kings in a liquidation?**

10       A.   I don't know what the market is.  I

11  don't know how that works.  I -- I would think you

12  could sell the seats.

13       **Q.   When we look at the next page, "Other**

14  **Investments" --**

15       A.   Yes.

16       **Q.   Okay.  Other than the Whittier Trust,**

17  **each investment has a recovery rate of zero**

18  **percent.**

19            **See that?**

20       A.   Yes.

21       **Q.   Do you agree with that?**

22       A.   I don't know.  I don't have any

23  experience doing this, so I am trusting experts to

24  do this.  It's not for me to say.

25       **Q.   When we look at footnote 11 on the**

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Page 384

 1    different investments you had done --

 2        A.   Yes.

 3        Q.   -- says:

 4             "Investment in private equity

 5        fund, illiquid, minority positions,

 6        unknown current market value."

 7             Do you see that?

 8        A.   Yes.

 9        Q.   What does "illiquid, minority positions"

10    mean?

11        A.   It means it's not a publicly traded

12    company and you own a very small part.

13        Q.   And you believe that your share of -- in

14    Hologenix are not marketable, such as the recovery

15    rate would be zero percent?

16        A.   From everyone I talked to, yes, with the

17    current situation with the Hologenix bankruptcy.

18    That's my understanding.

19        Q.   Who have you talked to?

20        A.   Different lawyers.

21        Q.   Other than lawyers, have you talked to

22    anybody else?

23        A.   CFO of our company.

24        Q.   What did he tell you?

25        A.   He doesn't see how anyone could buy

Page 385

 1   that, given the uncertainty around it.

 2        Q.    And then it lists an avoidance action

 3   valued at 110,333 dollars.

 4              Do you see that on the second page of

 5   the --

 6        (Unreportable cross-talk.)

 7              THE WITNESS:  Yes.

 8   BY MS. SULLIVAN:

 9        Q.    And what does that represent?

10        A.    I believe the payment to American

11   Express.

12        Q.    Was there anything else included in

13   there?

14        A.    I don't believe so.

15        Q.    And how did the fees associated with the

16   liquidation get determined?

17        A.    You'd have to ask Armory.

18        Q.    Can you turn to Exhibit C, "Projected

19   Income and Expense Statements."

20              What was your involvement concerning

21   this document titled "Seth Casden Projections"?

22        A.    Providing the historical financials, and

23   then reviewing what adjustments we could make on a

24   go-forward basis to reduce the costs as much as

25   possible.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

1    Q.   And if we look at your LinkedIn rental

2    mortgage, in the first half of 2024, it's 8,861,

3    and then in June, it drops to 6,900.

4         Why is that?

5    A.   Probably calculating taking out the

6    property tax.  I'm -- I'm not really sure.

7    Q.   Your mortgage itself hasn't been reduced

8    in any way, shape or form?

9    A.   Oh, I think that that was an assumption

10   in negotiating a lower rate with the mortgage

11   holder or extending the time to pay so I could

12   reduce the payment to get it below the -- so that

13   it would be cash flow positive.

14   Q.   And what was your role in preparing

15   this, other than providing the fact -- the

16   documentation?

17   A.   Just to review it.

18   Q.   Do you have any intention to amend these

19   financial projections?

20   A.   I'm sure it's possible.  There's nothing

21   now that we're aware of that we want to change, as

22   I sit here today.

23        MS. SULLIVAN:  Can you mark this as

24   Exhibit --

25        THE COURT REPORTER:  37.

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 387

```
 1            MS. SULLIVAN:  37.

 2            I don't have a binder clip, John.  I'll

 3   get something to clip it together.

 4       (Whereupon, MET's Exhibit Number

 5       37 was marked for identification

 6       by the deposition officer and is

 7       attached hereto.)

 8            THE WITNESS:  How close are we?

 9   BY MS. SULLIVAN:

10       Q.   Very close.

11            I'm showing you, Mr. Casden, what we've

12   marked as Exhibit 37.

13            Do you recognized this document?

14       A.   Yes.

15       Q.   Okay.  What is this document?

16       A.   This is a monthly operating for -- looks

17   like March for my personal bankruptcy, I think.

18   Yes.

19       Q.   Were you involved in preparing this?

20       A.   Yes.

21       Q.   There's an appendix on page 13,

22   appendix, page one of thirty, "Cash Receipts and

23   Disbursements."

24            Do you see that?

25       A.   Page one of thirty?
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

```
 1      Q.   Yeah.

 2      A.   Yes.

 3      Q.   If you turn to page three of thirty,

 4   please.

 5      A.   Yes.

 6      Q.   Five lines down has:

 7           "Westland School Facts,

 8      education, Charlie, 1,440."

 9           What is that for?

10      A.   So that would have been for some

11   supplement, like school bill, maybe, when the --

12   the contract -- the re-enrollment for the new

13   school year, you have to pay a deposit.  Or it

14   could have been for after school -- after school

15   activities.

16      Q.   Okay.  And then we look down below, and

17   on 3-28-24 there's a cash withdrawal, "Assisted

18   Living," 2,000.

19           Is that something different than what we

20   talked about earlier for the people you pay to help

21   your father?

22      A.   Sorry.  Just trying to find it.

23           No.  Yes.  That's correct.  It's nothing

24   different.

25      Q.   Then if you go to page five of thirty in
```

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

 1    Exhibit 37.

 2          A.    I'm sorry.  Five of thirty?

 3          Q.    Yeah.

 4          A.    Okay.

 5          Q.    Scroll towards the bottom.  March 7th.

 6    Says:

 7                "Be Hive of Healing, medical,

 8          1,350."

 9                Then another one for 350 right below it.

10                Do you see that?

11          A.    Yes.

12          Q.    What is that for?

13          A.    For blood tests and I.V. and

14    acupuncture.

15          Q.    If you go to page ten of thirty.

16          A.    Yes.

17          Q.    Under "Travel" in March of 2024, it's

18    3,968.

19                What does that represent?

20          A.    I think we covered that.  That would

21    have been some of the costs associated with my trip

22    to Austin or Charlie's trip to --

23          Q.    Okay.

24          A.    -- his grandmother's.  Those are the

25    only two trips that are recent, I guess.

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

Page 390

```
 1              Possible camping cost, but there really

 2    wasn't very much with camping, just gas and some

 3    equipment.

 4         Q.   Then you budgeted 30,000 dollars for

 5    child support and the actual payment was 47,950

 6    dollars.

 7              Why such a large discrepancy?

 8         A.   Well, if you read the footnote, it

 9    explains it.

10         Q.   Because you gave the tuition payment

11    directly to your son's mother instead of paying the

12    school directly?

13         A.   As well as the fact that the 4,000

14    dollars hadn't been coming out of my account

15    before.  I believe that's part of it, but ...

16              Yeah.  That's -- that's -- I'm reading

17    that right.

18              I'm getting a little tired.

19         Q.   We can just take a couple minutes.  I'll

20    just look quickly.  I think I'm done.

21         A.   All right.

22         (Whereupon, a recess was held

23          from 6:51 p.m. to 6:53 p.m.)

24              MR. RAMLO:  If you could add these as

25    exhibits too, I'd appreciate it.
```

 1               THE COURT REPORTER:  Sure.

 2               So that would be 38, and this one is 39?

 3               MR. RAMLO:  Yes.  This is 37 right here.

 4          (Whereupon, a discussion was held

 5          off the record.)

 6          (Whereupon, MET's Exhibit Numbers

 7          38 and 39 were marked for

 8          identification by the deposition

 9          officer and are attached hereto.)

10               THE COURT REPORTER:  Does anyone have

11     anything else to put on the record?

12               MS. SULLIVAN:  I don't have anything.

13          (Whereupon, a discussion was held

14          off the record.)

15               THE COURT REPORTER:  And do either of

16     you gentleman want to order a copy of the

17     transcript?

18               MR. TEDFORD:  Yes, I will.

19               MR. RAMLO:  I don't think I need it.

20               THE COURT REPORTER:  Okay.  Thank you.

21               Does anyone need a rough transcript?

22               MR. TEDFORD:  No.

23               THE COURT REPORTER:  Okay.  Off the

24     record.

25     / / /

1

2

3     (Whereupon, at the hour of

4    6:54 p.m., the proceedings

5         were concluded.)

6            -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    PENALTY OF PERJURY

2

3

4      I, _____, do hereby declare

5   under penalty of perjury that I have read the

6   foregoing transcript; that I have made any

7   corrections as appear noted, in ink, initialed by

8   me, or attached hereto; that my testimony as

9   contained herein, as corrected, is true and

10  correct.

11        EXECUTED this _____ day of _____, 20_____,

12  at _____, _____.
                  (City)                      (State)

13

14

15

16        _____

17                    SETH CASDEN

18

19

20

21

22

23

24

25

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

Page 394

| | |
|---|---|
| 1 | CERTIFICATE |
| 2 | OF |
| 3 | CERTIFIED SHORTHAND REPORTER |
| 4 | * * * * |
| 5 | |
| 6 | |
| 7 | The undersigned Certified Shorthand Reporter |
| 8 | of the State of California does hereby certify: |
| 9 | That the foregoing Deposition was taken |
| 10 | before me at the time and place therein set forth, |
| 11 | at which time the Witness was duly sworn by me. |
| 12 | That the testimony of the Witness and all |
| 13 | objections made at the time of the Deposition were |
| 14 | Recorded stenographically by me and were thereafter |
| 15 | transcribed, said transcript being a true and |
| 16 | correct copy of the proceedings thereof. |
| 17 | In witness whereof, I have subscribed my |
| 18 | name, this date:  May 3, 2024 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | _____ |
| | KELLI C. NORDEN, CSR NO. 7200 |
| 24 | |
| 25 | |

**IN RE SETH HALDANE CASDEN**
**Seth Casden, Vol. 1 on 04/26/2024**

<div align="right">

**Page 395**
</div>

1      ERRATA CORRECTION SHEET FOR THE DEPOSITION OF:

2    SETH CASDEN, conducted on April 26, 2024

3    Case Name: In Re SETH HALDANE CASDEN

4
       CORRECTIONS:
5
       Page/Line          Currently Reads          Change To
6
     _____
7
     _____
8
     _____
9
     _____
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     _____
22
     _____
23
     _____
24
     _____    _____
25            SETH CASDEN                        Date

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

**Exhibits**

**CasdenS 1**
  4:12 86:12
  123:14,15,
  16,21
  125:8
  129:18
  241:24
  314:19
  315:8

**CasdenS 2**
  4:13 86:13
  129:12,13,
  14,22
  149:14,17
  330:4,7,
  10,11

**CasdenS 3**
  4:15 86:15
  131:9,13,
  14,21
  143:20

**CasdenS 4**
  4:17 86:17
  145:14,16,
  17,22
  146:12,16

**CasdenS 5**
  4:18 86:18
  147:16,18,
  19 148:1

**CasdenS 6**
  5:5 87:5
  163:9,10,
  15

**CasdenS 7**
  5:9 87:9
  170:17,18,
  19 171:6
  172:22
  173:16,20
  174:9
  229:14,18,
  19 230:11,
  17 231:4,5
  232:15
  233:9
  234:12
  237:7,24
  239:4
  241:25
  242:25
  257:4
  259:9
  260:1
  274:2
  275:3
  278:9,10
  280:9
  287:17
  288:4,18
  289:6,7
  290:3
  292:2
  300:21,22
  301:7,8
  302:19

**CasdenS 8**
  5:14 87:14
  175:24
  176:1,2,7,
  25 177:17
  179:11

  180:20
  181:16

**CasdenS 9**
  5:17 87:17
  182:19,21,
  22 183:3

**CasdenS 10**
  5:18 87:18
  184:12,14,
  15,25
  185:1,8

**CasdenS 11**
  5:20 87:20
  188:8,10,
  11 189:2

**CasdenS 12**
  5:21 87:21
  191:15,16,
  21 192:3

**CasdenS 13**
  6:5 88:5
  195:14,15,
  16,20
  201:12

**CasdenS 14**
  6:7 88:7
  201:5,6,7,
  15,16

**CasdenS 15**
  6:9 88:9
  204:7,9,
  10,14,15

**CasdenS 16**
  6:11 88:11
  206:20,21,

  22 207:3

**CasdenS 17**
  6:13 88:13
  211:1,2,7,
  25 212:1
  213:8

**CasdenS 18**
  6:15 88:15
  215:15,16,
  17,18,23
  216:22,23
  224:15
  227:19
  228:15
  277:2
  279:25
  280:1

**CasdenS 19**
  6:18 88:18
  218:17,18
  219:3,16

**CasdenS 20**
  6:20 88:20
  302:24
  303:1,2,7
  304:8
  305:12
  317:7
  326:13
  327:6,19
  328:9
  329:4
  330:10

**CasdenS 21**
  7:5 89:5
  300:3,5,6

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/06/25    Entered 06/06/25 18:39:07    Desc
Declaration of Nibul A. Padue 417 of 462    Page 416 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                                    Index: (B)..1.5

CasdenS 22
  7:6 89:6
  332:20
  333:24,25
  334:7,8,
  13,14

CasdenS 23
  7:8 89:8
  342:20,21,
  22 343:3

CasdenS 24
  7:10 89:10
  348:6,7
  349:15,16
  354:6,10,
  14

CasdenS 25
  7:12 89:12
  353:6,8,9,
  14

CasdenS 26
  7:15 89:15
  356:15,18,
  19

CasdenS 27
  7:17 89:17
  357:22,23
  358:1,2,7

CasdenS 28
  7:20 89:20
  363:1,2,6,
  7

CasdenS 29
  7:22 89:22
  364:23
  365:1,2,6,

7

CasdenS 30
  8:5 90:5
  366:1,2,6,
  7

CasdenS 31
  8:7 90:7
  371:24
  372:1,2

CasdenS 32
  8:9 90:9
  373:1,2,6,
  7

CasdenS 33
  8:11 90:11
  375:5,6,7,
  8

CasdenS 34
  8:15 90:15
  375:11,12,
  13,14
  376:5,7

CasdenS 35
  8:17 90:17
  377:13,14,
  15 378:7

CasdenS 36
  8:19 90:19
  377:23,24
  378:1,2,17
  380:8

CasdenS 37
  8:21 90:21
  387:4,5,12
  389:1

CasdenS 38
  9:5 91:5

CasdenS 39
  9:8 91:8

———————
———————
        (
———————

(B)   289:8

———————
        -
———————

-86   321:18

-o0o-   99:10
  392:6

———————
        0
———————

004   90:16

01   90:16

———————
        1
———————

1   86:12,14
  87:17
  117:11
  123:14,16,
  21 125:8
  129:18
  149:21
  159:20
  241:24
  314:19
  315:8

1,100   181:1

1,200   248:15

1,350   389:8

1,382   307:4

1,402,481
  125:12

1,440   388:8

1,499.11
  329:7

1,500   241:13

1,650   266:23

1,666,333
  257:7

1,667   260:21

1,719,000
  281:25

1-16-24
  87:13

1-21-17
  89:21

1-21-20
  189:5

1-23-24
  90:20

1.0   355:13

1.1(A)
  222:7,23

1.2   295:25
  296:10

1.4   119:18
  120:8
  214:4,17,
  18 232:1

1.5   345:7,
  12 346:15

347:5,10

**1.66** 257:21

**1.7** 187:8,9
281:25

**1.8** 295:16

**1.894** 296:14

**1/2** 11:15,
18 13:25
21:6

**10** 86:4
87:18
184:12,15
185:1,8
328:15

**10,000** 139:8
278:7,8
307:5
311:19

**10,617**
307:11

**10-** 253:15

**10-17-2023**
373:9

**10-17-23**
87:16

**10-31-23**
86:21
88:17

**10-5** 336:9,
12

**10.31.2021**
89:16

**100,000**
180:1
183:8
196:15

**10036** 85:19

**101** 87:14
112:23

**102** 82:10
83:15
84:15
112:20
171:22

**103** 99:6

**105,000**
323:2
324:23

**10636** 219:22

**10639** 220:5

**10643** 222:6

**10658** 223:25

**10661** 219:22

**10662** 125:9

**10663** 125:10

**10668** 124:6,
22

**106SUM** 88:15

**107-** 125:19

**10703** 125:9

**108** 172:21

**10886** 146:16

**10888** 146:16

**10897** 300:12

**10:00** 10:3

**10:14** 84:22

**10th** 328:21

**11** 87:20
177:18
188:8,11,
16,18
189:2
237:11,23
261:22
294:4
326:18
383:25

**11,000**
260:25
261:21

**11,548**
290:11

**11,659**
320:24,25
324:3

**11,786**
212:10

**11,799**
228:17

**11-12-19**
189:3

**110** 112:23

**110,333**
385:3

**112** 192:4

**113** 192:4

**1132** 320:23

**114,357**
294:4

**117** 86:6

**11:40** 82:2

**11:55** 82:2

**12** 87:19,21
89:11,14
90:13
186:6
191:14,16,
21 192:3
337:4
375:22

**12-19-23**
88:14

**12-22-14**
61:13

**12.5** 193:21

**120,000**
309:7

**121** 172:6

**123** 86:12

**126** 171:20

**127** 172:10
173:3

**129** 86:14
173:19

**12:22** 116:23

**12:54** 116:23
117:3

**12th** 185:12

224:10
337:9,13
338:21
353:19

**13** 88:5
195:14,16,
20 201:12
387:21

**130** 195:20

**131** 86:16

**132** 174:9,
12

**133** 195:21

**134** 201:12

**135** 171:20
172:10,21
173:3,19
174:9,12
231:4
237:11,12,
23 241:25
242:24
244:23
245:15,16,
17 259:8,
25 274:2
275:3

**14** 88:7
201:5,7,16
234:11
261:20
326:13

**14.55** 193:10

**142** 189:3

**145** 86:17

**146** 366:19

**147** 86:21
369:13

**15** 88:9
204:7,10,
15 216:22
234:22
241:25
244:24,25
326:13
327:6,19

**15,000** 139:9
227:21
253:15
293:18
335:12

**15,991**
335:21

**150** 30:24
31:13,14
96:18 99:1
337:10,16

**150,000**
156:10
246:5

**154** 95:7

**15th** 346:2
351:2
365:21
374:10

**16** 88:11
206:20,22
207:3

242:24
244:23
283:8,16

**16(B)** 177:1,
3

**16,000**
261:18
262:3

**163** 87:8

**164,901**
294:14

**169** 204:15

**16th** 339:8
340:3,8
374:10

**17** 88:13
89:19
90:13
210:24
211:2,7
212:1
213:8
217:4
245:17
279:16
315:10
330:15
341:9
358:18

**17(B)** 279:18

**17,000**
328:19,20

**17,722.62**
328:16

**170** 87:13

**170,000**
214:7

**171** 204:15

**175,000**
291:5,22

**176** 87:16

**179,324**
283:4

**17th** 366:20
374:3
375:22

**18** 88:15
210:23
211:16
215:16,18,
23 216:23
224:15
227:19
228:15
229:15
237:10,24
277:2
280:1
292:3

**18,000**
293:17

**180** 13:17
61:15,16
73:5

**182** 87:17

**184** 87:19

**188** 87:20

**19**  87:7
  88:18
  218:5,16,
  18 219:3,
  16 228:3
  245:13,15
  246:5
  254:11
  280:1

**1901**  84:23
  85:6

**191**  87:23

**1930s**  42:24

**195**  88:6

**1970s**  39:17

**1980s**  251:5

**1992**  377:3

**1996**  377:2

**1998**  117:13

**1st**  183:12
  213:20
  367:2,14
  369:19,25
  371:1,4

─────────
        **2**
─────────

**2**  86:13
  129:12,14,
  22 131:11
  149:14,17,
  20 330:4,
  7,10,11

**2,000**  160:17

235:20
311:21
314:25
336:3
388:18

**2,070,000**
  213:16
  214:2,14
  257:13,14

**2,100**  275:18

**2,115**  268:7

**2,144,300**
  146:19

**2,195**  280:4

**2,200**  268:17
  269:15

**2,200-dollar-
per-month**
  312:13

**2,300**  270:24

**2,400**  276:3

**2,500**  253:7,
  11

**2,600**  316:13

**2,628**  315:21

**2,675**  264:8

**2,756**  312:2

**2-**  273:25

**2-2-22**  88:12

**2-2-24**  86:12

**2-22-22**
  86:16

**2-23-bk-16904-
br**  83:6
  84:6

**2.4**  158:25

**2.8**  281:4,8

**2/3/2024**
  87:23

**20**  88:20
  100:11
  237:6
  279:8,9
  302:24
  303:2,7
  304:8
  305:12
  317:7
  326:13
  327:6,19
  328:9
  329:4
  330:10

**20(A)**  289:8

**20,000**
  248:17,18
  262:2,4

**20,192**
  296:14

**20,554**  325:3

**20-**  248:23
  365:23
  372:7

**200**  271:22
  320:3
  343:12

**200,000**
  157:16
  196:14,17
  296:3
  309:7

**2000**  23:9,
  10 24:6
  35:15

**2001**  180:17

**2002**  53:16
  180:17

**2003**  296:12

**2004**  11:20
  83:16
  84:17 91:5
  343:12
  372:7
  375:25

**2005**  53:17
  118:7,8

**2006**  11:21
  12:8
  118:11
  169:12
  248:20

**2007**  36:4

**2008**  36:4
  164:23
  169:12
  296:9,12

**201**  88:8

**2013**  213:20
  214:3,4,24

**2014**  26:4

**2015**  26:4
 114:23
 213:20
 214:5

**2016**  90:13
 173:4
 306:2
 375:22

**2017**  21:18
 363:14,24

**2018**  228:3,
 4

**2019**  53:19
 86:14
 87:19
 185:12
 186:6
 224:10

**2020**  35:14
 55:24
 56:8,12
 57:9 89:19
 119:8,19
 121:15
 122:2,16
 123:2
 150:1
 189:10
 232:2
 297:20
 358:18

**2021**  56:10
 125:20
 126:5,10

 224:18
 227:15
 280:19
 282:9,12

**2022**  56:10,
 16 189:13
 197:3
 207:10
 280:13
 281:24
 282:8,10

**2023**  41:24
 45:25
 49:24
 50:16,21
 51:14
 52:20
 53:3,22
 54:1,14
 55:1,7,16,
 18,25
 56:11
 60:5,9
 76:7 77:12
 87:17
 89:7,9,11,
 14 90:6
 117:2
 148:13
 150:1
 151:8
 152:1,17
 154:3,18,
 22,25
 155:19
 157:14
 158:1,4,

 11,16
 159:20
 162:17,20,
 23 163:2
 168:7
 178:9
 183:12
 189:16,22
 205:8
 208:22
 210:15
 211:17
 212:13
 244:13
 254:22
 273:15
 277:11,18
 281:5,15
 283:8,16
 284:17
 285:19
 286:17
 287:8,14
 315:10
 316:4
 325:9
 327:12,13
 334:20
 339:19
 343:11
 344:10,21
 346:8
 347:14,18
 348:14,15,
 21 349:5,7
 353:20,23
 357:5,9
 361:8

 362:10
 364:9,19
 365:17
 366:20
 371:13,15
 374:10,11
 377:11

**2024**  10:2
 27:13
 32:15
 55:11
 83:18
 84:23 92:2
 101:18
 102:2
 129:9
 134:6
 194:10
 196:6,10
 197:8
 201:24
 273:16
 306:9
 315:11,14
 316:17
 330:15
 340:20
 351:21
 357:12,15
 375:22
 378:22
 386:2
 389:17

**204**  88:10

**206**  88:12

**21**  89:5
 224:15

228:14
237:6,11,
24 300:3,6
328:8

**21,666**
288:20

**211** 88:14

**212 631-4420**
85:20

**215** 88:17
207:3

**218** 88:19
207:3

**21st** 189:10
363:14

**22** 89:6
332:20
333:25
334:8,14

**22,298**
360:13

**23** 89:8
146:5
158:1
221:7,22
222:2
238:17
239:3
342:20,22
343:3

**23rd** 146:5
196:6
378:22

**24** 89:10

228:4
239:12
348:5,7
349:16
354:6,10,
14

**24/7** 97:22

**25** 27:14
89:12
256:24
329:3
353:6,9,14

**25,000**
160:15
194:4
289:1
304:24

**25,300**
282:13

**250** 321:14

**250,000**
369:8

**250,586**
321:6

**250-** 50:6

**254,418**
190:9

**254-** 12:4

**25406** 11:15,
18 13:25
21:6

**25408** 21:10,
12 23:13,
19

**25th** 125:20
126:5
189:13,22

**26** 10:2
83:18
84:23
89:15 92:2
102:2
117:2
201:24
329:3
356:15,19

**27** 89:17
277:9
357:23
358:2,7

**270-something-
thousand**
339:21

**28** 89:20
277:9
362:23
363:2,7

**29** 89:22
315:11,14
364:23
365:2,7

**29.2** 193:2

**2900** 85:19

**2:00** 171:4

**2:05** 171:4

**2:45** 208:3

**2:48** 208:3

**2e** 92:15

94:25 95:1

**2nd** 207:10
335:1,6

---

**3**

---

**3** 86:15
101:18
131:9,14,
21 143:20

**3,000** 264:25
265:6
314:25

**3,333** 272:8

**3,548** 290:17

**3,968** 389:18

**3-28-24**
388:17

**3-4-24** 88:6

**3.3** 149:24
150:18

**30** 90:5
365:24
366:2,7

**30,000**
112:13
248:23
302:21
390:4

**30,330**
325:24

**300** 89:5
114:4
218:14

273:25
337:19
338:5,10,
17

**300,000**
111:22
156:3
158:5
179:2,4
185:18,22
186:9,12,
17,25
187:10
188:23
189:6
191:8
196:14
200:22
205:15
227:24
257:20
280:17,23
341:10
357:21
374:3

**303** 88:24

**308,828**
321:21

**31** 89:7
90:7
124:24
328:17
371:24
372:2

**310** 229-1234
85:13

**310** 277-0077
85:7

**31st** 148:13
277:11,18
334:20

**32** 90:9
314:20
326:13,18
327:6,19
328:8
329:4
372:22
373:2,7

**32,076** 285:8

**33** 90:11
257:4
375:6,8,18

**330,000**
218:14

**334** 89:7

**34** 90:15
227:18
375:12,14
376:5,7

**341,000**
221:11

**342** 89:9

**348** 89:11

**35** 90:17
377:13,15
378:7

**35-** 286:10

**350** 64:18

269:18
389:9

**350,000** 50:6
162:5
220:6
221:4,9
339:8

**353** 89:14

**355** 328:6

**356** 89:16

**358** 89:19

**36** 90:19
294:14
377:24
378:2,17
380:8

**361,545**
280:13

**363** 89:21

**363,112**
280:20

**365** 89:23

**366** 90:6
276:4

**368.10**
329:22

**3687300**
90:14

**37** 90:21
259:9
274:2
386:25
387:1,5,12

389:1
391:3

**372** 90:8

**373** 90:10

**375** 90:14,
16

**377** 90:18

**378** 90:20

**38** 91:5
259:8,25
274:2
391:2,7

**387** 90:22

**39** 91:8
275:3
391:2,7

**39,000**
382:19,24

**390,674.14**
224:10

**391** 91:7,8

**395** 99:6

**3:01** 218:25

**3:03** 218:25

**3:30** 71:19

**3rd** 194:10
283:16

——————

4

——————

**4** 86:17
145:14,17,

| | | | |
|---|---|---|---|
| 22 146:12, 16 335:24 343:12 | 90:22 | 45,581 180:10 | 5,000 128:21 132:23 139:5 |
| 4,000 24:12, 15 63:10 66:12,15, 22,23 67:3,8,14, 18,24 72:25 115:2 235:18 243:14 263:6 297:2,10 306:1,12 307:2 390:13 | 4-9-24 88:24 4.15 224:16 4.16 228:16 4.4 217:6 4.9 218:6 40,000 78:25 79:2 284:25 286:10 302:21 | 45,582 190:12 450 84:24 85:6 457 181:11 457.84 181:4 47,406 258:6,10 47,950 390:5 | 249:2 273:21 314:22 316:23 319:4 336:12 340:8 357:16 365:20 5,585,000 359:11,21 |
| 4,200 13:6 19:12 311:9,13, 16 | 400,000 58:8 401(k) 37:25 406 12:4 409 301:10, 11 | 479.10 329:22 486,500 221:10,19 489,759 302:9 | 5,890 317:13,25 5.585 359:24 50 258:18 259:3 |
| 4,395 306:21 4,400 19:14 4,500 13:2 19:8 335:24 | 409,000 297:15,23 302:14 41 228:17 410 86:12 88:18 | 49 235:3 306:19 307:2,11 490 301:9 4:39 299:24 | 50,000 41:2 49:22 50:15,20 51:13 52:12,16, 25 179:22, 24 284:17 |
| 4,600 307:14 4,617 306:19 307:1 | 420,000 287:9,12 361:7,24 362:9 | 4:51 299:24 4th 196:10 213:20 336:2 | 286:15,16, 20 302:16 336:9 337:5,14 374:2 |
| 4,716 235:3 4,893 316:18 4- 158:9 4-19-24 | 434,000 259:2 434,536 258:18 259:3 440 302:17 | ————————— 5 ————————— 5 86:18 147:16,19 148:1 | 500 267:13 271:5,6 287:21 500,000 58:8 |

**IN RE SETH HALDANE CASDEN**

Seth Casden, Vol. 1 on 04/26/2024                    Index: 51..70,582

158:10

160:8

168:16

296:6,7

**51**   307:4

**52,500**
  252:17

**53,085**
  325:23

**530**   262:8,
  21

**534**   259:3

**54.97**   254:12

**550**   66:2,11

**57**   180:10

**58**   212:10

**58,242**
  321:25

**59**   216:22
  217:4
  218:5
  224:15
  227:18
  228:14
  277:9

**59,947**
  277:25

**5:49**   348:11

**5:57**   348:11

**5th**   189:16
  284:17

——————————

**6**

**6**   87:5
  163:10,15

**6(A)**   215:9

**6,000**   235:7
  236:4
  244:15
  263:24
  305:18
  307:9,10,
  13

**6,250**   22:18

**6,500**   22:9,
  17 23:24
  132:7

**6,900**   386:3

**6-19-20**
  88:19

**60**   27:15
  86:20
  285:8

**60,000**
  265:16

**600,000**
  117:15

**63**   125:12
  356:3

**65,000**   15:16
  296:16

**65,064**
  296:14

**650,000**

47:18

48:2,6

**67**   289:6

**670**   125:19
  214:5

**670,000**
  208:6,25
  209:13,19
  215:3

**670K**   207:13

**678,620**
  376:1

**69,463**
  274:3,12

**6:01**   352:10

**6:05**   352:10

**6:51**   390:23

**6:53**   390:23

**6:54**   392:4

**6th**   336:16

——————————

**7**

**7**   87:9
  118:11
  153:24
  170:17,19
  171:6
  172:22
  173:16,20
  174:9
  229:14,19
  230:11,17
  231:5

232:15

233:9

234:12

237:7,24

239:4

241:25

242:25

257:4

259:9

260:1

274:2

275:3

278:10

280:9

287:17

288:4,18

289:7

290:3

292:2

300:21,22

301:7,8

302:19

343:11

**7,047**   243:19
  244:2

**7,050**   335:19

**7,074**   243:2

**7,223**   330:17

**7,333**   293:12

**7-**   151:11

**70**   125:19
  280:10

**70,000**
  339:18

**70,582**

IN RE SETH HALDANE CASDEN

Seth Casden, Vol. 1 on 04/26/2024                    Index: 718..account

284:20

**718**  117:11

**7200**  83:25
84:21
101:22

**73**  287:6

**75**  287:16

**77**  234:16
288:3

**777**  90:16

**781,348.28**
224:11

**79**  288:18
290:2

**7th**  389:5

────────

**8**

────────

**8**  87:14
175:24
176:2,7,25
177:17
179:11
180:20
181:16

**8,000**  124:21
132:11,21
263:24
290:10

**8,800**  132:17
289:14
290:1

**8,861**  124:24
328:16

386:2

**8-**  132:11

**8-13-2019**
224:2,6

**80**  291:1

**80,000**
296:19
302:13

**800**  284:7

**800,000**
151:11

**82**  292:2
301:6,8

**83**  82:10
83:15
84:15

**83,415**
323:24
325:24

**83-102**  86:5

**838,075**
373:11

**84**  181:11

**850**  284:8

**87**  298:18,
23

**8:45**  71:19

**8th**  173:4

────────

**9**

────────

**9**  87:17

182:19,22
183:3
330:15

**9,126**  289:9,
13

**9-15-21**
88:10

**90034**  85:13

**90067-6006**
85:7

**90265**  11:16

**90s**  251:6

**921**  90:16

**926.62**  256:1

**94**  298:25

**95**  298:18,
23,25

**974**  289:20

**98**  302:9
378:21

────────

**A**

────────

**A-R-M-A-N-I-N-
O**  212:8

**a.m.**  10:3
82:2 84:22

**A/b**  245:20
292:4

**AA-DASH-1**
354:22
355:12

**ability**
216:9
277:23
352:5

**Absent**  308:2

**accept**  374:7

**accepts**
173:24

**access**  286:6

**accommodations**
327:10

**accompanying**
199:22

**account**
14:11,12,
18,22
15:1,7,10,
13,14,23
16:2,11,
12,18,20
17:2,5,6,
12,13,14,
21,22,24
18:6,17
19:15,16,
18,19,20
20:17
24:13 28:1
38:6,9
40:9
41:14,24
42:2,13
54:15 89:6
151:14
156:25

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 307 of 462   Page 426 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

157:4
168:3
187:1
188:25
189:9
205:11
206:8,16
222:11,18,
24 223:3
253:19,20
254:6,8
256:4,23
283:13
288:23
292:19,22
293:6,14,
16,22
294:2,5,7,
15,19,23,
25 295:6,8
297:1,3
305:25
306:3,7,8,
12 307:3
322:12,14,
24 323:3,4
324:18,25
325:4,8,9
328:24
329:1
334:22,24
336:6
339:10,19,
24,25
340:2,4
341:14
346:6
360:13

364:7,12,
15,16
365:13
366:14
367:16,19
390:14

**accountant**
260:5
278:22
279:15
288:7,13
380:13,14

**accounting**
151:18
260:20,23
341:5

**accounts**
14:23,25
17:7,14
18:1,2,5,
8,11,15
19:24
20:2,16,21
37:20,24
38:3 55:2
205:22,25
222:22
253:23,25
254:4
281:13
286:5,7
322:10
323:7
324:13
325:19
340:6

**accumulate**
16:10

**accuracy**
277:20

**accurate**
146:12
165:20
176:22
211:23
216:7,14,
19 237:9
238:3
274:6
279:22
280:8
288:22,23
305:14
322:2
381:9

**acknowledges**
173:22

**Acorn** 15:22
19:15
20:8,10
295:2

**Acorns** 15:1,
3,7,8,12
16:2,11,19
17:2,5,6,
13,14
19:19
20:17

**acquaintances**
30:11

**act** 108:14
166:6

**action** 50:3
57:12
127:5
157:25
385:2

**active**
256:7,9,19

**actively**
239:10

**activities**
71:20 72:5
73:2
388:15

**activity**
293:7

**actual**
175:14
248:13
260:13
315:9
321:11,21
323:23
325:24
326:3
349:7
355:8
390:5

**actuality**
284:24

**actuals**
260:15

**acupuncture**
389:14

**ad** 16:23,
24,25

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 388 of 462   Page 427 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: adamant..agreed

128:8

**adamant**
121:17

**add** 289:25
302:20
307:1
324:3
390:24

**addition**
54:20
66:11
76:12
77:16
79:2,21
175:20
241:15
275:24
276:10
299:12
312:2

**additional**
52:8 79:1
152:9,10,
11,16,19
159:5
162:10
216:12
235:8,20
257:25
290:22
305:18
308:5
311:9
316:5
324:14
369:1,2,9

**address**
11:13
21:6,8,9
117:10
147:4,10,
11 382:13

**addressed**
202:20

**addresses**
147:12

**ADHD** 92:13
94:17,25

**adjusted**
290:20

**adjustments**
385:23

**Admin** 359:9

**administration**
170:15
361:4

**administrator**
201:21

**adults**
372:13

**advance**
120:12
219:3,16,
21 221:6,
16,18
340:19

**advice**
47:10,12
48:22 49:9
51:16,22,

25 52:3
81:6
178:17,21
197:11
202:22
203:7,22
231:2
264:4
304:1,4
306:14
324:16

**advised**
197:13
246:12

**advises**
199:8

**advisor**
120:17
165:19
166:8,15,
23 167:18
169:13
170:6
173:25
174:6,11,
17,20,22,
23 175:2
184:4
249:25
250:6

**affirm** 10:12

**affirmatively**
255:20

**afford** 47:24
144:9,11

**afraid** 120:5

**after-school**
79:18

**aftercare**
79:3
299:16

**AFTERNOON**
86:6

**age** 42:16
234:15,16

**agencies**
309:5,24

**agency** 40:8
309:25
310:2

**agent** 143:18

**aggregate**
248:23

**aggregating**
262:25

**agree** 126:20
277:14,15
307:22
381:10,15
383:21

**agreeable**
82:4

**agreed** 50:7
53:1 107:2
126:19
198:22
333:14
353:1
365:20

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvo Page 389 of 462   Page 428 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: agreeing..amount

agreeing
  227:4

agreement
  63:9 66:20
  69:11,24
  70:1,12,
  16,19
  78:16
  86:14
  87:5,7
  90:18
  126:23
  129:9
  130:1,3,
  11,13,23
  131:1,5,6,
  25 150:23
  163:19,20
  173:13
  210:12,13
  214:16
  226:19,22
  229:5
  288:2
  378:13,15

agreements
  63:1,3,4,8
  69:12,14,
  16,20
  78:15

agrees
  173:23
  222:9,16

ahead  51:18
  52:6
  278:13

ahold  167:24

aide  28:16,
  18

air  96:3
  318:11

airfare
  316:20,22
  317:1

Airline
  329:6

Airlines
  327:10,11

airplanes
  298:12

AKIDO  298:1,
  3 301:1

akin  41:14

Alan  88:7
  165:21
  179:12
  183:7
  184:2

alcoholic
  370:10

Aling  169:15
  174:21,23
  175:3

alive  271:25

Alliance
  125:23

allocate
  49:16

allowed
  322:22

alternating
  73:15

Alvaro  44:14
  45:19
  108:17,19,
  24 109:9
  165:3,18
  167:24
  169:11
  203:10
  204:24
  231:25
  233:17
  379:24

Amazon
  182:14
  284:4

amend  386:18

amended
  88:14
  90:17
  124:4
  211:12
  260:25
  378:12

amendments
  173:15
  216:13
  230:16

America
  254:4
  336:8

American

18:12
  181:16
  182:6
  254:3
  283:3,15
  335:21
  340:3
  385:10

Amex  190:4,
  6

amount  16:4
  19:9 32:13
  47:17,24
  48:6 49:7
  56:13
  97:16,23
  112:16
  125:2,11,
  15,18
  132:13,20
  134:18
  135:25
  158:7
  169:3
  179:1,18
  187:5
  193:25
  196:21
  213:17
  214:14
  220:6
  221:15,19,
  20 224:17
  225:5,10
  226:9
  228:17
  231:1

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration of Nicole A. Salvato    Page 330 of 462    Page 429 of 1079

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024          Index: amount's..application

245:9
254:19
256:3,23
257:22
265:18,19,
23 274:12
283:4
284:19
285:8
286:8
288:25
289:17
294:9
297:24
298:6
301:21
307:12
323:13
326:3
339:25
364:18
367:20,22
369:20

**amount's**
34:4

**amounts**
125:4
129:7
193:24
246:11
265:19
283:11
308:7

**analysis**
24:17,19
90:20
313:17,24

380:22
381:2

**anecdotally**
310:8

**angel** 89:5
272:2
297:14
300:15,16,
24 301:2,
4,6

**Angeles** 10:1
23:14
29:21
35:11
71:14 83:3
84:3,24
85:7,13
92:1
116:11
117:1
160:25
161:3
319:14,17,
20,23
329:17

**anniversary**
196:21,22,
23

**annual** 160:7
261:23
342:13

**annually**
78:25
128:21,22
132:23
133:22

208:17
209:12
349:12
382:21

**Anonymous**
376:24
377:6,10

**answering**
333:15

**answers**
11:11

**anticipated**
130:20

**Antonio**
180:4

**anxiety**
312:14

**anymore**
40:12
135:10
154:19
245:16

**apartment**
11:25 13:9
14:5 22:2
23:1 25:13
29:18,21
31:16,17
33:2,4,12,
15,18
67:10
136:22
144:12,18
267:22
276:24

**apartments**
147:13

**Apologize**
337:14

**app** 59:17
198:24

**apparently**
115:12

**appeal** 46:9
47:14
109:8

**appeals**
56:25
57:11

**APPEARANCES**
85:1

**appears**
124:8

**appendix**
387:21,22

**Apple** 181:8
284:5

**apples-to-
apples**
278:25

**applicant**
358:20,25
359:3

**application**
122:4
229:9
358:23
360:7
361:3

Case 2:23-bk-16904-BR  Doc 366-1  Filed 06/06/25  Entered 06/06/25 18:39:07  Desc
Declaration of Nicole A. Sullivan  Page 301 of 462  Page 430 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024    Index: applications..ashamed

362:2,4

**applications**
  358:15

**applied**
  22:22
  111:12
  379:15

**apply** 30:4
  119:6,9
  122:1
  238:7

**appointment**
  115:21
  174:11

**appointments**
  27:19
  113:18,20

**appraisal**
  145:10

**appraisals**
  251:1
  252:8

**appraised**
  250:22
  251:9
  252:1

**approach**
  270:17

**approval**
  354:2,4

**approve**
  41:17
  344:15
  379:6

**approved**
  22:21
  66:10
  198:24

**approves**
  181:13

**approximate**
  236:6

**approximately**
  15:16 24:6
  41:20
  123:1
  196:16
  235:6
  278:8
  305:18
  307:9
  328:6

**April** 10:2
  55:24 56:8
  57:9 83:18
  84:22 92:2
  101:18
  102:2
  105:8
  117:2
  119:19
  122:2
  201:24
  213:20
  214:3,4,24
  273:19

**area** 35:11
  160:25
  367:7
  381:13

**areas** 95:6

**argument**
  37:16
  65:8,10
  78:8
  121:22

**arguments**
  157:4

**Aria** 89:20,
  22 90:7,9
  178:22
  179:4,7
  287:13
  336:14
  361:6,8,
  10,12,25
  362:1,13,
  18 363:13,
  23 364:4,
  8,13,19
  365:12,16
  366:11
  371:7,10,
  13,21
  372:7,20
  373:8,13,
  18 374:2
  375:24
  377:10

**Armanino**
  212:6,20,
  22,24
  261:17
  262:2

**Armory**
  275:10

291:23,24
  380:15,21
  385:17

**Armour**
  54:15,21
  55:4,11,13
  119:25
  155:24

**Armour's**
  55:5

**arrangement**
  128:25
  134:17
  137:10
  140:8
  150:11
  308:2

**arrears**
  329:1

**arrive**
  346:19

**art** 252:4

**artificial**
  62:11

**arts** 72:19
  318:12

**artwork**
  246:19
  248:7
  250:19

**as-needed**
  263:19
  266:20

**ashamed**

120:4

**asleep** 98:9

**asset** 159:1
196:6,12,
18 200:3,
19 322:16,
22 380:22
381:11,16

**assets** 60:7,
12,14
88:16
90:19
108:1
119:22
121:4
165:17
166:1,2
167:23
215:25
228:10,11
238:13,21
323:7
359:10
360:3
362:13
370:24
380:9,25

**assigned**
381:11

**assist**
114:12
310:10,14,
21

**assisted**
25:17
28:10,25

138:25
139:2
275:18
313:1,16,
23 388:17

**assisting**
32:19
201:1
312:22

**assists**
28:21

**assume** 12:24
193:25

**assumes**
194:20

**assumption**
386:9

**ATM** 293:22

**attached**
100:8
123:18
129:16
131:16
145:19
147:21
163:12
170:21
176:4
182:24
184:17
188:13
191:18
195:18
201:9
204:12

206:24
211:4
215:20
218:20
300:8
303:4
334:10
342:24
348:9
353:11
356:21
358:4
363:4
365:4
366:4
372:4
373:4
375:10,16
377:17
378:4
387:7
391:9

**attachment**
245:18
280:3

**attachments**
24:24
89:11

**attempt**
15:23
47:13

**attend** 98:21
115:20,21
269:11
361:23

**attending**

309:2

**attention**
97:21

**attested**
277:20

**attorney**
85:5,12,18
203:13,14,
16 226:23,
24

**attorney-
client** 60:2
203:25

**attorneys**
292:1

**attorneys'**
80:19

**attribute**
56:15

**audible**
106:1

**August** 111:9
213:20
214:5
228:4
269:5
283:7

**August/
september**
269:5

**aunts** 142:4

**Austin**
273:12,17
316:21,23

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/06/25   Entered 06/06/25 18:39:07   Desc
Declaration of Nichole A. Sadler Page 303 of 432   Page 432 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024      Index: authentication..bank

319:5
320:4
329:9,15,
18 389:22

**authentication**
172:17

**Authorities**
87:12
171:14
304:11

**authorize**
194:14

**authorized**
227:10,14
229:12

**autistic**
92:16
94:21

**auto** 262:8,
12,13
360:13

**avail** 377:8

**Avenue** 84:24
85:6,12

**average**
26:19
133:4
138:24
139:2
259:15
262:11
288:25
311:18,20

**averaging**

349:11

**avoid** 46:10
119:16
247:18
250:2

**avoidance**
385:2

**awarded**
177:10
357:4,6

**aware** 43:20
96:3
136:20
164:23
199:16
216:12
221:25
386:21

---

**B**

---

**B-A-U-D-I-N**
64:13

**babysitter**
68:3

**baccarat**
361:16
367:1,6,9

**back** 30:4
51:6,9
52:1 58:13
59:7
81:11,12
106:8
107:1
118:17

125:7
170:23
187:22,25
198:19
224:14
228:14
229:14
232:1
233:8
239:23
241:1
243:7
256:18
259:6,25
269:20
272:13
280:9
286:13,14
289:4,6
290:2
310:22,24
317:5
327:5
333:19
336:21,24
354:6
355:16
370:5
377:9
380:8

**backed**
289:25

**backs** 249:9

**bad** 140:13,
16

**balance**
15:23

93:3,8
156:2,5
187:23
190:11
196:15
280:18
283:18,19
288:14
295:14,15
315:6
340:24
366:17

**balloon**
342:13

**ballpark**
246:22

**band** 320:2

**bandwidth**
341:8

**bank** 14:15,
24 18:9,17
66:17
151:14
156:24
175:6
182:4,14
187:1
190:6,21
221:12
222:11,18,
22,24
228:16
244:3
254:3
260:16
288:13

307:17
315:7
322:14
325:8
328:25
334:18,19,
21,24
335:16
336:8
364:7,16

**bankrupt**
302:1

**bankruptcy**
17:18,20,
25 34:8,12
45:9,24
46:10
47:12
48:2,7
54:4
55:19,25
56:25
57:3,8,10,
13,16,21
58:3 60:1,
5,8 76:7
81:20 83:1
84:1 87:16
90:22
105:14,21,
25 106:12,
14,15
109:4,19
110:9
119:16
120:4,5,12
121:9,10,

11 122:21
123:23
124:14
130:7,10
141:7,9,11
143:8,11
152:21,24
153:5,7,9,
10,11,14,
21,23
154:13,17
155:13
158:10
162:12
168:6
176:11
179:6
181:13,25
187:8,16
197:14,17
198:14
199:5,15
200:16
203:16
205:21
206:1
211:13
216:3
219:4
220:20
221:1,3,
14,18
223:2,9,
11,15
232:23
238:23
240:22
241:7

242:20
246:24
247:13,20
249:11
252:22
253:1
257:7
258:9,12,
14,25
260:6
264:5,7
273:8
274:11,14,
16 277:17
283:20
284:8
293:20
294:17
297:7
311:6
319:6
324:19
325:2,10,
18 328:23
333:20
334:22
337:3
341:1
342:10,12
345:4,20
349:13
360:9
384:17
387:17

**barely**  69:5

**base**  194:12

**baseball**

249:23
251:4,5

**baseballs**
250:8

**based**  16:14
80:12,15
113:13
146:24
150:19
154:14
160:24
161:9,10
221:6
231:13
253:11
260:16
298:6
346:23
347:7
371:10

**basic**  66:25
95:8
138:24

**basically**
48:9 73:8
97:21
120:8
121:23
281:1
346:23

**basis**  30:1
54:17
58:25
59:19
63:11,13
98:12,14

115:23
160:7
168:20
261:24
263:19
266:20
307:8
308:11
315:4
351:18
385:24

**basketballs**
318:12

**Bates** 124:5
125:8
192:3
300:12
343:12
356:3
366:18

**bath** 13:10
23:2

**bathrooms**
111:6
135:6

**baths** 13:7
22:25

**Baudino**
64:13

**bedroom** 13:9
23:2

**bedrooms**
13:7 22:25
111:3
135:4,5

**beers** 370:11

**began** 35:13

**beginning**
308:23,24

**behalf** 84:19
179:8
188:2,4
197:5
199:14
227:8
278:4

**belong**
78:19,21

**belongings**
252:22,25

**BENDER** 85:11

**beneficiaries**
39:23

**beneficiary**
41:14
43:12
44:3,10,16
164:13

**benefit** 39:1
87:8
210:10
307:12

**bet** 367:9

**beverages**
370:10
371:6

**bicycle**
268:24

**bifurcate**
126:17
151:17

**big** 133:18
164:17
179:21

**biggest** 55:4
352:1

**bill** 114:21
212:18
226:9
261:17
311:19
332:13
388:11

**billed** 226:6

**bills** 14:9
25:15
50:12
191:10
226:20
227:6
293:24

**binder** 387:2

**binding**
69:15

**birth** 61:11,
12 92:9,
10,19

**birthday**
240:5
318:2,3,6

**birthday-
slash-
christmas**

317:12,24

**bit** 125:5
198:4
327:18

**black** 375:3

**blackjack**
361:15

**blackout**
370:6

**blanket**
60:15
252:3

**blood** 389:13

**board** 89:11,
13 127:4,
8,12,15,
17,19,23,
25 128:2
318:20
343:8,11,
16 344:15,
18 349:20,
25 350:3
352:12
353:19
354:2
356:9

**body** 98:6
138:12
237:18

**boilerplate**
250:5

**bond** 46:4,
7,8,13,23

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 306 of 435   Page 435 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: bonds..brokerage

47:7,11,
14,16,17,
23,24
48:1,6,10
49:7,11,14
105:20,21
106:14
108:20
109:7,10,
18 231:1

bonds  89:19
292:3

bondsmans
47:16

bonus
162:16,19,
23 259:7

book  75:21,
22 248:25
345:17

booked
240:16

bookkeeper
191:25
261:3,4
288:8
335:9
341:4

bookkeeping
340:10,16

books  247:3
248:25
249:2,3,4,
5,7,9
331:17

born  68:25
89:9 92:18
98:21
118:1
308:25
310:3

Borowsky
87:23 88:6
196:2
197:16,20,
23 198:7
202:19
203:4,7,22

borrow  345:6

borrowed
74:4

Boston
161:6,11,
14

bottom  146:3
148:11
172:16
220:8
242:4
245:14
246:5
259:9
274:1
280:10
284:16
287:7,16
288:4,19
289:7
290:4
304:15
317:8,15

321:13
328:10
389:5

bought  126:2
248:3
253:15
273:14
318:25
319:2
330:1
331:21

Boulevard
117:11

bound  82:12
99:7

box  30:6
124:23
148:19
149:3

brain  95:7

Brazilian
72:19

BRE  217:6,
9,23

break  11:5,7
19:25
63:23
81:1,11,15
82:4 93:24
94:6
115:13,16
116:19
207:22
247:4
267:17,19

299:19,22

break-even
54:8

breakdown
360:2

breaking
54:13

breaks
133:14

bridge
174:22

bring  75:5
103:22
137:2

bringing
126:9
137:8

broken  33:6

broker's
382:5,10

brokerage
18:14 38:2
41:14
205:21,24
206:8,16
281:12
292:18,21
293:22
294:5,6,
13,15,23
295:6
305:24
306:3,8,11
322:10,12,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A A Page 307 of 462   Page 436 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: Brokers..called

24  323:2,4
324:13,25
325:8,19
339:9,10,
19,25

**Brokers**
292:13,17

**Bronson**
335:9

**Bros**  256:12

**brother**
24:8,10,16
34:6,10
42:14
44:20,22
139:11,15,
18,20,23
140:4,7,8,
22 141:8,
10,14
164:5,11
170:5
174:5,17,
20,24
175:2
220:10
221:24,25
239:25
240:10,18
243:15
256:14,17

**brother's**
34:16

**brushing**
318:11

**budget**  54:22
55:3 162:4
315:9
325:23
348:22

**budgeted**
25:21
315:1
323:13
326:3
390:4

**building**
21:5
135:16
143:1,5,17
156:16
267:18,24
268:1,6
345:14

**building's**
267:18

**bunch**  71:25
97:11
299:1

**burden**  140:6

**business**
35:18
55:9,10
61:2 160:2
177:5,12
245:10
256:7,10,
20 265:8,
9,25
303:19
329:11,13

330:2
333:9
348:4
351:17
358:25
359:8
361:4
362:16

**buy**  17:9
264:22
276:11
318:14,23
329:14
384:25

**buying**
239:22

---

**C**

---

**C-**  72:23

**C-A-P-O-E-I-R-
A**  72:23

**calculate**
191:3

**calculated**
265:15
380:19

**calculates**
277:25

**calculating**
386:5

**calculation**
69:3

**calendar**
282:12

**California**
10:1 11:16
15:9 83:2
84:2,22,25
85:7,13
92:1 101:8
117:1
118:10,12
131:3
139:5,6
149:6

**call**  40:17
121:16
192:2,5
194:1,4,9,
15 196:5
197:25
198:3
200:4,15
201:2
203:10
293:3
343:19
349:22,24,
25 350:1,
4,7,9,14
352:25

**called**  10:6
39:19 40:8
122:11
183:21,25
187:21
199:25
213:13
217:23
222:3
269:13

309:25

**calls**
197:19,21,
24 232:23

**camera** 370:3

**camping**
273:23,24
390:1,2

**canal** 92:19

**cancel**
239:24
240:12

**cancelled**
239:16
240:8,24

**Cancun**
273:11,13,
14 316:1,
4,9,15

**candid**
352:15

**candor**
349:22
352:3

**cannabis**
371:4

**cap** 150:15
356:25

**capacity**
103:20
177:14

**capital**
122:11

123:2
125:23
126:3
192:2,5
193:25
194:3,9,15
196:5
197:7
200:4,10,
13 201:2
203:10
232:22
254:3

**CAPITALIZATION**
89:15

**capoeira**
72:14,17

**car** 25:20,
22 26:1,2,
3,5,6,7,
10,11,14
67:16
114:20,22
180:21
239:17
241:2
264:1
279:17,22,
24 331:15

**card** 181:3,
7,8,19,21
182:1,3,5,
9,12,15
188:6
190:7
229:9,11
245:8,10

251:4
283:11,12
284:1,9
293:23
335:22

**cards** 181:24
228:19,22
251:5,12
282:24
284:7,15
293:21

**care** 25:18
28:10,21,
25 29:24,
25 30:8
31:12,24
34:11
94:20
97:15,17,
20,24
98:11
103:13,14
104:3
113:11
114:8,12
136:16
137:16
138:7,13
140:18,25
235:14,24
236:18
275:18
298:2
307:20
308:5,14,
16 309:4,
8,9,11,14,

21 310:6,
21 341:5

**caring** 29:11
310:10,14

**Carr** 132:1,
5 133:24
134:4,11,
18,21
135:9

**Carr's**
132:8,12,
21 133:21
142:6

**cars**
279:23,24

**Cartier**
251:19
252:11

**carving**
248:10,11

**Casden** 10:5,
21 11:15
21:1 26:12
43:24 46:5
50:3,9
54:6 57:7,
12 58:15
81:2 83:7,
17 84:7,17
85:3 86:4
87:12
88:6,10,
12,22
89:10,20,
23 90:5,8,

10,13 92:7
100:16
102:2,3,25
103:6
117:8
123:20
124:6,22
125:9,10,
19 126:15,
19,25
127:5,9
128:6
129:21
130:15,22
131:2,18
145:21
146:16
149:16
157:11,25
163:14
171:7,15
172:2,22
173:21
174:10
176:6
183:2
185:8
189:3
191:20
201:11
207:2
211:6
213:14
215:22
219:2,15,
22 220:5
222:6
223:25

224:23
226:18
234:15,16
237:1,23
256:25
257:4
259:10
275:5,6
281:5
282:1
285:6
291:10
300:2,12
303:13
311:8
317:5
327:5
341:22,25
342:3,8
343:2
348:13
353:13
358:7
366:9,19
369:13
372:12
375:23
378:6
385:21
387:11

case   49:1
50:13 52:8
58:15 83:6
84:6 102:3
103:6
126:19,21,
25 128:6
130:15,23

131:2
157:11
158:25
165:21
186:8
187:8
258:25
325:21

case-by-case
63:11,13

cases   177:19

cash   28:5,7
158:17
159:3,5,11
166:3,8,20
167:8,11,
24 168:14,
15 188:1
275:23
293:14,16
295:14
315:4,9
322:19,22
324:14
330:5,14
346:12
347:8
351:8
367:19
386:13
387:22
388:17

cashed
206:3,17

casino
178:23

287:13
361:9,10,
11 367:7

casinos
376:7,16,
18,21

catch   59:10

catchall
360:8

categories
279:1
322:7

categorized
265:25
282:21

categorizes
339:6

category
28:2

caterer
318:9

caught
113:15

caused   53:4,
25 54:12
370:12

Cayman   76:23

Cazden
256:12

CD   175:11,
13,14,17

celebrating
331:9

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nubia A. Sauer 400 of 452   Page 439 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024     Index: CENTRAL..chemicals

CENTRAL  83:2
  84:2 90:15

cents  17:11
  124:24
  125:12
  180:10
  181:12
  212:10
  228:18
  235:3
  258:18
  259:3
  285:8
  294:4,14
  302:10
  306:19
  307:2,4,11
  328:17

CEO  53:12,
  15,18,21
  177:14
  333:16

CERTIFICATE
  101:1

Certified
  84:20
  101:3,7

certify
  101:8

CFO  348:24
  384:23

chain  160:1
  161:8
  192:1
  196:9
  204:6

343:7
  366:8

chains  204:6

challenges
  92:11,17
  94:4 238:8

challenging
  80:14

chance  48:10

change  16:8
  70:24,25
  73:4 102:5
  132:17
  195:5
  261:21
  284:25
  302:14
  339:18
  386:21

changed  35:4
  70:6 125:4
  355:5,6,9

Chapter
  153:24
  177:18

characterizati
on  141:20

characterize
  323:10

charge
  120:22
  133:24

charged
  226:12

charges
  63:11,13

charging
  289:23

charitable
  298:19,21
  299:4,6,8
  331:18

Charles  61:8
  294:19
  296:25
  297:6

Charlie  66:4
  106:4
  116:14,17
  234:15
  239:21
  267:5
  310:15
  332:12
  335:3
  337:11
  338:18
  388:8

Charlie's
  70:5
  116:10,12
  335:7
  389:22

chart  315:9
  322:5

Chase  18:9
  182:4,9,14
  284:4

chat  108:16

check  15:19
  20:19 30:2
  37:21
  151:18
  177:9
  178:15,20
  335:24
  336:1
  364:10,12,
  13,14,18

checked
  148:19
  177:8
  178:11,18

checking
  14:10,12,
  17 18:6
  24:13 89:6
  149:2
  205:11
  253:19,22
  256:4,23
  293:6
  297:1
  306:7
  328:24
  346:6
  364:12
  367:19

checks
  364:21
  365:10,11

chef  240:25
  241:4,9,10

chemicals
  271:9

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration Exhibit A Page 401 of 432    Page 440 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024    Index: chess..clothing

chess   72:8
  79:11
  318:20

chet   316:4

CHIEF   86:14

child   62:10
  68:21
  106:21
  109:21
  234:14,23
  235:14,25
  324:4,5,11
  390:5

child's
  235:9
  317:11,24

child-slash-
mom   323:21,
  24 325:23

childhood
  109:24

children
  61:9 65:17
  164:11

choice   80:18

chose   230:24
  320:17

chosen
  230:22

Christina
  31:8
  98:17,18,
  23 241:20

Christmas

318:2
330:20
331:6,7,8,
9,10

CIENEGA
  85:12

circumstances
  333:16

Citibank
  19:16,17

City   100:12
  335:16

claim   86:12
  88:19
  123:24
  124:4,8
  125:11
  177:10
  179:17
  181:3
  187:15
  213:17
  219:4,17,
  21 220:2
  221:15,20
  257:6
  258:6,7
  261:19

claimed
  125:11

claims   87:11
  88:21
  171:13
  177:20
  212:3
  217:1

257:5
258:8
303:12
374:15
382:6

clarify
  220:21
  221:5
  333:21

class   89:16
  149:25
  150:4
  329:12
  330:2

classroom
  96:25

clean   108:7
  113:25

cleaned
  241:2

cleaning
  25:17 33:3
  265:3
  276:17

clear   73:23
  92:23
  107:10
  114:19
  121:8
  126:22
  140:9,10
  144:16
  152:25
  230:9

client   55:14

351:20
368:4

clients
  266:7

clip   387:2,
  3

close   29:22
  54:13 57:9
  78:25
  137:11
  206:16
  286:6
  292:23,25
  306:8
  311:15
  340:25
  387:8,10

closed
  17:21,22
  181:9,23,
  24 182:1
  205:22
  222:25
  254:1
  286:6
  292:10
  328:24

closely   97:1

closer   56:20
  57:5 58:8

clothes   66:4
  67:5
  239:22

clothing
  331:20,21

clown  272:2

club  72:8
  79:11
  292:6
  370:9
  374:20

clubs  78:19

co-parent
  62:1

co-pays  34:3

co-tenant
  22:23
  110:18

Coast  217:9,
  23

cobia  272:4

code  149:7
  249:12

coin  246:6,
  9,15
  247:25
  248:1

coins  248:2,
  3,4

collect
  248:8

collected
  250:14

collectible
  249:6

collecting
  158:23
  223:21

collection
  246:6,9,15
  247:25
  248:1,5
  250:12
  251:4

collector
  249:3

Colorado
  34:20
  139:11,24
  140:5,23

column  302:8
  321:11

combination
  155:20
  209:15,24
  236:1
  287:24

combined
  128:13

comfortable
  80:17
  115:12

comforts
  98:22

comma  268:17

commencing
  84:22

comment
  203:24

commercial
  298:12

commitment
  196:14,20
  199:16
  200:17
  354:23

committed
  62:18
  313:15

common  28:8
  223:19

communicate
  63:16
  106:17
  167:14
  255:17

communicated
  314:7

communication
  48:17 60:3
  200:9

communications
  108:16
  314:5

companies
  34:23,24
  35:3
  182:2,3
  200:24
  298:17

company
  28:13 35:6
  53:2 56:5
  74:24
  90:18
  120:6

121:21
131:8
132:13,18
144:22,23
149:9
153:21
154:1,6,
  12,16,19
155:1,4
156:15,18,
  24 157:2,6
159:5
177:15
179:23
186:1,3,
  11,14,15,
  18 200:23
204:21,25
210:12
213:8
227:3
228:18
240:16
241:19,22
245:8
252:9
270:22
287:25
298:11
327:17
340:13
350:18
351:3
352:21
355:15,21
384:12,23

compare
  278:11

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvato Page 403 of 442   Page 442 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024      Index: comparison..continue

comparison
 279:1
 320:21

compassionate
 352:22

comped
 371:7,9

compelled
 233:11

compelling
 233:19

compensate
 29:11

complaint
 153:4

complete
 206:12
 216:14
 324:14
 370:5

completely
 320:19

complexity
 341:6

complicated
 92:9

complications
 92:20

comply
 165:23

computer
 59:6
 285:25

concerned
 157:8
 352:19,20,
 21 367:15
 370:1

concluded
 392:5

conclusion
 99:9
 322:19

condition
 80:22
 108:3
 237:13
 238:6

conditions
 82:6 93:6
 107:3,4
 108:9
 173:24
 237:8,25

condo  118:3
 123:3
 129:1
 133:2,22,
 25 134:1,
 11 135:9
 142:19,24
 143:6,12,
 24 147:1
 228:13
 381:22

CONDOMINIUM
 86:16

conducted

102:2

confidential
 51:17
 80:19
 82:7,11
 86:5 99:9
 106:3

confirm  25:3
 113:22
 158:7

confirmed
 109:6
 127:12,14,
 22

confirming
 127:18

conflating
 93:2 149:5

confusing
 132:9
 272:15
 333:19
 343:14

consent
 89:12
 353:18
 354:1

conservation
 35:2

consideration
 349:22

considered
 135:24
 142:9

259:20
 310:22
 377:9

consistent
 261:16

constantly
 98:6

constitute
 282:21

consultants
 161:25
 162:2

consume
 371:3

consumed
 370:7

contacted
 203:14,16

contained
 100:9
 146:11
 230:10

contentious
 121:22

contents
 176:21
 211:22

context
 149:2
 174:7

contingent
 178:12,16

continue

76:17
155:1
157:5
159:4
199:3

**continued**
75:9 87:1
88:1 89:1
90:1 91:1

**continuing**
198:13
199:13

**contract**
127:2
142:15
388:12

**contribute**
25:16
34:11

**contribution**
140:25
141:2,4
299:9
331:18

**contributions**
243:6,16
298:19
299:3,4

**control**
120:20
307:19

**controls**
120:18

**conversation**
37:15

45:12,15
65:4 75:4
107:6
128:9
142:23
143:4
167:7
231:21

**conversations**
199:12
223:17,22
255:16
365:19

**CONVERSION**
89:16

**convert**
298:12

**converted**
122:6
153:24
187:13
257:24
258:2

**convertible**
187:4,5,
16,18
209:22
257:11,18,
24

**COO**   227:17

**cook**   29:13
32:23

**cooking**   72:9
79:11

**coordinating**

113:16

**coordination**
93:4

**copies**   185:3
190:20,22
202:18
377:19

**copy**   101:16
110:5,8
184:19
203:21
208:13,15
391:16

**coral**   272:1,
4

**corner**
245:14

**corporate**
83:16
84:18
342:18

**corpus**   175:5

**correct**
12:8,10
15:4 16:3
17:3
19:11,13
20:12 21:2
31:1 38:16
41:18,22
43:10,24
44:24
49:24
50:9,10,13
52:20,22

53:13,16,
17,20 56:3
57:12
58:18,19
61:3,5
64:4 66:13
67:7,12,20
68:14
69:12
70:9,13
73:25 74:1
77:18
78:18
79:23
100:10
101:16
103:8
107:8
110:13
111:1,2,23
121:11
124:14
125:2,15,
18 128:13
132:1,18,
21,24
134:7
135:20
138:10
143:21
146:6,9,
10,14
147:6,8,12
148:17
149:1,13
150:2
152:14
153:8

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Baldevia Page 405 of 462   Page 444 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024

Index: corrected..cost

157:12
158:1,5,7,
11,17
160:9
165:6,7
168:7,21
169:4
170:3,4
171:18
172:24
173:5,8,
13,17
174:17
176:15,22
178:2,5,9,
13 179:2,
15 180:10,
21 181:19
182:7,10
183:9,12
184:4
185:13,19
187:11
189:3,6,
11,14,16
190:9,13
193:19
194:1,4
196:7,10
201:18
206:6,9,18
207:10
208:25
211:14
213:14,17,
21 215:2,
4,10,13
216:3,7

219:6,12
220:6
223:5
224:3
229:22,25
230:3,4
231:1
232:19
233:14
234:17,20,
21,24
235:3,10,
15 238:1
239:1,7
241:17
242:7,10
243:3
244:18
247:15
251:14
253:20,23
254:13
257:25
265:10,13
266:13
267:11
275:14,25
276:24
277:22
278:1,5
280:4
281:6
282:2
283:8,13
284:20,25
287:10
289:4
290:24

291:15,18
292:4
298:19
301:7
305:9,19
306:19,22
307:13,21,
25 308:9
312:14,24
313:3,18,
25 314:8
315:1,11,
18 320:16,
24,25
321:7,22,
25 322:20
323:17,21
324:6,19
325:6
328:17
334:24
335:10
336:3,10
337:11,21
344:6,11,
12,14
347:10
354:4
357:5,6,17
358:18
361:22
364:17
366:11,20,
23 367:4
370:19
372:14,15
376:9
379:3

380:10
388:23

**corrected**
100:9

**CORRECTION**
102:1

**corrections**
100:7
102:4

**correctly**
15:25

**correlated**
132:16

**cost**  13:1
26:19 69:5
73:20
133:4,25
135:19,22
138:21
139:3,8
158:18
159:8
241:12
249:15
253:13
269:14
271:20,21
273:20,24
287:20
290:23
309:3
310:5
316:11
318:4,8
345:14
382:21,24

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 406 of 462   Page 445 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: costing..cousins

390:1

**costing**
137:15

**costs** 50:8,
17 56:24
57:14,15
67:14,15
127:9
133:1
135:21
136:18
138:25
156:17
191:7
239:14,15
308:14,16,
21 357:20
382:7
383:2
385:24
389:21

**costume**
337:11,17

**counsel**
20:14
48:17,23
49:9 81:7,
8 82:4
85:1
178:17,21
197:12,13,
14 225:11
231:2,21
257:2
264:4,5,7
304:10
306:14

333:14

**counsel-**
116:1

**counseling**
116:2

**counselor**
63:19
64:4,6,23
65:4,11
115:18

**counselors**
116:1

**count** 322:13

**counting**
316:14

**country**
136:7

**couple** 21:23
22:15 24:3
32:16
75:17 76:2
93:12,25
105:4
116:17
118:9
119:1
137:25
158:3
159:10
162:14
187:22
197:21
209:15
242:23
259:13,17,

18 262:7
281:12
311:19
370:11
371:18
374:8
390:19

**couple-minute**
299:19

**court** 10:7,
10,17
11:10 14:2
15:2,5
24:18,20,
22 25:4,7
47:19,20,
25 48:5
51:10
53:11
59:9,12
64:24 65:2
73:23
81:25 83:1
84:1 90:22
106:2
116:21
118:14,19
124:10
130:7
176:18
188:16
191:14
192:21
198:25
201:18
202:4
206:12

208:1
210:22
212:7
213:1,4
216:3
217:7
218:16,23
219:8,11,
18 224:7
234:3,6
253:2
254:7,9
276:20
277:4
281:19,22
285:3
292:16
298:20,22
313:7,8,
13,20
317:20
325:5
334:5,11
356:22
378:21
379:2
386:25
391:1,10,
15,20,23

**court's**
230:25

**cousin** 380:2

**cousins**
142:2
193:15
379:23

**IN RE SETH HALDANE CASDEN**

Seth Casden, Vol. 1 on 04/26/2024                                Index: cover..current

**cover**  25:22
   34:4 67:4
   82:12 99:7
   133:21
   151:22
   155:4,9,
   14,18
   156:1,7,11
   179:24
   233:3,5
   270:6,19
   290:23
   304:13
   305:7
   324:14
   367:20,22

**covered**
   25:16
   33:24
   115:5,8
   236:10,14,
   15,19,22
   247:6
   267:2
   268:13
   270:10,13
   304:21
   305:4
   343:21
   389:20

**covering**
   156:16

**covers**
   133:25
   249:9
   304:24

**COVID**  73:6
   103:25
   119:25
   223:18
   312:13

**CP-**  293:9

**CPNG**
   204:20,23
   205:3,6
   206:17
   293:10,11

**crabs**  272:4

**crafts**
   318:13

**craps**  361:15

**CREATED**  87:6

**creating**
   95:23

**credit**
   22:11,20
   90:15
   180:20
   181:3,7,
   19,21,24
   182:1,3,5,
   9,14
   188:6,7
   190:7
   218:10,12
   220:3,14,
   17 221:4,6
   228:18,22
   229:8,10
   282:24
   283:12,25

**284:6,8,9**
   293:21
   335:22
   358:14
   363:25
   364:1
   369:1,2,5,
   6,10,11
   374:23

**creditor**
   162:12
   178:4
   179:12
   180:4,19
   181:2,15
   217:16
   224:17
   225:17
   228:17
   233:20

**creditors**
   177:19,25
   212:2
   216:25
   233:13
   283:23
   284:1
   292:8
   355:19

**cross-talk**
   14:16 19:1
   47:2 51:2
   133:12
   149:19
   206:5
   214:9
   220:24

**252:6**
   255:2
   272:14
   286:1
   292:15
   317:18
   320:5
   321:15
   324:21
   333:10,17,
   22 385:6

**crypto**
   296:20
   323:7
   324:24
   325:4

**cryptocurrency**
   296:21

**CSR**  83:25
   101:22

**cumulative**
   321:9,21
   323:23

**cure**  162:11
   258:17,22,
   23

**current**
   12:18
   53:18 63:9
   73:12,14
   107:15
   122:7
   132:3
   134:17
   284:7
   356:25

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Baldevia   Page 408 of 462   Page 447 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024      Index: custodian..DEBTORS

378:14
384:6,17

**custodian**
169:7,10
213:13

**customers**
351:20

**cut**  68:5
239:23
241:1
269:19

**cutting**
159:8

———————

**D**

———————

**dad**  31:17
36:19,23,
25 66:17
68:4 73:9
135:11
137:3
139:15,23
140:3,5,
18,20,23
241:14
262:19
293:23
295:21
310:15,17

**dad's**  132:9
140:25
169:24
265:3
339:3

**daily**  28:11

**damsels**
272:2

**Danning**
84:23 85:4

**dark**  346:21

**date**  61:11
62:13,15,
17 86:20
101:18
102:25
148:9
150:20
189:19
335:5
337:12

**dated**  86:14,
16 87:7,
17,18,20,
23 88:6,8,
10,12
89:7,9,11,
13,20 90:6
125:20
146:5
148:13
183:11
185:12
189:3
201:24
211:16
353:19
363:14

**dates**  150:20

**day**  16:7,8
27:18,20,
21 28:14

30:24
31:13,14,
15,18
71:19,25
90:12 99:1
100:11
103:7
104:7
113:23
173:4
183:14,17
259:14
370:8
374:6

**day-to-day**
16:14 30:1

**days**  13:17
32:3 58:23
59:16
61:15,16
70:21
71:15 73:5
86:20
112:9
148:8
284:11
309:14
316:16
325:13
328:22

**dead**  288:14

**deal**  224:2,
5

**debit**  253:19
293:23

**debited**

14:10,22

**debt**  57:1,4
177:13
178:11,18
179:1,6
183:8
212:16
213:19,23
225:20
226:2
361:1,2,6
364:3
365:16
368:21
370:18
374:4
377:7,10

**debtor**  83:8
84:8 85:3
148:6
178:22
313:1
317:9,23
320:23
323:15
326:21

**debtor's**
87:9 88:20
171:12
211:11
303:11
304:12

**DEBTOR(S)**
86:18

**DEBTORS**
88:14

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicholas A. Bravo   Page 409 of 462   Page 448 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: debts..deposit

debts 177:4,
 5 223:23
 368:19

decanted
 42:25 43:3

December
 21:18
 116:11
 211:16
 314:21
 317:5
 330:17,18
 331:6

decided
 69:1,9

decision
 121:20
 230:25

decks 268:2

declaration
 24:23
 86:18
 87:12
 88:13,22,
 23 148:6,
 15 171:15
 173:23
 211:11
 229:19,21,
 25 230:6,
 11,16
 231:4
 232:14
 233:9
 234:12,22
 236:5

237:7,19,
 24 239:4,
 12 241:25
 303:13,18,
 23 304:3,6
 305:12,13
 312:17
 314:20
 330:12

declarations
 110:11

declare
 100:4

declined
 46:18,20
 109:16
 199:18
 203:10
 223:20

decrease
 135:25
 249:18

decreasing
 136:18

deducted
 221:11
 279:6
 346:5

deductible
 266:5

deemed 82:6

defend
 126:19

defending

56:23,24
 57:18
 158:18

defense
 50:2,8,17
 57:11
 126:14
 127:9,13

Deferred
 344:12

definition
 28:18

definitive
 20:20

Defunct
 256:14

Delaware
 175:6,8
 213:9
 231:10
 232:12
 233:13

delayed
 159:9
 289:3
 344:10

deleted
 190:17
 191:1,5
 203:23

deliver
 241:11

delivered
 311:25

delivering
 241:14

Delta 329:6

demands
 97:21

demo 338:21

denies
 231:25

dental 34:1
 311:19

denying
 232:3

Department
 336:16

depend 27:4,
 10 234:13

depends
 27:3,9
 71:19
 133:6
 311:18
 331:13

deposed
 10:22

deposit
 17:2,12
 222:10,14,
 17,21
 240:17
 297:4
 307:2
 336:3
 339:9
 364:14

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 410 of 462   Page 449 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024      Index: deposited..difference

388:13

**deposited**
14:21  17:5
37:23
186:14
189:8
205:11
215:3
221:11
254:6
293:6
336:6
365:12
367:16

**depositing**
235:17

**deposition**
15:24
101:9,13
102:1
123:17
129:15
131:15
145:18
147:20
163:11
170:20
176:3
182:23
184:16
188:12
191:17
195:17
201:8
204:11
206:23
211:3

215:19
218:19
300:7
303:3
334:9
342:23
348:8
353:10
356:20
358:3
363:3
365:3
366:3
372:3
373:3
375:9,15
377:16
378:3
387:6
391:8

**deposits**
24:12
235:22
340:4

**derive**
297:22

**derived**
382:15

**descendants**
87:8  164:7

**describe**
237:6,25
246:6
359:11

**describing**
237:13

**designated**
82:11

**desperate**
120:7

**dessert**
318:10

**detail**  339:5

**detailed**
241:2
331:11

**details**  74:6
90:8  139:1
228:18
372:8,11

**deteriorating**
29:23

**determine**
44:9
138:21
153:6,12,
14,18
338:25
380:12

**determined**
152:2,7,
13,20
303:25
304:2
385:16

**developed**
97:6

**developer**
362:16

**development**

106:21
109:21
160:2

**Devoto**  87:20
180:5,7,
12,16
185:11,16,
21  186:10,
17,21
187:21
190:24
191:8
227:21
257:20
284:17,24
286:13,21,
23,25
336:9,23

**diagnosed**
92:12,15
94:21

**diagnoses**
95:11

**diagnosis**
94:18,24
309:12

**diagnosises**
95:12

**dialogue**
98:4

**difference**
95:22
165:10
190:5
221:20
305:7

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nibula A. Sadiyah 411 of 462   Page 450 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024      Index: differences..discussion

**differences**
278:12

**digging**
210:7

**digital**
196:6,12,
18 200:3,
18,21

**dilute** 258:3

**diluted**
254:25

**dining**
264:8,12
331:22

**DIP** 14:18
254:6,8
339:24
340:2

**direct**
14:10,21,
22 297:4
305:21
323:14
378:17

**directed**
366:16

**direction**
47:10
165:22
166:6,9
167:6,10

**directly**
79:14
127:20

235:9,23
275:6,14,
17,21
297:11,12
306:15,17
307:3,14
317:9,23
320:23
321:1
326:21
390:11,12

**director**
35:20
200:15

**directors**
131:8

**disagree**
65:18

**disappointing**
141:23

**Disbursements**
387:23

**discharged**
153:11,15

**disclosed**
368:25

**disclosing**
48:22
51:16

**Disclosure**
378:20

**Discover**
19:20
182:12

284:4
285:7,13
286:9

**discovery**
12:16
15:22
20:12
210:17
286:20

**discrepancy**
302:22
326:2
390:7

**discretion**
168:22

**discretionary**
202:24
307:4

**discuss**
44:6,22
46:2,7
63:11,12,
19 64:21,
23 65:5,10
78:17
80:20
105:10,12,
18 106:18
107:7,12,
16 108:10,
20,21,24
197:23
198:8
350:21
366:17

**discussed**

45:2 46:4
79:4,7,24
97:14
134:21
136:21
142:19
155:24
220:4
232:23
257:13
289:14
337:7
343:9,18
350:4,13,
15,17
379:19

**discussing**
80:17
172:3
186:1
202:20
214:7
278:9

**discussion**
45:1 75:1,
15 76:1
80:4,11
128:5
139:14
147:22
167:13
171:1
199:2
311:4
320:11
350:24
352:7

355:23
356:11
391:4,13

**discussions**
45:7 51:17
74:14
127:3,7,11
139:10
197:15
203:6
223:10,13
234:8
314:11,13
365:15

**dismissed**
153:24

**disputed**
178:19

**dissolved**
154:6

**distance**
319:20,22

**distinct**
257:12

**distracted**
59:11

**distress**
351:7

**distribute**
232:22

**distributed**
41:13,21
42:15
355:22

**distribution**
119:22
120:14
121:20
164:20,22,
25 165:12
166:13,19,
22 167:8,
20 168:5
233:3,4,6
291:22
367:21

**distributions**
41:10
111:25
120:24
121:1
151:22
165:6
202:24
232:17
233:12,19
237:1
281:4
282:4
291:5,10
305:9
336:5

**DISTRICT**
83:2 84:2

**DIVIDED**  87:7

**diving**  35:2

**DIVISION**
83:3 84:3

**divorced**
116:15

**docket**
224:14
378:21

**doctor**  93:14
267:1
270:14
327:23

**doctors'**
27:19

**document**
25:2
89:15,17,
22 90:7,9,
11,15 97:5
123:22,23
129:23
131:22
145:23
148:2,4
163:16
171:8,17,
24 173:16
176:8
183:4
188:19
191:22
195:22
201:13
204:16
207:4,6
211:8
215:24
216:2,5
219:5,23
220:1
226:11,14,
15 237:18

243:8
260:11
291:20
300:10
303:8,16
312:17
313:12
334:1,15
343:4
349:17
353:15,17
356:16
358:8
363:9
372:6
373:7
375:19
378:23
385:21
387:13,15

**documentation**
214:13
285:21
364:8
386:16

**documented**
322:3

**documents**
175:10
176:17
258:13,14
313:10
326:5

**Docusign**
353:3

**dog**  253:8,

10 271:3
272:24
332:11,12

**dollar**  17:9,
11 50:15,
20 51:13
52:12,17
56:22
57:19
119:18
166:25
183:8
188:23
196:14
201:2
208:25
209:13,19
221:4
280:23
286:20
291:22
296:11
302:21,22
307:10
311:19,21
319:5
328:20
337:14,19
339:8
340:8
346:20
361:7,25
362:9
365:21
374:4
379:7

**dollars**  13:2

19:8,12,14
22:9,17
23:24
24:12,15
27:14,15
30:24
31:13,14
32:16
38:15,18
41:2 47:18
48:2,6
49:22
52:25
56:18
57:10
58:4,6
63:10
66:2,11,
12,15,22,
23 67:3,9,
14,18,24
73:1 76:9
78:25 79:2
111:22
112:13
115:2
117:15
123:1
124:24
125:12
128:21
133:7
139:8,9
146:19
156:3
158:5,10
160:7
162:14

165:16,17
179:2,4,
18,22,24
180:2,10
181:1,11
185:19,22
186:9,12,
18,25
187:10
190:9
191:8
200:23
208:6
212:10
213:16
214:6
220:6
221:9,12
227:21
228:17
235:3,7,18
236:4,24
243:3,12
246:5
248:15,24
249:16
252:18
253:8,11,
15 257:7,
20 258:6,
11,18
259:2,3
260:21
261:13
262:2,3,7,
9,21
263:25
264:9,17

265:1
267:13
268:5,8
269:15,19
270:25
271:6,22
272:8,17,
25 273:2,
21,25
274:3,12,
24 275:19
276:4,13
278:1,7,8
280:4,13,
20 281:9,
25 282:13
283:4
284:17
285:8
286:11
287:9,12,
21 288:21
289:9,13,
24 290:12,
18 291:5
293:13
294:4,14
296:7,14,
15 297:2,
10 302:9
304:24
306:12,19,
21 307:2,
4,5,9,11
311:9,13
314:22
315:1,22
316:13,18,

23 317:13,
25 318:5,8
321:6,22,
25 323:24
324:3
325:3,24
327:19
328:6,16
330:17
335:13,22,
25 336:3,
9,13,17
337:5,10,
16 338:5,
10,17
339:21
341:10
345:8,12
347:3,6,10
349:11
357:16
359:11
360:13
367:11
373:11
374:3
376:1
379:3,11,
20 381:23
382:19,24
385:3
390:4,6,14

Domestic
215:9

door  96:2

double-sided
163:7

dozen  116:5
248:9

draft  328:25
354:24

drama  72:11
79:12

drink  370:4

drinking
370:9
374:20
375:2

drinks  370:7

drive  26:15,
16,23
114:22
310:17
331:16

driver
26:17,22
27:7,11,13
339:3

drivers
27:16,24
28:3,6

driveway
267:25

driving
310:17
319:20,22

drop  241:11

drops  386:3

drugged
370:2

374:19

drugs  371:1

drums  72:8
95:20

dry  276:17

dryer  96:4
133:16

due  196:6,
21,24
209:11
221:13,19
240:18
258:17
279:13
283:15

dues  128:19
290:14
331:24

duly  101:11

duration
144:25

dys-  92:13

dysgraphia
92:13

dyslexia
92:13

——————————
      E
——————————

E-DASH-F
212:2

e-mail
63:16,18
87:22

88:5,7,10,
12 89:8,10
90:5 121:7
191:25
195:25
196:9
197:18
200:9
201:23
203:4,12,
21 207:7
208:8
293:2
343:7,11,
15,20,24
347:23
349:20
366:8,19,
22

e-mailed
200:14

e-mails
87:21
88:5,9,11
89:8 90:5
113:16
203:25

earlier  61:3
117:24
126:18
163:21
165:4
172:19
178:8
184:3
235:17
243:18

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Sabella Exhibit 115 Page 445 of 462   Page 454 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: early..ensure

257:13
263:20
265:13
289:14
295:3,11
312:3
316:3,12
337:7
339:11
341:12
343:9
345:25
353:22
383:3
388:20

**early** 287:14
298:15,17

**earn** 40:15,
21 68:24
69:4
151:18
162:16,19

**earned** 36:3
76:6,8
162:23
272:17

**earning**
35:24 69:4

**earnings**
35:16
151:15

**earns** 168:20

**ease** 140:5

**easier**
138:18

**eating**
331:22

**eats** 98:7

**eclipse**
273:18
319:9,13,
16,19,23
320:14,16,
19

**economy**
329:15
330:1,3

**edition**
249:4,7

**education**
35:1
320:24
323:15
324:3
331:17
336:16
388:8

**educational**
97:3
319:10

**effect** 126:6
130:3

**effects**
287:24

**efforts**
75:25

**eighteen**
346:13
351:24

**eighty-nine**
17:10

**electricity**
14:5

**electronic**
12:2 15:10
42:12
146:4
175:12

**electronically**
285:23

**eleven** 17:11
301:18
302:9

**else's**
357:9,11

**emerge**
154:13

**employed**
148:22
149:1

**employee**
149:8
242:18

**employees**
103:15
160:21,24
161:2,5,21

**employer**
86:19
148:8,20
149:5

**employment**
86:13

103:19
127:1
130:1,23,
25 142:15
198:24

**end** 65:2,8,
9 137:15
240:14,21
241:6
347:23

**ended** 120:12
270:15

**ends** 249:23

**energy** 84:19
85:16
86:11 87:4
88:4,21
89:4 90:4
91:4,6
97:16,23
98:2
103:23
178:5,12,
19

**enforcement**
46:9 109:7

**engaged**
379:13

**engagement**
226:19,22
227:3,7,11

**engine**
263:20,23

**ensure** 223:3

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Part 1 Page 416 of 462   Page 455 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                     Index: enter..execute

| | | | |
|---|---|---|---|
| enter  21:16 | 151:1,6, | ERRATA  102:1 | 273:4 |
| entered | 13,16,23 | error  284:23 | evidence |
| 21:17,20 | 152:1,3,6, | escape  72:12 | 194:20 |
| 58:23 | 8,13,17 | 79:12 | evolved |
| 59:15 | 154:3,18, | established | 69:19 71:1 |
| 310:7 | 21,24 | 39:1 | exact  162:5 |
| entertain | 155:14,18 | 254:18 | 236:23 |
| 266:6 | 156:11,21 | estate | EXAMINATION |
| entertainment | 158:13,21 | 128:12 | 10:19 |
| 35:18 36:6 | 166:2 | 146:19 | 83:16 |
| 265:9 | 196:13 | 166:2 | 84:17 91:6 |
| 266:1 | 200:20 | 169:17 | 117:5 |
| 273:2 | 209:21 | 238:23 | examined |
| entertainment- | 254:17,20, | 289:19,21 | 10:7 86:3 |
| related | 22 255:6, | 290:1 | exceed  54:1 |
| 273:6 | 9,21 | estimate | 308:6 |
| entire | 281:13,14 | 50:4 57:24 | exceeded |
| 144:25 | 282:7 | 246:13,15, | 53:23 |
| 267:22 | 295:14 | 18 247:2,9 | 55:20 56:2 |
| entitled | 297:15,18 | 248:4 | exceptional |
| 231:18 | 298:5,16 | 308:18 | 95:2 |
| entity | 300:24 | 316:12 | exchange |
| 288:14 | 337:6 | estimated | 152:1,12 |
| entry  224:16 | 341:11 | 58:3 263:6 | 154:4,17 |
| environment | 343:19 | 381:22 | 186:25 |
| 96:6 | 346:8 | estimates | 209:19 |
| equipment | 347:13,17 | 260:14 | 210:3,4 |
| 268:23 | 350:22,25 | evening  30:3 | 222:15 |
| 390:3 | 351:5,10 | 369:18,25 | 354:22 |
| equities | 353:22 | evenings | excuse |
| 41:3,4 | 354:16,22 | 98:16 | 199:11 |
| equity | 357:5 | event  355:20 | 319:15 |
| 150:5,11, | 359:18,22 | events | execute |
| 12,14 | 384:4 | 107:22 | 165:22 |
| | errands | | |
| | 30:5,7 | | |
| | 114:11 | | |
| | 138:11 | | |

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 417 of 462   Page 456 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: executed..exhibit

**executed**
  100:11
  356:8

**executive**
  86:14
  103:21
  366:14

**exempt**
  238:13
  239:5

**exempted**
  238:11

**Exemption**
  87:11
  88:22
  171:14
  303:12

**exemptions**
  81:20

**exhausting**
  97:17,24

**exhibit**
  86:12,13,
  15,17,18
  87:5,9,14,
  17,18,20,
  21 88:5,7,
  9,11,13,
  15,18,20
  89:5,6,8,
  10,12,15,
  17,20,22
  90:5,7,9,
  11,15,17,
  19,21

91:5,8
98:3
123:14,15,
21 125:8
129:12,13,
18,22
131:9,13,
21 143:20
145:14,16,
22 146:12,
16 147:16,
18 148:1
149:14,17
163:9,15
170:17,18
171:6
172:22
173:16,20
174:9
175:24
176:1,7,25
177:17
179:11
180:20
181:16
182:19,21
183:3
184:12,14,
25 185:8
188:8,10,
15 189:2
191:13,15,
21 192:3
195:14,15,
20 201:5,
6,12,15
204:7,9,14
206:20,21

207:3
211:1,7,25
213:8
215:15,17,
23 216:22
218:15,17
219:3,16
222:19,23
224:15
227:19
228:15
229:14,18
230:11,17
231:4
232:15
233:9
234:12
237:7,24
239:4
241:24,25
242:25
257:4
259:9
260:1
274:2
275:3
277:2
278:9
279:25
280:9
287:17
288:4,18
289:6
290:3
292:2
300:3,5,
19,21,22
301:7,8

302:19,24
303:1,7
304:8
305:12
314:19
315:8
317:6,7
326:13
327:6,19
328:9
329:4
330:4,7,
10,11
332:20
333:24
334:7,13
342:20,21
343:3
348:6
349:15
353:6,8,14
354:6,10,
14 356:15,
18 357:22
358:1,7
363:1,6
364:23
365:1,6
366:1,6
371:24
372:1
373:1,6
375:5,7,
11,13
376:5,7
377:13,14,
23 378:1,
7,17,19,21

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Rauleton Page 418 of 462   Page 457 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: exhibits..extended

380:8
385:18
386:24
387:4,12
389:1
391:6

**exhibits**
86:10 87:3
88:3 89:3
90:3 91:3
390:25

**exist** 154:19

**existing**
361:1

**exists** 110:7

**exit** 106:14

**expect**
351:17

**expectancy**
231:9,23
232:5,8

**expected**
55:1

**expecting**
144:5
175:3
351:14

**expedited**
58:25
59:19

**expense**
68:2,5
162:14
242:9

244:16,17
245:2,5
262:6,12
274:1
332:18
338:11
385:19

**expenses**
24:22
25:1,14,
20,22,24
26:6 33:24
34:12
35:14,15
53:23
54:1,12,
20,23
55:20
56:2,17,
18,21,23
57:10
66:24
67:1,4,10,
22 79:1
114:25
119:12
122:18,19,
20 128:15
133:22
155:5,6,7,
10,15,19,
21,25
156:4,17
157:2
159:8
202:10,15
233:3,6
234:23

236:9,12
239:11
245:10
260:1,13
262:8,15
264:11
267:1
268:10,16,
22,23
273:6
274:3,7,19
275:5,13
277:11,17,
25 278:9
279:21,24
281:10
290:11
293:20
294:1
304:14,21,
24 305:5,8
311:10,11
316:5
321:6,14
323:14,16,
20,24
324:10,15
325:22
331:11
332:8
340:15
347:13
370:25

**expensive**
133:16
244:4,7,9,
10 263:21

**experience**
319:11
320:18
383:23

**experts**
383:23

**explain**
46:19
140:15
255:14
301:14,16
322:6
324:10
354:20

**explained**
204:2
369:16

**explaining**
92:24

**explains**
390:9

**explicit**
56:9

**Express**
18:12
181:16
182:6
254:3
283:3,16
335:21
340:4
385:11

**extended**
368:25
369:3

**extending**
  386:11

**extends**
  51:21,24
  52:1,2

**extension**
  207:14
  208:8
  209:5,6
  369:10

**extensions**
  369:11

**extent**
  48:16,21
  114:10
  165:24
  181:13
  283:17

**extracurricula**
**r**   71:20
  72:4 73:2

**extracurricula**
**rs**   73:19
  79:7

**extraordinary**
  54:7,11,12

**Eye**   267:1

**eyes**   80:19

────────
       **F**
────────

**F-A-R-I-D-A**
  335:2

**F-O-R-A**
  219:20

**F-R-I-M-M-E-R**
  234:5

**facilitate**
  109:13
  379:14

**fact**   158:14
  386:15
  390:13

**factor**
  345:5,21

**factors**   48:8
  55:9

**facts**   194:20
  335:18
  388:7

**fair**   11:3
  40:19 67:8
  133:10
  138:16
  141:20
  146:18
  151:21
  172:18
  236:25
  305:2
  326:25
  349:10,14

**fall**   77:3,
  9,10,20

**fallback**
  143:25
  144:3,5

**falling**   98:8

**family**   25:9

35:11
39:4,10
42:18,23
43:12,16,
17 44:3,6,
11,16,19
104:6
115:25
116:7
138:8
141:24
142:1
163:21
170:2
193:6
234:13,20,
21 238:15,
25 243:6,
15 251:14,
20 252:14
310:9,13,
18,21,23
379:21,22

**family's**
  169:18

**fantasy**
  136:19

**Fargo**   18:7
  228:16
  229:7,11
  253:20
  334:19
  336:6
  364:12,16
  365:13

**Farida**   335:2

**farmstead**
  301:24

**father**   21:11
  22:5,11,19
  23:4,10,18
  24:8,11,14
  25:10,14,
  23 26:1,6,
  14,15,17,
  24 27:24
  28:21,25
  29:6,12,
  20,25 30:8
  31:12,24
  32:12,15,
  20 33:4,21
  34:7 35:7,
  10,17,22,
  25 36:2,5,
  14 37:13,
  19 38:2,5,
  8,17,22
  60:16,19,
  25 135:9,
  13,15,20
  136:3,8,
  15,22,23
  137:6,9,
  11,14,18,
  20 138:12,
  17,22
  139:11
  147:14
  227:25
  234:16
  237:3,14
  243:2,9,18
  244:5

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvo   Page 420 of 462   Page 459 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: father's..filing

264:21,24
267:6
275:14,17
276:11
278:4
296:5,8
304:5
311:10
312:6
314:8,11
360:22
370:23
388:21

**father's**
21:1 22:2,
8,10 23:1,
6 24:13
25:12 28:9
33:9,12,
18,24
34:11
35:14 37:8
145:2,4,5
169:23,24
237:7,25
238:6
263:2,4
311:22

**Fe** 114:23

**feasible**
153:20
154:2,5

**February**
124:3
126:10
194:9
207:10

273:16
287:14
297:12
306:9
315:10,13
316:17
330:15
367:1,14
369:19,25
371:1,4,13

**federal**
149:7

**fee** 221:11

**feeds** 370:3

**feel** 107:19
115:12
230:20

**feeling**
142:12,13

**fees** 54:8
57:25
316:2
318:12
340:10
385:15

**feet** 160:17

**felt** 80:14

**fifteen**
41:20
168:18
195:1
256:11
310:16

**fifty** 73:8

121:19
210:5
248:6
256:15
271:21
304:25

**fifty-two**
73:8

**fight** 65:2

**figure** 47:5
210:7

**figured**
226:2

**file** 46:10
47:12 49:6
120:5
247:10,13

**filed** 17:18,
19,25
34:8,12
48:2
52:14,16
55:18,25
56:19
57:2,8
60:5 76:6
86:12,20
87:13,16
88:14,17,
19,24
90:20,22
91:8 124:3
141:6,9,11
143:8
155:12
158:10

168:6
176:14,18
177:25
181:25
213:2
216:3
219:21
220:20,23,
25 221:3,
18 223:11,
15 232:23
240:22
241:7
242:20
246:24
252:22
273:8
274:10,14
277:11,17
283:20
284:8
293:20
294:17
297:6
311:6
325:2,9
328:23
337:3
349:12
378:21

**filing** 45:23
48:7 56:25
60:1,8
87:15
143:10
206:1
223:1
247:20

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 421 of 462   Page 460 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024            Index: filings..fluctuations

325:18

**filings**
130:9,10

**fill**  246:23
247:8
250:1
291:24
358:12
362:2
363:13

**filled**  89:20
247:7,15
291:25
292:1
358:17
362:4,6,8

**filling**
359:7

**Films**  255:24
256:5
288:5,12
295:22
296:2
335:10

**final**  354:25
355:1
356:6

**finalize**
349:9

**finalized**
53:10
349:8

**finance**
227:16
348:25

**finances**
44:6 45:8,
20 65:16,
19 107:12

**financial**
20:5 25:10
34:7,12
74:2 76:3
89:18
108:2
111:19
140:5,19,
24 218:6
219:3,16,
20 222:3
223:4,6,
11,23
235:8
240:9,11
243:1
244:23
245:18
305:19
313:2,5
348:14,20
351:6
358:11,13,
16 386:19

**financially**
24:11
38:22
76:12

**financials**
44:23
45:1,2,13,
16,22 53:9
107:7

341:7
385:22

**find**  135:2
203:9
286:23
338:12
388:22

**finding**
174:22

**fine**  82:8
169:2
207:25
252:4
278:19
281:20
327:3

**finish**
206:10
239:3

**finished**
332:22

**Fiora**  345:24

**firm**  51:18
127:20
146:23
166:24
179:22
212:22
247:16
250:7
260:8,9
380:20

**firms**  205:20
227:11

**fiscal**  56:2

**fish**  271:3,
4,10,11,
14,17,18,
20,21,23
272:1,2,3

**fitness**
268:17
332:3

**fixed**  27:6,
17 267:23
268:1

**fixing**  33:5

**flag**  72:14

**flight**
316:1,8
329:17,21

**flights**
316:6

**flips**  73:18

**Flora**  345:23

**Florida**
116:16
317:4

**flow**  158:17
322:19,22
330:14
351:9
386:13

**flows**  315:9
330:5

**fluctuate**
16:13

**fluctuations**

16:9

**focus**  75:6

**focused**
  200:21

**folded**
  212:23
  213:3,4

**food**  66:25
  67:16
  115:11
  241:11,14
  264:11
  271:3
  272:24
  276:2
  293:24
  371:6

**foot**  373:23

**football**
  72:14

**footnote**
  322:6,8
  382:1,3
  383:25
  390:8

**Fora**  218:6
  219:3,16,
  20  220:3
  222:3
  223:3,6,
  10,22

**foregoed**
  159:9

**foregoing**

100:6
101:9
222:16

**forgot**
  203:20

**form**  86:12
  87:14
  88:15,18
  89:20
  291:24
  327:2
  363:12
  386:8

**formal**  97:5
  108:15
  123:4
  338:3
  380:4

**forms**  246:23
  338:11

**formulate**
  107:20

**forthright**
  250:4

**forty**  276:13

**forty-year**
  107:21

**forward**
  129:10
  221:10
  339:25
  366:22

**FOSTER**  87:22

**found**  123:12

198:22
203:13

**founded**  56:5
  210:6

**four-month**
  315:17

**fourplex**
  267:22

**fourth**  180:4

**France**  76:24

**Francis**
  350:2

**frankly**
  352:6,13

**free**  80:19
  114:18
  144:16

**freedom**
  307:24

**freelance**
  74:19

**freeze**  293:4

**Friday**  10:1
  30:14,25
  31:20,21
  71:17
  73:18
  83:18
  84:22  92:1
  117:1

**Fridays**  33:1
  72:11
  98:16

**friend**
  77:23,25
  78:2
  169:21
  180:8
  242:18

**friend's**
  78:2

**friends**
  29:4,5
  30:10
  180:15,18
  379:21

**Frimmer**
  234:2,9

**front**  348:1
  355:3

**frustrated**
  75:10,12

**full**  69:7
  90:16
  160:23
  274:3
  284:9
  368:22
  369:21

**full-time**
  308:18
  309:11,13,
  20

**fully**  236:15

**fund**  16:22
  89:5
  121:14
  122:18

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/06/25   Entered 06/06/25 18:39:07   Desc
Declaration of Nicole A. Salvador - Page 123   Page 462 of 1079
Exhibit A Page 423 of 462

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: funded..give

126:14
151:16
167:20
196:6,12,
18 199:17
200:3,19,
20 252:25
297:2
298:14,15,
16 300:15,
16,24
301:4
306:5
379:2,12,
16 384:5

**funded**
40:10,12,
13 44:10
170:2
224:2,6
306:4

**funding**
119:24
201:1
353:1
379:6,11,
19

**funding-slash-
financing**
344:2

**funds** 16:16,
17 119:20
120:2
126:12
151:12
191:12
238:12

239:6
254:2,5
305:25
307:19
367:17

**future**
162:23
163:1
222:10,17,
21 361:2

————————
G
————————

**G.C.** 220:9

**gamble**
362:20
376:18

**gambled**
287:13
362:21
368:8,11
371:16
376:8,11

**Gamblers**
376:23
377:5,10

**gambling**
287:8
362:22
371:12
372:19
377:7

**game** 249:24
361:13

**games** 113:5,
8 242:17,

20 361:14
383:1

**gaming** 90:15
298:9

**gap** 24:7
174:22

**garage** 29:18
32:23

**gas** 66:25
114:20
390:2

**gave** 185:3
203:22
217:20
242:18
246:22
250:13
316:12
318:17
364:1,9
390:10

**general** 33:5
108:22
203:24
249:5
337:23

**generally**
128:2
245:9
266:15
274:6

**generate**
42:11

**generates**
364:13

**generations**
43:9

**gentleman**
391:16

**gift**
227:20,25
282:13,17,
18,21,22
318:14

**gifts** 282:15
318:2
331:8

**gigs** 74:19
75:21,23

**Gill** 84:23
85:4

**give** 10:13
32:18,22
47:9 63:10
66:12,14,
21 73:1,24
77:15,16
79:21 99:3
109:10
134:18
159:25
165:13
198:12
202:2
227:25
246:21
254:23
328:25
339:5
363:23
364:8

374:2

**giving**  28:25
57:22 94:6
370:22

**glass**  318:19

**go-forward**
385:24

**God**  318:17

**goddaughter**
336:19,22

**Golden1**
180:20

**Goldman**
181:2

**GOLUBCHIK**
85:11

**good**  29:14
170:13
368:4

**goods**  67:5

**Google**
137:23
146:24

**Gordon**
103:17,18

**grace**  49:1
58:16,21

**grade**  79:19

**Graham**
34:18,19,
21 164:6
173:21
174:5,17,

20 220:11

**grand-**  164:8

**grandchildren**
39:21

**Grandchildrens**
39:19

**grandfather**
39:7,12
116:12

**grandmother**
39:7,13
116:10
164:1
317:1,3
329:25

**grandmother's**
163:25
389:24

**grandpa**
104:7

**grandparents**
39:14
40:14
42:15

**grandson**
164:8

**granted**
150:1
218:10

**grateful**
352:23

**great**  75:11
164:1,15

**greater**
111:18

**Greg**  193:9,
14

**groceries**
25:17 30:5
67:19
264:15,16,
18,20,22,
24 276:10
311:14,23
312:3
332:2

**grocery**
241:15
276:8
311:10

**gross**  288:20
290:10

**ground**  10:22

**group**  108:16

**grow**  351:17

**growing**
251:6

**growth**
280:13

**guarantee**
110:25
217:19,20,
21,24
229:6
288:1

**guaranteed**
186:15

217:18

**guarantees**
220:13
222:4

**guarantor**
110:11,15,
23 222:1
229:2

**guarantors**
221:24
222:2

**guess**  43:16
59:3,21
60:2 77:7
107:20
112:4
123:14
125:17
128:10
153:16
158:18,25
191:5
192:1
196:23
218:2
230:2
237:10
245:7
246:22
253:14
254:18
264:14
315:4
316:13
325:20
331:13
347:20

371:10
373:22
379:24
389:25

**guessing**
246:17
306:2

**gulf**   164:17

**gun**   318:23
319:1,2

**guy**   269:25

**gym**   32:22
268:22
269:6,8

---

**H**

---

**H-A-M-M-O-N-D**
276:23

**hair**   68:5

**HALDANE**   83:7
84:7 89:22
102:3

**half**   13:14,
15 80:8
93:11
111:7
116:4
135:7
160:6,8
248:9
269:19
311:15
322:23
329:19

386:2

**Halloween**
337:11,17,
20,25
338:3,17

**Hammond**
276:19,23

**hand**   10:11
367:12

**handle**
341:14

**handwriting**
94:8

**hang**   29:19
32:22

**Hanson**
261:5,9

**happen**   200:6
350:21
370:13

**happened**
37:17
58:13
74:18
122:4
139:14
166:16,21
200:2
220:19
223:19
254:2
293:18
339:20
347:16

**happening**
380:4

**happy**   52:4
134:17

**hard**   68:22
122:5,9
123:5
126:2,13
137:2
249:9
351:4

**Hawai'i**
76:23
77:3,19,25

**hawkfish**
272:4

**head**   73:22
110:22
112:12
227:16
268:15
326:6

**HEADED**
89:15,17,
22 90:11,
15

**heading**
191:10

**headphones**
95:24

**Healing**
327:22
328:2
389:7

**health**
28:15,18,
19 29:23
298:2
332:3
352:20

**hear**   219:9,
11 330:22

**held**   82:1
116:23
119:22
121:18
147:22
171:1,3
208:2
218:24
228:10,11
299:23
320:11
348:10
352:7,9
355:23
356:11
390:22
391:4,13

**helped**
166:10
191:10,11
239:21
313:13

**helping**
30:12 32:4
94:11
250:1,6
275:22
336:20
340:12

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Bavolak   Page 426 of 462
Exhibit A   Page 426 of 462   Page 465 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: helps..Hologenix

**helps** 98:16
269:21

**hematoma**
92:18

**hereto** 100:8
123:18
129:16
131:16
145:19
147:21
163:12
170:21
176:4
182:24
184:17
188:13
191:18
195:18
201:9
204:12
206:24
211:4
215:20
218:20
300:8
303:4
334:10
342:24
348:9
353:11
356:21
358:4
363:4
365:4
366:4
372:4
373:4

375:10,16
377:17
378:4
387:7
391:9

**hermit** 272:3

**HGX** 343:12

**hide** 247:22

**high** 97:15,
19 103:23
367:1,5,8

**higher** 139:5
236:7
274:10,21

**highest**
47:16

**hire** 58:7

**hired** 198:21
342:18
381:14

**historical**
221:6
385:22

**history**
89:22
107:21
108:2
188:22

**hit** 59:6
119:25
325:1,8

**Hive** 327:22
328:2
389:7

**HO-** 128:19

**HOA** 128:19
266:13,19
290:14

**HOAS** 132:23

**hobbies**
78:3,9,12

**hoc** 128:8

**Hol-** 226:7
347:16

**holder**
113:5,7
122:8
386:11

**holdings**
40:23,25

**holistic**
94:20
327:23

**Hologenix**
49:19
50:1,7,16,
19 52:19,
24 53:4,5,
7,13,21,22
54:5,12,25
55:6,10,
19,25
56:1,16,
19,24
57:2,8
83:16
84:19
85:10
86:13

89:13
90:17 91:6
103:20
105:14,19
107:13,14
111:21
119:15,24
126:18,20,
24 127:4,
8,12
130:2,22
131:1,5
149:1
150:4,12,
14,22
151:13,15,
19,20,23,
25 152:17,
21,24
153:4,12
154:3,22,
25 155:8,
12,17,25
157:7,15,
19,21,22
158:5,11,
14,22,25
159:2,3,12
160:10,21
161:2,14,
16,20
162:1,9,
10,16,19,
22,25
186:3,8,
22,24
187:7
189:5

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 427 of 462   Page 466 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024 Index: Hologenix's..housekeeper

191:9
209:17,19
210:2,4,6,
9,14 215:4
218:3,11
219:21
220:16,25
221:3,17
222:20,21
223:1,11
225:2,13,
20 226:12,
17,18,21
227:8,12
228:22
229:10,13
244:18
254:11
255:20
257:6,16,
17,25
258:6,10,
15,18,22,
24 259:2,
20 261:7
266:7,9
272:17,20
280:17,23
287:25
295:22,23
296:11
303:20
304:23
314:15
333:4,12
337:5
341:10,19,
23 342:1,

10,15,17,
18 343:8,
19 346:1,6
347:9,18
348:13,20
349:5,10
350:5,22
351:6,20
353:19
355:19
356:2
357:1,4,8,
11 358:21
359:1,2,
18,22,25
361:22
378:12,15
384:14,17

**Hologenix's**
53:25
55:13
57:15
121:10
153:14
156:8
158:17
159:16,19
187:15
189:9
217:13
223:7
259:11
333:8
357:19

**home** 11:25
13:8 62:23
67:19

69:1,9
74:11
98:11
111:4
114:1
137:2,8,
15,21
138:13,17,
19 144:10
192:8,9
235:2
332:5

**homeopathic**
270:16

**homes** 138:20

**Honda** 262:16

**honestly**
12:9
246:16
338:15
352:5,13

**honor** 166:9,
13

**hope** 166:10
351:21

**hospitalizatio
n** 92:10

**hosted** 79:8
319:1

**hotel** 140:21
371:6
372:16,17

**hotels**
327:11
376:12

**hour** 27:15
246:23
247:7
261:12
269:19
318:19
350:10
392:3

**hourly** 27:2,
5,7,12
261:11
288:17

**hours** 71:18
92:19
261:14
309:15
329:19,20

**house** 62:20
67:16
70:22 78:2
98:15
113:13
137:3,17
265:4
268:1
269:24

**household**
66:25
246:1
276:2,8
332:5

**households**
265:6

**housekeeper**
113:25
114:5

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 428 of 462   Page 467 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024     Index: housekeeping..include

**housekeeping**
33:5,11,
15,18
264:25
265:5
314:22

**housing**
136:1,18

**hundred**
32:16
48:11 76:8
133:7
162:14
166:25
179:18
201:1
248:6
261:13
267:18
268:4
272:25
274:23
275:1
309:7
363:20,24
367:11

**hus-** 311:22

**husband**
44:14,21
169:25

**hydrogen**
298:10,13

**hypothetical**
165:18
166:1
309:17

347:19

**hypothetically**
165:15

**Hyundai** 26:4
114:23
262:16,18,
19

**Hyundais**
262:17

——————————
——————————

**I**

**I.V.** 389:13

**idea** 49:12
140:13,16
224:13
246:16
251:24
279:4
291:12

**ideas** 65:12

**identification**
86:10 87:3
88:3 89:3
90:3 91:3
123:16
129:14
131:14
145:17
147:19
163:10
170:19
176:2
182:22
184:15
188:11

191:16
195:16
201:7
204:10
206:22
211:2
215:18
218:18
300:6
303:2
334:8
342:22
348:7
353:9
356:19
358:2
363:2
365:2
366:2
372:2
373:2
375:8,14
377:15
378:2
387:5
391:8

**identified**
222:22

**identify**
34:24
331:12

**Identifying**
222:19

**illiquid**
166:2
384:5,9

**impact** 54:20
55:4

**impacted**
54:17

**impetus**
156:7

**implemented**
97:9

**imply** 46:25

**impossible**
152:22,23

**impounding**
289:15

**improvement**
351:12,13

**inaccurate**
205:20
322:20
376:3

**inactive**
340:13

**inactivity**
293:8

**inaudible**
118:13
124:8
219:7

**include**
56:22
57:1,4,20
58:7 67:18
68:1
264:20,22,
23 267:6

271:7
278:3
279:6
316:8
323:14
360:21

**included**
33:25
67:24
212:17
213:23
249:22
266:23
268:11
271:1
273:3
279:7,21
289:22
360:6
385:12

**includes**
176:14
187:9
214:6
235:13
271:8

**including**
58:3 249:1
323:15
355:19

**income** 23:15
36:6 37:4,
7 38:23
68:1 78:7
86:19
111:18,20,
24 112:4

148:7
243:2
245:3
272:7,11,
19,20
280:13,16,
19 281:1
282:22
290:6
291:3
304:12,20,
23 305:3,8
321:20,24
322:2,9,
15,18
339:17
347:14
355:21
385:19

**incongruency**
95:7

**inconsistent**
133:6

**increase**
140:24
249:15
330:18
331:5
351:15,22
369:4
374:23

**increased**
145:5
254:24
306:24

**incredible**

97:16
347:25

**incur** 68:2
236:9
361:7

**incurred**
57:9
177:15
212:12
213:20
214:3
224:18
226:20
287:8
377:7,11

**indemnificatio
n** 131:7

**indemnify**
50:7 53:1
126:20
131:1

**indemnifying**
50:17
127:4,8

**indemnity**
126:24
128:5
130:14,22

**INDEX** 87:1
88:1 89:1
90:1 91:1

**India** 327:13

**Indian**
327:11

**Indiana**
116:16
310:22,25
311:5

**indicating**
363:21
373:15

**Indigo**
327:10

**Indirectly**
78:5

**individual**
83:16
84:18 85:3
97:3
177:18
207:20
246:11

**INDIVIDUALS**
87:15

**Indonesia**
240:3

**industry**
36:6

**info** 326:24

**information**
20:3 88:17
90:12
91:18
148:16
233:25
303:17
315:15
328:25
362:12

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nibal A. Sulieva A. Page 480 of 462 469 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024        Index: informed..investment

368:24

informed
  233:10,16

initial
  190:12
  220:8

initialed
  100:7

initially
  246:22

ink  100:7

inquired
  270:21

insemination
  62:11

insensitive
  95:19,21

insiders
  177:21

insight
  75:24

installment
  113:3
  240:18
  360:12

installment's
  196:24

instruction
  167:18

Instrument
  174:10

instruments
  166:4

insufficient
  166:7,20

insurance
  25:16
  33:25
  60:16,20
  61:1
  115:3,6,9
  125:4
  216:10
  236:10,14,
  16,20,22
  250:21
  252:3
  267:3
  270:6,11,
  13,19,21
  289:16,24
  312:10
  332:6

insure  252:9

insured
  252:2

intend  67:3

intending
  134:15

intent
  142:16
  369:20

intention
  76:15,16
  175:1
  252:24
  386:18

Interactive

292:13,17
339:9

interest
  16:10,12
  140:9,11
  143:23
  208:16,19
  209:11
  231:8,17,
  22 232:11
  342:13

interested
  143:13
  255:12,15,
  18 367:25

INTERNATIONAL
  90:11

internet
  382:13,14

Interplay
  298:14,15

interruption
  59:1,20
  320:10

introduced
  198:1

intrude
  81:19

invasive
  270:15

inventory
  246:25
  345:7,11,
  15,16,18

invest
  157:15
  186:17
  196:17
  197:4,5
  200:22
  292:8
  301:22

invested
  158:4,5,9
  197:6
  210:2
  254:17,22
  301:21
  302:8
  347:13

investing
  298:16

investment
  151:1,6,
  10,13,16,
  23 152:1,
  4,13,17
  154:3,18,
  22,24
  155:14,18
  156:1,11,
  21 157:18
  158:13,21
  166:8
  196:13,18
  200:2
  203:11
  204:24
  209:20
  210:4,14
  281:14

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/09/25   Entered 06/09/25 18:39:07   Desc
Declaration of Nicole A. Sullivan   Page 481 of 462   Page 470 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024        Index: investments..Jocelyn

297:15
298:3,6
337:6
341:11
343:19
346:8
347:17
350:5,22,
25 351:5,
11 353:22
354:3,17
357:5
383:17
384:4

investments
16:15 89:5
120:19,20
151:7
166:3
168:23
198:14
199:4,14
200:21
210:5,9
281:10,11,
13 282:8
292:3
297:18,19,
24 298:5
300:14,19
301:5,18,
23 302:3,9
383:14
384:1

invited  78:2

inviting
135:17

invoices
49:15,18

involve
48:16

involved
45:4,6
81:22
113:19
140:18
314:10
387:19

involvement
303:15
380:24
385:20

IQ  95:7

IRA  37:24

Irma  30:16,
21

irregular
98:14

Isabella
336:23

Islands
76:23

Israel  84:23
85:4

issue  96:7
153:25
158:20
166:16
293:8

issued  49:1
58:16,24,

25 59:18
127:18
150:24
151:3
154:14
178:8
204:25
355:15

issues  65:17
81:22 82:6
92:20
95:15
158:17
165:21

item  188:5
294:3
323:20

itemization
25:1

itemized
66:18
90:12
252:5
339:5,14

items  66:25
133:18
246:1,7
276:8
279:8
329:7

IV  85:5

IWC  251:18,
25

J

James  88:23
303:14,17
339:5

Jan-  287:8

January
55:25
105:6
108:21,24
109:10
129:4
189:9
197:2
244:13
287:8,14
306:25
315:21
316:4
328:15,21
344:24
357:15
361:8
362:9
363:14
365:16
371:13
378:21

Jeff  144:20

Jennifer
366:15,23

jewelry
251:13
252:4,9

Jocelyn

87:22 88:5
196:2
202:19

**John** 51:22
62:9 85:5
277:3,5
354:8
387:2

**John's** 250:7

**Johnson**
288:8,11
340:8

**JTEDFORD@
DANNINGGILL.
COM** 85:8

**Juan** 180:4
336:9

**judge** 48:25
58:15

**judgment**
46:5,9
47:14
48:11
58:14,23
59:15
109:7
126:21
127:5
158:23,24
159:1,2
178:7
232:2

**Judicial**
87:13
171:16

**jujitsu**
72:15

**JULIEN** 89:9

**July** 87:7
89:9,11,13
157:9,14
158:4
159:17,20
173:4
189:9
210:14
224:18
227:15
343:11,12
344:10,21
346:1,8
347:14,18
353:19,23

**June** 111:9,
11 158:1,
15 178:8
273:15
386:3

**jury** 157:24

———————

**K**

———————

**K-1** 281:1

**K-1S** 175:9,
20

**K-A-Z-D-E-N**
256:13

**K-O-C-H**
241:21

**Kaster**

143:19

**Katherine**
87:6
163:24

**Kelli** 83:24
84:20
101:22

**Kelly** 61:19
104:12
262:18
332:4,6,7

**Kelly's**
61:20
265:4
297:2

**Kia** 262:20,
21

**kick** 34:3

**kids** 79:19

**kind** 32:19
45:7 92:22
114:22
115:24
137:1,23
250:5
268:22
271:14,17
273:4
283:12
333:15
380:4

**kindergarten**
80:7

**kinds** 29:10

**Kings** 112:3,
6,15,21
113:2,8
242:12,19
265:9,21
382:18,24
383:9

**knew** 130:18
341:1

**knowledge**
12:6 34:9,
15 38:1,4,
5 61:10
74:10
78:20,22
108:12
146:13
173:18
175:23
178:3
179:9
216:8
243:17
305:15
371:5

**KR@LNBYG.COM**
85:14

**Kraken**
296:20

**Krasnoff**
84:23 85:4

**Kurt** 85:11
184:19

**L**

**L-O-R-I** 64:9

**L.A.** 161:9
265:9

**LA** 85:12

**lady** 30:14
98:15

**Laetitia**
350:2

**laid** 347:21

**Laker** 113:5
242:11,19
265:15

**Lakers**
112:3,6,
11,17
113:1
265:10
382:18,23
383:8

**landlord**
144:18,24
145:2
306:16,17
307:14

**lang-** 94:9

**language**
93:12
94:8,9
96:9
231:14,24
232:3
322:4

**large** 159:19
160:16
188:5
390:7

**largest**
54:15
55:13
177:20

**Las** 361:20
368:9
371:16
376:11,19

**late** 287:8

**laundry**
33:4,7,9,
21

**Laundry/
cleaning**
276:14

**LAURIE** 87:22

**law** 85:5,
12,18
127:20
131:3
146:23
166:24
205:20
227:11
231:10
232:12
233:13
247:16

**laws** 80:21

**lawsuit**
56:19

126:9

**lawsuits**
57:18

**lawyer** 47:22
58:7,9,12
130:6
150:7
164:16
169:17,18
170:10
196:1,3
198:5,20,
21,22
199:7,24
216:15
233:24
234:1
245:11
379:4,7

**lawyer's**
257:2

**lawyers**
48:19
199:9
200:8
226:1
231:14
379:24
384:20,21

**layer** 170:14

**learned**
198:4
325:20

**lease** 11:21,
22,24
12:4,5,8,

11,17,18,
22,23
20:24
21:14,16,
17,18,19
22:2,6,10,
12,20,23
86:15
110:5,12,
17,20,25
134:6,9,15
143:18,20
144:21
180:23,25
217:14,18,
19 259:22,
23 288:1

**leasee**
147:11

**leaseholder**
110:24

**leave** 136:14
142:16

**leaves**
190:11
307:3

**leaving**
136:7
142:12

**Leavitt** 88:7
165:21
166:5
167:5,7,18
169:8,14,
20 170:1
174:16,19,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Page - Exhibit A Page 484 of 462   Page 473 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: left..liquidated

25 179:12
180:2
183:7,18,
21 184:2
192:4
194:14
195:20
199:3
201:12,24,
25 204:15
207:3

**left** 124:23
200:1
245:12
290:4

**left-hand**
359:15

**legal** 43:4
50:12
51:22,25
52:2,21
54:8,12,
19,23
56:17,18,
21,23
57:10,25
69:14 81:6
119:15
164:17
191:10
215:13
224:18,22
231:19
299:9
304:1,4
324:16
350:20

**legally**
69:15
230:2,13,
18

**lemon** 370:9

**lender**
125:23

**Lending**
292:6

**length** 175:2

**Lenny**
106:23,25
107:1
108:14,17,
18,19,23
109:21
199:21

**Lenny's**
110:2

**LESLIE** 89:8

**lessons** 67:5

**lessor** 147:4
276:24

**lessor's**
147:4

**letter**
165:21
166:5,9
167:4,6,
10,17
227:3,7

**letters**
227:11

**letting**
206:10

**level** 97:15,
19 137:16
138:6

**LEVENE** 85:11

**Levitt's**
195:25
196:2

**liabilities**
88:16
108:2
216:1
360:11,16,
22 362:13

**liability**
90:18
157:24
158:15
177:15
226:20
360:23
361:1

**liable** 226:2

**lien** 58:17
60:8,15
223:6

**life** 60:16,
19,25
108:25
115:25
144:4
216:10
368:12

**limit** 363:19

364:1
367:1,5,8

**LIMITED**
90:18

**Lincoln**
86:15
117:11
214:21
266:12
289:12

**Linda** 87:8
164:3

**lined** 119:24

**lines** 388:6

**link** 17:8

**linked** 20:2

**Linkedin**
386:1

**links** 19:24

**linoleum**
248:11,14

**liquid**
298:12

**liquida-**
380:9

**liquidate**
324:13,24
325:5,7,
14,18

**liquidated**
205:25
324:18
325:1,19

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvadori   Page 485 of 462   Page 474 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: liquidating..lives

339:11

**liquidating**
322:12
339:19

**liquidation**
90:20
254:5
313:17,24
322:10
323:6
325:3
340:6
355:13
380:10,22
381:2,10
383:9
385:16

**liquidity**
119:10,11
120:25
121:3,14
165:5,8,9,
11,24
166:7,13
167:12,19,
25

**Lisa**  261:5
288:8
340:7

**list**  90:19
125:11
177:19,24
215:10
224:1,4
234:19,23
246:5

250:3
251:13
253:7
254:11
256:12,24
257:5
265:8
270:24
274:2
275:13
277:10
280:1,4,
12,19
281:4
282:13
284:11
287:6,7
288:4,20
292:3
297:14
300:24
301:2,4,6
302:19
313:15
380:8,22,
25

**listed**  58:1
60:13  89:5
122:20
150:17,20,
22  182:9
183:9
190:12
192:11,14
193:24
214:15
217:16
225:5,17

226:18,21
229:1
236:4
244:16
247:5
253:23
256:23
260:1,25
261:19
272:7
276:9
291:4
300:15,19
301:6,21
302:14
327:19
360:9,17
376:12

**listening**
96:1

**lists**  146:17
212:6
213:8,16
218:6
228:3,16
238:8
245:25
252:4
258:5
260:20
262:8
264:8,16
268:7
276:13
282:24
284:16
289:9

301:9
327:10
359:11
372:11
385:2

**litigation**
54:2,4,5
127:9
153:1,3,4,
22  155:20
157:21

**live**  13:11
23:3,10,12
34:19
61:16,22
62:20
74:11
118:3,5
135:15,17
137:5,9
144:2,8,10
271:25
272:1
280:2
310:23

**lived**  11:17
21:11
23:14
62:23
80:13
135:20

**lives**  21:5
29:17
61:14
78:14,17
116:15,16
135:15

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 486 of 452   Page 475 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                           Index: living..losing

142:14,25
143:4
235:2

**living**  34:21
35:17
66:24
67:16
134:11
135:13
138:25
139:2
281:10
293:25
388:18

**LLC**  85:10
86:13
89:13
90:15,17
91:6,7
125:24
131:4,6
217:9
218:6
219:17,21
255:24
256:17
257:6
288:5
359:1

**LLC'S**  88:21

**LLP**  85:4,
11,17
212:6,8

**loan**  47:6,
10,13
87:20

120:11
122:5,9,12
123:5,9
126:3,13
179:17,20,
21 180:9
183:14,19
185:18,21,
24 186:15,
18,21
188:23
189:5
207:19
208:5,8,
10,12,25
209:14
214:16,20
227:25
257:17
285:11,12,
14,15,22
286:4,8,19
287:1
295:15,23
296:1,4,7,
11 336:16,
19,25
342:7
345:24
358:20

**loan's**  189:3

**loaned**
214:19
342:1

**loans**  89:18
209:16
285:7,13

292:8
295:17,21
296:12
341:19
379:15

**located**
71:13

**Locked**  302:6

**log**  42:12
167:22
168:9
286:5,7
339:2

**logged**  168:2

**long**  11:6,
17 21:11
62:15,17
107:11
113:4,7
134:4
141:16
165:13
169:9,18
180:15
198:19
212:20
243:8
269:22
292:10
316:15
329:17
350:9
368:7
377:3

**longer**  41:13
76:11

142:17
241:1

**looked**  12:25
137:14,17,
22 138:25
143:12,14
251:7
339:16
345:24

**Lori**  64:7,
15,20
339:3

**Los**  10:1
23:14
29:21
35:11
71:14 83:3
84:3,24
85:7,13
92:1
116:11
117:1
160:25
161:3
319:14,17,
20,23
329:17

**lose**  53:4,
7,22 54:25
286:6
290:17

**loses**  168:24

**losing**  53:2
56:16
120:6
373:11

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 487 of 462   Page 476 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                                    Index: loss..make

**loss** 279:14
  287:9
  361:7
  375:25

**Losses** 287:7

**lost** 53:6
  56:11
  287:13
  368:15
  372:19
  373:13,18

**lot** 32:4
  34:1 67:22
  93:3 94:5
  98:1
  119:14
  124:1
  135:16,21,
  22 138:18
  210:7
  213:25
  253:17
  263:11,12
  267:2
  269:20
  333:5
  347:20
  358:14

**loud** 92:21,
  22 95:17,
  25 96:5,6

**lower** 236:8
  239:11
  386:10

**lowered**
  288:25

  289:17

**Lucas** 90:8
  362:15,17,
  20 372:12

**Luckily**
  351:4

**lump** 305:22

**lunch** 81:12

**luncheon**
  116:22

**Lynch** 294:3

---

**M**

---

**machine**
  276:16,17

**Macoy** 122:11
  123:1,12
  126:3

**macroeconomic**
  55:8

**made** 44:17
  49:23
  52:2,16
  56:13
  66:20
  92:21
  100:6
  101:13
  129:1,11
  140:8
  148:15,25
  151:1,8
  154:2
  155:14

159:7
162:22,25
164:23
167:12
179:5,7
183:15
188:24
189:12
191:4
194:7
196:20
199:16,17
204:24
207:20
210:5,14
216:13
221:17,21
229:24
242:6
243:5
246:22
280:18
282:17,25
283:7
284:4,11
285:10
292:8
297:19,25
298:5,7,19
325:5
340:4
341:19
343:18
346:7
347:17
374:5
380:4

**main** 34:2
  95:14
  105:17

**main-** 114:18

**maintain**
  271:10
  350:6

**maintained**
  175:5

**maintaining**
  113:13

**maintenance**
  271:2,4
  290:15
  332:13

**majority**
  67:12,14
  261:16,22
  269:16
  271:2

**make** 20:20
  27:24
  49:15,17
  50:15,20
  51:12
  52:12 57:6
  66:5 78:8
  119:20,21
  120:2,11
  121:5
  129:3
  140:10
  151:6,12
  154:21,24
  157:3

162:23
163:1
164:24
165:2,4,20
169:1
194:6,8
196:25
197:7,16
198:13
199:4,13,
19 200:4,
17 203:10
208:5
230:15,18
233:12,19
240:19
245:12
280:1
281:15
282:7
283:10
286:20
287:3
296:10
298:3
299:7,8,12
302:17
308:11
322:18
328:19,20
341:16
351:1
365:20
381:8
385:23

**makes** 97:17
168:23

**making** 52:21
54:13
95:23 96:6
188:1,3
202:23
210:4
230:13

**Malibu**
11:15,16,
18,25 12:4
13:25
21:7,10,12
23:13,19,
22 24:3,4
29:21
80:12
114:6
135:10
144:12,19
147:5,14

**managed**
165:17

**managers**
89:13
343:8
353:19

**manages**
121:4

**managing**
200:6,14

**MAR** 90:13

**March** 89:19
90:6
125:20
126:5
134:6

189:15
196:6,9
197:8
297:13
358:17,18
366:20
374:9,10
375:22
387:17
389:5,17

**MARGOLIN**
87:22 88:6

**marijuana**
371:3

**mark** 80:19
123:13
131:9
145:14
147:16
170:16
175:24
182:19
184:12
188:8
195:14
201:4
204:7
206:19
210:20
215:15
218:15
332:20
348:5
353:6
357:22
362:23
364:22

365:23
371:24
372:22
375:5
377:13
386:23

**marked**
123:16,21
125:8
129:14
131:14,19
145:17,22
146:12
147:19,25
149:17,20
163:5,10,
14 170:19
176:2,7
182:22
183:3
184:15,25
185:7
188:11,15
191:16,20
195:16
201:7,12,
15 204:10,
14 206:22
207:2
211:2,7
215:18,22
218:18
219:2,16
259:9
277:1
280:10
300:3,6
302:23

303:2
333:24
334:8,13
338:17
342:22
343:2
348:7
349:15
353:9,14
356:14,19
358:2
363:2,6
365:2,6
366:2,6
372:2
373:2,6
375:8,14,
18 376:5,6
377:15
378:2,6
387:5,12
391:7

**marker**
361:25
362:9
363:19,23
364:9,10

**markers**
367:15
369:18,25

**market** 16:9,
14 134:3
146:18
267:16
292:10
294:12
383:10

384:6

**marketable**
384:14

**marketing**
161:8

**marking**
129:22
195:20
358:6

**MAROOLIN**
89:8

**marriage**
115:25

**married** 62:3

**martial**
72:19

**Mary** 145:3

**match** 132:12
286:18

**matches**
383:3

**material**
351:22,23

**maternal**
39:14,15
116:10,12

**Matisse**
248:10,12,
13

**matter** 46:5
47:23
149:8
153:5

224:23
225:1

**matters**
224:24

**maturity**
342:14

**maze** 318:9
319:1

**Mcewin**
366:15,23
367:13
373:10

**meal** 239:18

**meals** 29:13
32:23
240:25
241:5,11
264:14

**Meaning**
138:9
354:2
360:24

**means** 95:4
150:10
151:1
170:12
232:5,8,10
257:24
261:25
271:24
272:11
314:18
384:11

**meant** 51:6
67:23

162:9
169:2

**mediate**
106:23

**mediation**
69:13,16,
18 199:20

**mediator**
105:9
106:19,20
108:14

**Medicaid**
312:7

**medical**
25:15
33:24
80:15,16,
21,25 82:6
92:7 93:5,
13 95:11
97:14
114:24
115:3,6,8
136:16
235:13,24
236:9,12,
14,15,18
237:7,13,
25 238:6
266:24,25
267:6
311:10,17
312:9
332:7
389:7

**Medicare**

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:35:07   Desc
Declaration of Nicole A. Sylvela A.Page 440 of 462 479 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: medication..Met's

312:6

**medication**
93:17
236:14
238:8

**medicine**
30:3,4
138:12

**meet**  63:18
64:4,19
104:25
105:1,3,4,
8 107:2,11
137:2
347:12

**meeting**
63:21
105:8
108:15,17
127:15
128:7,9

**meetings**
128:1,4

**meets**  128:2

**member**
234:20

**members**  25:9
104:6
116:7
193:6
234:13
310:10,13

**membership**
150:16
152:10,12,

16 268:22
269:6,9

**memorabilia**
247:3
249:21

**Memorandum**
87:11
171:14
304:10

**memorializing**
229:6

**memorization**
323:9

**memorize**
15:24

**memorized**
14:3 16:4
55:23
112:20
226:8

**memory**  42:7
70:15
174:4
210:1
215:6
221:23
291:21
310:1
313:15
343:22
373:12,17
382:20

**mental**  28:19
246:25
352:20

**mentioned**
61:3
350:11
366:25
368:18

**mere**  231:8,
23 232:5,8

**merge**  154:16

**Merrill**
294:3

**message**
200:1

**messages**
200:12

**messaging**
66:7

**met**  46:5
50:2,8
54:6 56:18
57:12
58:14 60:8
103:6
108:19,21
119:19
126:9,15,
19,24
127:5,9
128:6
130:14,22
131:2
157:10,11,
25 158:14,
22,24
177:11
180:17

186:8
224:23
225:3
232:2
343:12
366:25

**MET's**  121:14
123:15
129:13
131:13
145:16
147:18
157:17,20
159:1
163:9
170:18
176:1
182:21
184:14
188:10
191:15
195:15
201:6
204:9
206:21
211:1
215:17
218:17
300:5
303:1,12
334:7
342:21
348:6
353:8
356:18
358:1
363:1
365:1

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 441 of 462   Page 480 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                          Index: Mexico..money

366:1
372:1
373:1
375:7,13
377:14
378:1
387:4
391:6

Mexico  76:23
  273:11

MGA  368:19

MGM  90:11,
  13 368:5,
  15,19
  373:24
  375:21
  376:7,18

middle  186:7
  190:16

miles  320:3

million
  56:18,20,
  22 57:5,9,
  19 58:4,5
  119:18
  120:8
  122:13
  123:1
  158:25
  160:7,8
  165:16,17
  168:18
  187:8,9
  214:4,6,
  17,18
  232:1

281:4,8
295:16,25
296:10,14
345:7,12
346:15,16,
  20 347:3,
  4,6,10
349:6,11
359:24
379:3,7,
  11,19
381:23

million-three
  122:14

mind  76:25
  79:6 106:7
  108:3
  276:21

Mindry
  269:13

mine  184:20
  262:14

minimize
  159:11

minority
  384:5,9

minutes
  127:21,25
  128:3
  310:16
  390:19

Miscellaneous
  268:7,10,
  12

misinformed

325:17

missed  13:21

missing
  302:19
  326:9

mission
  348:4

misunderstandi
ng  206:3
  339:22

mixed  156:25
  333:4,5

MLM  74:24

Mohr
  144:20,21,
  24

mom  39:10
  45:3,5
  120:22
  250:13
  318:24

mom's  39:10
  42:18,23
  248:2

moment
  172:16

Monday  31:23
  71:17
  72:8,9
  73:16

monetary
  193:23

money  15:14

16:1 17:1,
  2,4,7
27:25
34:11
35:24 36:3
38:10,12
40:15,22
41:23 42:2
46:21,23
47:1,4,5,6
49:20
50:1,19
52:1,20,25
53:2,4,6,
  7,22
56:11,14,
  16 57:18,
  20 58:7
65:20,21,
  24,25 66:1
68:13,24
69:4,8
70:7 74:4
75:6 76:6
77:6,15,16
79:21 99:3
109:10
121:17
122:5,9,
  15,17
123:5
125:3
126:2,13,
  16 135:25
151:17,19
155:4,8,9,
  13 156:24,
  25 157:5,

14,22
158:22
159:17
162:11,12
168:11,20,
24 169:1
180:12
185:16
186:19
189:8
197:4,5
205:19
208:10
209:17
210:11
214:25
225:12
226:6,9,12
231:25
232:22
243:9
245:1
256:3
257:15,17
274:13
278:3
283:24
284:1,2
286:12
288:16,24
290:22
294:10,16,
24 295:7,
23 296:1,4
297:4,5
306:6
307:15,24
321:1

322:13
323:7
334:23
338:13
339:13
342:1,15
344:25
350:18
355:16,18
360:21
368:15
370:22

money's
294:11
350:19

Monica  117:9
147:1
381:22

monies
224:21
257:21

month  12:18,
19,20
14:6,7
22:3,4,9
23:24
24:12,15
26:20
37:22
63:10
66:12,15,
22,23
67:3,9,18,
24 73:1,20
79:22
115:2
116:11

128:3,20
132:6,11,
14 136:1,
18 138:22
139:5,9
156:3,9
157:7,10
160:15
235:7,18,
21 236:3,
24 241:12,
13 242:15
243:12,24
245:1
261:10,15
263:17
265:6
266:16
272:24
274:7,13
280:4
284:9
288:24
289:24
290:10,16,
21 297:2,
10,12
305:18
306:1,13
311:9,21
315:1,6
328:3
357:16
360:25
365:21,22

month-to-month
20:24 22:6
134:13

monthly
13:1,24
23:6,16,21
24:2 25:12
42:11
90:21
122:20
124:19
128:7,12,
23 156:18,
20 175:11,
14,18,20
180:25
233:3,5
260:1,14
262:11
265:17
274:1,19
277:25
278:9
279:21
287:18
288:1,25
304:12,13,
20,21,23,
24 305:3,
4,8 307:1,
8 312:23
357:16,19
387:16

months  13:4
25:2 66:17
68:19 71:1
93:21,25
104:23
116:4
137:25
159:10

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/09/25   Entered 06/09/25 18:39:07   Desc
Declaration of Nicholas A. Sullivan - Exhibit A   Page 443 of 482   Page 482 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: months'..names

236:7
265:20,22,
23 322:23
324:5
328:4
329:2
346:13
351:25

**months'**
24:21

**morning**
10:21 30:2
295:3

**Morocco**
76:23

**MORS** 53:11
57:25 58:1

**mortgage**
117:17,18,
20 119:3,
7,9 122:1,
8 123:2,4,
6 124:13,
16,19
125:16
126:6,8,14
128:13
132:13,18
144:14,15
145:11
214:22,25
266:13
289:9,11,
22 290:14
328:11,21
358:23

359:7
386:2,7,10

**mother** 44:4,
5,8,21
45:1,13,16
61:17,18,
25 62:4,7,
13 103:25
104:2,9,
11,14,16,
17,19,20,
22 105:13,
19,24
106:11,17,
23 107:1,
10,17
108:13,18
141:18,21
163:25
164:4,6
235:2,9
237:3
278:5
308:3,8
310:17
338:4
360:21
370:22
390:11

**mother's**
43:12
44:3,11,16
104:13
108:9
141:25
163:21
169:22

170:2
193:7,16
379:23

**motion** 49:6,
10,14
87:10
88:21 91:5
171:13
303:12

**motions**
52:13,15

**move** 29:20
108:3
118:8,17
135:22
139:24
140:5
144:6,12
230:7

**moved** 12:8,
13 23:12,
16,18
24:2,3
29:22
118:9
169:11
244:10

**movie** 248:8,
22 250:24

**moving** 98:6
137:14,17,
19,20
139:11
140:23
213:25
310:22,24

311:5

**MTL** 89:22

**Mulholland**
71:14

**multiple**
26:23,25
27:18
84:19
85:16
86:11 87:4
88:4,20
89:4 90:4
91:4,6
178:5,12,
19 227:6
243:22
282:15
364:21
369:10

**music** 67:5

**mutual**
16:15,17

---

**N**

---

**N-E-G-E-E-N**
335:2

**Nai-te**
88:10,12
207:9

**name's**
106:22
261:5

**names** 31:7,9
35:3,4

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nibula A. Sulayman   Page 483 of 1079
Exhibit A Page 444 of 462
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: nasty..note

93:2 95:13
138:23
159:24

**nasty** 65:2

**Natalie** 88:8
201:20

**National**
335:16

**nationally**
139:4

**nature**
179:17
181:3

**nay** 162:23

**NEALE** 85:11

**nearest**
17:10

**necessarily**
225:10

**necessity**
66:25

**needed** 29:24
41:12
105:10
119:10
121:17
128:4
144:8
155:4,13
157:22
159:11
205:19
233:1,2,4
263:20

271:9

**needing** 93:3

**negatively**
54:18

**Negeen**
335:2,4

**neglected**
328:24

**negotiable**
166:3

**negotiating**
386:10

**neighbor**
29:14

**neighbor's**
32:4,6

**neighbors**
29:4,5,17
30:10
63:24

**Nerf** 318:23
319:1,2

**net** 290:6
302:6
380:9
382:18

**network**
379:13,18

**neurotherapist**
339:4

**Nevada** 118:9
192:10

**nice** 299:22

**Nicole** 85:17
115:11

**night**
374:21,25
375:1,3

**ninety**
255:25
284:11

**ninety-fifth**
95:5

**ninety-ninth**
95:4

**noise** 95:17

**noises** 92:22

**non-recurring**
322:18

**non-regular**
115:23

**non-sufficient**
367:17

**nonconfidentia
l** 99:7

**nonexempt**
238:22

**Nonstop** 98:4

**Norden** 83:24
84:20
101:22

**normal**
347:14

**Northern**

43:25
165:22
166:4,12
167:22
168:3
169:5,9
172:25
173:4
175:6
201:21
207:8
213:8
257:15
342:4

**notarized**
173:7

**notation**
335:3
341:17

**note** 87:17,
18 125:20
183:7,11,
22,25
185:11
187:4,6,
12,16,19,
20,21
188:7
207:13,19
208:13,16,
24 209:3,
4,10,22
214:7
257:11,15,
18,24
321:4
323:12,19

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Sullivan Page 445 of 462   Page 484 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: noted..October

324:2,8
373:9

noted  100:7
    333:20
    343:24

notes  184:23
    295:13
    326:7,23
    359:18,25
    374:9

notice  12:24
    87:9,13
    134:19
    171:12,16

notification
    166:12

November
    87:19
    105:5
    185:12
    186:5
    224:10
    240:7
    327:11

number
    14:13,14
    39:11
    42:19
    52:13
    56:22
    57:5,19,22
    123:15
    129:13
    131:13
    139:7
    145:16

146:22
147:18
152:11,19
162:6
163:9
170:18
172:16
176:1
182:10,21
184:14
188:10
191:15
195:15
201:6
204:9
206:21
211:1
215:16,17
218:17
236:6,23
244:1,20
245:16
246:4
247:1,5
252:20
254:24
274:6,8,9,
15,16
278:3
279:3
280:6
284:22
289:18
292:3
300:5
303:1
334:7
342:21

348:6
353:8
356:3,18
358:1
363:1
365:1
366:1
372:1
373:1
375:7,13
376:2
377:14
378:1
387:4

numbered
    245:13

numbers
    15:24
    266:15
    391:6

_____

_____

O

Oaks  61:23
    235:2

Objecting
    87:10
    88:21
    171:13
    303:12

Objection
    373:19

objections
    101:13

obligated
    360:25

obligation
    215:13

Obligations
    215:9

observers
    96:25

obtain  22:20
    47:10
    229:10
    361:24

obtained
    229:12

obtaining
    126:8

occasionally
    29:7
    133:19

occasions
    156:6

Occupancy
    267:9

occupational
    93:10,18

occurred
    155:21

ocean  35:1,4
    147:14

OCT  90:13

October
    45:25
    49:24
    50:16,21
    51:14

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nubia A. Saylo on Page 446 of 462 485 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: odds..operating

52:20
53:3,5
60:5,9
76:7 89:7
105:5
146:5
148:13
158:11,12
168:7
189:13,21
205:7
210:15
212:13
277:11,18
283:8,16
284:17
286:17
315:10
325:9
330:15
334:20
335:1,6,24
336:2,16
337:4,9,13
338:21
339:8,19
340:2,3,8
341:9
353:23
374:3,9
375:22

**odds** 249:23

**offer** 32:23
82:3
255:19
370:16
374:2,5,7

**offered** 34:6
106:23

**office** 30:6
160:10,12,
14,16
161:13,16
162:7
217:11,13
218:3,4
259:21
332:8,18

**officer**
86:14
123:17
129:15
131:15
145:18
147:20
163:11
170:20
176:3
182:23
184:16
188:12
191:17
195:17
201:8
204:11
206:23
211:3
215:19
218:19
300:7
303:3
334:9
342:23
348:8

353:10
356:20
358:3
363:3
365:3
366:3
372:3
373:3
375:9,15
377:16
378:3
387:6
391:9

**officers**
131:7

**offices**
259:11

**OFFICIAL**
86:12
87:14
88:15,18

**offsets**
279:14

**older** 70:5
72:10
79:11,16

**one's**
328:15,16

**one-time**
54:7
322:21
346:23,25

**one-twelfth**
261:23
262:4

**ongoing** 54:2
119:12
122:18,19
157:5
168:20

**online** 138:2
167:22
251:12
298:9

**onwards**
369:19

**open** 16:19
140:14
305:24
352:5

**openly**
352:13

**operate**
155:2
159:4,6

**operates**
168:19,22

**operating**
90:21
131:4,6
155:7,9,
14,19,25
156:4,18,
21 290:11
312:23
347:12
350:6
357:20
378:13,14
387:16

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Sullivan Page 447 of 462   Page 486 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024     Index: operation..outcomes

operation
  191:7

operations
  156:15
  157:6
  186:11
  191:11

operative
  173:12

opinion
  382:6,10

Opp  298:14,
  15

opportunity
  348:1

opposed
  237:18

Opposition
  87:10
  88:20
  171:12,13
  303:11

optimism
  352:2

options
  144:9

oral  63:3
  69:12

ORAP  49:2
  58:17,24
  59:25
  60:4,14
  247:11,14,
  19

order  29:11
  59:25
  73:23
  91:5,8
  153:23
  223:3
  253:2
  346:11
  372:8
  375:25
  391:16

orders
  351:23,24

ordinarily
  120:23

ordinary
  249:9
  290:11
  328:21

organized
  114:11

original
  70:18
  142:15
  196:20
  212:17
  213:24
  214:22,23
  369:6

originally
  40:13  70:8
  163:5

originating
  343:11

Oringher

49:13,21
50:2,21
51:14
52:11
224:17,21
225:8,13,
17,21
226:7,13,
16,19,22,
25

Oringher's
  50:12

Osterholt
  61:21,22
  62:21,24
  63:2,12
  64:3,19,22
  65:3,9,18
  66:12,15,
  21  67:9
  68:6,23
  70:12,19
  72:25
  73:24
  74:3,15
  75:2,15
  76:2,10,18
  77:2,24
  78:4
  79:21,24
  98:10,18
  99:3
  104:18
  110:18
  113:11
  114:8
  115:5,19

234:19
235:18,23
236:3
244:8
303:22
304:3
305:25
306:12
307:8,16,
19  310:10,
20  311:5
314:3
324:11
332:15
337:10,20
342:16

Osterholt's
  67:19
  110:6,12
  111:3
  114:1,14,
  24  116:7
  263:8
  276:24
  305:17
  306:15
  307:3
  330:5,14

out-of-pocket
  25:19
  236:19,21

outcome
  139:17
  152:25

outcomes
  350:11

outstanding
  187:23
  208:12

overextended
  374:16,22

overnight
  70:22

overseas
  161:20
  162:2,7

overserved
  374:15,19,
  21,24

oversight
  214:1

owe   162:10
  179:4
  180:1,10,
  12 181:11
  208:10
  225:8,14
  226:9
  258:10,23
  272:21
  283:23,25
  284:2,20,
  24

owed   57:2
  119:18
  120:1
  125:16
  178:18
  214:25
  224:21
  225:20
  232:2

  257:15,16
  283:11
  369:20

owes   225:13
  226:3
  258:22
  259:2

owned   86:17
  114:18
  146:1
  195:3,5,9
  279:23

owner   149:9
  194:17,22
  195:8

owners
  192:1,17
  355:22

owners'
  258:3

ownership
  194:3
  195:10
  254:12,16
  255:25

owning   67:15

owns   255:8
  256:14
  262:18

―――――――――
       P
―――――――――

p.m.   116:23
  117:3
  171:4

208:3
218:25
299:24
348:11
352:10
390:23
392:4

Pacific
  160:13
  161:17
  259:11

package
  273:14
  316:7

Page/line
  102:5

pages   82:10
  83:15
  84:15 99:6
  173:11
  184:8
  374:8
  382:3

paid   27:13
  32:3,14
  49:20 50:1
  51:25 52:1
  76:22
  77:1,4,5,
  14,16
  113:1,2
  144:14,15
  148:20
  191:8
  194:13
  196:15

208:17,18
214:24
218:4
226:7
240:17
245:7
248:14,17
253:14
266:9,19
273:15
275:5,14
279:12
283:4
284:9
285:8
286:17
297:1,11,
12 306:17
311:9
316:3,7,
14,25
317:9,17,
23 320:22
321:1
323:15
324:11
326:21
327:15,16,
17 330:17
338:10,13,
14,16
342:15,17
344:21
345:18
355:16
357:11,15
368:22

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/09/25   Entered 06/09/25 18:39:07   Desc
Declaration Exhibit A. Bate 449 of 462   Page 488 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                                Index: pain..pay

pain 269:20

painful
329:16

painted
133:15

painting
248:13

Palisades
160:13
161:17,18
259:12

pan 168:24
169:1

paper 249:8

paragraph
149:24
150:18
231:3
232:14
233:8
234:11,22
237:10
238:10
239:3,12
257:4
279:16
289:8
290:4
305:16
306:18
307:18
308:1
311:8
312:21
369:15

paragraphs
237:6,24

pardon 106:2

parents
65:16 74:5
135:17
282:17
299:11

park 318:7,
12

part 15:21
103:19
158:19
160:23
176:25
179:21,22
205:25
215:8
239:22
243:1,20
257:21
259:6
266:5
316:24
325:18
327:16,17,
20 337:6
352:20
384:12
390:15

partially
286:13
345:1,2

participate
255:1,9,21
260:10

292:9
314:4

participating
255:13,15,
18

parties
227:6
257:5
308:4,21

partners
200:6

parts 130:4,
5,7 214:1

party 59:4,
23 309:4
318:2,3,6,
25

Pascotto
44:15
45:22
46:3,7,11,
17,22,25
47:9 87:8
105:15
109:15
119:21
120:11,13,
16,23
121:3,6,13
164:3
165:5
167:9,15,
19 168:23
199:13
233:18

passed 43:7,
8 140:1

past 77:10
340:20,23

paternal
39:14

path 319:24

Paul 32:8,
11,14
234:2

Paul's 32:9

pause 18:21
64:1 96:8
377:22

pay 14:4,7,
9 25:14,
15,17,19
26:6,17,23
27:1,7,8,
16 28:3,6,
9,12 29:5
30:21,23
31:11
32:11,17
33:23
35:15
49:10,13
52:25 63:9
66:21 67:9
69:8 72:4
73:1 76:18
77:24 78:3
79:13,20
96:15,17
98:23,25

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024                        Index: paying..payments

| | | | |
|---|---|---|---|
| 99:2,5 | 264:17,24 | 138:22 | 223:3 |
| 103:18 | 267:24 | 157:8 | 236:4 |
| 112:24 | 272:12,19 | 187:22 | 240:13,15, |
| 113:25 | 275:21,24 | 275:23 | 19 258:17, |
| 114:3,14, | 279:7 | 336:24 | 22,23 |
| 24 117:16, | 283:17,19 | 337:2 | 279:17,23 |
| 20,22 | 285:10 | 340:19 | 282:24 |
| 119:23 | 286:13,14 | 344:18 | 283:15 |
| 120:8 | 287:18 | 368:18 | 286:20,21, |
| 121:14 | 288:16 | 390:11 | 22,23 |
| 127:13 | 290:17,22 | | 289:11,22 |
| 128:22,23 | 292:7 | **payment** | 290:14 |
| 129:6 | 293:21,25 | 13:22 24:2 | 305:21 |
| 132:5,13, | 297:4 | 25:13 | 328:11,20, |
| 17,23 | 305:25 | 49:23 | 22 335:22 |
| 157:1 | 306:12,15 | 50:16,21 | 336:8,12 |
| 162:1 | 307:7,10, | 51:13 | 337:14,19 |
| 166:24 | 16 308:4,7 | 52:2,8,12, | 342:13,14 |
| 179:22 | 17,21 | 17,21 | 385:10 |
| 187:25 | 311:21 | 112:25 | 386:12 |
| 188:6 | 338:5 | 117:17 | 390:5,10 |
| 191:10 | 341:2 | 119:18,23 | |
| 194:15 | 346:1 | 120:2 | **payments** |
| 202:2,5,8 | 357:8 | 121:15 | 27:23 |
| 205:19 | 360:21,25 | 124:19,21, | 49:15,16, |
| 208:16,21 | 369:20 | 24 128:13, | 17 179:5,7 |
| 214:20 | 370:17 | 25 159:10 | 188:1,3,24 |
| 218:3 | 386:11 | 162:11,23 | 191:4 |
| 226:13 | 388:13,20 | 163:1 | 221:17,21 |
| 232:2 | | 180:25 | 224:4 |
| 233:20 | **paying** 23:8 | 183:21 | 265:18 |
| 235:20 | 24:1,5 | 188:22 | 275:16 |
| 236:2 | 35:13 | 189:15,21 | 279:21 |
| 237:2,3 | 50:11,17 | 194:6 | 280:1 |
| 248:18,21 | 58:9,12 | 197:1,8,17 | 283:7,10 |
| 259:6 | 77:5,7 | 200:4 | 284:3,11, |
| 261:9,12 | 78:8 | 209:9 | 14 285:10 |
| 262:1,2 | 118:21 | 221:13 | 299:1,7,12 |
| | 120:1 | 222:3 | 328:11 |
| | 128:24 | | |

338:20
344:13,16
357:16
364:7
365:20
370:17

**Paypal**  28:4

**payroll**
156:7,8,12
157:8
161:22,24
179:25
191:12
346:1,5
351:1

**pays**  23:6
64:14
67:13 99:3
115:1
208:19
287:25
312:3

**peace**  141:22

**penalties**
216:6
277:21

**penalty**
20:23 22:5
100:1,5
123:10
146:9
148:16
176:21
211:22
242:7
291:18

**pending**  11:7
46:9 47:14
81:2,4
109:8
153:4,22
302:4
330:25

**pension**
36:7,9,15
37:8,14
243:6,19,
20,24

**pensions**
243:22

**people**
26:16,23
27:16
28:12,22
29:1,3
31:25
113:17
137:8
159:21
160:18
161:9
236:13
239:20
269:25
275:22
308:17
331:9
334:5
347:20
379:13
388:20

**percent**
48:10,11

54:16 55:6
95:6
193:2,10,
21 202:3,
9,14
254:12
255:25
256:15
382:7
383:4,18
384:15

**percentage**
254:16
258:3

**percentile**
95:5

**period**  19:21
49:1 56:1
58:16,21
68:10
151:19
155:11
279:12
315:17
370:25
373:22
376:1

**periods**
156:19
344:4

**perjury**
100:1,5
146:9
148:16
176:21
211:22

216:6
242:7
277:21
291:18

**permutations**
350:12,20

**person**
28:20,24
32:21
94:12,13
167:16
184:3
309:12
366:16

**personal**
57:13,16,
21 58:2
60:12
78:14,17
81:8,20
89:17
105:14,25
106:11
110:25
121:11
124:14
180:9
188:25
198:14
199:4
211:13
212:15
217:20,21
220:13
229:2,4,5,
6 241:10
245:8,10,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 452 of 462   Page 491 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: personally..point

25 252:22,
25 267:10
268:16,25
269:3
285:7,13
287:24
319:6
327:16,20
332:10
340:16
341:4
358:11,13,
16 359:7,
19 360:4,6
387:17

**personally**
49:20
50:16
67:11
103:21
126:10
186:22
195:6
197:4,6
225:14
226:6
261:6,8

**pet** 332:11

**petition**
86:20
87:15
148:9
176:11,15

**Pets** 270:24

**phantom**
150:5,11

280:25

**pharmacy**
30:6

**phone** 16:25
59:6
121:7,16
167:16
197:19,21
200:15
247:16
287:5
314:10
332:13,15,
16

**photo**
337:20,25
338:5

**photographer**
68:8,9,12,
13

**photography**
68:17,24
69:4 74:22
75:21,22

**physical**
28:19
93:15
268:21
269:17,18,
22 270:3,
18 327:24

**Picasso**
248:10,16,
18 250:23

**pick** 30:5

32:23

**picked** 80:5

**picture**
338:2

**Pine** 192:2,
6,7
194:18,23
202:13,16,
17

**place** 29:19
70:1
101:10
106:15
130:11
133:15
144:1
244:10
269:13
309:6

**places**
135:22
138:3,5
244:6
269:12

**placing**
186:25

**plaintiff**
59:4,22

**plan** 97:2,4
104:1
109:6
167:25
252:25
265:22
313:10

378:19
379:1,2,7,
12,16

**plane** 68:4
329:8

**planning**
109:5

**plans** 112:25

**plants** 33:3

**plate** 94:5

**platform**
298:9

**platinum**
251:21

**play** 78:10
95:20
371:11

**played**
361:15

**playing**
361:13

**plumbing**
268:2,3

**pocket** 99:2,
5

**point** 24:7
50:18 73:6
74:23
108:1
154:7,9,
11,12
156:23
195:6

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Balevas Page 453 of 492   Page 492 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: points..presents

199:9
202:25
230:13
244:19
250:22
270:5
320:9
328:12
359:5

**points**  87:11
171:14
270:12
304:11

**policies**
216:10

**policy**
60:17,20
61:1 252:3

**Polsinelli**
57:2

**pools**  78:21

**portion**
214:2
221:15
227:24
262:23
275:21

**Portion's**
236:19

**portions**
82:5

**portraits**
342:19

**pos-**  250:24

**position**
173:25
381:12

**positions**
159:24
309:6
384:5,9

**positive**
54:9
321:24
322:19,22
351:8
386:13

**Possession**
83:8 84:8
85:3

**possessions**
60:15
250:4

**possibility**
136:21

**possibly**
92:16
198:18
342:17

**post**  30:6
46:4,8
47:6,11,14
109:10,18

**post-trial**
52:13,15

**posted**  46:13

**posters**
248:8,22

**posting**  46:7
105:20
106:13
109:7

**postpone**
230:22

**pot**  126:17

**practical**
164:18

**practice**
381:13

**PRE**  89:16

**pre-bankruptcy**
274:22

**prebankruptcy**
274:14,18

**prefer**  270:4

**preferable**
64:24

**preference**
355:14

**pregnancy**
68:19

**premises**
134:19

**premium**
267:1

**prep**  239:19

**preparation**
312:22

**prepare**
49:13

241:4
260:19,24
313:13
348:22

**prepared**
146:23
260:4
275:9
279:11
339:23
370:16
381:18

**prepares**
348:23

**preparing**
186:7
212:15
240:25
260:10
303:16
313:2
380:21
386:14
387:19

**prepay**
217:25

**prepayment**
340:25

**prescription**
270:3,5

**prescriptions**
293:24

**present**
362:22

**presents**

331:8

**pressure**
  76:4

**presume**  11:1

**pretty**  78:6
  104:12
  164:17
  223:19
  245:9
  280:8
  311:15

**prevailing**
  59:4,22

**prevent**
  60:7,24

**previous**
  19:9
  155:21

**previously**
  107:5
  277:1
  302:23

**price**  27:6
  117:14
  221:10
  249:15
  382:5,10

**primarily**
  177:4
  322:9

**primary**  18:6
  35:5

**print**
  248:10,14,

16,19
285:25

**prior**  55:18
  82:4
  143:10
  223:1
  231:20
  284:12
  298:20

**privacy**
  80:21
  137:1,8

**private**
  71:10,12
  166:2
  196:13,18
  200:20
  281:13,14
  282:7
  297:14,18
  298:4,16
  300:24
  384:4

**privately**
  115:23

**privilege**
  51:21
  204:3

**privileged**
  48:16
  50:22
  203:25

**problem**
  114:20

**problems**

263:22
268:2

**procedure**
  270:14
  333:1

**proceed**
  205:13
  223:20

**proceeding**
  57:11

**proceedings**
  10:14  64:1
  101:16
  377:22
  392:4

**proceeds**
  205:12
  222:10,17,
  22

**process**
  198:6
  247:19

**produced**
  12:15
  15:21
  20:11
  204:1
  210:16
  372:6
  373:7
  375:24

**producing**
  24:25

**products**
  156:16

**profit**  54:14

**profitable**
  56:10
  344:4

**program**
  79:19
  111:13

**programs**
  79:3

**projected**
  351:8
  385:18

**projections**
  313:2,6
  347:7
  348:14,18,
  20  349:1,4
  385:21
  386:19

**promise**
  162:22,25

**promising**
  251:8

**promissory**
  87:17,18
  183:7,11
  185:11
  187:4,6,
  12,16,19
  207:13
  257:11,18

**prompted**
  52:11
  155:17
  343:10,20

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A. Page 455 of 462   Page 494 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024    Index: pronounce..quarterly

377:5

**pronounce**
72:22

**proof** 86:12
88:18
123:24
125:11
219:3,17,
21 220:2

**properties**
368:6
373:24

**property**
86:17
117:7
122:8
124:20
146:1
147:12
192:17
202:11,14
214:21
231:9
232:11
238:22
245:21,25
287:9
289:9
290:7
359:19
360:4,6
381:21
386:6

**proposed**
379:12

**protect**

158:22

**PROTECTIVE**
91:8

**protector**
170:7

**provide**
11:13
20:14 25:9
29:13,15
34:6 63:2
74:2 138:6
234:23
235:6
238:14,24
252:8
305:17
307:20
309:4
324:13
346:11
362:12
380:25

**provided**
48:22
96:20
110:9
260:18
324:5
339:17

**provider**
270:9
298:2

**providers**
93:14
235:24
270:7

**providing**
310:6
385:22
386:15

**provision**
12:21

**psychiatrist**
93:16
94:15
115:22

**public** 71:10
79:25
80:12,13,
15 204:25
287:17,18

**publicly**
204:21
384:11

**pull** 149:14

**Pulled**
326:24

**purchase**
117:12,14

**purchased**
118:6
212:23
221:9
224:11
248:3
312:12

**purpose**
228:9
324:8

**pursuant**

82:3 372:7

**put** 30:3
46:22 47:1
120:22
138:17
159:17
179:23,24
188:6
210:11
223:2
231:14
245:9
254:20
257:22
279:2
350:18,19
380:3,6
383:4
391:11

**putting**
67:16
138:12

———————

Q

———————

**qualified**
282:21
381:18

**qualify**
22:21
111:16,17

**quarter** 58:5
276:16

**quarterly**
128:3,6,24
129:6

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Pavlevich Page 456 of 462 Page 495 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: quarters..recall

266:19

**quarters**
276:17

**question**
10:24
11:1,7
18:23
45:20
50:25
51:4,16
81:2,4,11
106:8
154:7
164:15
176:25
195:12
198:13
203:11
206:11
218:2
226:23
279:15
307:6
309:19
326:15
330:22,24
331:3
333:1
362:1

**questions**
91:13
108:1
247:17
333:3
343:13
381:3,5

**quickly**
390:20

---

**R**

---

**R-E-F-F-U-S**
192:23

**Rachel**
193:10,14

**Rafaela**
31:8,11,18

**raise**  10:10
69:2 166:8
255:6,22
346:14
347:10

**raised**  13:3,
5 22:14
142:5,8

**raising**  63:6
75:6 142:9
347:5

**RAMLO**  19:2
81:5,24
85:11
184:22
320:6,8
373:19
390:24
391:3,19

**range**  50:6

**rate**  27:2,
17,18,20,
21 267:16
380:19

381:15
383:5,17
384:15
386:10

**rates**  27:12

**raw**  351:22,
23

**re-enrollment**
388:12

**reached**
106:25

**react**  75:8

**read**  51:6,
8,11 59:7,
13 94:7
95:10
100:5
106:9
354:18
390:8

**reading**
94:11,12
106:8
202:7
317:22
335:7
372:15
390:16

**Reads**  102:5

**ready**  166:6

**real**  117:7
128:12
146:18
166:2

289:19,21,
25 290:7
381:21

**realize**
346:22

**realizes**
198:18

**realtor**
142:20,23,
25 143:4

**realtor's**
143:16

**reason**  48:25
65:3 68:23
137:4
140:2
157:21
159:3
212:16
266:4
279:2
324:12
329:14
338:4
343:17
352:1
360:20
376:2
383:7

**reasons**
240:9,11
266:2

**rec-**  340:1

**recall**  11:23
12:9 23:9,

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration of Nicole A. Bulavka    Page 457 of 462    Page 496 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: receipt..recollection

11  37:15
42:3 52:18
117:19,23
122:24
123:8
143:7
174:21
203:3
208:7,23
209:11
218:13
227:9
251:1
255:16
256:21
285:16,20
359:23
360:1
361:5
362:7,14
369:12
371:18,20

**receipt**
173:22
322:21

**receipts**
290:10
387:22

**receivable**
120:1

**receivables**
221:7,10
223:2,7
345:5,21

**receive**  36:5
41:10,23

42:9
111:25
122:15
151:25
152:12,16
154:4,17,
20 164:19
166:14
175:10
186:24
187:3
209:18
243:15
272:20
282:14
288:24
367:16

**received**
42:1 68:12
86:19
95:12
122:25
126:13
130:14,21
148:7
150:21
159:3
166:11
168:5
185:16
186:13
209:21
210:3,10
244:17
281:4,25
286:9
289:2,3
323:2

336:2
362:9
369:9

**receives**
24:15 70:7
96:12
243:10,14
307:12
347:14
355:18

**receiving**
96:10
175:9
203:3
232:16
357:15

**recent**
189:15,21
389:25

**recently**
105:7
142:21
166:17,21
242:22
269:12
308:23
371:19

**recess**  82:1
116:22
171:3
208:2
218:24
299:23
348:10
352:9
390:22

**recognize**
123:22
129:23
131:22,24
145:23,25
148:2
163:16,18
171:8,10,
24 176:8,
10 183:4,6
185:2,7
188:19
191:22
195:22,24
201:13
204:16,18
207:4
211:8,10
215:24
300:10
303:8
334:1,15
343:4,6
349:17
353:15
356:16
358:8
363:8,11
366:8
375:19
378:11

**recognized**
378:8
387:13

**recollection**
18:19
369:17,24

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvato   Page 458 of 462   Page 497 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024        Index: recommend..refrain

371:5

**recommend**
347:5

**recommendation**
96:22

**recommendations**   97:8

**recommending**
346:14

**reconciling**
307:17

**reconsider**
141:1,4

**record**   19:3,
5  51:11
59:13
81:24,25
106:9
116:21
147:23
171:2
206:13
208:1
218:23
320:12
352:8
355:24
356:12
368:18
377:21
391:5,11,
14,24

**recorded**
101:14
350:7

**records**
27:23,25
28:1

**recovery**
380:19
381:15
383:4,17
384:14

**redeemable**
296:18

**redo**   172:16

**redone**
267:25

**reduce**   231:1
385:24
386:12

**reduced**   48:6
49:7,11,14
69:20
111:13
239:15
242:17
274:8,9
349:1
386:7

**reducing**
239:14
259:20

**reef**   253:8
271:15,24
312:13

**refer**   14:1
15:22
16:18  20:6
24:17

53:11
57:25
66:18
150:15
156:17
187:7
258:12,24

**reference**
52:21
248:25
258:17
322:11
352:3
374:25

**referenced**
349:21
353:22
383:3

**references**
262:10

**referencing**
196:5
209:2
224:12
349:24
352:4
368:20
382:11

**referred**
43:23
54:11

**referring**
20:8
24:20,23,
25  28:10
32:21

39:3,5
41:5  42:20
45:6,9
47:21
49:18  54:3
69:17
111:20
121:10
202:13
207:18
224:20
237:17
250:11
256:16
257:10
258:15,21
267:10
309:9,24
313:9
340:1
352:14

**refers**
374:21,22

**Reffus**
192:19,23
193:5

**refinance**
123:11

**refinanced**
123:9

**reflected**
299:13

**REFORMED**
87:5

**refrain**
202:23

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/09/25    Entered 06/09/25 18:39:07    Desc
Declaration Exhibit A Page 459 of 462    Page 498 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: refresh..rental

**refresh** 42:7
  174:4
  210:1
  221:23
  291:21
  373:12,17
  382:20

**refrigerator**
  133:17

**refused**
  119:23

**register**
  190:21

**registered**
  26:11

**registration**
  25:25

**regular**
  93:13
  98:12

**regularly**
  15:20
  104:12
  116:13

**reimbursement**
  244:16,17
  245:2,5

**reimbursements**
  242:9

**relate**
  331:12,25

**related** 35:1
  50:12
  56:23,25

57:10,14,
  16 94:19
  105:20
  107:12
  110:6
  124:9
  157:20
  190:24
  214:25
  217:13
  225:9
  245:8
  258:8
  268:23
  273:1
  289:15
  293:9
  330:19
  331:9
  339:18
  355:4

**relating**
  82:5

**relationship**
  61:24
  62:6,19
  104:15
  105:15
  107:17,23
  108:10
  141:13,21
  169:19
  204:22

**relayed**
  367:13

**relevant**
  72:3,7

  81:21

**relocated**
  23:22

**rely** 343:22

**remainder**
  280:24

**remaining**
  214:14
  284:3
  383:1

**remember**
  23:23
  37:17 51:3
  128:10
  138:23
  139:1,7
  213:12
  282:18
  314:18
  318:17
  319:3
  352:22,23
  359:6,7
  370:12

**remembering**
  203:20

**Remind** 333:6

**reminder**
  48:15

**rendered**
  163:1
  340:21,23

**renew** 112:5
  134:9,15

**renewal**
  112:8,10,
  14,24

**renewed** 12:3
  21:19,22,
  24 112:7
  270:8

**rent** 19:7
  22:8,13
  23:6,8,17,
  18,21 24:5
  25:12
  63:10
  66:21
  67:15
  118:20,21
  132:5,9,
  10,12,21
  133:21,24
  134:2
  142:6
  144:9,11
  145:4,5
  147:14
  160:14
  218:1,3,4
  235:1
  244:14
  268:6
  288:1
  290:16,23
  306:15,19,
  24 307:1,
  11 336:1

**rental** 12:12
  13:1,21
  23:15

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Salvedan A. Page 460 of 462   Page 499 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: rentals..represent

24:1,2
25:13
131:25
134:13
144:25
236:3
244:5,9
245:3
267:11,16
288:2
290:6
386:1

**rentals**
135:10
147:4

**rented**
118:23,25

**repaid**
183:24
190:8
336:10
344:25
345:1
364:3

**repainted**
268:1

**repair**
263:17
332:13

**repaired**
266:22

**repairs**
133:2
263:1,7,13
266:13,20,
21 267:10,

13

**repay**  336:20

**repayment**
188:22
189:12
286:25
287:4
365:16

**repeat**  50:24
124:11
219:18
222:13
331:3
335:5

**repeating**
276:21

**rephrase**
10:25
23:17

**replace**
133:16
135:3,9
174:19

**replaced**
266:22
268:3

**replacing**
174:16
209:3

**replied**
107:1

**replying**
255:19

**report**

90:15,21
149:9,11
156:18,21
162:15
315:10

**Reported**
83:23

**reporter**
10:7,10,17
11:10
15:2,5
25:4,7
51:10
59:9,12
81:25
84:21
101:3,7
106:2
116:21
118:14,19
124:10
188:16
191:14
192:21
201:18
202:4
206:12
208:1
210:22
212:7
213:1,4
217:7
218:16,23
219:8,11,
18 224:7
234:3,6
254:7,9

276:20
277:4
281:19,22
292:16
298:20,22
313:20
317:20
334:5,11
356:22
386:25
391:1,10,
15,20,23

**reports**
312:23
376:15

**represent**
198:11,23
212:14
218:9
225:1
226:16
245:6
247:25
264:10
265:2
267:14
268:9,20
272:9
275:20
276:7,15
280:21
289:10
290:13
291:8
295:19
297:16
315:25

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 461 of 462   Page 500 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024 Index: representation..Resulting

316:19
318:1
332:18
335:14
338:22
340:5,9
385:9
389:19

**representation**
224:19,22

**representation
s** 226:3

**representative**
83:16
84:18
207:8

**represented**
224:24
248:7

**representing**
47:22
166:24
225:12

**represents**
265:3
275:13
297:17

**request**
41:12
44:7,17,18
47:23 48:1
66:5 87:12
121:5,14
153:23
164:24
165:2,6,8,

9,11,23
166:19,22
171:15
199:19,23
230:25
232:3
287:3
380:5

**requested**
44:21
59:3,21
91:18
232:21
363:19

**requests**
165:5

**require**
299:11
358:15

**required**
92:10
110:21
111:19
299:7,8
308:4
313:7,8

**requirement**
299:15

**requires**
97:15,19

**requiring**
73:24

**resale**
253:17

**rescue**

253:10

**research**
137:23
138:1,20,
24 293:1

**researched**
143:14
308:20
309:3

**resell** 112:2

**reservation**
372:11

**reserves**
346:12

**reside** 21:4

**residence**
110:6

**residual**
36:5

**resign** 175:4

**resigned**
174:21

**resigning**
174:23

**resolved**
153:7,25

**Resort**
178:22
287:13

**Resorts**
90:11
375:21

**respect** 50:8
174:1
381:1

**respective**
193:25

**respond**
46:17 66:9
109:15
255:11

**response**
106:1
198:12
375:25

**responsible**
227:6
267:17,21

**rest** 302:3
351:9

**restarted**
344:18

**restate**
206:13

**Restated**
87:5 90:17
378:13

**restaurants**
264:12

**restroom**
218:22

**result** 92:21

**Resulting**
43:24
172:2,23
174:10

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A.Page 462 of 462 Page 501 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: RESUMED..S.C.

192:20
193:9,10,
18 213:14
237:1
256:25
281:5
282:1
291:11
341:22,25
342:3,8

**RESUMED**
117:5

**retain** 95:14
110:2

**retainer**
166:25

**retainers**
205:19

**retirement**
37:20
38:6,9
239:6

**return**
118:10
212:15
281:2

**returned**
68:24
118:12

**returning**
74:15 75:2

**returns**
282:20

**revealing**

304:1

**revenue**
53:24
54:1,17,
20,25
55:5,14,20
56:3
349:4,7,12
351:19,23

**review**
176:17
177:24
187:20
285:2
291:21
386:17

**reviewed**
171:17
216:2
229:21
303:18
345:24
350:19

**reviewing**
385:23

**REWARDS**
90:14

**rights**
198:4,8,10

**ring**
251:14,20,
21 252:15

**Road** 11:15,
18 12:4
13:25

21:7,10,12
23:13,19
24:4

**Roberto**
103:17

**Robinhood**
294:13

**rock** 192:2,
6,7
194:18,23
202:13,16,
17 272:1

**role** 53:18,
19 160:1,
2,3 174:24
198:1
386:14

**roles** 160:5

**Rolex**
251:17,23

**rolled**
209:16
252:20

**Ron** 169:15
174:21,23
175:3
234:16
275:5,6

**Ronald** 21:1

**roof** 135:18

**room** 72:12
79:12 90:8
337:11
362:17

371:23
372:8,13,
18

**Rose** 309:25

**rough** 391:21

**roulette**
361:15

**round** 17:10
255:9

**rounds** 17:8

**Rubenstein**
145:3

**Ruffin**
32:10,11,
15

**Rule** 91:5
372:7

**rules** 10:22

**ruling** 47:25
48:4

**run** 30:5
159:12
218:21
298:12

**running**
138:11
294:2

**rushed** 247:8

_____

          **S**

_____

**s-** 200:18

**s.c.** 220:9

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: Sachs..season

Sachs   181:2

salaries
  160:4

salary
  111:21
  159:9,10
  289:3
  344:10,21
  357:9,12,
  14

sale
  222:10,22
  242:11
  322:15,21
  355:21

sales
  155:22,23
  157:1
  161:8
  222:17
  242:10
  245:3
  346:24,25
  347:1,3
  351:12,13,
  15

salt   253:8
  271:11,15,
  24

Santa   114:23
  117:9
  147:1
  381:22

Sarah   90:6
  192:20
  193:5

366:13
367:1

Saturday
  73:18

saved   160:6

saving   17:6

savings
  14:23,25
  15:13
  16:2,11
  20:16,21
  253:23
  281:10
  340:6

scenarios
  350:15

schedule
  64:21,23
  65:5,11,15
  73:12,14
  113:14
  212:2
  216:13,25
  245:20
  277:10,16,
  21 279:3,
  25 281:16
  286:23
  292:4
  360:10
  364:20
  365:9

scheduled
  52:22
  114:11
  240:1,2,4

361:19

schedules
  88:14
  122:21
  176:14
  183:9
  190:12
  211:12
  212:17
  213:24
  225:18
  229:1
  261:1
  302:15

scheduling
  94:4
  113:19,24

Schiavone
  88:8
  201:20,24

school   71:3,
  5,7,9,10,
  11,12,16,
  21 72:1,10
  74:16 75:3
  78:24
  79:10,14,
  25 80:12,
  13,15
  96:13,14,
  19,20,21
  97:1,7,9,
  10,11
  111:8
  113:10,12
  299:1,3,11
  309:2,14,

17,21
  310:7
  319:11
  321:2
  335:18
  336:20
  388:7,11,
  13,14
  390:12

school's
  96:22

schooling
  71:18

Schwab
  294:20
  296:25
  297:6

score   284:8

Scott's
  179:22

Scroll   389:5

scuba   35:2

SDV   196:6,
  12,18
  200:3,10,
  12,18

sea   272:3

search
  146:24

season
  112:2,5,
  10,14,24
  113:4,7
  265:13

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvidar Page 464 of 462 503 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: seats..set

266:9
382:17,23
383:8

**seats**
112:17,21
242:15
329:15
330:1
383:12

**sec-**  369:14

**section**  99:9
112:19,20,
23 222:7,
23 281:3
359:12,17
360:12

**sections**
268:14

**secure**  22:12
379:11

**secured**
47:17
382:6

**securing**
47:16
379:19

**securities**
294:12
295:2
355:15

**Security**
37:21
243:6,10
272:22

**seeking**
81:20

**sees**  104:7
307:24

**self-employed**
148:21
149:10,11
272:23

**sell**  123:12
205:16
242:14,17
251:7
252:21
253:4
383:8,12

**seller**
222:9,16,
20

**selling**
142:19,23
143:6,12,
13,24
251:12
252:24
382:7

**semesters**
71:24

**send**  110:8
167:17
175:11
203:12
341:16
343:10,20

**sending**
79:25

**senior**
362:16

**sense**  113:21
149:6

**sensitive**
92:21

**sensitivities**
81:18

**sensitivity**
95:16

**separate**
28:2 82:12
257:12
332:11
333:3

**separated**
116:15

**September**
87:17
111:9,11
158:12
178:9
183:12

**series**  87:21
88:5,9,11
89:8 90:5
107:22

**serve**  247:13

**served**
247:11,14,
19 370:4

**server**
247:19

**service**
271:8

**service-
related**
25:24

**services**
32:18
96:10,12,
15,17,20
110:3
163:1
239:17
240:24
260:21,23
340:20,23

**Servicing**
124:13

**session**
64:18 86:6
96:18

**sessions**
64:14
269:4

**set**  20:1
27:19
32:2,13
39:4,7,10,
13,16,25
42:15,19,
23 43:12
44:2,15
47:23 48:1
101:10
105:8
106:25
163:21

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nina A. Salvador   Page 465 of 462   504 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: Seth..showing

170:2
228:8
294:2
318:9
319:1
333:3

Seth   10:5
11:15
26:12
36:17
43:24 50:3
83:7,17
84:7,17
85:3 86:4
87:12
88:6,10,
12,22
89:10,22
90:5,8,10,
13 100:16
102:2,3,25
171:15
172:2,22
174:10
193:18
202:22
213:13
226:18
237:1
256:24
281:5,25
291:10
303:13
341:22,25
342:3,8
372:12
375:22
385:21

Seth's   202:9

setting
113:17
251:22

settle   374:3

settlement
121:15

seventeen
176:24
177:17
179:11
180:20
181:16

seventh
181:15

shape   386:8

share   70:6
202:10,14
205:13,14
255:8
352:17
362:17
372:11
384:13

shared   40:2
42:22
43:22
107:5

shareholder
205:2,5

shares
149:25
150:4,16,
17,21

151:2,4
205:1,10,
12,16
206:4,17
254:21,23,
24 257:25
258:3
293:5
296:17
314:14
341:23
355:4
357:4

sharing
136:22

SHC   228:3

She'll   63:14
113:22

sheet   86:17
102:1
146:2
210:16,18
275:9
300:4
353:21
354:5,14,
19,24,25
355:1
356:6

Shell   328:11

Shellpoint
124:9,13
126:6

Sherman
61:23
235:2

shoes   67:5

shoot   337:20
338:1,5,17

shopping
241:15

short   24:6
115:15
159:14
347:8

shorter
238:4

Shorthand
84:21
101:3,7

shot   346:21

show   20:5
25:2
111:19
171:6
183:2
226:12
281:21
300:2,17
302:23
327:1
361:20,21,
23

showed
132:19

shower   268:2

showing
123:20
129:21
131:18

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 406 of 462   Page 505 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024
Index: shows..small

145:21
147:25
149:16
163:14
176:6
184:25
188:15
191:20
201:11,15
204:14
207:2
211:6
215:22
219:2,15
333:24
334:13
343:2
349:15
353:13
356:14
358:6
363:6
365:6
366:6
372:6
373:6
375:18
378:6
387:11

**shows** 173:20
375:25

**shut** 351:3

**sia** 327:11

**siblings**
34:14

**sic** 59:17

143:19
154:16
159:9
345:24

**side** 142:1
169:23,24
189:24
193:7,16
278:11
359:15

**sign** 12:11
110:20
208:24
209:4
217:21
227:11
299:16
364:10,13

**sign-** 110:16

**signature**
146:3,4
148:10
211:19
242:2,4
291:14
363:16

**signed** 11:21
12:5,7
110:24
146:8
150:23
173:3
176:18,20
209:6
211:16
216:5

227:7
229:9,22
250:9
291:17
353:2
365:11

**significant**
35:7 74:9
238:13

**signing**
110:16

**signs** 93:5

**similar**
251:12
345:23

**single** 64:18
300:3

**sist-** 313:23

**sister's**
169:25

**sisters** 31:6

**sit** 98:7
103:10,23
134:2
329:11
367:9
386:22

**sitting**
15:25 81:8
225:7
226:5
230:15
232:7
259:1

323:3
338:15
357:3

**situation**
75:13
107:15
108:22,25
166:1,18
200:10,13,
16 250:2
350:20
380:7
384:17

**six-five**
329:16

**sixth** 181:2

**sixty** 112:9
148:8

**sizable**
345:6

**slamming**
96:2

**slap-happy**
249:19

**sleep** 203:19

**slight** 54:13

**slightly**
54:8 125:5

**slots** 361:16

**small** 29:18
56:13
245:9
262:6
359:8

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Rauler Page 467 of 662   Page 506 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: SMS..space's

361:4
384:12

SMS  66:6

snails  272:3

Social  37:21
  243:5,10
  272:22

soda  370:9
  374:20

soft  272:4

softening
  155:22,23

sol-  320:15

solar  273:18
  319:9,13,
  16,19,23
  320:14,15,
  19

sold  36:7,
  9,14,25
  122:6,7
  123:7
  224:10
  243:19,21
  253:13
  293:5
  323:3

sole  78:6

solemnly
  10:12

solutions
  69:19
  136:17

son  13:12,
13 61:3,5,
14 62:1,21
63:2,6,8,
19 65:2
67:4,11,13
68:6,11,25
69:2,6,9,
10 71:3
73:5
74:12,16
75:7 76:12
77:19
78:23
79:25
95:12
98:11
103:6,22
104:3,5,18
109:24
110:1,3
111:8
113:10
114:9,12
115:8
116:6
118:1
136:14
164:8
236:9
237:3
264:21,23
273:18,23
278:4
308:6,25
309:4,11,
13,20
310:3,6,

11,14,21
312:14
316:22
317:1
318:14
319:10
320:18
329:9,11,
15,24
331:12,16,
17,21,23
332:1,16
337:21,25
339:4
360:21
370:22

son's  61:7,
  11,25
  62:3,7
  64:21,23
  65:5,10
  70:9 78:23
  80:24 82:6
  92:7 97:13
  115:21
  278:5
  307:20
  308:3,7
  309:2,12
  335:19
  390:11

Sonata  26:4

sort  107:5
  143:25
  298:16
  380:3

sorted
  289:17

Soulcycle
  78:12

sound  95:23,
  24 96:3

sounds  49:25
  92:21
  95:17
  96:5,7
  134:8
  158:7
  302:22
  315:19
  337:24
  362:11
  364:2
  367:4

source  38:23
  55:14 78:6
  111:24
  120:2
  280:16

sources
  291:3

space  29:14,
  15 32:22
  137:12
  160:10,12
  161:13,17
  162:7
  217:12
  259:21

space's
  160:14

Spanish
  98:19

speak   352:5

speaking
  104:20,21
  141:10
  240:10
  342:2

special
  92:12
  128:25

specialist
  106:22
  109:22

specialized
  309:11,14,
  20 381:13

specific
  22:1 26:22
  28:20,24
  39:5 41:7
  46:15 53:5
  55:9 60:11
  63:7 93:5
  152:8
  154:12
  191:7
  239:15
  252:19
  330:21
  348:19
  351:19
  352:17

specifical-
  60:11

specifically
  24:20 33:1
  35:19
  43:18
  46:6,14
  65:14
  67:11
  75:20
  108:12,23
  308:21
  350:16
  352:13
  379:18
  380:1,16,
  24

specifics
  37:18

spectrum
  92:16
  94:22

speculative
  298:17

speech
  93:11,22,
  23 94:12
  96:9 335:7

spell   64:8
  72:20
  234:3

spend   17:7
  57:20
  104:5,9
  116:6
  136:1
  139:25
  262:25

263:17
  278:4
  307:24

spending
  274:13

spent   27:25
  34:4 56:17
  57:18 58:2
  66:23
  156:22
  268:4
  274:23

Splinterland
  298:8

spoke   127:19
  184:3
  309:23
  310:2
  314:2
  352:12

spoken
  105:11
  141:8
  235:19
  306:1
  310:5

sporting
  67:5

sports   72:10
  79:12,16

square   85:18
  160:17

stage
  298:16,17

stagnant
  169:2

stairs
  135:12

stamp   250:11
  343:12

stamped
  124:5
  125:8
  192:3
  300:12
  366:19

stamps
  250:13,14

standard
  58:24
  59:16

standing
  96:1

standpoint
  158:19
  231:19

Stars   84:24
  85:6

start   23:8
  93:25
  172:19

started
  74:16 75:3
  80:7
  187:22
  256:17
  320:6

Starting

249:19

**startling**
96:3

**starts**
237:10
314:20

**state** 84:21
100:12
101:8
238:10,20
239:9
301:22
305:17
306:18
307:18
308:1
311:8
345:3
368:4,23
369:14

**stated**
222:23
232:15
238:6
281:24
312:12

**statement**
15:15,17,
22 41:9
60:13
89:6,18
90:12
132:19
149:1
175:12,14,
18 202:18

215:12
243:1
244:23
245:18
304:18
308:12
334:18,19
339:15,23
340:2
344:8
358:11,13,
16 375:21
378:20

**statements**
20:4,5,6,
7,8,10
42:8,9,12
66:18
146:11
175:21
229:24
230:5,10
237:9
238:3
244:3
260:16
281:1
284:9
305:13
307:17
339:16
385:19

**states** 83:1
84:1 90:22
213:19
231:6
304:10

312:21
314:2

**STATISTICAL**
88:17

**stay** 46:8
69:1 78:2
109:7
140:21
371:21
372:17

**stayed** 130:7
142:16
372:16

**stenographical
ly** 101:14

**step** 48:14

**stepfather**
105:15
107:18,24
108:11

**stepped**
174:24
373:23

**steps** 12:22
247:18
379:10

**Stetson** 90:6
366:13,20
367:14

**Stibbs** 87:6
163:24

**stipulated**
47:24

**STIPULATION**

91:5

**stocks** 41:6,
7

**stone** 251:21

**Stoneybrooke**
255:24
256:5
288:5,12
295:21
296:2
335:10

**stop** 68:16
104:21
205:5
241:4
306:11
337:2

**stopgap**
175:3

**stopped**
119:25
239:17,18,
20,21
310:17
315:13

**storage**
287:17,18

**store** 287:23

**stories**
135:12

**strained**
141:13,21

**stress**
312:14

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Saucier Page 470 of 462   Page 509 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024        Index: stretch..SULLIVAN

**stretch**
  299:21

**strike**  307:6

**Stuart**  87:6
  163:24

**student**
  336:16,24

**stuff**  81:18
  287:25

**subject**
  202:16
  207:12

**subjective**
  126:17
  157:3

**submission**
  303:23
  304:6

**submit**
  167:4,5
  198:23
  288:13
  303:22
  304:3,5
  361:3

**submitted**
  14:2
  24:18,19,
  21  47:18,
  20,22
  53:10
  66:17
  167:11
  211:21
  216:5

285:3
313:10
378:20
379:1,2,5,
7

**subpoena**
  49:2

**subscribed**
  101:17

**subscriptions**
  331:25

**substance**
  75:3  80:10
  223:16

**subsumed**
  259:5

**successful**
  49:8

**Successor**
  174:11

**suffered**
  92:20

**sufficient**
  238:23
  346:12

**suggesting**
  270:14

**Suite**  84:24
  85:6,19

**SULLIVAN**
  10:20
  14:19  15:6
  19:10
  25:6,8

36:18,21,
24 37:6
47:8 49:3
51:1,5,8,
21,24 52:9
59:2,5,10,
24 63:25
64:2 81:7,
13,15 82:8
85:17 86:4
92:6 103:4
106:6,16
108:6,8
115:14,17
116:19
117:6
118:16,22
123:13,19
124:12
129:12,19,
20 131:9,
12,17
133:20
145:14,20
147:16,24
149:23
163:13
170:16,22
171:5
172:9,13,
18,20
175:24
176:5
182:19
183:1
184:12,18,
23,24
185:4,6

188:8,14,
17 189:20
191:13,19
192:23,24
194:21
195:2,19
201:4,10,
19 202:6
204:7,13
206:7,14,
19 207:1,
23 208:4
210:20,23
211:5
212:8,9
213:6
214:10
215:15,21
216:21
217:8
218:15
219:1,10,
12,14,20
221:2
224:5,8
229:16,17
234:7
237:21,22
249:20
252:7
254:8,10
255:3
272:16
276:22
277:5,8
281:20,23
286:3
292:17,20

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/06/25   Entered 06/06/25 18:39:07   Desc
Declaration Exhibit A. Part 11   Page 471 of 462 510 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1   04/16/2024

298:21,24
299:18
300:1,9
303:5
313:22
317:21
320:13
321:17
324:22
326:16,19,
22,25
327:3,4
331:4
332:20,24
333:13,23
334:3,12
342:20
343:1
348:5,12
352:11
353:6,12
354:10,13
356:1,13,
24 357:22
358:5
362:23
363:5
364:22
365:5,23
366:5
371:24
372:5,22
373:5
374:1
375:5,11,
17 377:13,
18,23
378:5

385:8
386:23
387:1,9
391:12

SULLIVANN@
WHITEANDWILLIA
MS.COM   85:20

sum   75:3
80:10
223:16
305:22
345:14

summaries
330:14

summary
86:17
88:16 89:5
146:1
215:25
300:14,18,
23 330:5

summer   94:1
116:14
122:16
123:2

Sunday   73:18

Sunset
217:9,23

Super   354:21
355:12

supplement
303:11
388:11

supplemental
88:20,22

303:13
305:11

supplements
271:9

supplies
276:2
332:5

supply   160:1
161:8

support
24:10
25:10
28:12 34:7
38:20,22
63:2,5,8
68:7 73:24
74:3 75:9,
11 76:11,
17 87:13
88:23
96:23
97:12
110:25
140:19
160:1
171:16
215:9
234:14,20
235:8
237:2
238:14,24,
25 280:2
303:14,23
304:6
305:19
313:10
324:4

352:24
370:25
390:5

supported
68:14

supporting
24:8 68:16
75:15
326:4

supposed
253:12

SURETY   89:18

surmise
267:15

Susan   143:19

suspended
342:9
344:13

suspension
344:15

Suzie   132:1

Swim
294:19,21

switched
73:10,11
297:11

sworn   10:6
101:11

_____

T

_____

t-shirts
318:12

**table**  67:17
  89:15
  150:15
  356:25
  367:1,6,9

**takes**  17:7
  30:8
  104:12,13
  116:14

**taking**
  103:13,14
  104:19
  319:4
  386:5

**talk**  45:19
  63:20
  78:14
  105:24
  106:10
  130:13
  141:24,25
  142:2
  198:15,20
  199:9
  200:15,25
  361:6

**talked**  45:21
  47:15
  96:19
  103:24
  126:18
  139:15
  140:7
  143:1
  149:25
  163:21
  200:6

235:17
265:12
295:2,11
312:3,24
314:9
341:12
384:16,19,
  21 388:20

**talking**
  28:15
  48:19
  57:17
  106:4
  172:23
  178:8
  200:7
  237:14
  308:17
  309:5
  334:6
  365:8
  380:7

**talks**  98:19

**tank**  253:8,
  15 271:3,
  4,10,12,
  15,19,24,
  25 312:13

**tasks**  28:11
  33:5

**tasted**  370:4

**Tasty**  295:5

**Tata**  327:11

**tax**  90:12
  124:20

149:7,8
212:15
260:20,23
266:2,4
272:22
281:2
282:19
370:17
386:6

**taxes**  128:12
  149:12
  212:21
  260:24
  272:7,11,
  12,19,21,
  22 278:20
  279:3,6,
  10,12,13
  289:19,21
  290:1

**team**  159:7,
  16,19
  160:20
  380:18

**technically**
  163:5

**Technologies**
  84:20
  85:16
  86:11 87:4
  88:4,21
  89:4 90:4
  91:4,7
  178:5,12,
  19

**TEDFORD**

18:25 19:6
36:16,19,
  22 37:1
48:13,20
50:24
51:3,7,15,
  23 52:6
63:23
81:10,14,
  23 82:3,9
85:5 106:5
107:25
115:11,15
116:20
129:17
131:11
163:4
172:8,11,
  15 185:3
189:19
194:19,24
207:21,25
216:16,20
219:6,13
220:21
229:15
237:17
249:11,14
277:7
299:21
320:1
326:14,17,
  20,24
327:1
330:23
331:1
334:2
354:9,11

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:35:07   Desc
Declaration Exhibit A. Page 473 of 462   Page 512 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024        Index: Telephone..things

391:18,22

**Telephone**
63:17

**telephonic**
59:1,20

**telling**
199:6

**tells**  201:25

**template**
358:23
359:4,9

**ten**  37:11
95:6
117:24
159:22
160:20,23
165:16
181:16
212:24
215:6
231:4
232:14
233:8
265:22
291:2
311:8
317:6
389:15

**ten-month**
265:22

**tenant**  132:3
134:4
135:3

**tennis**  78:10

**term**  11:22
12:18 22:1
43:4
210:16,18
353:21
354:4,14,
18,24,25
355:1,4
356:6

**terminate**
12:22,23
20:23

**terminates**
22:6

**terms**  70:25
123:8
129:5
173:23
187:18
209:9
342:7,11
354:16,21
355:8

**Terry**  179:12
184:2
202:22

**test**  323:9

**testified**
10:8
130:21
316:3
339:11

**testify**
216:16

**testifying**

121:9

**testimony**
10:13
100:8
101:12
157:17

**testing**
160:3

**tests**  95:4
389:13

**Texas**
273:12,17
320:6

**text**  63:16
66:7
200:12

**thanking**
349:21

**Theodora**
49:13,21
50:2,12,21
51:13
52:11
224:17,21
225:8,13,
17,21
226:7,13,
16,19,22,
24

**therapist**
93:11,22,
23  96:9
115:24
270:18
327:24

335:8

**therapists**
115:22

**therapy**
93:10,18
115:20
116:1
235:13,24
268:21
269:17,18,
23  270:3
377:8

**thereof**
87:13
88:23
101:16
171:16
303:14

**therewith**
308:22

**thing**  72:16
259:4

**things**  25:19
29:8,10
32:23 33:5
67:13
81:21 94:5
95:8 97:11
103:24
135:21
166:3
203:20
245:7
246:13
267:2,17,
19  268:13

270:13
282:20
316:6
330:19,21
331:9
360:9

**thinks** 36:19

**thirteen**
159:21

**thirty** 54:16
55:6 58:23
59:16
387:22,25
388:3,25
389:2,15

**thirty-day**
12:24 49:1
58:16,21

**thirty-five**
41:13,19
42:16

**thought** 37:2
51:5 56:4
134:24
136:5,11,
17 140:15
142:11
203:24
205:21,24
243:18
250:2
289:13,21
311:2
325:17
334:3,4

**thoughts**
352:16,17

**thousand**
166:25
179:18
201:1
243:12
249:16
262:7
264:16
268:5
273:2
274:24
275:1
289:24
318:5,8
327:18
336:17
363:24

**thousands**
236:24

**three-plus**
344:3

**thrown**
330:13

**Thursday**
31:24
72:11
73:17

**ticket** 68:4
113:4
133:18
242:10
245:2

**tickets**
112:2,5,

11,15,18,
22 242:12,
17 265:12,
13,16,21
266:6,10
329:8
382:17,23
383:8

**tied** 16:15,
17 17:12,
15,23,24
18:1,8,11,
14,18
19:15,19,
24 136:15

**time** 11:5
12:3 13:3,
14,15
19:21
22:13
35:21 36:2
37:7 42:1
44:25
45:21,23
56:1 58:24
59:16
65:23
68:10
69:7,19
70:6 75:14
77:1 80:3,
13 99:5
101:10,11,
13 104:5,9
107:1
109:9
116:6

118:6
120:10
122:2
123:3
125:18
130:19
137:12,24
139:13,25
141:3
142:3,5,22
143:2,3
145:5
148:25
151:19
155:11
156:19
159:17
160:23
166:16
168:2,9,12
169:18
175:2
183:20
185:15,23
186:2
198:19
202:1
207:8
208:18
214:21
221:14
223:14
232:18
247:10
256:9,19
262:25
267:20
269:2,8

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration of Nicole A. Salvato - Part 2    Page 514 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: timeframe..total

| | | | |
|---|---|---|---|
| 279:12 | 227:13 | 226:5 | 88:5,9,11 |
| 285:19 | 259:13,17, | 230:15 | 89:8 90:5 |
| 292:10 | 18 311:3 | 232:8 | 110:22 |
| 293:15 | 344:20 | 238:18 | 112:12 |
| 309:17 | | 239:1 | 172:14 |
| 310:16 | **timing** 158:6 | 254:16 | 189:2 |
| 315:17 | 210:8 | 256:5 | 222:7 |
| 318:20 | | 259:2,14 | 268:15 |
| 328:5 | **tiptoes** 93:4 | 280:7 | 276:1 |
| 342:19 | **tired** 390:18 | 293:16 | 280:12 |
| 344:19 | | 323:4 | 288:5 |
| 347:7 | **tires** 25:25 | 343:23 | 326:5 |
| 349:22 | **title** 114:19 | 349:23 | |
| 362:8 | 200:7 | 357:3 | **topics** |
| 367:22 | | 378:15,24 | 105:10,12, |
| 368:7,21 | **titled** 26:11 | 386:22 | 17 107:6 |
| 369:5 | 385:21 | | **total** 124:24 |
| 370:6,25 | **today** 16:1,4 | **today's** | 125:11 |
| 371:16 | 30:11,13 | 150:20 | 133:21 |
| 373:22 | 31:20 | **toilet** 268:3 | 151:9 |
| 376:1 | 40:4,7,15, | **told** 19:8 | 152:11 |
| 377:4 | 22 70:2 | 38:11,12 | 179:1 |
| 383:1 | 93:8,19,23 | 48:9 76:10 | 185:18 |
| 386:11 | 95:17 | 105:9 | 190:8 |
| **timeframe** | 110:3 | 140:21 | 221:19 |
| 169:12 | 123:21,25 | 203:14 | 257:22 |
| **timeline** | 129:22 | 240:18 | 274:19 |
| 107:22 | 130:3,11 | 255:20 | 277:25 |
| **times** 19:23, | 160:22 | 367:14 | 283:3 |
| 25 20:2 | 162:11 | 374:6 | 285:7 |
| 32:1 74:5 | 171:18 | | 290:23 |
| 85:18 | 172:4,24 | **tomorrow** | 307:7 |
| 104:14 | 180:13 | 20:24 | 321:6,13, |
| 105:5 | 208:11 | **tonight** | 20 323:20 |
| 116:5,18 | 214:11 | 203:20 | 324:4 |
| 122:7 | 216:14,17 | **TONY** 87:20 | 325:22 |
| 128:4 | 219:24 | | 357:19 |
| | 220:17 | **top** 73:21 | 368:16 |
| | 225:7 | 87:21 | |

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/09/25   Entered 06/09/25 18:39:07   Desc
Declaration of Nicole A. Baldwin Page 476 of 662
Exhibit A Page 515 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024          Index: total-..trust

372:19
375:25
383:2

**total-**
319:25

**totalitary**
319:24

**totality**
320:1,2,
15,18,20

**totally**
59:11

**town**  30:9
104:13
247:22,24

**townhome**
117:9,10,
12 118:18
119:4
122:2
245:24

**townhouse**
128:16
135:4,12
144:6,13,
15,16
145:9
147:1
215:1
228:13
266:12
290:17,22

**track**  307:15
368:18

**trade**  29:8

295:5
361:19,21,
23

**traded**
204:21
384:11

**trailing**
347:1,2

**trails**
351:24

**trainer**
268:25
269:3

**training**
268:22

**tranche**
196:25

**tranches**
196:19

**transactions**
190:23
224:1,5

**transcribed**
101:15

**transcript**
86:5 100:6
101:15
391:17,21

**transcripts**
82:5

**transfer**
337:4,10
341:9

**transferred**
334:23

**transferring**
159:1

**travel**
239:16,24
273:1,5
274:21,22,
24 278:24
315:21
316:18
327:9
332:14
389:17

**treatment**
97:2,9
308:5
309:4

**trial**  103:6,
11,22
186:8
191:11

**triathlon**
268:23

**trip**  239:25
240:12,16
273:14,15
316:4,11,
20,25
319:5,8,10
327:15
329:9,12,
23 361:18
371:7,15,
22 389:21,
22

**trips**  77:16
273:5,7,22
315:7
389:25

**trouble**
92:14
93:3,7
98:8

**truck**  318:10

**true**  55:16
100:9
101:15
146:12
148:16
176:21
211:22
215:12
216:7
229:25
230:3,4,5
237:9
238:3,18
239:1,7
254:15
280:6
284:3
290:21
304:18,20,
22 305:3,
14 344:8
367:3

**trust**  39:8,
13,18,20,
24 40:1,2,
4,7,9,10,
15,18,21
41:11,13,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Sullivan   Page 477 of 462   Page 516 of 1079

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024                    Index: trust's..turn

24 42:2,8,
10,14,24,
25 43:2,
21,24,25
44:10
58:6,10,
11,12
87:5,6
111:25
119:22
120:14,17,
19,21
121:18
151:22
163:19,20
164:14,20
165:15,19,
22,23,25
166:1,4,7,
12,15,23
167:6,11,
18,23
168:3,6,
11,13,17,
19,22
169:5,6,7,
9,10,11,13
170:1,5,7
172:2,3,
23,25
173:4,12
174:1,6,
10,17,20,
21,23
175:2,5,6,
21 184:4
192:20
193:3,10,

12,18,24
194:15,22
195:3,9,11
197:5,16
198:5,13
199:3,13
201:21,22
202:2,5,8
207:8,19,
20 208:5,
14 213:8,
14 214:14,
19 228:3,
7,8,9,10,
11,12
231:8,17,
19,22
232:11,17,
21 233:6,
10,19
237:1
256:25
257:15
281:5
282:1
291:11
295:10,24
296:2,13
305:9
336:3,5
341:22,25
342:2,3,4,
8 367:22
383:16

**trust's**
58:9,12

**trust-reporting**
175:10

**trustee**
41:16
120:17
169:5,8
296:23
325:4

**trusting**
215:6
383:23

**trusts**  38:25
39:2,4,5,
9,11 42:19
43:11
44:2,15
120:24
192:11,14
193:3,12

**truth**  10:14,
15

**Tuesday**  72:9
73:16

**tuition**
78:24
79:2,20
111:13
299:12,16
335:19
390:10

**turn**  17:17,
19 124:5
125:10,19
149:24
171:20

172:6
173:3,19
174:9,14
176:24
177:16
179:10
211:25
213:7
216:22
217:4
218:5
220:5
221:22
222:6
223:25
224:9,14,
15 227:18
228:2,14
229:18
241:24
243:7
245:13
246:4
257:3
258:5
259:8
275:2
277:9,24
280:10
282:23
287:16
288:18
289:6
290:2
291:1,13
292:2
298:18
304:8

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration Exhibit A Page 478 of 462   517 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024     Index: turned..understanding

305:11
312:16
314:19
326:12
328:8
329:3
359:16
360:11
366:18
385:18
388:3

**turned** 17:16
296:22

**Turning**
172:21
259:25
380:8

**tutor** 93:12
94:4,8,10
96:9

**twelve** 13:4
39:25
92:19
116:4
160:20
173:11
265:18
346:13
351:24

**twelve-month**
347:1,2

**twenty** 11:19
38:19,21
177:20
200:24
268:5

271:13
310:16

**twenty-five**
24:7,9
113:6
202:3,9,14

**twenty-four**
351:25

**type** 128:9
210:12
271:23
292:9
308:13,16
309:6,8,9
363:12
382:13

**typed** 190:15

**types** 271:18
281:11
360:9

**typo** 184:10
294:21
301:14
302:18

**Tyson** 90:8
362:15
372:12

———————

——— U ———

**U-SLASH-I-**
**SLASH-D**
228:4

**U.A.** 225:3

**U.K.** 142:14

**U.S.** 296:23
325:4
359:8

**Uh-huh** 148:3
204:4
242:1
284:13
301:12,20,
25 383:6

**ultimately**
356:8

**unable**
138:13

**unanimous**
89:12
353:4,18
354:1

**UNANSWERED**
91:13

**unanticipated**
54:24

**uncertainty**
119:15
385:1

**uncle**
169:21,22
179:15
184:3

**unclear**
200:5

**uncles** 142:4

**uncollectible**
295:17

**undersigned**
101:7

**understand**
10:24
15:25 43:6
57:7 66:22
67:2 81:17
132:15
165:14
198:1,3
200:8
232:10
259:1
261:25
271:17
309:18

**understanding**
58:22
59:14
60:14
131:4
150:10
170:11,14
194:7,13
197:11
202:12
205:20
209:8
227:2,5
228:25
231:7,13,
15,16,22
232:4,7
260:15,17
274:17
281:2
308:13,16

Case 2:23-bk-16904-BR   Doc 366-1   Filed 06/00/25   Entered 06/00/25 18:39:07   Desc
Declaration of Nicole A. Salvato Page 479 of 462 518 of 1079
IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024     Index: understands..vehicle's

384:18

**understands**
   76:3

**understood**
   11:2
   206:15
   354:21

**unemployment**
   272:21

**unfortunate**
   323:11

**unintelligible**
   281:18
   317:17

**unintentionall
y**   165:14

**Union**   180:20

**unique**   98:21

**unit**   117:11
   135:20
   355:12

**United**   83:1
   84:1 90:22
   329:21

**units**   150:16
   151:3,5
   152:9,10,
   12,16,20
   154:14
   354:22

**Universal**
   298:10

**unknown**

217:11
224:17
225:5,6,9,
15,22,23
226:4
256:25
257:1
350:11
355:7
384:6

**unpaid**
   221:15

**unrelated**
   257:14

**unreportable**
   14:16 19:1
   47:2 51:2
   133:12
   149:19
   206:5
   214:9
   220:24
   252:6
   255:2
   272:14
   286:1
   292:15
   317:18
   320:5
   321:15
   324:21
   333:10,17,
   22 385:6

**unsecured**
   177:20
   212:3
   217:1

257:6
258:6

**updated**
   328:25

**upset**   107:24

**urchins**
   272:3

**usual**   191:12

**utilities**
   13:24
   66:24

**utility**   14:9

---

**V**

---

**V.P.**   348:24

**vacant**   134:1

**vacate**
   134:19

**vacation**
   77:2

**vacations**
   76:19,21

**vague**   373:19

**vaguely**
   37:15
   203:5

**Valentino**
   227:20

**valuable**
   249:7
   250:16

**valuation**
   145:8
   146:25
   152:22,24
   153:7,12,
   18 154:15
   314:14
   346:15,20
   355:6,7
   382:5

**valued**
   246:9,15,
   19 250:17,
   20 251:10
   345:11,16
   385:3

**values**   298:5
   380:12
   381:11

**variance**
   315:10
   325:24

**Varies**
   160:19
   259:13

**Vegas**   361:20
   368:9
   371:16
   376:11,19

**vehicle**
   114:15
   263:2,5,8,
   15,18
   279:17

**vehicle's**
   114:18

Case 2:23-bk-16904-BR    Doc 366-1    Filed 06/00/25    Entered 06/00/25 18:39:07    Desc
Declaration of Nicole A. Salvato Page 480 of 462 519 of 1079

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: vehicles..weeks

**vehicles**
  245:24

**vendor**
  156:16

**Venmo**  28:4
  339:2
  341:16

**verbal**  11:11

**verbally**
  127:16

**verdict**
  157:11,17,
  24 158:15

**verse**  50:2,8
  57:12
  58:15
  103:6
  126:15,19,
  25 127:5,9
  128:6
  130:15,22
  131:2
  157:11,25
  224:23

**version**  12:2

**versus**  96:1
  149:6
  351:15

**vest**  150:1,
  18

**vestibular**
  92:11,17,
  24 93:1

**video**  370:2,

3
  **vintage**
  248:8,21

**violating**
  44:7

**visibility**
  43:1

**visit**  138:3,
  5 140:20
  271:8
  317:1,3

**visitation**
  70:6,16,
  18,24 73:4

**VOLUME**  83:13
  84:13

**voluntary**
  87:15
  230:1,12,
  20

**vote**  352:25
  353:4

———————

W

———————

**W-O-N-G**  25:5

**wages**  288:20

**wait**  48:4
  230:24

**waive**  230:25

**waived**  289:3

**walk**  72:2

**walking**

93:3,4,7

**wanted**  12:22
  44:1  46:8
  47:1,5
  106:18
  119:14,17
  139:25
  159:4
  206:13
  227:5
  250:1
  270:7
  283:17
  319:10
  377:7
  381:8

**wanting**
  137:7
  245:11

**washed**
  239:18
  241:2

**washer**
  133:16

**watch**  69:6,8
  251:19,25
  252:12

**watches**
  251:14,16
  310:15

**water**  253:8
  268:2
  271:9,11,
  15,24

**WATSON**

88:10,12

**Wednesday**
  72:10
  73:17

**week**  31:3,
  18 33:15
  63:19
  64:17,20
  70:21
  71:15
  96:11
  104:1,2
  114:4
  115:19
  160:19
  198:25
  199:1
  221:12
  259:13,16
  271:5,6
  273:19
  309:14
  316:16

**week-off**
  73:10

**week-on**
  73:10

**weekend**
  73:7,9,16

**weekends**
  70:21
  72:13 73:8
  98:17

**weeks**  37:22
  75:17 76:2
  94:16

IN RE SETH HALDANE CASDEN
Seth Casden, Vol. 1 on 04/26/2024                    Index: weird..wrong

158:3,4
294:1

**weird**  370:4

**Wells**  18:6
228:16
229:6,11
253:20
334:19
336:6
364:11,16
365:12

**West**  218:6

**westernmost**
320:8

**Westland**
71:6,7,16
78:24
79:8,14,20
80:1,5
299:1
321:2,3
335:18
388:7

**Westland's**
111:12

**When's**
259:23

**where-do-you-**
**work**  149:6

**whereof**
101:17

**WHITE**  85:17

**Whittier**
40:9,18,21

41:11,24
42:2,8,10
295:10,24
296:2,13
383:16

**wide**  320:3

**WILLIAMS**
85:17

**win/loss**
90:12
375:21
376:15

**wire**  190:3,
6 335:15

**withdrawal**
315:5
335:12
388:17

**withdrawals**
339:14

**withdrawn**
109:19
294:11,16,
24 295:8
297:6

**withheld**
250:2

**withholding**
125:3
289:16

**women**  32:25

**Wong**  24:24
25:4 88:23
260:7

275:11
303:14,19
312:21
313:16,20,
23 314:2,
11,14
315:8
322:4
339:17,23
340:1
380:16

**Wong's**
260:8,9
312:16
314:19
330:4,11

**wood**  248:10

**word**  92:14

**words**  46:24
107:20

**work**  29:18
34:1 35:25
36:6 38:25
52:7,11
65:6,7
68:22 69:7
74:15,21
75:2
103:21
115:23
160:18
260:6
261:6,14
327:17
340:19
380:21

**worked**  35:22
69:18
106:22
109:23

**working**
68:9,12
74:23 97:1
239:20
270:1

**works**  35:24
223:9
236:13
383:11

**worth**  251:7

**write**  95:10

**writer**  35:20

**writes**  36:1

**writing**
69:21
92:14
127:17
190:15
349:2

**writings**
199:22

**written**
69:23
70:11
89:12
126:23
229:4,5
353:18

**wrong**  50:25
157:23

**IN RE SETH HALDANE CASDEN**
Seth Casden, Vol. 1 on 04/26/2024

189:19

---

**Y**

---

**year** 13:18
34:4 37:10
45:13
53:6,8
54:9 55:6
56:2 61:15
73:5
111:8,22
112:6,13
116:18
123:7,8,9
128:24
129:11
132:14
133:5,8,
14,25
139:16
141:5
142:10
143:10
145:7
157:9
159:14
162:1
205:7
237:4
240:1,5,
14,21
241:6
259:24
262:1,3,7
263:20
265:16
266:20,21

269:5
274:24
279:13
282:12
297:3,21
306:5,25
309:7
316:14
338:1,2
348:22
351:9,15
382:24
388:13

**year-over-year**
54:17
351:18

**years** 11:19
16:21
19:22
21:13,23
22:15
24:3,7,9
28:23 34:2
36:12
37:12
38:19,21
41:20 42:4
45:16,18
55:19,23
69:25
70:11
73:12
80:8,9
93:12
113:6,9
117:24
118:9

119:2
121:19
128:11
133:15
134:5
137:23
155:22
180:18
187:22
195:1
204:17
208:7
212:25
215:6
256:11,18
263:22
267:18
268:5
269:10,24
270:1
304:25
305:4
311:19
344:3
368:5,13
371:17,18
376:13

**yesterday**
16:5 65:25

**yoga** 78:11
268:21
269:11,14

**YOO** 85:11

**York** 85:19
161:6,10,
13

---

**Z**

---

**Zelle** 28:4
335:1
340:7

# EXHIBIT C

**Joel Tucker**

███████████

December 16, 2024

The Northern Trust Company of Delaware
Natalie Schiavone, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust
(known as the 2046 Trust fbo Seth Casden)**

Dear Natalie,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $450,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

| | |
|---|---|
| Bank Name: | Banc of California |
| Bank Location: | Los Angeles, CA 90049 |
| Bank ABA Number: | ███████ |
| Account Name: | Danning, Gill, Israel & Krasnoff, LLP |
| | Client Trust Account #: ████████ |
| Account Number: | ███████ |

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Joel Tucker*

Joel Tucker
As Adviser to the 2046 Trust fbo Seth Casden dated 9/6/2024

# EXHIBIT D

**Joel Tucker**

February 20, 2025

The Northern Trust Company of Delaware
Natalie Schiavone, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Natalie,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on management and investments of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all matters relating to the management and investments of the Trust assets.

In my capacity as Adviser, I direct NTDE to execute the Limited Partner Transfer and Substitution Agreement of Interplay Ventures Fund III, LP.  This transfer and substitution agreement transfers Seth Caden's remaining  capital commitment of  $75,418 to the Trust.  I further direct you to wire $23,976.69 to Interplay Venture Fund III, LP account ending in ███. I also direct you to hold Interplay Ventures Fund III, LP as an asset of the Trust with a value of $_____1.00_____.  I also direct NTDE to perform all actions pursuant to this direction, including but not limited to making any and all future capital calls, market price updates and tax cost updates. This direction shall be in effect until such time as we withdraw or change it in a written letter delivered to the Trustee of the Trust.

Webster Bank, N.A.
Bank Location: One Jericho Plaza Suite 304
Jericho, NY 11753
Bank ABA Number: ███████
Account Name: Interplay Ventures Fund III, L.P.
Account Number: ███████
Reference: The Seth Casden Resulting Trust


The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing

instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

Joel Tucker
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-20

# EXHIBIT E

**From:** Gregory Salvato <gsalvato@salvatoboufadel.com>
**Sent:** Thursday, August 21, 2025 9:02 PM
**To:** Sullivan, Nicole
**Cc:** Roye Zur; Joseph Boufadel
**Subject:** RE: 2004 Discovery / Update re Trust disbursements

CAUTION: This message originated outside of the firm. Use caution when opening attachments, clicking links or responding to requests for information.

To Nicole Sullivan:

Nicole,

By way of updating the previously supplied information, please see the scheduled below, indicating the three transfers by Northern Trust to Seth's attorneys:  Danning Gill (12/18/24), Benedon & Serlin (6/23/25) and Salvato Boufadel (6/24/25).

**22-78762  2046 TRUST FOR SETH CASDEN**

| Date | Distribution | Description |
|---|---|---|
| 12/18/2024 | 450,000 | WIRE PAYMENT TO DANNING |
| 6/23/2025 | 100,000.00 | WIRE PAYMENT TO BENEDON |

**22-40724 RESULTING TRUST FOR SETH-CASH**

| Date | Distribution | Description |
|---|---|---|
| 6/24/2025 | 40,000.00 | DISTRIBUTION FBO SETH CAS |

GMS>

**Gregory M. Salvato**
**Salvato Boufadel LLP**
*Business litigation, bankruptcy  & real estate*
**9110 Irvine Center Drive**
**Irvine, California 92618**
**Office: (213) 484-8400**
**Mobile: (213) 400-4424**
**E-mail: gsalvato@salvatoboufadel.com**

**From:** Sullivan, Nicole <Sullivann@whiteandwilliams.com>
**Sent:** Friday, July 25, 2025 4:14 PM
**To:** Gregory Salvato <gsalvato@salvatoboufadel.com>
**Cc:** Roye Zur <rzur@elkinskalt.com>; Joseph Boufadel <jboufadel@salvatoboufadel.com>
**Subject:** RE: 2004 Discovery

Thanks Greg for the quick response. We are requesting that Mr. Casden supplement his responses from March 15, 2024 as required under the Rules for Requests 12, 13 and 14. For your convenience, I am attaching Mr. Casden's responses here.

Enjoy the weekend,

Nicole



**Nicole A. Sullivan**
810 Seventh Avenue, Suite 500 | New York, NY 10019
Direct 212.631.4420 | Fax 212.631.4429
sullivann@whiteandwilliams.com | whiteandwilliams.com

**Confidentiality Notice:** This e-mail message and any documents accompanying this e-mail transmission contain information from the law firm of White and Williams LLP which is privileged and confidential attorney-client communication and/or work product of counsel. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution and/or the taking of or refraining from taking of any action in reliance on the contents of this e-mail information is strictly prohibited and may result in legal action being instituted against you. Please reply to the sender advising of the error in transmission and delete the message and any accompanying documents from your system immediately. Thank you.

**From:** Gregory Salvato <gsalvato@salvatoboufadel.com>
**Sent:** Friday, July 25, 2025 7:03 PM
**To:** Sullivan, Nicole <Sullivann@whiteandwilliams.com>
**Cc:** Roye Zur <rzur@elkinskalt.com>; Joseph Boufadel <jboufadel@salvatoboufadel.com>
**Subject:** RE: 2004 Discovery

CAUTION: This message originated outside of the firm. Use caution when opening attachments, clicking links or responding to requests for information.

To Nicole Sullivann

Nicole,

I was not aware there was outstanding discovery request from you.  Would you kindly forward the discovery requests to me right away so I can see what they are all about?

Thank you!

GMS>

**Gregory M. Salvato**
**Salvato Boufadel LLP**
*Business litigation, bankruptcy  & real estate*
**9110 Irvine Center Drive**
**Irvine, California  92618**
**Office: (213) 484-8400**
**Mobile: (213) 400-4424**
**E-mail: gsalvato@salvatoboufadel.com**

**From:** Sullivan, Nicole <Sullivann@whiteandwilliams.com>
**Sent:** Friday, July 25, 2025 3:43 PM
**To:** Gregory Salvato <gsalvato@salvatoboufadel.com>
**Cc:** Roye Zur <rzur@elkinskalt.com>
**Subject:** 2004 Discovery

Greg-

We write to request that Mr. Casden produce documents responsive to MET's Requests for Production No. 12, 13 and 14 since the first production in or around March 2024. Please provide the supplemental production by August 1, 2025.

Thanks,
Nicole



**Nicole A. Sullivan**
810 Seventh Avenue, Suite 500 | New York, NY 10019
Direct 212.631.4420 | Fax 212.631.4429
sullivann@whiteandwilliams.com | whiteandwilliams.com

**Confidentiality Notice:** This e-mail message and any documents accompanying this e-mail transmission contain information from the law firm of White and Williams LLP which is privileged and confidential attorney-client communication and/or work product of counsel. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution and/or the taking of or refraining from taking of any action in reliance on the contents of this e-mail information is strictly prohibited and may result in legal action being instituted against you. Please reply to the sender advising of the error in transmission and delete the message and any accompanying documents from your system immediately. Thank you.

# EXHIBIT F

**Fill in this information to identify the case:**

Debtor Name _Hologenix, LLC_

United States Bankruptcy Court for the: Central District of California

Case number: _2:20-bk-13849-BR_

☐ Check if this is an amended filing

---

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

Month: _June 2025_

Date report filed: 06/29/2025
MM / DD / YYYY

Line of business: _Fiber, Yarn, Thread Mills_

NAISC code: _3133_

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party: _Hologenix, LLC_

Original signature of responsible party _Seth Casden_

Printed name of responsible party _Seth Casden_

---

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☐ | ☑ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

| Debtor Name | Hologenix, LLC | Case number | 2:20-bk-13849-BR |
|---|---|---|---|

17. Have you paid any bills you owed before you filed bankruptcy?  ☐  ☑  ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 357,410.28

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 50,303.53

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

− $ 366,159.66

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

-315,856.13

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 41,554.15

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

$ 2,259,823.5

   *(Exhibit E)*

Debtor Name  Hologenix, LLC

Case number  2:20-bk-13849-BR

## 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**

    *(Exhibit F)*

$ 398,619.69

## 5. Employees

26. What was the number of employees when the case was filed?

4

27. What is the number of employees as of the date of this monthly report?

6

## 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?

$ 11,500.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?

$ 1,754,191.0

30. How much have you paid this month in other professional fees?

$ 25,000.00

31. How much have you paid in total other professional fees since filing the case?

$ 893,379.46

## 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
|  | **Projected** | — | **Actual** | = | **Difference** |
|  | Copy lines 35-37 from the previous month's report. |  | Copy lines 20-22 of this report. |  | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 51,407.00 | — | $ 50,303.53 | = | $ 1,103.47 |
| 33. **Cash disbursements** | $ 378,371.00 | — | $ 366,159.66 | = | $ 12,211.34 |
| 34. **Net cash flow** | $ -326,964.00 | — | $ -315,856.10 | = | $ -11,107.87 |

35. Total projected cash receipts for the next month:

$ 449,987.00

36. Total projected cash disbursements for the next month:

- $ 275,895.00

37. Total projected net cash flow for the next month:

= $ 174,092.00

Debtor Name  Hologenix, LLC

Case number  2:20-bk-13849-BR

| 8. Additional Information |

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39. Bank reconciliation reports for each account.

☐ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☐ 41. Budget, projection, or forecast reports.

☐ 42. Project, job costing, or work-in-progress reports.

# EXHIBIT "A"

No quarterly fees in subchapter V cases

# EXHIBIT "B"

10. No activity for following Taiwan bank accounts:

- Megabank x2883 and x0087
- Yuanta Bank TWD x7002

Bank accounts are to remain open as it is a requirement of doing business in Taiwan.

14. Unusual or significant unanticipated expenses:

| 06/16/2025 | Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 5,000 |
|------------|---------------------|-------------------------------------------------|-------|

Some of these legal fees are for the defense of the lawsuit against the company's CEO Seth Casden. This was not expected or anticipated when Debtor's 2020 Chapter 11 plan was filed and confirmed, as this lawsuit by creditor Multiple Energy Technologies, LLC was filed in February 2021. However, the Debtor filed an application to employ Theodora Oringher PC and disclosed this litigation in August 2021, and for the balance of 2021, these legal fees are more or less expected and anticipated but disclosed here in relation to the 2020 plan.

# EXHIBIT "C"

Checking - Wells Fargo 2016
June 2025

| Date | Payee | Memo | Foreign Currency | Deposit (USD) | Reconciliation Status | Type | Account |
|---|---|---|---|---|---|---|---|
| 06/02/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 1,115.16 | 1,273.42 | Reconciled | Deposit | |
| 06/03/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 1,701.75 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/04/2025 | | Return Wires | | 1,220.00 | Reconciled | Deposit | 1600.200 Reimbursable Fees & Costs |
| 06/04/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 896.32 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/04/2025 | Customer name. Redacted as confidential business information | Raw Materials Sales | | 5,091.08 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/05/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 1,913.60 | Reconciled | Deposit | Channel Clearing Account |
| 06/06/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 46.03 | Reconciled | Deposit | 1400.100 Amazon Sales Reserve Balance:Amazon Sales - US |
| 06/06/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 3,223.56 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/09/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 213.93 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/09/2025 | Vendor name. Redacted as confidential business information | Refund | | 841.19 | Reconciled | Deposit | 2000.000 Accounts Payable (A/P) - USD |
| 06/09/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 511.22 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/10/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 104.85 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/11/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 1,493.01 | 1,720.02 | Reconciled | Deposit | 1700.200 Undeposited Funds |
| 06/12/2025 | Customer name. Redacted as confidential business information | Raw Materials Sales | 195.51 | 225.58 | Reconciled | Deposit | |
| 06/13/2025 | Vendor name. Redacted as confidential business information | Refund | | 500.00 | Reconciled | Deposit | 1600.200 Reimbursable Fees & Costs |
| 06/16/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 1,897.97 | 2,194.32 | Reconciled | Deposit | |
| 06/17/2025 | Vendor name. Redacted as confidential business information | Refund | 2,014.99 | 2,476.33 | Reconciled | Deposit | |
| 06/17/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 464.05 | 533.65 | Reconciled | Deposit | |
| 06/18/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 119.74 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/18/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 4,635.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/20/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 258.67 | Reconciled | Deposit | 1400.100 Amazon Sales Reserve Balance:Amazon Sales - US Clearing Account |
| 06/20/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 138.44 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/20/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 2,780.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/23/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 320.22 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 06/23/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 80.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/25/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 703.77 | 822.99 | Reconciled | Deposit | |
| 06/26/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 1,921.57 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/26/2025 | Customer name. Redacted as confidential business information | Raw Materials Sales | | 1,935.95 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |

| Date | | Description | | Amount | Status | Type | Account |
|------|---|-------------|---|--------|--------|------|---------|
| 06/26/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 1,154.02 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/26/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 643.29 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/26/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 17.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/27/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 5,043.08 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 06/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 1,106.30 | 812.71 | Reconciled | Deposit | |
| 06/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 4,934.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| | | | | **50,303.53** | | | |

# EXHIBIT "D"

**Checking - Wells Fargo 2016**

**June 2025**

| Date | Payee | Memo | Foreign Currency | Payment (USD) | Reconciliation Status | Type | Account |
|---|---|---|---|---|---|---|---|
| 06/02/2025 | Seth Casden | February 2025 Salary - Set amount per court approval | | 5,000.00 | Reconciled | Expense | 2250.000 Insider Compensation Payable |
| 06/02/2025 | Seth Casden | May 2025 Salary - Set amount per court approval (1/5) | | 25,000.00 | Reconciled | Expense | 2250.000 Insider Compensation Payable |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Eastern European Sales Representative | -2900.00 | 3,390.39 | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Administration Support | | 8,250.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Wells Fargo Bus. MasterCard/Visa 9938 | Credit Card Payment | | 11,712.07 | Reconciled | Credit Card | 2050.102 WFB Visa 9938 |
| 06/02/2025 | Wells Fargo Bus. MasterCard/Visa 3243 | Credit Card Payment | | 2,200.51 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Regulatory & QMS Costs | | 759.92 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Shipping Fees | | 845.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Shipping Fees | | 800.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Wells Fargo Bus. MasterCard/Visa-Lucas 2711 | Credit Card Payment | | 4,660.52 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | IT Consultant | | 650.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Supply Chain Warehouse Storage Unit | | 357.99 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | CIO/CTO Consultant | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Oceania Liaison & Regulatory Support Representative | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Asian Liaison Office - Taiwan Sales Representative | | 4,100.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Indian Sales Representative | | 500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | | 13,130.94 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | | 125.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | CFO Salary | | 7,218.75 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | ACH Processing Fee | | 3.50 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/02/2025 | Vendor name. Redacted as confidential business information. | D&O Liability Policy Annual Renewal | | 19,949.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/03/2025 | Vendor name. Redacted as confidential business information. | Printing Cost | | 238.44 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/03/2025 | Vendor name. Redacted as confidential business information. | Administration Support | | 1,215.88 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/03/2025 | Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | | 1,881.48 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/03/2025 | Vendor name. Redacted as confidential business information. | Marketing & PR Consultant | | 8,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/03/2025 | Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | | 475.44 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/04/2025 | M&G Partners LLP | Chapter 11 Accountant & Tax Consultant | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/04/2025 | Vendor name. Redacted as confidential business information. | Delaware - Annual Report - Domestic eFiling for LLC | | 588.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/04/2025 | Vendor name. Redacted as confidential business information. | Marketing Samples | | 5,100.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/04/2025 | Vendor name. Redacted as confidential business information. | Delaware - Annual Report - Domestic eFiling for LLC | | 500.00 | Reconciled | Expense | 1600.200 Reimbursable Fees & Costs |
| 06/04/2025 | Vendor name. Redacted as confidential business information. | Business Development Consultant | | 1,369.22 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/04/2025 | Vendor name. Redacted as confidential business information. | Photoshoot for Shopify store | | 1,270.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/09/2025 | Vendor name. Redacted as confidential business information. | Uber to LAX | | 225.00 | Reconciled | Expense | 6070.001 Travel & Entertainment:Airfare & Transportation |
| 06/09/2025 | Vendor name. Redacted as confidential business information. | Uber to LAX | | 150.00 | Reconciled | Expense | 6070.001 Travel & Entertainment:Airfare & Transportation |
| 06/09/2025 | Vendor name. Redacted as confidential business information. | Shipping Fees | | 2,950.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/09/2025 | Vendor name. Redacted as confidential business information. | Shipping Fees | | 403.91 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/10/2025 | Wells Fargo Bus. MasterCard/Visa-Seth 1195 | Credit Card Payment | | 5,000.00 | Reconciled | Credit Card | 2050.006 WFB Mastercard 1195 |
| 06/11/2025 | Vendor name. Redacted as confidential business information. | Administration Support | | 667.72 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/11/2025 | TriNet HR Corporation | Payroll Costs | | 48,609.87 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/11/2025 | Vendor name. Redacted as confidential business information. | Printing Cost | | 1.01 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/12/2025 | Vendor name. Redacted as confidential business information. | R&D Samples | | 826.83 | Reconciled | Expense | 6029.010 Product Development:Trials - R & D  Materials |
| 06/12/2025 | Vendor name. Redacted as confidential business information. | Regulatory & QMS Costs | -2000.00 | 2,543.02 | Reconciled | Expense | 6021.003 Legal & Professional Fees:Regulatory & QMS Expenses |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Regulatory & QMS Costs | -1500.00 | 1,000.20 | Reconciled | Bill Payment | 2000.003 Accounts Payable (A/P) - AUD |
| 06/16/2025 | LNBYG | Chapter 11 Legal Rep - LNBYG | | 10,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Howard Grobstein | Chapter 11 Legal - BK Expert Witness | | 1,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Buchalter | Chapter 11 Professionals - Patent Services | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Troutman Pepper LLP | Chapter 11 Professionals - Trademark Services | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | | 850.96 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | | 411.22 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Wells Fargo Bus. MasterCard/Visa 3243 | Credit Card Payment | | 4,845.65 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 06/16/2025 | Theodora Oringher PC | Legal Fees | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Manager Consultant | | 6,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Supply Chain Warehouse Storage Unit | | 516.70 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Inventory Purchase | | 7,140.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Business Development Consultant | | 3,995.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Wells Fargo Bus. MasterCard/Visa 2711 | Credit Card Payment | | 77.50 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | P/T Supply Chain Consultant | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Wells Fargo Bus. MasterCard/Visa 9938 | Credit Card Payment | | 15,000.00 | Reconciled | Credit Card | 2050.102 R WFB Visa 9938 |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Japan Sales Representative + Japan Office Expenses | | 1,030.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | EO Los Angeles and Global Membership | | 6,780.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 432.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |

| Date | Vendor | Description | | Amount | Status | Payment Info |
|---|---|---|---|---|---|---|
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Testing Fees | | 196.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Marketing Consultant | | 2,800.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Fisher & Phillips LLP | 2025 Retainer for Legal Matter Hologenix vs. Lyndsey White | | 15,000.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/16/2025 | Vendor name. Redacted as confidential business information. | Administration Support | | 1,050.00 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/17/2025 | Vendor name. Redacted as confidential business information. | Viscose hand samples | | 148.33 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/18/2025 | Vendor name. Redacted as confidential business information. | Ketamine-assited 40 Years of Zen Program | | 7,000.00 | Reconciled | Expense    1600.101 Prepaid Expenses:Prepaid Events & Travels Costs |
| 06/18/2025 | Wells Fargo Bus. MasterCard/Visa 9938 | Credit Card Payment | | 12,000.00 | Reconciled | Credit Card F2050.102  WFB Visa 9938 |
| 06/20/2025 | Vendor name. Redacted as confidential business information. | Printing Cost | | 2.98 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/20/2025 | Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | | 475.44 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| 06/26/2025 | TriNet HR Corporation | Payroll Costs | | 48,556.16 | Reconciled | Bill Payment 2000.000 Accounts Payable (A/P) - USD |
| | | | **$** | **366,159.66** | | |
| | | | | | | |
| 6/30/2025 | Kresimir Hernaus (ERSTE Bank Account) | Eastern European Office OOP Expenses | 35.72 | 42.11 | Reconciled | Bill Payment Accounts Payable (A/P) - EUR |

# EXHIBIT "E"

**Hologenix LLC**
**A/P Aging Summary**
As of June 30, 2025

| Vendor | Expense Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| LNBYG | Chapter 11 Legal Rep - LNBYG | 65,157.84 | 35,964.01 | 25,319.87 | 718,350.63 | 844,792.35 |
| Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 2,720.00 | | 1,125.00 | 230,232.21 | 234,077.21 |
| Buchalter | Chapter 11 Professionals - Patent Services | | | 3,750.00 | 81,247.61 | 84,997.61 |
| Troutman Pepper LLP | Chapter 11 Professionals - Trademark Services | 16,265.36 | 2,618.00 | 1,695.00 | 27,101.07 | 47,679.43 |
| Vendor name. Redacted as confidential business information. | Deposit for 2026 Biohacking | 16,000.00 | | | | 16,000.00 |
| Vendor name. Redacted as confidential business information. | June 2025 Rent | 15,442.59 | | | | 15,442.59 |
| Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | 12,985.00 | | | | 12,985.00 |
| Vendor name. Redacted as confidential business information. | CIO/CTO Consultant + Research & Experimental Expenses | 2,500.00 | | | 10,000.00 | 12,500.00 |
| Vendor name. Redacted as confidential business information. | Marketing Samples | | 9,896.25 | | | 9,896.25 |
| Vendor name. Redacted as confidential business information. | Marketing & PR Consultant | 8,000.00 | | | | 8,000.00 |
| Vendor name. Redacted as confidential business information. | Regulatory & QMS Consultant | | | | 7,471.17 | 7,471.17 |
| Vendor name. Redacted as confidential business information. | Interzum 2025 Economy and Marketing Package | 7,322.47 | | | | 7,322.47 |
| Vendor name. Redacted as confidential business information. | Exhibitor costs for Health Optimisation Summit | 6,872.50 | | | | 6,872.50 |
| Howard Grobstein | Chapter 11 Legal - BK Expert Witness | | | | 6,542.02 | 6,542.02 |
| Fisher & Phillips LLP | Chapter 11 Professionals - Corporate GC Services | 73.50 | 196.00 | 324.50 | 5,797.50 | 6,391.50 |
| Vendor name. Redacted as confidential business information. | Pitch for TEDx - Founder's Story Virtual Interview | 6,000.00 | | | | 6,000.00 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 5,327.40 | | | | 5,327.40 |
| Vendor name. Redacted as confidential business information. | Tradeshow Cost | | 5,010.00 | | | 5,010.00 |
| Vendor name. Redacted as confidential business information. | P/T Supply Chain Consultant | 5,000.00 | | | | 5,000.00 |
| Vendor name. Redacted as confidential business information. | P/T Asian Liaison Office - Taiwan Sales Representative | 4,100.00 | | | | 4,100.00 |
| Vendor name. Redacted as confidential business information. | Inventory Shipping Costs | 3,521.96 | | | | 3,521.96 |
| Vendor name. Redacted as confidential business information. | Eastern European Sales Representative | 3,496.82 | | | | 3,496.82 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 3,087.03 | | | | 3,087.03 |
| Vendor name. Redacted as confidential business information. | Quarterly Board Deck Review & Analysis Consultant | 3,000.00 | | | | 3,000.00 |
| Vendor name. Redacted as confidential business information. | Marketing Samples | 2,859.67 | | | | 2,859.67 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 2,640.00 | | | | 2,640.00 |
| Vendor name. Redacted as confidential business information. | Oceania Sales & Regulatory Support Representative | 2,500.00 | | | | 2,500.00 |
| Vendor name. Redacted as confidential business information. | CFO Salary | 2,406.25 | | | | 2,406.25 |
| Vendor name. Redacted as confidential business information. | Japan Sales Representative + Japan Office Expenses | 1,030.00 | | | | 1,030.00 |
| Vendor name. Redacted as confidential business information. | Parking Cost | | | | 761.95 | 761.95 |
| Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | 755.86 | | | | 755.86 |
| Vendor name. Redacted as confidential business information. | IT Consultant | 650.00 | | | | 650.00 |
| Vendor name. Redacted as confidential business information. | Japan Sales Representative + Japan Office Expenses | 500.00 | | | | 500.00 |
| Vendor name. Redacted as confidential business information. | Supply Chain Inventory Storage Warehouse | 412.26 | | | | 412.26 |
| Vendor name. Redacted as confidential business information. | Consultant | 396.37 | | | | 396.37 |
| Lewitt Hackman | OOP Expenses Reimbursement | 268.74 | | | | 268.74 |
| Vendor name. Redacted as confidential business information. | | 150.00 | | | | 150.00 |
| Gregory Jones | Chapter 11 Legal Rep - Sub-V Trustee | | | | 117.20 | 117.20 |
| | | $ 201,441.62 | $ 53,684.26 | $ 32,214.37 | $ 1,087,621.36 | $ 1,374,961.61 |

| | | | |
|---|---|---|---|
| Wells Fargo CCs | Outstanding Credit Cards Balance | | 2,408.09 |
| Chapter 11 Payroll | 2024-2025 Employee Bonuses & Sales Commission | | 1,395.83 |
| Insider Compensation Payable - BOM | Unpaid Guaranteed Payments & Service Fees to BOM | | 210,000.00 |
| Insider Compensation Payable - Seth | Unpaid Guaranteed Payments to Seth Casden - Pending BK Court's Approval Post-BK | | 568,466.06 |
| Due to Members - Seth | Chapter 11 MET Legal Fees - MET vs. Seth Casden Reimbursable to Seth Casden | | 105,000.00 |
| Accrued Payables | Accrual for expenses incurred in 2024-2025 | | 21,928.59 |
| | | $ | 2,259,823.50 |

# EXHIBIT "F"

# A/R Aging Summary
### As of June 30, 2025

| Customer | Revenue Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 185,714.55 | 81,453.13 | | | 267,167.68 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 27,949.35 | | | | 27,949.35 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 19,521.61 | | | | 19,521.61 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 17,577.89 | | | | 17,577.89 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 15,263.60 | | | | 15,263.60 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 13,283.20 | | | | 13,283.20 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 7,012.28 | 767.55 | | | 7,779.83 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 4,525.41 | 2,050.79 | 532.41 | | 7,108.61 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 5,100.00 | | | | 5,100.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 4,582.00 | | | | 4,582.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | 3,605.00 | | | 3,605.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 961.53 | | 812.93 | 1,646.94 | 3,421.40 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,675.33 | | | | 1,675.33 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,559.67 | | | | 1,559.67 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,245.39 | | | | 1,245.39 |
| Customer name. Redacted as confidential business information. | Raw Material Sales | | | | 1,203.12 | 1,203.12 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 327.94 | 275.48 | 559.16 | | 1,162.58 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,074.48 | | | | 1,074.48 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 679.00 | | | | 679.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | 535.94 | | | 535.94 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 378.32 | | | | 378.32 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 360.97 | | | | 360.97 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 308.18 | | | | 308.18 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 263.77 | | | | 263.77 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 250.68 | | -9.00 | | 241.68 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Customer name. Redacted as confidential business information. | Raw Material Sales | | | | 207.86 | 207.86 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 170.00 | | | | 170.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 151.56 | | | | 151.56 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | | 84.03 | 84.03 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2.71 | | 0.75 | 2.54 | 6.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | 0.01 | | 0.01 |
| confidential business information. | Miscellaneous | | | -6.62 | | (6.62) |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | -5,465.29 | 423.54 | (5,041.75) |
| | | $ 309,939.42 | $ 88,687.89 | $ (3,575.65) | $ 3,568.03 | $ 398,619.69 |

# IZVOD PROMETA PO RAČUNU

Datum i vrijeme izdavanja:  01.07.2025. 17:46
Za razdoblje (po datumu obrade):  01.06.2025. do 30.06.2025.

**ERSTE&STEIERMÄRKISCHEBANK D.D.**          KREŠIMIR HERNAUS
OIB:      ██████9320                              KARLOVAČKA CESTA 65 D/1
SWIFT/BIC: ESBCHR22                             10000 ZAGREB
SAVJETODAVNI CENTAR ZAGREB - VUKOVARSKA        REPUBLIKA HRVATSKA
10000 ZAGREB, IVANA LUČIĆA 2
Tel.: (072) 37 2580 Faks: (072) 37 1956

Naziv klijenta:        KREŠIMIR HERNAUS
OIB:                   45925046683

IBAN:                  HR2224020063212234851
Naziv računa:          TEKUĆI RAČUN
Oznaka valute:         EUR

| Datum valute<br>Datum obrade | Platitelj/Primatelj<br>Broj računa/IBAN<br>Tečaj | Redni broj<br>Opis plaćanja<br>Šifra namjene | Poziv na broj zaduženja<br>Poziv na broj odobrenja<br>Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| **Početno stanje** | | | | | **35,72** |
| 01.06.2025<br>01.06.2025 | Vendor name. Redacted as confidential business information | 1 - Naplata naknade za vođenje računa | HR99<br>HR99<br>10062134553 | | |
| | | | | 0,52 | |
| 02.06.2025<br>02.06.2025 | Vendor name. Redacted as confidential business information | 2 - 462765XXXXXX2330, MCDONALD'S KIOSK ZAGREB-NOVI Z, 30.05.2025 19:24 | HR99<br>HR99<br>10069884289 | | |
| | | | | 7,60 | |
| 02.06.2025<br>02.06.2025 | Vendor name. Redacted as confidential business information | 3 - 462765XXXXXX2330, MCDONALD'S ZAGREB-NOVI Z, 30.05.2025 19:59 | HR99<br>HR99<br>10069891840 | | |
| | | | | 9,80 | |
| 03.06.2025<br>03.06.2025 | Vendor name. Redacted as confidential business information | 4 - 462765XXXXXX2330, LJEKARNE FILIPOVIC LJEK ZAGREB, 31.05.2025 12:43 | HR99<br>HR99<br>10074382329 | | |
| | | | | 17,80 | |
| **Konačno stanje** | | | | | **0,00** |

| REKAPITULACIJA | | | | Konačno stanje | 0,00 |
|---|---|---|---|---|---|
| Naloga na teret | 4 | Dugovni promet | 35,72 | Rezervirano za naplatu | 0,00 |
| Naloga u korist | 0 | Potražni promet | 0,00 | Prekoračenje | 0,00 |
| Naloga ukupno | 4 | Ukupno promet | -35,72 | Rezervirano po nalogu FINA-e | 0,00 |
| | | | | Raspoloživo stanje | 0,00 |

**Vaš međunarodni broj bankovnog računa (IBAN) je HR2224020063212234851, a identifikacijska šifra banke je ESBCHR22.**

**Dospjelo nepodmireno dugovanje**

| | Iznos na dan 31.05.2025. | Iznos za obračunsko razdoblje | Iznos na dan 30.06.2025. |
|---|---|---|---|
| Dospjela nepodmirena kamata | 0,00 | 0,00 | 0,00 |
| Dospjela nepodmirena naknada | 2,00 | 0,00 | 3,48 |
| Ukupno dospjelo dugovanja za naplatu | 2,00 | 0,00 | 3,48 |

U slučaju postojanja dospjelih nepodmirenih dugovanja za naplatu po
gore navedenoj osnovi molimo Vas da se obratite u najbližu poslovnicu
Banke.
Prema članku 40. stavak 1. Zakona o PDV-u naknade za usluge Banke
oslobođene su plaćanja PDV-a.

| Credit date | Debit Date | Booking Text | Recipient | Amount | Currency | 2024 Balance | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 6/23/24 | Decathlon Shirts and Shorts - Samples | Alexander Kühlmann | (109.96) | EUR | 107.18 | € | 107.18 | As 06/30/2025 |
| | 6/23/24 | Cost account June 2024 | NASPA Bank Account | (20.00) | EUR | 217.14 | $ | 142.33 | |
| | 6/23/24 | Cost account March 2024 | NASPA Bank Account | (15.00) | EUR | 237.14 | | | |
| | 6/23/24 | Cost account February 2024 | NASPA Bank Account | (6.00) | EUR | 252.14 | | | |
| | 6/23/24 | Hologenix telephone November 2023 | Alexander Kühlmann | (18.00) | EUR | 258.14 | | | |
| | 5/31/24 | Hologenix telephone April 2024 | Alexander Kühlmann | (21.38) | EUR | 276.14 | | | |
| | 4/30/24 | Hologenix telephone March 2024 | Alexander Kühlmann | (29.66) | EUR | 297.52 | | | |
| | 3/31/24 | Hologenix telephone February 2024 | Alexander Kühlmann | (20.42) | EUR | 327.18 | | | |
| | 2/29/24 | Hologenix telephone January 2024 | Alexander Kühlmann | (18.44) | EUR | 347.60 | | | |
| | 1/31/24 | Heimtextil - Last Day Ticket ohne Info-Service | Alexander Kühlmann | (43.00) | EUR | 366.04 | | | |
| | 1/31/24 | Heimtextil - Lunch on 01/12/2024 | Alexander Kühlmann | (11.50) | EUR | 409.04 | | | |
| | 1/31/24 | Heimtextil - Roundtrip to Frankfurt - 60km | Alexander Kühlmann | (18.00) | EUR | 420.54 | | | |
| | 1/31/24 | Hologenix telephone December 2023 | Alexander Kühlmann | (18.00) | EUR | 438.54 | | | |
| | | | | | | | | | |
| | | | Account balance on 12/31/2023 | 456.54 | EUR | | | | |



| Merchant Account ID: ▮▮▮▮▮▮QAWQ | PayPal ID: ap@celliant.com | 6/1/25 - 6/30/25 |
|---|---|---|

## Statement for June 2025

Hologenix, LLC
1113 Montana Ave #13
90403 Santa Monica

### Balance Summary (6/1/25 - 6/30/25)

|  | Available beginning | Available ending | Withheld beginning | Withheld ending |
|---|---|---|---|---|
| USD | 0.00 | 334.59 | 0.00 | 0.00 |
| EUR | 0.00 | 1,425.95 | 0.00 | 0.00 |



| Merchant Account ID: ⬛⬛⬛QAWQ | PayPal ID: ap@celliant.com | 6/1/25 - 6/30/25 |
|---|---|---|

## Activity Summary (6/1/25 - 6/30/25)

|  | USD | EUR |
|---|---|---|
| **Beginning Available Balance** | **0.00** | **0.00** |
| Payments received | 350.24 | 1,425.95 |
| Payments sent | 0.00 | 0.00 |
| Withdrawals and Debits | 0.00 | 0.00 |
| Deposits and Credits | 0.00 | 0.00 |
| Fees | -15.65 | 0.00 |
| **Ending Available Balance** | **334.59** | **1,425.95** |

**PayPal**

| Merchant Account ID: ██████ QAWQ | PayPal ID: ap@celliant.com | 6/1/25 - 6/30/25 |
|---|---|---|

## Payments received

| Description | USD | EUR |
|---|---|---|
| General payment | 0.00 | 1,425.95 |
| Express Checkout Payment | 350.24 | 0.00 |
| Total | **350.24** | **1,425.95** |

## Fees

| Description | USD | EUR |
|---|---|---|
| Payment Fee | -15.65 | 0.00 |
| Total | **-15.65** | **0.00** |

# PayPal

| Merchant Account ID: ████QAWQ | PayPal ID: ap@celliant.com | 6/1/25 - 6/30/25 |
|---|---|---|

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|---|---|---|---|---|---|
| 6/3/25 | Express Checkout Payment<br>ID: 5JC46107JY6119204 | jeanye irwin<br>ji1977@att.net | 69.68 | -2.92 | 66.76 |
| 6/12/25 | Express Checkout Payment<br>ID: 74721313VP826653U | William Erdek<br>werdek@att.net | 17.46 | -1.10 | 16.36 |
| 6/12/25 | Express Checkout Payment<br>ID: 90612268NH167500K | ann salvati<br>sclarea171@aol.com | 47.45 | -2.15 | 45.30 |
| 6/15/25 | Express Checkout Payment<br>ID: 7T773192B73025334 | Carolyn Bloxsom<br>carolynmarie808@yahoo.com | 28.76 | -1.49 | 27.27 |
| 6/15/25 | Express Checkout Payment<br>ID: 6KT737918E243901B | Java Break Inc dba New Glarus<br>Bakery<br>dbla75@gmail.com | 28.97 | -1.50 | 27.47 |
| 6/26/25 | Express Checkout Payment<br>ID: 6R0835269B169431K | Katherine Kheel<br>kkheel@verizon.net | 129.26 | -5.00 | 124.26 |
| 6/30/25 | Express Checkout Payment<br>ID: 157809845W293360T | Andrea Hallock<br>a.hallock@hotmail.com | 28.66 | -1.49 | 27.17 |

## Transaction History - EUR

| Date | Description | Name \ Email | Gross | Fee | Net |
|---|---|---|---|---|---|
| 6/29/25 | General Payment<br>ID: 7PR21911W9052721Y | Yak Sleep GmbH<br>support@yakbett.de | 1,425.95 | 0.00 | 1,425.95 |

To report an unauthorized transaction or other error NOT involving your debit card: call (402-938-3614) or write to us (Attn: Error Resolution Department, P.O. Box 45950, Omaha, NE 68145-0950).

To report an unauthorized transaction or other error concerning your debit card: call (402-938-3614), fax (303-395-2855) or write to us (PayPal Debit Card Department, P.O. Box 45950, Omaha, NE 68145-0950).

To cancel a pre-authorized or recurring payment or determine whether a pre-authorized or recurring transfer has been made: call us at 1-877-896-6383 (please note that only calls pertaining to pre-authorized or recurring payments will be accepted at this number).

# Initiate Business Checking™

June 30, 2025 ■ Page 1 of 7



HOLOGENIX LLC
17383 W SUNSET BLVD
SUITE A420
PACIFIC PALISADES CA 90272-4181

### Questions?

*Available by phone Mon-Sat 7:00am-11:00pm Eastern Time, Sun 9:00am-10:00pm Eastern Time:*
We accept all relay calls, including 711

**1-800-CALL-WELLS**  (1-800-225-5935)

*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:*  Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Visit wellsfargo.com/digitalbusinessresources to explore tours, articles, infographics, and other resources on the topics of money movement, account management and monitoring, security and fraud prevention, and more.

**Other Wells Fargo Benefits**

**This June, be wary of scams targeting older and vulnerable adults**

June 15 is World Elder Abuse Awareness Day, and now is a great time to learn how to help protect yourself and your loved ones from common scams, including:

**- Investment scams,** where the scammer makes friends with you on social media then offers to show you how to invest in crypto. Watch out for promises of big returns, suggestions to invest in crypto or requests to wire money.

**- Tech Imposter scams,** where scammers pose as legitimate tech support to convince you to give them access to your device. They can then plant fake evidence of fraud and pass you to another scammer posing as your bank, who asks you to wire money or courier cash or gold to "keep it safe". Wells Fargo will never ask you to do this. Watch out for unsolicited contact from "tech support" scammers. Never give up access to your device or accounts.

Remember, always be cautious when you're asked for your personal information or money. Don't respond until you validate the who and the why. You are in control when it's your money.


WELLS FARGO

## Statement period activity summary

| | | |
|---|---|---|
| Beginning balance on 6/1 | | $363,566.36 |
| Deposits/Credits | | 50,303.53 |
| Withdrawals/Debits | | - 371,117.55 |
| **Ending balance on 6/30** | | **$42,752.34** |

Account number: ▮▮▮▮2016  **(primary account)**

**HOLOGENIX LLC**

*Nevada account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 321270742

For Wire Transfers use
Routing Number (RTN): 121000248

### Overdraft Protection

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 6/2 | | Customer name. Redacted as confidential business information | 1,273.42 | | |
| 6/2 | | Online Transfer Ref #Ib0SIpnf55 to Signify Business Essential Card Payment | | 5,000.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 1,645.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 13,130.94 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 7,218.75 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 759.92 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 3,390.39 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 500.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 4,100.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 357.99 | |
| 6/2 | | Online Transfer to Casden S Ref #Ib0Smhp67C Premier Checking Hologenix LLC May2025Bk | | 25,000.00 | |
| 6/2 | | Online Transfer to Casden S Ref #Ib0Smhpd5S Premier Checking Hologenix LLC Feb2025 2 of 5 | | 5,000.00 | |
| 6/2 | | Online Transfer Ref #Ib0Smhprc2 to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 3243 | | 2,200.51 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 6/2 | | Online Transfer Ref #Ib0Smhpxzz to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 2711 | | 4,660.52 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 125.00 | |
| 6/2 | | Payment on 06/02 Ref #Pp0Yw9H335 Hologenix LLC Pay IN Full Bal CC 9938 | | 11,712.07 | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|------------------|---------------------|---------------------|
| 6/2 | | Vendor name. Redacted as confidential business information | | 650.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 8,250.00 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 3.50 | |
| 6/2 | | Vendor name. Redacted as confidential business information | | 19,949.00 | 246,186.19 |
| 6/3 | | Customer name. Redacted as confidential business information | 1,701.75 | | |
| 6/3 | | Vendor name. Redacted as confidential business information | | 475.44 | |
| 6/3 | | Vendor name. Redacted as confidential business information | | 1,215.88 | |
| 6/3 | | Vendor name. Redacted as confidential business information | | 1,881.48 | |
| 6/3 | | Vendor name. Redacted as confidential business information | | 238.44 | |
| 6/3 | | Vendor name. Redacted as confidential business information | | 8,000.00 | 236,076.70 |
| 6/4 | | Customer name. Redacted as confidential business information | 896.32 | | |
| 6/4 | | WT Seq130226 WF Return Wires IN Proc /Org= Srf# 2025060400129450 Trn#250604130226 Rfb# | 1,220.00 | | |
| 6/4 | | Customer name. Redacted as confidential business information | 5,091.08 | | |
| 6/4 | | Vendor name. Redacted as confidential business information | | 1,369.22 | |
| 6/4 | | Vendor name. Redacted as confidential business information | | 1,270.00 | |
| 6/4 | | Vendor name. Redacted as confidential business information | | 5,100.00 | |
| 6/4 | | Vendor name. Redacted as confidential business information | | 500.00 | |
| 6/4 | | Vendor name. Redacted as confidential business information | | 588.00 | |
| 6/4 | < | Business to Business ACH Debit - M&G Partners, LI Vendor Pmt | | 5,000.00 | 229,456.88 |
| 6/5 | | Customer name. Redacted as confidential business information | 1,913.60 | | 231,370.48 |
| 6/6 | | Customer name. Redacted as confidential business information | 46.03 | | |
| 6/6 | | Customer name. Redacted as confidential business information | 3,223.56 | | 234,640.07 |
| 6/9 | | Customer name. Redacted as confidential business information | 511.22 | | |
| 6/9 | | Customer name. Redacted as confidential business information | 213.93 | | |
| 6/9 | | Vendor name. Redacted as confidential business information - Refund | 841.19 | | |
| 6/9 | | Vendor name. Redacted as confidential business information | | 150.00 | |
| 6/9 | | Vendor name. Redacted as confidential business information | | 225.00 | |
| 6/9 | | Vendor name. Redacted as confidential business information | | 3,353.91 | 232,477.50 |
| 6/10 | | Customer name. Redacted as confidential business information | 104.85 | | |
| 6/10 | | Online Transfer Ref #Ib0Sqdzktp to Signify Business Essential Card Prepayment | | 5,000.00 | 227,582.35 |
| 6/11 | | Customer name. Redacted as confidential business information | 1,720.02 | | |
| 6/11 | | WT Fed#04958 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25061100077258 Trn#250611048118 Rfb# Q+50203385 384 | | 48,609.87 | |
| 6/11 | | Vendor name. Redacted as confidential business information | | 667.72 | |
| 6/11 | | Vendor name. Redacted as confidential business information | | 1.01 | 180,023.77 |
| 6/12 | | Customer name. Redacted as confidential business information | 225.58 | | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 6/12 | | Vendor name. Redacted as confidential business information | | 2,543.02 | |
| 6/12 | | Vendor name. Redacted as confidential business information | | 826.83 | 176,879.50 |
| 6/13 | | Vendor name. Redacted as confidential business information - Refund | 500.00 | | 177,379.50 |
| 6/16 | | Customer name. Redacted as confidential business information | 2,194.32 | | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 6,780.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 3,995.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 1,000.20 | |
| 6/16 | | WT Fed#00506 Western Alliance B /Ftr/Bnf=Theodora Oringher PC IOLTA Srf# Ow00005792381500 Trn#250616200216 Rfb# Ow00005792381500 | | 5,000.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 2,800.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 1,030.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 3,768.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 516.70 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 7,140.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 5,000.00 | |
| 6/16 | | WT Fed#00202 Zions Bancorporati /Ftr/Bnf=Buchalter Srf# Ow00005792406920 Trn#250616202282 Rfb# Ow00005792406920 | | 2,500.00 | |
| 6/16 | | WT Seq202912 Fisher & Phillips LLP /Bnf=Fisher and Phillips LLP Depository Srf# Ow00005792407894 Trn#250616202912 Rfb# Ow00005792407894 | | 15,000.00 | |
| 6/16 | | WT Fed#00484 Jpmorgan Chase Ban /Ftr/Bnf=Grobstein Teeple LLP Srf# Ow0000592415069 Trn#250616203381 Rfb# Ow00005792415069 | | 1,500.00 | |
| 6/16 | | WT Fed#00915 Zions Bancorporati /Ftr/Bnf=Levene Neale Bender Yoo and Golubch Srf# Ow00005792429756 Trn#250616204325 Rfb# Ow00005792429756 | | 10,000.00 | |
| 6/16 | | WT Seq204648 Troutman Pepper Locke L /Bnf=Troutman Pepper Hamilton Sanders L Srf# Ow00005792429840 Trn#250616204648 Rfb# Ow00005792429840 | | 2,500.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 1,050.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 6,500.00 | |
| 6/16 | | Vendor name. Redacted as confidential business information | | 1,262.18 | |
| 6/16 | | Online Transfer Ref #Ib0Ssgw675 to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 3243 | | 4,845.65 | |
| 6/16 | | Online Transfer Ref #Ib0Ssgwbqc to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 2711 | | 77.50 | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 6/16 | | Payment on 6/16 Ref #Pp0Yxpk3B6 Hologenix LLC Pay IN Full Bal CC 9938 | | 15,000.00 | 82,308.59 |
| 6/17 | | Customer name. Redacted as confidential business information | 533.65 | | |
| 6/17 | | Vendor name. Redacted as confidential business information - Refunded | 2,476.33 | | |
| 6/17 | | Vendor name. Redacted as confidential business information | | 148.33 | 85,170.24 |
| 6/18 | | Customer name. Redacted as confidential business information | 119.74 | | |
| 6/18 | | Customer name. Redacted as confidential business information | 4,635.00 | | |
| 6/18 | | Payment on 06/18 Ref #Pp0Yxv8Ysj Hologenix LLC Pay IN Full Bal CC 9938 | | 12,000.00 | |
| 6/18 | | Vendor name. Redacted as confidential business information | | 7,000.00 | 70,924.98 |
| 6/20 | | Customer name. Redacted as confidential business information | 2,780.00 | | |
| 6/20 | | Customer name. Redacted as confidential business information | 138.44 | | |
| 6/20 | | Customer name. Redacted as confidential business information | 258.67 | | |
| 6/20 | | Vendor name. Redacted as confidential business information | | 475.44 | |
| 6/20 | | Vendor name. Redacted as confidential business information | | 2.98 | 73,623.67 |
| 6/23 | | Customer name. Redacted as confidential business information | 80.00 | | |
| 6/23 | | Customer name. Redacted as confidential business information | 320.22 | | 74,023.89 |
| 6/25 | | Customer name. Redacted as confidential business information | 822.99 | | 74,846.88 |
| 6/26 | | Customer name. Redacted as confidential business information | 5,671.83 | | |
| 6/26 | | WT Fed#07595 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25062600263243 Trn#250626079085 Rfb# Q+50220040 924 | | 48,556.16 | 31,962.55 |
| 6/27 | | Customer name. Redacted as confidential business information | 5,043.08 | | 37,005.63 |
| 6/30 | | Customer name. Redacted as confidential business information | 4,934.00 | | |
| 6/30 | | Customer name. Redacted as confidential business information | 812.71 | | 42,752.34 |
| **Totals** | | | **$50,303.53** | **$371,117.55** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted.  If you had insufficient available funds when a transaction posted, fees may have been assessed.*

< **Business to Business ACH:**  *If this is a business account, this transaction has a return time frame of one business day from post date. This time frame does not apply to consumer accounts.*

## Monthly service fee summary

For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 06/01/2025 - 06/30/2025 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following each fee period | | |
| • Average ledger balance | $1,000.00 | $143,283.00 ☑ |
| • Minimum daily balance | $500.00 | $31,962.55 ☑ |

C1/C1



---

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 5,000 | 0 | 0.0030 | 0.00 |
| Transactions | 72 | 100 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

 IMPORTANT ACCOUNT INFORMATION

---

Drawdown Wires incur a fee of $15 for Consumer and Small Business non-analyzed accounts. For Drawdown Wires on analyzed accounts, there is a fee of $22. For more information, please review the Consumer and Business Fee & Information Schedule.

---

**Using a Digital Version of your Debit Card**

Effective June 3, 2025, the following subsection will be added to the "Using Your Card" section of the Wells Fargo Debit and ATM Card Terms and Conditions:

**Using a digital version of your debit card**
You can use the digital version of your debit card, if eligible, for card-not-present transactions like online and in-app purchases, or for payments over the phone. You will not be able to use the digital version of your debit card for in-store purchases or to access Wells Fargo ATMs, unless you add the digital version of your debit card to a Mobile Device (see "Using Your Card Through A Mobile Device" for more details). Note that the PIN for a digital version of your debit card will be the same as the PIN for your physical debit card.

---

NEW YORK CITY CUSTOMERS ONLY -- Pursuant to New York City regulations, we request that you contact us at 1-800-TO WELLS (1-800-869-3557) to share your language preference.



---

## Important Information You Should Know

- **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts:** Wells Fargo Bank, N.A. may furnish information about deposit accounts to Early Warning Services. You have the right to dispute the accuracy of information that we have furnished to a consumer reporting agency by writing to us at Wells Fargo Bank N.A. Attn: Deposit Furnishing Disputes MAC F2304-019 PO Box 50947 Des Moines, IA 50340. Include with the dispute the following information as available: Full name (First, Middle, Last), Complete address, The account number or other information to identify the account being disputed, Last four digits of your social security number, Date of Birth. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

- **In case of errors or questions about other transactions (that are not electronic transfers):** Promptly review your account statement within 30 days after we made it available to you, and notify us of any errors.

- **If your account has a negative balance:** Please note that an account overdraft that is not resolved 60 days from the date the account first became overdrawn will result in closure and charge off of your account. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. The closure will be reported to Early Warning Services. We reserve the right to close and/or charge-off your account at an earlier date, as permitted by law. The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.

- To download and print an Account Balance Calculation Worksheet(PDF) to help you balance your checking or savings account, enter www.wellsfargo.com/balancemyaccount in your browser on either your computer or mobile device.

---

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**
**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**
**B.** Any deposits listed in your        $ _____
register or transfers into        $ _____
your account which are not        $ _____
shown on your statement.      + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
.                                              **TOTAL** $ _____

**SUBTRACT**
**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total amount** | | $ |

©2021 Wells Fargo Bank, N.A. All rights reserved.  Member FDIC.  NMLSR ID 399801

Hologenix LLC

**1000.110 ERSTE Funds, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | EUR |
|---|---|
| Statement beginning balance | 35.72 |
| Checks and payments cleared (1) | -35.72 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 0.00 |
| | |
| Register balance as of 06/30/2025 | 0.00 |

**Details**

Checks and payments cleared (1)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (EUR) |
|---|---|---|---|---|
| 06/30/2025 | Bill Payment | ERSTE May26 | Vendor name. Redacted as confidential business information | -35.72 |
| Total | | | | -35.72 |

Hologenix LLC

**1000.120 NASPA Funds, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | EUR |
|---|---|
| Statement beginning balance | 107.18 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 107.18 |
| | |
| Register balance as of 06/30/2025 | 107.18 |

Hologenix LLC

**1000.200 PayPal, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 0.00 |
| Checks and payments cleared (1) | -15.65 |
| Deposits and other credits cleared (2) | 2,020.56 |
| Statement ending balance | 2,004.91 |
| | |
| Register balance as of 06/30/2025 | 2,004.91 |

**Details**

Checks and payments cleared (1)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 06/30/2025 | Expense | 0625SHOPIFYFEES | Paypal | -15.65 |
| Total | | | | -15.65 |

Deposits and other credits cleared (2)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 06/29/2025 | Receive Payment | | | 1,670.32 |
| 06/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 350.24 |
| Total | | | | 2,020.56 |

Hologenix LLC

**1000.300 Petty Cash, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 0.00 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 0.00 |
| | |
| Register balance as of 06/30/2025 | 0.00 |

Hologenix LLC

**1000.400 Taiwan Bank Accounts, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 1,597.78 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 1,597.78 |
| | |
| Register balance as of 06/30/2025 | 1,597.78 |

Hologenix LLC

**1000.000 Checking - Wells Fargo 2016, Period Ending 06/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 07/16/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 363,566.36 |
| Checks and payments cleared (82) | -371,117.55 |
| Deposits and other credits cleared (34) | 50,303.53 |
| Statement ending balance | 42,752.34 |
| | |
| Register balance as of 06/30/2025 | 42,752.34 |
| Cleared transactions after 06/30/2025 | 0.00 |
| Uncleared transactions after 06/30/2025 | -32,594.04 |
| Register balance as of 07/16/2025 | 10,158.30 |

**Details**

Checks and payments cleared (82)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 05/31/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -5,000.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -19,949.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3.50 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -7,218.75 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -125.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -13,130.94 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -500.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -4,100.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -650.00 |
| 06/02/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -4,660.52 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -800.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -845.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -759.92 |
| 06/02/2025 | Expense | May2025(BK) | Seth Casden | -25,000.00 |
| 06/02/2025 | Expense | February2025(BK)(123) | Seth Casden | -5,000.00 |
| 06/02/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -2,200.51 |
| 06/02/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -11,712.07 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,250.00 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,390.39 |
| 06/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -357.99 |
| 06/03/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -238.44 |
| 06/03/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -475.44 |
| 06/03/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,000.00 |
| 06/03/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,881.48 |
| 06/03/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,215.88 |
| 06/04/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -5,100.00 |
| 06/04/2025 | Expense | | Vendor name. Redacted as confidential business information | -500.00 |
| 06/04/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -588.00 |
| 06/04/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,270.00 |

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 06/04/2025 | Bill Payment | Payment 5 of 5 of Bk | Vendor name. Redacted as confidential business information | -5,000.00 |
| 06/04/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,369.22 |
| 06/09/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,950.00 |
| 06/09/2025 | Expense | | Vendor name. Redacted as confidential business information | -225.00 |
| 06/09/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -403.91 |
| 06/09/2025 | Expense | | Vendor name. Redacted as confidential business information | -150.00 |
| 06/10/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -5,000.00 |
| 06/11/2025 | Bill Payment | | TriNet HR Corporation | -48,609.87 |
| 06/11/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1.01 |
| 06/11/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -667.72 |
| 06/12/2025 | Expense | | Vendor name. Redacted as confidential business information | -2,543.02 |
| 06/12/2025 | Expense | | Vendor name. Redacted as confidential business information | -826.83 |
| 06/16/2025 | Bill Payment | | Theodora Oringher PC | -5,000.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,050.00 |
| 06/16/2025 | Bill Payment | | Fisher & Phillips LLP | -15,000.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,800.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -196.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -432.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,780.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,030.00 |
| 06/16/2025 | Bill Payment | Fee App 5-Payment 1 | Buchalter | -2,500.00 |
| 06/16/2025 | Bill Payment | Fee App 4-Payment 3 | Howard Grobstein | -1,500.00 |
| 06/16/2025 | Bill Payment | Fee App 6-Payment 1 | Troutman Pepper LLP | -2,500.00 |
| 06/16/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -15,000.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -5,000.00 |
| 06/16/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -77.50 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,995.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -7,140.00 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -516.70 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,500.00 |
| 06/16/2025 | Bill Payment | Fee App 4-Payment 3 | BRG | -10,000.00 |
| 06/16/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -4,845.65 |
| 06/16/2025 | Bill Payment | Payment 27 | Vendor name. Redacted as confidential business information | -1,000.20 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -411.22 |
| 06/16/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -850.96 |
| 06/17/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -148.33 |
| 06/18/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -12,000.00 |
| 06/18/2025 | Expense | SC-RETREAT | Vendor name. Redacted as confidential business information | -7,000.00 |
| 06/20/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -475.44 |
| 06/20/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2.98 |
| 06/26/2025 | Bill Payment | | TriNet HR Corporation | -48,556.16 |

| Total | | | | -371,117.55 |

**Deposits and other credits cleared (34)**

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|

Case 2:23-bk-16844-BR    Doc 367-1    Filed 08/04/25    Entered 08/04/25 09:39:37    Desc
Declaration of Noreen Sullivan Page 40 of 571 of 1079

7/28/25, 3:30 AM

| 06/02/2025 | Deposit | | Customer name. Redacted as confidential business information | 1,273.42 |
|---|---|---|---|---|
| 06/03/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,701.75 |
| 06/04/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 5,091.08 |
| 06/04/2025 | Deposit | | Customer name. Redacted as confidential business information | 896.32 |
| 06/04/2025 | Deposit | | Wires Returned | 1,220.00 |
| 06/05/2025 | Deposit | | Customer name. Redacted as confidential business information | 1,913.60 |
| 06/06/2025 | Deposit | | Customer name. Redacted as confidential business information | 3,223.56 |
| 06/06/2025 | Deposit | 23655348651 | Customer name. Redacted as confidential business information | 46.03 |
| 06/09/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 511.22 |
| 06/09/2025 | Deposit | | Customer name. Redacted as confidential business information | 213.93 |
| 06/09/2025 | Deposit | | Vendor name. Redacted as confidential business information - refund | 841.19 |
| 06/10/2025 | Deposit | | Customer name. Redacted as confidential business information | 104.85 |
| 06/11/2025 | Deposit | | Customer name. Redacted as confidential business information | 1,720.02 |
| 06/12/2025 | Deposit | | Customer name. Redacted as confidential business information | 225.58 |
| 06/13/2025 | Deposit | | Vendor name. Redacted as confidential business information - refund | 500.00 |
| 06/16/2025 | Deposit | | Customer name. Redacted as confidential business information | 2,194.32 |
| 06/17/2025 | Deposit | | Vendor name. Redacted as confidential business information - refund | 2,476.33 |
| 06/17/2025 | Deposit | | Customer name. Redacted as confidential business information | 533.65 |
| 06/18/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 4,635.00 |
| 06/18/2025 | Deposit | | Customer name. Redacted as confidential business information | 119.74 |
| 06/20/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 2,780.00 |
| 06/20/2025 | Deposit | | Customer name. Redacted as confidential business information | 138.44 |
| 06/20/2025 | Deposit | 23764363011 | Customer name. Redacted as confidential business information | 258.67 |
| 06/23/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 80.00 |
| 06/23/2025 | Deposit | | Customer name. Redacted as confidential business information | 320.22 |
| 06/25/2025 | Deposit | | Customer name. Redacted as confidential business information | 822.99 |
| 06/26/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,154.02 |
| 06/26/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 17.00 |
| 06/26/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 643.29 |
| 06/26/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,935.95 |
| 06/26/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,921.57 |
| 06/27/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 5,043.08 |
| 06/30/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 4,934.00 |
| 06/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 812.71 |

| Total | | | | 50,303.53 |
|---|---|---|---|---|

# EXHIBIT G

**Fill in this information to identify the case:**

Debtor Name    Hologenix, LLC

United States Bankruptcy Court for the: Central District of California

Case number:    2:20-bk-13849-BR

☐ Check if this is an
amended filing

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

Month:    April 2025

Date report filed:    05/23/2025
MM / DD / YYYY

Line of business:    Fiber, Yarn, Thread Mills

NAISC code:    3133

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    Hologenix, LLC

Original signature of responsible party    *Seth Casden*

Printed name of responsible party    Seth Casden

## 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | Yes | No | N/A |
|---|---|---|---|
| **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | |
| 1. Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☐ | ☑ |
| 9. Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | |
| 10. Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

| Debtor Name | Hologenix, LLC | Case number | 2:20-bk-13849-BR |
|---|---|---|---|

17. Have you paid any bills you owed before you filed bankruptcy?  ☐  ☑  ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 74,419.82

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 361,019.23

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

– $ 307,251.95

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

+53,767.28

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 128,187.10

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

$ 2,215,759.3

*(Exhibit E)*

| Debtor Name | Hologenix, LLC | Case number | 2:20-bk-13849-BR |
|---|---|---|---|

## 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**     $ 702,010.99

   *(Exhibit F)*

## 5. Employees

26. What was the number of employees when the case was filed?     4

27. What is the number of employees as of the date of this monthly report?     6

## 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?     $ 13,000.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?     $ 1,741,191.0

30. How much have you paid this month in other professional fees?     $ 10,000

31. How much have you paid in total other professional fees since filing the case?     $ 858,379.46

## 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
|  | **Projected** | − | **Actual** | = | **Difference** |
|  | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 177,282.00 | − | $ 361,019.23 | = | $ -183,737.20 |
| 33. **Cash disbursements** | $ 295,840.00 | − | $ 307,251.95 | = | $ -11,411.95 |
| 34. **Net cash flow** | $ -118,558.00 | − | $ 53,767.28 | = | $ -172,325.20 |

35. Total projected cash receipts for the next month:     $ 577,744.00

36. Total projected cash disbursements for the next month:     − $ 290,701.00

37. Total projected net cash flow for the next month:     = $ 287,043.00

Debtor Name  Hologenix, LLC                                    Case number  2:20-bk-13849-BR

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☐ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☐ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

# EXHIBIT "A"

No quarterly fees in subchapter V cases

# EXHIBIT "B"

10. No activity for following Taiwan bank accounts:

- Megabank x2883 and x0087
- Yuanta Bank TWD x7002

Bank accounts are to remain open as it is a requirement of doing business in Taiwan.


14. Unusual or significant unanticipated expenses:

| 04/15/2025 | Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 5,000 |

Some of these legal fees are for the defense of the lawsuit against the company's CEO Seth Casden. This was not expected or anticipated when Debtor's 2020 Chapter 11 plan was filed and confirmed, as this lawsuit by creditor Multiple Energy Technologies, LLC was filed in February 2021.  However, the Debtor filed an application to employ Theodora Oringher PC and disclosed this litigation in August 2021, and for the balance of 2021, these legal fees are more or less expected and anticipated but disclosed here in relation to the 2020 plan.

# EXHIBIT "C"

**Checking - Wells Fargo 2016**
**April 2025**

| Date | Payee | Memo | Foreign Currency | Deposit (USD) | Reconciliation Status | Type | Account |
|------|-------|------|------------------|---------------|----------------------|------|---------|
| 04/03/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 1,405.54 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/04/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 343.87 | 376.86 | Reconciled | Deposit | |
| 04/09/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 2,234.33 | 2,454.08 | Reconciled | Deposit | |
| 04/10/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 28,757.16 | 17,575.54 | Reconciled | Payment | 1100.001 Accounts Receivable (A/R) - AUD |
| 04/11/2025 | Customer name. Redacted as confidential business information | DTC Sales | | 30.98 | Reconciled | Deposit | 1400.100 Amazon Sales Reserve Balance:Amazon Sales - US Clearing Account |
| 04/11/2025 | Customer name. Redacted as confidential business information | OUTGOING MASTER TR /ORG=SETH CASDEN RESULTING | | 300,000.00 | Reconciled | Deposit | 3000.001 Members' Equity:Owner's Equity - Contributions |
| 04/11/2025 | Seth Casden | Transfer Correction | | 8,000.00 | Reconciled | Deposit | 1600.200 Reimbursable Fees & Costs |
| 04/11/2025 | Seth Casden | Transfer Correction | | 10,000.00 | Reconciled | Deposit | 1600.200 Reimbursable Fees & Costs |
| 04/11/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 344.25 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/14/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 4,070.64 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/16/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 367.02 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/22/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 397.76 | 452.73 | Reconciled | Deposit | |
| 04/23/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 566.18 | 642.16 | Reconciled | Deposit | |
| 04/23/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 267.16 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/23/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 3,156.39 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/24/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 5,379.69 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/28/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 2,515.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/28/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 72.23 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 253.06 | 286.25 | Reconciled | Deposit | |
| 04/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 1,072.89 | 777.58 | Reconciled | Deposit | |
| 04/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | 416.53 | 471.16 | Reconciled | Deposit | |
| 04/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 1,644.47 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 04/30/2025 | Customer name. Redacted as confidential business information | Royalty Licensing Fees | | 729.50 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| | | | | **361,019.23** | | | |

# EXHIBIT "D"

Checking - Wells Fargo 2016
April 2025

| Date | Payee | Memo | Foreign Currency | Payment (USD) | Reconciliation Status | Type | Account |
|---|---|---|---|---|---|---|---|
| 04/01/2025 | Vendor name. Redacted as confidential bEastern European Sales Representative | | -2,600.00 | 2,866.24 | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 04/01/2025 | Vendor name. Redacted as confidential bAdministration Support | | | 2,250.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Vendor name. Redacted as confidential business information. | | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Wells Fargo Bus. MasterCard/Visa-2177 | | | 1,384.43 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 04/01/2025 | Wells Fargo Bus. MasterCard/Visa-2177 | | | 6,234.75 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Wells Fargo Bus. MasterCard/Visa-1195 | | | 2,116.59 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| 04/01/2025 | Wells Fargo Bus. MasterCard/Visa- 3243 | | | 80.76 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 04/01/2025 | Wells Fargo Bus. MasterCard/Visa- 3243 | | | 650.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Vendor name. Redacted as confidential business information. | | | 150.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Vendor name. Redacted as confidential business information. | | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Vendor name. Redacted as confidential business information. | | | 4,100.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/01/2025 | Vendor name. Redacted as confidential business information. | | | 3,965.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/02/2025 | Vendor name. Redacted as confidential business information. | | | 500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/02/2025 | Vendor name. Redacted as confidential business information. | | | 237.94 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/03/2025 | Vendor name. Redacted as confidential business information. | | | 9,014.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/03/2025 | Vendor name. Redacted as confidential business information. | | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/09/2025 | Vendor name. Redacted as confidential business information. | | | 476.12 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/11/2025 | Vendor name. Redacted as confidential bEO Dinner | | | 72.03 | Reconciled | Expense | 6070.009 Travel & Entertainment:Promotional Meals & Events |
| 04/11/2025 | TriNet HR Corporation | | | 6,545.17 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/11/2025 | TriNet HR Corporation | | | 88,575.07 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/11/2025 | Seth Casden | Transfer Correction | | 18,000.00 | Reconciled | Expense | 1800.200 Reimbursable Fees & Costs |
| 04/14/2025 | Wells Fargo Bus. MasterCard/Visa-1195 | | | 3,909.57 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | -1,500.00 | 5,520.57 | Reconciled | Expense | 1600.105 Prepaid Expenses:Prepaid Prof. Fees & Retainage |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 973.50 | Reconciled | Bill Payment | 2000.003 Accounts Payable (A/P) - AUD |
| 04/15/2025 | LNBVG | | | 10,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Howard Godstein | | | 1,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Bucketfeet | | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Troutman Pepper LLP | | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Gregory Jones | | | 1,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Seth Casden | March 2025 Salary - Set amount per court approval | | 25,000.00 | Reconciled | Expense | 2250.000 Insider Compensation Payable |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 6,528.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Wells Fargo Bus. MasterCard/Visa-3243 | | | 3,610.80 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | (1,484.68) | 1,592.47 | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 227.83 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| 04/15/2025 | Wells Fargo Bus. MasterCard/Visa-2711 | | | 12,685.41 | Reconciled | Credit Card | 2050.102 Roberts Gordon's WFB Visa 9938 |
| 04/15/2025 | Wells Fargo Bus. MasterCard/Visa-2711 | | (8,135.00) | 946.11 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 9,373.96 | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 5,030.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 381.89 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/15/2025 | Vendor name. Redacted as confidential business information. | | | 4,400.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/17/2025 | Vendor name. Redacted as confidential business information. | | | 8,450.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/28/2025 | Vendor name. Redacted as confidential business information. | | | 58,973.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/28/2025 | Vendor name. Redacted as confidential bBank Fees | | | 10.00 | Reconciled | Expense | 6028.014 Office Expenses:Bank & Finance Charges:Processing / Service Fees |
| 04/28/2025 | Vendor name. Redacted as confidential business information. | | | 470.64 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/30/2025 | Vendor name. Redacted as confidential business information. | | | 6,895.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 04/30/2025 | Wells Fargo Bus. MasterCard/Visa-1195 | | | 5,528.70 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| | | | | **$ 307,251.95** | | | |
| 04/30/2025 | Kresimir Herraus (ERSTE Bank Account|Eastern European Office OOP Expenses Reimbursement | | 2,378.58 | 2,690.55 | Reconciled | Bill Payment | Accounts Payable (A/P) - EUR |

# EXHIBIT "E"

**Hologenix LLC**
**A/P Aging Summary**
As of April 30, 2025

| Vendor | Expense Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| LNBYG | Chapter 11 Legal Rep - LNBYG | 61,283.88 | 10,232.90 | 5,270.00 | 722,847.73 | 799,634.51 |
| Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 1,125.00 | 10,215.00 | 6,975.00 | 213,042.21 | 231,357.21 |
| Buchalter | Chapter 11 Professionals - Patent Services | 5,536.65 | | 10,244.11 | 74,216.85 | 89,997.61 |
| Troutman Pepper LLP | Chapter 11 Professionals - Trademark Services | 20,578.36 | 4,177.00 | 2,420.00 | 25,504.07 | 52,679.43 |
| Vendor name. Redacted as confidential business information. | Inventory Purchase | 24,000.00 | | | | 24,000.00 |
| Vendor name. Redacted as confidential business information. | Marketing & PR Consultant | 16,000.00 | | | | 16,000.00 |
| Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | 12,985.00 | | | | 12,985.00 |
| Vendor name. Redacted as confidential business information. | CIO/CTO Consultant + Research & Experimental Expenses | 2,500.00 | | | 10,000.00 | 12,500.00 |
| Vendor name. Redacted as confidential business information. | Chapter 11 Professionals - Accountant & Tax Consultant | | | | 10,000.00 | 10,000.00 |
| Vendor name. Redacted as confidential business information. | Chapter 11 Legal - BK Expert Witness | | | | 9,542.02 | 9,542.02 |
| Vendor name. Redacted as confidential business information. | Regulatory & QMS Consultant | | | | 9,444.72 | 9,444.72 |
| Vendor name. Redacted as confidential business information. | Chapter 11 Professionals - Corporate GC Services | 520.50 | 513.50 | 1,579.00 | 3,705.00 | 6,318.00 |
| Vendor name. Redacted as confidential business information. | P/T Supply Chain Consultant | 5,000.00 | | | | 5,000.00 |
| Vendor name. Redacted as confidential business information. | P/T Asian Liaison Office - Taiwan Sales Representative | 4,100.00 | | | | 4,100.00 |
| Vendor name. Redacted as confidential business information. | Business Development | 3,995.00 | | | | 3,995.00 |
| Vendor name. Redacted as confidential business information. | Eastern European Sales Representative | 3,903.44 | | | | 3,903.44 |
| Vendor name. Redacted as confidential business information. | CFO Salary | 3,784.55 | | | | 3,784.55 |
| Vendor name. Redacted as confidential business information. | Quarterly Board Deck Review & Analysis Consultant | 3,000.00 | | | | 3,000.00 |
| Vendor name. Redacted as confidential business information. | Oceania Sales & Regulatory Support Representative | 2,500.00 | | | | 2,500.00 |
| Vendor name. Redacted as confidential business information. | Marketing Consultant | 2,160.00 | | | | 2,160.00 |
| Vendor name. Redacted as confidential business information. | P/T European Business Development Consultant | 1,131.16 | | | | 1,131.16 |
| Vendor name. Redacted as confidential business information. | Japan Sales Representative + Japan Office Expenses | 1,030.00 | | | | 1,030.00 |
| Vendor name. Redacted as confidential business information. | P/T Indian Sales Representative | 877.00 | | | | 877.00 |
| Vendor name. Redacted as confidential business information. | R&D Samples for New Powder Formula | 826.83 | | | | 826.83 |
| Vendor name. Redacted as confidential business information. | Parking Cost | | | 761.95 | | 761.95 |
| Vendor name. Redacted as confidential business information. | IT Consultant | 650.00 | | | | 650.00 |
| Vendor name. Redacted as confidential business information. | Inventory Shipping Costs | 403.91 | | | | 403.91 |
| Vendor name. Redacted as confidential business information. | Supply Chain Inventory Storage Warehouse | 357.99 | | | | 357.99 |
| Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | 331.62 | | | -19.82 | 311.80 |
| Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | 175.00 | | | | 175.00 |
| Vendor name. Redacted as confidential business information. | Chapter 11 Legal Rep - Sub-V Trustee | | | | 117.20 | 117.20 |
| Vendor name. Redacted as confidential business information. | Leased Office Equipment - Printer | 1.01 | | | | 1.01 |
| TOTAL | | $ 178,756.90 | $ 25,138.40 | $ 27,250.06 | $ 1,078,399.98 | $ 1,309,545.34 |
| | | | | | | |
| Wells Fargo CCs | Outstanding Credit Cards Balance | | | | | 18,886.53 |
| Chapter 11 Payroll | 2024-2025 Employee Bonuses & Sales Commission | | | | | 1,395.83 |
| Insider Compensation Payable - BOM | Unpaid Guaranteed Payments & Service Fees to BOM | | | | | 210,000.00 |
| Insider Compensation Payable - Seth | Unpaid Guaranteed Payments to Seth Casden - Pending BK Court's Approval Post-BK | | | | | 570,502.36 |
| Due to Members - Seth | Chapter 11 MET Legal Fees - MET vs. Seth Casden Reimbursable to Seth Casden | | | | | 105,000.00 |
| Accrued Payables | Accrual of expenses incurred in 2024-2025 | | | | | 429.29 |
| | | | | | | $ 2,215,759.35 |

# EXHIBIT "F"

# A/R Aging Summary

**As of April 30,2025**

| Customer | Revenue Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|----------|--------------|---------|---------|---------|-------------|-------|
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 209,101.38 | 267,866.65 | | | 476,968.03 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 28,422.40 | 88,235.20 | | | 116,657.60 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 16,703.71 | | | | 16,703.71 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 16,060.17 | | | | 16,060.17 |
| confidential business | Raw Material Sales | 5,091.08 | 5,240.36 | | | 10,331.44 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 10,035.00 | | | | 10,035.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 9,988.47 | | | | 9,988.47 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 9,858.31 | | | | 9,858.31 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 4,620.44 | | | | 4,620.44 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 3,345.50 | | | | 3,345.50 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,780.00 | | | | 2,780.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,583.20 | | | | 2,583.20 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,564.86 | 17.00 | | | 2,581.86 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 812.93 | 1,646.94 | | | 2,459.87 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,063.35 | | | | 2,063.35 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,892.44 | | | | 1,892.44 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,435.69 | 423.54 | | | 1,859.23 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,592.28 | | | | 1,592.28 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,303.42 | | | | 1,303.42 |
| Customer name. Redacted as confidential business information. | Raw Material Sales | | | | 1,203.12 | 1,203.12 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 974.84 | | | | 974.84 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 834.64 | | | | 834.64 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 188.26 | | 645.80 | | 834.06 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | | 825.96 | 825.96 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 626.19 | | | | 626.19 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 602.23 | | | | 602.23 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 535.94 | | | | 535.94 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 521.23 | | | | 521.23 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 473.58 | | | | 473.58 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 264.63 | | | | 264.63 |
| **Customer name. Redacted as confidential business information.** | Raw Material Sales | | | | 207.86 | 207.86 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | | | | 194.33 | 194.33 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 140.73 | | | | 140.73 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | | 84.03 | | | 84.03 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 0.75 | 2.54 | | | 3.29 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 0.01 | | | | 0.01 |
| **TOTAL** | | $ 335,417.66 | $ 363,516.26 | $ 645.80 | $ 2,431.27 | $ 702,010.99 |

# IZVOD PROMETA PO RAČUNU

Datum i vrijeme izdavanja:  01.05.2025. 14:11
Za razdoblje (po datumu obrade):  01.04.2025. do 30.04.2025.

| | |
|---|---|
| **ERSTE&STEIERMÄRKISCHEBANK D.D.** | **KREŠIMIR HERNAUS** |
| OIB: ████████9320 | KARLOVAČKA CESTA 65 D/1 |
| SWIFT/BIC: ESBCHR22 | 10000 ZAGREB |
| SAVJETODAVNI CENTAR ZAGREB - VUKOVARSKA | REPUBLIKA HRVATSKA |
| 10000 ZAGREB, IVANA LUČIĆA 2 | |
| Tel.: (072) 37 2580 Faks: (072) 37 1956 | |

Naziv klijenta:          KREŠIMIR HERNAUS
OIB:                          45925046683

IBAN:                       HR2224020063212234851
Naziv računa:          TEKUĆI RAČUN
Oznaka valute:        EUR

| Datum valute Datum obrade | Platitelj/Primatelj Broj računa/IBAN Tečaj | Redni broj Opis plaćanja Šifra namjene | Poziv na broj zaduženja Poziv na broj odobrenja Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| **Početno stanje** | | | | | **1.380,91** |
| 07.04.2025 07.04.2025 | Vendor name. Redacted as confidential business information | 1 - 462765XXXXXX2330, BOLT.EU/O/2504070147 Tallinn,  07.04.2025 03:47 | HR99 HR99 6238427477 | 31,70 | |
| 08.04.2025 08.04.2025 | Vendor name. Redacted as confidential business information | 2 - 462765XXXXXX2330, GRUPPO TORINESE TRASPO TORINO, 07.04.2025 20:26 | HR99 HR99 6241029463 | | 2,00 |
| 08.04.2025 08.04.2025 | Vendor name. Redacted as confidential business information | 3 - 462765XXXXXX2330, ASPIT BERGAMO        - MILANO EST,  07.04.2025 14:55 | HR99 HR99 6241080569 | | 3,70 |
| 08.04.2025 08.04.2025 | Vendor name. Redacted as confidential business information | 4 - 462765XXXXXX2330, GAVIO - SATAP A4 TORINO,  07.04.2025 15:53 | HR99 HR99 6241080590 | 17,90 | |
| 09.04.2025 09.04.2025 | Vendor name. Redacted as confidential business information | 5 - 462765XXXXXX2330, AUTOST DIREZIONE SUD/FALC HERA BA, 07.04.2025 16:06 | HR99 HR99 6243823877 | | 1,50 |
| 09.04.2025 09.04.2025 | Vendor name. Redacted as confidential business information | 6 - 462765XXXXXX2330, GAVIO - SATAP A4 TORINO,  08.04.2025 13:05 | HR99 HR99 6243919566 | | 3,00 |
| 09.04.2025 09.04.2025 | Vendor name. Redacted as confidential business information | 7 - 462765XXXXXX2330, GAVIO - SATAP A4 TORINO,  08.04.2025 12:51 | HR99 HR99 6243919590 | | 3,50 |
| 09.04.2025 09.04.2025 | Vendor name. Redacted as confidential business information | 8 - 462765XXXXXX2330, GAVIO - SATAP A4 TORINO,  08.04.2025 12:42 | HR99 HR99 6243919609 | 17,90 | |
| 09.04.2025 09.04.2025 | Vendor name. Redacted as confidential business information | 9 - 462765XXXXXX2330, MISER DIREZ.ENTRATA  - TERRAZZANO BA, 08.04.2025 13:08 | HR99 HR99 6243921236 | | 3,40 |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 10 - 462765XXXXXX2330, NH TORINO CENTRO TURIN,  08.04.2025 10:14 | HR99 HR99 6247145900 | 165,42 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 11 - 462765XXXXXX2330, CAFFE HARDY MILANO, 09.04.2025 12:03 | HR99 HR99 6247187130 | 2,70 | |

| Datum valute Datum obrade | Platitelj/Primatelj Broj računa/IBAN Tečaj | Redni broj Opis plaćanja Šifra namjene | Poziv na broj zaduženja Poziv na broj odobrenja Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 12 - 462765XXXXXX2330, GIOIA M2 MILANO, 09.04.2025 14:17 | HR99 HR99 6247187152 | 2,20 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | S. AMBROGIO M2 MILANO, 09.04.2025 19:25 | HR99 HR99 6247201982 | 2,20 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 14 - 462765XXXXXX2330, AUTOSILO SARONNO SARONNO, 09.04.2025 20:07 | HR99 HR99 6247201996 | 5,00 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 15 - 462765XXXXXX2330, FNM*TRENORD TVM 1025- MILANO, 09.04.2025 19:37 | HR99 HR99 6247242795 | 3,10 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 16 - 462765XXXXXX2330, CADORNA M1 MILANO, 09.04.2025 11:05 | HR99 HR99 6247423640 | 2,20 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 17 - 462765XXXXXX2330, S. BABILA M1 MILANO, 09.04.2025 17:50 | HR99 HR99 6247423661 | 2,20 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 18 - 462765XXXXXX2330, LA RINASCENTE DUOMO 10 MILANO, 09.04.2025 17:38 | HR99 HR99 6247424532 | 35,50 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 19 - 462765XXXXXX2330, PV SARONNO 01 SARONNO, 09.04.2025 10:07 | HR99 HR99 6247429896 | 3,10 | |
| 10.04.2025 10.04.2025 | Vendor name. Redacted as confidential business information | 20 - 462765XXXXXX2330, IL MANNARINO SRL MILANO, 09.04.2025 12:58 | HR99 HR99 6247513534 | 35,00 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 21 - 462765XXXXXX2330, ASPIT DIREZ. USCITA - LAINATE, 10.04.2025 19:04 | HR99 HR99 6250531382 | 0,80 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 22 - 462765XXXXXX2330, ASPIT DIREZ.ENTRATA - LAINATE, 10.04.2025 21:15 | HR99 HR99 6250531401 | 0,80 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 23 - 462765XXXXXX2330, ASPIT DIREZ.ENTRATA - COMO-GRANDATE, 10.04.2025 18:16 | HR99 HR99 6250531427 | 2,40 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 24 - 462765XXXXXX2330, ASPIT DIREZ. USCITA - COMO-GRANDATE, 10.04.2025 07:49 | HR99 HR99 6250531452 | 2,40 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 25 - 462765XXXXXX2330, ROMANTICA ARESE, 10.04.2025 20:52 | HR99 HR99 6250735265 | 9,41 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 26 - 462765XXXXXX2330, TRATTORIA DEL VAPORE CERNOBBIO, 10.04.2025 13:40 | HR99 HR99 6250834765 | 34,00 | |
| 11.04.2025 11.04.2025 | Vendor name. Redacted as confidential business information | 27 - 462765XXXXXX2330, vintrica vintrica.com E-V 46,99 CHF, 10.04.2025 08:18 | HR99 HR99 6250951759 | 52,18 | |

| Datum valute Datum obrade | Platitelj/Primatelj Broj računa/IBAN Tečaj | Redni broj Opis plaćanja Šifra namjene | Poziv na broj zaduženja Poziv na broj odobrenja Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 28 - 462765XXXXXX2330, Trainline SAS Paris, 11.04.2025 18:00 | HR99 HR99 6252789173 | 3,70 | |
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 29 - 462765XXXXXX2330, MOSCOVA M2 MILANO, 11.04.2025 12:40 | HR99 HR99 6252823881 | 2,20 | |
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 30 - 462765XXXXXX2330, AUTOSILO SARONNO SARONNO, 11.04.2025 18:50 | HR99 HR99 6252863771 | 5,00 | |
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 31 - 462765XXXXXX2330, RISTORAZIONE RHO, 11.04.2025 16:10 | HR99 HR99 6253198681 | 8,50 | |
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 32 - 462765XXXXXX2330, RISTORAZIONE RHO, 11.04.2025 14:39 | HR99 HR99 6253198702 | 15,50 | |
| 12.04.2025 12.04.2025 | Vendor name. Redacted as confidential business information | 33 - 462765XXXXXX2330, FIORAIO BIANCHI CAFFE SR MILANO, 11.04.2025 11:49 | HR99 HR99 6253273647 | 6,00 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 34 - 462765XXXXXX2330, Le Petit Bistrot Milano, 12.04.2025 12:43 | HR99 HR99 6254675640 | 13,50 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 35 - 462765XXXXXX2330, Trainline SAS Paris, 12.04.2025 07:34 | HR99 HR99 6254681500 | 6,80 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 36 - 462765XXXXXX2330, TRAINLINE PARIS, 11.04.2025 10:26 | HR99 HR99 6254706385 | 5,30 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 37 - 462765XXXXXX2330, ASPIT MILANO EST   - BERGAMO, 12.04.2025 18:16 | HR99 HR99 6254737751 | 3,70 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 38 - 462765XXXXXX2330, ASPIT DIREZ. USCITA  - MILANO NORD, 12.04.2025 17:33 | HR99 HR99 6254737775 | 1,80 | |
| 13.04.2025 13.04.2025 | Vendor name. Redacted as confidential business information | 39 - 462765XXXXXX2330, BOLT.EU/O/2504122157 Tallinn, 12.04.2025 23:57 | HR99 HR99 6254999358 | 26,60 | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 40 - 462765XXXXXX2330, AUTOSILO SARONNO SARONNO, 12.04.2025 13:46 | HR99 HR99 6258218076 | 5,00 | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 41 - 462765XXXXXX2330, JUST HOTEL SRL SOC.UNI SARONNO, 12.04.2025 06:55 | HR99 HR99 6258218591 | 73,00 | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 42 - 462765XXXXXX2330, JUST HOTEL SRL SOC.UNI SARONNO, 12.04.2025 17:13 | HR99 HR99 6258218612 | 13,00 | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 43 - 462765XXXXXX2330, PASTICCERIA MARCHESI MILANO, 12.04.2025 10:56 | HR99 HR99 6258330630 | 20,00 | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 44 - 462765XXXXXX2330, CLESS TICKET ATM | HR99 HR99 | 2,20 | |

| Datum valute Datum obrade | Platitelj/Primatelj Broj računa/IBAN Tečaj | Redni broj Opis plaćanja Šifra namjene | Poziv na broj zaduženja Poziv na broj odobrenja Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| | | MILANO MILANO, 11.04.2025 00:00 | 6258331699 | | |
| 14.04.2025 14.04.2025 | Vendor name. Redacted as confidential business information | 45 - 462765XXXXX2330, PANINO GIUSTO SPA ORIO AL SERIO, 12.04.2025 21:07 | HR99 HR99 6258335195 | 13,10 | |
| 15.04.2025 15.04.2025 | Vendor name. Redacted as confidential business information | 46 - 462765XXXXX2330, Europcar Bergamo, 13.04.2025 00:00 | HR99 HR99 6262462335 | 571,07 | |
| 21.04.2025 21.04.2025 | Vendor name. Redacted as confidential business information | 47 - 462765XXXXX2330, ERSTE ATM  ZAGREB Jaruščića bb,  21.04.2025 13:19 | HR99 HR99 6276850547 | 100,00 | |
| 30.04.2025 30.04.2025 | Vendor name. Redacted as confidential business information | 48 - Naplata naknade za vođenje računa | HR99 HR99 6303323999 | 2,00 | |
| **Konačno stanje** | | | | **37,73** | |

| REKAPITULACIJA | | Prethodno stanje | 1.380,91 | **Konačno stanje** | **37,73** |
|---|---|---|---|---|---|
| Naloga na teret | 48 | Dugovni promet | 1.343,18 | Rezervirano za naplatu | 0,00 |
| Naloga u korist | 0 | Potražni promet | 0,00 | Prekoračenje | 0,00 |
| Naloga ukupno | 48 | Ukupno promet | -1.343,18 | Rezervirano po nalogu FINA-e | 0,00 |
| | | | | Raspoloživo stanje | 37,73 |

**Vaš međunarodni broj bankovnog računa (IBAN) je HR2224020063212234851, a identifikacijska šifra banke je ESBCHR22.**

**U lipnju 2025. izdvajamo poslovanje vezano za aplikaciju KEKS Pay u zasebno trgovačko društvo KEKS Pay d.o.o., zbog čega će od 16.6.2025. vrijediti novi Opći uvjeti poslovanja Erste banke. KEKS Pay d.o.o. preuzet će pružanje usluga aplikacije KEKS Pay, a Erste banka će nastaviti s pružanjem svih platnih usluga (slanje i primanje novca, plaćanje na prodajnim mjestima) te s ponudom drugih bankovnih usluga u aplikaciji.  Usvajanje i izmjena Općih uvjeta predstavljaju i izmjene Okvirnog ugovora o platnim uslugama. Spomenuti Okvirni ugovor možete otkazati ako niste suglasni s izmjenama - bez naknade sve do stupanja izmjena na snagu. Otkazivanjem Okvirnog ugovora zatvara se i transakcijski račun u Erste banci otvoren na temelju tog ugovora. Klijente s kojima smo sklopili Okvirni ugovor o platnim uslugama i korisnici su aplikacije KEKS Pay, obavijestit ćemo o promjenama. Također, tekst Općih uvjeta možete pronaći na našoj web stranici i u poslovnicama Erste banke.**

| Credit date | Debit Date | Booking Text | Recipient | Amount | Currency | 2024 Balance | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | € | **107.18** As 04/30/2025 |
| | | | | | | | $ | 142.33 |
| | 6/23/24 | Decathlon Shirts and Shorts - Samples | Alexander Kühlmann | (109.96) | EUR | 107.18 | | |
| | 6/23/24 | Cost account June 2024 | NASPA Bank Account | (20.00) | EUR | 217.14 | | |
| | 6/23/24 | Cost account March 2024 | NASPA Bank Account | (15.00) | EUR | 237.14 | | |
| | 6/23/24 | Cost account February 2024 | NASPA Bank Account | (6.00) | EUR | 252.14 | | |
| | 6/23/24 | Hologenix telephone November 2023 | Alexander Kühlmann | (18.00) | EUR | 258.14 | | |
| | 5/31/24 | Hologenix telephone April 2024 | Alexander Kühlmann | (21.38) | EUR | 276.14 | | |
| | 4/30/24 | Hologenix telephone March 2024 | Alexander Kühlmann | (29.66) | EUR | 297.52 | | |
| | 3/31/24 | Hologenix telephone February 2024 | Alexander Kühlmann | (20.42) | EUR | 327.18 | | |
| | 2/29/24 | Hologenix telephone January 2024 | Alexander Kühlmann | (18.44) | EUR | 347.60 | | |
| | 1/31/24 | Heimtextil - Last Day Ticket ohne Info-Service | Alexander Kühlmann | (43.00) | EUR | 366.04 | | |
| | 1/31/24 | Heimtextil - Lunch on 01/12/2024 | Alexander Kühlmann | (11.50) | EUR | 409.04 | | |
| | 1/31/24 | Heimtextil - Roundtrip to Frankfurt - 60km | Alexander Kühlmann | (18.00) | EUR | 420.54 | | |
| | 1/31/24 | Hologenix telephone December 2023 | Alexander Kühlmann | (18.00) | EUR | 438.54 | | |
| | | **Account balance on 12/31/2023** | | 456.54 | EUR | | | |



| Merchant Account ID: ▮▮▮▮QAWQ | PayPal ID: ap@celliant.com | 4/1/25 - 4/30/25 |

## Statement for April 2025

Hologenix, LLC
1113 Montana Ave #13
90403 Santa Monica

### Balance Summary (4/1/25 - 4/30/25)

|  | Available beginning | Available ending | Withheld beginning | Withheld ending |
|---|---|---|---|---|
| USD | 0.00 | 0.00 | 0.00 | 0.00 |
| EUR | 0.00 | 0.00 | 0.00 | 0.00 |

**PayPal**

Merchant Account ID: N6TPDFYPZQAWQ          PayPal ID: ap@celliant.com          4/1/25 - 4/30/25

*-- There are no transactions for this month --*

To report an unauthorized transaction or other error NOT involving your debit card: call (402-938-3614) or write to us (Attn: Error Resolution Department, P.O. Box 45950, Omaha, NE 68145-0950).

To report an unauthorized transaction or other error concerning your debit card: call (402-938-3614), fax (303-395-2855) or write to us (PayPal Debit Card Department, P.O. Box 45950, Omaha, NE 68145-0950).

To cancel a pre-authorized or recurring payment or determine whether a pre-authorized or recurring transfer has been made: call us at 1-877-896-6383 (please note that only calls pertaining to pre-authorized or recurring payments will be accepted at this number).

# Initiate Business Checking™

April 30, 2025 ■ Page 1 of 7



HOLOGENIX LLC
17383 W SUNSET BLVD
SUITE A420
PACIFIC PALISADES CA 90272-4181

## Questions?

*Available by phone Mon-Sat 7:00am-11:00pm Eastern Time, Sun 9:00am-10:00pm Eastern Time:*
We accept all relay calls, including 711

**1-800-CALL-WELLS**  (1-800-225-5935)

*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:*  Wells Fargo Bank, N.A. (825)
        P.O. Box 6995
        Portland, OR  97228-6995

## Your Business and Wells Fargo

Visit wellsfargo.com/digitalbusinessresources to explore tours, articles, infographics, and other resources on the topics of money movement, account management and monitoring, security and fraud prevention, and more.

---

**Other Wells Fargo Benefits**

**Keep your accounts and money safe. Know how to spot a scam with these two tips.**

**1. Question unusual payment requests.**
Scammers prefer payment methods that make it difficult or impossible to recover your money. Be cautious if anyone asks you to pay with gift cards, prepaid cards, cryptocurrency, wire transfers, or a payment app. These payment methods are like sending cash. Remember that requests for gift cards are almost always a scam.

Learn more at wellsfargo.com/saferpayments

**2. Don't allow anyone remote access to your devices.**
Scammers may call you posing as a computer technician, or you may get a pop-up window on your screen warning you about an issue with your device. If you engage, they'll ask you to allow them into your computer or to do a screen share.

**Know that legitimate tech support companies don't contact you and ask for access to your computer. If this happens to you, it's a scam.** If you have an issue with your computer or device, go to a company you know and trust. Never rely on someone reaching out to you and don't allow them access to your device.



It's your money and your personal information. Protect it.

Learn more at wellsfargo.com/scams

## Statement period activity summary

| | |
|---|---|
| Beginning balance on 4/1 | $71,305.76 |
| Deposits/Credits | 361,009.23 |
| Withdrawals/Debits | - 304,551.40 |
| **Ending balance on 4/30** | **$127,763.59** |

Account number: ████ **2016  (primary account)**

**HOLOGENIX LLC**

*Nevada account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN) 321270742

For Wire Transfers use
Routing Number (RTN) 121000248

## Overdraft Protection

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility
requirements please call the number listed on your statement or visit your Wells Fargo branch.

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 4/1 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 3,995.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 6,294.75 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 2,866.24 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 4,100.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 150.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 650.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 1,394.45 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 2,116.59 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 80.76 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 500.00 | |
| 4/1 | | Vendor name. Redacted as confidential business information | | 2,250.00 | 41,907.97 |
| 4/2 | | Vendor name. Redacted as confidential business information | | 237.94 | |
| 4/2 | | Vendor name. Redacted as confidential business information | | 9,014.00 | 32,656.03 |
| 4/3 | | Customer name. Redacted as confidential business information | 1,405.54 | | |
| 4/3 | | Vendor name. Redacted as confidential business information | | 5,000.00 | 29,061.57 |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------------|-------------|-----------------:|------------------:|--------------------:|
| 4/4 | | Customer name. Redacted as confidential business information | 376.86 | | 29,438.43 |
| 4/9 | | Customer name. Redacted as confidential business information | 2,454.08 | | |
| 4/9 | | Vendor name. Redacted as confidential business information | | 476.12 | 31,416.39 |
| 4/10 | | Customer name. Redacted as confidential business information | 17,575.54 | | |
| 4/10 | | Vendor name. Redacted as confidential business information | | 72.03 | 48,919.90 |
| 4/11 | | Customer name. Redacted as confidential business information | 30.98 | | |
| 4/11 | | Customer name. Redacted as confidential business information | 344.25 | | |
| 4/11 | | Customer name. Redacted as confidential business information | 300,000.00 | | |
| 4/11 | | Seth Casden - Transfer Correction | 10,000.00 | | |
| 4/11 | | Seth Casden - Transfer Correction | 8,000.00 | | |
| 4/11 | | WT Fed#00393 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25041100272088 Trn#250411052190 Rfb# Q+50145346 253 | | 58,575.07 | |
| 4/11 | | WT Fed#02034 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25041100287119 Trn#250411191594 Rfb# Q+50146843 740 | | 6,545.17 | |
| 4/11 | | Seth Casden - Transfer Correction | | 18,000.00 | 284,174.89 |
| 4/14 | | Customer name. Redacted as confidential business information | 4,070.64 | | |
| 4/14 | | Vendor name. Redacted as confidential business information | | 3,909.57 | 284,335.96 |
| 4/15 | | Vendor name. Redacted as confidential business information | | 4,400.00 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 5,000.00 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 9,373.96 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 1,592.47 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 1,030.00 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 381.99 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 5,000.00 | |
| 4/15 | | WT Fed#09042 Zions Bancorporati /Ftr/Bnf=Buchalter Srf# Ow0000587260464 Trn#250415176751 Rfb# Ow00005587260464 | | 2,500.00 | |
| 4/15 | | WT Fed#09136 City National Bank /Ftr/Bnf=Stradling Yocca Carlson and Rauth Srf# Ow0000587267696 Trn#250415177434 Rfb# Ow00005587267696 | | 1,500.00 | |
| 4/15 | | WT Fed#08972 Jpmorgan Chase Ban /Ftr/Bnf=Grobstein Teeple LLP Srf# Ow00005587271338 Trn#250415177785 Rfb# Ow00005587271338 | | 1,500.00 | |
| 4/15 | | WT Fed#09001 Jpmorgan Chase Ban /Ftr/Bnf=Levene Neale Bender Yoo and Golubch Srf# Ow00005587273609 Trn#250415178065 Rfb# Ow00005587273609 | | 10,000.00 | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 4/15 | | WT Seq178396 Troutman Pepper Locke L /Bnf=Troutman Pepper Hamilton Sanders L Srf# Ow00005587276346 Trn#250415178396 Rfb# Ow00005587276346 | | 2,500.00 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 973.50 | |
| 4/15 | | Online Transfer to Casden S Ref #Ib0S2D8Wjd Premier Checking Hologenix LLC March 2025 Payment | | 25,000.00 | |
| 4/15 | | Online Transfer Ref #Ib0S2D97MH to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 3243 | | 3,610.80 | |
| 4/15 | | Online Transfer Ref #Ib0S2D9Dlm to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 1195 | | 227.83 | |
| 4/15 | | Online Transfer Ref #Ib0S2D9Jqn to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 2711 | | 946.11 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 6,500.00 | |
| 4/15 | | Vendor name. Redacted as confidential business information | | 12,685.41 | 189,613.89 |
| 4/16 | | Customer name. Redacted as confidential business information | 367.02 | | 189,980.91 |
| 4/17 | | Vendor name. Redacted as confidential business information | | 8,450.00 | 181,530.91 |
| 4/22 | | Customer name. Redacted as confidential business information | 452.73 | | 181,983.64 |
| 4/23 | | Customer name. Redacted as confidential business information | 267.16 | | |
| 4/23 | | Customer name. Redacted as confidential business information | 3,156.39 | | |
| 4/23 | | Customer name. Redacted as confidential business information | 642.16 | | 186,049.35 |
| 4/24 | | Customer name. Redacted as confidential business information | 5,379.69 | | 191,429.04 |
| 4/28 | | Customer name. Redacted as confidential business information | 2,505.00 | | |
| 4/28 | | Customer name. Redacted as confidential business information | 72.23 | | |
| 4/28 | | Vendor name. Redacted as confidential business information | | 470.64 | |
| 4/28 | | WT Fed#06754 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25042800463823 Trn#250428069665 Rfb# Q+50157077 559 | | 58,557.63 | 134,978.00 |
| 4/30 | | Customer name. Redacted as confidential business information | 729.50 | | |
| 4/30 | | Customer name. Redacted as confidential business information | 286.25 | | |
| 4/30 | | Customer name. Redacted as confidential business information | 471.16 | | |
| 4/30 | | Customer name. Redacted as confidential business information | 777.58 | | |
| 4/30 | | Customer name. Redacted as confidential business information | 1,644.47 | | |
| 4/30 | | Online Transfer Ref #Ib0S7F72Bs to Signify Business Essential Card Hologenix LLC Pay IN Full Bal CC 1195 | | 5,228.37 | |
| 4/30 | | Vendor name. Redacted as confidential business information | | 5,895.00 | 127,763.59 |
| **Totals** | | | **$361,009.23** | **$304,551.40** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

< **Business to Business ACH:** *If this is a business account, this transaction has a return time frame of one business day from post date. This time frame does not apply to consumer accounts.*



## Monthly service fee summary

For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 04/01/2025 - 04/30/2025 | | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|---|
| **How to avoid the monthly service fee** | | Minimum required | This fee period |
| Have any **ONE** of the following each fee period | | | |
| • Average ledger balance | | $1,000.00 | $142,891.00 √ |
| • Minimum daily balance | | $500.00 | $29,061.57 √ |
| C1/C1 | | | |

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 5,000 | 0 | 0.0030 | 0.00 |
| Transactions | 47 | 100 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |



# IMPORTANT ACCOUNT INFORMATION

----

Effective June 4, 2025, we are updating the following sections of the "Availability of Funds Policy" in our Deposit Account Agreement:

The "Longer delays may apply" section is deleted and replaced with the following:

In some cases, we will not make the first $400 of a business day's check deposits available to you on the day we receive the deposits. Further, in some cases, we will not make all the funds that you deposit by check available to you on the first business day after the day of your deposit.

Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $275 of your deposit, however, may be available on the first business day after the day of your deposit.

Except as otherwise explained in this paragraph, if we are not going to make all funds from your deposit available on the business day of deposit or the first business day after the day of deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Wells Fargo employee, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit.

If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe a check you deposit will not be paid
- You deposit checks totaling more than $6,725 on any one day
- You redeposit a check that has been returned unpaid
- You have overdrawn your account repeatedly in the last six months
- There is an emergency, such as failure of computer or communications equipment

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. The funds will generally be available no later than the seventh business day after the day of your deposit.

The "Special rules for new accounts" section is deleted and replaced with the following:

**If you are a new customer, the following special rules apply during the first 30 days your account is open.** Incoming wire transfers, electronic direct deposits, and cash deposited at a teller window and at a Wells Fargo ATM will be available on the day we receive the deposit. Funds from your check deposits will be available on the business day after the day we receive the deposits; no funds from a business day's check deposits are available on the day we receive the deposits.

If we delay the availability of your deposit the following special rules may apply:



**- The first $6,725** of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks, and U.S. Postal Service money orders made payable to you will be available on the first business day after the day of your deposit, if your deposit meets certain conditions. For example, the checks must be payable to you. If your deposit of these checks (other than U.S. Treasury checks) is not made in person to one of our employees, the first $6,725 may not be available until the second business day after the day of your deposit.
**- The excess over $6,725** and funds from all other check deposits will be available no later than the seventh business day after the day of your deposit. The first $275 of a day's total deposit of funds from all other check deposits, however, may be available on the first business day after the day of your deposit.
We will notify you if we delay your ability to withdraw funds and we will tell you when the funds will be available.

——————————

Effective May 15, 2025, the section of the Deposit Account Agreement titled "Availability of Funds Policy," subsection "Your ability to withdraw funds," is deleted and replaced with the following:

Our policy is to make funds from your check deposits to your checking or savings account (in this policy, each account) available to you on the first business day after the day we receive your deposits. Incoming wire transfers, electronic direct deposits, cash deposited at a teller window and at a Wells Fargo ATM, and the first $400 of a day's check deposits at a teller window, at a Wells Fargo ATM, and with the Wells Fargo Mobile Banking app will be available on the day we receive the deposits. Certain electronic credit transfers, such as those through card networks or funds transfer systems, will generally be available on the day we receive the transfer. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks and other items presented for payment and applicable fees that you have incurred.

Effective May 15, 2025, the section of the Deposit Account Agreement titled "Fund Transfer Disclosures-General," subsection "ACH transactions," is deleted and replaced with the following:

These additional terms apply to payments to or from your account that you transmit through an ACH:
- Your rights as to payments to or from your account will be based on the laws governing your account.
- When we credit your account for an ACH payment, the payment is provisional until we receive final settlement through a Federal Reserve Bank or otherwise receive payment.
- If we don't receive final settlement or payment, we're entitled to a refund from you for the amount credited to your account and the sender of the payment will not be considered to have made the payment to you.
- For ACH debit entries that debit your non-Wells Fargo account and credit your Wells Fargo account, Wells Fargo Bank generally holds those funds for 3-4 business days to make sure that the funds will not be returned unpaid before we credit your Wells Fargo account. Longer holds may apply, or we may return the funds to the sending bank and not make the funds available to your Wells Fargo account, if we - in our sole discretion - believe the transfer is irregular or suspicious.
- Any Originating Depository Financial Institution (ODFI) may initiate, pursuant to ACH Operating Rules, ACH debit entries to your account for presentment or re-presentment of items you write or authorize.

——————————

NEW YORK CITY CUSTOMERS ONLY -- Pursuant to New York City regulations, we request that you contact us at 1-800-TO WELLS (1-800-869-3557) to share your language preference.



---

## Important Information You Should Know

- **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts:** Wells Fargo Bank, N.A. may furnish information about deposit accounts to Early Warning Services. You have the right to dispute the accuracy of information that we have furnished to a consumer reporting agency by writing to us at Wells Fargo Bank N.A. Attn: Deposit Furnishing Disputes MAC F2304-019 PO Box 50947 Des Moines, IA 50340. Include with the dispute the following information as available: Full name (First, Middle, Last), Complete address, The account number or other information to identify the account being disputed, Last four digits of your social security number, Date of Birth. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

- **In case of errors or questions about other transactions (that are not electronic transfers):** Promptly review your account statement within 30 days after we made it available to you, and notify us of any errors.

- **If your account has a negative balance:** Please note that an account overdraft that is not resolved 60 days from the date the account first became overdrawn will result in closure and charge off of your account. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. The closure will be reported to Early Warning Services. We reserve the right to close and/or charge-off your account at an earlier date, as permitted by law. The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.

- To download and print an Account Balance Calculation Worksheet(PDF) to help you balance your checking or savings account, enter www.wellsfargo.com/balancemyaccount in your browser on either your computer or mobile device.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your          $ _____
register or transfers into              $ _____
your account which are not              $ _____
shown on your statement.              + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
.                                        **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . . $ _____

| Number | Items Outstanding | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  | **Total amount** $ |

©2021 Wells Fargo Bank, N.A. All rights reserved.  Member FDIC.  NMLSR ID 399801

Hologenix LLC

1000.110 ERSTE Funds, Period Ending 04/30/2025

**RECONCILIATION REPORT**

Reconciled on: 05/20/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

**Summary**

| | EUR |
|---|---|
| Statement beginning balance | |
| Checks and payments cleared (2) | -1,343.18 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 2.73 |

Register balance as of 04/30/2025

**Details**

Checks and payments cleared (2)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (EUR) |
|---|---|---|---|---|
| 04/30/2025 | Transfer | | | -300.00 |
| 04/30/2025 | Bill Payment | ERSTE-April25(2) | Vendor name: Redacted as confidential business information | -1,043.18 |
| Total | | | | -1,343.18 |

Hologenix LLC

**1000.120 NASPA Funds, Period Ending 04/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 05/20/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | EUR |
| --- | --- |
| Statement beginning balance, | ...07/18 |
| Checks and payments cleared (0), | 0.00 |
| Deposits and other credits cleared (0), | 0.00 |
| Statement ending balance, | ...07/18 |
| | |
| Register balance as of 04/30/2025, | ...07/18 |

Hologenix LLC

**1000.200 PayPal, Period Ending 04/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 05/20/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

**Summary**

| | USD |
|---|---|
| Statement beginning balance, | 0.00 |
| Checks and payments cleared (0), | 0.00 |
| Deposits and other credits cleared (0), | 0.00 |
| Statement ending balance, | 0.00 |
| | |
| Register balance as of 04/30/2025, | 0.00 |

Hologenix LLC

**1000.300 Petty Cash, Period Ending 04/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 05/20/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

**Summary**

| | USD |
|---|---|
| Statement beginning balance | |
| Checks and payments cleared (3) | -4,728.72 |
| Deposits and other credits cleared (2) | -9,774.86 |
| Statement ending balance | 346.14 |
| | |
| Register balance as of 04/30/2025 | 0.00 |

**Details**

Checks and payments cleared (3)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 03/31/2025 | Journal | 03.31 Close PettyCash | | 75.44 |
| 03/31/2025 | Journal | 03.31PettyCashRecon | | 19.00 |
| 04/30/2025 | Bill Payment | ERSTE Apr25 | Vendor name: Redacted as confidential business information | 1,634.42 |

Total 1,728.86

Deposits and other credits cleared (2)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 03/31/2025 | Transfer | | | 3,100.02 |
| 04/30/2025 | Transfer | | | 13.12 |

Total 346.14

Hologenix LLC

1000.400 Taiwan Bank Accounts, Period Ending 04/30/2025

**RECONCILIATION REPORT**

Reconciled on: 05/23/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

**Summary**

USD

| | |
|---|---|
| Statement beginning balance | |
| Checks and payments cleared (0) | |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | |
| | |
| Register balance as of 04/30/2025 | |

Case 2:23-bk-16904-BR    Doc 3663    Filed 07/03/25    Entered 07/03/25 14:59:17    Desc
Declaration of Nicole Sullivan Page 37 of 809

Case 2:23-bk-16904-BR    Doc 3661    Filed 07/03/25    Entered 07/03/25 14:59:07    Desc
Main Document    Page 609 of 1079

5/23/25, 3:41 PM

Hologenix LLC

**1000.000 Checking - Wells Fargo 2016, Period Ending 04/30/2025**

**RECONCILIATION REPORT**

Reconciled on: 05/20/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 71,305.76 |
| Checks and payments cleared (47) | -304,561.40 |
| Deposits and other credits cleared (23) | 361,019.23 |
| Statement ending balance | 127,763.59 |
| | |
| Register balance as of 04/30/2025 | 127,763.59 |
| Cleared transactions after 04/30/2025 | 0.00 |
| Uncleared transactions after 04/30/2025 | 371,025.56 |
| Register balance as of 05/20/2025 | 498,789.15 |

**Details**

Checks and payments cleared (47)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -500.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,995.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -4,100.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 04/01/2025 | Bill Payment | | WFG Visa 9938 | -150.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -650.00 |
| 04/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -80.76 |
| 04/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -2,116.59 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,294.75 |
| 04/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -1,394.45 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,250.00 |
| 04/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,866.24 |
| 04/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -9,014.00 |
| 04/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -237.94 |
| 04/03/2025 | Bill Payment | Payment 3 of 5 of BK | Vendor name. Redacted as confidential business information | -5,000.00 |
| 04/09/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -476.12 |
| 04/10/2025 | Expense | SC-EO | Vendor name. Redacted as confidential business information | -72.03 |
| 04/11/2025 | Bill Payment | | TriNet HR Corporation | -58,575.07 |
| 04/11/2025 | Bill Payment | | TriNet HR Corporation | -6,545.17 |
| 04/11/2025 | Expense | | Seth Casden - Transfer Correction | -18,000.00 |
| 04/14/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -3,909.57 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -381.99 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -4,400.00 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,030.00 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -9,373.96 |
| 04/15/2025 | Expense | March2025(BK) | Seth Casden | -25,000.00 |
| 04/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -946.11 |
| 04/15/2025 | Bill Payment | Fee App 4-Payment 2 | Howard Grobstein | -1,500.00 |
| 04/15/2025 | Bill Payment | Fee App 6-Payment 3 | Gregory Jones | -1,500.00 |
| 04/15/2025 | Expense | April2025 | Vendor name. Redacted as confidential business information | -5,000.00 |

| 04/15/2025 | Credit Card Payment | | WFG Visa 9938 | -12,685.41 |
| 04/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -227.83 |
| 04/15/2025 | Bill Payment | Fee App 6-Payment 7 | Troutman Pepper LLP | -2,500.00 |
| 04/15/2025 | Bill Payment | Fee App 5-Payment 8 | Buchalter | -2,500.00 |
| 04/15/2025 | Bill Payment | Fee App 4-Payment 20 | NBYG | -10,000.00 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,592.47 |
| 04/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -3,610.80 |
| 04/15/2025 | Bill Payment | Payment 25 | Vendor name. Redacted as confidential business information | -973.50 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -5,000.00 |
| 04/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,500.00 |
| 04/17/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,450.00 |
| 04/28/2025 | Bill Payment | | TriNet HR Corporation | -58,557.63 |
| 04/28/2025 | Expense | | Vendor name. Redacted as confidential business information | -10.00 |
| 04/28/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -470.64 |
| 04/30/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -5,895.00 |
| 04/30/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -5,228.37 |

Total     -304,561.40

Deposits and other credits cleared (23)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|------|------|---------|-------|--------------|
| 04/03/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,405.54 |
| 04/04/2025 | Deposit | | Customer name. Redacted as confidential business information | 376.86 |
| 04/09/2025 | Deposit | | Customer name. Redacted as confidential business information | 2,454.08 |
| 04/10/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 17,575.54 |
| 04/11/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 344.25 |
| 04/11/2025 | Deposit | 23227670871 | Customer name. Redacted as confidential business information | 30.98 |
| 04/11/2025 | Deposit | | Seth Casden - Transfer Correction | 10,000.00 |
| 04/11/2025 | Deposit | | Seth Casden - Transfer Correction | 8,000.00 |
| 04/11/2025 | Deposit | | Seth Casden | 300,000.00 |
| 04/14/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 4,070.64 |
| 04/16/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 367.02 |
| 04/22/2025 | Deposit | | Customer name. Redacted as confidential business information | 452.73 |
| 04/23/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 267.16 |
| 04/23/2025 | Deposit | | Customer name. Redacted as confidential business information | 642.16 |
| 04/23/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 3,156.39 |
| 04/24/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 5,379.69 |
| 04/28/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 2,515.00 |
| 04/28/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 72.23 |
| 04/30/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 729.50 |
| 04/30/2025 | Receive Payment | 10742 | Customer name. Redacted as confidential business information | 1,644.47 |
| 04/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 777.58 |
| 04/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 286.25 |
| 04/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 471.16 |

Total     361,019.23

# EXHIBIT H

Fill in this information to identify the case:

Debtor Name    Hologenix, LLC

United States Bankruptcy Court for the: Central District of California

Case number: 2:20-bk-13849-BR

☐ Check if this is an amended filing

## Official Form 425C

# Monthly Operating Report for Small Business Under Chapter 11    12/17

Month:    July 2025

Date report filed:    09/01/2025
MM / DD / YYYY

Line of business:    Fiber, Yarn, Thread Mills

NAISC code:    3133

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    Hologenix, LLC

Original signature of responsible party    *Seth Casden*

Printed name of responsible party    Seth Casden

## ▮ 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☐ | ☑ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

| | |
|---|---|
| Debtor Name | Hologenix, LLC |
| Case number | 2:20-bk-13849-BR |

17. Have you paid any bills you owed before you filed bankruptcy?  ☐  ☑  ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 41,554.15

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C.* Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C.*

Report the total from *Exhibit C* here.

$ 689,965.61

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D.* List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D.*

Report the total from *Exhibit D* here.

– $ 290,326.38

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit.*

399,639.23

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

= $ 441,193.38

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E.* Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

*(Exhibit E)*

$ 2,402,408.8

| Debtor Name | Hologenix, LLC | Case number | 2:20-bk-13849-BR |
|---|---|---|---|

## 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**                                                          $ 237,284.86

   *(Exhibit F)*

## 5. Employees

26. What was the number of employees when the case was filed?                          4

27. What is the number of employees as of the date of this monthly report?             6

## 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?          $ 11,500.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?          $ 1,765,691.0

30. How much have you paid this month in other professional fees?          $ 10,000.00

31. How much have you paid in total other professional fees since filing the case?          $ 903,379.46

## 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | Column B | Column C |
|---|---|---|---|
|  | **Projected** | — **Actual** | = **Difference** |
|  | Copy lines 35-37 from the previous month's report. | Copy lines 20-22 of this report. | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 449,987.00 | — $ 689,965.61 | = $ -239,978.60 |
| 33. **Cash disbursements** | $ 275,895.00 | — $ 290,326.38 | = $ -14,431.38 |
| 34. **Net cash flow** | $ 174,092.00 | — $ 399,639.23 | = $ -225,547.20 |

35. Total projected cash receipts for the next month:                          $ 108,630.66

36. Total projected cash disbursements for the next month:                       - $ 294,861.00

37. Total projected net cash flow for the next month:                            = $ -186,230.34

| Debtor Name | Hologenix, LLC | Case number | 2:20-bk-13849-BR |
|---|---|---|---|

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39. Bank reconciliation reports for each account.

☐ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☐ 41. Budget, projection, or forecast reports.

☐ 42. Project, job costing, or work-in-progress reports.

# EXHIBIT "A"

No quarterly fees in subchapter V cases

# EXHIBIT "B"

10. No activity for following Taiwan bank accounts:

- Megabank x2883 and x0087
- Yuanta Bank TWD x7002

Bank accounts are to remain open as it is a requirement of doing business in Taiwan.

14. Unusual or significant unanticipated expenses:

| 07/15/2025 | Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 5,000 |

Some of these legal fees are for the defense of the lawsuit against the company's CEO Seth Casden. This was not expected or anticipated when Debtor's 2020 Chapter 11 plan was filed and confirmed, as this lawsuit by creditor Multiple Energy Technologies, LLC was filed in February 2021.  However, the Debtor filed an application to employ Theodora Oringher PC and disclosed this litigation in August 2021, and for the balance of 2021, these legal fees are more or less expected and anticipated but disclosed here in relation to the 2020 plan.

# EXHIBIT "C"

**Checking - Wells Fargo 2016**
**July 2025**

| Date | Payee | Memo | Foreign Currency | Deposit (USD) | Reconciliation Status | Type | Account |
|------|-------|------|-----------------|---------------|----------------------|------|---------|
| 07/01/2025 | Seth Casden | OUTGOING MASTER TR /ORG=SETH CASDEN RESULTING | | 350,000.00 | Reconciled | Deposit | 3000.001 Members' Equity:Owner's Equity - Contributions |
| 07/01/2025 | Customer name. Redacted as | Royalty Licensing Fees | 531.07 | 626.28 | Reconciled | Deposit | 1700.200 Undeposited Funds |
| 07/01/2025 | Customer name. Redacted as | Royalty Licensing Fees | 112.89 | 133.19 | Reconciled | Deposit | |
| 07/02/2025 | Customer name. Redacted as | DTC Sales | | 242.56 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/02/2025 | Customer name. Redacted as | Royalty Licensing Fees | 500.18 | 589.85 | Reconciled | Deposit | |
| 07/02/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 8,355.00 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/03/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 9.92 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/07/2025 | Customer name. Redacted as | DTC Sales | | 362.60 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/07/2025 | Customer name. Redacted as | DTC Sales | | 218.19 | Reconciled | Deposit | 1400.100 Amazon Sales Reserve Balance:Amazon Sales - US Clearing Account |
| 07/09/2025 | Customer name. Redacted as | Raw Materials Sales | | 1,571.85 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/09/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 443.20 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/11/2025 | Customer name. Redacted as | DTC Sales | | 209.42 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/14/2025 | Customer name. Redacted as | Royalty Licensing Fees | 27,887.22 | 18,259.02 | Reconciled | Deposit | |
| 07/14/2025 | Customer name. Redacted as | Royalty Licensing Fees | 318.52 | 371.92 | Reconciled | Deposit | |
| 07/14/2025 | Customer name. Redacted as | Royalty Licensing Fees | 563.90 | 658.45 | Reconciled | Deposit | |
| 07/14/2025 | Customer name. Redacted as | Royalty Licensing Fees | 3,113.26 | 3,635.24 | Reconciled | Deposit | |
| 07/14/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 3,637.38 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/15/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 1,585.55 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/17/2025 | Customer name. Redacted as | DTC Sales | | 334.59 | Reconciled | Transfer | 1000.200 PayPal |
| 07/17/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 1,599.10 | Reconciled | Transfer | 1000.200 PayPal |
| 07/18/2025 | Customer name. Redacted as | DTC Sales | | 928.77 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/18/2025 | Customer name. Redacted as | DTC Sales | | 60.80 | Reconciled | Deposit | 1400.100 Amazon Sales Reserve Balance:Amazon Sales - US Clearing Account |
| 07/18/2025 | Customer name. Redacted as | Royalty Licensing Fees | 476.37 | 553.92 | Reconciled | Deposit | |
| 07/22/2025 | Customer name. Redacted as | DTC Sales | | 26.65 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/23/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 1,592.98 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/24/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 134.48 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/25/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 285.27 | Reconciled | Deposit | Channel Clearing Account:Shopify Clearing Account |
| 07/25/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 4,201.56 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/25/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 294.16 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/29/2025 | Customer name. Redacted as | Royalty Licensing Fees | 1,163.67 | 1,345.50 | Reconciled | Deposit | |
| 07/30/2025 | Customer name. Redacted as | Royalty Licensing Fees | 512.80 | 370.93 | Reconciled | Deposit | |
| 07/30/2025 | Customer name. Redacted as | Royalty Licensing Fees | 14,982.61 | 17,114.77 | Reconciled | Deposit | |
| 07/30/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 1,379.13 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/30/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 767.55 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/30/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 308.18 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/31/2025 | Customer name. Redacted as | Royalty Licensing Fees | 514.32 | 587.26 | Reconciled | Deposit | 1700.200 Undeposited Funds |
| 07/31/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 139,996.85 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/31/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 45,717.70 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/31/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 81,453.13 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| 07/31/2025 | Customer name. Redacted as | Royalty Licensing Fees | | 2.71 | Reconciled | Payment | 1100.000 Accounts Receivable (A/R) - USD |
| | | | | **689,965.61** | | | |

EXHIBIT "D"

**Checking - Wells Fargo 2016**
**July 2025**

| Date | Payee | Memo | Foreign Currency | Payment (USD) | Reconciliation Status | Type | Account |
|------|-------|------|------------------|---------------|----------------------|------|---------|
| 07/01/2025 | Seth Casden | February 2025 Salary - Set amount per court approval | | 5,000.00 | Reconciled | Expense | 2250.000 Insider Compensation Payable |
| 07/01/2025 | Seth Casden | June 2025 Salary - Set amount per court approval | | 25,000.00 | Reconciled | Expense | 2250.000 Insider Compensation Payable |
| 07/01/2025 | Vendor name. Redacted as confidential t | Office Rent | | 12,672.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Wells Fargo Bus. MasterCard/Visa-9938 | Credit Card Payment | | 6,012.09 | Reconciled | Credit Card | 2050.102 WFB Visa 9938 |
| 07/01/2025 | Wells Fargo Bus. MasterCard/Visa-3243 | Credit Card Payment | | 49.00 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 07/01/2025 | Wells Fargo Bus. MasterCard/Visa-2711 | Credit Card Payment | | 100.00 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 07/01/2025 | Vendor name. Redacted as confidential t | Marketing Samples | | 2,473.54 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Marketing Samples | | 386.13 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Oceania Sales & Regulatory Support Representative | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | IT Consultant | | 650.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Virtual Interview Fees | | 6,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Asian Liaison Office - Taiwan Sales Representative | | 4,100.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | OOP Expenses Reimbursement | | 150.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Oceania Sales & Regulatory Support Representative | | 565.54 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | CIO/CTO Consultant | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | OOP Expenses Reimbursement | | 386.37 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | CFO Salary | | 2,406.25 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Indian Sales Representative | | 500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Patent Costs | | 5,327.40 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/01/2025 | Vendor name. Redacted as confidential t | Eastern European Sales Representative | -2,900.00 | | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 07/02/2025 | Vendor name. Redacted as confidential t | Printing Cost | | 238.44 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Vendor name. Redacted as confidential t | Administration Support | | 8,250.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Vendor name. Redacted as confidential t | Tradeshow Cost | | 8,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Wells Fargo Bus. MasterCard/Visa-7414 | Credit Card Payment | | 119.99 | Reconciled | Credit Card | 2050.100 BA Visa 7414 |
| 07/02/2025 | Vendor name. Redacted as confidential t | Marketing & PR Consultant | | 8,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Vendor name. Redacted as confidential t | Shipping Cost | | 3,050.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Vendor name. Redacted as confidential t | Shipping Cost | | 398.35 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/02/2025 | Vendor name. Redacted as confidential t | Shipping Cost | | 73.61 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/09/2025 | Vendor name. Redacted as confidential t | Ketamine-assisted 40 Years of Zen Program | | 7,000.00 | Reconciled | Expense | 1600.101 Prepaid Expenses:Prepaid Events & Travels Costs |
| 07/10/2025 | Vendor name. Redacted as confidential t | Consultant Fees | | 204.99 | Reconciled | Expense | 6016.002 Consultants:Business Development |
| 07/11/2025 | TriNet HR Corporation | Payroll Cost | | 55,073.32 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/14/2025 | Wells Fargo Bus. MasterCard/Visa-1195 | Credit Card Payment | | 2,000.00 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| 07/15/2025 | Vendor name. Redacted as confidential t | Regulatory & QMS Costs | -1,500.00 | 998.70 | Reconciled | Bill Payment | 2000.003 Accounts Payable (A/P) - AUD |
| 07/15/2025 | LNBYG | Chapter 11 Legal Rep - LNBYG | | 10,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Howard Grobstein | Chapter 11 Legal - BK Expert Witness | | 1,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Buchalter | Chapter 11 Professionals - Patent Services | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Troutman Pepper LLP | Chapter 11 Professionals - Trademark Services | | 2,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Theodora Oringher PC | Legal Fees | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Wells Fargo Bus. MasterCard/Visa-9938 | Credit Card Payment | | 14,615.42 | Reconciled | Credit Card | 2050.102 WFB Visa 9938 |
| 07/15/2025 | Vendor name. Redacted as confidential t | Japan Sales Representative + Japan Office Expenses | | 1,030.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Quarterly Board Deck Review | | 3,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | P/T Supply Chain Consultant | | 5,000.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Shipping Cost | | 1,682.82 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Patent Costs | | 2,521.49 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Regulatory & QMS Costs | -100.00 | 118.52 | Reconciled | Bill Payment | 2000.001 Accounts Payable (A/P) - EUR |
| 07/15/2025 | Vendor name. Redacted as confidential t | Regulatory & QMS Costs | | 711.12 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Testing Manager Consultant | | 6,500.00 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Vendor name. Redacted as confidential t | Supply Chain Warehouse Storage Unit | | 412.26 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/15/2025 | Wells Fargo Bus. MasterCard/Visa-3243 | Credit Card Payment | | 3,597.00 | Reconciled | Credit Card | 2050.007 Corporate WFB Mastercard 3243 |
| 07/15/2025 | Wells Fargo Bus. MasterCard/Visa-2711 | Credit Card Payment | | 946.97 | Reconciled | Credit Card | 2050.005 Corporate WFB Mastercard 2711 |
| 07/22/2025 | Vendor name. Redacted as confidential t | Chapter 11 MET Legal Fees - MET vs. Seth Casden | | 268.74 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/28/2025 | Wells Fargo Bus. MasterCard/Visa-1195 | Credit Card Payment | | 5,000.00 | Reconciled | Credit Card | 2050.006 Corporate WFB Mastercard 1195 |
| 07/29/2025 | TriNet HR Corporation | Payroll Cost | | 49,030.58 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/29/2025 | Vendor name. Redacted as confidential t | Business Applications & Software Expenses | | 475.44 | Reconciled | Bill Payment | 2000.000 Accounts Payable (A/P) - USD |
| 07/31/2025 | Vendor name. Redacted as confidential t | Uber Charge | | 175.00 | Reconciled | Expense | 6070.001 Travel & Entertainment:Airfare & Transportation |
| | | | | **$ 290,326.38** | | | |

| | | | | | | | |
|------|-------|------|------|------|------|------|------|
| 7/30/2025 | Kresimir Hernaus (ERSTE Bank Account | Eastern European Office OOP Expenses Reimbursement | 42.46 | 48.48 | Reconciled | Bill Payment | Accounts Payable (A/P) - EUR |

# EXHIBIT "E"

**Hologenix LLC**
**A/P Aging Summary**
As of July 31, 2025

| Vendor | Expense Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| LNBYG | Chapter 11 Legal Rep - LNBYG | 139,134.49 | | 35,964.01 | 733,670.50 | 908,769.00 |
| Theodora Oringher PC | Chapter 11 MET Legal Fees - MET vs. Seth Casden | 8,075.00 | | | 226,357.21 | 234,432.21 |
| Buchalter | Chapter 11 Professionals - Patent Services | 24,173.14 | | | 82,497.61 | 106,670.75 |
| Troutman Pepper LLP | Chapter 11 Professionals - Trademark Services | | 16,265.36 | 2,618.00 | 26,296.07 | 45,179.43 |
| Vendor name. Redacted as confidential business information. | June 2025 Rent | 15,442.59 | 2,770.59 | | | 18,213.18 |
| Vendor name. Redacted as confidential business information. | Business Applications & Software Expenses | 12,985.00 | | | | 12,985.00 |
| Vendor name. Redacted as confidential business information. | CIO/CTO Consultant + Research & Experimental Expenses | | | | 10,000.00 | 10,000.00 |
| Vendor name. Redacted as confidential business information. | Marketing Samples | | | 9,896.25 | | 9,896.25 |
| Vendor name. Redacted as confidential business information. | Marketing & PR Consultant | 9,087.94 | | | | 9,087.94 |
| Vendor name. Redacted as confidential business information. | Booth for Biohacking in 2026 | 8,000.00 | | | | 8,000.00 |
| Vendor name. Redacted as confidential business information. | Interzum 2025 Economy and Marketing Package | 7,322.47 | | | | 7,322.47 |
| Vendor name. Redacted as confidential business information. | Regulatory & QMS Consultant | | | | 6,484.39 | 6,484.39 |
| Vendor name. Redacted as confidential business information. | Chapter 11 Professionals - Corporate GC Services | | 73.50 | 196.00 | 6,122.00 | 6,391.50 |
| Howard Grobstein | Chapter 11 Legal - BK Expert Witness | | | | 5,042.02 | 5,042.02 |
| Vendor name. Redacted as confidential business information. | Tradeshow Cost | | | 5,010.00 | | 5,010.00 |
| Vendor name. Redacted as confidential business information. | CFO Salary | 4,138.75 | | | | 4,138.75 |
| Vendor name. Redacted as confidential business information. | P/T Asian Liaison Office - Taiwan Sales Representative | 4,100.00 | | | | 4,100.00 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 2,395.00 | 245.00 | | | 2,640.00 |
| Vendor name. Redacted as confidential business information. | Marketing Consultant | 1,640.00 | | | | 1,640.00 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 1,258.24 | | | | 1,258.24 |
| Vendor name. Redacted as confidential business information. | Japan Sales Representative + Japan Office Expenses | 1,030.00 | | | | 1,030.00 |
| Vendor name. Redacted as confidential business information. | Patent Costs | 923.40 | | | | 923.40 |
| Vendor name. Redacted as confidential business information. | Parking Cost | | | | 761.95 | 761.95 |
| Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | | 755.86 | | | 755.86 |
| Vendor name. Redacted as confidential business information. | Video Package Costs | 488.07 | | | | 488.07 |
| Vendor name. Redacted as confidential business information. | OOP Expenses Reimbursement | 334.13 | | | | 334.13 |
| Gregory Jones | Chapter 11 Legal Rep - Sub-V Trustee | | | | 117.20 | 117.20 |
| | | $ 240,528.22 | $ 20,110.31 | $ 53,684.26 | $ 1,097,348.95 | $ 1,411,671.74 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Wells Fargo CCs | Outstanding Credit Cards Balance | | | | | 21,232.09 |
| Chapter 11 Payroll | 2024-2025 Employee Bonuses & Sales Commission | | | | | 1,395.83 |
| Insider Compensation Payable - BOM | Unpaid Guaranteed Payments & Service Fees to BOM | | | | | 210,000.00 |
| Insider Compensation Payable - Seth | Unpaid Guaranteed Payments to Seth Casden - Pending BK Court's Approval Post-BK | | | | | 567,447.91 |
| Due to Members - Seth | Chapter 11 MET Legal Fees - MET vs. Seth Casden Reimbursable to Seth Casden | | | | | 105,000.00 |
| Accrued Payables | Accrual for expenses incurred in 2024-2025 | | | | | 85,661.30 |
| | | | | | | $ 2,402,408.87 |

# EXHIBIT "F"

# A/R Aging Summary
### As of July 31,2025

| Customer | Revenue Type | Current | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 121,060.11 | | | | 121,060.11 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 27,949.35 | | | | 27,949.35 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 19,521.61 | | | | 19,521.61 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 13,283.20 | | | | 13,283.20 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 11,475.00 | | | | 11,475.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 10,248.33 | | | | 10,248.33 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 9,946.00 | | | | 9,946.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 4,073.06 | 2,173.06 | 2,050.79 | 532.41 | 8,829.32 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | 3,605.00 | | | 3,605.00 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,900.21 | | | | 2,900.21 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 2,231.00 | | | | 2,231.00 |
| Customer name. Redacted as confidential business information. | Raw Material Sales | 1,593.90 | | | | 1,593.90 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,536.18 | | | | 1,536.18 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,321.79 | | | | 1,321.79 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 221.10 | 196.38 | 275.48 | 559.16 | 1,252.12 |
| Customer name. Redacted as confidential business information. | Raw Material Sales | | | | 1,203.12 | 1,203.12 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 1,011.66 | | | | 1,011.66 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 594.04 | | | | 594.04 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 540.94 | | | | 540.94 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | 535.94 | | 535.94 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 524.84 | | | | 524.84 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 263.77 | | | | 263.77 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 250.68 | | -9.00 | | 241.68 |
| Customer name. Redacted as confidential business information. | Raw Material Sales | | | | 207.86 | 207.86 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 151.56 | | | | 151.56 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | 139.62 | | | | 139.62 |
| Customer name. Redacted as confidential business information. | Royalty Licensing Fees | | | | 84.03 | 84.03 |

| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | 77.75 | | | | 77.75 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | | | | 3.29 | 3.29 |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | | | | 0.01 | 0.01 |
| **confidential business** | Miscellaneous | | | -6.62 | | (6.62) |
| **Customer name. Redacted as confidential business information.** | Royalty Licensing Fees | | | -5,465.29 | 423.54 | (5,041.75) |
| | | **$ 230,915.70** | **$ 5,974.44** | **$ (2,618.70)** | **$ 3,013.42** | **$ 237,284.86** |

# EXHIBIT "7"

Negative net cash flow projected for July 2025 due to the majority of our cash receipts being received on a quarterly basis.

# IZVOD PROMETA PO RAČUNU

Datum i vrijeme izdavanja:  01.08.2025. 13:07
Za razdoblje (po datumu obrade):  01.07.2025. do 31.07.2025.

ERSTE&STEIERMÄRKISCHEBANK D.D.                    KREŠIMIR HERNAUS
OIB:        █████9320                             KARLOVAČKA CESTA 65 D/1
SWIFT/BIC: ESBCHR22                               10000 ZAGREB
SAVJETODAVNI CENTAR ZAGREB - VUKOVARSKA           REPUBLIKA HRVATSKA
10000 ZAGREB, IVANA LUČIĆA 2
Tel.: (072) 37 2580 Faks: (072) 37 1956

Naziv klijenta:        KREŠIMIR HERNAUS
OIB:                   45925046683

IBAN:                  HR2224020063212234851
Naziv računa:          TEKUĆI RAČUN
Oznaka valute:         EUR

| Datum valute<br>Datum obrade | Platitelj/Primatelj<br>Broj računa/IBAN<br>Tečaj | Redni broj<br>Opis plaćanja<br>Šifra namjene | Poziv na broj zaduženja<br>Poziv na broj odobrenja<br>Referenca plaćanja | Isplata | Uplata |
|---|---|---|---|---|---|
| **Početno stanje** | | | | | **0,00** |
| 09.07.2025<br>09.07.2025 | Vendor name. Redacted as confidential business information | 1 - Hologenix's money | HR99<br>HR99<br>2025-61901111-10191897963 | | |
| | | | | | 450,12 |
| 09.07.2025<br>09.07.2025 | Vendor name. Redacted as confidential business information | 2 - Naplata naknade za vođenje računa | HR99<br>HR99<br>10191897970 | | |
| | | | | 3,48 | |
| 10.07.2025<br>10.07.2025 | Vendor name. Redacted as confidential business information | 3 - 462765XXXXXX2330,<br>Prime Video<br>AMZN.DE/INFO,<br>09.07.2025 15:06 | HR99<br>HR99<br>10197899845 | | |
| | | | | 6,99 | |
| 29.07.2025<br>29.07.2025 | Vendor name. Redacted as confidential business information | 4 - 462765XXXXXX2330,<br>Europcar.com/it Roma,<br>28.07.2025 14:31 | HR99<br>HR99<br>10259572428 | | |
| | | | | 25,00 | |
| 01.08.2025<br>31.07.2025 | Vendor name. Redacted as confidential business information | 5 - 462765XXXXXX2330,<br>Prime Video<br>AMZN.DE/INFO,<br>30.07.2025 23:43 | HR99<br>HR99<br>10266256869 | | |
| | | | | 6,99 | |
| **Konačno stanje** | | | | | **407,66** |

| REKAPITULACIJA | | | | | |
|---|---|---|---|---|---|
| | | Prethodno stanje | 0,00 | **Konačno stanje** | **407,66** |
| Naloga na teret | 4 | Dugovni promet | 42,46 | Rezervirano za naplatu | 0,00 |
| Naloga u korist | 1 | Potražni promet | 450,12 | Prekoračenje | 0,00 |
| Naloga ukupno | 5 | Ukupno promet | 407,66 | Rezervirano po nalogu FINA-e | 0,00 |
| | | | | Raspoloživo stanje | 407,66 |

**Vaš međunarodni broj bankovnog računa (IBAN) je HR2224020063212234851, a identifikacijska šifra banke je ESBCHR22.**

**Dospjelo nepodmireno dugovanje**

| | Iznos na dan<br>30.06.2025. | Iznos za<br>obračunsko<br>razdoblje | Iznos na dan<br>31.07.2025. |
|---|---|---|---|
| Dospjela nepodmirena kamata | 0,00 | 0,00 | 0,00 |
| Dospjela nepodmirena naknada | 3,48 | 0,00 | 2,00 |
| Ukupno dospjelo dugovanje za naplatu | 3,48 | 0,00 | 2,00 |

U slučaju postojanja dospjelih nepodmirenih dugovanja za naplatu po
gore navedenoj osnovi molimo Vas da se obratite u najbližu poslovnicu
Banke.

Prema članku 40. stavak 1. Zakona o PDV-u naknade za usluge Banke
oslobođene su plaćanja PDV-a.

| Credit date | Debit Date | Booking Text | Recipient | Amount | Currency | 2024 Balance | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 6/23/24 | Decathlon Shirts and Shorts - Samples | Alexander Kühlmann | (109.96) | EUR | 107.18 | € | 107.18 | As 07/31/2025 |
| | 6/23/24 | Cost account June 2024 | NASPA Bank Account | (20.00) | EUR | 217.14 | $ | 142.33 | |
| | 6/23/24 | Cost account March 2024 | NASPA Bank Account | (15.00) | EUR | 237.14 | | | |
| | 6/23/24 | Cost account February 2024 | NASPA Bank Account | (6.00) | EUR | 252.14 | | | |
| | 6/23/24 | Hologenix telephone November 2023 | Alexander Kühlmann | (18.00) | EUR | 258.14 | | | |
| | 5/31/24 | Hologenix telephone April 2024 | Alexander Kühlmann | (21.38) | EUR | 276.14 | | | |
| | 4/30/24 | Hologenix telephone March 2024 | Alexander Kühlmann | (29.66) | EUR | 297.52 | | | |
| | 3/31/24 | Hologenix telephone February 2024 | Alexander Kühlmann | (20.42) | EUR | 327.18 | | | |
| | 2/29/24 | Hologenix telephone January 2024 | Alexander Kühlmann | (18.44) | EUR | 347.60 | | | |
| | 1/31/24 | Heimtextil - Last Day Ticket ohne Info-Service | Alexander Kühlmann | (43.00) | EUR | 366.04 | | | |
| | 1/31/24 | Heimtextil - Lunch on 01/12/2024 | Alexander Kühlmann | (11.50) | EUR | 409.04 | | | |
| | 1/31/24 | Heimtextil - Roundtrip to Frankfurt - 60km | Alexander Kühlmann | (18.00) | EUR | 420.54 | | | |
| | 1/31/24 | Hologenix telephone December 2023 | Alexander Kühlmann | (18.00) | EUR | 438.54 | | | |
| | | | | | | | | | |
| | | | Account balance on 12/31/2023 | 456.54 | EUR | | | | |



| Merchant Account ID: ▇▇▇QAWQ | PayPal ID: ap@celliant.com | 7/1/25 - 7/31/25 |
|---|---|---|

## Statement for July 2025

Hologenix, LLC
1113 Montana Ave #13
90403 Santa Monica

### Balance Summary (7/1/25 - 7/31/25)

|  | Available beginning | Available ending | Withheld beginning | Withheld ending |
|---|---|---|---|---|
| USD | 334.59 | 129.84 | 0.00 | 0.00 |
| EUR | 1,425.95 | 1,400.30 | 0.00 | 0.00 |



| Merchant Account ID: ▆▆▆▆QAWQ | PayPal ID: ap@celliant.com | 7/1/25 - 7/31/25 |
|---|---|---|

## Activity Summary (7/1/25 - 7/31/25)

|  | USD | EUR |
|---|---|---|
| Beginning Available Balance | 334.59 | 1,425.95 |
| Payments received | 137.18 | 1,400.30 |
| Payments sent | 0.00 | 0.00 |
| Withdrawals and Debits | -1,933.69 | 0.00 |
| Deposits and Credits | 0.00 | 0.00 |
| Fees | -7.34 | 0.00 |
| Transfers | 1,599.10 | -1,425.95 |
| Ending Available Balance | 129.84 | 1,400.30 |

# PayPal

| Merchant Account ID: ████QAWQ | PayPal ID: ap@celliant.com | 7/1/25 - 7/31/25 |
|---|---|---|

## Payments received

| Description | USD | EUR |
|---|---|---|
| General payment | 0.00 | 1,400.30 |
| Express Checkout Payment | 137.18 | 0.00 |
| **Total** | **137.18** | **1,400.30** |

## Withdrawals and Debits

| Description | USD | EUR |
|---|---|---|
| Transfer Withdrawal | -1,933.69 | 0.00 |
| **Total** | **-1,933.69** | **0.00** |

## Fees

| Description | USD | EUR |
|---|---|---|
| Payment Fee | -7.34 | 0.00 |
| **Total** | **-7.34** | **0.00** |

## Transfers

| Description | USD | EUR |
|---|---|---|
| Currency Conversion | 1,599.10 | -1,425.95 |
| **Total** | **1,599.10** | **-1,425.95** |



| Merchant Account ID: ▓▓▓▓▓QAWQ | PayPal ID: ap@celliant.com | 7/1/25 - 7/31/25 |
|---|---|---|

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|---|---|---|---|---|---|
| 7/16/25 | User Initiated Withdrawal<br>ID: 9W669039MR099073R | | -334.59 | 0.00 | -334.59 |
| 7/16/25 | User Initiated Withdrawal<br>ID: 1FS43824668428533 | | -1,599.10 | 0.00 | -1,599.10 |
| 7/16/25 | General Currency Conversion<br>ID: 45A28156S5372604N | | 1,599.10 | 0.00 | 1,599.10 |
| 7/25/25 | Express Checkout Payment<br>ID: 7KR988495P3336012 | Customer name. Redacted as confidential business information | 137.18 | -7.34 | 129.84 |

## Transaction History - EUR

| Date | Description | Name \ Email | Gross | Fee | Net |
|---|---|---|---|---|---|
| 7/16/25 | General Currency Conversion<br>ID: 9MX4541675659342J | | -1,425.95 | 0.00 | -1,425.95 |
| 7/30/25 | General Payment<br>ID: 7KU42829HC0018902 | Customer name. Redacted as confidential business information | 1,400.30 | 0.00 | 1,400.30 |

To report an unauthorized transaction or other error NOT involving your debit card: call (402-938-3614) or write to us (Attn: Error Resolution Department, P.O. Box 45950, Omaha, NE 68145-0950).

To report an unauthorized transaction or other error concerning your debit card: call (402-938-3614), fax (303-395-2855) or write to us (PayPal Debit Card Department, P.O. Box 45950, Omaha, NE 68145-0950).

To cancel a pre-authorized or recurring payment or determine whether a pre-authorized or recurring transfer has been made: call us at 1-877-

**PayPal**

| | | |
|---|---|---|
| Merchant Account ID: N6TPDFYPZQAWQ | PayPal ID: ap@celliant.com | 7/1/25 - 7/31/25 |

896-6383 (please note that only calls pertaining to pre-authorized or recurring payments will be accepted at this number).

Case 2:23-bk-16949-BR    Doc 368    Filed 09/08/25    Entered 09/08/25 16:29:17    Desc
Main Document    Page 639 of 1079

# Initiate Business Checking

July 31, 2025 ■ Page 1 of 7



HOLOGENIX LLC
17383 W SUNSET BLVD
SUITE A420
PACIFIC PALISADES CA 90272-4181

## Questions?

*Available by phone Mon-Sat 7:00am-11:00pm Eastern Time, Sun 9:00am-10:00pm Eastern Time:*
We accept all relay calls, including 711

**1-800-CALL-WELLS**  (1-800-225-5935)

*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

Visit wellsfargo.com/digitalbusinessresources to explore tours, articles, infographics, and other resources on the topics of money movement, account management and monitoring, security and fraud prevention, and more.

**Other Wells Fargo Benefits**

**Beware of bank impersonation scams.**

**Five signs that you're speaking to a scammer posing as Wells Fargo:**

1. You're asked to provide your online banking password, PIN, or a verification code. Wells Fargo will not contact you and request this.
2. You're told you need to return your card, wire money, make a cash withdrawal, purchase a cashier's check, or deposit money at a crypto or bank ATM. **Wells Fargo will never ask you to move or send money in any form to another account or a person to protect it.**
3. You're advised to keep the conversation secret due to an "investigation" or for your protection.
4. The person you're talking to will not allow you to end the call or text. A real Wells Fargo employee would not pressure you to continue a conversation.
5. You're given exact steps for how to complete a transaction, including how to respond to any bank employee questions.

When in doubt, check it out. Contact us to verify any transactions or suspicious contact. You're in charge when it comes to your money. Learn more at wellsfargo.com/nophishing.

Case 2:23-bk-16969-BR    Doc 3681    Filed 09/08/25    Entered 09/08/25 16:39:07    Desc
Declaration of Dino A. Sullivan    Page 640 of 1079

July 31, 2025 ■ Page 2 of 7



## Statement period activity summary

| | | |
|---|---|---|
| Beginning balance on 7/1 | | $42,752.34 |
| Deposits/Credits | | 689,965.61 |
| Withdrawals/Debits | | - 290,277.90 |
| **Ending balance on 7/31** | | **$442,440.05** |

Account number:          2016  (primary account)

**HOLOGENIX LLC**

*Nevada account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 321270742

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo branch.

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 7/1 | | Customer name. Redacted as confidential business information | 133.19 | | |
| 7/1 | | Customer name. Redacted as confidential business information | 626.28 | | |
| 7/1 | | WT Fed#02764 Outgoing Master Tr /Org=Seth Casden Resulting Tr Srf# 2025070102945034 Trn#250701252554 Rfb# 960508501 | 350,000.00 | | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 6,000.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 12,672.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 5,327.40 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 2,406.25 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 565.54 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 4,100.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 2,500.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 500.00 | |
| 7/1 | | Online Transfer to Casden S Ref #Ib0Syrrn8S Premier Checking Hologenix LLC June 2025 Services | | 25,000.00 | |
| 7/1 | | Online Transfer to Casden S Ref #Ib0Syrs6Yk Premier Checking Hologenix LLC February 2025 Services 3of5 | | 5,000.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 49.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 100.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 6,012.09 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 650.00 | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|---------|------------|--------|
| 7/1 | | Vendor name. Redacted as confidential business information | | 396.37 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 150.00 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 3,496.82 | |
| 7/1 | | Vendor name. Redacted as confidential business information | | 2,859.67 | 313,226.67 |
| 7/2 | | Customer name. Redacted as confidential business information | 242.56 | | |
| 7/2 | | Customer name. Redacted as confidential business information | 8,355.00 | | |
| 7/2 | | Customer name. Redacted as confidential business information | 589.85 | | |
| 7/2 | | Vendor name. Redacted as confidential business information | | 238.44 | |
| 7/2 | | Vendor name. Redacted as confidential business information | | 3,521.96 | |
| 7/2 | | Vendor name. Redacted as confidential business information | | 8,000.00 | |
| 7/2 | | Vendor name. Redacted as confidential business information | | 8,000.00 | |
| 7/2 | | Vendor name. Redacted as confidential business information | | 8,250.00 | 294,403.68 |
| 7/3 | | Customer name. Redacted as confidential business information | 9.92 | | 294,413.60 |
| 7/7 | | Customer name. Redacted as confidential business information | 218.19 | | |
| 7/7 | | Customer name. Redacted as confidential business information | 362.60 | | |
| 7/7 | | Vendor name. Redacted as confidential business information | | 119.99 | 294,874.40 |
| 7/9 | | Customer name. Redacted as confidential business information | 443.20 | | |
| 7/9 | | Customer name. Redacted as confidential business information | 1,571.85 | | |
| 7/9 | | Vendor name. Redacted as confidential business information | | 7,000.00 | 289,889.45 |
| 7/10 | | Vendor name. Redacted as confidential business information | | 204.99 | 289,684.46 |
| 7/11 | | Customer name. Redacted as confidential business information | 209.42 | | |
| 7/11 | | WT Fed#04428 Keybank National A /Drw/Bnf=Trinet Hr III, Inc Srf# US25071100555227 Trn#250711055858 Rfb# Q+50235656 770 | | 55,073.32 | 234,820.56 |
| 7/14 | | Customer name. Redacted as confidential business information | 3,637.38 | | |
| 7/14 | | Customer name. Redacted as confidential business information | 3,635.24 | | |
| 7/14 | | Customer name. Redacted as confidential business information | 658.45 | | |
| 7/14 | | Customer name. Redacted as confidential business information | 18,259.02 | | |
| 7/14 | | Customer name. Redacted as confidential business information | 371.92 | | |
| 7/14 | | Vendor name. Redacted as confidential business information | | 2,000.00 | 259,382.57 |
| 7/15 | | Customer name. Redacted as confidential business information | 1,585.55 | | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 1,030.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 412.26 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 1,682.82 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 5,000.00 | |



## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 7/15 | | WT Fed#03R01 Zions Bancorporati /Ftr/Bnf=Buchalter Srf# Ow00005887354937 Trn#250715193173 Rfb# Ow00005887354937 | | 2,500.00 | |
| 7/15 | | WT 250715-193544 Jpmorgan Chase Bank /Bnf=Grobstein Teeple LLP Srf# Ow00005887359399 Trn#250715193544 Rfb# Ow00005887359399 | | 1,500.00 | |
| 7/15 | | WT Fed#02R01 Zions Bancorporati /Ftr/Bnf=Levene Neale Bender Yoo and Golubch Srf# Ow00005887373905 Trn#250715194436 Rfb# Ow00005887373905 | | 10,000.00 | |
| 7/15 | | WT Seq194623 Troutman Pepper Locke L /Bnf=Troutman Pepper Hamilton Sanders L Srf# Ow00005887377543 Trn#250715194623 Rfb# Ow00005887377543 | | 2,500.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 3,000.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 2,521.49 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 5,000.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 118.52 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 6,500.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 14,615.42 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 3,597.00 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 946.97 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 711.12 | |
| 7/15 | | Vendor name. Redacted as confidential business information | | 998.70 | 198,333.82 |
| 7/17 | | Customer name. Redacted as confidential business information | 334.59 | | |
| 7/17 | | Customer name. Redacted as confidential business information | 1,599.10 | | 200,267.51 |
| 7/18 | | Customer name. Redacted as confidential business information | 60.80 | | |
| 7/18 | | Customer name. Redacted as confidential business information | 928.77 | | |
| 7/18 | | Customer name. Redacted as confidential business information | 553.92 | | 201,811.00 |
| 7/22 | | Customer name. Redacted as confidential business information | 26.65 | | |
| 7/22 | | Vendor name. Redacted as confidential business information | | 268.74 | 201,568.91 |
| 7/23 | | Customer name. Redacted as confidential business information | 1,592.98 | | 203,161.89 |
| 7/24 | | Customer name. Redacted as confidential business information | 134.48 | | 203,296.37 |
| 7/25 | | Customer name. Redacted as confidential business information | 285.27 | | |
| 7/25 | | Customer name. Redacted as confidential business information | 294.16 | | |
| 7/25 | | Customer name. Redacted as confidential business information | 4,201.56 | | 208,077.36 |
| 7/28 | | Vendor name. Redacted as confidential business information | | 5,000.00 | 203,077.36 |
| 7/29 | | Customer name. Redacted as confidential business information | 1,345.50 | | |
| 7/29 | | Vendor name. Redacted as confidential business information | | 475.44 | |
| 7/29 | | Vendor name. Redacted as confidential business information | | 49,030.58 | 154,916.84 |

WELLS FARGO

## Transaction History (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 7/30 | | Customer name. Redacted as confidential business information | 308.18 | | |
| 7/30 | | Customer name. Redacted as confidential business information | 17,114.77 | | |
| 7/30 | | Customer name. Redacted as confidential business information | 370.93 | | |
| 7/30 | | Customer name. Redacted as confidential business information | 2,146.68 | | 174,857.40 |
| 7/31 | | Customer name. Redacted as confidential business information | 267,167.68 | | |
| 7/31 | | Customer name. Redacted as confidential business information | 587.26 | | |
| 7/31 | | Customer name. Redacted as confidential business information | 2.71 | | |
| 7/31 | | Vendor name. Redacted as confidential business information | | 175.00 | 442,440.05 |
| **Totals** | | | **$689,965.61** | **$290,277.90** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

< **Business to Business ACH:**  *If this is a business account, this transaction has a return time frame of one business day from post date. This time frame does not apply to consumer accounts.*

### Monthly service fee summary

For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 07/01/2025 - 07/31/2025 | Standard monthly service fee $10.00 | You paid $0.00 |
|------|------|------|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following each fee period | | |
| • Average ledger balance | $1,000.00 | $242,909.00  ☑ |
| • Minimum daily balance | $500.00 | $154,916.84  ☑ |

C1/C1

### Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|------|------|------|------|------|------|
| Cash Deposited ($) | 0 | 5,000 | 0 | 0.0030 | 0.00 |
| Transactions | 54 | 100 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

 IMPORTANT ACCOUNT INFORMATION



Drawdown Wires incur a fee of $15 for Consumer and Small Business non-analyzed accounts. For Drawdown Wires on analyzed accounts, there is a fee of $22. For more information, please review the Consumer and Business Fee & Information Schedule.

_____

NEW YORK CITY CUSTOMERS ONLY -- Pursuant to New York City regulations, we request that you contact us at 1-800-TO WELLS (1-800-869-3557) to share your language preference.

Case 2:23-bk-16949-BR    Doc 368    Filed 09/08/25    Entered 09/08/25 14:29:07    Desc
Declaration of Dioon A. Sullivan    Page 645 of 1079

July 31, 2025 ■ Page 7 of 7



---

## Important Information You Should Know

- **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts:** Wells Fargo Bank, N.A. may furnish information about deposit accounts to Early Warning Services. You have the right to dispute the accuracy of information that we have furnished to a consumer reporting agency by writing to us at Wells Fargo Bank N.A. Attn: Deposit Furnishing Disputes MAC F2304-019 PO Box 50947 Des Moines, IA 50340. Include with the dispute the following information as available: Full name (First, Middle, Last), Complete address, The account number or other information to identify the account being disputed, Last four digits of your social security number, Date of Birth. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

- **In case of errors or questions about other transactions (that are not electronic transfers):** Promptly review your account statement within 30 days after we made it available to you, and notify us of any errors.

- **If your account has a negative balance:** Please note that an account overdraft that is not resolved 60 days from the date the account first became overdrawn will result in closure and charge off of your account. In this event, it is important that you make arrangements to redirect recurring deposits and payments to another account. The closure will be reported to Early Warning Services. We reserve the right to close and/or charge-off your account at an earlier date, as permitted by law. The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.

- To download and print an Account Balance Calculation Worksheet(PDF) to help you balance your checking or savings account, enter www.wellsfargo.com/balancemyaccount in your browser on either your computer or mobile device.

---

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . .  $ _____

**ADD**

**B.** Any deposits listed in your                                $ _____
register or transfers into                                      $ _____
your account which are not                                      $ _____
shown on your statement.                                      + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
.                                                              **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . .  - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . .  $ _____

| Number | Items Outstanding | Amount |
|--------|-------------------|--------|
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        |                   |        |
|        | **Total amount** $ |        |

©2021 Wells Fargo Bank, N.A. All rights reserved.  Member FDIC.  NMLSR ID 399801

Hologenix LLC

**1000.110 ERSTE Funds, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/18/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | EUR |
|---|---|
| Statement beginning balance | 0.00 |
| Checks and payments cleared (1) | -42.46 |
| Deposits and other credits cleared (1) | 450.12 |
| Statement ending balance | 407.66 |
| | |
| Register balance as of 07/31/2025 | 407.66 |

**Details**

Checks and payments cleared (1)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (EUR) |
|---|---|---|---|---|
| 07/31/2025 | Bill Payment | ERSTE July25 | Vendor name. Redacted as confidential business information | -42.46 |
| Total | | | | -42.46 |

Deposits and other credits cleared (1)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (EUR) |
|---|---|---|---|---|
| 07/09/2025 | Deposit | | Vendor name. Redacted as confidential business information | 450.12 |
| Total | | | | 450.12 |

Case 2:23-bk-16969-BR    Doc 361    Filed 09/08/25    Entered 09/08/25 16:39:07    Desc
Declaration of Nicole A. Sullivan    Page 647 of 1079

5/18/25, 6:05 AM

Hologenix LLC

**1000.120 NASPA Funds, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/18/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | EUR |
|---|---|
| Statement beginning balance | 107.18 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 107.18 |
| | |
| Register balance as of 07/31/2025 | 107.18 |

Hologenix LLC

**1000.200 PayPal, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/18/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 2,004.91 |
| Checks and payments cleared (4) | -2,012.25 |
| Deposits and other credits cleared (2) | 1,718.79 |
| Statement ending balance | 1,711.45 |
| | |
| Register balance as of 07/31/2025 | 1,711.45 |

**Details**

Checks and payments cleared (4)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 07/17/2025 | Transfer | | | -1,599.10 |
| 07/17/2025 | Expense | | Paypal | -71.22 |
| 07/17/2025 | Transfer | | | -334.59 |
| 07/25/2025 | Expense | 0725SHOPIFY | Paypal | -7.34 |
| Total | | | | -2,012.25 |

Deposits and other credits cleared (2)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 07/25/2025 | Deposit | | | 137.18 |
| 07/31/2025 | Receive Payment | | Customer name. Reacted as confidential business information | 1,581.61 |
| Total | | | | 1,718.79 |

Hologenix LLC

**1000.300 Petty Cash, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/29/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 0.00 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 0.00 |
| | |
| Register balance as of 07/31/2025 | 0.00 |

Hologenix LLC

**1000.400 Taiwan Bank Accounts, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/29/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 1,597.78 |
| Checks and payments cleared (0) | 0.00 |
| Deposits and other credits cleared (0) | 0.00 |
| Statement ending balance | 1,597.78 |
| | |
| Register balance as of 07/31/2025 | 1,597.78 |

Case 2:23-bk-16844-BR    Doc 3081    Filed 09/08/25    Entered 09/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 481 of 1079

9/9/25, 6:13 AM

Hologenix LLC

**1000.000 Checking - Wells Fargo 2016, Period Ending 07/31/2025**

**RECONCILIATION REPORT**

Reconciled on: 08/18/2025

Reconciled by: Mimi Nguyen

Any changes made to transactions after this date aren't included in this report.

| Summary | USD |
|---|---|
| Statement beginning balance | 42,752.34 |
| Checks and payments cleared (55) | -290,277.90 |
| Deposits and other credits cleared (40) | 689,965.61 |
| Statement ending balance | 442,440.05 |
| | |
| Register balance as of 07/31/2025 | 442,440.05 |
| Cleared transactions after 07/31/2025 | 0.00 |
| Uncleared transactions after 07/31/2025 | -25,100.02 |
| Register balance as of 08/18/2025 | 417,340.03 |

**Details**

Checks and payments cleared (55)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|---|---|---|---|---|
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -12,672.00 |
| 07/01/2025 | Bill Payment | | .Vendor name. Redacted as confidential business information | -5,327.40 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -500.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,406.25 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -396.37 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -565.54 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -150.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -4,100.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,000.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -650.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,500.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -386.13 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,473.54 |
| 07/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -100.00 |
| 07/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -49.00 |
| 07/01/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -6,012.09 |
| 07/01/2025 | Expense | June2025(BK) | Seth Casden | -25,000.00 |
| 07/01/2025 | Expense | February2025(BK)(3/5) | Seth Casden | -5,000.00 |
| 07/01/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,496.82 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,250.00 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,000.00 |
| 07/02/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -119.99 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -8,000.00 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -238.44 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -73.61 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -398.35 |
| 07/02/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,050.00 |
| 07/09/2025 | Expense | | Vendor name. Redacted as confidential business information | -7,000.00 |
| 07/10/2025 | Expense | | Vendor name. Redacted as confidential business information | -204.99 |
| 07/11/2025 | Bill Payment | | TriNet HR Corporation | -55,073.32 |

Case 2:23-bk-16999-BR    Doc 3681    Filed 09/08/25    Entered 09/08/25 16:29:07    Desc
Declaration of Nicole Sullivan    Page 452 of 1079
Main Document    Page 41 of 63

9/9/25, 6:13 AM

| Date | | | Payee | Amount |
|------|---|---|-------|--------|
| 07/14/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -2,000.00 |
| 07/15/2025 | Bill Payment | | Theodora Oringher PC | -5,000.00 |
| 07/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -946.97 |
| 07/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -3,597.00 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -412.26 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -6,500.00 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -711.12 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -118.52 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -2,521.49 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,682.82 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -5,000.00 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -3,000.00 |
| 07/15/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -1,030.00 |
| 07/15/2025 | Bill Payment | Fee App 5-Payment 19 | Buchalter | -2,500.00 |
| 07/15/2025 | Bill Payment | Fee App 4-Payment 29 | Howard Grobstein | -1,500.00 |
| 07/15/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -14,615.42 |
| 07/15/2025 | Bill Payment | Fee App 6-Payment 6 | Troutman Pepper LLP | -2,500.00 |
| 07/15/2025 | Bill Payment | Fee App 4-Payment 31 | LNBYG | -10,000.00 |
| 07/15/2025 | Bill Payment | Payment 28 | Vendor name. Redacted as confidential business information | -998.70 |
| 07/22/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -268.74 |
| 07/28/2025 | Credit Card Payment | | Wells Fargo Bus. MasterCar… | -5,000.00 |
| 07/29/2025 | Bill Payment | | TriNet HR Corporation | -49,030.58 |
| 07/29/2025 | Bill Payment | | Vendor name. Redacted as confidential business information | -475.44 |
| 07/31/2025 | Expense | | Vendor name. Redacted as confidential business information | -175.00 |

Total                                                                                        -290,277.90

Deposits and other credits cleared (40)

| DATE | TYPE | REF NO. | PAYEE | AMOUNT (USD) |
|------|------|---------|-------|--------------|
| 07/01/2025 | Deposit | | Customer name. Redacted as confidential business information | 133.19 |
| 07/01/2025 | Deposit | | Seth Casden | 350,000.00 |
| 07/01/2025 | Deposit | | Customer name. Redacted as confidential business information | 626.28 |
| 07/02/2025 | Deposit | | Customer name. Redacted as confidential business information | 342.56 |
| 07/02/2025 | Deposit | | Customer name. Redacted as confidential business information | 989.85 |
| 07/02/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 8,355.00 |
| 07/03/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 9.92 |
| 07/07/2025 | Deposit | | Customer name. Redacted as confidential business information | 362.60 |
| 07/07/2025 | Deposit | | Customer name. Redacted as confidential business information | 218.19 |
| 07/09/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 443.20 |
| 07/09/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,571.85 |
| 07/11/2025 | Deposit | | Customer name. Redacted as confidential business information | 209.42 |
| 07/14/2025 | Deposit | | Customer name. Redacted as confidential business information | 658.45 |
| 07/14/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 3,637.38 |
| 07/14/2025 | Deposit | | Customer name. Redacted as confidential business information | 18,259.02 |
| 07/14/2025 | Deposit | | Customer name. Redacted as confidential business information | 371.92 |
| 07/14/2025 | Deposit | | Customer name. Redacted as confidential business information | 3,635.24 |
| 07/15/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,585.55 |
| 07/17/2025 | Transfer | | Customer name. Redacted as confidential business information | 334.59 |
| 07/17/2025 | Transfer | | Customer name. Redacted as confidential business information | 1,599.10 |
| 07/18/2025 | Deposit | | Customer name. Redacted as confidential business information | 553.92 |
| 07/18/2025 | Deposit | 131802366317 | Customer name. Redacted as confidential business information | 928.77 |
| 07/18/2025 | Deposit | | Customer name. Redacted as confidential business information | 60.80 |
| 07/22/2025 | Deposit | 131849159021 | Customer name. Redacted as confidential business information | 26.65 |
| 07/23/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 1,592.98 |
| 07/24/2025 | Deposit | 131893690733 | Customer name. Redacted as confidential business information | 134.48 |
| 07/25/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 4,201.56 |

| 07/25/2025 | Deposit | 131919937901 | Customer name. Redacted as confidential business information | 285.27 |
| 07/25/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 294.16 |
| 07/29/2025 | Deposit | | Customer name. Redacted as confidential business information | 1,345.50 |
| 07/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 17,114.77 |
| 07/30/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 308.18 |
| 07/30/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 767.55 |
| 07/30/2025 | Receive Payment | 10842 | Customer name. Redacted as confidential business information | 1,379.13 |
| 07/30/2025 | Deposit | | Customer name. Redacted as confidential business information | 370.93 |
| 07/31/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 2.71 |
| 07/31/2025 | Deposit | | Customer name. Redacted as confidential business information | 587.26 |
| 07/31/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 108,996.85 |
| 07/31/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 45,717.70 |
| 07/31/2025 | Receive Payment | | Customer name. Redacted as confidential business information | 84,453.13 |

| Total | | | | 689,965.61 |

# EXHIBIT I

**In the Matter Of:**

IN RE: SETH HALDANE CASDEN

2:23-bk-16904-BR

---

**ALAN LEAVITT**

*August 21, 2025*

---



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 656 of 1079

ALAN LEAVITT                                                            August 21, 2025
IN RE: SETH HALDANE CASDEN                                                           1

1           UNITED STATES BANKRUPTCY COURT
        CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES
2
     In re                          )
3                                   )
     SETH HALDANE CASDEN,           ) No. 2:23-bk-16904-BR
4                                   )
         Debtor.                    ) Chapter 11
5

6

7

8

9

10
             2004 Examination of Alan Leavitt
11                   via videoconference

12                   August 21, 2025

13

14
             Reporter: Seth Arndt
15

16

17

18

19

20

21

22

23

24

25



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 657 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              2

```
 1              2004 Examination of Alan Leavitt, taken
     via videoconference pursuant to Notice of Taking
 2   Deposition, before Seth Arndt, on August 21, 2025.

 3
                    APPEARANCES OF COUNSEL
 4          (All present via videoconference)

 5   On Behalf of Multiple Energy Technologies:
            White & Williams
 6          810 Seventh Avenue, Suite 500
            New York, NY  10019
 7          212-631-4420
            By:   Nicole A. Sullivan
 8                sullivann@whiteandwilliams.com

 9   On Behalf of Alan Levitt:
            Duane Morris LLP
10          865 South Figueroa Street, Suite 3100
            Los Angeles, CA  90017
11          213-689-7421
            By:   Betty Luu
12                bluu@duanemorris.com

13   Also present:
            Gregory Salvato
14          Roye Zur, counsel for MET

15

16

17

18

19

20

21

22

23

24

25
```



ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                          3

| | |
|---|---|
| 1 | INDEX OF INTERROGATION |
| 2 | Examination by Ms. Sullivan                Page 5 |
| 3 | |
| | INDEX OF EXHIBITS |
| 4 | |

| | | |
|---|---|---|
| 5 | Exhibit 1 | Page 22 |
| | Exhibit 2 | Page 42 |
| | Exhibit 3 | Page 47 |
| 6 | Exhibit 4 | Page 55 |
| | Exhibit 5 | Page 64 |
| 7 | Exhibit 6 | Page 68 |
| | Exhibit 7 | Page 71 |
| 8 | Exhibit 8 | Page 73 |
| | Exhibit 9 | Page 74 |
| 9 | Exhibit 10 | Page 75 |
| | Exhibit 11 | Page 77 |
| 10 | Exhibit 12 | Page 79 |
| | Exhibit 13 | Page 82 |
| 11 | Exhibit 14 | Page 84 |
| | Exhibit 15 | Page 86 |
| 12 | Exhibit 16 | Page 87 |
| | Exhibit 17 | Page 87 |
| 13 | Exhibit 18 | Page 89 |
| | Exhibit 19 | Page 90 |
| 14 | Exhibit 20 | Page 91 |
| | Exhibit 21 | Page 95 |
| 15 | Exhibit 22 | Page 98 |
| | Exhibit 23 | Page 99 |
| 16 | Exhibit 24 | Page 100 |
| | Exhibit 25 | Page 101 |
| 17 | Exhibit 26 | Page 101 |
| | Exhibit 27 | Page 102 |
| 18 | Exhibit 28 | Page 105 |
| | Exhibit 29 | Page 107 |
| 19 | Exhibit 30 | Page 108 |
| | Exhibit 31 | Page 109 |
| 20 | Exhibit 32 | Page 110 |
| | Exhibit 33 | Page 111 |
| 21 | Exhibit 34 | Page 113 |
| | Exhibit 35 | Page 116 |
| 22 | Exhibit 36 | Page 121 |
| | Exhibit 37 | Page 123 |
| 23 | Exhibit 38 | Page 125 |

| | |
|---|---|
| 24 | |
| 25 | |



ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                         4

```
 1   Exhibit 39                               Page 128
     Exhibit 40                               Page 129
 2   Exhibit 41                               Page 130
     Exhibit 42                               Page 131

 3
                    (All exhibits are attached.)
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    5

```
 1        The witness, ALAN LEAVITT, first having been
 2   duly sworn, testified as follows:
 3             [9:06 a.m.]
 4                  EXAMINATION
 5   BY MS. SULLIVAN:
 6        Q.    Good morning, Mr. Leavitt.  My name is
 7   Nicole Sullivan.  I'm an attorney for Multiple Energy
 8   Technologies.  We're a creditor in Seth Casden's
 9   bankruptcy.  I'm going to be asking you some questions
10   today.
11        If you do not understand my question, please let
12   me know and I will rephrase it.  If you answer a
13   question, it will be presumed that you understood it.
14        Is that fair?
15        A.    Yes.
16        Q.    Okay.  If at any time you want a break,
17   just let me know.  As long as you answer an open
18   question, we can take a break.
19        Okay?
20        A.    Okay.
21        Q.    Have you ever been deposed before?
22        A.    No.
23        Q.    Okay.  So the only other instruction I
24   would give you is that we have a court reporter taking
25   down my questions and answers, so just let me finish --
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 661 of 1079

ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                          6

 1   I mean, your answers, my questions.  Let me finish my

 2   question, and then you can proceed to answer, so that

 3   way we don't talk over each other.  Sometimes you might

 4   know where I'm going with a question.

 5        Can you just give us your full name, please?

 6        A.    Alan Terry Leavitt.

 7        Q.    And what is your address?

 8        A.    470 West Demling Place, Chicago, Illinois,

 9   60614.

10        Q.    Okay.  Are you by yourself right now?

11        A.    No.

12        Q.    Okay.  Where are you?

13        A.    I'm in a room over at my attorney's

14   office.

15        Q.    Okay.

16             [Discussion off the record.]

17   BY MS. SULLIVAN:

18        Q.    Do you have anything in front of you, Mr.

19   Leavitt?

20        A.    No, except the computer.

21        Q.    Okay.  Is there anything open on the

22   computer other than the Zoom?

23        A.    No.

24        Q.    What is your relationship with Seth

25   Casden?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 662 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                            7

1        A.     Seth is my nephew through -- my wife's

2   brother's son.

3        Q.     So your brother-in-law's son?

4        A.     My -- yes.  Yes.

5        Q.     And are you familiar with the Seth Casden

6   resulting trust?

7        A.     A little.

8        Q.     All right.  So when did you first hear

9   about the Seth Casden resulting trust?

10        A.     Particularly -- I guess I'm going to say

11   2016.

12        Q.     And who first told you about the Seth

13   Casden resulting trust?

14        A.     I was asked to be an adviser.

15        Q.     Who asked you to be an adviser?

16        A.     Seth asked me to be an adviser.

17        Q.     How did he ask you?

18        A.     He -- verbally he asked me.

19        Q.     What specifically did he ask you to do?

20        A.     Just -- he was explaining the duties of

21   the trust and -- and if I could -- if I could fill that

22   position and do him a favor, because he needed an

23   adviser.

24        Q.     Okay.  What duties did Mr. Casden explain

25   to you about the trust?



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 663 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    8

1          A.    You know, it -- it's been a lot of years,

2     and I don't really remember all of it.

3          Q.    Do you remember anything?

4          A.    Some things.

5          Q.    Do you remember anything that Mr. Casden

6     told you when he asked you to be an adviser?

7          A.    He said, you know, that I would look over

8     expenditures and see, you know, if they were relevant

9     to the business, and make a decision on whether to

10    grant those expenditures.

11         Q.    And when you say expenditures, what do you

12    mean?

13         A.    What -- you know, whatever would be

14    turned -- whatever would be turned in as an expenditure

15    to -- that Seth would -- how would I put this?

16         If there was an expenditure, I would get the

17    opportunity to look it over and make a decision whether

18    or not to grant it.

19         Q.    When you say expenditure, though, do you

20    mean money coming out of the trust or something else?

21         A.    Well, the trust -- you know, the trust

22    would -- we would come out of the trust, yeah.  That's

23    what -- I was adviser of the trust.

24         Q.    So you agreed in 2016 to be the adviser of

25    the Seth Casden resulting trust?



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 664 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                            9

1          A.    I don't know.  I seem to think I read the

2     trust over, that I can't tell you at this point in time

3     if I agreed at that time, and when I actually took

4     position.

5          Q.    Okay.  Did you ultimately become the

6     adviser for the Seth Casden resulting trust?

7          A.    I did.

8          Q.    Okay.  Was it in or around the same time

9     that Seth Casden asked you to do him a favor and be the

10    trust's adviser?

11         A.    I can't recall.

12         Q.    But I need --

13         A.    It's not that I'm avoiding it.  I had a

14    stroke a little while back, and you know,

15    sometimes it's not clear to me, so --

16         Q.    I'm very sorry to hear that.

17         A.    Thank you.

18         Q.    Were you replacing somebody else as the

19    adviser to the trust?

20         A.    I think so.

21         Q.    Do you know who you replaced?

22         A.    No, no.

23         Q.    You said Mr. Casden had asked you to do

24    him a favor.  Why was it a favor?

25         A.    Well, because there were certain



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 665 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                              10

1  stipulations that the trustee -- that went along with

2  being a trustee, like you couldn't be involved with a

3  financial institution, and you had to -- I think you

4  couldn't live in California.

5       Q.   Were you compensated for your services as

6  an adviser to the trust?

7       A.   No.

8       Q.   Did you talk to anyone else other than

9  Seth Casden about what your duties were as a trust

10  adviser for the Seth Casden resulting trust?

11       A.   Well, I -- the Northern Trust.

12       Was a holder of the trust (phone rings) --

13  sorry.  Was a holder of the trust.

14       And so I am sure I spoke with people over there,

15  but I can't recall.

16       I'm sorry.

17       Q.   That's okay.  Were you done answering?

18       A.   Yeah.

19       Q.   Okay.

20       Mr. Casden told you you would have to make

21  decisions about granted expenditures.

22       What did that mean?

23       A.   So -- I would -- I'm sorry, give me one

24  second so I can arrange my thoughts here.

25       Q.   Sure.  Take your time, Mr. Leavitt.



ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                            11

1        A.    Sure.   Thank you.

2        I'm sorry, I'm trying to find the right words,

3   and it's escaping me right now.   Give me another

4   second?

5        Q.    Sure.

6        A.    So if I -- I would issue a letter --

7   usually a letter of direction for distribution, and

8   that was done on -- at my own discretion.

9        Q.    How would you decide when to issue a

10  letter of direction?

11       A.    Well, you know, Seth would come to me and

12  needed -- needed funds from the trust, and I would -- I

13  would review it, and you know, make sure that

14  everything was in order with that, and then I issue a

15  letter of direction for the -- for the distribution of

16  the funds for --

17       Q.    How would you make sure that everything

18  was in order?

19       A.    I'd -- you know, my work was -- I was with

20  a Fortune 500 company, and I was an account executive,

21  and so you know, I had business sense in going over

22  this stuff.   And I would look at it and see if it was a

23  worthwhile investment in my determination, because it

24  was my -- it was up to me.   It was up to my discretion.

25       Q.    What was your role at Hansel?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 667 of 1079

ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                    12

```
 1              A.    At where?

 2              Q.    At Hansel.

 3              A.    I --

 4              Q.    Didn't you say you were an Hansel, an

 5      executive at Hansel?

 6              A.    No.  No, I didn't say that.

 7              Q.    Oh, I apologize.  Okay.

 8              Did you just briefly describe your work history?

 9              A.    Yeah.

10              I work -- I was in a dental supply company, a

11      couple of them, and two -- and both of them are Fortune

12      500 companies, and they're both the two largest supply

13      companies in the country.

14              Q.    Mr. Leavitt, do you have a phone in front

15      of you still?

16              A.    I do.

17              Q.    Is it face down or face up?  Can we turn

18      it off?

19              A.    Yeah, absolutely.  I'm sorry.  I should

20      have done that before.

21              Q.    That's okay.

22              A.    Okay.

23              So my wife -- I like to keep it -- actually turn

24      it down because there are some issues there.  But we're

25      okay.
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 668 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                            13

1    Q.    Okay.  So is the phone off now?

2    A.    Yes.

3    Q.    Okay.  Thank you.

4          Did you ever issue a letter of direction without

5    Mr. Casden first asking you to do so?

6    A.    No.

7    Q.    Did Mr. Cas -- did you ever turn down Mr.

8    Casden's request for a letter of direction?

9    A.    Yes.

10   Q.    When was that?

11   A.    I don't recall the date.

12   Q.    What were the circumstances?

13   A.    The circumstance that I recall was that

14   there was -- that there was a company called -- it was

15   an investment Side Door, and we wouldn't grant it.

16   Q.    Why not?

17   A.    I spoke to my attorney, and just at the

18   time -- I think that it did get granted eventually, but

19   at that time it was a conflict of interest.

20   Q.    What was the conflict of interest?

21   A.    Well --

22         MS. LUU:  Objection.  Attorney-client

23   privilege.

24         MS. SULLIVAN:  There was a conflict of

25   interest for the trust to invest in Side Door, and



1   that's attorney-client privilege?

2              MS. LUU:  Well, to the extent -- I just

3   don't want him to reveal any discussion about -- that

4   we had about it.

5              MS. SULLIVAN:  I'm -- you -- he said that

6   in his discretion he didn't -- he turned down the

7   letter of direction because there was a conflict of

8   interest, and so I think I'm allowed to probe what that

9   conflict of interest was.

10             MS. LUU:  You can probe --

11             MS. SULLIVAN:  I'll rephrase the question.

12   BY MS. SULLIVAN:

13        Q.    Mr. Leavitt, what was the conflict of

14   interest that caused you to deny Mr. Casden's request

15   for a letter of direction to invest in Side Door?

16        A.    My attorney at the time advised me that it

17   may not be an investment that we could make.  It didn't

18   fit into the guidelines of what we would do a

19   distribution on.

20        Q.    When you say guidelines, what guidelines

21   are you referring to?

22        A.    You know, we wanted to make sure that it

23   was something that -- it was -- it was an investment,

24   and we wanted to make sure that the trust would allow

25   for that type of investment.  And the specifics of it

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 670 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                              15

1  hadn't come in yet, so we couldn't grant it.

2        Q.    And ultimately, you allowed the trust to

3  invest in Side Door Ventures?

4        A.    My understanding was yes.  I think I -- I

5  don't know if I was still the -- you know, involved in

6  my role with the trust.

7        So at that point in time I don't recall if I was

8  there or not, but I think that it did get granted.

9        Q.    Is there anyone else in the room with you,

10  Mr. Leavitt, beside some Ms. Luu?

11        A.    No.

12        Q.    And you said you spoke with your attorney.

13  Who is the attorney?

14        A.    Jocelyn --

15        What is Jocelyn's last name?

16            MS. LUU:  Borowsky.

17  BY MS. SULLIVAN:

18        Q.    It was an attorney from Duane Morris?

19        A.    Yes.

20        Q.    Who pays for the fees for Duane Morris to

21  represent you?

22        A.    The trust.

23        Q.    Are there any other times that you used

24  your discretion to decline Mr. Casden's request for a

25  distribution or investment from the trust?



1        A.    I think so, but I can't recall.

2        Q.    When you would -- when you declined Mr.

3   Casden's request to invest in Side Door, how did you

4   inform him of that?

5        A.    Well, Nicole, I don't remember.  I don't

6   know if we had Jocelyn do it, because you know, there

7   was some discrepancy there, and we were going back and

8   forth.

9        So I don't recall at the time.

10       Q.    Did you ever use your discretion to refuse

11  to provide a monetary distribution to Mr. Casden at his

12  request?

13       A.    I don't recall.

14       Q.    How did Mr. Casden tell you when he wanted

15  you to issue a letter of direction?

16       A.    Usually an e-mail.

17       Q.    And after Mr. Casden would send you an

18  e-mail requesting a distribution from the trust, what

19  would be your next step?

20       A.    I examined it, and I determined whether or

21  not I thought it was a good source of financing, and

22  then, you know, if it was, I issue a letter of

23  direction, you know, for distribution.

24       Q.    How did you issue the letter of direction?

25       A.    E-mail.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 672 of 1079

ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                                                     17

1      Q.     Would you draft it yourself?

2      A.     Sometimes.

3      Q.     Who would draft it other times?

4      A.     Jocelyn, the attorney.

5      Q.     Anyone else?  Did Mr. Casden ever prepare

6  letters of direction for you?

7      A.     No.

8      Q.     How would you send the letters of

9  direction to Northern Trust?

10     A.     I don't know that I sent them to -- I

11 can't recall if ever sent them to Northern Trust,

12 but -- maybe in the beginning.  I had a contact over

13 there who handled the trust.  I can't recall her name.

14     Q.     What was your interaction with this

15 contact at Northern Trust?

16     A.     It wasn't -- it wasn't frequent.  I didn't

17 really have a close relationship.  We kind of -- I

18 always felt like she looked at me as like an outsider,

19 but she was the -- she took care of the -- she handled

20 the trust for Northern Trust.  She was the go-to

21 person.

22     Q.     And when Mr. Casden requested a hundred

23 thousand dollars be distributed from the trust to him.

24 How did you examine that request, if at all?

25     A.     I don't recall.  I don't -- I don't even



ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                    18

1   recall that request.

2         Q.    Did you ever review the (inaudible)

3   document?

4         A.    I'm sorry.  Say that again, Nicole.

5         Q.    Did you ever review the mutual trust

6   document?

7               MS. LUU:  You're cutting in and out.

8         A.    Yeah, we're breaking up here, Nicole.  I

9   heard what you said, though, last time.

10        Did I ever review -- I think I did in like 2016.

11   And I only say that because that seemed to -- popped up

12   before.  But I'm not even sure of that.

13   BY MS. SULLIVAN:

14        Q.    You're not sure if you ever read the trust

15   document?

16        A.    Oh, I'm sure I read the trust document.  I

17   don't recall when.

18        Q.    Okay.

19        A.    And that's popping up because I think

20   that's when I got involved with the trust, but I'm not

21   sure.

22        But if that's what I did, that's when I would

23   have read it.

24        Q.    Who is Graham Casden?

25        A.    Graham Casden is Seth Casden's brother.



ALAN LEAVITT                                     August 21, 2025
IN RE: SETH HALDANE CASDEN                                    19

1          Q.    Did he ever act as the adviser for the

2     Seth Casden resulting trust?

3          A.    You know what?  You had -- yes.  Yes.  I'm

4     sorry, you had asked me that before and I couldn't

5     remember --

6          But yes, Graham was an adviser.

7          Q.    Was he the adviser that preceded you?

8          A.    I think so.

9          Q.    Do you know why Mr. Graham Casden no

10    longer was the adviser for the trust?

11         A.    I don't really -- I think there was family

12    disagreements, but I'm not sure.

13         Q.    Did Seth Casden explain to you why his

14    brother was no longer going to be the adviser?

15         A.    If he did, I don't recall.

16         Q.    What family disagreements were you aware

17    of at that time?

18         A.    You know, it -- so my -- my

19    brother-in-law, who is Seth's father and Graham's

20    father, is divorced from their mother.  So I -- that's

21    a whole aspect of -- you know, that aspect of what was

22    going on, I really had no -- I had idea it was separate

23    from any dealings I have ever -- or any encounters,

24    excuse me, I had with Seth or Graham.  I didn't really

25    know what was going on on that side of the family.



ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        20

1        Q.    Did you ever have any conversations with

2    Graham Casden about the Seth Casden resulting trust?

3        A.    Never.

4        Q.    Did Seth Casden ever tell you that his

5    brother Graham was refusing his requests for

6    distribution?

7        A.    No, no.  I didn't know what the cause was.

8        Q.    Did you ever have to sign anything when

9    you decided to act as an adviser for the Seth Casden

10   resulting trust?

11       A.    Did I have to sign anything?

12       Q.    Yes.

13       A.    In general, you mean?

14       Q.    No.  To become the adviser.

15       A.    Oh.  I don't recall.  I don't recall.

16       Q.    Do you keep any records about your -- what

17   you did or didn't do as a trust adviser?

18       A.    I'm sure I have -- yes, I was keeping --

19   keeping documentation, you know, printed -- that were

20   online that I wanted a copy of that I printed up.

21   Don't ask me where they are.

22       Q.    Did you -- do you still have those

23   printouts?

24       A.    I don't know.

25       Q.    How much time did you spend act as the



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 676 of 1079

ALAN LEAVITT                                           August 21, 2025
IN RE: SETH HALDANE CASDEN                                          21

 1  trust adviser for the Seth Casden resulting trust per

 2  week?

 3          A.    Not much.  Only if I had to review

 4  expenditure.  But not much.

 5          Q.    And how much time would you spend

 6  reviewing expenditure?

 7          A.    Depends on what it was.

 8          Q.    If it was a monetary distribution directly

 9  to Mr. Casden, how much time would you spend reviewing

10  that expenditure?

11          A.    Again, it's relative to the expenditure,

12  but I would have to talk to Seth and see the need

13  for it and where it was going.

14          Q.    Have you ever acted as an adviser for

15  another trust?

16          A.    No.

17          Q.    I'll open it -- I'm going to drop an

18  exhibit, a document into the chat.  I'm going to open

19  it and share my screen, Mr. Leavitt, so you can review

20  it.  If you prefer to download it on your computer and

21  view it that way, you can.  I just downloaded it.

22          Q.    I'm sharing my screen, Mr. -- you see --

23          A.    I can see it.

24          Q.    Do you recognize this document?

25          A.    Well, it says to Seth Casden resulting



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 677 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              22

1   trust, also known as 2046 trust of Seth Casden.

2          Q.    I can scroll through it as well.

3          Let's mark this as Exhibit 1 today, please.

4                [Exhibit 1 marked for identification.]

5                [Discussion off the record.]

6   BY MS. SULLIVAN:

7          Q.    Sorry, Mr. Leavitt, you were reading --

8   I'm not asking you to read the whole document.

9          A.    Oh.

10         Q.    I mean, you can.  It's 23 pages.  I just

11  wanted to see if you have seen this document before

12  today.

13         A.    I --

14         Q.    If you want me to keep scrolling, I can.

15  It's up to you.

16         A.    I really don't recall.

17         Q.    It has -- you'll notice on the bottom it's

18  Bates-stamped, which is how we mark documents.

19  LEAVITT0000046, and it goes through LEAVITT0000068,

20  which means that it was -- it came to us through your

21  attorneys as part of the documents that you were asked

22  to produce.

23         So I don't know if that refreshes your memory

24  about if you have seen this document before or not.

25         A.    You know, I could have.  I just don't



ALAN LEAVITT                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                    23

 1   recall.

 2          Q.    Okay.

 3          Do you know what a trust protector is?

 4          A.    No.

 5          Q.    Do you know if the Seth Casden resulting

 6   trust had a trust protector?

 7          A.    Are you referring to a particular

 8   terminology that you would call the trust?  Because I

 9   don't understand, Nicole, the term you're using.  That

10   I never heard before.

11          Q.    Is there anyone else other than you and

12   Northern Trust that had any interaction with the Seth

13   Casden resulting trust?

14          A.    That I don't know.  I know that there's

15   been a few different people assigned to the trust

16   after -- well, the -- I'm -- the mind's a horrible

17   thing to waste.  I'm remembering, her name was Nicole,

18   I think, Shiverelli (ph) or something at Northern

19   Trust.

20          But someone else after her became the -- handled

21   the trust.  But I couldn't tell you the name.

22          Q.    After you replaced Graham Casden as the

23   trust adviser, did Mr. -- did Graham Casden have any

24   other role with the Seth Casden resulting trust?

25          A.    If he did -- I don't know.  I never spoke



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 679 of 1079

ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                          24

 1   to Graham.

 2          Q.    Other than speaking to Seth Casden, the

 3   people at Northern Trust and Duane Morris, did you ever

 4   speak to anyone else about the Seth Casden resulting

 5   trust?

 6          A.    No.  No.

 7          Q.    Did you ever speak to Seth Casden's father

 8   about the trust?

 9          A.    I did.  I did.

10          Q.    What did you and his father speak about?

11          A.    His stepfather.  His stepfather.

12          At one point in time, I -- so his -- his name is

13   Alvaro Pascotto (ph).  And Alvaro was going to at one

14   time purchase the investments of the trust, and I don't

15   know what happened with that.

16          Q.    When you say purge the investments of the

17   trust --

18          A.    Oh, not purge.  Purchase.  Purchase.

19          Q.    Purchase.

20          When was that?

21          A.    I don't know the exact time.  It was

22   probably a couple of years ago.

23          Q.    Were you still the trust adviser at that

24   time?

25          A.    I think so, but I'm not certain.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 680 of 1079

ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        25

1      Q.    How did you and Mr. Pascotto have this

2  conversation where he informed you he wanted to

3  purchase the investments of the trust?

4      A.    He really -- how did that go down?  Let me

5  see.  Okay.

6      So I reached out to Aldero, and I have no --

7  before this I had no communication with him whatsoever,

8  not even as a distant family member.

9      But I reached out to him, and I asked him if --

10  what he thought about this -- this was when we were

11  going back and forth with that Side Door investment,

12  and whether -- and whether or not it could be funded,

13  and I asked him because he's a savvy investor if he

14  would -- what he thought about it, and would he

15  consider -- would that be something that he would buy

16  if it were -- you know, if he could.

17      And I think what he did was came back and said

18  it was -- it was a good investment.  And that's about

19  the extent of -- of what I recall on that.

20      Q.    Did Mr. Pascotto end up purchasing the

21  investments from the trust?

22      A.    I don't think so.

23      Q.    Why not?

24      A.    I don't know.

25      Q.    Who would you submit the letter of



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 681 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                              26

1  direction to?

2       A.   Really I -- other than that gal at -- in

3  Northern Trust, I don't recall who those would get

4  submitted to.

5       Q.   Did Northern Trust ever refuse to execute

6  a letter of direction that you sent?

7       A.   I don't think so.

8       Q.   Did Northern Trust ever object --

9       A.   I don't recall, but I don't think so.  I

10 wasn't really that involved with the gal handling this

11 hat Northern Trust.  As I said before, I just -- I felt

12 kind of distant from her, and she was the one that

13 controlled that -- I kind of felt that she looked at me

14 as -- I don't know -- maybe not a valid reputation of

15 the trust.  I don't know what her motivation -- but

16 this is just the feeling I was getting.

17      Q.   Did Northern Trust ever object to any of

18 the letters of direction that you submitted for the

19 trust?

20      A.   I don't recall.

21      Q.   You're aware that Seth Casden filed for

22 bankruptcy on October 16th, 2023, correct?

23      A.   Yes.

24      Q.   And prior to Mr. Casden filing for

25 bankruptcy, did he talk to you about it?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 682 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                              27

1        A.    I think he just told me that he was filing

2   for bankruptcy, but you know, not to any extent.

3        Q.    Did he ask you to distribute any money to

4   him immediately prior to his filing for bankruptcy?

5        A.    I don't recall.

6        Q.    Did he have any -- did Mr. Casden?

7        A.    I'm sorry, did Seth Casden have any

8   discussions with you prior to filing for bankruptcy

9   about continuing to receive distributions from his

10  trust.

11       A.    The trust -- the trust is a spendthrift

12  trust, which means that -- you know, it's -- the trust

13  is for Seth's benefit.  So it doesn't pay creditors.

14       Q.    Did Mr. -- did Seth Casden ask you if he

15  would be permitted to receive monetary distributions

16  from the trust while he was in bankruptcy?

17       A.    I don't recall.

18       Q.    How did Mr. Casden tell you that he was

19  filing for bankruptcy?

20       A.    Must have been verbally.

21       Q.    Did you and Mr. Casden communicate over

22  text?

23       A.    Over text?  Yeah, of course.

24       Q.    Did you communicate with Mr. Casden about

25  the trust over text?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 683 of 1079

ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        28

1        A.    You know, there may have been mention, but

2   I really don't recall.

3        Q.    Did you communicate with Mr. Casden over

4   e-mail?

5        A.    Same thing, yeah.  We did -- you know, I

6   really don't recall, but it could have been.

7        Q.    After Mr. Casden filed for bankruptcy, did

8   he make any requests for distributions from the trust?

9        A.    That time period is so jumbled, I don't

10  know.

11       Q.    If Mr. Casden wanted to make a request for

12  a distribution from the trust to you, would he send you

13  an e-mail or a text message about it?

14       A.    I would assume so.

15       Q.    Did Mr. Casden ask after he filed for

16  bankruptcy if he could take a loan from the trust to

17  fund his reorganization plan?

18       A.    I don't recall that.

19       Q.    Did Mr. Casden ask you after he filed for

20  bankruptcy to have his trust fund any capital calls?

21       A.    I think -- I think that that investment

22  Side Door was -- was one that was an issue.

23       Q.    After he filed for bankruptcy?

24       A.    I think.  I think that was the issue with

25  that.



ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        29

1          Q.    So when we were talking earlier about the

2     Side Door investment and whether or not you were going

3     to permit the trust to invest in it, that was after he

4     had filed for bankruptcy?

5          A.    I think so.

6          Q.    Did you ever tell Mr. Casden after he

7     filed for bankruptcy that the trust could no longer

8     make distributions to him?

9          A.    Yes.  Yeah, I think there was -- yeah.

10         Q.    When did you tell him that?

11         A.    I can't tell you the -- the exact time,

12    but --

13         Q.    How did you tell him that the trust

14    couldn't give him any distributions after he filed for

15    bankruptcy?

16         A.    I don't know what the -- what the feature

17    of communication between us was, whether it was a text

18    message or a phone or --

19         Q.    What specifically did you tell Mr. Casden?

20         A.    Well, if I couldn't allot financing to him

21    that's probably what I said to him, that the -- you

22    know, the guidelines of the bankruptcy won't allow it

23    with the trust.

24         Q.    What did you understand wasn't allowed by

25    the guidelines of the bankruptcy?



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              30

1          A.    Well, I just -- as I said before, he had a

2    spendthrift trust, and I know with the trust -- the

3    trust doesn't -- isn't -- it's for his benefit, so it

4    isn't for creditors.  So you're limited there.

5          Q.    How did you learn that information?

6          A.    I don't recall if it was through -- may

7    have been through my attorney.

8          Q.    And by your attorney, you mean Duane

9    Morris?

10         A.    That firm, yes.

11         Q.    Did Duane Morris represent you prior to

12   Seth Casden filing for bankruptcy?

13         A.    I think -- I don't -- I don't know the

14   time period there.  I can't answer that.

15         Q.    Did you sign -- with Duane Morris?

16         A.    I don't know.  I don't know.

17         Q.    Did you ever tell Mr. Casden that the

18   trust could not make any further payments on

19   investments while he was in bankruptcy?

20         A.    Specific, yeah.  So certain specific

21   investments like the creditors, you know, weren't paid,

22   couldn't pay those.

23         So yes, that was -- he was told that.

24         Q.    What specifically did you tell him?

25         A.    I don't know specifically, but we -- you



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 686 of 1079

ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        31

1  know, that the spendthrift trust couldn't pay

2  creditors.

3         Q.    Which creditors did Mr. Casden ask you to

4  pay from the trust?

5         A.    I don't recall at this time.

6         Q.    Did he ever ask you to pay one to DeVoto

7  (ph)?

8         A.    Never heard that name before.

9         Q.    Did Mr. Casden ask you to make a payment

10  from the trust to Aria Casino?

11         A.    Never heard that name before.

12         Q.    Did Mr. Casden ask you to make a

13  distribution from the trust -- or payment from the

14  trust to American Express?

15         A.    Though I have heard that before, but not

16  from him, no.

17         Q.    Did Mr. Casden ever ask you to make a

18  payment to yourself from the trust after he filed for

19  bankruptcy?

20         A.    No.

21         Q.    Did you ever tell Mr. Casden that the

22  trust could not pay his attorney's fees after he filed

23  for bankruptcy?

24         A.    I didn't know that, but no.

25         Q.    You didn't know what?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 687 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                            32

1          A.    That they won't pay -- the trust won't pay

2    his attorney's fees.

3          Q.    Was the trust paying his attorney's fees?

4          A.    No, I don't know that.  I'm just saying

5    you had mentioned a statement that I had never heard

6    before, so I was unfamiliar with that.

7          Q.    I just want to be clear.

8          Did you ever tell Mr. Casden that the trust

9    could not pay his attorney's fees while he was in

10   bankruptcy?

11         A.    I never had this conversation with him.

12         Q.    And are you currently the adviser for the

13   Seth Casden resulting trust?

14         A.    No.

15         Q.    When did you stop being the adviser?

16         A.    I'm going to guess a year-and-a-half, two

17   years ago.

18         Q.    And why did you stop?

19         A.    And that's purely a guess.

20         Q.    And who asked you to stop -- why did you

21   step down as the adviser for the trust?

22         A.    I just didn't want that responsibility at

23   my age, and you know, I had a stroke, and I just -- I

24   did it as a favor to Seth.  You know, it -- it became

25   more involved with -- you know, more involved than I



ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                      33

1   would have wanted it to.

2           Q.     When was your stroke?

3           A.     The stroke was -- as a matter of fact, it

4   was a year ago today.

5           Q.     And who replaced you as the trust adviser?

6           A.     You know, I -- Nicole, I heard the name,

7   but I don't recall it, no.

8           Q.     I said Joel Tucker.  Does that refresh

9   your memory?

10          A.     Yes.

11          Q.     Do you know who Joel Tucker is?

12          A.     Other than he's the adviser -- other than

13  that -- that's all I know.

14          Q.     Do you know how Seth Casden knows Joel

15  Tucker?

16          A.     I have no idea.

17          Q.     How did you resign as the adviser?  Did

18  you send an e-mail, something else?

19          A.     Probably an e-mail.

20          Q.     And who did you send it to?

21          A.     Again, probably -- probably Seth.

22          Q.     Did you ever give written notice to

23  Northern Trust that you were no longer the adviser to

24  the Seth Casden resulting trust?

25          A.     That I don't recall.



1      Q.    Were there any specific steps in the trust

2  document that you had to follow to stop being the trust

3  adviser?

4      A.    That I don't recall.

5      Q.    You said that it became more involved than

6  you wanted, being the trust adviser.

7          What were you referring to?

8      A.    I guess you know with -- just the -- you

9  know, here's -- with like -- overall, you know, not --

10  was interested in -- in taking over the investments and

11  not and family issues like that, and I just wanted to

12  be out of that whole thing.

13      Q.    When Mr. Pascotto and you had that

14  discussion about him purchasing the assets from the

15  trust -- or sorry, the investments from the trust --

16  was that after Mr. Casden filed for bankruptcy?

17      A.    I can't recall the time frame there, of

18  that discussion.

19      Q.    Do you have any writings between you and

20  Mr. Pascotto about that discussion?

21      A.    I'm sure I sent him an e-mail on it, you

22  know because we didn't talk over the phone.  So it must

23  have been an e-mail.

24      Q.    I believe you resigned as the trust

25  adviser longer than an year ago, so I don't believe



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 690 of 1079

ALAN LEAVITT                                            August 21, 2025
IN RE: SETH HALDANE CASDEN                                           35

1   that your stroke was a reason for the resignation.

2          Is that fair, or do you still believe that the

3   stroke was a reason that you resigned?

4          A.   Yeah, I do.  I just -- you know, it was

5   one more thing.

6          Nicole, I got to add something to the whole

7   equation.  I don't know if it means anything.

8          But I was a competitive fighter for over 40

9   years, I still coach for the park district.  I have

10  been hit in the head millions of times.

11         So my -- it scares me, but my recall isn't the

12  best.  And whether or not it has to go with the stroke

13  or my choice of athletic activities, I'm very

14  forgetful.

15         So I just wanted to throw that in too.

16         Q.   Have you ever loaned any money to Seth

17  Casden?

18         A.   Yes.

19         Q.   When was that?

20         A.   I want to say -- again, I'm guessing.  I

21  want to say about three years ago was the first time.

22         Q.   How much money did you loan Mr. Casden?

23         A.   $100,000.

24         Q.   Is that the only loan you gave him, or

25  were there other loans?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 691 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                   36

```
 1          A.     No, he paid me back on that, and I lent
 2     him money -- it was probably about a year ago.  No, two
 3     years ago.  I lent him $100,000.
 4          Q.     And what was the $100,000 loan for?
 5          A.     Didn't ask him.
 6          Q.     Has it been paid back?
 7          A.     That one has not.
 8          Q.     Did you file a proof of claim in his
 9     bankruptcy?
10          A.     No.  I have got a promissory note.
11          Q.     What are the terms of your promissory note
12     with Mr. Casden?
13          A.     I couldn't tell you.  I -- you know, I
14     don't have the note with me, but he's supposed to pay
15     it back after a year, and then -- it was -- I forget
16     what percentage.
17          You know, it's -- Nicole, it's family, so I'm
18     not of course -- I want to get paid back, but I'm
19     not -- I know he's -- you know, he's involved in a lot
20     of stuff right now, so I'm not sitting over his
21     shoulder and, you know, asking him to pay it back now.
22     You know, I'm sure when he gets situated he'll pay me
23     back.
24          Q.     You mean after he's out of bankruptcy?
25          A.     Whatever -- I don't know that -- you're
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 692 of 1079

ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                        37

1   using that terminology, not me.

2          But you know, whenever his situation clears

3   about and he can afford to do it.

4          Q.    When you say -- when you say his situation

5   clears up, what situation are you referring to?

6          A.    Whatever -- you know, whether it's legal

7   or anything else involved, you know, I -- you know, I

8   lent it to him because I have faith in him, and I have

9   faith in -- he's always been an upright guy.

10         And you know, you don't -- it's not just a

11  promissory note that, you know, you lend someone like

12  that.  That's real money, you know.  I hope I'm not

13  wrong, but I'm confident he'll pay it pack.

14         Q.    Have you ever heard of Hologenix?

15         A.    Yes.

16         Q.    And what is Hologenix?

17         A.    That's Seth's firm.

18         Q.    When you say his firm, you mean his

19  company?

20         A.    His company, yes.

21         Q.    Have you ever invested any money in

22  Hologenix?

23         A.    No.

24         Q.    Have you ever loaned any money to

25  Hologenix?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 693 of 1079

ALAN LEAVITT                                                   August 21, 2025
IN RE: SETH HALDANE CASDEN                                              38

 1          A.    I don't know what the money I lent him
 2    for -- was for.
 3          So I can't really answer that because I don't
 4    know.
 5          Q.    Have you ever loaned money directly to
 6    Hologenix?
 7          A.    No, no.
 8          Q.    Did you ever authorize a distribution from
 9    the trust to Hologenix?
10          A.    No.
11          Q.    You're aware -- are you aware that my
12    client, Multiple Energy Technologies, had sued
13    Hologenix?
14          A.    Yes.
15          Q.    And are you aware that Hologenix and
16    Multiple Energy Technologies had reached a settlement
17    of that lawsuit?
18          A.    No.
19          Q.    What do you know about the Hologenix and
20    MET lawsuit?
21          A.    You know, I -- what I had heard was
22    that -- that MET was suing Hologenix for an advertising
23    claim, and that was the extent of it.
24          Q.    Did Mr. Casden ever ask the trust to
25    distribute any money for MET?



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 694 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              39

1        A.      No.

2        Q.      Were you aware of any loan from the Seth

3   Casden resulting trust to Hologenix?

4        A.      Nicole, say that again.  What?

5        Q.      Are you aware of any loans from the Seth

6   Casden resulting trust to Hologenix?

7        A.      No.

8        Q.      Okay.

9        Maybe this is a good time to take a few-minute

10  break.

11       A.      Thank you.

12       Q.      This has been an hour, and I'm going to

13  switch into some documents.

14       A.      Okay.

15       Q.      How long would you like, Mr. Leavitt?

16       A.      About a year.

17       Q.      I'm sure -- I'm hoping it's less painful

18  that you thought it would be.

19       A.      Okay.  No, it's fine.

20       Q.      Do you want five minutes, 10 minutes,

21  something longer?  It's up to you.

22       A.      Let me refer to my counsel.

23              MS. LUU:  However long you need.

24       A.      I just want to refill my coffee, and then

25  we're good to go.



```
 1                    MS. LUU:  So maybe 10 minutes.

 2                    MS. SULLIVAN:  Okay.  Sounds good.  We'll

 3      come back at 11:15.

 4                    [A recess was taken.]

 5      BY MS. SULLIVAN:

 6           Q.   Mr. Leavitt, are you aware that MET also

 7      sued Mr. Casden personally?

 8           A.   No.

 9           Q.   Are you aware that there's a $6 million

10      judgement against Mr. Casden personally?

11           A.   I didn't recall what the amount was, but

12      okay.

13           Q.   So you are aware that there was a

14      judgement against Mr. Casden personally?

15           A.   I knew that there was a judgement.  I

16      don't recall the amount.

17           Q.   How did you learn that there was a

18      judgement against Mr. Casden?

19           A.   I can't recall.  I'm assuming through

20      conversation.

21           Q.   With Mr. Casden or someone else?

22           A.   That I don't recall.

23           Q.   You said earlier that you were confident

24      that Mr. Casden would be able to pay you back the

25      $100,000.
```



ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                              41

1          Why were you confident that he would be able to

2     do that?

3          A.   I just -- I think that he's -- he's of a

4     higher moral fiber, and I think that we would make good

5     on his -- you know, on his loan.

6          Q.   Do you think he would be able to pay you

7     back from the money that he earns from Hologenix?

8          A.   I would hope at one time, whether -- you

9     know, look.  I lent him the money because I had faith

10    in -- that I would get it back.  Now, I'm not going to

11    question if I -- I wouldn't have lent it if I -- you

12    know, if I felt differently about it.  But I felt

13    secure, and so when he's -- when he's ready to pay me

14    back, you know, it'll happen, so --

15         Q.   When he repaid you back the first loan for

16    $100,000 --

17         A.   Yeah.

18         Q.    -- where did he obtain the money to pay

19    you back?

20         A.   I don't know.  You know, I have no idea.

21         Q.   Did he use it --

22         A.   I was happy to get it, but I have no idea

23    where he got that.

24         Q.   When was that loan repaid to you, the

25    first loan for $100,000?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 697 of 1079

ALAN LEAVITT                                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                                            42

1          A.    I don't recall.  It was probably two years

2    ago, three years ago, something like that.

3          Q.    Did Mr. Casden use a distribution from his

4    trust to pay you back that fist $100,000 loan?

5          A.    No -- no.

6          Q.    How do you know he didn't use the trust

7    money to pay you back the $100,000?

8          A.    Because it would have to go through me.

9          Q.    So are you aware -- every time Mr. Casden

10   received a monetary distribution from the trust, were

11   you aware of what he intended to do with that money?

12         A.    Yes.

13         Q.    Okay.

14         I'm going to show you some documents like I did

15   earlier.  I'm going to share the screen again.

16         So let me just -- I'm going to drop it in the

17   chat first so your attorney and the court reporter can

18   have it.

19         A.    Okay.

20         Q.    I'm going to show you what what we're

21   going to mark as Exhibit 2 today, Mr. Leavitt.

22         A.    Okay.

23              [Exhibit 2 marked for identification.]

24   BY MS. SULLIVAN:

25         Q.    It has a Bates stamp of Casden 00050.



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              43

1          Do you recognize this document?  I'm just going

2    to put it at 100 percent so it's all there for you.

3          Can you see the document?

4          A.    Yeah, yeah.  Boy, that name -- it's been a

5    while.

6          But yeah, Nai-te Watson.

7          Q.    Who is Nai-te Watson?

8          A.    He was the -- he worked for Northern

9    Trust, and he was the trust adviser from Northern

10   Trust.

11         Q.    You mean the trustee -- he was acting as a

12   trustee for Northern Trust, or the individual --

13         A.    Yeah, he worked for Northern Trust.  Now

14   that was his account.  I don't know what capacity or

15   what title he had.

16         But yes, he was -- he worked for Northern Trust,

17   and he was in charge of the trust, Seth Casden trust.

18         Q.    Do you recognize this letter?

19         A.    No.

20         Q.    Do you know who drafted this letter?

21         A.    It said -- my name is signed at the bottom

22   of this.

23         Q.    Do you know who drafted this letter?

24         A.    No.

25         Q.    Is that your signature?



1        A.    Yes.  Well -- yes, that's my signature.

2        Q.    Is that how you write your name, or is

3   that an electronic signature, or something else?

4        A.    It's an electronic signature.

5        Q.    And you inputted that electronic signature

6   on this document?

7        A.    I don't recall.

8        Q.    Did anyone else have the authority to put

9   your electronic signature on a document?

10       A.    You know, I'm -- I don't recall.

11       Q.    Did Mr. Casden ever have authority to put

12   your electronic signature on a document?

13       A.    I don't recall.

14       Q.    Did Mr. Casden have access to your

15   electronic signature?

16       A.    No -- again, I've got to say I don't

17   recall.

18       Q.    Is that your address on the top, 470

19   Demling Place, Chicago, Illinois?

20       A.    That is.

21       Q.    The first paragraph references Article

22   2nd, Paragraph 1, of the above-referenced trust

23   agreement, referring to the Seth Casden resulting

24   trust.

25            Do you see that?

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 700 of 1079

ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                                       45

1          A.     I do, the first paragraph, yes.

2          Q.     Okay.

3          What is the Article 2nd, Paragraph 1, of the

4    Seth Casden resulting trust?

5          A.     Do you -- so you're talking about,

6    "Pursuant to Article 2nd, Paragraph 1 of the

7    above-referenced trust agreement, the trust.  I am

8    the" -- "I am the adviser for the trust and can direct

9    the Northern Trust Company of Delaware as trustee for

10   distribution of the assets of the trust."  "Is required

11   to follow my written directions as adviser with respect

12   to all distributions."

13         "In any (sic) capacity as adviser, I direct

14   Northern Trust to suspend the monthly distributions of

15   $30,000 effectively (sic) with the July 1st, 2020,

16   distribution until further notice.

17         "The directions contained in this letter are

18   intended by me to be directions described in Section

19   3313 of the Title 12 of the Delaware code.  Section

20   3313 states, in relevant part, that if a governing

21   instrument provides that a trustee is to follow the

22   directions of the adviser, and the trustee acts in

23   accordance with such directions, then except in cases

24   of willful misconduct, the trustee shall not be liable

25   for any loss resulting in such an act."

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 701 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    46

1        And then signed Alan T. Leavitt, as adviser of

2   the 2016 (sic) trust, Seth Casden dated --

3        Okay.  Okay.

4        Q.    Are you familiar with what you just read?

5        A.    I don't recall it.

6        Q.    Okay.  When it states that NTDE is

7   required to follow my written directions as adviser

8   with respect to all distributions, the last line of the

9   first paragraph, is that a true and correct statement?

10       A.    I would -- you know, I don't know.  I

11  don't recall any of that, so I don't know how to answer

12  that.

13       Q.    And what was Mr. Casden receiving monthly

14  distributions of $30,000 for?

15       A.    You know, it's dated May 18th, 2020.

16  So I don't recall.

17       Q.    Why were you directing Northern Trust to

18  suspend the monthly distribution of $30,000 effective

19  with the July 1st, 2020, distribution?

20       A.    Nicole, I don't know.  I don't recall.

21       Q.    And what is Section 3313 of Title 12 of

22  the Delaware code?

23       A.    I don't know.

24       Q.    I'm going to show you -- Exhibit 3 -- keep

25  my screen zoomed in, so let me zoom it out for you so



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              47

1  you can see the -- it's Bates stamp Casden 00051.

2          Do you recognize this document?

3              [Exhibit 3 marked for identification.]

4          A.    No.   No.   Let me read.

5          Okay.

6  BY MS. SULLIVAN:

7          Q.    Having read the document we marked as

8  Exhibit 3, Casden 51, does it refresh your memory?

9          A.    No.

10         Q.    And the -- is that your signature at the

11 bottom?

12         A.    It's my name.   Again, it's generated.

13         Q.    Did you generate that electronic

14 signature?

15         A.    I don't recall.   This was in 2021.   I

16 don't recall.

17         Q.    I'm just going to show you Exhibit 2

18 again.

19         Do you see your electronic signature there

20 includes your full name, Alan Terry Leavitt?

21         A.    I see it, yes.

22         Q.    And if we go back to Exhibit 3, it just

23 says Alan Leavitt without your middle name.

24         Do you see that?

25         A.    Yeah.



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    48

1        Q.    How do you ordinarily sign your name?  Is
2   it with Terry or without Terry?
3        A.    Both.
4        Q.    You sign it both ways.
5        Did you see authorize this electronic signature
6   to be placed on this letter, dated February 1st, 2021,
7   to Northern Trust?
8        A.    I don't recall.
9        Q.    Did Mr. Casden have access to your
10  electronic signature as is delineated on Exhibit 3
11  here?
12       A.    I don't recall.
13       Q.    In the letter to Northern Trust, you
14  direct it to send $400,000 from principal for the
15  benefit of Seth Casden on February 1st, 2021.
16       Do you see that?
17       A.    Yeah, yeah.
18       Q.    What was the purpose of that $400,000
19  distribution?
20       A.    You know, too long ago.  I really don't
21  recall.  Yeah.
22       Q.    What steps would you take -- if you
23  received a request from Mr. Casden for a $400,000
24  distribution, what steps would you take before you sent
25  this letter of direction to Northern Trust?



1        A.    I would question Seth on what he was going

2   to use for the funds, and if it was -- you know, if it

3   was a wise business decision to do that, and go from

4   there.

5        Q.    How would you question him about what he

6   was going to do with the fund?

7        A.    Well, it depends on what the funds were

8   being used for.

9        Q.    What does that mean?

10       A.    That means that I would have to make the

11  determination of whether it was -- you know, it was a

12  useful investment.

13       Q.    But sitting here today, you don't know

14  what the $400,000 on February 1st, 2021, was being used

15  for?

16       A.    Yeah, it was four years ago.  I don't

17  remember what happened yesterday, so --

18       Q.    Do you have any writings that you would

19  have concerning what Mr. Casden was intending to do

20  with each distribution he requested?

21       A.    No, I don't.

22       Q.    Did you have any text communications or

23  e-mail communications with Mr. Casden about the purpose

24  of his distribution requests?

25       A.    You know, I think that MET would have --



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 705 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                               50

1   you know, they looked at my phones and my e-mails.  So

2   whatever was distributed to them, you know, they should

3   have that there.  Because I can't recall.

4          Q.    Who looked at your phone and your e-mails?

5          A.    I don't know -- it was -- it was MET.  I

6   don't know who they authorized to -- to take the

7   e-mails and the text messages.

8          Q.    When you say MET, do you mean my client

9   Multiple Energy Technologies?

10         A.    Yes.

11         Q.    So as you sit here today, you believe that

12  my client had access to your telephone and your

13  e-mails?

14         A.    I thought it was them, unless I'm

15  misunderstanding, you know.

16         But I would say I thought that's who it was.

17         Q.    Why do you think it was MET?

18         A.    Well, it could only be -- it could only

19  be, you know, two sources, either my legal team or the

20  legal team you represent.

21         Q.    Have you ever spoken to anyone from my

22  legal team?

23         A.    No, you're the first one.

24         Q.    Have you ever spoken to anyone that

25  represents Seth Casden?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 706 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              51

1          A.    I don't recall.

2          Q.    Have you ever spoken to John Tedford?

3          A.    Well, I'm -- no.  No.  I was wondering why

4    I knew that name.  I think I have seen that printed,

5    but I don't think so.

6          Q.    Have you ever spoken to Gregory Selvado

7    (ph)?

8          A.    No.

9          Q.    Have you ever spoken to J.P. Fritz?

10         A.    No.

11         Q.    Have you ever spoken to Curt Ramwell (ph)?

12         A.    No.

13         Q.    Have you ever spoken to Scott Barrent

14   (ph)?

15         A.    No.

16         Q.    How would you -- other than discussing

17   what Mr. Casden intended to do with the distribution he

18   requested.  What other steps, if any, would you take

19   before authorizing the distribution?

20         A.    Well, for instance, going back to Mr.

21   Pascotto, you know, I -- since he was a savvy investor,

22   I questioned him about that investment of Side Door,

23   and whether or not, you know, it would be a good

24   investment.

25         Q.    I'm asking specifically about this



1   $400,000 distribution request.

2          A.    Oh.  Yeah.  Yeah.

3          Q.    What other steps, other than talking to

4   Mr. Casden, if any, would you take?

5          A.    You know, I don't recall this investment

6   at the time, so --

7          Q.    Okay.  But when Mr. Casden requested a

8   monetary distribution, what was your ordinary course of

9   conduct after the request for money came in?

10         A.    I would want to know what it's for, and

11  what -- and whether or not it was a useful investment,

12  you know, to allocate the monies for.

13         Q.    What if Mr. Alan told he just wanted to

14  use it for everyday living?  Would that be something

15  that you would consider a useful investment?

16         A.    No.

17         Q.    What if Mr. Casden told you he wanted to

18  use it to take his family on vacation.  Would that be a

19  useful investment?

20         A.    No.

21         Q.    What if Mr. Casden told you he wanted to

22  use the money to investigate into his company.  Would

23  that be a useful investment?

24         A.    I would have to run that by my legal team

25  in the trust.



1          Q.    And who was your legal team in the trust?

2          A.    Well, Jocelyn -- as I said before,

3    Jocelyn, Betty Luu, and whether or not, you know, it

4    was -- it was acceptable by the guidelines of the

5    trust.

6          Q.    Other than Side Door investments -- the

7    investment into Side Door, did you review any other

8    investments with Duane Morris?  And I don't want your

9    discussions with them; just whether you've review any

10   other investments with them.

11         A.    I'm sure I did, but I don't recall.

12         Q.    If Mr. Casden told you he wanted the money

13   to buy a car, would that be a useful investment?

14         A.    You know, I would assume if it was a

15   business expense, but I really I can't answer that at

16   this point.  I don't know.

17         Q.    If Mr. Casden told you he wanted the

18   monetary distribution -- let me stop sharing, hold

19   on -- the monetary distribution to pay for his father's

20   day-to-day living, would that be a useful investment?

21         A.    No.

22         Q.    If Mr. Casden told you that he wanted to

23   use the monetary distribution to pay for his son's

24   school, would that be a useful investment?

25         A.    No.





ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              54

1        Q.    If Mr. Casden told you that he wanted to

2    use the monetary distribution to pay the living

3    extension expenses for his son's mother, would that be

4    a useful investment?

5        A.    No.

6        Q.    So if Mr. Casden had told you that he was

7    using the monetary distribution for any of those

8    reasons other than investing in his company, you would

9    have declined to issue a letter of direction.

10       Is that fair?

11       A.    Yes.

12       Q.    And if Mr. Casden told you he wanted the

13   monetary distribution to pay for pet care, would you

14   have issued a letter of direction for that?

15       A.    No.

16       Q.    If Mr. Casden told you that he wanted to

17   use the money to pay for therapy services, would you

18   have issued a letter of direction for that

19   monetary distribution?

20            MS. LUU:  Objection.  Calls for

21   speculation.

22       A.    I don't know that I understand that.

23   BY MS. SULLIVAN:

24       Q.    Sure.

25       If Mr. Casden asked for a monetary distribution,



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 710 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                              55

 1   and then you said what are you going to use the money

 2   for, and then he said for therapy with a social worker

 3   or a psychologist, is that something you would have

 4   issued a letter of direction for?

 5               MS. LUU:  Objection.  Calls for

 6   speculation.

 7               MS. SULLIVAN:  It's his judgement as to --

 8   he said he has complete discretion and he examined all

 9   of them.  He knows what he would say yes or no to.

10   BY MS. SULLIVAN:

11         Q.    Go ahead.  You can answer.

12               MS. LUU:  I'm just stating my objection

13   for the record.

14         A.    I don't know.

15   BY MS. SULLIVAN:

16         Q.    Okay, I'm going to share another document

17   with you, Mr. Leavitt.

18         A.    Okay.

19         Q.    We'll mark this Exhibit 4.

20               [Exhibit 4 marked for identification.]

21   BY MS. SULLIVAN:

22         Q.    It has your name on top, Alan Terry

23   Leavitt, and a signature on the bottom, and it's dated

24   July 8th, 2024.

25               Do you recognize this document?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 711 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  56

1          A.    Let me read it.

2          Q.    If you would like to read it.  Do you need

3    me to zoom in?

4          A.    If you could make it larger, it would

5    help.

6          Q.    Sure.

7          A.    Ah, perfect.  Okay.

8          Q.    Just let me know when you want me to

9    scroll again.

10         A.    Okay.

11         Can you go up --

12         Q.    Sure.

13         A.    Okay.  Okay.

14         Okay.  Okay, Nicole.

15         Q.    Okay.  Do you recognize this document, Mr.

16   Leavitt?

17         A.    I don't.  But I see it.

18         Q.    Is that your signature?

19         A.    Yeah -- yes.

20         Q.    Okay.  And that's -- that's an actual

21   signature, not an electronic signature, correct?

22         A.    Yes.

23         Q.    And did you write that date there,

24   7-8-2024?

25         A.    It says I did.



ALAN LEAVITT                                                                         August 21, 2025
IN RE: SETH HALDANE CASDEN                                                                       57

1      Q.    Well, I mean, is that your handwriting?

2      A.    Yes.

3      Q.    But you don't recall this letter?

4      A.    No.  But we've talked about that.  I don't

5    recall the letter, but I recall the Side Door

6    investment somewhat.

7      Q.    Okay.  And in this letter, you state, "In

8    my capacity as adviser of the trust, I hereby direct

9    the trustee take the following actions," and then,

10   "Wire $100,020 per the attached wiring instructions,"

11   and then you say this is for an initial investment in

12   Side Door Ventures, Roman Numeral 2, LP.

13     Correct?

14     A.    Yes.

15     Q.    What made you decide to allow the trust to

16   make an initial investment in Side Door Ventures on

17   July 8, 2024?

18     A.    At first, you know, the trust wouldn't do

19   it, and then we -- excuse me.  We found that the

20   parameters that would allow us to make that investment

21   in Side Door.  But we had checked with the trust to

22   make sure that it was -- the investment was a good

23   investment, as far as following the guidelines as a

24   trust.

25     Q.    When you say check with the trust, who



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 713 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              58

```
 1   were you checking with?

 2         A.    Well, I checked with really my legal team.

 3         Q.    Okay.  That's Duane Morris again, right?

 4         A.    Yes.

 5         Q.    And then it states to hold Side Door

 6   Ventures II, LP, as an asset of the trust with a value

 7   of $100,020.

 8         Correct?

 9         A.    That's what it says, yes.

10         Q.    What does it mean to be an asset of the

11   trust?

12         A.    I would assume that it's part of the

13   investments in the trust.  That's just my assumption.

14         Q.    Were there other assets of the trust?

15         A.    Yes.

16         Q.    What were the other assets of the trust?

17         A.    I don't know them all.  They were

18   investments of the trust, whether it be real estate --

19         But they were investments of the trust.

20         Q.    What other types of investments would the

21   trust do other than real estate?

22         A.    You know what?  I -- I don't know.

23         Q.    Okay.  And then the next paragraph says,

24   "To fund any and all future capital calls as received

25   via notices from the funds, and to update the market
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 714 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                   59

1   value accordingly."

2          Do you see that?

3          A.    I'm trying to --

4          Q.    I put the mouse here.  It's right here.

5          A.    Where are you, Nicole?

6          Q.    Do you see the mouse with the little hand?

7   It says to fund any and all future capital calls.

8          A.    Yes.  Yeah, yeah, yeah, yeah.  Okay.

9          Q.    What did you mean by that?

10         A.    I don't know.  I don't know.

11         I don't know.

12         Q.    And the next paragraph beginning,

13  "Further," you state, "I acknowledge that I have been

14  provided copies of all relevant documents, including

15  but not limited to the subscription agreement."

16         Do you recall receiving all relevant documents

17  for the Side Door Ventures investment?

18         A.    I don't.

19         Q.    Do recall reviewing the subscription

20  agreement?

21         A.    I don't.

22         Q.    And then it says -- and you've

23  consulted --

24         Well, do you know what other relevant documents

25  are being referenced there?



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              60

1          A.    I don't.  No, unless -- like I said, it

2    went through maybe Alvaro Pascotto checking these

3    things to see the relevance of the investment.

4          But other than that, I don't know.

5          Q.    Did you check with Mr. Pascotto about --

6          A.    What's C -- I'm sorry.

7          Q.    Go ahead.

8          A.    What's CTA?

9          Q.    I don't know.  I was going to ask you.

10         A.    Oh, okay.  I don't know.

11         Q.    So it says this includes any obligations

12   associated with the CTA.

13         What is CTA?

14         A.    Chicago Transit Authority?  I don't

15   know -- I don't know what the --

16         No, I don't know.

17         Q.    I assume that's a guess, correct?

18         Who drafted this letter?

19         A.    I don't know.

20         Q.    Would you have drafted this letter, or

21   someone else?

22         A.    I don't know.

23         Q.    If you wanted to find out who drafted this

24   letter, how would you go about doing that?

25         A.    I would see who signed it.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 716 of 1079

ALAN LEAVITT                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                              61

1    Q.   Well, you signed it.

2    A.   Okay.  I --

3    Q.    If you drafted the letter, would there --

4    Sorry.  Finish your answer.  Sorry.

5    A.   Oh, I was going to say that maybe my legal

6    team too, maybe Jocelyn, because I remember the Side

7    Door, until they were able to verify it wasn't a -- it

8    wasn't a good -- wasn't an investment that we were

9    going to pursue.

10   So maybe Jocelyn, who heads the legal team.

11   Q.   Do you recall where you were when you

12   signed this document?

13   A.   No.  No.

14   Q.    If you had drafted this document, would it

15   be on your computer?

16   A.   Possibly.

17   Q.   Do you have a folder on your computer for

18   the Seth Casden resulting trust?

19   A.   Do I have a folder?  No.  You know, I'm a

20   dinosaur.  I -- my technological skills are very

21   challenged.

22   So it may be on there, but I don't have a

23   folder.

24   Q.   Okay.  But you have files --

25   Do you have a computer?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 717 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                            62

 1          A.    Do I have -- no.

 2          Q.    In general, do you have a computer?

 3          A.    Yes.

 4          Q.    And on your computer, do you have a word

 5    processing app, whether Microsoft Word or something

 6    else?

 7          A.    I think so, but I don't use that at all.

 8    I'm very basic, so --

 9          Q.    And then if we go back to that paragraph

10    that began further in the middle of Exhibit 4.

11          It says, "Consult with my own advisers as to

12    tax, legal, accounting, and related matters concerning

13    this LP investment."

14          Other than Duane Morris and Mr. Pascotto, who

15    else if anyone did you consult with?

16          A.    That would -- that would be it, I think.

17    Yeah.

18          Q.    That would be it?  Is that what you said?

19          A.    That would be it.  I think I looked -- I

20    tried to research it on my own, and you know, now that

21    I'm -- I'm lost in thought with this.  I think they

22    did -- Side Door -- send me the documentations on this.

23          Q.    Do you still have that documentation?

24          A.    I don't know.

25          Q.    Okay.  Who is Natalie Schiavone?



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 718 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              63

1          A.    Natalie was the representative from

2     Northern Trust.

3          Q.    If we go back to the the first paragraph,

4     Mr. Leavitt, the last sentence, says pursuant to the

5     authority granted to me under the trust, the trustee is

6     required to follow my written directions as adviser

7     with respect to all matters relating to the management

8     and investment of the trust assets.

9          Do you see that?

10         A.    Yes.

11         Q.    Is that a true and correct statement?

12         A.    I don't know.

13         Q.    On what basis would you believe that the

14    trustee is required to follow your written directions

15    as adviser with respect to all matters relating to the

16    management and investment of the trust assets?

17         A.    I don't know.  You know, I'm not a

18    professional adviser.  I'm just -- I was just an

19    adviser.  I'm not a professional trustee.  I'm just an

20    adviser.

21         So whatever my input would be toward those

22    decisions, is -- you know, what I'm left with.

23         Q.    Before you would sign a document, would

24    you read it?

25         A.    Yes.  Oh, yeah.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 719 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              64

1          Q.    All right.  So is it fair to -- fair here

2     to say that since your signature is on this letter,

3     that you had read it before you signed it?

4          A.    You know, I don't know.

5          Q.    Is it possible that you signed this

6     document without reading it?

7          A.    Nicole, anything is possible.

8               [Exhibit 5 marked for identification.]

9     BY MS. SULLIVAN:

10         Q.    Okay, I'm going to show you, Mr. Leavitt,

11    what we're going to mark as Exhibit 5.  It's another

12    letter, Bates stamp Casden 00080.

13         Do you recognize this document?  And I can zoom

14    in if you want me to.

15         A.    Please.

16         Can you go up, please?

17         Q.    Yep.

18         A.    Okay.

19         Okay.

20         Q.    Do you recognize what we have marked today

21    as Exhibit 5, Casden 80?

22         A.    I don't remember, but I see what you're

23    talking about.

24         Q.    Is that your signature on the bottom of

25    the page?



ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                                              65

1          A.    It's generated, but yeah.

2          Q.    By generated, you mean it's an electronic

3    signature?

4          A.    Yes.

5          Q.    And this one, again, is your full name,

6    Alan Terry Leavitt, correct?

7          A.    Yes.

8          Q.    When would you choose to use your full

9    name and when would you choose to use just Alan Leavitt

10   when you signed a document?

11         A.    You know, I'm -- I go by both.  My family

12   calls me Terry.  My -- and legally I sign Alan, as long

13   as Alan's in there.

14         Q.    And how is this letter sent to Northern

15   Trust?

16         A.    How is it?  I don't know.

17         Q.    Would you -- did you ever mail any letters

18   of direction to Northern Trust?

19         A.    I may have.  I don't recall.

20         Q.    Did you ever e-mail any letters of

21   direction to Northern Trust?

22         A.    Yeah, pretty sure I did.

23         Q.    And what e-mail address?  What e-mail

24   address would you use to send something to Northern

25   Trust?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 721 of 1079

ALAN LEAVITT                                            August 21, 2025
IN RE: SETH HALDANE CASDEN                                           66

1       A.      Capital lionofzion477@cs.com.

2       Q.      Is that your only e-mail address?

3       A.      Yes.

4       Q.      In this letter of direction with your

5  signature on it to Northern Trust, dated October 16th,

6  2023, you state in my capa -- in the second paragraph.

7       "In my capacity as adviser, I direct NTDE to

8  send $400,000 from principal for the benefit of Seth

9  Casden."

10      Do you see that?

11      A.      Yes.

12      Q.      And what was that $400,000 for?

13      A.      What was it?  Boy, I'm sorry.  I don't

14  remember.

15      Q.      If I told you that -- on the same day that

16  Mr. Casden filed for bankruptcy, does that refresh your

17  memory?

18          [Discussion off the record.]

19  BY MS. SULLIVAN:

20      Q.      Mr. Leavitt, if I told you that this

21  distribution request was made on the same day or in or

22  around the same day that Mr. Casden filed for

23  bankruptcy, does that refresh your memory as to the

24  purpose of the $400,000?

25      A.      No.



ALAN LEAVITT                                            August 21, 2025
IN RE: SETH HALDANE CASDEN                                          67

```
 1            Q.    What was the business of --

 2            A.    We're breaking up here.

 3            Q.    Can you hear me?

 4            A.    Now I can, yeah.

 5            Q.    What was the invest -- what was Side Door

 6   Ventures?  What type of business is it?

 7            A.    It was a real estate investment.

 8            Q.    It's an investment -- Side Door Ventures

 9   is another investment vehicle, or it's --

10            A.    It's a real estate.  Real estate.

11            Q.    What does that mean?

12            A.    Whatever real estated property, I'm

13   assuming, you know.

14            Q.    Does Side Door Ventures own real property?

15            A.    I don't know.  I don't know.  I can tell

16   you what I assume, but I don't know.

17            Q.    Well, you approved the letter of direction

18   investing over $100,000 into Side Door Ventures,

19   correct?

20            A.    Yes, yes.

21            Q.    And when you made that approval, what your

22   understanding of what the trust was investing the

23   $100,000 into?

24            A.    A real estate investment, whether it

25   was -- you know, the land, whatever -- I can't recall
```



1   if there was a property on it, but it was a real estate

2   investment.

3           Q.    I'm going to show you what we're marking

4   as Exhibit 6.  It's a document Bates stamp Casden 00056

5   to 00057.

6           Do you recognize this document?

7               [Exhibit 6 marked for identification.]

8           A.    Nicole, can you -- oh, there you go.

9   Okay.

10          Can you go up, please?

11  BY MS. SULLIVAN:

12          Q.    Sure.

13          A.    Okay.

14          Got it.

15          Q.    Do you recognize this document we marked

16  as Exhibit 6?

17          A.    I don't recall it, but I read it.

18          Q.    Do you know who drafted this letter?

19          A.    I don't.  My -- again, my signature, which

20  is generated, is on the --

21          Q.    And by generated, again, you mean

22  electronic signature?

23          A.    Yes, yeah.

24          Q.    Did you review this document before your

25  electronic signature was added to it?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 724 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  69

1      A.    I don't recall.

2      Q.    And then there's a series of instructions

3  in the middle of the letter.  We see, "In my capacity

4  as investment adviser, I hereby direct NTDE to complete

5  the following actions," and then there are specific

6  actions one to seven.

7      Do you see that?

8      A.    Yes.

9      Q.    We'll just go through them one by one.

10     A.    Okay.

11     Q.    So the first one is to sign the

12  substitution of trustee and full reconveyance document

13  for the 718 North Lincoln Boulevard, Unit 1, Santa

14  Monica, Claifornia, property.

15     What is that referencing?

16     A.    I don't know.  I don't know.  I could

17  assume, but I don't know.

18     Q.    Okay.  Is that a property that Mr. Casden

19  owned or that the trust previously owned?

20     A.    Again, I don't know.

21     Q.    Under Number 2, it says provide a letter

22  signed by the Northern Trust Company of Delaware, as

23  trustee, to WFG National Title Company of California,

24  authoring them to record the document with no funds due

25  to the Northern Trust Company of Delaware.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 725 of 1079

ALAN LEAVITT                                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                               70

1          What is your understanding of what you were

2     directing in Number 2?

3          A.    No understanding whatsoever.

4          Q.    Under 3, it says, "To sign the amended and

5     that restated operating agreement of Pine Rock, LLC."

6          What was Pine Rock, LLC?

7          A.    Pine Rock was, again, a real estate

8     investment that was owned by the trust, but there were

9     also -- it wasn't totally owned by Seth.  I think

10    members of his family were in -- was split, and they

11    had shares of it too.

12         So he had a percentage of it.

13         Q.    But it was in the name of the trust or Mr.

14    Casden personally?

15         A.    No, I think it was -- I think it was in

16    the name of the trust.

17         Q.    Okay.  And then Number 4 says, "Update

18    Pine Rock, LLC, to reflect the 12.5 percent interest

19    hold in the above-referenced trust."

20         What does that mean?

21         A.    I don't know.  Maybe that's his share.  I

22    don't know.

23         Q.    And Number 5 states, "To sign the

24    operating agreement of Green Rock, LLC."

25         What is Green Rock, LLC?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 726 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                            71

1          A.    Green Rock, I have no idea.

2          Q.    Do you know what it means to receive and

3     hold the 12.5 percent interest in Green Rock, LLC, in

4     the above-referenced trust, as delineated in Number 6?

5          A.    I do not.  I don't recall.

6          Q.    Do you know what it means under Number 7

7     when it says, "To complete any and all investment

8     documents necessary to effectuate these actions?"

9          A.    No.

10         Q.    Is that the type of language that you

11    would normally expect to see in a letter that you

12    drafted?

13         A.    I can't recall.

14         Q.    Let me show you what we're marking as

15    Exhibit 7, Bates-stamp Casden 00053.  It's dated July

16    29th, 2021.

17              [Exhibit 7 marked for identification.]

18    BY MS. SULLIVAN:

19         Q.    Do you recognize this document, Mr.

20    Leavitt?

21         A.    No.

22         Q.    In the second paragraph, it states, "In my

23    capacity as adviser, I direct NTDE to send $150,000

24    from principal for the benefit of Seth Casden on July

25    30th, 2021."



ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                              72

1          What was the $150,000 distribution for?

2          A.    Nicole, I don't recall.

3          Q.    Do you know who drafted this letter?

4          A.    I don't recall that.

5          Q.    Do you know how it was sent to Northern

6    Trust?

7          A.    No, I don't.

8          Q.    And that's your electronic signature on

9    the bottom of Exhibit 7?

10         A.    Yeah, it was -- yeah, my signature again,

11   generated.

12         Q.    What is Wells Fargo?

13         A.    Oh, it's where you directed the funds via

14   wire using the phone wire instruction.  You tell me.

15   What is Wells Fargo?

16         A.    Okay.  Okay.  I didn't recall.  Okay.

17         Q.    Do you know what Wells Fargo is

18   referencing.

19         A.    No.  I mean, I know it's a financial

20   institution, but I don't recall this.

21         Q.    Did Mr. Casden have a bank account at

22   Wells Fargo?

23         A.    I couldn't tell you.

24         Q.    Let me know show you what we're going to

25   mark as Exhibit 8.  It's a document Bates stamp Casden



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 728 of 1079

ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                       73

1    00058, dated September 16th, 2021.

2              [Exhibit 8 marked for identification.]

3    BY MS. SULLIVAN:

4         Q.    Do you recognize this document?

5         A.    I do not.

6         Okay.  I do not.

7         Q.    Okay.  In the second paragraph, it states,

8    "In my capacity as adviser, I hereby direct NTDE to

9    complete the following actions," and then there's a

10   bullet that says, "Transfer all Coupang, Inc., Class A

11   shares, parenthetical, 121,451 shares, end

12   parenthetical, to interactive brokerage in the name of

13   Seth Casden to Account Number U7034689."

14        What is that referencing?

15        A.    I don't know, Nicole.

16        Q.    Is that your signature on the bottom?

17        A.    Again, it's generated, yes.

18        Q.    How is your electronic signature

19   generated?

20        A.    I don't know.

21        Q.    Do you have an electronic signature for

22   yourself?

23        A.    Say that again.  We broke up here.

24        Q.    Have you ever generated an electronic

25   signature for yourself?



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    74

1          A.    I'm assuming I have, but I can't recall.

2    As I said, my technological skills are challenged.

3          Q.    What makes you believe that you have ever

4    generated an electronic signature for yourself?

5          A.    Well, I know that recently there were some

6    documents I signed that I know that was -- that was

7    electronic signature on it.

8          But other than that, I don't recall before that.

9    And we're talking about recently, like in the last

10   week.

11         Q.    For the one you did recently, how was your

12   electronic signature generated?

13         A.    I just -- I don't know, I just clicked on

14   words that signed and signed my -- you know, my

15   signature was produced on them.

16         Q.    Do you recall ever just clicking on

17   something to sign with respect to the trust?

18         A.    I don't recall.

19         Q.    I'm going to show you what we're going to

20   mark as Exhibit 8 (sic), a document, a letter with your

21   letterhead, June 3rd, 2022, Bates stamp Casden 61.

22         Do you recognize this document?

23              [Exhibit 9 marked for identification.]

24         A.    Let me see.  Okay.

25         Can you go up, please?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 730 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              75

1        Okay.

2   BY MS. SULLIVAN:

3        Q.    Do you recognize this document?

4        A.    No.

5        Q.    And the document has your electronic

6   signature at the bottom again, correct?

7        A.    Yes.

8        Q.    And it directs Northern Trust to send

9   $500,000 from principal to the benefit of Seth Casden,

10  correct?

11       A.    Yes.

12       Q.    And what was the purpose of that $500,000?

13       A.    I don't know.

14       Q.    Why did you provide this -- why did you

15  have this letter of direction date -- addressed to

16  Northern Trust?

17       A.    I don't -- you know, that was back in

18  2022, and I can't recall.

19            [Exhibit 10 marked for identification.]

20  BY MS. SULLIVAN:

21       Q.    Let me show you what we're going to mark

22  as Exhibit 9 (sic).  It's another letter of direction

23  with your letterhead, dated July 18th, 2022, and the

24  Bates stamp Casden 00064 to Casden 00065.

25            And if we're looking on the second page, it says



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 731 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              76

1   very truly yours, and your name's there, but there's no

2   signature, correct?

3        A.    Right.

4        Q.    I'll let you read the letter, see if it

5   refreshes your memory.

6        A.    Okay.

7        Can you go up, please?

8        Q.    Sure.

9        A.    Okay.

10       Q.    And there's a second page.

11       A.    Oh.

12       Okay.

13            MS. SULLIVAN:  I'm sorry.  Is this 8 or 9?

14   I'm asking the court reporter who's not there.  I think

15   it's 9.  I think I said 8, but it's 9.  All right.

16   BY MS. SULLIVAN:

17       Q.    So I'm showing you again, Mr. Leavitt,

18   what we're marking as Exhibit 9.  It's Bates stamp

19   Casden 64 to 65.

20       Having just read the document, are you -- have

21   you seen this document before today?

22       A.    I don't recall.

23       Q.    And this letter of direction was unsigned.

24   Do you know why?

25       A.    I don't.



ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  77

1          Q.    It references Green Rock, LLC.  Does this

2    refresh your memory as to what Green Rock, LLC is?

3          A.    As I said before -- yeah, I don't know.

4          Q.    Okay.  And it references that you were

5    certifying that you would have been provided with and

6    reviewed the consent and agreement.

7          Do you recall receiving those documents?

8          A.    I don't.

9          Q.    Do you know who directed this draft

10   letter?

11         A.    I don't.

12         Q.    Is this language that you would normally

13   use if you were drafting a letter?

14         A.    Nicole, I don't know.  It was when?  In

15   2022?

16         Q.    Yep.

17         A.    Okay.

18   No.

19         Q.    I'm going to show you what we're marking

20   as Exhibit 10 (sic).  So another letter of direction,

21   Bates-stamp Casden 00066, dated January 28, 2022.

22              [Exhibit 11 marked for identification.]

23   BY MS. SULLIVAN:

24         Q.    Do you recognize this document?

25         A.    Give me a second here.



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 733 of 1079

ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                                       78

1    Q.    Do you need me to zoom in?  Let me know.

2    A.    Okay.

3    Q.    Do you recognize this document that we

4  have marked as Exhibit 10 (sic)?

5    Do you recognize this document, Mr. Leavitt?

6    A.    No.

7    Q.    It reference $670,000 promissory note,

8  dated January 31st, 2022.

9    Do you know what that is referring to?

10   A.    I don't.  Who is the promissory note to?

11   Q.    I don't know.  I was going to ask you.

12   A.    No, I don't recall.

13   Q.    And then in the third paragraph, it

14  states, "This direction is intended to modify the

15  $670,000 promissory note, due and payable 8-1-2021 at

16  an interest rate of 2.12 percent per annum.  Please

17  remove this note from the trust."

18   Do you know what that's referring to?

19   A.    I don't.

20   Q.    Did the trust ever give a promissory note

21  to Hologenix?

22   A.    Not -- I don't know.

23   Q.    Did you ever authorize the trust to give a

24  promissory note to Hologenix?

25   A.    I don't know.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 734 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                              79

1        Q.    Did you draft this letter of direction?

2        A.    I don't know.  My signature again is on

3   there, but it's -- it's not my original signature.

4   It's --

5        Q.    At the end of the first paragraph, it

6   says, "NTDE is required to follow my written directions

7   as adviser with respect to all matters relating to the

8   management and investment of the trust assets."

9        Do you know why NTDE is required to follow your

10  written directions?

11       A.    I don't.  It's Northern Trust of Delaware,

12  right -- yeah, yeah.

13       No.

14            [Discussion off the record.]

15            MS. SULLIVAN:  Betty, are you okay with

16  that?  Just correcting the numbers in the record?

17            MS. LUU:  That's fine.

18            MS. SULLIVAN:  So 8 would be Casden 58, 9

19  would be Casden 61, 10 would be Casden 64, 11 would be

20  Casden 66.  Okay.  Sorry about that.

21            [Exhibit 12 marked for identification.]

22  BY MS. SULLIVAN:

23       Q.    I'm going to show you what we're going to

24  mark as Exhibit 12.  It's another letter of direction,

25  Bates stamp Casden 00067.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 735 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  80

1    Can you see that?

2    A.    Yes.

3    Q.    June 2nd, 2022.

4    I'll give you a second to read it, Mr. Leavitt.

5    A.    Can you go up, please?

6    Q.    Sure.

7    I'm sorry, did I go too fast?

8    A.    Yeah.

9    Okay.

10    Q.    That's the second page, Mr. Leavitt.

11    A.    Got it.  Okay.

12    Q.    Do you recognize what we marked as Exhibit

13    12 today?

14    A.    No, I don't.

15    Q.    In the second paragraph, it references

16    directing NTDE to borrow $500,000 from LSG Holdings,

17    LLC, in exchange for a promissory note to the trust, at

18    an interest rate of 2.25 percent, maturity May 31st,

19    2023.

20    Do you know what that's referencing?

21    A.    I don't.  I know what LSG is, but I don't

22    know what it's referencing.

23    Q.    What's LSG Holdings?

24    A.    LSG is Alvaro Pascotto's investment

25    holdings in the trust.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 736 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                               81

1          Q.    What do you mean, investment holdings in

2    the trust?

3          A.    He owns the holdings in the trust.

4          Q.    What are the holdings in the trust?

5          A.    I don't know.  Whatever -- whether it's

6    real estate or -- he's the owner of those holdings.

7          Q.    When you say holdings, what does holdings

8    mean?

9          A.    Investments.

10         Q.    So would that include like Pine Rock, LLC,

11   and like Side Door investment or something else?

12         A.    I would assume so, but I don't know

13   exactly.

14         Q.    How do you know that LSG Holdings is owned

15   or controlled by Alvaro Pascatto?

16         A.    Because I talked to -- well, I texted

17   Alvaro and -- when I was looking into Side Door

18   investments, you know, and asking what he thought about

19   it.

20         Q.    Did Mr. Pascotto have any other

21   involvement with the Seth Casden resulting trust?

22         A.    I don't know.

23         Q.    Are there any holdings or investments in

24   Seth Casden resulting trust that Mr. Pascotto is not

25   involved with?



ALAN LEAVITT                                         August 21, 2025
IN RE: SETH HALDANE CASDEN                                      82

1          A.    I couldn't tell you that either.

2               [Exhibit 13 marked for identification.]

3    BY MS. SULLIVAN:

4          Q.    I'm showing you, Mr. Leavitt, what we're

5    going to mark as Exhibit 13.  It's Bates-stamped Casden

6    00069.  It's another letter of direction to Northern

7    Trust, dated August 3rd, 2022.

8          A.    Can you bring that up, please?

9    Okay, read it.

10         Q.    Okay -- Exhibit 13?

11         I said do you recognize what we marked today as

12   Exhibit 13?

13         A.    I do not.

14         Q.    In the second paragraph, you state, "In my

15   capacity as investment adviser."

16         What does "investment adviser" mean?

17         A.    An investment adviser would be -- as I

18   said before, whether -- I look at the investments, and

19   I determine whether or not it's good for the trust.

20         Q.    Is investment adviser different than trust

21   adviser?

22         A.    Yes.

23         Q.    When did you become the investment adviser

24   for the trust?

25         A.    I don't know the exact date.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 738 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              83

1    I don't know the exact date.

2         Q.    How do you become the investment adviser

3    for the trust?

4         A.    Seth asked me to become the investment

5    adviser.

6         Q.    So were you acting as the trust --

7         A.    Or I'm -- let me just say I'm the adviser,

8    okay, of the trust.  As I said, I'm not a professional

9    adviser, I'm not a professional trustee.  I'm just an

10   adviser.

11        Q.    What were your duties as investment

12   adviser for the trust?

13        A.    I -- I would determine whether allocations

14   that were requested were good for the trust.

15        Q.    Was there any difference in your duties as

16   investment adviser versus trust adviser?

17        A.    Well, I wasn't a trust adviser.  I was an

18   investment adviser.  I don't know what the duties of a

19   trust adviser are.

20        Q.    Okay.  So -- in the second paragraph, it

21   states, "I hereby direct NTDE to pay off the $500,000

22   promissory note, principal and outstanding interest,

23   held in the above-referenced trust and issued by LSG

24   Holdings."

25        Correct?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 739 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              84

1        A.    Yes.   That's what it says.

2        Q.    On what basis did you make that direction

3   to Northern Trust?

4        A.    You know what?   It -- of 2023, I don't

5   recall.

6        Q.    Did Mr. Casden ask you to make the -- to

7   pay off the $500,000 promissory note?

8        A.    I don't recall.

9        Q.    Did you ever receive instructions from

10  anyone other than Seth Casden about what to do with

11  respect to directing Northern Trust?

12       A.    No, unless it was -- would come from my

13  legal counsel, but I don't know that they were involved

14  back then.

15       Q.    And some of the earlier exhibits we looked

16  at, it would say a specific monetary amount, like

17  $500,000 from principal.

18       What does "from principal" mean?

19       A.    I don't know.

20            [Exhibit 14 marked for identification.]

21  BY MS. SULLIVAN:

22       Q.    I'm going to show you what we're going to

23  mark as Exhibit 14.   It's another letter of direction,

24  dated October 3rd, 2023, with a Bates stamp Casden

25  00079.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 740 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    85

```
 1          Let me know if you recognize this document.
 2          A.    Can you go up, please?
 3          Okay.
 4          Q.    Do you recognize what we've marked today
 5     as Exhibit 14?
 6          Do you recognize the document, Mr. Leavitt?
 7          A.    I do not.
 8          Q.    And it's dated October 3rd, 2023, and it
 9     directs Northern Trust to send $200,000 from principal
10     for the benefit of Seth Casden.
11          Do you see that?
12          A.    Yes.
13          Q.    Okay.  What was the purpose of the
14     $200,?000.
15          A.    I don't know.
16          Q.    Did you keep any notes or records of your
17     conversations with Mr. Casden about what he intended to
18     do with monetary distributions from the trust?
19          A.    I would think that would be in the e-mails
20     that were sent.  I can't recall.
21          Q.    And would those e-mails be between
22     yourself and Mr. Casden?
23          A.    Yes.
24          Q.    Would anyone else be copied on those
25     e-mails?
```



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 741 of 1079

ALAN LEAVITT                                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                                         86

1        A.    I don't know.

2        Q.    Would you still have copies of those

3   e-mails?

4        A.    I may.

5        Q.    Maybe we can take a 10-minute break or a

6   15-minute break.  I want to look through some other

7   documents to see what I want to move forward with.

8        A.    Love to.

9        Q.    I don't want to make any promises, but

10  we're getting towards the end.

11       A.    Love to.  Thanks.

12       Q.    We'll come back around 1:00, I guess, is

13  good.  Thank you.

14             [A recess was taken.]

15             [Exhibit 15 marked for identification.]

16  BY MS. SULLIVAN:

17       Q.    I'm going to show you what we're marking

18  as Exhibit 15.  It's the document Bates stamp Casden

19  00059.

20       Do you recognize this document, Mr. Leavitt?

21       A.    I don't.  I don't.

22       Q.    It's another letter of direction to

23  Northern Trust from you dated January 18th, 2022.

24       Is that your electronic signature on the bottom?

25       A.    Okay.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 742 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    87

1          Q.    Is it -- I'm asking is that your

2    electronic signature on the bottom?

3          A.    Yeah.  Yes.

4          Q.    Okay.  In the second paragraph, it directs

5    Northern Trust to send $300,000 from principal for the

6    benefit of Seth Casden.

7          What was the purpose of that $300,000?

8          A.    Nicole, I don't recall.

9          [Exhibit 16 marked for identification.]

10   BY MS. SULLIVAN:

11         Q.    I'm going to show you what we're going to

12   mark as Exhibit 16.  This is Casden 60.  Another letter

13   of direction, dated February 10th, 2022.

14         Do you recognize this document?

15         A.    I do not.

16         Q.    And it has a direction to Northern Trust

17   to send $200,000 from the principal for the benefit of

18   Seth Casden, dated February 10th, 2022.

19         What was the purpose of that $200,000?

20         A.    I don't know.

21         Q.    Is that your electronic signature on the

22   document?

23         A.    It is.

24         [Exhibit 17 marked for identification.]

25   BY MS. SULLIVAN:



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 743 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                           88

1          Q.    I'm going to show you what we're going to

2   mark as Exhibit 17, Bates stamp Casden 00062.  Another

3   letter of direction, dated July 29th, 2022, on your

4   letterhead.

5          Do you recognize this document?

6          A.    I do not.

7          Q.    Is that your electronic signature on the

8   bottom?

9          A.    It is.

10          Q.    And this letter directs Northern Trust to

11   send $500,000 from principal for the benefit of Seth

12   Casden.

13          What was the purpose of that $500,000?

14          A.    I don't recall.

15          Q.    What would you need to refresh your memory

16   as to the purpose of that $500,000 distribution?

17          A.    I would have to go back to 2022.

18          Q.    How would you do that?

19          A.    Time machine.  I have no idea.

20          Q.    Is there any way that you could learn

21   today what the purpose of that $500,000 was?

22          A.    Not that I know of.

23          Q.    Did you prepare this letter that was sent

24   to Northern Trust?

25          A.    I don't -- I don't recall.



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 744 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                               89

1          Q.    Have you ever prepared a letter of

2    direction to send to Northern Trust?

3          A.    I think so.

4          Q.    Okay.  When was that?

5          A.    I don't know.

6          Q.    How would you prepare the letter to

7    Northern Trust?

8          A.    How would I?  I would generate the letter

9    and send it to Northern Trust.

10         Q.    How would you generate the letter?

11         A.    E-mail.

12         Q.    You would draft the letter on e-mail?

13         A.    I would draft the letter and then send it

14   to Northern Trust.

15         Q.    And what program would you use to draft

16   the letter?

17         A.    Just -- an e-mail.  Standard e-mail.

18         Q.    And that would be from your lion --

19         A.    Yes.  Of Zion, 477 --

20         Q.    477, Zion, at CS e-mail?

21         A.    That's me.  Yep.

22         Q.    Okay.

23               [Exhibit 18 marked for identification.]

24   BY MS. SULLIVAN:

25         Q.    I'm going to show you what we're going to



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 745 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              90

 1   mark as Exhibit 18.  It's Casden 00063.

 2        Do you recognize this document?

 3        A.    That's not the same one you just showed

 4   me, right?

 5        Q.    It is not.

 6        A.    Okay.

 7   Okay.

 8        Q.    Is that your electronic signature on

 9   Exhibit 18?

10        A.    Yes, it is.

11        Q.    Okay.  And this letter of direction to

12   Northern Trust, you stated, "I direct NTDE to send

13   $200,000 from principal to the benefit of Seth Casden."

14        What was the purpose of that $200,000?

15        A.    I'm sorry to say I don't recall.

16        Q.    Okay.  And when it says to send $200,000

17   from principal, what is principal referencing?

18        A.    I don't know.  I don't recall.

19        Q.    Is there anything that you have that could

20   refresh your memory as to what is being referenced as

21   principal?

22        A.    Not this far back.

23   No, I don't know.

24            [Exhibit 19 marked for identification.]

25        Q.    I'm going to show you what we're going to



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 746 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              91

 1   mark as Exhibit 19, which is another letter of

 2   direction with the Bates stamp Casden 00070, dated

 3   January 11th, 2023.

 4        Do you recognize this document?

 5        A.   Go up, please, a little bit.

 6   No.  It was 2023.  No.

 7        Q.   And there's another electronic signature

 8   with your name.  Is that your electronic signature?

 9        A.   Yes.

10        Q.   Do you know how that electronic signature

11   was added to this document?

12        A.   I don't.  I don't recall.

13        Q.   In this letter dated January 11th, 2023,

14   you direct Northern Trust to send $500,000 from

15   principal for the benefit of Seth Casden.

16        What was the purpose of that $500,000?

17        A.   I don't recall.

18        [Exhibit 20 marked for identification.]

19   BY MS. SULLIVAN:

20        Q.   I'm going to show you what we're going to

21   mark as Exhibit 20, which is a letter of direction

22   dated March 7th, 2023, from you to Northern Trust,

23   Casden 00071.

24        Do you recognize this document?

25        A.   No.  Can you go up please?  A little -- so



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 747 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                   92

1    I could see the bottom.

2         Q.    Sure.  Oh, sorry.  I went the wrong way

3    for you.

4         A.    Okay.  Yeah.

5         Q.    Do you know who drafted this letter?

6         A.    I don't recall.

7         Q.    Did you draft this letter?

8         A.    I may have.

9         Q.    If you drafted this letter, would you

10   still have a record of it in your e-mail?

11        A.    I would think so.

12        Q.    And in this letter dated March 7th, 2023,

13   you direct Northern Trust to send $550,000 from

14   principal for the benefit of Seth Casden.

15        What was the purpose of the $550,000?

16        A.    I don't recall.

17        Q.    How often would you speak to Seth Casden

18   about his trust in a given -- in a given month?

19        A.    Four or five times a month, I'm guessing.

20        Q.    Did Mr. Casden always initiate those

21   conversations, or something else?

22        A.    No, I would also call him.

23        Q.    Why would you initiate a call to Mr.

24   Casden about his trust?

25        A.    I just -- he's -- he's my nephew, so we



ALAN LEAVITT                                           August 21, 2025
IN RE: SETH HALDANE CASDEN                                          93

 1 | would talk in general, and --
 2 |        Q.    Did you speak to Mr. Casden in general
 3 | four to five times a month, or specifically about the
 4 | trust four to five times a month?
 5 |        A.    No.  Well, I mean, we would talk about it,
 6 | but it was a general conversation.
 7 |        Q.    When was the last time you spoke to Mr.
 8 | Casden?
 9 |        A.    Maybe a week, a week-and-a-half ago.
10 |        Q.    And what was the sum and substance of that
11 | conversation?
12 |        A.    I just told him that I'm going to be in a
13 | deposition.
14 |        Q.    And what did Mr. Casden say to you?
15 |        A.    He's been in a lot of depositions himself,
16 | so there's really not much to add to it.
17 |        Q.    Did he describe anything about me to you?
18 |        A.    No, just that you were a terrific gal
19 | and -- no, he didn't, no.
20 |        Q.    Did Mr. Casden give you any other
21 | instructions about your deposition today?
22 |        A.    No, I didn't -- I didn't ask him of any,
23 | and I know -- you know, I know of what a deposition is,
24 | and so I -- no.
25 |        Q.    Did you speak to Mr. Casden about the



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 749 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              94

 1  trust in that conversation a week, a week-and-a-half

 2  ago?

 3         A.    Not that really, no.

 4         Q.    When you say "not really," what do you

 5  mean?

 6         A.    I mean, no, we didn't really -- the trust

 7  always, you know, kind of foreshadows a conversation.

 8         But no, we didn't discuss the trust.

 9         Q.    Did you and Mr. Casden discuss in that

10  last conversation the letters of direction issued to

11  Northern Trust?

12         A.    Not at all.

13         Q.    Did you and Mr. Casden discuss in that

14  conversation your obligations under the trust?

15         A.    Not at all.

16         Q.    Have you ever spoken to Mr. Casden's

17  mother?

18         A.    It's been -- it's been a very long time.

19         Q.    Have you ever spoken to -- go ahead.

20         A.    Oh, I was going to say, probably 20 years.

21         Q.    Have you ever spoken to Mr. Casden's

22  mother about this trust?

23         A.    Never.

24         Q.    Did you have any conversations with Mr.

25  Casden's biological father about this trust?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 750 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    95

```
 1              A.    No, never.

 2              Q.    Did you ever -- do you talk to Mr.

 3   Casden's father?

 4              A.    Not really.  Not really.  He's my

 5   brother-in-law, but there's a little disconnect.

 6              But I mean, we never really bumped heads or

 7   anything, but there's just a little bit of a

 8   disconnect.  We don't have a close relationship.

 9              Q.    When you say there's a little bit of

10   disconnect, what do you mean?

11              A.    I mean that we're not close like that.

12   You know, maybe some brother-in-laws are.  We're not.

13              Q.    Does your wife have a relationship with

14   her brother?

15              A.    Yes.

16              Q.    Has your wife had conversations with Mr.

17   Casden's father about the trust?

18              A.    Never.

19                    [Exhibit 21 marked for identification.]

20   BY MS. SULLIVAN:

21              Q.    I'm going to show you what we're going to

22   mark as Exhibit 21, which is another letter of

23   direction dated March 22nd, 2023, with a Bates stamp

24   Casden 0072 (sic).

25              A.    Okay.
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 751 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                            96

1        Q.    Do you recognize this document?

2        A.    I do not.

3        Q.    In this letter of direction, you direct

4   Northern Trust to send $100,000 from principal for the

5   benefit of Seth Casden.

6        What was the purpose of that $100,000 payment?

7        A.    I don't know.  I don't know.

8        Q.    And there is a signature on the bottom of

9   the page.  Is that your signature?

10       A.    Yes, it is.  It's generated.  Yes.

11       Q.    How is this signature generated?

12       A.    As the other ones were.

13       Q.    How were any of them generated then?

14       A.    I don't know the technique used, but it

15   was -- it's not my original signature.

16       Q.    Did you generate this electronic signature

17   on these letters of direction?

18       A.    I'm assuming so, yes.

19       Q.    On what basis do you make that assumption?

20       A.    My name is on it.  It looks -- you know,

21   it's not my original signature, but that is my name.

22       Q.    Do you -- do you recall ever adding your

23   electronic signature to the letter of direction to

24   Northern Trust?

25       A.    I -- you know, not offhand, but I'm sure



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 752 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    97

 1  that I have.

 2          Q.    Why are you sure that you have?

 3          A.    Because you know, we would -- that's a

 4  method that we would use to sign the letters of

 5  direction.

 6          Q.    Who is we?

 7          A.    I'm saying that's the -- that's the --

 8  where am I -- that's the method I would use to sign the

 9  letters of direction.

10          Q.    What program would you use to add your

11  electronic signature to the letters of direction?

12          A.    That I can't answer.

13          Q.    Would you do it on your computer?

14          A.    Yes.

15          Q.    Is that -- do you still have that same

16  computer that you were using in 2023?

17          A.    I do.  I think I do.  2023, yeah.  Okay.

18          You know, I had a company computer, and in my

19  retirement they took that back, so I don't -- I don't

20  know which computer I was on.

21          Q.    When did you retire?

22          A.    I retired in twenty twenty -- I think

23  2022.

24          Q.    Do you know what month you retired in

25  2022?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 753 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              98

1          A.    I think it was July.

2          Q.    What's your educational background, Mr.

3     Leavitt?

4          A.    College.

5          Q.    What college did you graduate from?

6          A.    Arizona State.

7          Q.    What was your degree in?

8          A.    Zoology.

9          Q.    Did you ever take any courses in finance

10    or investments?

11         A.    Yes.

12         Q.    What courses did you take?

13         A.    I don't recall, no.

14         Q.    Do you have any licenses?

15         A.    In finance?  No.

16         Q.    Do you have any licenses in general?

17         A.    I have a driver's license.

18         Q.    Okay.

19         I'm going to show you what we're going to mark

20    as Exhibit 22.  It's Bates stamp Casden 00073, another

21    letter of direction dated May 1st, 2023.

22              [Exhibit 22 marked for identification.]

23         A.    Okay.  Got it.

24    BY MS. SULLIVAN:

25         Q.    Do you recognize this document?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 754 of 1079

ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                      99

1          A.    No.

2          Q.    Did you maintain a copy of all of the

3    letters of direction that you sent to Northern Trust?

4          A.    I maintained some, and I would imagine

5    they are in the computer.

6          Q.    This letter of direction from May 1st,

7    2023, directs Northern Trust to send $250,000 from

8    principal for the benefit of Seth Casden.

9          What was the purpose of that $250,000?

10         A.    I do not recall.  It was 2023 -- yeah, I

11   do not recall.

12               [Exhibit 23 marked for identification.]

13   BY MS. SULLIVAN:

14         Q.    Let's look at what we're going to mark as

15   Exhibit 23.  It's another letter of direction, dated

16   June 1st, 2023, Casden 00074.

17         Do you recognize this document?

18         A.    I do not.

19         Q.    Is that your signature again?

20         A.    It is.  Generated --

21         Q.    Your electronic signature?

22         A.    Yes.

23         Q.    And this letter directs Northern Trust to

24   send $200,000 from principal for the benefit of Seth

25   Casden.



ALAN LEAVITT                                                     August 21, 2025
IN RE: SETH HALDANE CASDEN                                              100

1          What was the purpose of that $200,000?

2          A.    I don't know.  I don't remember.

3          Q.    Did you keep any notes -- notes about the

4    trust distributions or letters of direction?

5          A.    No, you know they would be in the

6    computer, but I made -- in some instances, I made

7    copies of it, but then I stopped doing that --

8          Q.    Made copies of what -- oh, I'm sorry.

9          A.    No, made a copy of letters of direction.

10         Q.    Why would you make a copy of the letter of

11   direction?

12         A.    I would just print it.

13         Q.    And then once you printed the copy of the

14   letter of direction, where would you put it?

15         A.    That's a good question.  I would have to

16   search my home for --

17         Q.    Would you -- would you print it at home or

18   at work?

19         A.    At home.

20               [Exhibit 24 marked for identification.]

21   BY MS. SULLIVAN:

22         Q.    Show what we're going to mark as Exhibit

23   24.  It's Casden 00075.  It's a letter of direction

24   dated June 16th, 2023.

25               Do you recognize this document?



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 756 of 1079

ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                              101

1          A.    Go back once.  A hundred -- okay.

2     No.

3          Q.    Direct Northern Trust to send $100,000

4     from principal to the benefit of Seth Casden.

5          What was the purpose of that $100,000?

6          A.    I don't know.  I don't remember.

7               [Exhibit 25 marked for identification.]

8     BY MS. SULLIVAN:

9          Q.    Okay.  I'm going to show you what we're

10    going to mark as Exhibit 25.  It's Casden 00076,

11    another letter of direction July 10th, 2023.

12         Do you recognize this document?

13         A.    I do not.

14         Q.    It directs Northern Trust to send $200,000

15    from principal for the benefit of Seth Casden.

16         Do you know what the purpose of that $200,000

17    was?

18         A.    I don't remember.

19         Q.    Was that your signature on the bottom of

20    the page?

21         A.    It's generated, yes.

22         Q.    I want to go back to Exhibit 24.

23         Is that your signature on that exhibit as well?

24         A.    Yes.  Generated.  Yes.

25              [Exhibit 26 marked for identification.]



 1   BY MS. SULLIVAN:

 2         Q.    Let me show you what we're going to mark

 3   as Exhibit 26.  It's Casden 00077.  It's a letter of

 4   direction dated August 1st, 2023.

 5         Do you recognize this document?

 6         A.    I do not.

 7         Q.    It's a direction to Northern Trust to send

 8   $100,000 from principal for the benefit of Seth Casden.

 9         What was the purpose of the $100,000?

10         A.    I'm sorry, I don't recall.

11         Q.    And is that your signature on the bottom

12   of this document?

13         A.    Yes, it's a generated signature, yes.

14         Q.    Do you know how this signature was

15   generated for this letter of direction?

16         A.    No, I don't recall.

17              [Exhibit 27 marked for identification.]

18   BY MS. SULLIVAN:

19         Q.    Let me show you what we're going to mark

20   as Exhibit 27.  It's Casden 00078, another letter of

21   direction dated September 1st, 2023.

22         Do you recognize this document?

23         A.    No.

24         Q.    It's directing Northern Trust to send

25   $100,000 from principal for the benefit of Seth Casden.



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 758 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              103

1          What was the purpose of that $100,000?

2          A.    I wish I could tell.  I don't know.  I

3     don't remember.

4          Q.    We can go through them together, but -- if

5     we start with Exhibit 23, Casden 74, dated June 1st,

6     2023.

7          Do you see that?

8          A.    Yes.

9          Q.    And you directed Northern Trust to send

10    $200,000 for the bene -- from the trust to Seth Casden,

11    correct?

12         A.    Okay.

13         Q.    Do you agree with that or no?

14         A.    Yeah.  That's what it says, yep.

15         Q.    But was that your direction?  Did you

16    provide that direction?

17         A.    I don't recall.

18         Q.    Is there any reason to think that this

19    letter of direction with your electronic signature,

20    Exhibit 23, is not accurate or correct?

21         A.    I don't know, really.

22         Q.    $200,000 on June 1st and then another

23    $100,000 on June 16 for a total of $300,000, and then

24    if we go to Exhibit 25, July 10th, 2023, there's

25    $200,000.  That's $500,000 over -- a little over a



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 759 of 1079

ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                                    104

 1  month period of time.

 2          Did that raise any concerns for you at the time,

 3  that Mr. Casden was requesting $500,000 over a month

 4  period?

 5          A.   You know, I don't remember what my

 6  thoughts were about it.

 7          But for right now, no, it didn't.

 8          Q.   And then if we go to Exhibit 26, August

 9  1st, 2023, it's another $100,000.  And Exhibit 27,

10  September 1st, 2023, it's another $100,000, a total of

11  $700,000 from June 1st to September 1st.

12          Did that raise any concerns for you at the time?

13          A.   I don't recall.  I don't --

14          Q.   Did you have any discussions with Mr.

15  Casden about the amount of money he was requesting in

16  or around June to September 2023?

17          A.   I may have.  I just -- I don't recall it.

18          Q.   Would you have had e-mail discussions with

19  Mr. Casden from June to September of 2023 about the

20  distribution requests?

21          A.   There could be, yeah.  There could be.

22  Phone calls or e-mails.

23          Q.   All right.  I dropped another exhibit into

24  the chat.

25          I'm showing you, Mr. Leavitt, what we're marking



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 760 of 1079

ALAN LEAVITT                                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                                           105

1  as Exhibit 28.  It's Bates stamp LEAVITT0000005 to 6.

2             MS. LUU:  I don't see it in the chat.

3             MS. LUU:  Oh, okay.  I'm sorry.  I thought

4  I put it in.  Hold on.  I had to stop sharing, so hold

5  on.  Oh, it didn't send.  Sorry about that.  I have to

6  probably close it first.

7        Okay.  Okay.

8             [Exhibit 28 marked for identification.]

9  BY MS. SULLIVAN:

10       Q.    I'm showing you what we have marked as

11  Exhibit 28.  It's an e-mail from Ronnett Roach to Seth

12  Casden, with a CC to Nai-Te and yourself.

13       Correct?

14       A.    I see that.

15       Q.    Do you recognize this e-mail chain?

16       A.    I do not.

17       Q.    That's your e-mail address,

18  lionofzion477@cs.com, correct?

19       A.    That is, yes.

20       Q.    And if we scroll to the last e-mail on the

21  first page, which is the first e-mail on the chain,

22  dated June 1st, 2023, from Seth Casden to Ronnett

23  Roach, saying, "Dear Ronnett, please find attached a

24  letter of direction from Terry."

25       Do you see that?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 761 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  106

1          A.    Yes.

2          Q.    Why was Mr. Casden sending a letter of

3    direction from you to Northern Trust?

4          A.    I don't recall.

5          Q.    Did you ask Mr. Casden to do that for you?

6          A.    I probably did, but I don't recall.

7          Q.    Who is Ronnett Roach?

8          A.    Boy.  I don't remember who -- northern --

9    Gmail says Northern Trust.  So there's been a number of

10   people who have been in charge of the trust, so maybe

11   that was one of the people that was in charge of it.

12   Because it was also that -- Nai-Te Watson was at one

13   point in charge of it too, as was -- I can't recall the

14   gal's name, but there was a gal -- we talked about her

15   earlier -- who was also in charge of it.

16         Q.    Okay.

17               So this e-mail chain is from June 1st, 2023, and

18   in the response to Mr. Casden's request, Ms. Roach

19   says, "Per the letter of direction dated June 1st,

20   2023, we'll arrange for a $200,000 distribution to

21   Seth,"

22               Do you see that?

23         A.    Yes.

24         Q.    Did you ever respond to this e-mail chain?

25         A.    I don't recall.



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              107

```
 1           Q.    Okay.
 2           And if we go back to Exhibit 23, which was
 3   Casden 74, it's dated June 1st, 2023, and directs
 4   Northern Trust to send $200,000 from principal for the
 5   benefit of Seth Casden.
 6           Do you see that?
 7           A.    I do.
 8           Q.    Does that refresh your memory as to who
 9   drafted and sent the letters of requests to Northern
10   Trust?
11           A.    It does not.
12                 [Exhibit 29 marked for identification.]
13   BY MS. SULLIVAN:
14           Q.    I'm going to show you what we're going to
15   mark as Exhibit 29.  Another e-mail between Ms. Roach,
16   Mr. Casden, Mr. Watson, and yourself, Bates stamp
17   LEAVITT0000011 through 12.
18           I'll start on the bottom of the first page, and
19   then we can scroll up for you to read it.
20           A.    Okay.
21   Okay.
22           Q.    Do you recognize this e-mail chain?
23           A.    I do not.
24           Q.    Do you know why Mr. Casden was sending a
25   letter of direction from yourself to Northern Trust?
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 763 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                             108

 1        A.    I don't.

 2              [Exhibit 30 marked for identification.]

 3   BY MS. SULLIVAN:

 4        Q.    I'm going to show you, Mr. Leavitt, what

 5   we're marking as Exhibit 30.  Another e-mail chain

 6   between Northern Trust, Mr. Casden, and yourself, Bates

 7   stamp Leavitt 23 to 24.

 8        Again, Mr. Casden starts the e-mail chain with,

 9   "Please find attached the letter of direction from

10   Terry," copied you on the e-mail, and then Ronnett

11   responds that they will make the $100,000 distribution

12   per the letter of direction unless there was anything

13   else you need.

14        Do you recall this e-mail chain?

15        A.    I do not.

16        Q.    Why was Mr. Casden sending a letter of

17   direction to Northern Trust on your behalf?

18        A.    I may have -- you know, I don't recall,

19   but I have had him write the letter because I was too

20   involved with whatever I was doing.

21        Q.    Do you believe that you instructed Mr.

22   Casden to draft letters of direction on your behalf?

23        A.    No, he may have -- you know, you had asked

24   me about that one, but I don't recall.

25        But I could have instructed him to do that.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 764 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              109

1          Q.    Did you instruct him to do it, or are you
2     guessing?
3          A.    I don't remember, really, at this point.
4          Q.    Have you ever had any discussions with
5     Ronnett Roach at Northern Trust?
6          A.    I don't recall.
7                [Exhibit 31 marked for identification.]
8     BY MS. SULLIVAN:
9          Q.    I'll show you what we're going to mark as
10    Exhibit 31.  It's Bates stamp Leavitt 28 to 30.  And
11    again, another e-mail chain between Mr. Casden,
12    Northern Trust, and yourself.
13         Do you see -- do you recognize the e-mail chain?
14         A.    I do not.
15         Q.    And again, when we go to the first e-mail
16    in the chain on Exhibit 31 from Seth Casden to Northern
17    Trust with a copy to you, saying, "Please find attached
18    the letter of direction from Terry" --
19         Do you see that?
20         A.    I do.
21         Q.    And it's dated October 3rd, 2023.
22         A.    Okay.
23         Q.    Why did Mr. Casden send this letter of
24    direction on your behalf to Northern Trust?
25         A.    I don't recall.



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 765 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                            110

1        Q.    Did you have any communications with

2    Northern Trust about this letter of direction?

3        A.    I don't recall.

4              [Exhibit 32 marked for identification.]

5    BY MS. SULLIVAN:

6        Q.    Let me show you what we're going to mark

7    as Exhibit 32.  It's another e-mail chain, with a Bates

8    stamp Leavitt 44, again between Northern Trust, Mr.

9    Casden, and yourself.

10       A.    Natalie -- okay.

11       Q.    Do you recognize this e-mail chain?

12       A.    I do not.

13       Q.    This was referencing the October 16, 2023,

14   letter of direction.  Again, it's being sent from Mr.

15   Casden to Northern Trust.

16            Why did Mr. Casden send this letter of direction

17   instead of you?

18       A.    I don't recall.

19       Q.    Showing you again what we have previously

20   marked as Exhibit 5, which is the October 16, 2023,

21   letter of direction for $400,000, which was the same

22   day that Mr. Casden filed for bankruptcy.

23            Do you recall this?

24       A.    Excuse me.  I do not.

25       Q.    Bless you.



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                           111

1          A.    Thank you.

2          Q.    I just meant do you recall us going over

3    it earlier today.

4          A.    Oh, yeah, yeah.  Yes, I do remember you

5    asking me.

6          Q.    Okay.  Then we'll go back to Exhibit 32,

7    the same dates.  This is the letter of direction for

8    $400,000.

9          Correct?

10         A.    I see that.

11         Q.    Is it possible that Mr. Casden sent this

12   letter of direction without your knowledge?

13         A.    No.

14         Q.    How do you know it's not possible?

15         A.    Because he -- if he sent anything, he

16   would let me know.

17         Q.    He would let you know before he sent it or

18   just by copying you on the e-mail?

19         A.    No, he would let me know before he sent

20   it.

21         Q.    How would he let you know?

22         A.    With an e-mail, phone call.

23               [Exhibit 33 marked for identification.]

24   BY MS. SULLIVAN:

25         Q.    Show you, Mr. Leavitt, what we're going to



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 767 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                            112

1   mark as Exhibit 33.  It's another e-mail chain, Bates

2   stamp Leavitt 219 to Leavitt 22 (sic).

3          And the first e-mail on the chain, which is last

4   e-mail on the document, is from Mr. Casden to Northern

5   Trust without a CC to you.

6          Correct?

7          A.    I'm sorry, I didn't hear that last part,

8   Nicole.

9          Q.    I said the first e-mail on the chain,

10  which is the last e-mail on the document --

11         A.    Yeah.

12         Q.    -- is from Mr. Casden to Northern Trust

13  without a copy to you.

14         Correct?

15         A.    I don't see my name on there at all.

16         Q.    Okay.  Have you ever seen this e-mail

17  before today?

18         A.    I don't recall.

19         Q.    And then we scroll up to the next e-mail,

20  which is from Mr. Watson to Mr. Casden, with a copy to

21  you, and then there's a note saying at the end, "Also,

22  I have attached a letter of direction for Terry's

23  signature.  The LOD directed NTDE to remove the 670K

24  old note from our records and add the new 670K note."

25         Do you see that?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 768 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              113

1    A.    Yes.

2    Q.    Does that refresh your memory about who

3  drafted letters of direction on your behalf?

4    A.    Not at all.

5    Q.    Is there any reason to believe what Mr.

6  Watson said here about drafting a letter of direction

7  for your signature is not true?

8    A.    No.

9    Q.    Do you know why Mr. Watson didn't send the

10  letter of direction directly to you instead of through

11  Mr. Casden?

12    A.    I don't recall.

13    Q.    And then Mr. Casden responds on Monday,

14  January 31st, 2022, with a copy to you now, stating,

15  "Letter of execution by Terry is attached."

16    Do you see that?

17    A.    I do.

18    Q.    Okay.  Why did Mr. Casden send back the

19  executed letter instead of yourself?

20    A.    I don't recall.

21    [Exhibit 34 marked for identification.]

22  BY MS. SULLIVAN:

23    Q.    I'm going to show you what we're going to

24  mark as Exhibit 34, Bates stamp Leavitt 120 to 122.

25    I'll give you a minute to read through the



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 769 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              114

1  e-mail chain, Mr. Leavitt.

2         A.    Okay.

3         Q.    And this is the attachment.

4         A.    You're a little fast for me.

5         Q.    Oh, sorry.  I don't know if you wanted to

6  read the whole thing or you just wanted to see it.

7         A.    I didn't -- whatever you wanted me to read

8  here.

9         Okay.

10        Q.    Going back to the first page of Exhibit

11  34, Leavitt 120 --

12        A.    Yeah.

13        Q.    Do you recall this e-mail chain?

14        A.    Not at all.

15        Q.    Did you have any conversations with Aaron

16  de Leest about Mr. Casden or the trust?

17        A.    I don't recall any.  That doesn't -- I

18  just don't recall.

19        Q.    Do you recall any conversations with Mr.

20  Casden concerning the possibility of the trust funding

21  the capital call?

22        A.    No.  No.

23        Q.    Did you ever participate in a conversation

24  with Jocelyn and Mr. Casden concerning this capital

25  call from March 4th, 2024?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 770 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                115

1          A.    I don't recall.

2          This capital call, is this -- what investment?

3     Is this Side Door?

4          Q.    It says cap -- the subject says capital

5     call for SDV digital asset fund.

6          A.    Oh, it does say Side Door.  Okay.  It does

7     say Side Door.

8          No, I don't recall -- I don't recall the

9     conversation.

10         Q.    And if we look at the second page of

11    Exhibit 34, Leavitt 21.  It says, "Capital call for SDV

12    digital asset fund, please transfer $100,020 to your

13    AngelList balance."

14         Do you see that?

15         A.    Yes.

16         Q.    And then we scroll down, it says,

17    "Investing as Seth Casden."

18         What did you understand that to mean?

19         A.    I'm assuming this is for the Side Door

20    investment that we eventually funded.

21         Q.    Was it funded in Mr. Casden's name or in

22    the trust's name?

23         A.    The trust.

24         Q.    How do you know --

25         A.    I don't -- you know what?  I shouldn't say



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 771 of 1079

ALAN LEAVITT                                                       August 21, 2025
IN RE: SETH HALDANE CASDEN                                              116

```
 1   that.  I don't recall.

 2              [Exhibit 35 marked for identification.]

 3   BY MS. SULLIVAN:

 4        Q.    I'm going to show you, Mr. Leavitt, what

 5   we're marking as Exhibit 35.  It's Bates stamp Leavitt

 6   126 to 129.

 7        A.    Okay.

 8        Q.    And if we look at the second e-mail on the

 9   first page from Mr. Borowsky, saying, "Seth, because

10   this investment is not owned by the trust, it is

11   inadvisable for the trustee to proceed at this time."

12        Do you see that?

13        A.    Yes.

14        Q.    Did you discuss this statement with Mr.

15   Casden?

16        A.    I know that we had conversations about it.

17   I don't recall this exact e-mail that we're discussing.

18        But yes.

19        Q.    What were your conversations with Mr.

20   Casden?

21        A.    Well, you know, we were questioning

22   whether or not it could be funded by the trust.

23        Q.    What did you and Mr. Casden discuss?

24        A.    I don't recall, but that's what we were --

25   that's what the conversation was about, whether or not
```



1    the trust could -- could fund this investment.

2          Q.    Was Mr. Casden upset that he might not be

3    able to fund the investment?

4          A.    You know, I don't know if upset.  He

5    was -- this was something that -- you know, he felt

6    that -- from a monetary point of view that it would

7    worthwhile.

8          Q.    Why did he believe it would be worthwhile

9    from a monetary point of view?

10         A.    Well, you know, because even his

11   stepfather had look at it, who was, you know, involved

12   in the investments and thought it was a good

13   investment.

14         Q.    Did Mr. Casden ever use any of the trust

15   funds to pay for the attorneys to defend him in the

16   action brought by MET?

17         A.    I can't answer that.  I don't know.

18         Q.    Did Mr. Casden ever use any of the funds

19   distributed from the trust to him to defend the action

20   MET brought against Hologenix?

21         A.    I can't answer that.  I don't know.

22         Q.    Did Mr. Casden ever use any of the funds

23   distributed from the trust to gamble in Las Vegas?

24         A.    I don't know that either.

25         Q.    Why did you laugh?



ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                          118

1          A.    I just -- it wasn't -- it wasn't a good --

2    you know, gambling wouldn't be a good source in using

3    your funds, so I found that funny.

4          Q.    Were you aware that Mr. Casden had a

5    gambling problem?

6          A.    I was not.

7          Q.    Were you aware that Mr. Casden attended

8    Gamblers Anonymous?

9          A.    I was not.

10         Q.    Were you aware that Mr. Casden gambled and

11   lost over $400,000 in February 2023 in Las Vegas?

12         A.    I was not.

13         Q.    You mentioned earlier that there was -- I

14   don't know if this is the exact verbiage, but like

15   family strife or discord between Mr. Casden and his

16   brother.

17         Is that correct?

18         A.    That's what I've heard.

19         Q.    Okay.  What have you heard?

20         A.    Well, I didn't -- not in any detail, but

21   I -- I knew he resigned from the position.  I want to

22   say that they had -- you know they didn't agree on

23   everything, so they parted ways.

24         Q.    Were they having disagreement about how to

25   distribute money from the trust to Mr. Casden?



ALAN LEAVITT                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                                   119

1          A.    That I can't tell you.  I don't know the

2    extent of what their disagreement was.

3          Q.    How did you know there were disagreements?

4          A.    Well, because I had heard talk of his --

5    when he resigned.

6          Q.    What talk did you hear when he resigned?

7          A.    Well, they weren't in agreement with

8    whatever it was, they parted ways.

9          Q.    Who wasn't in agreement on what?

10         A.    Well, Seth and his brother.

11         Q.    What specifically were they not in

12   agreement on?

13         A.    That I don't know.  I wasn't privy to

14   that.

15         Q.    Do you know if -- what Graham Casden's

16   opinion of his brother is?

17         A.    I have no idea.  I'm sure he loves his

18   brother, but I don't know.

19         Q.    Have you ever had any discussions with

20   Graham Casden about Seth Casden?

21         A.    I'm -- really never talked to Graham, you

22   know.  It's rare.

23         Q.    Before Mr. -- Seth Casden asked you to be

24   the trust adviser, how often did you communicate with

25   him?



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 775 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              120

 1        A.    Probably more so beforehand than when I

 2   became the trust adviser.  I can't give you a specific

 3   amount, but --

 4        Q.    Why is that?

 5        A.    Because I just don't recall.

 6        Q.    No, I'm sorry, why did you speak to him

 7   more before you became the adviser than after?

 8        A.    I don't know.  We just seemed to have more

 9   of a friendship type of involvement.

10        Q.    So before you became a trust adviser,

11   would you speak to him on a monthly basis, something

12   more frequent?

13        A.    I would say monthly.

14        Q.    How often would you get together with Mr.

15   Casden?

16        A.    Not often.  He's in California and I'm in

17   Chicago.

18        Q.    Would you speak on the phone or video chat

19   or something else?

20        A.    Yeah, on the phone.

21        Q.    You mentioned earlier that there was

22   issues between Mr. Pascotto and Seth Casden also,

23   correct?

24        A.    That's what I've heard.

25        Q.    And what did you hear about that?



ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                     121

1        A.    Just that they're not on the same page,

2   you know.

3        Q.    What does that mean, they're not on the

4   same page?

5        A.    I mean that there's some disagreements.  I

6   don't know what it involves, but I know that there's

7   disagreements.  Family issues.

8        Q.    Are there family issues around money?

9        A.    That I couldn't tell you.

10        Q.    Do you know what Mr. Pascotto thinks of

11   Seth?

12        A.    I couldn't tell you that.

13        Q.    Does Mr. Casden have any issues with other

14   family members that you're aware of?

15        A.    No.

16        Q.    No, he doesn't have any other issues, or

17   you're not aware of any issues?

18        A.    I'm not aware of it.  I'm not aware.

19        Q.    Right, it wasn't the best question.

20        A.    Yeah.

21              [Exhibit 36 marked for identification.]

22   BY MS. SULLIVAN:

23        Q.    Showing you -- or sorry.  I'm not yet --

24        I will show you what I'm going to mark as

25   Exhibit 36.



ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                           122

```
1              Have you seen this document before today?

2         A.    Let me take a look at it and see.

3         Q.    Yep, take your time.

4         A.    Okay.  No.

5         Q.    You have never seen it before?

6         A.    I don't recall it.

7         Q.    Okay.

8              Did anyone ever request that you fund the plan

9    for reorganization and Mr. Casden's bankruptcy with

10   money from the trust?

11        A.    No.

12        Q.    Do you know if anyone ever asked Northern

13   Trust to fund the plan for reorganization for Mr.

14   Casden's bankruptcy from the trust?

15        A.    I don't know that.

16        Q.    Was it your understanding that Mr. Casden

17   could not compel the trust to make any distributions

18   while he was in bankruptcy?

19        A.    That's what I understood.

20        Q.    Do you have an -- was that understanding

21   based on anything other than conversations with your

22   counsel?

23        A.    No.

24        Q.    What was your understanding that would

25   happen if the trust made a distribution to Mr. Casden
```



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 778 of 1079

ALAN LEAVITT                                               August 21, 2025
IN RE: SETH HALDANE CASDEN                                           123

```
 1   while he was in bankruptcy?
 2          A.    It just -- you know, I was advised
 3   against, we wouldn't do it.
 4          Q.    Did you advise Mr. Casden about it?
 5          A.    He knew about that.
 6          Q.    Did you specifically discuss that with
 7   him?
 8          A.    I can't recall how that became available
 9   to us, but we most -- either his lawyers or our lawyers
10   or --
11          Q.    Do you recall how Mr. Casden reacted when
12   he learned he couldn't receive trust distributions when
13   he was in bankruptcy?
14          A.    No, I don't.
15          Q.    Did you have conversations with Mr. Casden
16   before he filed for bankruptcy about trust
17   distributions?
18          A.    No.
19          Q.    Let's take a few minutes and let me go
20   through my notes'.  I think I might be done.
21          A.    Yeah.
22                [A recess was taken.]
23                [Exhibit 37 marked for identification.]
24   BY MS. SULLIVAN:
25          Q.    I'm going to show you, Mr. Leavitt, what
```



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              124

1  we're going to mark as Exhibit 37, the document

2  produced by you.  It's a Bates stamp Leavitt 137 to

3  Leavitt 138.

4       Do you recognize this e-mail and attachment?

5       A.   No, I don't.

6       Q.   I'll just show you the attachment so you

7  can see it.

8       This is another e-mail from Mr. Casden dated

9  July 29th, 2021, to Northern Trust with a copy to you,

10  with a direction letter for distribution dated July

11  29th, 2021, attached.

12       Correct?

13       A.   It seems to be, yes.

14       Q.   And that's your e-mail address,

15  lionofzion477@cs.com?

16       A.   That is.

17       Q.   Did you send this letter of direction with

18  your e-signature to Mr. Casden before he sent it to

19  Northern Trust?

20       A.   Repeat that please.  Did I send it with --

21       Q.   Did you send this letter of direction to

22  Mr. Casden with your e-signature, your electronic

23  signature --

24       A.   Before --

25       Q.   -- before he sent it to Northern Trust in



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 780 of 1079

ALAN LEAVITT                                            August 21, 2025
IN RE: SETH HALDANE CASDEN                                          125

1  this e-mail on July 29th, 2021?

2         A.    I would assume that that would have been

3  the case.

4         Q.    And how would you have delivered it to Mr.

5  Casden?

6         A.    I don't recall.  Maybe in an e-mail.

7         Q.    Is there any other way that you would have

8  delivered the letter of direction signed by you to Mr.

9  Casden other than e-mail?

10         A.    I don't think so.

11         Q.    Okay.  And do you know why Mr. Casden was

12  sending this letter of direction to Northern Trust

13  instead of you?

14         A.    I don't recall.  Maybe a time element.  I

15  don't recall.

16              [Exhibit 38 marked for identification.]

17  BY MS. SULLIVAN:

18         Q.    Let me show you what we're going to mark

19  as Exhibit 38, Bates stamp Leavitt 223 to 225.

20         Do you see that document, Mr. Leavitt?

21         A.    I do.

22         Q.    Do you recognize this e-mail?

23         A.    No, I do not.

24         Q.    Just scrolling through it for you.

25         A.    Okay.



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                            126

1          Q.    And then there's a letter of direction

2     dated January 18th, 2022, attached, directing Northern

3     Trust to send $300,000 to Seth Casden with your

4     electronically-generated signature.

5          Correct?

6          A.    Go down, please.

7     Yes.

8          Q.    Okay.

9          Looking at Leavitt 224 of Exhibit 38, there's an

10    e-mail from Seth to Northern Trust with a copy to you

11    stating, "Dear Nai-Te, will you kindly prepare a letter

12    of direction for $300,000 for Terry to execute?"

13         Do you see that?

14         A.    Yes.

15         Q.    Does this refresh your memory as to who

16    prepared and drafted the letters of direction?

17         A.    I don't recall it, but I'm reading it,

18    yeah.

19         Q.    And then Mr. Watson responds, "Hi, Seth.

20    Attached is a letter of direction prepared for Terry's

21    signature.  Please note that after the $300,000

22    distribution, the cash balance is $400,170."

23         Do you see that?

24         A.    Yes.

25         Q.    Okay.  Did it raise any concerns for you



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 782 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                          127

1   that after the $300,000 distribution, the cash balance

2   would be about $400,000?

3           A.    No.  Why would it?

4           Q.    Isn't that the cash balance of the trust?

5           A.    I would have thought the trust would have

6   been larger than that, but you know --

7           Q.    What's your understanding of how much

8   money is in the trust?

9           A.    I don't know.  You know, it's -- there's

10  investments, but I'm not privy to that.  So I don't

11  know really how much is in there.

12          Q.    Did you ever review any of the statements

13  from Northern Trust?

14          A.    I never got them, but no, I can't recall

15  that I did.

16          Q.    And then if we look at the top e-mail on

17  Exhibit 38, it's an e-mail from Mr. Casden to Mr.

18  Watson with a copy to you and Ms. Roach saying, "Please

19  find the executed letter attached."

20          Do you see that?

21          A.    I do.

22          Q.    Why did Mr. Casden send the letter of

23  direction instead of you on January 18th, 2022?

24          A.    I don't know.  I don't know.

25          Q.    Did you send the letter -- the executed



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 783 of 1079

ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                                               128

1    letter of direction to Mr. Casden before he sent it to

2    Northern Trust?

3         A.    I don't recall.

4         Q.    How did Mr. Casden obtain a copy of the

5    signed letter of direction with your electronic

6    signature?

7         A.    I would imagine he got an e-mail with it.

8         Q.    From you or somebody else?

9         A.    I would imagine from me.

10              [Exhibit 39 marked for identification.]

11   BY MS. SULLIVAN:

12        Q.    I'm going to show you, Mr. Leavitt, what

13   we're marking as Exhibit 39, Leavitt 226 (sic).

14   Another e-mail from Mr. Casden to Northern Trust with a

15   copy to you, asking Northern Trust to prepare a letter

16   of direction for $300,000 for Terry to execute.

17        Do you see that?

18        A.    Yes.

19        Q.    Does that refresh your memory as to who

20   prepared your letters of direction for Northern Trust?

21        A.    No, it doesn't, but it says -- yeah, okay.

22   I'm sorry.

23        Yes.

24        Q.    How many letters of direction did Northern

25   Trust prepare for you to sign?



1        A.    Boy, I don't recall.

2        Q.    How would you receive the draft letter of

3    direction from Northern Trust for your signature?

4        A.    I would imagine through an e-mail.

5              [Exhibit 40 marked for identification.]

6    BY MS. SULLIVAN:

7        Q.    I'm going to show you what we're going to

8    mark as Exhibit 40, Leavitt 229.  Another e-mail from

9    Mr. Casden to Northern Trust with a copy to you.

10        Just read the e-mail and let me know if you

11    recall it.

12        A.    Okay.

13    Okay.

14        Q.    Do you recall this e-mail that we have

15    marked as Exhibit 40 today?

16        A.    No.

17        Q.    In the e-mail, Mr. Casden tells Northern

18    Trust if he would please repay the $500,000 loan from

19    LSG and any interest due, and then distribute $500,000

20    to my checking account per the letter executed by Terry

21    and attached.

22        Correct?

23        A.    Okay.  And we'll just scroll down, and

24    there's the attached letter of direction with your name

25    and address dated July 29th, 2022, with the direction



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 785 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                                  130

1   to send $500,000 to Seth Casden.

2         Correct?

3         A.    It says that yes.

4         Q.    Who drafted this letter of direction?

5         A.    I don't recall.

6         Q.    How did you send this executed letter of

7   direction to Mr. Casden to send to Northern Trust?

8         A.    I don't recall.

9         Q.    Okay.  How would -- how would you send it

10  to Mr. Casden so that he could send the signed letter

11  of direction to Northern Trust?

12        A.    An e-mail.

13              [Exhibit 41 marked for identification.]

14  BY MS. SULLIVAN:

15        Q.    I'm going to show you, Mr. Leavitt, what

16  we're marking as Exhibit 41.  It's Bates-stamped

17  Leavitt 1 to 2.  It looks to be this short message

18  report, outline of conversations.  It has Alan Leavitt

19  and Seth Casden.

20        Is that your phone number?

21        A.    I'm trying to focus here.

22        Yes.

23        Q.    Is that Mr. Casden's phone number?

24        A.    I don't know.

25        Q.    It says date range 10-3-2023, and then we



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 786 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                            131

 1   scroll to Page 2, and there's two messages from Seth

 2   Casden.  "Sending a letter to Northern for 200K, hope

 3   all is well and let's connect soon."

 4          Do you recall these text messages?

 5          A.    I do not.

 6          Q.    Did you ever respond to Mr. Casden?

 7          A.    Have I --

 8          Q.    No.  Did you ever respond to these text

 9   messages from Mr. Casden?

10          A.    Oh.  That I don't know.  That I don't

11   know.

12          Q.    Why did Mr. Casden text you on October

13   3rd, 2023, that he was sending a letter to Northern for

14   $200,000?

15          A.    Maybe -- let me see here.  Maybe for a

16   distribution, to okay distribution of that.  I don't

17   recall.

18               [Exhibit 42 marked for identification.]

19   BY MS. SULLIVAN:

20          Q.    I'm going to show you, Mr. Leavitt, what

21   we're marking as Exhibit 42, Leavitt 134.

22          Do you recognize this e-mail?

23          A.    Give me one second.

24          Q.    Sure.

25          A.    Vaguely.



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 787 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              132

1      Q.    What prompted you to send this e-mail to

2   Natalie Schiavone at Northern Trust?

3      A.    I don't know if it's -- oh, yeah.

4      I don't know.  Probably seeing if it was part of

5   the trust, you know, that we could fund that, I'm

6   assuming.

7      Yeah, it says right there, they're referring

8   from discretionary distribution to you at this point.

9   Okay.

10     Q.    So what prompted you to send this to Ms.

11  Schiavone?

12     A.    I was questioning whether or not that

13  investment could be made.

14     Q.    Did you have any conversations with Mrs.

15  Schiavone about this e-mail?

16     A.    I don't recall.

17     Q.    Did you have any other e-mail

18  communications with Northern Trust after you sent this

19  e-mail on January 6th, 2024?

20     A.    I don't know.

21     Q.    Did you refrain from making any

22  discretionary distributions to Mr. Casden at that point

23  in time?

24     A.    I think so.

25          MS. SULLIVAN:  I don't have any other



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 788 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                              133

1   questions.  Thank you, Mr. Leavitt, I appreciate the

2   time.

3                  THE WITNESS:  Oh, thank you.

4                  [1:38 p.m.]

5

6                  [SIGNATURE RESERVED.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                               134

C E R T I F I C A T E

        I, Seth Arndt, do hereby certify that ALAN
LEAVITT, prior to the commencement of the examination,
was sworn by me via videoconference on August 21, 2025,
to testify the truth, the whole truth and nothing but
the truth.

        I DO FURTHER CERTIFY that the foregoing is a
true and accurate transcript of the proceedings as
taken stenographically by and before me at the time,
place and on the date hereinbefore set forth.

        I DO FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel of any
of the parties to this action, and that I am neither a
relative nor employee of such attorney or counsel, and
that I am not financially interested in this action.



_____

SETH ARNDT

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 790 of 1079

ALAN LEAVITT                                                  August 21, 2025
IN RE: SETH HALDANE CASDEN                                              135

1

2

3              I, Alan Leavitt, the witness herein,

4    having read the foregoing testimony of the pages of

5    this examination, do hereby certify it to be a true and

6    correct transcript, subject to the corrections, if any,

7    shown on the attached page.

8

9

10

11                              _____

12                              Alan Leavitt

13

14

15

16

17   Sworn and subscribed to before me,

18   This _____ day of _____, 202_.

19

20

21   _____

22          Notary Public

23

24

25



ALAN LEAVITT                                          August 21, 2025
IN RE: SETH HALDANE CASDEN                                        136

1                            ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22   SIGNATURE:_____DATE:_____

23                    Alan Leavitt

24

25



ALAN LEAVITT
IN RE: SETH HALDANE CASDEN

August 21, 2025
Index: $100,000..16

**$**

**$100,000**
35:23
36:3,4
40:25
41:16,25
42:4,7
67:18,23
96:4,6
101:3,5
102:8,9,
25 103:1,
23 104:9,
10 108:11

**$100,020**
57:10
58:7
115:12

**$150,000**
71:23
72:1

**$200,000**
85:9
87:17,19
90:13,14,
16 99:24
100:1
101:14,16
103:10,
22,25
106:20
107:4
131:14

**$200,?000**
85:14

**$250,000**
99:7,9

**$30,000**
45:15
46:14,18

**$300,000**

87:5,7
103:23
126:3,12,
21 127:1
128:16

**$400,000**
48:14,18,
23 49:14
52:1
66:8,12,
24 110:21
111:8
118:11
127:2

**$400,170**
126:22

**$500,000**
75:9,12
80:16
83:21
84:7,17
88:11,13,
16,21
91:14,16
103:25
104:3
129:18,19
130:1

**$550,000**
92:13,15

**$6**
40:9

**$670,000**
78:7,15

**$700,000**
104:11

**0**

**00050**
42:25

**00051**

47:1

**00053**
71:15

**00056**
68:4

**00057**
68:5

**00058**
73:1

**00059**
86:19

**00062**
88:2

**00063**
90:1

**00064**
75:24

**00065**
75:24

**00066**
77:21

**00067**
79:25

**00069**
82:6

**00070**
91:2

**00071**
91:23

**00073**
98:20

**00074**
99:16

**00075**
100:23

**00076**
101:10

**00077**

102:3

**00078**
102:20

**00079**
84:25

**00080**
64:12

**0072**
95:24

**1**

**1**
22:3,4
44:22
45:3,6
69:13
130:17

**10**
39:20
40:1
75:19
77:20
78:4
79:19

**10-3-2023**
130:25

**10-minute**
86:5

**100**
43:2

**10th**
87:13,18
101:11
103:24

**11**
77:22
79:19

**11:15**
40:3

**11th**
91:3,13

**12**
45:19
46:21
79:21,24
80:13
107:17

**12.5**
70:18
71:3

**120**
113:24
114:11

**121,451**
73:11

**122**
113:24

**126**
116:6

**129**
116:6

**13**
82:2,5,
10,12

**134**
131:21

**137**
124:2

**138**
124:3

**14**
84:20,23
85:5

**15**
86:15,18

**15-minute**
86:6

**16**
87:9,12

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 793 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                                Index: 16th..35

| | | | | |
|---|---|---|---|---|
| 103:23 | 42:21,23 | 127:23 | **223** | 124:9,11 |
| 110:13,20 | 47:17 | 129:25 | 125:19 | 125:1 |
| | 57:12 | | | 129:25 |
| **16th** | 69:21 | **2023** | **224** | |
| 26:22 | 70:2 | 26:22 | 126:9 | **2nd** |
| 66:5 73:1 | 130:17 | 66:6 | | 44:22 |
| 100:24 | 131:1 | 80:19 | **225** | 45:3,6 |
| | | 84:4,24 | 125:19 | 80:3 |
| **17** | **2.12** | 85:8 | | |
| 87:24 | 78:16 | 91:3,6, | **226** | |
| 88:2 | | 13,22 | 128:13 | |
| | **2.25** | 92:12 | | **3** |
| **18** | 80:18 | 95:23 | **229** | |
| 89:23 | | 97:16,17 | 129:8 | |
| 90:1,9 | **20** | 98:21 | | **3** |
| | 91:18,21 | 99:7,10, | **22nd** | 46:24 |
| **18th** | 94:20 | 16 100:24 | 95:23 | 47:3,8,22 |
| 46:15 | | 101:11 | | 48:10 |
| 75:23 | **200K** | 102:4,21 | **23** | 70:4 |
| 86:23 | 131:2 | 103:6,24 | 22:10 | |
| 126:2 | | 104:9,10, | 99:12,15 | **30** |
| 127:23 | **2016** | 16,19 | 103:5,20 | 108:2,5 |
| | 7:11 8:24 | 105:22 | 107:2 | 109:10 |
| **19** | 18:10 | 106:17,20 | 108:7 | |
| 90:24 | 46:2 | 107:3 | | **30th** |
| 91:1 | | 109:21 | **24** | 71:25 |
| | **2020** | 110:13,20 | 100:20,23 | |
| **1:00** | 45:15 | 118:11 | 101:22 | **31** |
| 86:12 | 46:15,19 | 131:13 | 108:7 | 109:7,10, |
| | | | | 16 |
| **1:38** | **2021** | **2024** | **25** | |
| 133:4 | 47:15 | 55:24 | 101:7,10 | **31st** |
| | 48:6,15 | 57:17 | 103:24 | 78:8 |
| **1st** | 49:14 | 114:25 | | 80:18 |
| 45:15 | 71:16,25 | 132:19 | **26** | 113:14 |
| 46:19 | 73:1 | | 101:25 | |
| 48:6,15 | 124:9,11 | **2046** | 102:3 | **32** |
| 49:14 | 125:1 | 22:1 | 104:8 | 110:4,7 |
| 98:21 | | | | 111:6 |
| 99:6,16 | **2022** | **21** | **27** | |
| 102:4,21 | 74:21 | 95:19,22 | 102:17,20 | **33** |
| 103:5,22 | 75:18,23 | 115:11 | 104:9 | 111:23 |
| 104:9,10, | 77:15,21 | | | 112:1 |
| 11 105:22 | 78:8 80:3 | **219** | **28** | |
| 106:17,19 | 82:7 | 112:2 | 77:21 | **3313** |
| 107:3 | 86:23 | | 105:1,8, | 45:19,20 |
| | 87:13,18 | **22** | 11 109:10 | 46:21 |
| | 88:3,17 | 98:20,22 | | |
| **2** | 97:23,25 | 112:2 | **29** | **34** |
| | 113:14 | | 107:12,15 | 113:21,24 |
| **2** | 126:2 | | | 114:11 |
| | | | **29th** | 115:11 |
| | | | 71:16 | |
| | | | 88:3 | **35** |

ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                                          Index: 36..advise

116:2,5

**36**
121:21,25

**37**
123:23
124:1

**38**
125:16,19
126:9
127:17

**39**
128:10,13

**3rd**
74:21
82:7
84:24
85:8
109:21
131:13

---

**4**

**4**
55:19,20
62:10
70:17

**40**
35:8
129:5,8,
15

**41**
130:13,16

**42**
131:18,21

**44**
110:8

**470**
6:8 44:18

**477**
89:19,20

**4th**
114:25

---

**5**

**5**
64:8,11,
21 70:23
110:20

**500**
11:20
12:12

**51**
47:8

**58**
79:18

---

**6**

**6**
68:4,7,16
71:4
105:1

**60**
87:12

**60614**
6:9

**61**
74:21
79:19

**64**
76:19
79:19

**65**
76:19

**66**
79:20

**670K**
112:23,24

**6th**

132:19

---

**7**

**7**
71:6,15,
17 72:9

**7-8-2024**
56:24

**718**
69:13

**74**
103:5
107:3

**7th**
91:22
92:12

---

**8**

**8**
57:17
72:25
73:2
74:20
76:13,15
79:18

**8-1-2021**
78:15

**80**
64:21

**8th**
55:24

---

**9**

**9**
74:23
75:22
76:13,15,
18 79:18

9:06
5:3

---

**A**

**a.m.**
5:3

**Aaron**
114:15

**above-
referenced**
44:22
45:7
70:19
71:4
83:23

**absolutely**
12:19

**acceptable**
53:4

**access**
44:14
48:9
50:12

**accordance**
45:23

**account**
11:20
43:14
72:21
73:13
129:20

**accounting**
62:12

**accurate**
103:20

**acknowledge**
59:13

**act**
19:1
20:9,25

45:25

**acted**
21:14

**acting**
43:11
83:6

**action**
117:16,19

**actions**
57:9
69:5,6
71:8 73:9

**activities**
35:13

**acts**
45:22

**actual**
56:20

**add**
35:6
93:16
97:10
112:24

**added**
68:25
91:11

**adding**
96:22

**address**
6:7 44:18
65:23,24
66:2
105:17
124:14
129:25

**addressed**
75:15

**advertising**
38:22

**advise**

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 795 of 1079

ALAN LEAVITT                                              August 21, 2025
IN RE: SETH HALDANE CASDEN                        Index: advised..authorizing

123:4

**advised**
14:16
123:2

**adviser**
7:14,15,
16,23
8:6,23,24
9:6,10,19
10:6,10
19:1,6,7,
10,14
20:9,14,
17 21:1,
14 23:23
24:23
32:12,15,
21 33:5,
12,17,23
34:3,6,25
43:9
45:8,11,
13,22
46:1,7
57:8
63:6,15,
18,19,20
66:7 69:4
71:23
73:8 79:7
82:15,16,
17,20,21,
23 83:2,
5,7,9,10,
12,16,17,
18,19
119:24
120:2,7,
10

**advisers**
62:11

**afford**
37:3

**age**

32:23

**agree**
103:13
118:22

**agreed**
8:24 9:3

**agreement**
44:23
45:7
59:15,20
70:5,24
77:6
119:7,9,
12

**ahead**
55:11
60:7
94:19

**Alan**
5:1 6:6
46:1
47:20,23
52:13
55:22
65:6,9,12
130:18

**Alan's**
65:13

**Aldero**
25:6

**allocate**
52:12

**allocations**
83:13

**allot**
29:20

**allowed**
14:8 15:2
29:24

**Alvaro**
24:13

60:2
80:24
81:15,17

**amended**
70:4

**American**
31:14

**amount**
40:11,16
84:16
104:15
120:3

**Angellist**
115:13

**annum**
78:16

**Anonymous**
118:8

**answering**
10:17

**answers**
5:25 6:1

**apologize**
12:7

**app**
62:5

**approval**
67:21

**approved**
67:17

**Aria**
31:10

**Arizona**
98:6

**arrange**
10:24
106:20

**Article**
44:21
45:3,6

**aspect**
19:21

**asset**
58:6,10
115:5,12

**assets**
34:14
45:10
58:14,16
63:8,16
79:8

**assigned**
23:15

**assume**
28:14
53:14
58:12
60:17
67:16
69:17
81:12
125:2

**assuming**
40:19
67:13
74:1
96:18
115:19
132:6

**assumption**
58:13
96:19

**athletic**
35:13

**attached**
57:10
105:23
108:9
109:17
112:22
113:15
124:11
126:2,20

127:19
129:21,24

**attachment**
114:3
124:4,6

**attended**
118:7

**attorney**
5:7 13:17
14:16
15:12,13,
18 17:4
30:7,8
42:17

**attorney's**
6:13
31:22
32:2,3,9

**attorney-
client**
13:22
14:1

**attorneys**
22:21
117:15

**August**
82:7
102:4
104:8

**authoring**
69:24

**authority**
44:8,11
60:14
63:5

**authorize**
38:8 48:5
78:23

**authorized**
50:6

**authorizing**



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 796 of 1079

ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                               Index: avoiding..bullet

51:19

avoiding
  9:13

aware
  19:16
  26:21
  38:11,15
  39:2,5
  40:6,9,13
  42:9,11
  118:4,7,
  10
  121:14,
  17,18

———————

    B
———————

back
  9:14 16:7
  25:11,17
  36:1,6,
  15,18,21,
  23 40:3,
  24 41:7,
  10,14,15,
  19 42:4,7
  47:22
  51:20
  62:9 63:3
  75:17
  84:14
  86:12
  88:17
  90:22
  97:19
  101:1,22
  107:2
  111:6
  113:18
  114:10

background
  98:2

balance
  115:13

126:22
127:1,4

bank
  72:21

bankruptcy
  5:9
  26:22,25
  27:2,4,8,
  16,19
  28:7,16,
  20,23
  29:4,7,
  15,22,25
  30:12,19
  31:19,23
  32:10
  34:16
  36:9,24
  66:16,23
  110:22
  122:9,14,
  18 123:1,
  13,16

Barrent
  51:13

based
  122:21

basic
  62:8

basis
  63:13
  84:2
  96:19
  120:11

Bates
  42:25
  47:1
  64:12
  68:4
  72:25
  74:21
  75:24
  76:18
  79:25

84:24
86:18
88:2 91:2
95:23
98:20
105:1
107:16
108:6
109:10
110:7
112:1
113:24
116:5
124:2
125:19

Bates-stamp
  71:15
  77:21

Bates-
stamped
  22:18
  82:5
  130:16

began
  62:10

beginning
  17:12
  59:12

behalf
  108:17,22
  109:24
  113:3

bene
  103:10

benefit
  27:13
  30:3
  48:15
  66:8
  71:24
  75:9
  85:10
  87:6,17
  88:11

90:13
91:15
92:14
96:5
99:8,24
101:4,15
102:8,25
107:5

Betty
  53:3
  79:15

biological
  94:25

bit
  91:5
  95:7,9

Bless
  110:25

Borowsky
  15:16
  116:9

borrow
  80:16

bottom
  22:17
  43:21
  47:11
  55:23
  64:24
  72:9
  73:16
  75:6
  86:24
  87:2 88:8
  92:1 96:8
  101:19
  102:11
  107:18

Boulevard
  69:13

Boy
  43:4
  66:13

106:8
129:1

break
  5:16,18
  39:10
  86:5,6

breaking
  18:8 67:2

briefly
  12:8

bring
  82:8

broke
  73:23

brokerage
  73:12

brother
  18:25
  19:14
  20:5
  95:14
  118:16
  119:10,
  16,18

brother's
  7:2

brother-in-
law
  19:19
  95:5

brother-in-
law's
  7:3

brother-in-
laws
  95:12

brought
  117:16,20

bullet
  73:10

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 797 of 1079

ALAN LEAVITT                                             August 21, 2025
IN RE: SETH HALDANE CASDEN                             Index: bumped..chain

**bumped**
  95:6

**business**
  8:9 11:21
  49:3
  53:15
  67:1,6

**buy**
  25:15
  53:13

———————————

———————————
          **C**
———————————

**California**
  10:4
  69:23
  120:16

**call**
  23:8
  92:22,23
  111:22
  114:21,25
  115:2,5,
  11

**called**
  13:14

**calls**
  28:20
  54:20
  55:5
  58:24
  59:7
  65:12
  104:22

**cap**
  115:4

**capa**
  66:6

**capacity**
  43:14
  45:13
  57:8 66:7

69:3
71:23
73:8
82:15

**capital**
  28:20
  58:24
  59:7 66:1
  114:21,24
  115:2,4,
  11

**car**
  53:13

**care**
  17:19
  54:13

**Cas**
  13:7

**Casden**
  6:25 7:5,
  9,13,24
  8:5,25
  9:6,9,23
  10:9,10,
  20 13:5
  16:11,14,
  17 17:5,
  22 18:24,
  25 19:2,
  9,13
  20:2,4,9
  21:1,9,25
  22:1
  23:5,13,
  22,23,24
  24:2,4
  26:21,24
  27:6,7,
  14,18,21,
  24 28:3,
  7,11,15,
  19 29:6,
  19 30:12,
  17 31:3,

9,12,17,
21 32:8,
13 33:14,
24 34:16
35:17,22
36:12
38:24
39:3,6
40:7,10,
14,18,21,
24 42:3,
9,25
43:17
44:11,14,
23 45:4
46:2,13
47:1,8
48:9,15,
23 49:19,
23 50:25
51:17
52:4,7,
17,21
53:12,17,
22 54:1,
6,12,16,
25 61:18
64:12,21
66:9,16,
22 68:4
69:18
70:14
71:15,24
72:21,25
73:13
74:21
75:9,24
76:19
77:21
79:18,19,
20,25
81:21,24
82:5
84:6,10,
24 85:10,
17,22
86:18

87:6,12,
18 88:2,
12 90:1,
13 91:2,
15,23
92:14,17,
20,24
93:2,8,
14,20,25
94:9,13
95:24
96:5
98:20
99:8,16,
25 100:23
101:4,10,
15 102:3,
8,20,25
103:5,10
104:3,15,
19
105:12,22
106:2,5
107:3,5,
16,24
108:6,8,
16,22
109:11,
16,23
110:9,15,
16,22
111:11
112:4,12,
20
113:11,
13,18
114:16,
20,24
115:17
116:15,
20,23
117:2,14,
18,22
118:4,7,
10,15,25
119:20,23
120:15,22

121:13
122:16,25
123:4,11,
15 124:8,
18,22
125:5,9,
11 126:3
127:17,22
128:1,4,
14 129:9,
17 130:1,
7,10,19
131:2,6,
9,12
132:22

**Casden's**
  5:8 13:8
  14:14
  15:24
  16:3
  18:25
  24:7
  94:16,21,
  25 95:3,
  17 106:18
  115:21
  119:15
  122:9,14
  130:23

**case**
  125:3

**cases**
  45:23

**cash**
  126:22
  127:1,4

**Casino**
  31:10

**caused**
  14:14

**certifying**
  77:5

**chain**

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 798 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                          Index: challenged..correct

105:15,21
106:17,24
107:22
108:5,8,
14
109:11,
13,16
110:7,11
112:1,3,9
114:1,13

**challenged**
61:21
74:2

**charge**
43:17
106:10,
11,13,15

**chat**
21:18
42:17
104:24
105:2
120:18

**check**
57:25
60:5

**checked**
57:21
58:2

**checking**
58:1 60:2
129:20

**Chicago**
6:8 44:19
60:14
120:17

**choice**
35:13

**choose**
65:8,9

**circumstance**

13:13

**circumstances**
13:12

**Claiifornia**
69:14

**claim**
36:8
38:23

**Class**
73:10

**clear**
9:15 32:7

**clears**
37:2,5

**clicked**
74:13

**clicking**
74:16

**client**
38:12
50:8,12

**close**
17:17
95:8,11
105:6

**coach**
35:9

**code**
45:19
46:22

**coffee**
39:24

**college**
98:4,5

**communicate**
27:21,24
28:3
119:24

**communication**
25:7
29:17

**communications**
49:22,23
110:1
132:18

**companies**
12:12,13

**company**
11:20
12:10
13:14
37:19,20
45:9
52:22
54:8
69:22,23,
25 97:18

**compel**
122:17

**compensated**
10:5

**competitive**
35:8

**complete**
55:8 69:4
71:7 73:9

**computer**
6:20,22
21:20
61:15,17,
25 62:2,4
97:13,16,
18,20
99:5
100:6

**concerns**
104:2,12
126:25

**conduct**
52:9

**confident**
37:13
40:23
41:1

**conflict**
13:19,20,
24 14:7,
9,13

**connect**
131:3

**consent**
77:6

**consult**
62:11,15

**consulted**
59:23

**contact**
17:12,15

**contained**
45:17

**continuing**
27:9

**controlled**
26:13
81:15

**conversation**
25:2
32:11
40:20
93:6,11
94:1,7,
10,14
114:23
115:9
116:25

**conversations**
20:1

**85:17**
92:21
94:24
95:16
114:15,19
116:16,19
122:21
123:15
130:18
132:14

**copied**
85:24
108:10

**copies**
59:14
86:2
100:7,8

**copy**
20:20
99:2
100:9,10,
13 109:17
112:13,20
113:14
124:9
126:10
127:18
128:4,15
129:9

**copying**
111:18

**correct**
26:22
46:9
56:21
57:13
58:8
60:17
63:11
65:6
67:19
75:6,10
76:2
83:25



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 799 of 1079
ALAN LEAVITT                                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                              Index: correcting..direction

103:11,20
105:13,18
111:9
112:6,14
118:17
120:23
124:12
126:5
129:22
130:2

**correcting**
79:16

**counsel**
39:22
84:13
122:22

**country**
12:13

**Coupang**
73:10

**couple**
12:11
24:22

**courses**
98:9,12

**court**
5:24
42:17
76:14

**creditor**
5:8

**creditors**
27:13
30:4,21
31:2,3

**CS**
89:20

**CTA**
60:8,12,
13

**Curt**

51:11

**cutting**
18:7

_____

D
_____

**date**
13:11
56:23
75:15
82:25
83:1
130:25

**dated**
46:2,15
48:6
55:23
66:5
71:15
73:1
75:23
77:21
78:8 82:7
84:24
85:8
86:23
87:13,18
88:3
91:2,13,
22 92:12
95:23
98:21
99:15
100:24
102:4,21
103:5
105:22
106:19
107:3
109:21
124:8,10
126:2
129:25

**dates**

111:7

**day**
66:15,21,
22 110:22

**day-to-day**
53:20

**de**
114:16

**dealings**
19:23

**Dear**
105:23
126:11

**decide**
11:9
57:15

**decided**
20:9

**decision**
8:9,17
49:3

**decisions**
10:21
63:22

**decline**
15:24

**declined**
16:2 54:9

**defend**
117:15,19

**degree**
98:7

**Delaware**
45:9,19
46:22
69:22,25
79:11

**delineated**
48:10
71:4

**delivered**
125:4,8

**Demling**
6:8 44:19

**dental**
12:10

**deny**
14:14

**depends**
21:7 49:7

**deposed**
5:21

**deposition**
93:13,21,
23

**depositions**
93:15

**describe**
12:8
93:17

**detail**
118:20

**determinati
on**
11:23
49:11

**determine**
82:19
83:13

**determined**
16:20

**Devoto**
31:6

**difference**
83:15

**differently**
41:12

**digital**
115:5,12

**dinosaur**
61:20

**direct**
45:8,13
48:14
57:8 66:7
69:4
71:23
73:8
83:21
90:12
91:14
92:13
96:3
101:3

**directed**
72:13
77:9
103:9
112:23

**directing**
46:17
70:2
80:16
84:11
102:24
126:2

**direction**
11:7,10,
15 13:4,8
14:7,15
16:15,23,
24 17:6,9
26:1,6,18
48:25
54:9,14,
18 55:4
65:18,21
66:4
67:17
75:15,22
76:23
77:20
78:14
79:1,24



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 800 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                            Index: directions..dollars

82:6
84:2,23
86:22
87:13,16
88:3 89:2
90:11
91:2,21
94:10
95:23
96:3,17,
23 97:5,
9,11
98:21
99:3,6,15
100:4,9,
11,14,23
101:11
102:4,7,
15,21
103:15,
16,19
105:24
106:3,19
107:25
108:9,12,
17,22
109:18,24
110:2,14,
16,21
111:7,12
112:22
113:3,6,
10
124:10,
17,21
125:8,12
126:1,12,
16,20
127:23
128:1,5,
16,20,24
129:3,24,
25 130:4,
7,11

**directions**
45:11,17,

18,22,23
46:7
63:6,14
79:6,10

**directly**
21:8 38:5
113:10

**directs**
75:8 85:9
87:4
88:10
99:7,23
101:14
107:3

**disagreemen
t**
118:24
119:2

**disagreemen
ts**
19:12,16
119:3
121:5,7

**disconnect**
95:5,8,10

**discord**
118:15

**discrepancy**
16:7

**discretion**
11:8,24
14:6
15:24
16:10
55:8

**discretiona
ry**
132:8,22

**discuss**
94:8,9,13
116:14,23
123:6

**discussing**
51:16
116:17

**discussion**
6:16 14:3
22:5
34:14,18,
20 66:18
79:14

**discussions**
27:8 53:9
104:14,18
109:4
119:19

**distant**
25:8
26:12

**distribute**
27:3
38:25
118:25
129:19

**distributed**
17:23
50:2
117:19,23

**distributio
n**
11:7,15
14:19
15:25
16:11,18,
23 20:6
21:8
28:12
31:13
38:8
42:3,10
45:10,16
46:18,19
48:19,24
49:20,24
51:17,19
52:1,8

53:18,19,
23 54:2,
7,13,19,
25 66:21
72:1
88:16
104:20
106:20
108:11
122:25
124:10
126:22
127:1
131:16
132:8

**distributio
ns**
27:9,15
28:8
29:8,14
45:12,14
46:8,14
85:18
100:4
122:17
123:12,17
132:22

**district**
35:9

**divorced**
19:20

**document**
18:3,6,
15,16
21:18,24
22:8,11,
24 34:2
43:1,3
44:6,9,12
47:2,7
55:16,25
56:15
61:12,14
63:23
64:6,13

65:10
68:4,6,
15,24
69:12,24
71:19
72:25
73:4
74:20,22
75:3,5
76:20,21
77:24
78:3,5
85:1,6
86:18,20
87:14,22
88:5 90:2
91:4,11,
24 96:1
98:25
99:17
100:25
101:12
102:5,12,
22 112:4,
10 122:1
124:1
125:20

**documentati
on**
20:19
62:23

**documentati
ons**
62:22

**documents**
22:18,21
39:13
42:14
59:14,16,
24 71:8
74:6 77:7
86:7

**dollars**
17:23



**Door**
13:15,25
14:15
15:3 16:3
25:11
28:22
29:2
51:22
53:6,7
57:5,12,
16,21
58:5
59:17
61:7
62:22
67:5,8,
14,18
81:11,17
115:3,6,
7,19

**download**
21:20

**downloaded**
21:21

**draft**
17:1,3
77:9 79:1
89:12,13,
15 92:7
108:22
129:2

**drafted**
43:20,23
60:18,20,
23 61:3,
14 68:18
71:12
72:3
92:5,9
107:9
113:3
126:16
130:4

**drafting**

77:13
113:6

**driver's**
98:17

**drop**
21:17
42:16

**dropped**
104:23

**Duane**
15:18,20
24:3
30:8,11,
15 53:8
58:3
62:14

**due**
69:24
78:15
129:19

**duly**
5:2

**duties**
7:20,24
10:9
83:11,15,
18

—————————

**E**

—————————

**e-mail**
16:16,18,
25 28:4,
13 33:18,
19 34:21,
23 49:23
65:20,23
66:2
89:11,12,
17,20
92:10
104:18
105:11,

15,17,20,
21
106:17,24
107:15,22
108:5,8,
10,14
109:11,
13,15
110:7,11
111:18,22
112:1,3,
4,9,10,
16,19
114:1,13
116:8,17
124:4,8,
14 125:1,
6,9,22
126:10
127:16,17
128:7,14
129:4,8,
10,14,17
130:12
131:22
132:1,15,
17,19

**e-mails**
50:1,4,7,
13 85:19,
21,25
86:3
104:22

**e-signature**
124:18,22

**earlier**
29:1
40:23
42:15
84:15
106:15
111:3
118:13
120:21

**earns**
41:7

**educational**
98:2

**effective**
46:18

**effectively**
45:15

**effectuate**
71:8

**electronic**
44:3,4,5,
9,12,15
47:13,19
48:5,10
56:21
65:2
68:22,25
72:8
73:18,21,
24 74:4,
7,12 75:5
86:24
87:2,21
88:7 90:8
91:7,8,10
96:16,23
97:11
99:21
103:19
124:22
128:5

**electronica
lly-
generated**
126:4

**element**
125:14

**encounters**
19:23

**end**
25:20
73:11

79:5
86:10
112:21

**Energy**
5:7
38:12,16
50:9

**equation**
35:7

**escaping**
11:3

**estate**
58:18,21
67:7,10,
24 68:1
70:7 81:6

**estated**
67:12

**eventually**
13:18
115:20

**everyday**
52:14

**exact**
24:21
29:11
82:25
83:1
116:17
118:14

**EXAMINATION**
5:4

**examine**
17:24

**examined**
16:20
55:8

**exchange**
80:17

**excuse**
19:24



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 802 of 1079

ALAN LEAVITT                                                August 21, 2025
IN RE: SETH HALDANE CASDEN                                   Index: execute..find

57:19
110:24

**execute**
26:5
126:12
128:16

**executed**
113:19
127:19,25
129:20
130:6

**execution**
113:15

**executive**
11:20
12:5

**exhibit**
21:18
22:3,4
42:21,23
46:24
47:3,8,
17,22
48:10
55:19,20
62:10
64:8,11,
21 68:4,
7,16
71:15,17
72:9,25
73:2
74:20,23
75:19,22
76:18
77:20,22
78:4
79:21,24
80:12
82:2,5,
10,12
84:20,23
85:5
86:15,18

87:9,12,
24 88:2
89:23
90:1,9,24
91:1,18,
21 95:19,
22 98:20,
22 99:12,
15
100:20,22
101:7,10,
22,23,25
102:3,17,
20 103:5,
20,24
104:8,9,
23 105:1,
8,11
107:2,12,
15 108:2,
5 109:7,
10,16
110:4,7,
20 111:6,
23 112:1
113:21,24
114:10
115:11
116:2,5
121:21,25
123:23
124:1
125:16,19
126:9
127:17
128:10,13
129:5,8,
15
130:13,16
131:18,21

**exhibits**
84:15

**expect**
71:11

**expenditure**

8:14,16,
19 21:4,
6,10,11

**expenditure
s**
8:8,10,11
10:21

**expense**
53:15

**expenses**
54:3

**explain**
7:24
19:13

**explaining**
7:20

**Express**
31:14

**extension**
54:3

**extent**
14:2
25:19
27:2
38:23
119:2

_____

**F**
_____

**face**
12:17

**fact**
33:3

**fair**
5:14 35:2
54:10
64:1

**faith**
37:8,9
41:9

**familiar**
7:5 46:4

**family**
19:11,16,
25 25:8
34:11
36:17
52:18
65:11
70:10
118:15
121:7,8,
14

**Fargo**
72:12,15,
17,22

**fast**
80:7
114:4

**father**
19:19,20
24:7,10
94:25
95:3,17

**father's**
53:19

**favor**
7:22 9:9,
24 32:24

**feature**
29:16

**February**
48:6,15
49:14
87:13,18
118:11

**feeling**
26:16

**fees**
15:20
31:22
32:2,3,9

**felt**
17:18
26:11,13
41:12
117:5

**few-minute**
39:9

**fiber**
41:4

**fighter**
35:8

**file**
36:8

**filed**
26:21
28:7,15,
19,23
29:4,7,14
31:18,22
34:16
66:16,22
110:22
123:16

**files**
61:24

**filing**
26:24
27:1,4,8,
19 30:12

**fill**
7:21

**finance**
98:9,15

**financial**
10:3
72:19

**financing**
16:21
29:20

**find**
11:2

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 803 of 1079

ALAN LEAVITT                                        August 21, 2025
IN RE: SETH HALDANE CASDEN                          Index: fine..hand

60:23
105:23
108:9
109:17
127:19

**fine**
39:19
79:17

**finish**
5:25 6:1
61:4

**firm**
30:10
37:17,18

**fist**
42:4

**fit**
14:18

**focus**
130:21

**folder**
61:17,19,
23

**follow**
34:2
45:11,21
46:7
63:6,14
79:6,9

**foreshadows**
94:7

**forget**
36:15

**forgetful**
35:14

**Fortune**
11:20
12:11

**forward**
86:7

**found**
57:19
118:3

**frame**
34:17

**frequent**
17:16
120:12

**friendship**
120:9

**Fritz**
51:9

**front**
6:18
12:14

**full**
6:5 47:20
65:5,8
69:12

**fund**
28:17,20
49:6
58:24
59:7
115:5,12
117:1,3
122:8,13
132:5

**funded**
25:12
115:20,21
116:22

**funding**
114:20

**funds**
11:12,16
49:2,7
58:25
69:24
72:13
117:15,
18,22

118:3

**funny**
118:3

**future**
58:24
59:7

———————

**G**

———————

**gal**
26:2,10
93:18
106:14

**gal's**
106:14

**gamble**
117:23

**gambled**
118:10

**Gamblers**
118:8

**gambling**
118:2,5

**gave**
35:24

**general**
20:13
62:2
93:1,2,6
98:16

**generate**
47:13
89:8,10
96:16

**generated**
47:12
65:1,2
68:20,21
72:11
73:17,19,
24 74:4,

12 96:10,
11,13
99:20
101:21,24
102:13,15

**give**
5:24 6:5
10:23
11:3
29:14
33:22
77:25
78:20,23
80:4
93:20
113:25
120:2
131:23

**Gmail**
106:9

**go-to**
17:20

**good**
5:6 16:21
25:18
39:9,25
40:2 41:4
51:23
57:22
61:8
82:19
83:14
86:13
100:15
117:12
118:1,2

**governing**
45:20

**graduate**
98:5

**Graham**
18:24,25
19:6,9,24
20:2,5

23:22,23
24:1
119:15,
20,21

**Graham's**
19:19

**grant**
8:10,18
13:15
15:1

**granted**
10:21
13:18
15:8 63:5

**Green**
70:24,25
71:1,3
77:1,2

**Gregory**
51:6

**guess**
7:10
32:16,19
34:8
60:17
86:12

**guessing**
35:20
92:19
109:2

**guidelines**
14:18,20
29:22,25
53:4
57:23

**guy**
37:9

———————

**H**

———————

**hand**
59:6



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 804 of 1079

ALAN LEAVITT                                                      August 21, 2025
IN RE: SETH HALDANE CASDEN                              Index: handled..intending

**handled**
17:13,19
23:20

**handling**
26:10

**handwriting**
57:1

**Hansel**
11:25
12:2,4,5

**happen**
41:14
122:25

**happened**
24:15
49:17

**happy**
41:22

**hat**
26:11

**he'll**
36:22
37:13

**head**
35:10

**heads**
61:10
95:6

**hear**
7:8 9:16
67:3
112:7
119:6
120:25

**heard**
18:9
23:10
31:8,11,
15 32:5
33:6
37:14

38:21
118:18,19
119:4
120:24

**held**
83:23

**higher**
41:4

**history**
12:8

**hit**
35:10

**hold**
53:18
58:5
70:19
71:3
105:4

**holder**
10:12,13

**holdings**
80:16,23,
25 81:1,
3,4,6,7,
14,23
83:24

**Hologenix**
37:14,16,
22,25
38:6,9,
13,15,19,
22 39:3,6
41:7
78:21,24
117:20

**home**
100:16,
17,19

**hope**
37:12
41:8
131:2

**hoping**
39:17

**horrible**
23:16

**hour**
39:12

**hundred**
17:22
101:1

───────────

───────────

**I**

**idea**
19:22
33:16
41:20,22
71:1
88:19
119:17

**identificat
ion**
22:4
42:23
47:3
55:20
64:8 68:7
71:17
73:2
74:23
75:19
77:22
79:21
82:2
84:20
86:15
87:9,24
89:23
90:24
91:18
95:19
98:22
99:12
100:20
101:7,25

102:17
105:8
107:12
108:2
109:7
110:4
111:23
113:21
116:2
121:21
123:23
125:16
128:10
129:5
130:13
131:18

**II**
58:6

**Illinois**
6:8 44:19

**imagine**
99:4
128:7,9
129:4

**immediately**
27:4

**inadvisable**
116:11

**inaudible**
18:2

**include**
81:10

**includes**
47:20
60:11

**including**
59:14

**individual**
43:12

**inform**
16:4

**information**
30:5

**informed**
25:2

**initial**
57:11,16

**initiate**
92:20,23

**input**
63:21

**inputted**
44:5

**instance**
51:20

**instances**
100:6

**institution**
10:3
72:20

**instruct**
109:1

**instructed**
108:21,25

**instruction**
5:23
72:14

**instruction
s**
57:10
69:2 84:9
93:21

**instrument**
45:21

**intended**
42:11
45:18
51:17
78:14
85:17

**intending**



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 805 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                        Index: interaction..lawyers

49:19

**interaction**
17:14
23:12

**interactive**
73:12

**interest**
13:19,20,
25 14:8,
9,14
70:18
71:3
78:16
80:18
83:22
129:19

**interested**
34:10

**invest**
13:25
14:15
15:3 16:3
29:3 67:5

**invested**
37:21

**investigate**
52:22

**investing**
54:8
67:18,22
115:17

**investment**
11:23
13:15
14:17,23,
25 15:25
25:11,18
28:21
29:2
49:12
51:22,24
52:5,11,
15,19,23

53:7,13,
20,24
54:4
57:6,11,
16,20,22,
23 59:17
60:3 61:8
62:13
63:8,16
67:7,8,9,
24 68:2
69:4 70:8
71:7 79:8
80:24
81:1,11
82:15,16,
17,20,23
83:2,4,
11,16,18
115:2,20
116:10
117:1,3,
13 132:13

**investments**
24:14,16
25:3,21
30:19,21
34:10,15
53:6,8,10
58:13,18,
19,20
81:9,18,
23 82:18
98:10
117:12
127:10

**investor**
25:13
51:21

**involved**
10:2 15:5
18:20
26:10
32:25
34:5

36:19
37:7
81:25
84:13
108:20
117:11

**involvement**
81:21
120:9

**involves**
121:6

**issue**
11:6,9,14
13:4
16:15,22,
24 28:22,
24 54:9

**issued**
54:14,18
55:4
83:23
94:10

**issues**
12:24
34:11
120:22
121:7,8,
13,16,17

_____

**J**

_____

**J.P.**
51:9

**January**
77:21
78:8
86:23
91:3,13
113:14
126:2
127:23
132:19

**Jocelyn**
15:14
16:6 17:4
53:2,3
61:6,10
114:24

**Jocelyn's**
15:15

**Joel**
33:8,11,
14

**John**
51:2

**judgement**
40:10,14,
15,18
55:7

**July**
45:15
46:19
55:24
57:17
71:15,24
75:23
88:3 98:1
101:11
103:24
124:9,10
125:1
129:25

**jumbled**
28:9

**June**
74:21
80:3
99:16
100:24
103:5,22,
23
104:11,
16,19
105:22
106:17,19
107:3

_____

**K**

_____

**keeping**
20:18,19

**kind**
17:17
26:12,13
94:7

**kindly**
126:11

**knew**
40:15
51:4
118:21
123:5

**knowledge**
111:12

_____

**L**

_____

**land**
67:25

**language**
71:10
77:12

**larger**
56:4
127:6

**largest**
12:12

**Las**
117:23
118:11

**laugh**
117:25

**lawsuit**
38:17,20

**lawyers**
123:9

ALAN LEAVITT
IN RE: SETH HALDANE CASDEN

August 21, 2025
Index: learn..loan

**learn**
30:5
40:17
88:20

**learned**
123:12

**Leavitt**
5:1,6
6:6,19
10:25
12:14
14:13
15:10
21:19
22:7
39:15
40:6
42:21
46:1
47:20,23
55:17,23
56:16
63:4
64:10
65:6,9
66:20
71:20
76:17
78:5
80:4,10
82:4 85:6
86:20
98:3
104:25
108:4,7
109:10
110:8
111:25
112:2
113:24
114:1,11
115:11
116:4,5
123:25
124:2,3
125:19,20

126:9
128:12,13
129:8
130:15,
17,18
131:20,21
133:1

**LEAVITT0000
005**
105:1

**LEAVITT0000
011**
107:17

**LEAVITT0000
046**
22:19

**LEAVITT0000
068**
22:19

**Leest**
114:16

**left**
63:22

**legal**
37:6
50:19,20,
22 52:24
53:1 58:2
61:5,10
62:12
84:13

**legally**
65:12

**lend**
37:11

**lent**
36:1,3
37:8 38:1
41:9,11

**letter**
11:6,7,
10,15

13:4,8
14:7,15
16:15,22,
24 25:25
26:6
43:18,20,
23 45:17
48:6,13,
25 54:9,
14,18
55:4
57:3,5,7
60:18,20,
24 61:3
64:2,12
65:14
66:4
67:17
68:18
69:3,21
71:11
72:3
74:20
75:15,22
76:4,23
77:10,13,
20 79:1,
24 82:6
84:23
86:22
87:12
88:3,10,
23 89:1,
6,8,10,
12,13,16
90:11
91:1,13,
21 92:5,
7,9,12
95:22
96:3,23
98:21
99:6,15,
23
100:10,
14,23
101:11

102:3,15,
20 103:19
105:24
106:2,19
107:25
108:9,12,
16,19
109:18,23
110:2,14,
16,21
111:7,12
112:22
113:6,10,
15,19
124:10,
17,21
125:8,12
126:1,11,
20
127:19,
22,25
128:1,5,
15 129:2,
20,24
130:4,6,
10 131:2,
13

**letterhead**
74:21
75:23
88:4

**letters**
17:6,8
26:18
65:17,20
94:10
96:17
97:4,9,11
99:3
100:4,9
107:9
108:22
113:3
126:16
128:20,24

**liable**
45:24

**license**
98:17

**licenses**
98:14,16

**limited**
30:4
59:15

**Lincoln**
69:13

**lion**
89:18

**lionofzion4
77@cs.com**
105:18
124:15

**lionofzion4
77@cs.com.**
66:1

**live**
10:4

**living**
52:14
53:20
54:2

**LLC**
70:5,6,
18,24,25
71:3
77:1,2
80:17
81:10

**loan**
28:16
35:22,24
36:4 39:2
41:5,15,
24,25
42:4
129:18

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 807 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                           Index: loaned..members

**loaned**
  35:16
  37:24
  38:5

**loans**
  35:25
  39:5

**LOD**
  112:23

**long**
  5:17
  39:15,23
  48:20
  65:12
  94:18

**longer**
  19:10,14
  29:7
  33:23
  34:25
  39:21

**looked**
  17:18
  26:13
  50:1,4
  62:19
  84:15

**loss**
  45:25

**lost**
  62:21
  118:11

**lot**
  8:1 36:19
  93:15

**Love**
  86:8,11

**loves**
  119:17

**LP**
  57:12
  58:6

  62:13

**LSG**
  80:16,21,
  23,24
  81:14
  83:23
  129:19

**Luu**
  13:22
  14:2,10
  15:10,16
  18:7
  39:23
  40:1 53:3
  54:20
  55:5,12
  79:17
  105:2,3

———————

**M**

———————

**machine**
  88:19

**made**
  57:15
  66:21
  67:21
  100:6,8,9
  122:25
  132:13

**mail**
  65:17

**maintain**
  99:2

**maintained**
  99:4

**make**
  8:9,17
  10:20
  11:13,17
  14:17,22,
  24 28:8,
  11 29:8

  30:18
  31:9,12,
  17 41:4
  49:10
  56:4
  57:16,20,
  22 84:2,6
  86:9
  96:19
  100:10
  108:11
  122:17

**makes**
  74:3

**making**
  132:21

**management**
  63:7,16
  79:8

**March**
  91:22
  92:12
  95:23
  114:25

**mark**
  22:3,18
  42:21
  55:19
  64:11
  72:25
  74:20
  75:21
  79:24
  82:5
  84:23
  87:12
  88:2 90:1
  91:1,21
  95:22
  98:19
  99:14
  100:22
  101:10
  102:2,19

  107:15
  109:9
  110:6
  112:1
  113:24
  121:24
  124:1
  125:18
  129:8

**marked**
  22:4
  42:23
  47:3,7
  55:20
  64:8,20
  68:7,15
  71:17
  73:2
  74:23
  75:19
  77:22
  78:4
  79:21
  80:12
  82:2,11
  84:20
  85:4
  86:15
  87:9,24
  89:23
  90:24
  91:18
  95:19
  98:22
  99:12
  100:20
  101:7,25
  102:17
  105:8,10
  107:12
  108:2
  109:7
  110:4,20
  111:23
  113:21
  116:2

  121:21
  123:23
  125:16
  128:10
  129:5,15
  130:13
  131:18

**market**
  58:25

**marking**
  68:3
  71:14
  76:18
  77:19
  86:17
  104:25
  108:5
  116:5
  128:13
  130:16
  131:21

**matter**
  33:3

**matters**
  62:12
  63:7,15
  79:7

**maturity**
  80:18

**means**
  22:20
  27:12
  35:7
  49:10
  71:2,6

**meant**
  111:2

**member**
  25:8

**members**
  70:10
  121:14



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 808 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                              Index: memory..northern

memory
    22:23
    33:9 47:8
    66:17,23
    76:5 77:2
    88:15
    90:20
    107:8
    113:2
    126:15
    128:19

mention
    28:1

mentioned
    32:5
    118:13
    120:21

message
    28:13
    29:18
    130:17

messages
    50:7
    131:1,4,9

MET
    38:20,22,
    25 40:6
    49:25
    50:5,8,17
    117:16,20

method
    97:4,8

Microsoft
    62:5

middle
    47:23
    62:10
    69:3

million
    40:9

millions
    35:10

mind's
    23:16

minute
    113:25

minutes
    39:20
    40:1
    123:19

misconduct
    45:24

misundersta
nding
    50:15

modify
    78:14

Monday
    113:13

monetary
    16:11
    21:8
    27:15
    42:10
    52:8
    53:18,19,
    23 54:2,
    7,13,19,
    25 84:16
    85:18
    117:6,9

money
    8:20 27:3
    35:16,22
    36:2
    37:12,21,
    24 38:1,
    5,25
    41:7,9,18
    42:7,11
    52:9,22
    53:12
    54:17
    55:1
    104:15

118:25
    121:8
    122:10
    127:8

Monica
    69:14

monies
    52:12

month
    92:18,19
    93:3,4
    97:24
    104:1,3

monthly
    45:14
    46:13,18
    120:11,13

moral
    41:4

morning
    5:6

Morris
    15:18,20
    24:3
    30:9,11,
    15 53:8
    58:3
    62:14

mother
    19:20
    54:3
    94:17,22

motivation
    26:15

mouse
    59:4,6

move
    86:7

Multiple
    5:7
    38:12,16

50:9

mutual
    18:5

_____

N

_____

Nai-te
    43:6,7
    105:12
    106:12
    126:11

name's
    76:1

Natalie
    62:25
    63:1
    110:10
    132:2

National
    69:23

needed
    7:22
    11:12

nephew
    7:1 92:25

Nicole
    5:7 16:5
    18:4,8
    23:9,17
    33:6 35:6
    36:17
    39:4
    46:20
    56:14
    59:5 64:7
    68:8 72:2
    73:15
    77:14
    87:8
    112:8

North
    69:13

northern
    10:11
    17:9,11,
    15,20
    23:12,18
    24:3
    26:3,5,8,
    11,17
    33:23
    43:8,9,
    12,13,16
    45:9,14
    46:17
    48:7,13,
    25 63:2
    65:14,18,
    21,24
    66:5
    69:22,25
    72:5
    75:8,16
    79:11
    82:6
    84:3,11
    85:9
    86:23
    87:5,16
    88:10,24
    89:2,7,9,
    14 90:12
    91:14,22
    92:13
    94:11
    96:4,24
    99:3,7,23
    101:3,14
    102:7,24
    103:9
    106:3,8,9
    107:4,9,
    25 108:6,
    17 109:5,
    12,16,24
    110:2,8,
    15 112:4,
    12 122:12
    124:9,19,

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 809 of 1079

ALAN LEAVITT                                August 21, 2025
IN RE: SETH HALDANE CASDEN
Index: note..people

25 125:12
126:2,10
127:13
128:2,14,
15,20,24
129:3,9,
17 130:7,
11 131:2,
13 132:2,
18

note
36:10,11,
14 37:11
78:7,10,
15,17,20,
24 80:17
83:22
84:7
112:21,24
126:21

notes
85:16
100:3

notes'
123:20

notice
22:17
33:22
45:16

notices
58:25

NTDE
46:6 66:7
69:4
71:23
73:8
79:6,9
80:16
83:21
90:12
112:23

number
69:21
70:2,17,

23 71:4,6
73:13
106:9
130:20,23

numbers
79:16

Numeral
57:12

─────────

O

─────────

object
26:8,17

objection
13:22
54:20
55:5,12

obligations
60:11
94:14

obtain
41:18
128:4

October
26:22
66:5
84:24
85:8
109:21
110:13,20
131:12

offhand
96:25

office
6:14

online
20:20

open
5:17 6:21
21:17,18

operating
70:5,24

opinion
119:16

opportunity
8:17

order
11:14,18

ordinarily
48:1

ordinary
52:8

original
79:3
96:15,21

outline
130:18

outsider
17:18

outstanding
83:22

owned
69:19
70:8,9
81:14
116:10

owner
81:6

owns
81:3

─────────

P

─────────

p.m.
133:4

pack
37:13

pages
22:10

paid
30:21
36:1,6,18

painful
39:17

paragraph
44:21,22
45:1,3,6
46:9
58:23
59:12
62:9 63:3
66:6
71:22
73:7
78:13
79:5
80:15
82:14
83:20
87:4

parameters
57:20

parenthetic
al
73:11,12

park
35:9

part
22:21
45:20
58:12
112:7
132:4

parted
118:23
119:8

participate
114:23

Pascatto
81:15

Pascotto

24:13
25:1,20
34:13,20
51:21
60:2,5
62:14
81:20,24
120:22
121:10

Pascotto's
80:24

pay
27:13
30:22
31:1,4,6,
22 32:1,9
36:14,21,
22 37:13
40:24
41:6,13,
18 42:4,7
53:19,23
54:2,13,
17 83:21
84:7
117:15

payable
78:15

paying
32:3

payment
31:9,13,
18 96:6

payments
30:18

pays
15:20

people
10:14
23:15
24:3
106:10,11



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 810 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                              Index: percent..purpose

percent
  43:2
  70:18
  71:3
  78:16
  80:18
percentage
  36:16
  70:12
perfect
  56:7
period
  28:9
  30:14
  104:1,4
permit
  29:3
permitted
  27:15
person
  17:21
personally
  40:7,10,
  14 70:14
pet
  54:13
ph
  23:18
  24:13
  31:7
  51:7,11,
  14
phone
  10:12
  12:14
  13:1
  29:18
  34:22
  50:4
  72:14
  104:22
  111:22

120:18,20
130:20,23
phones
  50:1
Pine
  70:5,6,7,
  18 81:10
Place
  6:8 44:19
plan
  28:17
  122:8,13
point
  9:2 15:7
  24:12
  53:16
  106:13
  109:3
  117:6,9
  132:8,22
popped
  18:11
popping
  18:19
position
  7:22 9:4
  118:21
possibility
  114:20
Possibly
  61:16
preceded
  19:7
prefer
  21:20
prepare
  17:5
  88:23
  89:6
  126:11
  128:15,25

prepared
  89:1
  126:16,20
  128:20
presumed
  5:13
pretty
  65:22
previously
  69:19
  110:19
principal
  48:14
  66:8
  71:24
  75:9
  83:22
  84:17,18
  85:9
  87:5,17
  88:11
  90:13,17,
  21 91:15
  92:14
  96:4
  99:8,24
  101:4,15
  102:8,25
  107:4
print
  100:12,17
printed
  20:19,20
  51:4
  100:13
printouts
  20:23
prior
  26:24
  27:4,8
  30:11
privilege
  13:23

14:1
privy
  119:13
  127:10
probe
  14:8,10
problem
  118:5
proceed
  6:2
  116:11
processing
  62:5
produce
  22:22
produced
  74:15
  124:2
professiona
l
  63:18,19
  83:8,9
program
  89:15
  97:10
promises
  86:9
promissory
  36:10,11
  37:11
  78:7,10,
  15,20,24
  80:17
  83:22
  84:7
prompted
  132:1,10
proof
  36:8
property

67:12,14
  68:1
  69:14,18
protector
  23:3,6
provide
  16:11
  69:21
  75:14
  103:16
provided
  59:14
  77:5
psychologis
t
  55:3
purchase
  24:14,18,
  19 25:3
purchasing
  25:20
  34:14
purely
  32:19
purge
  24:16,18
purpose
  48:18
  49:23
  66:24
  75:12
  85:13
  87:7,19
  88:13,16,
  21 90:14
  91:16
  92:15
  96:6 99:9
  100:1
  101:5,16
  102:9
  103:1



Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 811 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                              Index: pursuant..recognize

**pursuant**
  45:6  63:4

**pursue**
  61:9

**put**
  8:15  43:2
  44:8,11
  59:4
  100:14
  105:4

——————————

**Q**

——————————

**question**
  5:11,13,
  18  6:2,4
  14:11
  41:11
  49:1,5
  100:15
  121:19

**questioned**
  51:22

**questioning**
  116:21
  132:12

**questions**
  5:9,25
  6:1  133:1

——————————

**R**

——————————

**raise**
  104:2,12
  126:25

**Ramwell**
  51:11

**range**
  130:25

**rare**
  119:22

**rate**
  78:16
  80:18

**reached**
  25:6,9
  38:16

**reacted**
  123:11

**read**
  9:1
  18:14,16,
  23  22:8
  46:4
  47:4,7
  56:1,2
  63:24
  64:3
  68:17
  76:4,20
  80:4  82:9
  107:19
  113:25
  114:6,7
  129:10

**reading**
  22:7  64:6
  126:17

**ready**
  41:13

**real**
  37:12
  58:18,21
  67:7,10,
  12,14,24
  68:1  70:7
  81:6

**reason**
  35:1,3
  103:18
  113:5

**reasons**
  54:8

**recall**
  9:11
  10:15
  13:11,13
  15:7
  16:1,9,13
  17:11,13,
  25  18:1,
  17  19:15
  20:15
  22:16
  23:1
  25:19
  26:3,9,20
  27:5,17
  28:2,6,18
  30:6  31:5
  33:7,25
  34:4,17
  35:11
  40:11,16,
  19,22
  42:1
  44:7,10,
  13,17
  46:5,11,
  16,20
  47:15,16
  48:8,12,
  21  50:3
  51:1  52:5
  53:11
  57:3,5
  59:16,19
  61:11
  65:19
  67:25
  68:17
  69:1
  71:5,13
  72:2,4,
  16,20
  74:1,8,
  16,18
  75:18
  76:22
  77:7

  78:12
  84:5,8
  85:20
  87:8
  88:14,25
  90:15,18
  91:12,17
  92:6,16
  96:22
  98:13
  99:10,11
  102:10,16
  103:17
  104:13,17
  106:4,6,
  13,25
  108:14,
  18,24
  109:6,25
  110:3,18,
  23  111:2
  112:18
  113:12,20
  114:13,
  17,18,19
  115:1,8
  116:1,17,
  24  120:5
  122:6
  123:8,11
  125:6,14,
  15  126:17
  127:14
  128:3
  129:1,11,
  14  130:5,
  8  131:4,
  17  132:16

**receive**
  27:9,15
  71:2  84:9
  123:12
  129:2

**received**
  42:10
  48:23

  58:24

**receiving**
  46:13
  59:16
  77:7

**recently**
  74:5,9,11

**recess**
  40:4
  86:14
  123:22

**recognize**
  21:24
  43:1,18
  47:2
  55:25
  56:15
  64:13,20
  68:6,15
  71:19
  73:4
  74:22
  75:3
  77:24
  78:3,5
  80:12
  82:11
  85:1,4,6
  86:20
  87:14
  88:5  90:2
  91:4,24
  96:1
  98:25
  99:17
  100:25
  101:12
  102:5,22
  105:15
  107:22
  109:13
  110:11
  124:4
  125:22
  131:22

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 812 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                          Index: reconveyance..resulting

reconveyanc
e
    69:12

record
    6:16 22:5
    55:13
    66:18
    69:24
    79:14,16
    92:10

records
    20:16
    85:16
    112:24

refer
    39:22

reference
    78:7

referenced
    59:25
    90:20

references
    44:21
    77:1,4
    80:15

referencing
    69:15
    72:18
    73:14
    80:20,22
    90:17
    110:13

referring
    14:21
    23:7 34:7
    37:5
    44:23
    78:9,18
    132:7

refill
    39:24

reflect

70:18

refrain
    132:21

refresh
    33:8 47:8
    66:16,23
    77:2
    88:15
    90:20
    107:8
    113:2
    126:15
    128:19

refreshes
    22:23
    76:5

refuse
    16:10
    26:5

refusing
    20:5

related
    62:12

relating
    63:7,15
    79:7

relationshi
p
    6:24
    17:17
    95:8,13

relative
    21:11

relevance
    60:3

relevant
    8:8 45:20
    59:14,16,
    24

remember
    8:2,3,5

16:5 19:5
49:17
61:6
64:22
66:14
100:2
101:6,18
103:3
104:5
106:8
109:3
111:4

remembering
    23:17

remove
    78:17
    112:23

reorganizat
ion
    28:17
    122:9,13

repaid
    41:15,24

repay
    129:18

Repeat
    124:20

rephrase
    5:12
    14:11

replaced
    9:21
    23:22
    33:5

replacing
    9:18

report
    130:18

reporter
    5:24
    42:17
    76:14

represent
    15:21
    30:11
    50:20

representat
ive
    63:1

represents
    50:25

reputation
    26:14

request
    13:8
    14:14
    15:24
    16:3,12
    17:24
    18:1
    28:11
    48:23
    52:1,9
    66:21
    106:18
    122:8

requested
    17:22
    49:20
    51:18
    52:7
    83:14

requesting
    16:18
    104:3,15

requests
    20:5 28:8
    49:24
    104:20
    107:9

required
    45:10
    46:7
    63:6,14
    79:6,9

research
    62:20

RESERVED
    133:6

resign
    33:17

resignation
    35:1

resigned
    34:24
    35:3
    118:21
    119:5,6

respect
    45:11
    46:8
    63:7,15
    74:17
    79:7
    84:11

respond
    106:24
    131:6,8

responds
    108:11
    113:13
    126:19

response
    106:18

responsibil
ity
    32:22

restated
    70:5

resulting
    7:6,9,13
    8:25 9:6
    10:10
    19:2
    20:2,10
    21:1,25
    23:5,13,



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 813 of 1079
ALAN LEAVITT
IN RE: SETH HALDANE CASDEN

August 21, 2025
Index: retire..Seth

24  24:4
32:13
33:24
39:3,6
44:23
45:4,25
61:18
81:21,24

retire
97:21

retired
97:22,24

retirement
97:19

reveal
14:3

review
11:13
18:2,5,10
21:3,19
53:7,9
68:24
127:12

reviewed
77:6

reviewing
21:6,9
59:19

rings
10:12

Roach
105:11,23
106:7,18
107:15
109:5
127:18

Rock
70:5,6,7,
18,24,25
71:1,3
77:1,2
81:10

role
11:25
15:6
23:24

Roman
57:12

Ronnett
105:11,
22,23
106:7
108:10
109:5

room
6:13  15:9

run
52:24

———————
S
———————

Santa
69:13

savvy
25:13
51:21

scares
35:11

Schiavone
62:25
132:2,11,
15

school
53:24

Scott
51:13

screen
21:19,22
42:15
46:25

scroll
22:2  56:9
105:20

107:19
112:19
115:16
129:23
131:1

scrolling
22:14
125:24

SDV
115:5,11

search
100:16

Section
45:18,19
46:21

secure
41:13

Selvado
51:6

send
16:17
17:8
28:12
33:18,20
48:14
62:22
65:24
66:8
71:23
75:8  85:9
87:5,17
88:11
89:2,9,13
90:12,16
91:14
92:13
96:4
99:7,24
101:3,14
102:7,24
103:9
105:5
107:4
109:23

110:16
113:9,18
124:17,
20,21
126:3
127:22,25
130:1,6,
7,9,10
132:1,10

sending
106:2
107:24
108:16
125:12
131:2,13

sense
11:21

sentence
63:4

separate
19:22

September
73:1
102:21
104:10,
11,16,19

series
69:2

services
10:5
54:17

Seth
5:8  6:24
7:1,5,9,
12,16
8:15,25
9:6,9
10:9,10
11:11
18:25
19:2,13,
24  20:2,
4,9  21:1,

12,25
22:1
23:5,12,
24  24:2,
4,7  26:21
27:7,14
30:12
32:13,24
33:14,21,
24  35:16
39:2,5
43:17
44:23
45:4  46:2
48:15
49:1
50:25
61:18
66:8  70:9
71:24
73:13
75:9
81:21,24
83:4
84:10
85:10
87:6,18
88:11
90:13
91:15
92:14,17
96:5
99:8,24
101:4,15
102:8,25
103:10
105:11,22
106:21
107:5
109:16
115:17
116:9
119:10,
20,23
120:22
121:11
126:3,10,



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 814 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                           Index: Seth's..speculation

19 130:1,
19 131:1

**Seth's**
19:19
27:13
37:17

**settlement**
38:16

**share**
21:19
42:15
55:16
70:21

**shares**
70:11
73:11

**sharing**
21:22
53:18
105:4

**Shiverelli**
23:18

**short**
130:17

**shoulder**
36:21

**show**
42:14,20
46:24
47:17
64:10
68:3
71:14
72:24
74:19
75:21
77:19
79:23
84:22
86:17
87:11
88:1
89:25

90:25
91:20
95:21
98:19
100:22
101:9
102:2,19
107:14
108:4
109:9
110:6
111:25
113:23
116:4
121:24
123:25
124:6
125:18
128:12
129:7
130:15
131:20

**showed**
90:3

**showing**
76:17
82:4
104:25
105:10
110:19
121:23

**sic**
45:13,15
46:2
74:20
75:22
77:20
78:4
95:24
112:2
128:13

**side**
13:15,25
14:15
15:3 16:3

19:25
25:11
28:22
29:2
51:22
53:6,7
57:5,12,
16,21
58:5
59:17
61:6
62:22
67:5,8,
14,18
81:11,17
115:3,6,
7,19

**sign**
20:8,11
30:15
48:1,4
63:23
65:12
69:11
70:4,23
74:17
97:4,8
128:25

**signature**
43:25
44:1,3,4,
5,9,12,15
47:10,14,
19 48:5,
10 55:23
56:18,21
64:2,24
65:3 66:5
68:19,22,
25 72:8,
10 73:16,
18,21,25
74:4,7,
12,15
75:6 76:2
79:2,3

86:24
87:2,21
88:7 90:8
91:7,8,10
96:8,9,
11,15,16,
21,23
97:11
99:19,21
101:19,23
102:11,
13,14
103:19
112:23
113:7
124:23
126:4,21
128:6
129:3
133:6

**signed**
43:21
46:1
60:25
61:1,12
64:3,5
65:10
69:22
74:6,14
125:8
128:5
130:10

**sit**
50:11

**sitting**
36:20
49:13

**situated**
36:22

**situation**
37:2,4,5

**skills**
61:20
74:2

**social**
55:2

**son**
7:2,3

**son's**
53:23
54:3

**Sounds**
40:2

**source**
16:21
118:2

**sources**
50:19

**speak**
24:4,7,10
92:17
93:2,25
120:6,11,
18

**speaking**
24:2

**specific**
30:20
34:1 69:5
84:16
120:2

**specificall
y**
7:19
29:19
30:24,25
51:25
93:3
119:11
123:6

**specifics**
14:25

**speculation**
54:21
55:6

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 815 of 1079

ALAN LEAVITT                                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                               Index: spend..talking

**spend**
  20:25
  21:5,9

**spendthrift**
  27:11
  30:2 31:1

**split**
  70:10

**spoke**
  10:14
  13:17
  15:12
  23:25
  93:7

**spoken**
  50:21,24
  51:2,6,9,
  11,13
  94:16,19,
  21

**stamp**
  42:25
  47:1
  64:12
  68:4
  72:25
  74:21
  75:24
  76:18
  79:25
  84:24
  86:18
  88:2 91:2
  95:23
  98:20
  105:1
  107:16
  108:7
  109:10
  110:8
  112:2
  113:24
  116:5
  124:2

  125:19

**Standard**
  89:17

**start**
  103:5
  107:18

**starts**
  108:8

**state**
  57:7
  59:13
  66:6
  82:14
  98:6

**stated**
  90:12

**statement**
  32:5 46:9
  63:11
  116:14

**statements**
  127:12

**states**
  45:20
  46:6 58:5
  70:23
  71:22
  73:7
  78:14
  83:21

**stating**
  55:12
  113:14
  126:11

**step**
  16:19
  32:21

**stepfather**
  24:11
  117:11

**steps**

**34:1**
  48:22,24
  51:18
  52:3

**stipulation
s**
  10:1

**stop**
  32:15,18,
  20 34:2
  53:18
  105:4

**stopped**
  100:7

**strife**
  118:15

**stroke**
  9:14
  32:23
  33:2,3
  35:1,3,12

**stuff**
  11:22
  36:20

**subject**
  115:4

**submit**
  25:25

**submitted**
  26:4,18

**subscriptio
n**
  59:15,19

**substance**
  93:10

**substitutio
n**
  69:12

**sued**
  38:12
  40:7

**suing**
  38:22

**Sullivan**
  5:5,7
  6:17
  13:24
  14:5,11,
  12 15:17
  18:13
  22:6
  40:2,5
  42:24
  47:6
  54:23
  55:7,10,
  15,21
  64:9
  66:19
  68:11
  71:18
  73:3
  75:2,20
  76:13,16
  77:23
  79:15,18,
  22 82:3
  84:21
  86:16
  87:10,25
  89:24
  91:19
  95:20
  98:24
  99:13
  100:21
  101:8
  102:1,18
  105:9
  107:13
  108:3
  109:8
  110:5
  111:24
  113:22
  116:3
  121:22

  123:24
  125:17
  128:11
  129:6
  130:14
  131:19
  132:25

**sum**
  93:10

**supply**
  12:10,12

**supposed**
  36:14

**suspend**
  45:14
  46:18

**switch**
  39:13

**sworn**
  5:2

———————

                T

**taking**
  5:24
  34:10

**talk**
  6:3 10:8
  21:12
  26:25
  34:22
  93:1,5
  95:2
  119:4,6

**talked**
  57:4
  81:16
  106:14
  119:21

**talking**
  29:1 45:5
  52:3



Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 816 of 1079

ALAN LEAVITT                                                    August 21, 2025
IN RE: SETH HALDANE CASDEN                                      Index: tax..trust

64:23
74:9

**tax**
62:12

**team**
50:19,20,
22 52:24
53:1 58:2
61:6,10

**technique**
96:14

**technologic
al**
61:20
74:2

**Technologie
s**
5:8
38:12,16
50:9

**Tedford**
51:2

**telephone**
50:12

**tells**
129:17

**term**
23:9

**terminology**
23:8 37:1

**terms**
36:11

**terrific**
93:18

**Terry**
6:6 47:20
48:2
55:22
65:6,12
105:24
108:10

109:18
113:15
126:12
128:16
129:20

**Terry's**
112:22
126:20

**testified**
5:2

**text**
27:22,23,
25 28:13
29:17
49:22
50:7
131:4,8,
12

**texted**
81:16

**therapy**
54:17
55:2

**thing**
23:17
28:5
34:12
35:5
114:6

**things**
8:4 60:3

**thinks**
121:10

**thought**
16:21
25:10,14
39:18
50:14,16
62:21
81:18
105:3
117:12
127:5

**thoughts**
10:24
104:6

**thousand**
17:23

**throw**
35:15

**time**
5:16 9:2,
3,8 10:25
13:18,19
14:16
15:7 16:9
18:9
19:17
20:25
21:5,9
24:12,14,
21,24
28:9
29:11
30:14
31:5
34:17
35:21
39:9 41:8
42:9 52:6
88:19
93:7
94:18
104:1,2,
12 116:11
122:3
125:14
132:23
133:2

**times**
15:23
17:3
35:10
92:19
93:3,4

**title**
43:15

45:19
46:21
69:23

**today**
5:10
22:3,12
33:4
42:21
49:13
50:11
64:20
76:21
80:13
82:11
85:4
88:21
93:21
111:3
112:17
122:1
129:15

**told**
7:12 8:6
10:20
27:1
30:23
52:13,17,
21 53:12,
17,22
54:1,6,
12,16
66:15,20
93:12

**top**
44:18
55:22
127:16

**total**
103:23
104:10

**totally**
70:9

**transfer**
73:10

115:12

**Transit**
60:14

**true**
46:9
63:11
113:7

**trust**
7:6,9,13,
21,25
8:20,21,
22,23,25
9:2,6,19
10:6,9,
10,11,12,
13 11:12
13:25
14:24
15:2,6,
22,25
16:18
17:9,11,
13,15,20,
23 18:5,
14,16,20
19:2,10
20:2,10,
17 21:1,
15 22:1
23:3,6,8,
12,13,15,
19,21,23,
24 24:3,
5,8,14,
17,23
25:3,21
26:3,5,8,
11,15,17,
19 27:10,
11,12,16,
25 28:8,
12,16,20
29:3,7,
13,23
30:2,3,18

Case 2:23-bk-16904-BR    Doc 366-1    Filed 10/08/25    Entered 10/08/25 14:39:07    Desc
Declaration of Nicole A. Sullivan    Page 817 of 1079

ALAN LEAVITT
IN RE: SETH HALDANE CASDEN

August 21, 2025
Index: trust's..wanted

31:1,4,
10,13,14,
18,22
32:1,3,8,
13,21
33:5,23,
24 34:1,
2,6,15,24
38:9,24
39:3,6
42:4,6,10
43:9,10,
12,13,16,
17 44:22,
24 45:4,
7,8,9,10,
14 46:2,
17 48:7,
13,25
52:25
53:1,5
57:8,15,
18,21,24,
25 58:6,
11,13,14,
16,18,19,
21 61:18
63:2,5,8,
16 65:15,
18,21,25
66:5
67:22
69:19,22,
25 70:8,
13,16,19
71:4 72:6
74:17
75:8,16
78:17,20,
23 79:8,
11 80:17,
25 81:2,
3,4,21,24
82:7,19,
20,24
83:3,6,8,
12,14,16,

17,19,23
84:3,11
85:9,18
86:23
87:5,16
88:10,24
89:2,7,9,
14 90:12
91:14,22
92:13,18,
24 93:4
94:1,6,8,
11,14,22,
25 95:17
96:4,24
99:3,7,23
100:4
101:3,14
102:7,24
103:9,10
106:3,9,
10 107:4,
10,25
108:6,17
109:5,12,
17,24
110:2,8,
15 112:5,
12
114:16,20
115:23
116:10,22
117:1,14,
19,23
118:25
119:24
120:2,10
122:10,
13,14,17,
25
123:12,16
124:9,19,
25 125:12
126:3,10
127:4,5,
8,13
128:2,14,

15,20,25
129:3,9,
18 130:7,
11 132:2,
5,18

**trust's**
9:10
115:22

**trustee**
10:1,2
43:11,12
45:9,21,
22,24
57:9
63:5,14,
19 69:12,
23 83:9
116:11

**Tucker**
33:8,11,
15

**turn**
12:17,23
13:7

**turned**
8:14 14:6

**twenty**
97:22

**type**
14:25
67:6
71:10
120:9

**types**
58:20

— U —

**U7034689**
73:13

**ultimately**
9:5 15:2

**understand**
5:11 23:9
29:24
54:22
115:18

**understanding**
15:4
67:22
70:1,3
122:16,
20,24
127:7

**understood**
5:13
122:19

**unfamiliar**
32:6

**Unit**
69:13

**unsigned**
76:23

**update**
58:25
70:17

**upright**
37:9

**upset**
117:2,4

— V —

**vacation**
52:18

**Vaguely**
131:25

**valid**
26:14

**Vegas**
117:23
118:11

**vehicle**
67:9

**Ventures**
15:3
57:12,16
58:6
59:17
67:6,8,
14,18

**verbally**
7:18
27:20

**verbiage**
118:14

**verify**
61:7

**versus**
83:16

**video**
120:18

**view**
21:21
117:6,9

— W —

**wanted**
14:22,24
16:14
20:20
22:11
25:2
28:11
33:1
34:6,11
35:15
52:13,17,
21 53:12,
17,22
54:1,12,
16 60:23
114:5,6,7



ALAN LEAVITT
IN RE: SETH HALDANE CASDEN

August 21, 2025
Index: waste..zoomed

**waste**
23:17

**Watson**
43:6,7
106:12
107:16
112:20
113:6,9
126:19
127:18

**ways**
48:4
118:23
119:8

**week**
21:2
74:10
93:9 94:1

**week-and-a-half**
93:9 94:1

**Wells**
72:12,15,17,22

**West**
6:8

**WFG**
69:23

**whatsoever**
25:7 70:3

**wife**
12:23
95:13,16

**wife's**
7:1

**willful**
45:24

**wire**
57:10
72:14

**wiring**
57:10

**wise**
49:3

**wondering**
51:3

**word**
62:4,5

**words**
11:2
74:14

**work**
11:19
12:8,10
100:18

**worked**
43:8,13,16

**worker**
55:2

**worthwhile**
11:23
117:7,8

**write**
44:2
56:23
108:19

**writings**
34:19
49:18

**written**
33:22
45:11
46:7
63:6,14
79:6,10

**wrong**
37:13
92:2

———————————

**Y**
———————————

**year**
33:4
34:25
36:2,15
39:16

**year-and-a-half**
32:16

**years**
8:1 24:22
32:17
35:9,21
36:3
42:1,2
49:16
94:20

**yesterday**
49:17

———————————

**Z**
———————————

**Zion**
89:19,20

**Zoology**
98:8

**zoom**
6:22
46:25
56:3
64:13
78:1

**zoomed**
46:25



# EXHIBIT J

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

May 18, 2020

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to suspend the monthly distribution of $30,000
effective with the July 1, 2020 distribution until further notice.

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

**Casden 00050**

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

February 1, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $400,000 from principal for the benefit of Seth
Casden on February 1, 2021. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Leavitt*
_____
Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

**Casden 00051**

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

June 14, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden on June 15, 2021. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

Casden 00052

**Alan Terry Leavitt
470 Demling Place
Chicago, IL 60614**

July 29, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

### Re: The Seth Casden Resulting Trust
### (known as the 2046 Trust fbo Seth Casden)

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $150,000 from principal for the benefit of Seth Casden on July 30, 2021. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

Casden 00053

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**


March 3, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re:**    **The Seth Casden Resulting Trust**
                **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on management and investment of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Investment Adviser, I hereby direct NTDE to complete the following actions:
    1.) To sign the Substitution of Trustee and Full Reconveyance document for the 718 N. Lincoln
        Boulevard, Unit 1, Santa Monica, CA property.
    2.) Provide a letter signed by the Northern Trust Company of Delaware, as Trustee, to WFG
        National Title Company of California authoring them to record the document with no
        funds due to The Northern Trust Company of Delaware.
    3.) To sign the Amended and Restated Operating Agreement of Pine Rock LLC.
    4.) Update Pine Rock, LLC to reflect the 12.5% interest hold in the above referenced trust.
    5.) To sign the Operating Agreement of Green Rock LLC.
    6.) To receive and hold the 12.5% interest in Green Rock LLC in the above referenced trust.
    7.) To complete any and all investment documents necessary to effectuate these actions.

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.


Very truly yours,


_____


NTAC:2SE-18

NTAC:3NS-20

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:2SE-18

NTAC:3NS-20

**Casden 00055**

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

March 3, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

     **Re:**    **The Seth Casden Resulting Trust**
               **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the
Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on management and
investment of the assets of the Trust. NTDE is required to follow my written directions as Adviser with
respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Investment Adviser, I hereby direct NTDE to complete the following actions:
    1.) To sign the Substitution of Trustee and Full Reconveyance document for the 718 N. Lincoln
        Boulevard, Unit 1, Santa Monica, CA property.
    2.) Provide a letter signed by the Northern Trust Company of Delaware, as Trustee, to WFG
        National Title Company of California authoring them to record the document with no
        funds due to The Northern Trust Company of Delaware.
    3.) To sign the Amended and Restated Operating Agreement of Pine Rock LLC.
    4.) Update Pine Rock, LLC to reflect the 12.5% interest hold in the above referenced trust.
    5.) To sign the Operating Agreement of Green Rock LLC.
    6.) To receive and hold the 12.5% interest in Green Rock LLC in the above referenced trust.
    7.) To complete any and all investment documents necessary to effectuate these actions.

The directions contained in this letter are intended by me to be directions described in section 3313 of
Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument
provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such
a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting
from any such act.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to
the Trustee of the Trust.

Very truly yours,

*Alan Terry Leavitt*

NTAC:2SE-18

NTAC:3NS-20

**Casden 00056**

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:2SE-18

Casden 00057

<div align="center">

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

</div>

September 16, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the
"Trust"), as the Adviser for the Trust, I can direct The Northern Trust Company of Delaware
as Trustee ("NTDE") on distributions from the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I hereby direct NTDE to complete the following actions:

- Transfer all Coupang Inc. Class A shares (121,451 shares) to Interactive Brokerage (IB)
  in the name of Seth Casden to account number U7034689

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

This direction shall be in effect until such time as I withdraw or change it in a written letter
delivered to the Trustee of the Trust.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Distribution Adviser to the 2046 Trust fbo Seth Casden dated 6/30/2016

NTAC:2SE-18

NTAC:3NS-20

**Casden 00058**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 18, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $300,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-20

**Casden 00059**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

February 10, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,
*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-20

Casden 00060

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

June 3, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $500,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-20

Casden 00061

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

July 29, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

   **Re: The Seth Casden Resulting Trust**
   **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $500,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

   Bank Name: Wells Fargo
   Bank Location: Reno, NV
   Bank ABA Number: 121000248
   Account Name: Seth Casden
   Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00062**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 17, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-20

**Casden 00063**

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

July 18, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Senior Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re:    The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First (1) and (2) of the above-referenced Trust (the "Trust"), I am the sole Adviser for the Trust and have the responsibility to direct The Northern Trust Company of Delaware as Trustee of the Trust (the "Trustee") on management and investment of the assets of the Trust. Pursuant to the authority granted to me under the Trust, the Trustee is required to follow my written directions as Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Adviser of the Trust, I hereby direct The Northern Trust company of Delaware, as Trustee, to take the following actions:

1) Sign the Agreement for Purchase and Sale of Membership Interests (the "Agreement"), whereby the Trust agrees to sell its 12.5% interest in Green Rock, LLC at the agreed upon price of $1,350,000. A copy of the Agreement is attached hereto as Exhibit A.

2) Sign the Unanimous Consent Resolution of Management and Members of Green Rock, LLC  A copy of the Unanimous Consent Resolution of Management and Members of Green Rock, LL") (the "Consent") A copy is attached hereto as Exhibit B.

In connection with the foregoing, I hereby certify to the Trustee (i) I have been provided with, and reviewed the Consent, and Agreement , (ii) that the action directed by me, in my capacity as the Adviser, to be taken by the Trustee are authorized by the Trust and applicable law, (ii) that I have considered and/or consulted with competent advisers regarding the authority pursuant to which I am acting in providing this direction and the potential consequences of the action I am directing, including (but not limited to) federal, state and local tax consequences, and (iii) that, pursuant to applicable law and the terms of the Trust, the Trustee does not have any duty or responsibility to inquire into or examine whether the powers herein exercised by me, in my capacity as the Adviser, are authorized by the Trust or applicable law.

NTAC:2SE-18
RLF1 27421408v.1

NTAC:3NS-20

Casden 00064

Page 2

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.

This direction may be executed by electronic signature and/or delivered by electronic means, including (but not limited to) facsimile, .pdf or electronic mail, each of which shall be deemed to be an original signature and/or written instrument.

This direction shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to principles of conflict of laws. This direction, along with all exhibits attached hereto, shall be maintained by the Trustee as a part of the Trust's records.

Very truly yours,

_____

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:2SE-18
RLF1 27421408v.1

NTAC:3NS-20

Casden 00065

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 28, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re:      The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on management and investment of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Adviser of the Trust, I hereby direct NTDE to sign $670,000 Promissory Note dated January 31, 2022 at an interest rate of .44% annum. Receive and hold this note as an asset of the above referenced trust.

This direction is intended to modify the $670,000 Promissory Note due and payable 8/1/2021 at an interest rate of 2.12% per annum. Please remove this note from the trust.

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:2SE-18

NTAC:3NS-20

Casden 00066

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

June 2, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Senior Vice President
1313 Market Street, Suite 5300
Wilmington, DE 19801

     Re:    **The Seth Casden Resulting Trust**
           **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First of the above referenced Trust Agreement (the "Trust"), I am the Investment Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee of the Trust ("NTDE") on management and investment of the assets of the Trust. NTDE is required to follow my written directions as Investment Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Investment Adviser, I hereby direct NTDE to borrow $500,000.00 from LSG Holdings, LLC (Lender) in exchange for a Promissory Note to the Seth Casden Resulting Trust dated 7/8/2016 (Borrower) at an interest rate of 2.25%, maturity May 31, 2023.

Furthermore, I hereby direct NTDE complete all payments and satisfy all terms as provided in the above referenced Promissory Note.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Thank you for your prompt assistance.

NTAC:3NS-20
NTAC:3NS-20

**Casden 00067**

Page 2

Sincerely,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:3NS-20
NTAC:3NS-20

Casden 00068

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

August 3, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Senior Vice President
1313 Market Street, Suite 5300
Wilmington, DE 19801

      Re:    **The Seth Casden Resulting Trust**
              **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article First of the above referenced Trust Agreement (the "Trust"), I am the Investment Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee of the Trust ("NTDE") on management and investment of the assets of the Trust. NTDE is required to follow my written directions as Investment Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Investment Adviser, I hereby direct NTDE to pay off the $500,000.00 Promissory Note (principal and outstanding interest) held in the above referenced trust (Borrower) and issued by LSG Holdings, LLC (Lender) at an interest rate of 2.25%, maturity May 31, 2023.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Thank you for your prompt assistance.

Sincerely,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden

NTAC:3NS-20
NTAC:3NS-20

Casden 00069

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 11, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $500,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00070**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

March 7, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

   **Re: The Seth Casden Resulting Trust**
   **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $550,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

   Bank Name: Wells Fargo
   Bank Location: Reno, NV
   Bank ABA Number: 121000248
   Account Name: Seth Casden
   Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00071**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

March 22, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00072**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

May 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

### Re: The Seth Casden Resulting Trust
### (known as the 2046 Trust fbo Seth Casden)

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $250,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

Casden 00073

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

June 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00074**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

June 16, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

Casden 00075

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

July 10, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00076**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

August 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00077**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

September 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:3NS-20

**Casden 00078**

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 3, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

Casden 00079

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 16, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Natalie,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $400,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

**Casden 00080**

**Alan Terry Leavitt**

The Northern Trust Company of Delaware
ATTN : Natalie Schiavone, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

## RE: The Seth Casden Resulting Trust (aka the 2046 Trust fbo Seth Casden)

Dear Natalie,

Pursuant to Article First (1) and (2) of the above-referenced Trust (the "Trust"), I am the sole Adviser for the Trust and have the responsibility to direct The Northern Trust Company of Delaware as Trustee of the Trust (the "Trustee") on management and investment of the assets of the Trust. Pursuant to the authority granted to me under the Trust, the Trustee is required to follow my written directions as Adviser with respect to all matters relating to the management and investment of the Trust assets.

In my capacity as Adviser of the Trust, I hereby direct the Trustee take the following actions:

To Wire $100,020.00 per the attached wiring instructions. This is for an initial investment in Side Door Ventures II, LP

To hold Side Door Ventures II, LP as an asset of the Trust with a value of $100,020.00

To fund any and all future capital calls as received via notices from the funds and to update the market value accordingly.

Further, I acknowledge that I have been provided copies of all relevant documents, including but not limited to the Subscription Agreement, and have consulted with my own advisers as to tax, legal, accounting and related matters concerning this LP investment and, on that basis, understand the financial, legal, tax, accounting and related consequences of this investment. This includes any obligations associated with the CTA.

This direction shall be in effect until such time as I withdraw or change it in a written letter delivered to the Trustee of the Trust.

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act
Sincerely,

_____
Alan Terry Leavitt
As Adviser of the 2046 Trust fbo Seth Casden

7 - 8-2024
Date

# EXHIBIT K

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 2 |
| Total Messages: 2 | Date Range: 10/3/2023 |

## Outline of Conversations

CHAT - 240307ALeavitt_0000001 - 00423 - 2023/10/03 · 2 messages on 10/3/2023 · Alan Leavitt · (720) 507-8123· · Cody Damon < (13106308275)2·

LEAVITT0000001

**Messages in chronological order** (times are shown in GMT -05:00)

...

💬  CHAT - **240307ALeavitt_0000001 - 00423 - 2023/10/03**

SC   Seth Caoden <+13768003873>                                      ► 10/3/2023, 12:53 PM
     Sending a letter to Northern for 200k.

BL   Bob Clayton <+13768003073>                                      ► 10/3/2023, 12:53 PM
     Hope all is well and let's connect soon

Message
| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 6/1/2023 5:17:53 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Letter of direction |

Thank you, well received.

---

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Thursday, June 1, 2023 at 8:58 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Letter of direction

Hello there!

Per the letter of direction dated June 1, 2023, we will arrange for the $200k distribution to Seth.  Please let us know if anything additional is needed.

Thanks and have a great day also!
Ronnett



**Ronnett Roach**
Senior Account Manager | Office | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5900, Wilmington, DE 19801 USA
Phone +1 302-428-6719 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights.  If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts.  Learn more about how to submit messages from Northern Trust.

CONFIDENTIALITY NOTICE:  This communication is confidential, may be privileged and is meant only for the intended recipient.  If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Thursday, June 1, 2023 10:36 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

LEAVITT0000003

Kindly let us know if you have any questions.

Hope you are having a good day.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**



☐ 310-600-3673    🔹 www.celliant.com    ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
**July 18-19    Booth #436**

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000004

Message

| | |
|---|---|
| **From:** | Ronnett Roach [RR249@ntrs.com] |
| **on behalf of** | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| **Sent:** | 6/1/2023 3:57:49 PM |
| **To:** | Seth Casden [seth@celliant.com] |
| **CC:** | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | RE: Letter of direction |

Hello there!

Per the letter of direction dated June 1, 2023, we will arrange for the $200k distribution to Seth.  Please let us know if anything additional is needed.

Thanks and have a great day also!
Ronnett



**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. **Learn** more about how to unfold messages from Northern Trust

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Thursday, June 1, 2023 10:36 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good day.

Cheers,

Seth

LEAVITT0000005



**Seth Casden**
CEO and Co-Founder

 

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19   Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000006

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 6/1/2023 2:36:05 PM |
| **To:** | Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Nai-te Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction |
| **Attachments:** | Direction Letter for Distribution_2023_06_01.pdf |

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good day.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**

in ⊙

☐ 310-600-3673   ☐ www.celliant.com   ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19    Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

June 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"). I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000008

Message
_____

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 7/10/2023 4:52:19 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Letter of direction |

Thank you, have a great day.

_____

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Monday, July 10, 2023 at 8:10 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Letter of direction

Good morning Terry and Seth,

Per your letter of direction dated July 10, 2023 we will arrange for the $200k distribution to Seth. Please let us know if anything additional is needed.

Thanks and have a great day!
Ronnett



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Office | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-426-6710 | Fax +1 866-451-6558 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to submit messages from Northern Trust.

CONFIDENTIALITY NOTICE. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, July 10, 2023 10:55 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

LEAVITT0000009

Kindly let us know if you have any questions.

Hope you are having a good start to the week.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**



310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
**July 18-19    Booth #436**

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000010

Message

| From: | Ronnett Roach [RR249@ntrs.com] |
|---|---|
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 7/10/2023 3:10:23 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Letter of direction |

Good morning Terry and Seth,

Per your letter of direction dated July 10, 2023 we will arrange for the $200k distribution to Seth.  Please let us know if anything additional is needed.

Thanks and have a great day!
Ronnett



**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8658 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to unfold messages from Northern Trust

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, July 10, 2023 10:55 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good start to the week.

Cheers,

Seth



**Seth Casden**
CEO and Co-Founder

 

☐ 310-600-3673    🔗 www.celliant.com    ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19    Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000012

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 7/10/2023 2:55:07 PM |
| **To:** | Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Nai-te Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction |
| **Attachments:** | Direction Letter for Distribution_2023_07_10.pdf |

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good start to the week.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**

 

☐ 310-600-3673  ◌ www.celliant.com  ✉ seth@celliant.com

◌ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19    Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

July 10, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

    Bank Name: Wells Fargo
    Bank Location: Reno, NV
    Bank ABA Number: 121000248
    Account Name: Seth Casden
    Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTDE-3NS-01

Message

| | |
|---|---|
| **From:** | Ronnett Roach [RR249@ntrs.com] |
| **on behalf of** | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| **Sent:** | 6/16/2023 2:58:46 PM |
| **To:** | Seth Casden [seth@celliant.com] |
| **CC:** | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | RE: Letter of direction |

Good morning Seth and Terry,

Per your letter of direction dated June 16, 2023, we will arrange for the $100k distribution to Seth.  Please let us know if anything additional is needed.

Thanks and have a great weekend!
Ronnett

 **NORTHERN TRUST**

**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 6300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a n@rtherntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Friday, June 16, 2023 10:03 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good day.

Cheers,

Seth

LEAVITT0000015



**Seth Casden**
**CEO and Co-Founder**

 

310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
**July 18-19    Booth #436**

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000016

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 6/16/2023 2:02:32 PM |
| **To:** | Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Nai-te Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction |
| **Attachments:** | Direction Letter for Distribution_2023_06_16.pdf |

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Hope you are having a good day.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**



310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



**VISIT US AT**
**FUNCTIONAL FABRIC FAIR NYC**
**July 18-19   Booth #436**

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

June 16, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTDE-BNS-01

LEAVITT0000018

Message

| | |
|---|---|
| From: | Ronnett Roach [RR249@ntrs.com] |
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 9/1/2023 4:26:02 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Letter of direction 9/1/23 |

Hi Terry and Seth,

Per the letter of direction dated for today, Sept 1ˢᵗ.  We will arrange for the $100k distribution to Seth.  Please let us know if anything additional is needed.

Thanks and have a great holiday weekend!
Ronnett



**NORTHERN
TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Friday, September 1, 2023 9:46 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction 9/1/23

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth

LEAVITT0000019



**Seth Casden**
**CEO and Co-Founder**

 

☐ 310-600-3673   ☐ www.celliant.com   ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19    Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000020

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 9/1/2023 1:46:29 PM |
| **To:** | Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Nai-te Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction 9/1/23 |
| **Attachments:** | Direction Letter for Distribution_2023_09_01.pdf |

Dear Ronnett,

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth



## Seth Casden
### CEO and Co-Founder



☐ 310-600-3673  ⚊ www.celliant.com  ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



VISIT US AT
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19    Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000021

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

September 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $100,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000022

Message
_____

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 9/1/2023 6:36:13 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Letter of direction 9/1/23 |

Thank you!

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Friday, September 1, 2023 at 9:26 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Letter of direction 9/1/23

Hi Terry and Seth,

Per the letter of direction dated for today, Sept 1ˢᵗ.   We will arrange for the $100k distribution to Seth.  Please let us
know if anything additional is needed.

Thanks and have a great holiday weekend!
Ronnett



**NORTHERN TRUST**

**Ronnett Roach**
Senior Account Manager | Office | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5900, Wilmington, DE 19801 USA
Phone +1 302-426-6710 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our
latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages
from Northern Trust.

CONFIDENTIALITY NOTICE. This communication is confidential, may be privileged and is meant only for the intended recipient. If you
are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Friday, September 1, 2023 9:46 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction 9/1/23

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction from Terry.

LEAVITT0000023

Kindly let us know if you have any questions.

Best regards,

Seth



### Seth Casden
**CEO and Co-Founder**



310-600-3673     www.celliant.com     seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



**VISIT US AT**
**FUNCTIONAL FABRIC FAIR NYC**
July 18-19     Booth #436

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000024

Message
___

| From: | Ronnett Roach [RR249@ntrs.com] |
|---|---|
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 10/4/2023 9:10:15 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| Subject: | RE: Request for distribution |

Hi Seth,

Yes, the wire has been approved and sent.  Please confirm receipt.

Thanks!



**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics  add a northerntrust.com to your contacts. Learn more about how to extend messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, October 4, 2023 4:11 PM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Nai-Te J Watson <NJW2@ntrs.com>
**Subject:** [EXT] Re: Request for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Ronnett,

I hope this note finds you well. Can you advise if the wire will be able to be sent today?

Best regards,

Seth

LEAVITT0000025

## Seth Casden
### CEO and Co-Founder

☐ 310-600-3673  ☐ www.celliant.com  ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

This content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply, to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Tuesday, October 3, 2023 at 12:41 PM
**To:** Seth Casden <seth@celliant.com>, Nai-te Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Request for distribution

Terry,
Per your letter of direction dated October 3, 2023, we will arrange for the $200k distribution to Seth.

Seth,
Please find attached K1 for your Resulting Trust. These documents contain account numbers and therefore are password-protected with the last 6 digits of your SSN.

Let us know if you need anything additional.

Kind regards,
Ronnett



**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

LEAVITT0000026

CONFIDENTIALITY NOTICE. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, October 3, 2023 2:15 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>; Ronnett Roach <RR249@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Request for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth

### Seth Casden
**CEO and Co-Founder**

☐ 310-600-3673   ☐ www.celliant.com   ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000027

Message
| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 10/4/2023 8:11:13 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| Subject: | Re: Request for distribution |

Hi Ronnett,

I hope this note finds you well. Can you advise if the wire will be able to be sent today?

Best regards,

Seth



**Seth Casden**
**CEO and Co-Founder**

📧 310-600-3673   📧 www.celliant.com   📧 seth@celliant.com

📧 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

This content of this email is confidential and intended for the intended recipient's messages only. It is strictly forbidden to share any part of this message with any third party without the written consent of the sender. If you received this message by mistake, please notify us if the message and follow with us notification. Let us know please note a mistake have not send a note form.

From: Ronnett Roach <RR249@ntrs.com>
Date: Tuesday, October 3, 2023 at 12:41 PM
To: Seth Casden <seth@celliant.com>, Nai-te Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@cs.com>
Subject: RE: Request for distribution

Terry,
Per your letter of direction dated October 3, 2023, we will arrange for the $200k distribution to Seth.

Seth,
Please find attached K1 for your Resulting Trust. These documents contain account numbers and therefore are
password-protected with the last 6 digits of your SSN.

Let us know if you need anything additional.

LEAVITT0000028

Kind regards,
Ronnett



**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
**Phone** +1 302-428-8719 | **Fax** +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, October 3, 2023 2:15 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>; Ronnett Roach <RR249@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Request for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth

### Seth Casden
**CEO and Co-Founder**

☐ 310-600-3673  ☐ www.celliant.com  ☐ seth@celliant.com
☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

LEAVITT0000029

LEAVITT0000030

Message
_____

| | |
|---|---|
| From: | Ronnett Roach [RR249@ntrs.com] |
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 10/3/2023 7:41:36 PM |
| To: | Seth Casden [seth@celliant.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Request for distribution |
| Attachments: | SCRT 22-78762_tr_2022_SCK1.pdf |

Terry,

Per your letter of direction dated October 3, 2023, we will arrange for the $200k distribution to Seth.

Seth,

Please find attached K1 for your Resulting Trust. These documents contain account numbers and therefore are
password-protected with the last 6 digits of your SSN.

Let us know if you need anything additional.

Kind regards,
Ronnett


 **NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5309, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our
latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages
from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you
are not the intended recipient, please notify the sender ASAP and delete this message from your system.


NTAC:3NS-20

From: Seth Casden <seth@celliant.com>
Sent: Tuesday, October 3, 2023 2:15 PM
To: Nai-Te J Watson <NJW2@ntrs.com>; Ronnett Roach <RR249@ntrs.com>
Cc: Terry Leavitt <lionofzion477@cs.com>
Subject: [EXT] Request for distribution

> This email originated from outside the organization. Do not click links or open attachments unless you have
> verified this email is legitimate.

Dear Ronnett,

Hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

LEAVITT0000031

Best regards,

Seth

**Seth Casden**
CEO and Co-Founder

☐ 310-600-3673    ☐ www.celliant.com    ☐ seth@celliant.com
☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 10/3/2023 6:15:21 PM |
| **To:** | Nai-te Watson [NJW2@ntrs.com]; Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Request for distribution |
| **Attachments:** | Direction Letter for Distribution_2023_10_03.pdf |

Dear Ronnett,

Hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth

### Seth Casden
**CEO and Co-Founder**

📞 310-600-3673    🌐 www.celliant.com    ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000033

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 3, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000034

Message
_____

| From: | Seth Casden [seth@celliant.com] |
|---|---|
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 10/3/2023 7:47:28 PM |
| To: | Ronnett Roach [RR249@ntrs.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Request for distribution |

Thank you, Ronnett.

Well received.

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Tuesday, October 3, 2023 at 12:41 PM
**To:** Seth Casden <seth@celliant.com>, Nai-te Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Request for distribution

Terry,
Per your letter of direction dated October 3, 2023, we will arrange for the $200k distribution to Seth.

Seth,
Please find attached K1 for your Resulting Trust. These documents contain account numbers and therefore are
password-protected with the last 6 digits of your SSN.

Let us know if you need anything additional.

Kind regards,
Ronnett



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street  Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-8710 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** here about how to unsubscribe messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC 3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, October 3, 2023 2:15 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>; Ronnett Roach <RR249@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Request for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions.

Best regards,

Seth

### Seth Casden
**CEO and Co-Founder**

☐ 310-600-3673   ☐ www.celliant.com   ☐ seth@celliant.com
☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000036

Message
_____

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 10/16/2023 3:30:07 PM |
| **To:** | Ronnett Roach [RR249@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | FW: Request for distribution |
| **Attachments:** | Direction Letter for Distribution_2023_10_16.pdf |

Hi Ronnett.

I know I have a new team now. I am going to miss your help!

I sent below to them but since it's the first time, I thought it wouldn't hurt to send to you as well.

I am hoping to get this processed today.

Take care and thanks for everything you did to help me these last few years.

Cheers,

Seth


## Seth Casden
### CEO and Co-Founder

310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

*[illegible disclaimer text]*

**From:** Seth Casden <seth@celliant.com>
**Date:** Monday, October 16, 2023 at 7:31 AM
**To:** Natalie Schiavone <NS543@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>, Mike Brown <MSB18@ntrs.com>
**Subject:** Re: Request for distribution

Dear Natalie,

LEAVITT0000037

I hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions or confirm.

Best regards,

Seth



**Seth Casden**
**CEO and Co-Founder**

 

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



**VISIT US IN PORTLAND**
**FUNCTIONAL FABRIC FAIR**
November 1-2   Booth #1042

BOOK AN APPOINTMENT

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 16, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Natalie,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"). I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $400,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000039

Message

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 10/16/2023 2:31:35 PM |
| To: | Natalie Schiavone [NSS43@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Mike Brown [MSB18@ntrs.com] |
| Subject: | Re: Request for distribution |
| Attachments: | Direction Letter for Distribution_2023_10_16.pdf |

Dear Natalie,

I hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions or confirm.

Best regards,

Seth

### Seth Casden
**CEO and Co-Founder**

310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000040

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 16, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

      **Re: The Seth Casden Resulting Trust**
      **(known as the 2046 Trust fbo Seth Casden)**

Dear Natalie,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $400,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

      Bank Name: Wells Fargo
      Bank Location: Reno, NV
      Bank ABA Number: 121000248
      Account Name: Seth Casden
      Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000041

Message

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 10/16/2023 5:15:44 PM |
| To: | Natalie Schiavone [NS543@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com], Mike Brown [MSB18@ntrs.com] |
| Subject: | Re: Request for distribution |

Wonderful. Thank you. I appreciate it.

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

> On Oct 16, 2023, at 10:14, Natalie Schiavone <NS543@ntrs.com> wrote:

HI Seth,

Thank you for sending.  We will confirm once the funds are sent.

Regards,

Natalie

<image002.png>

Natalie Schiavone, CTFA
Vice President | Senior Trust Advisor
1313 N. Market Street, Suite 5300, Wilmington, DE 19601 USA
Phone +1 302-428-8701 | Fax +1 866-451-8658 | ns543@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If
you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn**
more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended
recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your
system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, October 16, 2023 10:32 AM
**To:** Natalie Schiavone <NS543@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Mike Brown <MSB18@ntrs.com>
**Subject:** [EXT] Re: Request for distribution

LEAVITT0000042

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Natalie,

I hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions or confirm.

Best regards,

Seth

## Seth Casden
**CEO and Co-Founder**

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

Message
_____

| | |
|---|---|
| From: | Natalie Schiavone [NS543@ntrs.com] |
| on behalf of | Natalie Schiavone <NS543@ntrs.com> [NS543@ntrs.com] |
| Sent: | 10/16/2023 5:14:40 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Mike Brown [MSB18@ntrs.com] |
| Subject: | RE: Request for distribution |

Hi Seth,

Thank you for sending. We will confirm once the funds are sent.

Regards,

Natalie

 **NORTHERN
TRUST**

**Natalie Schiavone, CTFA**
Vice President | Senior Trust Advisor
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8701 | Fax +1 866-451-8858 | ns543@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add s.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, October 16, 2023 10:32 AM
**To:** Natalie Schiavone <NS543@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Mike Brown <MSB18@ntrs.com>
**Subject:** [EXT] Re: Request for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Natalie,

I hope this note finds you well.

Please find attached a letter of direction from Terry.

Kindly let us know if you have any questions or confirm.

Best regards,

Seth

LEAVITT0000044

### Seth Casden

**CEO and Co-Founder**

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000045

Message

| From: | ALAN LEAVITT [lionofzion477@cs.com] |
|---|---|
| on behalf of | ALAN LEAVITT <lionofzion477@cs.com> [lionofzion477@cs.com] |
| Sent: | 5/11/2023 6:53:15 PM |
| To: | lionofzion477@cs.com |
| Subject: | Fwd: Direction letter for distribution |

Sent from my iPhone

Begin forwarded message:

> **From:** ALAN LEAVITT <lionofzion477@cs.com>
> **Date:** May 3, 2023 at 11:02:37 PM CDT
> **To:** LIONOFZION477@cs.com
> **Subject: Re: Direction letter for distribution**

> Sent from my iPhone

>> On May 3, 2023, at 5:48 PM, Seth Casden <seth@celliant.com> wrote:

>> Hi Ronnett,

>> Thank you for your email and support. Well noted.

>> Please be advised I wired $28,000 today to cover the interest payment due.

>> Let me know if you need anything further from me.

>> Cheers,

>> Seth



>> **Seth Casden**
>> **CEO and Co-Founder**

>> 📧 310-600-3673    📧 www.celliant.com    📧 seth@celliant.com
>> 📧 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

LEAVITT0000104

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Tuesday, May 2, 2023 at 10:06 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Direction letter for distribution

Hi Seth,

We have updated your protected profile confirming new banking account information.
Please note going forward, no authentication will be needed unless there is a change to
the instructions. Thank you so for verifying.

Take care, Ronnett

<image002.png>
Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8868 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights. If you would like our latest insights, including Cyber Security topics, add
a northerntrust.com to your contacts. Learn more about how to safelist messages from Northern
Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant
only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP
and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 12:52 PM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless
you have verified this email is legitimate.

Good afternoon Ronnett,

Thank you for the reply and understood.

LEAVITT0000105

They can call me at (310) 600-3673 at their convenience.

Best regards,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

> On May 1, 2023, at 09:31, Ronnett Roach <RR249@ntrs.com> wrote:

> Good afternoon, Seth and Terry.

> Please be advised we received your request.
> In order to process the transfer we will need to verbally confirm the information with Seth. Our back office will authenticate **your new bank account** information, please let me know when it is a good time to call?

> Thanks, Ronnett

> <image009.png>
> **Ronnett Roach**
> Senior Account Manager | Officer | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
> Phone+1 302-428-8719 | Fax +1 800-451-8858 | rr249@ntrs.com

> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights - including Cyber Security topics, and e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

> CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

> NTAC:3NS-20

> **From:** Seth Casden <seth@celliant.com>
> **Sent:** Monday, May 1, 2023 10:13 AM
> **To:** Ronnett Roach <RR249@ntrs.com>
> **Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
> **Subject:** [EXT] Direction letter for distribution

LEAVITT0000106

This email originated from outside the organization. Do not click links or open attachments unless
verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a
distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth

<image010.png>    **Seth Casden**                                <image011.png> <image0
                   **CEO and Co-Founder**

                   <image013.png>
                   310-600-3673
                   <image014.png>
                   www.celliant.com
                   <image015.png>
                   seth@celliant.com

                   <image016.png>
                   17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this
mail party, without the written request of the lawyer. If you received this message by mistake, please reply to this message and follow with the
we can ensure such a mistake does not come to the future.

<image017.png>

LEAVITT0000107

Message

| | |
|---|---|
| From: | ALAN LEAVITT [lionofzion477@cs.com] |
| on behalf of | ALAN LEAVITT <lionofzion477@cs.com> [lionofzion477@cs.com] |
| Sent: | 5/4/2023 4:02:37 AM |
| To: | lionofzion477@cs.com |
| Subject: | Re: Direction letter for distribution |

Sent from my iPhone

On May 3, 2023, at 5:48 PM, Seth Casden <seth@celliant.com> wrote:

Hi Ronnett,

Thank you for your email and support. Well noted.

Please be advised I wired $28,000 today to cover the interest payment due.

Let me know if you need anything further from me.

Cheers,

Seth

**Seth Casden**
**CEO and Co-Founder**

310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

<image001.png>

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Tuesday, May 2, 2023 at 10:06 AM
**To:** Seth Casden <seth@celliant.com>

LEAVITT0000108

Cc: Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>

**Subject:** RE: Direction letter for distribution

Hi Seth,

We have updated your protected profile confirming new banking account information. Please note going forward, no authentication will be needed unless there is a change to the instructions. Thank you so for verifying.

Take care, Ronnett

\<image002.png\>

Ronnett Roach

Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 12:52 PM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Good afternoon Ronnett,

Thank you for the reply and understood.

They can call me at (310) 600-3673 at their convenience.

Best regards,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

LEAVITT0000109

On May 1, 2023, at 09:31, Ronnett Roach <RR249@ntrs.com> wrote:

Good afternoon, Seth and Terry.

Please be advised we received your request.
In order to process the transfer we will need to verbally confirm the information with
Seth. Our back office will authenticate **your new bank account** information, please let
me know when it is a good time to call?

Thanks, Ronnett

<image009.png>
Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8558 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights. If you would like our latest insights, including Cyber Security topics, add
e_notif@ntrust.com to your contacts. Learn more about how to safelist messages from Northern
Trust.

CONFIDENTIALITY NOTICE. This communication is confidential, may be privileged and is meant
only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP
and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 10:13 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you h
verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the
amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth

LEAVITT0000110

 **Seth Casden**
**CEO and Co-Founder**

 


310-600-3673

www.celliant.com

seth@celliant.com


17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.



LEAVITT0000111

Message

| | |
|---|---|
| **From:** | Laurie Foster [laurie@sbsnv.com] |
| **on behalf of** | Laurie Foster <laurie@sbsnv.com> [laurie@sbsnv.com] |
| **Sent:** | 2/3/2024 4:50:53 PM |
| **To:** | Borowsky, Jocelyn Margolin [JMBorowsky@duanemorris.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com]; Seth Casden [seth@celliant.com] |
| **Subject:** | RE: Casden Resulting Trust |

All,

Please forgive the delay. Per your request please see the Capital Call below

CAPITAL CALL FOR PINEROCK—$200,000

Reffus and Sarah Resulting Trust—29.2% each

Greg Resulting Trust and Rachel Resulting Trust —14.55% each

Seth Resulting Trust —12.5%

———

Reffus        $58,400

Sarah Resulting Trust   $58,400

Greg Resulting Trust   $29,100

Rachel Resulting Trust   $29,100

Seth Resulting Trust   $25,000

Please let me know if you have any questions

*Laurie Foster*

Specialized Bookkeeping LLC
PO Box 27231
Carson City, NV 89721
Phone/Fax 775-461-1388
laurie@sbsnv.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Sent:** Wednesday, January 31, 2024 5:40 PM
**To:** Laurie Foster <laurie@sbsnv.com>

LEAVITT0000112

**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** Casden Resulting Trust

Hi Laurie. I represent Alan Terry Leavitt, the Trust Advisor for the Seth Casden Resulting Trust. We have recently become aware of a capital call for Pine Rock. Would you kindly send the "official" capital call notice to me? We will then be able to process it for the trust. Many thanks!
Jocelyn Borowsky



Jocelyn Margolin Borowsky
Partner

Duane Morris LLP
1201 North Market St, Suite 501      P: +1 302 657 4921
Wilmington, DE 19801                 F: +1 215 827 5538

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice. This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this information in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client and other privilege.

LEAVITT0000113

Message

| | |
|---|---|
| From: | Laurie Foster [laurie@sbsnv.com] |
| on behalf of | Laurie Foster <laurie@sbsnv.com> [laurie@sbsnv.com] |
| Sent: | 2/4/2024 2:59:31 PM |
| To: | Borowsky, Jocelyn Margolin [JMBorowsky@duanemorris.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Seth Casden [seth@celliant.com] |
| Subject: | RE: Casden Resulting Trust |

This is how we have been sending the Capital Call's since I've started working with them.

Please let me know if you have any questions

*Laurie Foster*

Specialized Bookkeeping LLC
PO Box 22231
Carson City, NV 89721
Phone/Fax 775-882-1388
Laurie@sbsnv.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Sent:** Sunday, February 4, 2024 6:58 AM
**To:** Laurie Foster <laurie@sbsnv.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Seth Casden <seth@celliant.com>
**Subject:** RE: Casden Resulting Trust

Is this the official notice?  Did you send a letter on letterhead?  We are looking for a notice that is not a mere email.

**From:** Laurie Foster <laurie@sbsnv.com>
**Sent:** Saturday, February 3, 2024 11:51 AM
**To:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Seth Casden <seth@celliant.com>
**Subject:** RE: Casden Resulting Trust

All,

Please forgive the delay.  Per your request please see the Capital Call below

CAPITAL CALL FOR PINEROCK—$200,000

Reffus and Sarah Resulting Trust—29.2% each

Greg Resulting Trust and Rachel Resulting Trust —14.55% each

Seth Resulting Trust —12.5%

LEAVITT0000114

Reffus          $58,400

Sarah Resulting Trust    $58,400

Greg Resulting Trust    $29,100

Rachel Resulting Trust    $29,100

Seth Resulting Trust    $25,000

Please let me know if you have any questions

*Laurie Foster*

Specialized Bookkeeping LLC
PO Box 22331
Carson City, NV 89721
Phone/Fax 775-882-1398
Laurie@sbsnv.com

CONFIDENTIALITY NOTICE:  This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain
confidential or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient,
please contact the sender by reply email and destroy all copies of the original message.

**From:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Sent:** Wednesday, January 31, 2024 5:40 PM
**To:** Laurie Foster <laurie@sbsnv.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** Casden Resulting Trust

Hi Laurie.  I represent Alan Terry Leavitt, the Trust Advisor for the Seth Casden Resulting Trust.  We have recently
become aware of a capital call for Pine Rock.  Would you kindly send the "official" capital call notice to me?  We will
then be able to process it for the trust.  Many thanks!
Jocelyn Borowsky



DuaneMorris
www.duanemorris.com
Jocelyn Margolin Borowsky
Partner

Duane Morris LLP
1201 North Market St, Suite 501        P: +1 302 657 4921
Wilmington, DE 19801                    F: +1 315 827 5538

LEAVITT0000115

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

LEAVITT0000116

Message

| | |
|---|---|
| From: | Borowsky, Jocelyn Margolin [JMBorowsky@duanemorris.com] |
| on behalf of | Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com> [JMBorowsky@duanemorris.com] |
| Sent: | 3/5/2024 8:01:03 PM |
| To: | Laurie Foster [laurie@sbsnv.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Seth Casden [seth@celliant.com] |
| Subject: | RE: Casden Resulting Trust |

Do you have wire information for the capital call?

**From:** Laurie Foster <laurie@sbsnv.com>
**Sent:** Sunday, February 4, 2024 10:00 AM
**To:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Seth Casden <seth@celliant.com>
**Subject:** RE: Casden Resulting Trust

This is how we have been sending the Capital Call's since I've started working with them.


Please let me know if you have any questions

*Laurie Foster*

Specialized Bookkeeping LLC
PO Box 12351
Carson City, NV 89721
Phone/Fax 775-882-1998
Laurie@sbsnv.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Sent:** Sunday, February 4, 2024 6:58 AM
**To:** Laurie Foster <laurie@sbsnv.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Seth Casden <seth@celliant.com>
**Subject:** RE: Casden Resulting Trust

Is this the official notice? Did you send a letter on letterhead? We are looking for a notice that is not a mere email.

**From:** Laurie Foster <laurie@sbsnv.com>
**Sent:** Saturday, February 3, 2024 11:51 AM
**To:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Seth Casden <seth@celliant.com>
**Subject:** RE: Casden Resulting Trust

All,

Please forgive the delay. Per your request please see the Capital Call below

CAPITAL CALL FOR PINEROCK—$200,000

LEAVITT0000117

Reffus and Sarah Resulting Trust—29.2% each

Greg Resulting Trust and Rachel Resulting Trust —14.55% each

Seth Resulting Trust —12.5%

----------

Reffus          $58,400

Sarah Resulting Trust   $58,400

Greg Resulting Trust   $29,100

Rachel Resulting Trust   $29,100

Seth Resulting Trust   $25,000

Please let me know if you have any questions.

*Laurie Foster*

Specialized Bookkeeping LLC
PO Box 22231
Carson City, NV 89721
Phone/Fax 775-882-1306
laurie@sbsnv.com

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain
confidential or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient,
please contact the sender by reply email and destroy all copies of the original message.

**From:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Sent:** Wednesday, January 31, 2024 5:40 PM
**To:** Laurie Foster <laurie@sbsnv.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** Casden Resulting Trust

Hi Laurie. I represent Alan Terry Leavitt, the Trust Advisor for the Seth Casden Resulting Trust. We have recently
become aware of a capital call for Pine Rock. Would you kindly send the "official" capital call notice to me? We will
then be able to process it for the trust. Many thanks!
Jocelyn Borowsky

LEAVITT0000118



Jocelyn Margolin Borowsky
Partner

Duane Morris LLP
1201 North Market St, Suite 501
Wilmington, DE 19801

P: +1 302 657 4921
F: +1 215 827 5538

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

LEAVITT0000119

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 3/4/2024 8:01:14 PM |
| **To:** | Jocelyn Margolin Borowsky [jmborowsky@duanemorris.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com]; Aaron E. de Leest [adeleest@DanningGill.com]; John N. Tedford [JTedford@danninggill.com] |
| **Subject:** | FW: Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024 |
| **Attachments:** | Seth Casden_Side Door Ventures II, LP_Capital Call Notice.pdf |

Hi Jocelyn,

Can we arrange a call to discuss this capital call?

Is it correct that the trust can continue to make investments while I am in personal BK?

I would like to understand the possibility of the trust funding the capital call required below and having that investment reside/owned by the resulting trust.

Best,

Seth

  

### Seth Casden
**CEO and Co-Founder**

☐ 310-600-3673  ☐ www.celliant.com  ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** AngelList <invest@angellist.com>
**Date:** Saturday, March 2, 2024 at 10:20 AM
**To:** Seth Casden <seth@celliant.com>
**Subject:** Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024

LEAVITT0000120



## Capital call for SDV Digital Asset Fund: Please transfer $100,020 to your AngelList balance

Hi Seth,

SDV Digital Asset Fund has called 33.3% of the fund. Please transfer your contribution of $100,020 to your AngelList balance by **Saturday, March 23, 2024.**

Deposit Funds

**Note from Side Door Ventures**

Dear Limited Partners,

We're officially calling our last capital call for the Digital Asset Fund. As you know, the fund is performing extremely well and we're eager to make our last investments this year. Thanks for being on this journey with us, I don't think we could have timed the market any better.

Cheers,
Andrew

| | |
|---|---|
| **Investing as** | Seth Casden |
| **Your total commitment** | $300,000 |
| **Total called to date** | $300,000 (100%) |
| **Previous contributions** | $199,980 |
| **Call amount** | $100,020 (33.3%) |
| **Amount due (03/23/2024)** | $100,020 |

LEAVITT0000121

If you would like additional contacts to receive future capital call notices, add them to your team here.

## Transfer funds to your AngelList balance

Use the wire information below to submit funding for your subscription. Wires are credited 1 business day after receipt.

**Amount**
$100,020

**Memo**
INV3667A5A - Seth Casden

**Bank**
Grasshopper Bank
261 5th Ave, Suite 610
New York, NY 10016

**Beneficiary**
FBO AngelList - Seth Casden
261 5th Ave, Suite 610
New York, NY 10016

**Account Number**
███████████

**SWIFT**
GRNOUS33

**ABA**
026015024

**IBAN**
None

Grasshopper Bancorp, Inc. N.A., Member FDIC acts as a receiving bank for AngelList's networked banking sweep account program, which aims to maximize FDIC insurance coverage on deposits.

Wires from banks outside of the United States may take additional time, and may deduct an intermediary bank fee. Please contact your bank for more information.

You're receiving this email because you signed up for
AngelList
90 Gold St • San Francisco, CA 94133

Message

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 3/4/2024 10:53:18 PM |
| To: | Borowsky, Jocelyn Margolin [JMBorowsky@duanemorris.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Aaron E. de Leest [adeleest@danninggill.com]; John N. Tedford [JTedford@danninggill.com] |
| Subject: | Re: Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024 |

My thought was to bifurcate the investment and have the portion the trust would be paying owned by the trust.

Per below, I'd like to discuss:

> I would like to understand the possibility of the trust funding the capital call required below and having that investment reside/owned by the resulting trust.

To be clear, the investment would be owned by the trust.

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

> On Mar 4, 2024, at 14:48, Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com> wrote:
>
> Seth, because this investment is not owned by the trust; it is inadvisable for the trustee to proceed at this time

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, March 4, 2024 3:01 PM
**To:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Aaron E. de Leest <adeleest@DanningGill.com>; John N. Tedford <JTedford@danninggill.com>
**Subject:** FW: Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024

Hi Jocelyn,

Can we arrange a call to discuss this capital call?

Is it correct that the trust can continue to make investments while I am in personal BK?

I would like to understand the possibility of the trust funding the capital call required below and having that investment reside/owned by the resulting trust.

Best,

LEAVITT0000126

Seth

 **Seth Casden**

**CEO and Co-Founder**                                  <image012.png> <image014.png>

<image016.png>
310-600-3673
<image018.png>
www.celliant.com
<image020.png>
seth@celliant.com

<image022.png>
17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

<image024.jpg>

The contents of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

<image025.png>

---

**From:** AngelList <invest@angellist.com>
**Date:** Saturday, March 2, 2024 at 10:20 AM
**To:** Seth Casden <seth@celliant.com>
**Subject:** Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024

<image026.jpg>

## Capital call for SDV Digital Asset Fund: Please transfer $100,020 to your AngelList balance

Hi Seth,

SDV Digital Asset Fund has called 33.3% of the fund. Please transfer your contribution of $100,020 to

your AngelList balance by **Saturday, March 23, 2024.**

Deposit Funds

**Note from Side Door Ventures**

Dear Limited Partners,

We're officially calling our last capital call for the Digital Asset Fund. As you know, the fund is performing extremely well and we're eager to make our last investments this year. Thanks for being on this journey with us, I don't think we could have timed the market any better.

Cheers,
Andrew

| | |
|---|---|
| **Investing as** | Seth Casden |
| **Your total commitment** | $300,000 |
| **Total called to date** | $300,000 (100%) |
| **Previous contributions** | $199,980 |
| **Call amount** | $100,020 (33.3%) |
| **Amount due (03/23/2024)** | $100,020 |

If you would like additional contacts to receive future capital call notices, add them to your team here.

**Transfer funds to your AngelList balance**

Use the wire information below to submit funding for your subscription. Wires are credited 1 business day after receipt

| **Amount** | **Memo** |
|---|---|
| $100,020 | INV3667A5A - Seth Casden |

LEAVITT0000128

**Bank**

Grasshopper Bank

261 5th Ave, Suite 610

New York, NY 10016

**Beneficiary**

FBO AngelList - Seth Casden

261 5th Ave, Suite 610

New York, NY 10016

**Account Number**

███████████

**SWIFT**

GRNOUS33

**ABA**

026015024

**IBAN**

None

Grasshopper Bancorp, Inc. N.A., Member FDIC acts as a receiving bank for AngelList's networked banking sweep account program, which aims to maximize FDIC insurance coverage on deposits.

Wires from banks outside of the United States may take additional time, and may deduct an intermediary bank fee. Please contact your bank for more information.

<image027.jpg>

You're receiving this email because you signed up for AngelList
90 Gold St • San Francisco, CA 94133

<image028.jpg>

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the Attorney-Client or any other privilege.

LEAVITT0000129

Message

| | |
|---|---|
| **From:** | Borowsky, Jocelyn Margolin [JMBorowsky@duanemorris.com] |
| **on behalf of** | Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com> [JMBorowsky@duanemorris.com] |
| **Sent:** | 3/4/2024 10:47:55 PM |
| **To:** | Seth Casden [seth@celliant.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com]; Aaron E. de Leest [adeleest@DanningGill.com]; John N. Tedford [JTedford@danninggill.com] |
| **Subject:** | RE: Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024 |

Seth, because this investment is not owned by the trust, it is inadvisable for the trustee to proceed at this time.

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, March 4, 2024 3:01 PM
**To:** Borowsky, Jocelyn Margolin <JMBorowsky@duanemorris.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Aaron E. de Leest <adeleest@DanningGill.com>; John N. Tedford <JTedford@danninggill.com>
**Subject:** FW: Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024

Hi Jocelyn,

Can we arrange a call to discuss this capital call?

Is it correct that the trust can continue to make investments while I am in personal BK?

I would like to understand the possibility of the trust funding the capital call required below and having that investment reside/owned by the resulting trust.

Best,

Seth



### Seth Casden
**CEO and Co-Founder**

in ⬚

📞 310-600-3673   🌐 www.celliant.com   ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** AngelList <invest@angellist.com>
**Date:** Saturday, March 2, 2024 at 10:20 AM
**To:** Seth Casden <seth@celliant.com>
**Subject:** Action Required: Capital Call for SDV Digital Asset Fund due by Saturday, March 23, 2024

## Capital call for SDV Digital Asset Fund: Please transfer $100,020 to your AngelList balance

Hi Seth,

SDV Digital Asset Fund has called 33.3% of the fund. Please transfer your contribution of $100,020 to your AngelList balance by **Saturday, March 23, 2024.**

Deposit Funds
**Note from Side Door Ventures**

Dear Limited Partners,

We're officially calling our last capital call for the Digital Asset Fund. As you know, the fund is performing extremely well and we're eager to make our last investments this year. Thanks for being on this journey with us, I don't think we could have timed the market any better.

Cheers
Andrew

| | |
|---|---|
| **Investing as** | Seth Casden |
| **Your total commitment** | $300,000 |
| **Total called to date** | $300,000 (100%) |

LEAVITT0000131

| | |
|---|---|
| **Previous contributions** | $199,980 |
| **Call amount** | $100,020 (33.3%) |
| **Amount due (03/23/2024)** | $100,020 |

If you would like additional contacts to receive future capital call notices, add them to your team here

## Transfer funds to your AngelList balance

Use the wire information below to submit funding for your subscription. Wires are credited 1 business day after receipt

**Amount**
$100,020

**Memo**
INV3667A5A - Seth Casden

**Bank**
Grasshopper Bank
261 5th Ave, Suite 610
New York, NY 10016

**Beneficiary**
FBO AngelList - Seth Casden
261 5th Ave, Suite 610
New York, NY 10016

**Account Number**
█████████

**SWIFT**
GRNOUS33

**ABA**
026015024

**IBAN**
None

Grasshopper Bancorp, Inc. N.A., Member FDIC acts as a receiving bank for AngelList's networked banking sweep account program, which aims to maximize FDIC insurance coverage on deposits.

Wires from banks outside of the United States may take additional time, and may deduct an intermediary bank fee. Please contact your bank for more information.

You're receiving this email because you signed up for
AngelList
90 Gold St • San Francisco, CA 94133

.

For more information about Gxxxx Mxxxx, please visit http://www.Gxxxxxxxxx.com

Confidentiality Notice. This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

LEAVITT0000133

Message

| | |
|---|---|
| **From:** | ALAN LEAVITT [lionofzion477@cs.com] |
| on behalf of | ALAN LEAVITT <lionofzion477@cs.com> [lionofzion477@cs.com] |
| **Sent:** | 1/26/2024 6:29:27 PM |
| **To:** | Natalie Schiavone [ns543@ntrs.com] |
| **Subject:** | The trust paying Seth portion of expenses for Pine Rock |

Natalie

When the time comes and I give the ok, the trust has to pay the 25% of Seth's expenses for his share of the property. I'm forwarding my attorney Jocelyn suggestion on how it to be titled.

> Seth, my advice to Terry would be to refrain from making any discretionary distributions to you at this point. However, Terry could direct the trustee to make the investment and the trust would be the owner of that slice of equity in Pine Rock.
>
> Jocelyn

Please let me know if there's any problems or questions. Have a good weekends
Thank you
Alan leavitt
773-5078130
Sent from my iPhone

LEAVITT0000134

Message

| From: | Ronnett Roach [RR249@ntrs.com] |
|---|---|
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 7/30/2021 1:52:45 PM |
| To: | Seth Casden [sethcasden@hotmail.com] |
| CC: | Nai-te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Casden letter of direction |

Hi Seth,

Terry, per your direction, we will arrange for the $150k distribution to Seth from his Resulting Trust (2046 Trust). Please let us know if anything additional is needed.

Thank you and have a great day!

Ronnett



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com
**I am WFH.  Please reach me on my cell phone at (302) 462.1947**

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

From: Seth Casden <sethcasden@hotmail.com>
Sent: Thursday, July 29, 2021 6:06 PM
To: Ronnett Roach <RR249@ntrs.com>
Cc: Nai-te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
Subject: [EXT] Casden letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

I hope this note finds you well.

Please see attached. I sent to Nai-te and received his ooo reply.

Kindly let us know if you have any questions.

Best regards,

Seth

LEAVITT0000138

Message
--------------------------------------------------------------------------------

| | |
|---|---|
| From: | Seth Casden [sethcasden@hotmail.com] |
| on behalf of | Seth Casden <sethcasden@hotmail.com> [sethcasden@hotmail.com] |
| Sent: | 7/29/2021 7:55:51 PM |
| To: | rr269@ntrs.com |
| CC: | Nai-te J Watson [NJW2@ntrs.com]; Terry Leavitt [Tonofzion777@cs.com] |
| Subject: | Casden letter of direction |
| Attachments: | Direction Letter for Distribution_2021_07_29.pdf |

Dear Ronnett,

I hope this note finds you well.

Please see attached. I sent to Nai-te and received his app reply.

Kindly let us know if you have any questions.

Best regards,

Seth

LEAVITT0000137

**Alan Terry Leavitt**
**470 Demling Place**
**Chicago, IL 60614**

July 29, 2021

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

    **Re: The Seth Casden Resulting Trust**
    **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $150,000 from principal for the benefit of Seth Casden on July 30, 2021. Send the funds via wire using the following wire instructions:

    Bank Name: Wells Fargo
    Bank Location: Reno, NV
    Bank ABA Number: 121000248
    Account Name: Seth Casden
    Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*
_____
Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:25E-18

LEAVITT0000138

Message
--------------------------------------------------------------------------------

| | |
|---|---|
| From: | Nai-te J Watson [NJW2@ntrs.com] |
| on behalf of | Nai-te J Watson <NJW2@ntrs.com> [NJW2@ntrs.com] |
| Sent: | 9/20/2021 4:39:29 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Terry Leavitt [tionofzion77@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| Subject: | RE: Follow from call |

Hi Seth,

Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver the Coupang shares to your brokerage account.  Once we receive the DTC instructions, we will submit the request to distribute the shares

Best,
Nai te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722
email njw2@ntrs.com Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.nnrtherntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:25E-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
 c: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <tionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [-X ] Re: Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

Have a great weekend.

Best regards,

Seth

On 9/16/21, 10:20 AM, "Nai te J Watson" <NJW2@ntrs.com> wrote:

    Hi Seth,

    I will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime, I have attached the LOD for Terry's signature.  Once Terry signs the letter, we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

    Best regards,
    Nai te

    Nai-te J. Watson   Senior Vice President   The Northern Trust Company of Delaware
    1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | Fax (302) 428-8722   email njw2@ntrs.com
      Please visit us at northerntrust.com

    Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

LEAVITT0000139

NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 16, 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <tiono#zion4778cs.com>; Ronnett Rosch <RR249@ntrs.com>
Subject: 'EXT' Re: Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless
you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth


Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P.  +1.888.721.1545
M.  +1.310.600.3673
E.  seth@celliant.com
1/383 Sunset Boulevard, Suite A120
Pacific Palisades, CA 90272


https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant...com%2F&amp;data=04%7C01%7CN
JW2%40ntrs.com%7Cc1b44a26c515473da5d7c8d97a14e49b%7C434528d427U4977B1ddae3U8c1761a3%7CU%7C0%7C637675015.5
5870643B%7CUnknown%7C%7CWpG%3Ahd3dRey1xljnimc4oL_AxMDAlI.GJQ_lniv%3luMzI.I.cIRl..61klhatzait.c.svc1f6vnD%3D0%7C100
0&amp;sdata=6%2F%2FIcru%2FQlCv%%dRxwuc%5aF2l9tRgRdAwpvBhvc<jE%5U&amp;reserved=0


On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it.  The information I provided for the 2016 Trust is correct. While the 2016
Trust is for your benefit, it would not use your tax ID number.  Not sure why the trust distributing the
assets would need to have your tax ID number.

Best,
Nai-te


Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801   phone (302) 428-8720   fax (302)
428-8722  | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your
related rights. If you would like our latest insights, including Cyber Security topics, add
e.rnr.herntrus..com in your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 7:49 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <liancl#zion4778cs.cmm>; Ronnett Rosch <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@cellian..com

https://nam04.safelirks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CW
JW2%40ntrs.com%7Cc1b4%426c5154%3da5d%C8d9%a14e49b%%C2434%28d%2%2F049%%81dda6308c1%6113%%C0%%C0%%C63%67%5b%25
5870643857CJn+rowr%7C7xFpbG2sb3d8cy3xIjoi%C4wLfAxMDAiLCJQZfoiV2luMzIiLCJBTfI6IkthaWNiLC3XVCI6Vr0%30%7c190
0&amp;sdata=6%2F%2FIcru%2FQ7Cv%5dRxwuc%5aFZ19tRgRdAwpvGhvc<jE%3D&amp;reserved=0
+13106003673

via wireless device

> Or Sep 15, 2021, at 11:39, Nai te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information. We will prepare the LOD for Terry's signature. Below, I have provided the account number you requested.
>
>       Account number: ▊▊▊▊▊
>       Account title: 2046  RUST FOR SE H CASDEN
>       Tax ID number: ▊▊▊▊▊
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai te J. Watson   Senior Vice President   The Northern Trust Company
> cf Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 428-8720 | fax (302) 428-8722  | email rjw2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.rnr.herntrus..com in your contacts. Learn more about how to safelist messages from Nor.hern Trust.
>
> NTAC:3NS-2D
>
> -----Original Message-----
> From: Seth Casden <seth@cellfant.com>
> Sent: Tuesday, September 14, 2021 4:41 PM
> To: Nai te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <tlienn/zien477@cs.com>
> Subject: [EXT] Re: Follow from call
>
> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te,
>
> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a discretionary distribution of all c=%6 shares.
>

LEAVITT0000141

> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :
>
> The receiving account is also requesting that I provide them with the following into for the
contra-account transferring the assets:
>
> Account number:
> Account title:
> Tax ID number:
>
> Can you provide me with the correct info to relay to them?
>
> Thank you for preparing the letter of direction.
>
> Best regards,
>
> Seth
>
>
> Seth Casden
> Chief Executive Officer
>
> Hologenix
> Inventors of CELLIANT®
>
> T.  +1.888.721.1545
> M  +1.310.600.3673
> E.  seth@celliant.com
> 17383 Sunset Boulevard, Suite A470
> Pacific Palisades, CA 90272
>

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.c%2F&amp;data=04%7C0_%7Cnjw2%40ntrs.
com%2Cc1c74126c515773da5d/D8d9/a1/e49b%/C2/34525d42/C49//81dda63C8c1/61a3%/CC%/CD%/C63/6/5C52558/DG438%/C
unknown%7CTWFp:oGZsb3d8cy:WIjo²¹C4x_jAxMDAiLCJCIjoiV2I.VzIi_C:BTiI6C<_haWaiLCJxVCI6Mn0%3D%7C1000&amp;sdate
=%7Bys:HD4%2R_kr8:d/3WS¹InSgndI8H%2H`pdr13X0%2B6%2Fp:iI_¹s%3D&amp:reserved=0
> elliant.com%CIr&amp;data=04%7CU1%7CNCW2%40ntrs.com%7Cfa>4cfec7f854b9311
> 7608d975797Sed%7:2434528d427D4977a`dd:63D8r:76`a3%7cD%7r0%7cC6376732853
> 72U72885%7CUnknown%7CTWFpbGZsb3d8ey:WIjo²¹C4x_j4x¹DA²LCJCIjoiv2IuvzIiL
> CiRii_Gik1Fawxi_c_xyc16vn0%3u%7c1CD0&amp;;sdata:d-1ohs:elr6Hi7sx:x25/1%?
> BjyDycrPrc_¹you/FBx/2ZC%3D&amp;reserved=0
>
>
>
>
> On 9/14/21. 12:57 PM. "Nai te J Watson" <NJW29ntrs.com> wrote:
>
>    Hi Seth,
>
>    Please confirm that the distribution of the CPNG shares would be a discretionary
distribution?  If so, the distribution amount would be the tax cost of asset, and you would pick up the
gain when the shares are sold.
>
>    I believe you mentioned distributing all the CPNG shares.  Please provide delivery
instructions for the transfer of shares and I will prepare the letter of direction.
>
>    Thanks,
>    Nai-te
>
>
>    Nai-te J. Watson   Senior Vice President   The Northern Trust Company of Delaware
>    1313 N. Market Street, Suite 3300 Wilmington, Delaware _9801 | phone (302) 428-8720 | Fax
(302) 428-8722  | email n_jx29ntrs.com
>    Please visit us at northerntrust.com
>
>    Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights.  If you would like our latest insights, including Cyber Security topics, add
e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>    NTAC:3NS-20
>
>       Original Message
>    From: Seth Casden <seth@celliant.com>
>    Sent: Tuesday, September 14, 2021 1:54 PM

LEAVITT0000142

> To: Nai-te : Watson <hJW2@ntrs.com>
>
> Cc: Terry Leavitt <liono=zion477@cs.com>
>
> Subject: [EXT] Follow from call
>
> this email originated from outside the organization.  Do not click links or open attachments
unless you have verified this email is legitimate.
>
> Hi Nai-te,
>
> I wanted to check in with you and see if you were able to garner any additional information
regarding the potential for distributing the CYNG shares and any related tax issues/liability?
>
> Assuming administratively it can happen, we would like to execute a letter of direction from
entry to proceed
>
> Thanks for any additional information.
>
> Best regards,
>
> Seth Casder
>
> seth@celliant.com

https://nam04.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CW
%2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7c2434526d4270497781dda6308c1761a3%7C0%7C0%7C6376750525
>8/08438%7CJN<rown%/C="FpbGZsb3d8eyJxIjoiMC4uLjAwMD=iLCJQCjoiV2lu4zI=LClbT=I8Ik1haWwiLC=XvCI6YnD%3D%/C1CD
0&amp;sdata=G%2F%2FIcru%2FQlCvXsdRxwuc%SaF2I9tKgRdA4pvBhvc<jE%3D&crp;reserved=0
>
> +13106003673
>
> via wireless device

Message

| | |
|---|---|
| From: | Nai-te J Watson [NJW2@ntrs.com] |
| on behalf of | Nai-te J Watson <NJW2@ntrs.com> [NJW2@ntrs.com] |
| Sent: | 9/16/2021 12:35:24 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Terry Leavitt [tlionnf7'z'c'ny77@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| Subject: | RE: Follow from call |

Hi Seth,

Let me look into it. The information I provided for the 2016 Trust is correct. While the 2016 Trust is
for your benefit, it would not use your tax ID number.  Not sure why the trust distributing the assets
would need to have your tax ID number.

Best,
Nai te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 728-8720 | fax (302) 428-8722
  email rjw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related
rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com
to your contacts. Learn more about how to satellis. messages from Northern Trust.

NTAC:3NS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:49 PM
To: Nai te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <linnof7'nn477@cs.com>; Ronne.t Roach <RR249@n.rs.com>
Subject: [XT] Re: Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you
have verified this email is legitimate.

Hi Nai te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be
rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of
situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
ht.ps://fram04.sa'e1irks.protection.outlnck.com/?url=h.tp%3A%2F%2Fwww.celliant..com%2F&amp;da.a=04%7CC1%7CN
1w2%40ntrs.com%7Cfab4c=ec7f854b331176C8d9787978ed4c7C.434528d4c7U4977B1ddat3U8c1761a3%7CU%7C0%7C63767325853
72672&3%57C.un.crnwr%7C.WFpb&%3b3d8ey.tXIjn1MC4ot.JAAMDA11cJQ'.JnIv?1uWz1TiC1R11.61kIhaww1iz.xvc16vnD%3D%7c1CD
U&amp;sdata=LlohScW1r6IIT7SxOxzSz1%2BjvDycrPmcuTyUJ7FBwZZ0%3D&amp;reserved=0
-13168003673

via wireless device

> On Sep 15, 2021, at 11:39. Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information.  We will prepare the LOD for Terry's signature
Below, I have provided the account number you requested.

```
>
>    Account number:
>    Account title: 2048 TRUST FOR SETH CASDEN
>    Tax ID number:
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801    phone
> (302) 428-8720 | fax (302) 428-8722   | craft njw2@rtrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your
> related rights. If you would like our latest insights, including cyber security topics, add
> e.nr.herntrus..cor .n your contacts. Learn more about how to safelist messages from Northern Trust.
>
> NTAC:3NS 20
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 4:41 PM
> To: Nai-te J Watson <NJW2@rtrs.com>
> Cc:  erry Leavitt <lioncl+inn477@cs.cnum>
> Subject: [DJT] Re: Follow from call
>
> This email originated from outside the organization.  Do not click links or open attachments unless you
> have verified this email is legitimate.
>
> Hi Nai-te,
>
> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a
> discretionary distribution of all CPMG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :
>
> The receiving account is also requesting that I provide them with the following info for the contra-
> account transferring the assets:
>
> Account. number:
> Account title:
> Tax ID number:
>
> Can you provide me with the correct info to relay to them?
>
> Thank you for preparing the letter of direction.
>
> Best regards,
>
> Seth
>
>
> Seth Casden
> Chief Executive Officer
>
> Anlogenix
> Inventors of CELLIANT:
>
> P.  +1.888.721.1545
> M. +1.310.699.3673
> E.  seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272
>
> https://nard4.safelinks.protection.outlook.com/?.rl=http%34%2F%2Fwww.c
> elliant.com%2F&arp;data=04%7C01%7CNJW2&40ntrs.com%7Cfab<cfec7f854b531L
> 76C5d9787978&d97c743452ad42704897781dda6308c1761a3%7c0%7c0%7c637673?853
> 72072885&7CUrknown%7CTWFpbGZsb3d8eyJWLjoiMC4wLjAwMDAi.CIQIjo'VLluMZInL
```

> CJBTiIBI<1haWwiLCJXVCI6Mn0x3Ds/c1D0C&amp;sdata=_lohscw1reR=/sx0xzsz1x2
> EqyDycrPmcuTy0L7FBw2Z0%3D&amp;reserved-0
>
>
>
> On 5/14/21, 12:57 PM, "Nai-te T Watson" <k1w2@n.rs.cnmo orn.e:
>
> Hi Seth,
>
> Please confirm that the distribution of the CPNG shares would be a discretionary distribution?  If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.
>
> I believe you mentioned distributing all the CPNG shares.  Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.
>
> Thanks,
> Nai-te
>
>
> Nai te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801   phone (302) 428-8720   fax (302) 428-8722   email rjw2@ntrs.com
> Please visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including cyber security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> W ACC345-70
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion4770cs.com>
> Subject: [EXT] Follow from call
>
> this email originated from outside the organization   Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te,
>
> I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?
>
> Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed.
>
> thanks for any additional information.
>
> Best regards,
>
> Seth Casden
>
> seth@celliant.com
>
> https://ram04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com&2F&arp:data=04d7C01X7CN
.w2%40ntrs.com%7C1bk4c'mc71854b93117605d9787578=d%7C2434529d427049778idda6308c1761a3%7C0%7CC%7C637673?853
/20823303!/CJn<row=%/C=VFpbaZab3d8eyTxIjoiMC4uL_AwND41LCJQ[_oiV2Tu4zI'LC3BT'EGIk1haWwiLC:XVCI6YnD%3D%/C1CD
0&arp;sdata=pIX9Zz~pc4J9rJh:MDkoniGsCbmum22c6YLZRJU~6m2%3D&arp;reserved-0
> +13106003673
>
> via wireless device

Message

| | |
|---|---|
| **From:** | Ronnett Roach [RR249@ntrs.com] |
| **on behalf of** | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| **Sent:** | 9/23/2021 4:26:13 PM |
| **To:** | Seth Casden [seth@celliant.com]; Nai-te J Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | RE: Follow from call |
| **Attachments:** | W9 Seth Casden - 2021.pdf |

Hi Seth,

By the way introduction, I will be working with Nai-te on the distribution of assets to your brokerage account. In addition, to the DTC instructions from IB we will also need the attached W9 completed, signed, and dated. Once we receive the W9, our back office can move forward with request to distribute the shares. Thank you for your kind attention to this matter.

Best, Ronnett

 **NORTHERN
TRUST**

**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-6858 | rr249@ntrs.com
**I am WFH.  Please reach me on my cell phone at (302) 462.1947**

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a northerntrust.com to your contacts. Learn more about how to safeguard messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NT4C-3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, September 20, 2021 4:47 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

I received the additional instructions:

> IBCS 2021/09/20 16:22:46
> Dear Mr. Casden,
>
> Direct NT to deliver to IB via DTC 0534 FBO Seth Casden - ███

Regards,

IB Funds and Banking Dept.
IBKR Client Services

Kindly let me know if you need anything further.

Best,

Seth

On 9/20/21, 12:27 PM, "Seth Casden" <seth@celliant.com> wrote:

Please also see attached. Are you able to receive the DTC instructions based on this information?

On 9/20/21, 9:29 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver the Coupang shares to your brokerage account. Once we receive the DTC instructions, we will submit the request to distribute the shares.

Best,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722
email njw2@ntrs.com Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:2SE-18

----Original Message----
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@ca.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate

Dear Nai-te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

LEAVITT0000148

Have a great weekend.

Best regards,

Seth

On 9/16/21, 10:20 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

I will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime, I have attached the LOD for Terry's signature. Once Terry signs the letter, we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

Best regards,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 16, 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <honofzion477@ics.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth

Seth Casden

Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P.  +1.888.721.1545
M. +1.310.600.3673
E.  seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C
01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d4270497781dda6308c176fa3%7C0
%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJ
BTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=G%2F%2FIcru%2FQlCvXSdRxWucNSaF2I9tKgRdAwpvB
hvckjE%3D&amp;reserved=0

On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it.  The information I provided for the 2046 Trust is correct. While the 2046 Trust is for your benefit, it would not use your tax ID number.  Not sure why the trust distributing the assets would need to have your tax ID number.

Best,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 email njw2@ntrs.com

Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:49 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <honofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

LEAVITT0000150

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%
7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d4270497781ddao308c17b1a3%7
C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIi
LCJBTjI6fk1JhaWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=G%2F%2FIcru%2FQlCvXSdRxWncNSaF2l9tKgRdAw
pvBhvckjE%3D&amp;reserved=0

+13106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information.  We will prepare the LOD for Terry's signature.  Below, I have provided the account number you requested.
>
> Account number: ▮▮▮▮
> Account title: 2046 TRUST FOR SETH CASDEN
> Tax ID number: ▮▮▮▮
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS-20
>

LEAVITT0000151

> ——Original Message——
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 4:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@cs.com>
> Subject: [EXT] Re: Follow from call
>
> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te,
>
> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a discretionary distribution of all CPNG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :
>
> The receiving account is also requesting that I provide them with the following info for the contra-account transferring the assets:
>
> Account number:
> Account title:
> Tax ID number:
>
> Can you provide me with the correct info to relay to them?
>
> Thank you for preparing the letter of direction.
>
> Best regards,
>
> Seth
>
>
> Seth Casden
> Chief Executive Officer
>
> Hologenix
> Inventors of CELLIANT®
>
> P. +1.888.721.1545
> M. +1.310.600.3673
> E. seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272
>
>

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.c%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26e515473da5d708d97a14e49b%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=%2BygHDF%2BfJxcBsdz9N8fJm5gnRfBB%2Bfpdr1XW%2BG%2FpiLjs%3D&amp;reserved=0

> elliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cfab4cfec7f854b9311

> 7608d9787978ed%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C6376732853
> 72072885%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiL
> CJBTil6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=LlohScwlr6HT7SxOxzSz1%2
> BjyDycrPmcuTy0U7FBw2Z0%3D&amp;reserved=0
>
>
>
> On 9/14/21, 12:57 PM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.
>
> I believe you mentioned distributing all the CPNG shares. Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.
>
> Thanks,
> Nai-te
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
> Please visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS-20
>
> ——Original Message——
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@ics.com>
> Subject: [EXT] Follow from call
>
> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te,
>
> I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?
>
> Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed.
>
> Thanks for any additional information.
>
> Best regards,
>

LEAVITT0000153

> Seth Casden
>
> seth@celliant.com
> https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=0
4%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d4270497781dda6308c1761a3
%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luM
zIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=G%2F%2FIcru%2FQlCvXSdRxWucNSaF2l9tKgRd
AwpvBhvekjE%3D&amp;reserved=0
> +13106003673
>
> via wireless device

LEAVITT0000154

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give Form to the
requester. Do not
send to the IRS.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Seth Casden

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☑ Individual/sole proprietor or single-member LLC

☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

1112 Montana Ave Ste 13

6 City, state, and ZIP code

Santa Monica, CA 90403

7 List account number(s) here (optional)

Requester's name and address (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

▮▮▮ – ▮ – ▮ ▮ ▮ ▮

or

Employer identification number

▮ ▮ – ▮ ▮ ▮ ▮ ▮ ▮ ▮

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of
U.S. person ▶

Date ▶

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

LEAVITT0000155

By signing the filled-out form you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued)

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting*, later, for further information.

Note: If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships*, earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

LEAVITT0000158

Case 2:23-bk-16904-BR   Doc 366-1   Filed 10/08/25   Entered 10/08/25 14:39:07   Desc
Declaration of Nicole A. Sullivan   Page 948 of 1079

Form W-9 (Rev. 10-2018)                                                                                           Page 3

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietor, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and a corporation that provides medical or health care services is not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for... | THEN the payment is exempt for... |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, enter a NEW at line 5. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

## Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at www.SSA.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/Businesses and clicking on *Employer Identification Number (EIN)* under *Starting a Business*. Go to www.irs.gov/Forms to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to www.irs.gov/OrderForms to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for one and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to all other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code*, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

Form W-9 (Rev. 10-2018)

Page 5

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor[4] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships, earlier.

**\*Note:** The grantor also must provide a Form W-8 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

LEAVITT0000159

Form W-9 (Rev. 10-2018)

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at spam@uce.gov or report them at www.ftc.gov/complaint. You can contact the FTC at www.ftc.gov/idtheft or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see www.IdentityTheft.gov and Pub. 5027.

Visit www.irs.gov/IdentityTheft to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

LEAVITT0000160

Message
_____

From:          Nai-te J Watson [NJW2@nts.com]
on behalf of   Nai-te J Watson <NJW2@nts.com> [NJW2@nts.com]
Sent:          9/14/2021 7:57:02 PM
To:            Seth Casden [seth@celliant.com]
CC:            Terry Leavitt [lionofzion77@cs.com]
Subject:       RE: Follow from call


Hi Seth,

Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.

I believe you mentioned distributing all the CPNG shares. Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.

Thanks,
Nai-te


Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428 8720 | fax (302) 428 8722
email rjw28n.ts.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add c.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust

NTAC:3NS 20

        Original Message
From: Seth Casden <seth@celliant.com>
Sent: Tuesday, September 14, 2021 1:54 PM
To: Nai-te J Watson <NJW2@nts.com>
CC: Terry Leavitt <lionofzion177@cs.com>
Subject: [EXT] Follow from call


This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?

Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed

Thanks for any additional information.

Best regards.

Seth Casden

seth@celliant.com
https://ram04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04d7CC1%7CN
.w2%40ntrs.rom%7c5ed109744d924bc.ac768C6d977a593d9%7c2434528d4270497781dda6308c1761a3%7c0%7c0%7c637672388
788b0411s7C.m4roxr%7C.wfpbGZab3d8ey3WIjoiMC4vL5AwNDAnLC30Z5oiV2Iu4zI5LCJ8T5IEIk1ha%w1LC5XvCI6Vn0%30%7C100
0&amp;sdata—wRBv91qljfci6su0c%wtprHr4-AbCF6ia8%2HGe/4uFi%30&amp;reserved=0
-1310b0C3673

via wireless device

Message
-----------------------------------------------------------------------------------------------

From:        Seth Casden [seth@celliant.com]
on behalf of  Seth Casden <seth@celliant.com> 'seth@celliant.com'
Sent:        9/16/2021 3:57:29 PM
To:          Nai-te J Watson [NJW2@ntrs.com]
CC:          Terry Leavitt [tiono²z'on'77@cs.com]: Ronnett Roach [RR249@ntrs.com].
Subject:     Re: Follow from call


Hi Nai te,

Thank you. I agree and provided your contact to IR and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth


Seth Casden
Chief Executive Officer

Hologenix
 inventors of CELLIANT®

P.   +1.868.721.1543
V.  -1.310.600.3673
E.   seth@celliant.com
17383 Sunset Boulevard, Suite 6420
Pacific Palisades, CA 90272

www.celliant.com



On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

    Hi Seth,

    Let me look into it.  The information I provided for the 2046 Trust is correct. While the 2046 Trust
    is for your benefit, it would not use your tax ID number.  Not sure why the trust distributing the assets
    would need to have your tax ID number.

    Best,
    Nai-te

    Nai-te J. Watson   Senior Vice President   The Northern Trust Company of Delaware
    1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428 8720 | Fax (302) 428
    8722    email rjw2@ntrs.com
    Please visit us at northerntrust.com

    Please read our Privacy Notice to learn how we use the personal information you provide and your
    related rights. If you would like our latest insights, including cyber security topics, add
    e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

    NTAC:3NS 20

        Original Message
    From: Seth Casden <seth@celliant.com>
    Sent: Wednesday, September 15, 2021 2:49 PM
    To: Nai-te J Watson <NJW2@ntrs.com>
    Cc: Terry Leavitt <tiono²zion²77@cs.com>; Ronnett Roach <RR249@ntrs.com>
    Subject: _EXT_ Re: Follow from call

    This email originated from outside the organization.  Do not click links or open attachments unless
    you have verified this email is legitimate.

    Hi Nai-te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com

https://ram04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CN
.W2%40ntrs.com%7Clab4e7be71854b63117605d5787978ed%7C243452ad4270497781ddae308c1761a3%7F0%7C0%7C637637379553
7.07%2B85%7CUnkrownN%7C%7FpbG2sb3d8evJWIjoiMC4wLjAwMDAiLCJQIjoiV2luV2Ii.CJBT%22I5I%3Ihab%wiLCJXVCI6MrU%3D%7C10U
0&amp;rdata=lohSnwlr6Rl7SxnkzSz'%2RjyDyc rPmrui1y0L7HHo2%2D%3D&amp;reserved=0
+13106603673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> hank you for sharing the requested information. We will prepare the DO for erry's signature.
Below, I have provided the account number you requested.
>
>     Account number: ███████
>     Account title: 2046 TRUS FOR SETH CASDEN
>     Tax ID number: ████████
>
> Please let me know if you require any additional information.
>
> hanks,
> Nai te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street, Suite 5300 Wilming.nn, Delaware 1980' | phone
> (302) 428 8720    fax (302) 428 8722  | email njw2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your
related rights. If you would like our latest insights, including Cyber Security topics, add
e.rortherntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
> NIAC:3NS-26
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: uesday, September 14, 202' 4:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry _eavitt <lionofzion477@cs.com>
> Subject: [EXT] Re: Follow from call
>
> his email originated from outside the organization. Do not click links or open attachments unless
you have verified this email is legitimate.
>
> Hi Nai te,
>
> Thank you for the follow up and confirmation or tax status/treatment. We can confirm this would be
a discretionary distribution of all CPNG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> he account name is Seth Casden
> The account number is : ███████

> The receiving account is also requesting that I provide them with the following info for the
contra-account transferring the assets:

> Account number:
> Account title:
> Tax ID number:

> Can you provide me with the correct info to relay to them?

> Thank you for preparing the letter of direction.

> Best regards,

> Seth

> Seth Casden
> Chief Executive Officer

> Helagenix
> Inventors of CELLIANT*

> P    +1.888 721 1545
> M.  +1.310.600.3673
> E.  seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272

> ht.ps://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fswww<
> elliart.com%2f&amp;data=04%7C01%7Ch3W%40rtrs.com%7C=ab4cfec7=b54b03_1
> 7698d37837975ed%7c2434528d4270497781dda63c5c1761a3%7c0%7c0%7c0%7c637632853
> 7207.2885%7CJn<rok=X7C"WpbG2sb3d8ey0wIjoiMC4wLjAwMDAiLCJQCjoiV21u4zIi_
> CJE"iI6IklhawmLCJXVEC6"n0X3DX7C_000&amp;sdata=LIoh5cwlr6HT75x0x25z1X2
> B;yUycr=mcuTyCJ/FBw2Z0%3D0&arp;reserved=0

> On 9/14/21, 12:57 PM, "Nai te J Watson" <NEW2&rtrs com> wrote:

>    Hi Seth,

>        Please confirm that the distribution of the CPNG shares would be a discretionary distribution?
If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the
shares are sold.

>        believe you mentioned distributing all the CPNG shares.  Please provide delivery instructions
for the transfer of shares and I will prepare the letter of direction.

>        Thanks,
>        Nai-.e

>        Nai=te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
>        1313 N. Market Street, Suite 5300 Wilmington, Delaware 1980_ | phone (302) 428-8720 | fax (302)
428-8722  | email n_w2@rtrs.com
>        Please visit us at northerntrust.com

>        Please read our Privacy Notice to learn how we use the personal information you provide and your
related rights. If you would like our latest insights, including cyber security topics, add
e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

>        NTAC:3NS-20

>            Original Message
>        From: Seth Casden <seth@celliant.com>
>        Sent: Tuesday, September 14, 2021 1:54 PM
>        cc: Nai-te J Watson <N0W2@ntrs.com>
>        Cc: Terry Leavitt <lfonofzion17/4c3.com>
>        Subject: [EXT] Follow from call

>        This email originated from outside the organization.  Do not click links or open attachments
unless you have verified this email is legitimate.

>        Hi Nai-.e,

>

&gt;   I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CYUG shares and any related tax issues/liability?

&gt;

&gt;   Assuming administratively it can happen, we would like to execute a letter of direction from entry to proceed.

&gt;

&gt;   hanks for any additional information.

&gt;

&gt;   Best regards,

&gt;

&gt;   Seth Casden

&gt;

&gt;   seth@celliart.com

&gt;

https://ram04.safelirks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7C%
2W2X40ntrs.com%7Cfab4c%cc7f854b93117606d9787978ed%7C2434528d4270497781dda6308c1761a1%%7C0%7C0%7C6376732853
/2082838%7CJn<rown%7C%FpbGZ5b3d8eyJxIjoiMC4uL;AwNDAiLCJqIjoiV21.VzIi.CJRT²IbI<1haWwiLCJXVCI6Mr0%30%7C100
0&amp;sdata=pIX9Zz¯pC4L9rJh;NDkoniGsChmum2Zc6XLZRL.¯6m%30&amp;rp;reserved=0

&gt;   -131C60C36/3

&gt;

&gt;   via wireless device

Message
------------------------------------------------------------------------------------

| From: | Seth Casden [seth@celliant.com] |
|---|---|
| on behalf of | Seth Casden <seth@celliant.com> "seth@celliant.com" |
| Sent: | 9/15/2021 6:48:53 PM |
| To: | Nai-te J Watson [NJW2@ntrs.com] |
| CC: | Terry Leavitt [tionofzion777@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| Subject: | Re: Follow from call |

Hi Nai-te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
www.celliant.com
-13106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information. We will prepare the LOD for Terry's signature. Below, I have provided the account number you requested.
>
>     Account number:
>     Account title: 2045 TRUST FOR SETH CASDEN
>     Tax ID number:
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801    phone (302) 428 8720    fax (302) 428 8722    email rjw2@ntrs.com
> Please visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS 20
>
>        Original Message
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 7:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <tionofzion777@cs.com>
> Subject: [EXT] Re: Follow from call
>
> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te,

> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a
discretionary distribution of all CPNG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :
>
> The receiving account is also requesting that I provide them with the following info for the contra-
account transferring the assets:
>
> Account number
> Account title:
> Tax ID number:
>
> Can you provide me with the correct info to relay to them?
>
> Thank you for preparing the letter of direction.
>
> Best regards,
>
> Seth
>
>
> Seth Casden
> Chief Executive Officer
>
> Hologenix
> Inventors of CELLIANT®
>
> P. +1.888.721.1545
> M. +1.310.600.3673
> E. seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272
>
>
https://ram04.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7C
...%7C637c50d7be58fca743c0093a05d977b1f32%7Cc2434528d4270497781dda6308e1761a3%7C0%7C0%7C637672443857
e8140%7c4%7cJn<rowr%7C~wfppoGZsb3d8ev3w1joi%C4%L;AwMDAiLCJQIjoiV2L.WzI'LCJBT'CbIk1haWwiLCJXVCI6%r0%30%7C100
0&amp;sdata=2s0h%2Fg%21Ar~62e5%1%2Fobc%ntVxpV4IM-xkqc8?qR4%3iX&amp;reserved=0
>
>
>
> On 9/14/21, 12:57 PM, "Nai-te T Watson" <Nlw2@ntrs.com> wrote:
>
>     Hi Seth,
>
>     Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If
so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the
shares are sold.
>
>     I believe you mentioned distributing all the CPNG shares.  Please provide delivery instructions for
the transfer of shares and  will prepare the letter of direction
>
>     thanks,
>     Nai te
>
>
>     Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
>     1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801   phone (302) 428-8720   fax (302) 428-
8722    email rjw2@ntrs.com
>     Please visit us at northerntrust.com
>
>     Please read our Privacy Notice to learn how we use the personal information you provide and your
related rights. If you would like our latest insights, including Cyber Security topics, add
e.rnr.herntrus..cor .n your contacts. Learn more about how to safelist messages from Northern Trust.
>
>     VFAC:3NG-20
>
>     -----Original Message-----
>     From: Seth Casden <seth@celliant.com>
>     Sent: Tuesday, September 14, 2021 1:54 PM
>     To: Nai te J Watson <NLW2@ntrs.com>

> Cc: Terry Leavitt <lionofzion477@cs.com>
> Subject: [EXT] Follow from call
>
> This email originated from outside the organization.  Do not click links or open attachments unless
you have verified this email is legitimate.
>
> Hi Nairus,
>
> I wanted to check in with you and see if you were able to garner any additional information
regarding the potential for distributing the CNVG shares and any related tax issues/liability?
>
> Assuming administratively it can happen, we would like to execute a letter of direction from Terry
to proceed.
>
> Thanks for any additional information.
>
> Best regards,
>
> Seth Casden
>
> seth%cellian..cor
>
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7Cv
iw2%40ntrs.com%7C0Ud2be08%ca%43c0U93aC8d977bff32447C2434528d42704U7781ddab3C8c1761a3447CC%7CC0%7C63767264885
7661404487CUn<rowr%7C%7CFpbGZsb3d8cyJ*Ijo1MC4wLjAAMDAiLC3QEfoiV2lu%zI%LC3BT%C6IkLhaWAiLC3XVCI6%n0%3D%7C100
0&amp;sdata=2s0h%2Fg<Z1Ar£6Ze5YT%2FobcvntVApV%TMtZxkyc8/qR4%3D&amp;reserved=0
> +13106003673
>
> via wireless device

Message

From:           Nai-te J Watson [NJW2@ntrs.com]
on behalf of    Nai-te J Watson <NJW2@ntrs.com> [NJW2@ntrs.com]
Sent:           9/15/2021 6:39:49 PM
To:             Seth Casden [seth@celliant.com]
CC:             Terry Leavitt [lionof2ion77@cs.com]; Ronnett Roach [RR249@ntrs.com]
Subject:        RE: Follow from cell

Hi Seth,

Thank you for sharing the requested information.  We will prepare the LOD for Terry's signature.  Below,
I have provided the account number you requested.

        Account number:
        Account title: 7046   RUST FOR SETH CASDEN
        Tax ID number:

Please let me know if you require any additional information.

Thanks,
Nai-te

Nai te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Stree., Suite 5300 Wilming.nn, Delaware 1980   | phone (302) 478-8720 | fax (302) 478-8722
email rjw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related
rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com
to your contacts. Learn more about how to safelist messages from Northern Trust.

NTDC:BN8-2G

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Tuesday, September 14, 2021 4:41 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionof2ion477@cs.com>
Subject: [-x ] Re: Follow from cell

 his email originated from outside the organization.  Do not click links or open attachments unless you
have verified this email is legitimate

Hi Nai-te,

Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a
discretionary distribution of all CPNG shares.

The brokerage account is with.

Interactive Brokerage (IB)
The account name is Seth Casden
The account number is :

The receiving account is also requesting that I provide them with the following info for the contra-
account transferring the assets:

Account number:
Account title:
Tax ID number:

Can you provide me with the correct info to relay to them?

Thank you for preparing the letter of direction

Best regards,

Seth

Seth Casden
Chief Executive Officer

Hologenix
 nventions of CH. IANT®

P.  +1.858.721.1545
V.  -1.310.600.3673
E.  seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CN.w2%40ntrs.rnm%7C00d2be08?ca?43c0093a05d977b1f374%7c243452ad4270497781dda6308e1761a3%7c0%7c0%7c637276724885
7e814044s7CJn<rown%7C?WFpbGZsb3d8evJWIjoi%C4%L;AwMDAiLC3Q;joiV21.%zI?LCJBT?EeIk1ha%wiLCJXvCI6Vr0%3D%7C100
0&amp;sdata=2s0h%2Fq<21Ar=62c5?I%2FobcvntVwpV4TMtExkqc87qR4%3D&amp;reserved=0

On 9/14/21, 12:57 PM, "Nai-te . Na.snn" <N.w2?@ntrs.com> wrote:

   Hi Seth,

   Please confirm that the distribution of the CPNG shares would be a discretionary distribution?  If
   so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the
   shares are sold.

   I believe you mentioned distributing all the CPNG shares.  Please provide delivery instructions for
   the transfer of shares and  will prepare the letter of direction

      thanks,
      Nai te

   Nai-te J. Watson   Senior Vice President   The Northern Trust Company of Delaware
   1313 N. Market Street, Suite 3300 Wilmington, Delaware 19801 | phone (302) 428-8720 | Fax (302) 428-
8722   email rjw2@ntrs.com
       Please visit us at rnrtherntrust.com

   Please read our Privacy Notice in learn how we use the personal information you provide and your
   related rights. If you would like our latest insights, including Cyber Security topics, add
   e.rnr.herntrus..com in your contacts. Learn more abou. how to sa?elist messages from Nor.hern Trust.

   NTAC:3NS-20

   -----Original Message-----
   From: Seth Casden <seth@celliant.com>
   Sent: Tuesday, September 14, 2021 1:54 PM
   To: Nai te J Watson <NJW2@ntrs.com>
   Cc: Terry Leavit. <licnn?zicn477%s.com>
   Subject: "EXT" Follow from call

   This email originated from outside the organization.  Do not click links or open attachments unless
   you have verified this email is legitimate.

      Hi Nai te,

      I wanted to check in with you and see if you were able to garner any additional information regarding
   the potential for distributing the CPNG shares and any related tax issues/liability?

      Assuming administratively it can happen, we would like to execute a letter of direction from Terry to
   proceed.

      thanks for any additional information.

      Best regards,

      Seth Casden

      seth@celliant.com

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CN.w2%40ntrs.rnm%7C00d2be08?ca?43c0093a05d977b1f374%7c243452ad4270497781dda6308e1761a3%7c0%7c0%7c637276724885
7e814044s7CJn<rown%7C?WFpbGZsb3d8evJWIjoi%C4%L;AwMDAiLC3Q;joiV21.%zI?LCJBT?EeIk1ha%wiLCJXvCI6Vr0%3D%7C100
0&amp;sdata=2s0h%2Fq<21Ar=62e5?I%2Fobcvnt%wpV4IM<-xkqc87qR4%3D&amp;reserved=0
   +13106003673

via wireless device

LEAVITT0000171

Message
```
From:          Seth Casden [seth@celliant.com]
on behalf of   Seth Casden <seth@celliant.com> 'seth@celliant.com'
Sent:          9/14/2021 8:40:51 PM
To:            Nai-te J Watson [NJW2@ntrs.com]
CC:            Terry Leavitt [tionptzion77@cs.com]
Subject:       Re: Follow from cal
```

Hi Nai-te,

Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a discretionary distribution of all CPNG shares.

The brokerage account is with.

Interactive Brokerage (IB)
The account name is Seth Casden
The account number is :  ▮▮▮▮▮▮▮

The receiving account is also requesting that I provide them with the following info for the contra-account transferring the assets:

Account number:
Account title:
Tax ID number:

Can you provide me with the correct info to relay to them?

Thank you for preparing the letter of direction

Best regards,

Seth


Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P.  +1.858.721.1545
V.  +1.310.600.3673
F.  seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com


On 9/14/21, 12:57 PM, "Nai-te . Watson" <NJW2@ntrs.com> wrote:

    Hi Seth,

    Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.

    I believe you mentioned distributing all the CPNG shares.  Please provide delivery instructions for the transfer of shares and  will prepare the letter of direction.

    Thanks,
    Nai-te


    Nai-te J. Watson    Senior Vice President    The Northern Trust Company of Delaware
    1313 N. Yorke. Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722    email rjw2@ntrs.com
    Please visit us at rnrtherntrust.com

LEAVITT0000172

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including cyber security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS 20

-----Original Message-----
From: Seth Casder <seth@celliant.com>
Sent: Tuesday, September 14, 2021 1:51 PM
To: Nai-to C Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <tlienn7zicn4772@s.com>
Subject: [EXT] Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-to,

I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the TPKG shares and any related tax issues/liability?

Assuming administratively it can happen, we would like to execute a letter of direction from Terry in proceed

Thanks for any additional information.

Best regards,

Seth Casder

seth@celliant.com

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C0_%7CN
IW2%40ntrs.com%7C5edf09774d921bcac7680Sd977a893d9%7C24345280d72704977781dda6509c1761i3%7C0%7C0%7C637650635
786904111?7C.Unknown%7C_WFpbGZsb3d8cyJmIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6IkikihaWaiLcixvC16%n0%30%7C100
0&amp;sdata=WFBv91qJjfoLGS0Ch%7tpr+C4EAbCF_GIa8%28Ge24uFI%3D&amp;reserved=0
+13106003673

via wireless device

Message
--------------------------------------------------------------------------------
From:          Seth Casden [seth@celliant com]
on behalf of   Seth Casden <seth@celliant.com> 'seth@celliant.com'
Sent:          9/20/2021 7:37:07 PM
To:            Nai-te J Watson [NJW2@ntrs.com]
CC:            Terry Leavitt [tiono²z²on⁴77@cs.com]; Ronnett Roach [RR249@ntrs.com]
Subject:       Re: Fo low from cal
Attachments:   CPNG_LOB.pdf


Please also see attached. Are you able to receive the DTC instructions based on this information?

On 9/20/21, 9:29 AV, "Nai te J Watson" <NJW2@ntrs.com> wrote:

    Hi Seth,

    Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that
    we can deliver the Company shares to your brokerage account. Once we receive the DTC instructions, we
    will submit the request to distribute the shares.

    Hest,
    Nai te


    Nai-te I. Watson   Senior Vice President   The Northern Trust Company of Delaware
    1313 N. Market Street, Suite 3300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-
    8722    email rjw2@ntrs.com Please visit us at northerntrust.com

    Please read our Privacy Notice to learn how we use the personal information you provide and your
    related rights. If you would like our latest insights, including cyber security topics, add
    e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

    NTAC:2SE-18

    -----Original Message-----
    From: Seth Casden <seth@celliant.com>
    Sent: Friday, September 17, 202_ 3:34 PM
    To: Nai-te J. Watson <NJW2@ntrs.com>
    Cc: Terry Leavitt <liono²zion⁴77&cs.com>; Ronnett Roach <RR249@ntrs.com>
    Subject: [EXT] Re: Follow from call

    This email originated from outside the organization.  Do not click links or open attachments unless
    you have verified this email is legitimate.

    Dear Nai-te,

    Please find attached the executed letter of direction.

    I have also forwarded to IB in the hopes it will help facilitate the transfer.

    Have a great weekend.

    Best regards.

    Seth


    Or 9/16/21, 10:20 AM, "Nai te J Watson" <NJW2@ntrs.com> wrote:

        Hi Seth,

        I will wait to hear from IB.  I'm happy to discuss this matter with them. In the meantime, I have
    attached the LOD for Terry's signature.  Once Terry signs the letter, we will be in a position to
    transfer the shares, provided we can resolve any of IB's questions/concerns.

        Best regards,
        Nai te


        Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
        1313 N. Market Street, Suite 3300 Wilmington, Delaware 19801    phone (302) 428-8720    fax (302)
    428-8722   | email njw2@ntrs.com

Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.rnr.herntrus..<or .n your contacts. Learn more abou. how to sa"elist messages from Northern Trust.

NTAC:2SE-18

-----Original Message-----
From: Seth Casden <sethCcelliant.com>
Sent: Thursday, September 16, 202' 1':57 AM
To: Nai te J Watson <NJW2@ntrs.com>
Cc: Terry Leavi.t <lionelzion477@cs.comm>; Barnett Roach <BR2490ntrs.com>
Subject: [EXT] Re. Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth

Seth Casden
Chief Executive Officer

Hologerix
Inventors of CELLIANT®

P.  1.885.721.1545
M. +1.310.600.3673
F.  se.h@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://ram0/.sa=elirks.protection.outlook.cor/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=C4%7C01%7CN
:W2%40ntrs.com%7Cc1b44a26c515473da5d7c8d97a14c49b%7C2434528d4270497781dda6308c1761c3%7C0%7C0%7C6376750525
5870643%7Cun crnwr%7C wFpb&&sh3d&ey IxIjniMC4ot IAAMUAiICUQ IniV?luM/I ICIRI I 6ikIhas&iir.xvci6&nD%30%7c1CD
U&arp;sdata=G42F&2FIcru%2FQlCvX&dRxwuc NSaF2l9tKgRdAwpvBhvc<jC&3D&arp:reserved=0

On 9/16/21. 5:35 AM. "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it.  The information I provided for the 2046 Trust is correct. While the 2046 Trust is for your benefit, I would not use your tax ID number.  Not sure why the trust distributing the assets would need to have your tax ID number.

Best.
Nai-te

Nai-.e T. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington Delaware 19801 | phone (302) 428 8720 | fax (302) 428-8722  | email nj_2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.rortherntrust.cor to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS 20

Original Message

From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:49 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <l-onofzion477@cs.com>, Ronnett Roach <RR24@ntrs.com>
Subject: [-x ] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments
unless you have verified this email is legitimate.

Hi Nai-te,

Thanks for the follow.

have been informed by H that if the account title and tax ID does not match the transfer
will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of
situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com

https://nam04.safelinks.protection.outlook.com/?url=h.tp%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7c01%7cN
JW2%40ntrs.com%7cc1b44a26c515473da5d7c8d97a14e49b47c434528d4270497781ddae3U8c1761a3%7C0%7C0%7C637676750525
5870643857cUncnwer%7C0%7cpo6zsb3dRey1wtjniMc4si_AemDaitc10_jniv?l_M2TTCl8T1_6lkIhatwait.xvc16vrD%30%7c10D
U&amp;sdata=G42F42F1cruszFQlCvXSdRsNucNSaf219tKgRdAwpvBhvc<jEG3D&amp;reserved=0
-13106003673

via wireless device

> On Sep 15, 2021 at 1:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information. We will prepare the LOD for Terry's
signature. Below, I have provided the account number you requested.
>
>     Account number: [redacted]
>     Account title: 2046 TRUST FOR SETH CASDEN
>     Tax ID number: [redacted]
>
> Please let me know if you require any additional information.
>
> Thanks
> Nai-te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street. Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 428-8720 | fax (302) 428-8722    email njo2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights. If you would like our latest insights, including Cyber Security topics, add
e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS 20
>
>        Original Message
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 7:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <l-onofzion477@cs.com>
> Subject: [EXT] Re: Follow from call
>
> This email originated from outside the organization. Do not click links or open
attachments unless you have verified this email is legitimate.
>

LEAVITT0000178

> Hi Nai-te,
>
> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this
would be a discretionary distribution of all CPNG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is: ███████████
>
> The receiving account is also requesting .ha.   provide .hem with the following info for
the contra account transferring the assets:
>
> Account number:
> Account title:
> Tax ID number:
>
> Can you provide re with the correct info to relay to them?
>
> Thank you for preparing the letter of direction.
>
> Best regards,
>
> Seth
>
>
> Seth Casden
> Chief Executive Officer
>
> Hologenix
> Inventors of C-ELEANT?
>
> P.  -1.888.721._545
> M. +1.310.600.3673
> E.  seth@cell:ant.com
> 1/383 Sunset Boulevard, Suite A/20
> Pacific Palisades, CA 90272
>

ht.ps://ram04.sa'slirks.protection.outlnck.con/?url-h.tp%3A%2F%2Fwww.c%2F&amp;data=D4%7C0'%7Ftt.n%2%40ntrs.
com%7Cc1>44a2ec515+73da5d708d97a1.4e4Ub%7C24845:8d42704U7781dda6308c17e1a3%7C0%7C0%7C0a7Ce37e75C52558706438a7C
snkncon%7C10%-p:6z-b3dSey.et jc'vC4w jawtnAilC1G1jniv2l.v2li C.H111G .C'harweilCJ.svC16Mn0%30%7C1D0G&amp;sdata
=%2BycHDF%2B2xcBadz9V8"JrbgnRfU0%2B_pdr1XW%2B6%2FpiLj's%3D&amp:reserved=0
> elli'art.con%2F&crp;data-04%7C0_37CNJ%2%40rtrs.com%7Cfab4cfcc7"654>931_
> /608d9/8/9/8ed%/C2134528d/2/049//81dda630Sc1/61a3%/C0%/C0%/C63/6/32853
> 72072863%7CLnknoanX7CTWFpbGZsb3d0cyJ%_joiMC4wLjAm^DAi_C:QIjo'v2luMzzil.
> C.B111G .C'harweilC1svC16Mn0%30%7C1D0G&amp;sda.i.-1lnFScolr6H17SxOx>Sz1%?
> BjyDycrPmcuTyUL7FBw2Z0%3D&amp:reserved=0
>
>
>
> On 9/14/2_. _2:57 PV, "Nai-te J Watson" <NJW29ntrs.com> wrote:
>
>     Hi Seth,
>
>     Please confirm that the distribution of the CPNG shares would be a discretionary
distribution?   'se, the distribution amount would be the tax cost of asset, and you would pick up the
gain when the shares are sold.
>
>     I believe you mentioned distributing all the CPNG shares.  Please provide delivery
instructions for the transfer of shares and I will prepare the letter of direction.
>
>     Thanks,
>     Nai-te
>
>
>     Nai te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
>     '313 N. Market Street, Suite 5300 Wilmington, Delaware 19801    phone (302) 428-8720
fax (302) 428-8/22  | email njw2@ntrs.com
>     Please visit us at northerntrust.com
>
>     Please read our Privacy Notice to learn how we use the personal information you provide
and your related rights. If you would like our latest insights, including cyber security topics, add
e.rortherntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>

> MAC:3N5-20
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM
> To: Nate J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionelzion477@cs.com>
> Subject: [EXT] Follow from call
>
> This email originated from outside the organization.  Do not click links or open
attachments unless you have verified this email is legitimate.
>
> Hi Nate.
>
> I wanted to check in with you and see if you were able to garner any additional
information regarding the potential for distributing the CPWG shares and any related tax
issues/liability?
>
> Assuring administratively it can happen, we would like to execute a letter of direction
for Terry to proceed.
>
> Thanks for any additional information.
>
> Best regards
>
> Seth Casden
>
> seth@celliant.com

https://ram04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CN
JW2%40ntrs.com%7Cc1b44a26c51547sda5d7C&d97a14e49b%7C243452&d<27U4977&1ddab3C&c1761a3.s7C0%7C0%7C637675U525
5870643&%7CUnknrwer%7C:BYpb&Vsb3dRey1wIjniBc4ol_jAkNDAiIcUQ_JniV?luMz111CIRI"_61k1hata1ir.wC1(VnD%30%7r1CD
U&amp;sdata=G.2Fs2FIcru%2FQlCvXSdReVwucVSar219tKgRdAkpvBhvc<jD.30&amp;reserved=U
>
> +13_06003673
>
> via wireless device

LEAVITT0000178

Authorization Form

Process the requested DTC share delivery to Interactive Brokers (DTC 0534) per the instructions below:

Request Date
2023-08-28 00:08:09

Reference Number
189664072

Account ID


Broker Name
THE NORTHERN TRUST COMPANY (92485)

Account Name of Titles

Tax Identification Number

**Transaction Information**

| ASSET TYPE | POSITION NAME | IDENTIFIERS | QUANTITY |
|---|---|---|---|
| Stock | COUPANG INC / NYSE | ISIN: US22266T1097 Symbol: CPNG CUSIP: 22266T109 | 12467 |

**Customer Signature**

**Brokerage Contact**
Clearing Operations

Telephone
203-618-5920

Fax
203-618-5891

Interactive Brokers LLC
P.O. Box 5275
Greenwich 06831
United States

LEAVITT0000179

Message
--------------------------------------------------------------------------------
From:          Seth Casden [seth@celliant com]
on behalf of   Seth Casden <seth@celliant.com> "seth@cellian..com"
Sent:          9/20/2021 7:34:55 PM
To:            Nai-te J Watson [NJW2@ntrs.com]
CC:            Terry Leavitt [tjpnp7z'en/77@cs.com]; Ronnett Roach [RR249@ntrs.com].
Subject:       Re: Fo low from cal

Hi Nai-te,

I received this response today:

> IBCS 2021/09/20 15:00:00
> Dear Mr. Casden,
>
> If NT is willing to execute the delivery, you may complete an FOP (US) notification to prepare your account for
> the delivery and provide them with the instructions shown for processing.
>
> Regards,
>
> Funds & Banking Dept.
> IBKR Client Services

I followed their instructions and completed an FOP. I received the following reference number: 189584072.

Please confirm if this is sufficient to proceed or if anything further is required. Thank you for your patience and help
throughout this process.

Best,

Seth

On 9/20/21, 9:29 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

   Hi Seth,

   Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver
   the Company shares to your brokerage account. Once we receive the DTC instructions, we will submit the request to
   distribute the shares.

   Best,
   Nai-te


   Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
   1313 N. Market Street. Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720   fax (302) 428-8722   email
   njw2@ntrs.com Please visit us at nor.herntrust.com

   Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you
   would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about
   how to safelist messages from Northern Trust.


   NTAC:2SE 18

LEAVITT0000180

Original Message
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion177@es.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

Have a great weekend.

Best regards,

Seth


On 9/16/21, 10.20 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote.

Hi Seth,

i will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime, I have attached the LOD for Terry's signature. Once Terry signs the letter. we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

Best regards,
Nai-te


Nai-te J. Watson  Senior Vice Presiden.  The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington. Delaware 19801   phone (302) 428-8720   fax (302) 428-8722
email njw2@ntrs.com

Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights. including Cyber Security topics. add c.northern.trust.com to your contacts. Learn more about now to safelist messages from Northern Trust.


NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Thursday. September 16. 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion177@es.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth

Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P +1.858.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CNJW2%24=0ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d4270497781dda6308c176Ia3%7C0%7C0%7C637675052558706438%7C7CUnknown%7C7CTWTpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2LMdiLCJB Ti16Ik1haWwiLCJXVCl6Mn0%3D%7C7C1000&amp;sdata=G%2F%2FTheru%i2TQlCvXSdRxWusNSaF210.KgRdAwpvB3 vokjI-%31D&amp;reserved=0

On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote.

Hi Seth,

Let me look into it. The information I provided for the 2046 Trust is correct. While the 2046 Trust is for your benefit, it would not use your tax ID number. Not sure why the trust distributing the assets would need to have your tax ID number.

Best,
Nai-te

Nai-te J. Watson  Senior Vice President  The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 728-8730  fax (302) 428-8733
email njw2@ntrs.com
Please visit us at: northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:29 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@nos.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai te.

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26a515473cba5d708d07a14ac9b%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C637637505255870648%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=G%2F%2Floru%2FQR%2FXNdRxWteNSaF2l9tKgRdAwpvBhvekjE%3D&amp;reserved=0

13106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information. We will prepare the LOD for Terry's signature. Below, I have provided the account number you requested
>
> Account number: ▮▮▮▮▮▮▮
> Account title: 2046 TRUST FOR SETH CASDEN
> Tax ID number: ▮▮▮▮▮▮▮
>
> Please let me know if you require any additional information.

> -
> Thanks,
> Nai-te
>
>
>
> Nai te J. Watson  Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N  Market  Street, Suite 5300 Wilmington, Delaware 19801  phone
> (302) 428-8720  fax (302) 428-8722   email njw2@ntrs.com. Please
> visit us at northerntrust.com
>

> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights.
If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn
more about how to safehs. messages from Northern Trust.

>
>
> NTAC:3NS 20
>
> -----Original Message-----
> From: Seth Casden <seth@boellian..com>
> Sent: Tuesday, September 14, 2021 4:11 PM
> To: Nai te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@es.com>
> Subject: [EXT] Re: Follow from call
>

> This email originated from outside the organization.  Do not chck links or open attachments unless you have
verified this email is legitimate.

>
> Hi Nai-te,
>

> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a
discretionary distribution of all CPNCi shares.

>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :  ▮▮▮▮▮▮▮▮▮
>

> The receiving account is also requesting that I provide them with the following info for the contra account
transferring the assets:

>
> Account number:
> Account title:
> Tax ID number:
>

> Can you provide me with the correct info to relay to them?
>

> Thank you for preparing the letter of direction.
>

> Best regards,
>
> Seth
>
>

> Seth Casden
> Chief Executive Officer
>
> Holugenix
> Inventors of CELLIAN 136
>
> P  +1.888.721.1545
> M.  1.310.600.3673
> E:  seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272
>
>

https://nam04-safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.c%2F&amp;data=04%7C01%7CNJW2%40
ntrs.com%7Cc1b4da26e515473cba5d708d97a14ae9b%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C637675
05355870648%7Unknown%7CTWFphCizsb3dxeyJWIjoiMCIwLjAwMDAAil CJQIjoiV2luMzdiIiCJBTiI6IkI 1nWwil .
CJAVCI6Mn0%3D%7C1000&amp;sdata=%3ByqHDF%2BlxeBsdz9N8tJm5gnRJBB%2B1pd/1XW%2BG%2FpiLjs%3
D&amp;reserved=0

> elliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7C1ib4cfec7/354b93 11
> 7608d9787978ed%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C637673285
> 720728485%7CUnknown%7CTWFphCi7sb3d8eyJWIjniMC4wLjAwMDAil CJQIjoiV2luMzdiI.
> CJBTiI6ikI 1nWwil CJXVCI6Mn0%3D%7C1000&amp;sdata=LiohSewlr6H175xOxxSz1%2
> BjyDyeiPmeiTy0U7FBw2Z0%3D&amp;reserved=0
>
>
>
>
> On 9/14/21, 12:57 PM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.
>
> I believe you mentioned distributing all the CPNG shares. Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.
>
> Thanks,
> Nai-te
>
>
> Nai-te J. Watson  Senior Vice President  The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720  fax (302) 428-8722  email njw2@ntrs.com
> Please visit us at northerntrust.com.
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trus..
>
>
> NTAC:3NS 20
>
> ------Original Message------
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM

LEAVITT0000185

> To: Nai×e J Watson <NJW2@entrs.com>

> Cc: Terry Leavitt <lioncZaron477@cs.com>

> Subject: [EXT] Follow from call

>

> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

>

> Hi Nai×e.

>

> I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?

>

> Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed.

>

> Thanks for any additional information.

>

> Best regards,

>

> Seth Casden

>

> seth@cclliant.com

> https://nam11.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.cclliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26e515473da5d708d97a14e49b%7C2434528d4270497781dda630δc1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2lzM2hLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;data=G%2F%2Fleru%2FQlCvXSdRxWucNSaT2l9tKgRdAwpvBavskjP%3D&amp;reserved=0

> −13318003673

>

> via wireless device

Message
--------------------------------------------------------------------------------
From:         Seth Casden [seth@celliant.com]
on behalf of  Seth Casden <seth@celliant.com> 'seth@cellian..com'
Sent:         9/20/2021 8:46:40 PM
To:           Nai-te J Watson [NJW2@ntrs.com]
CC:           Terry Leavitt [tlonnfz'lon/77@cs.com]; Ronnett Reach [RR249@ntrs.com]
Subject:      Re: Follow from cal

Hi Nai-te,

I received the additional instructions.

    IBCS 2021/09/20 16:22:46
    Dear Mr. Casden,

    Direct NT to deliver to IB via DTC 0534 FBO Seth Casden

    Regards,

    IB Funds and Banking Dept.
    IBKR Client Services

Kindly let me know if you need anything further.

Best,

Seth


On 9/20/21, 12 27 PM, "Seth Casden" <seth@celliant.com> wrote:

   Please also see attached. Are you able to receive the DTC instructions based on this information?

   On 9/20/21, 9.29 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

   Hi Seth,

   Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver the Company shares to your brokerage account. Once we receive the DTC instructions, we will submit the request to distribute the shares.

   Best,
   Nai-te

   Nai-te J. Watson  Senior Vice President  The Northern Trust Company of Delaware
   1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801  phone (302) 428 8720  fax (302) 428 8722
   email njw2@ntrs.com Please visit u s at northerntrust.com

   Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add c.northerntrust com to your contacts. Learn more about how to safelist messages from Northern Trust.


   NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <llionofzion77@cs.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

Have a great weekend

Best regards,

Seth

On 9/16/21, 10:20 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

I will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime, I have attached the LOD for Terry's signature. Once Terry signs the letter, we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

Best regards,
Nai te

Nai-te J. Watson   Senior Vice President   The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 728-8730   fax (302) 428-8732
email njw2@ntrs.com

Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add c.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust

NTAC.25E-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 16, 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

LEAVITT0000188

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth

Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P.   1.888.721.1545
M.  1.310.600.3673
E.  seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C
01%7CNJW2%40ntrs.com%7Cc1b44a26e515473da5d708d97a14ee9b%7C243452824270497781dda6308c1761a3%7C0
%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJ
BTi6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=G%2F%2Flcru%2FOJCvXSdRxWLeNSaT2l9tKgRdAwpvB
hvekjE%3D&amp;reserved=0)

On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it. The information I provided for the 2046 Trust is correct. While the 2046 Trust is for your
benefit, it would not use your tax ID number. No sure why the trust distributing the assets would need to have your tax
ID number.

Best,
Nai-te

Nai-te J. Watson  Senior Vice President  The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801  phone (302) 428-8720  fax (302) 428-8722
email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NT ACCESS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:19 PM
To: Nailte J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <tleonofzion477@cs.com>, Robnxtt Roach <RR2494jntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nailte,

Thanks for the follow.

I have been informed by 18 that if the account title and tax ID does not match the transfer will be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
https://nam04.safelinks.protection.outlook.com?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26e515473da5d708d97a14e49b%7C2434528d4270497781dda6308e1761a3%57C0%57C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=i%2F%2Fleru%2FQlGvXSdRxWueNSaF2l9tKgRdAwpvBhvekjE%3D&amp;reserved=0
113106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nailte J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth
>
> Thank you for sharing the requested information. We will prepare the LOD for Terry's signature. Below, I have provided the account number you requested.
>
> Account number:
> Account title: 2046 TRUST FOR SETH CASDEN
> Tax ID number:
>
> Please let me know if you require any additional information.

LEAVITT0000190

> Thanks.
> Nai-te
>
>
>
> Nai te J Watson  Senior Vice President  The Northern Trust Company
> of Delaware
> 1313 N. Market Street Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 228-8720  fax (302) 228-8722   email njw2@ntrs.com Please
> visit us at northerntrust.com
>

> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights  including Cyber Security topics, add e.northerntrust.com to your contacts Learn more about how to safebat messages from Northern Trus..

>
>
> NTAC:3NS 20
>
> -----Original Message-----
> From: Seth Casden <seth@eeelliant.com>
> Sent: Tuesday, September 14, 2021 4:21 PM
> To: Nai te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@cs.com>
> Subject: [EXT] Re: Follow from call
>

> This email originated from outside the organization   Do not click links or open attachments unless you have verified this email is legitimate.
>
> Hi Nai-te.
>

> Thank you for the follow up and confirmation on tax status treatmen.. We can confirm this would be a discretionary distribution of all CPNG shares.
>
> The brokerage account is with:
>
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is :
>

> The receiving account is also requesting that I provide them with the following info for the contra account transferring the assets:
>
> Account number:
> Account title:
> Tax ID number:
>
> Can you provide me with the correct info to relay to them?
>
> Thank you for preparing the letter of direction
>
> Best regards.
>
> Seth
>
>

LEAVITT0000191

> Seth Casden
> Chief Executive Officer
>
> Hologenix
> Inventors of CELLIANT®
>
> P.   1.888.721.1545
> M. 11.310.600.3673
> E.  seth@celliant.com
> 17385 Sunset Boulevard, Suite A121
> Pacific Palisades, CA 90272
>
>

http://nam04-safelinks.protection.outlook.com/?url-http%3A%2F%2Fwww.c%3F&amp;data-04%7C01%7CNJW2%540ntrs.com%7Cc1b44a26e515473da5d708d97a14e49b%7C24345 28d4270497781dda6308c1761a3%7C0%7C0%7C637675053558706438%7CUnknown%7CTWFpbGZsb3dkeyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=%3ByqHDF%2BbxeBsdz9N8Jm5gnRtBB%2B1pd/1XW%2BG%2FpiLjs%3D&amp;reserved=0

> elliant.com%2F&amp;data-04%7C01%7CNJW2%540ntrs.com%7CClab4efec7l854b9311
> 7608d97897782d%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C637673285 3
> 72072855%7CUnknown%7CTWTpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiL.
> CJBTiI6IkThaWwiLCJXVC16Mn0%3D%7C1000&amp;sdata=IJohSewk6H17SxOxzS21%2
> BjyDyeiPmeuTyOU7FBw2Z0%3D&amp;reserved=0
>
>
>
>
> On 9/14/21, 12:57 PM, "Nai-te J Watson" <NJW2@ntrs.com> wrote.
>
> Hi Seth,
>
> Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.
>
> I believe you mentioned distributing all the CPNG shares. Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.
>
> Thanks,
> Nai-te
>
>
> Nai-te J. Watson  Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market. Street, Suite 5300 Wilmington, Delaware 19801  phone (302) 428-8720 | fax (302) 428-8722  email njw2@ntrs.com
> Please visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC 3NS 20
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM

LEAVITT0000192

> To: Nai te J Watson <NJW2@nrs.com>

> Cc: Terry Leavitt <tlonoff.ion477@cs.com>

> Subject: [EXT] Follow from call

>

> This email originated from outside the organization. Do not chek links or open attacoments unless you have verified this email is legitimate.

>

> Hi Nai-te,

>

> I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?

>

> Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed.

>

> Thanks for any additional information.

>

> Best regards,

>

> Seth Casden

>

> seth@collian.com.

> https://nam02.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.collian.com%2F&amp;data=0 4%7C01%7CNJW2%40nrs.com%7Cc1b44a26c515473da5d70%d97a14c49b%7C2434528d427049778 1dda6308c1761a3 %7C0%7C0%7C637675052558706438%7CUnknown%7CTWT pbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2l.M /hLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=Gi%2F%2FIcru%52FQICvXSdRxWueNSaT2l9tKgRd 4wpvBavekjF%3D)&amp;reserved=0

> +13106913673

>

> via wireless device

Message

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 9/30/2021 10:00:41 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Follow from call |

Dear Ronnett,

I hope this note finds you well.

Would you be able to kindly confirm that the shares have been sent?

Or is it in-process?

Before I follow up further with IB, I wanted to understand better the status from your POV?

Thank you and best regards,

Seth

---

From: Seth Casden <seth@celliant.com>
Date: Thursday, September 23, 2021 at 10:10 AM
To: Ronnett Roach <RR249@ntrs.com>
Cc: Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
Subject: Re: Follow from call

Hi Ronnett,

Thank you so much for your help!

Hope you are having a great day.

Please see attached.

Cheers,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

LEAVITT0000194

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer Identification Number and Certification

▶ Go to www.irs.gov/FormW9 for instructions and the latest information.

Give Form to the requester. Do not send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Seth Gaden

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC
☐ C Corporation
☐ S Corporation
☐ Partnership
☐ Trust/estate

☑ Limited liability company.

Note: Check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

**5** Address (number, street, and apt. or suite no.) See instructions.

1112 Montana Ave Ste 13

**6** City, state, and ZIP code

Santa Monica, CA 90403

Requester's name and address (optional)

**7** List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN, later.

Social security number

Note: If the account is in more than one name, see the instructions for line 1. Also see What Name and Number To Give the Requester for guidelines on whose number to enter.

or

Employer identification number

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**
Signature of U.S. person ▶

Date ▶ 9-23-2021

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)
• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
• Form 1099-S (proceeds from real estate transactions)
• Form 1099-K (merchant card and third party network transactions)
• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
• Form 1099-C (canceled debt)
• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

LEAVITT0000195

On Sep 23, 2021, at 09:26, Ronnett Roach <RR249@ntrs.com> wrote:

Hi Seth,

By the way introduction, I will be working with Nai-te on the distribution of assets to your brokerage account. In addition, to the DTC instructions from IB we will also need the attached W9 completed, signed, and dated. Once we receive the W9, our back office can move forward with request to distribute the shares. Thank you for your kind attention to this matter.

Best, Ronnett


<image001.png>
Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8658 | rr249@ntrs.com
**I am WFH.  Please reach me on my cell phone at (302) 462.1947**

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.    NTAC:2SC-18


NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, September 20, 2021 4:47 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

I received the additional instructions:

> IBCS 2021/09/20 16:22:46
> Dear Mr. Casden,
>
> Direct NT to deliver to IB via DTC 0534 FBO Seth Casden - ███████
>
> Regards,
>
> IB Funds and Banking Dept.
> IBKR Client Services

Kindly let me know if you need anything further.

Best,

Seth


On 9/20/21, 12:27 PM, "Seth Casden" <seth@celliant.com> wrote:

Please also see attached. Are you able to receive the DTC instructions based on this information?

On 9/20/21, 9:29 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver the Coupang shares to your brokerage account. Once we receive the DTC instructions, we will submit the request to distribute the shares.

Best,
Nai-te


Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.


NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@icloud.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

Have a great weekend.

Best regards,

Seth

On 9/16/21, 10:20 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

I will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime, I have attached the LOD for Terry's signature. Once Terry signs the letter, we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

Best regards,
Nai-te


Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax
(302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.


NTAC:2SE-18

——Original Message——
From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 16, 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <honofyion477@ca.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth


Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673

LEAVITT0000198

E. seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&a
mp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14c49b%7C2434528d42
70497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZab3d8e
yJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;
sdata=G%2F%2FIcru%42FQICvXSdRxWueNSaF2I9tKgRdAwpvBhvekjE%3D&amp;reserved=0

On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it. The information I provided for the 2046 Trust is correct. While the 2046
Trust is for your benefit, it would not use your tax ID number. Not sure why the trust distributing the
assets would need to have your tax ID number.

Best,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax
(302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights. If you would like our latest insights, including Cyber Security topics, add
e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS-20

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:49 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@ca.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments
unless you have verified this email is legitimate.

Hi Nai-te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will
be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

LEAVITT0000199

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F
&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d70%d97a14e49b%7C243452%d
4270497781dda6308e1761a3%7C0%7C0%7C63767505255587706438%7CUnknown%7CTWFpbGZsb3d
8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&am
p;sdata=G%2F%2Flcrn%2FQICvXSdRxWucNSuf2J9tKgRdAwpvBhvckjE%3D&amp;reserved=0
+13106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information.  We will prepare the LOD for Terry's signature.  Below, I have provided the account number you requested.
>
>   Account number: ███████
>   Account title: 2046 TRUST FOR SETH CASDEN
>   Tax ID number: ███████
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS-20
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 4:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@cs.com>
> Subject: [EXT] Re: Follow from call

LEAVITT0000200

> 
> This email originated from outside the organization.  Do not click links or open attachments
unless you have verified this email is legitimate.
> 
> Hi Nai-te,
> 
> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this
would be a discretionary distribution of all CPNG shares
> 
> The brokerage account is with:
> 
> Interactive Brokerage (IB)
> The account name is Seth Casden
> The account number is : ███████
> 
> The receiving account is also requesting that I provide them with the following info for the
contra-account transferring the assets:
> 
> Account number:
> Account title:
> Tax ID number:
> 
> Can you provide me with the correct info to relay to them?
> 
> Thank you for preparing the letter of direction.
> 
> Best regards,
> 
> Seth
> 
> 
> Seth Casden
> Chief Executive Officer
> 
> Hologenix
> Inventors of CELLIANT®
> 
> P.  +1.888.721.1545
> M. +1.310.600.3673
> E.  seth@celliant.com
> 17383 Sunset Boulevard, Suite A420
> Pacific Palisades, CA 90272
> 
> 

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.c%2F&amp;data=04%7C01
%7CNJW2%40ntrs.com%7Cc1b44a26e515473da5d708d97a14e49b%7C2434528d4270497781dda6308c
1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAw
MDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=%2ByqHDF%
2BIxcBsdz9N8Jm5gnRfBB%2B1pdr1XW%2BG%2FpiLis%3D&amp;reserved=0
> elliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cfab4cfec7f854b9311
> 7608d9787978ed%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C6376732853
> 
72072885%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiL
> CJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=LlohScwlr6HT7SxOxzSz1%2
> BjyDyerPmcuTy0U7FBw2Z0%3D&amp;reserved=0
>

> 
> 
> 
> On 9/14/21, 12:57 PM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:
> 
> Hi Seth,
> 
> Please confirm that the distribution of the CPNG shares would be a discretionary distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain when the shares are sold.
> 
> I believe you mentioned distributing all the CPNG shares. Please provide delivery instructions for the transfer of shares and I will prepare the letter of direction.
> 
> Thanks,
> Nai-te
> 
> 
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
> Please visit us at northerntrust.com
> 
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
> 
> 
> NTAC:3NS-20
> 
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM
> To: Nai-te J Watson <NJW2@mrs.com>
> Cc: Terry Leavitt <hunofzion477@cs.com>
> Subject: [EXT] Follow from call
> 
> This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.
> 
> Hi Nai-te,
> 
> I wanted to check in with you and see if you were able to garner any additional information regarding the potential for distributing the CPNG shares and any related tax issues/liability?
> 
> Assuming administratively it can happen, we would like to execute a letter of direction from Terry to proceed.
> 
> Thanks for any additional information.
> 
> Best regards,
> 
> Seth Casden
> 
> seth@celliant.com

LEAVITT0000202

> https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C24345 28d4270497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZ= b3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000 &amp;sdata=G%2F%2FIcru%2FQlCvXSdRxWucNSaF2l9tKgRdAwpvBhvckjE%3D&amp;reserved=0

> +13106003673

>

> via wireless device

<W9 Seth Casden - 2021.pdf>

LEAVITT0000203

Message

| From: | Ronnett Roach [RR249@ntrs.com] |
|---|---|
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 10/1/2021 2:16:52 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Nai-te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Follow from call |

Seth, good morning,

Sorry for the delay, I just received notice from our back office, the shares are in process to transfer today.  But they ask if the transfer can be done via NON-ACATS itself as an ACAT transfer takes around 2 working days to settle & a Non - Acat transfer will settle on the same business day. Can you confirm with IB?

Best regards, Ronnett

 **NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 6300, Wilmington, DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com
**I am WFH.  Please reach me on my cell phone at (302) 462.1947**

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights.  If you would like our latest insights, including Cyber Security topics, add a northerntrust.com to your contacts. Learn more about how to safely messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 30, 2021 6:01 PM
To: Ronnett Roach <RR249@ntrs.com>
Cc: Nai-te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

I hope this note finds you well.

Would you be able to kindly confirm that the shares have been sent?

Or is it in-process?

Before I follow up further with IB, I wanted to understand better the status from your POV?

LEAVITT0000204

Thank you and best regards,

Seth

---

**From:** Seth Casden <seth@celliant.com>
**Date:** Thursday, September 23, 2021 at 10:10 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** Re: Follow from call

Hi Ronnett,

Thank you so much for your help!

Hope you are having a great day.

Please see attached.

Cheers,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

LEAVITT0000205

# Form W-9
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer Identification Number and Certification

▶ Go to www.irs.gov/FormW9 for instructions and the latest information.

Give Form to the requester. Do not send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Seth Caaden

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☑ Individual/sole proprietor or single-member LLC
☐ C Corporation
☐ S Corporation
☐ Partnership
☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

**5** Address (number, street, and apt. or suite no.) See instructions.

1112 Montana Ave Ste 13

**6** City, state, and ZIP code

Santa Monica, CA 90403

**7** List account number(s) here (optional)

Requester's name and address (optional)

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see What Name and Number To Give the Requester for guidelines on whose number to enter.

**Social security number**

**Employer identification number**

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶

Date ▶  9 · 23 · 2021

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

LEAVITT0000206

On Sep 23, 2021, at 09:26, Ronnett Roach <RR249@ntrs.com> wrote:

Hi Seth,

By the way introduction, I will be working with Nai-te on the distribution of assets to your brokerage account. In addition, to the DTC instructions from IB we will also need the attached W9 completed, signed, and dated. Once we receive the W9, our back office can move forward with request to distribute the shares. Thank you for your kind attention to this matter.

Best, Ronnett

<image001.png>
Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8658 | rr249@ntrs.com
**I am WFH.  Please reach me on my cell phone at (302) 462.1947**

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.    NTAC:2SE-18

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, September 20, 2021 4:47 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

I received the additional instructions:

> IBCS 2021/09/20 16:22:46
> Dear Mr. Casden,
>
> Direct NT to deliver to IB via DTC 0534 FBO Seth Casden -
>
> Regards,
>
> IB Funds and Banking Dept.
> IBKR Client Services

Kindly let me know if you need anything further.

Best,

Seth

On 9/20/21, 12:27 PM, "Seth Casden" <seth@celliant.com> wrote:

Please also see attached. Are you able to receive the DTC instructions based on this information?

On 9/20/21, 9:29 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Thank you returning the signed LOD. In addition, we will need the DTC instructions from IB so that we can deliver the Coupang shares to your brokerage account. Once we receive the DTC instructions, we will submit the request to distribute the shares.

Best,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:2SE-18

-----Original Message-----
From: Seth Casden <seth@celliant.com>
Sent: Friday, September 17, 2021 3:54 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofsion477@ics.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Please find attached the executed letter of direction.

I have also forwarded to IB in the hopes it will help facilitate the transfer.

Have a great weekend.

Best regards,

Seth

LEAVITT0000208

On 9/16/21, 10:20 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

I will wait to hear from IB. I'm happy to discuss this matter with them. In the meantime. I have attached the LOD for Terry's signature. Once Terry signs the letter, we will be in a position to transfer the shares, provided we can resolve any of IB's questions/concerns.

Best regards,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax
(302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:2SE-18

——Original Message——
From: Seth Casden <seth@celliant.com>
Sent: Thursday, September 16, 2021 11:57 AM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <honofzion477@ea.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you. I agree and provided your contact to IB and asked for an exception to their policy.

I'll let you know if/when I hear back.

Appreciate your help.

Best,

Seth

Seth Casden
Chief Executive Officer

Hologenix
Inventors of CELLIANT®

P.  +1.888.721.1545
M. +1.310.600.3673

LEAVITT0000209

E. seth@celliant.com
17383 Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F&a
mp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d42
70497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8e
yJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTjoiIk1haWwiLCJXVCI6Mn0%3D%7C1000&amp;
sdata=G%2F%2FIcru%42FQJCvXSdRxWueNSaF2l9tKgRdAwpvBhvckjE%3D&amp;reserved=0

On 9/16/21, 5:35 AM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:

Hi Seth,

Let me look into it. The information I provided for the 2046 Trust is correct. While the 2046
Trust is for your benefit, it would not use your tax ID number. Not sure why the trust distributing the
assets would need to have your tax ID number.

Best,
Nai-te

Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax
(302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our Privacy Notice to learn how we use the personal information you provide and
your related rights. If you would like our latest insights, including Cyber Security topics, add
e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

NTAC:3NS-20

----Original Message----
From: Seth Casden <seth@celliant.com>
Sent: Wednesday, September 15, 2021 2:49 PM
To: Nai-te J Watson <NJW2@ntrs.com>
Cc: Terry Leavitt <lionofzion477@ca.com>; Ronnett Roach <RR249@ntrs.com>
Subject: [EXT] Re: Follow from call

This email originated from outside the organization. Do not click links or open attachments
unless you have verified this email is legitimate.

Hi Nai-te,

Thanks for the follow.

I have been informed by IB that if the account title and tax ID does not match the transfer will
be rejected. Meaning the account needs to read Seth Casden and the tax ID needs to be my SSN.

I don't have any additional information or experience with this.

LEAVITT0000210

Is it possible that is correct? Or do you have any experience or input with this type of situation/process?

Thanks for any additional insight.

Best regards,

Seth Casden

seth@celliant.com
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%2F
&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C243452&d
4270497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d
8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&am
p;sdata=G%2F%2FIcrn%2FQfCvXSdRxWucNSnf2J9tKgRdAwpvBhvckjE%3D&amp;reserved=0
+13106003673

via wireless device

> On Sep 15, 2021, at 11:39, Nai-te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Thank you for sharing the requested information.  We will prepare the LOD for Terry's signature.  Below, I have provided the account number you requested.
>
>    Account number: ███████
>    Account title: 2046 TRUST FOR SETH CASDEN
>    Tax ID number: ███████
>
> Please let me know if you require any additional information.
>
> Thanks,
> Nai-te
>
>
>
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company
> of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone
> (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com Please
> visit us at northerntrust.com
>
> Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.
>
>
> NTAC:3NS-20
>
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 4:41 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <lionofzion477@cs.com>
> Subject: [EXT] Re: Follow from call

LEAVITT0000211

\>

\> This email originated from outside the organization.  Do not click links or open attachments unless you have verified this email is legitimate.

\>

\> Hi Nai-te,

\>

\> Thank you for the follow up and confirmation on tax status/treatment. We can confirm this would be a discretionary distribution of all CPNG shares.

\>

\> The brokerage account is with:

\>

\> Interactive Brokerage (IB)

\> The account name is Seth Casden

\> The account number is : █████████

\>

\> The receiving account is also requesting that I provide them with the following info for the contra-account transferring the assets:

\>

\> Account number:

\> Account title:

\> Tax ID number:

\>

\> Can you provide me with the correct info to relay to them?

\>

\> Thank you for preparing the letter of direction.

\>

\> Best regards,

\>

\> Seth

\>

\>

\> Seth Casden

\> Chief Executive Officer

\>

\> Hologenix

\> Inventors of CELLIANT®

\>

\> P.  +1.888.721.1545

\> M. +1.310.600.3673

\> E.  seth@celliant.com

\> 17383 Sunset Boulevard, Suite A420

\> Pacific Palisades, CA 90272

\>

\>

https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.c%2F&amp;data=04%7C01
%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C2434528d4270497781dda6308c
1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAw
MDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=%2ByqHDP%
2BIxcBsdz9N8Dm5gnRfBB%2B1pdr1XW%2BG%2FruLjs%3D&amp;reserved=0

\> elliant.com%2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cfab4cfec7f854b9311
\> 7608d9787978ed%7C2434528d4270497781dda6308c1761a3%7C0%7C0%7C6376732853

\>

72072885%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiL
\> CJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=LlohScwlr6HT7SxOxzSz1%2
\> BjyDycrPmcuTy0U7FBw2Z0%3D&amp;reserved=0

\>

LEAVITT0000212

> 
> 
> 
> On 9/14/21, 12:57 PM, "Nai-te J Watson" <NJW2@ntrs.com> wrote:
> 
> Hi Seth,
> 
> Please confirm that the distribution of the CPNG shares would be a discretionary
distribution? If so, the distribution amount would be the tax cost of asset, and you would pick up the gain
when the shares are sold.
> 
> I believe you mentioned distributing all the CPNG shares. Please provide delivery
instructions for the transfer of shares and I will prepare the letter of direction.
> 
> Thanks,
> Nai-te
> 
> 
> Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 |
fax (302) 428-8722 | email njw2@ntrs.com
> Please visit us at northerntrust.com
> 
> Please read our Privacy Notice to learn how we use the personal information you provide
and your related rights. If you would like our latest insights, including Cyber Security topics, add
c.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust
> 
> 
> NTAC:3NS-20
> 
> -----Original Message-----
> From: Seth Casden <seth@celliant.com>
> Sent: Tuesday, September 14, 2021 1:54 PM
> To: Nai-te J Watson <NJW2@ntrs.com>
> Cc: Terry Leavitt <hunofcaon477@cs.com>
> Subject: [EXT] Follow from call
> 
> This email originated from outside the organization. Do not click links or open attachments
unless you have verified this email is legitimate.
> 
> Hi Nai-te,
> 
> I wanted to check in with you and see if you were able to garner any additional information
regarding the potential for distributing the CPNG shares and any related tax issues/liability?
> 
> Assuming administratively it can happen, we would like to execute a letter of direction from
Terry to proceed.
> 
> Thanks for any additional information.
> 
> Best regards,
> 
> Seth Casden
> 
> seth@celliant.com

LEAVITT0000213

> https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.celliant.com%
2F&amp;data=04%7C01%7CNJW2%40ntrs.com%7Cc1b44a26c515473da5d708d97a14e49b%7C24345
28d4270497781dda6308c1761a3%7C0%7C0%7C637675052558706438%7CUnknown%7CTWFpbGZx
b3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTil6Ik1haWwiLCJXVCI6Mn0%3D%7C1000
&amp;sdata=G%2F%2FIcru%2FQlCvXSdRxWucNSeF2I9tKgRdAwpvBhvckjE%3D&amp;reserved=0

> +13106003673

>

> via wireless device

<W9 Seth Casden - 2021.pdf>

LEAVITT0000214

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 2/2/2022 5:56:07 PM |
| **To:** | Nai-te J Watson [NJW2@ntrs.com] |
| **CC:** | Ronnett Roach [RR249@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Re: 670K promissory note extension |

Hi Nai-te,

Thank you for your note and my apologies.

Wells Fargo wire system was down.

It's back up and working and I sent the payment this am. Please confirm.

Any additional amount owed, kindly let me know and I'll send that as well.

Appreciate your help.

Cheers,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device


On Feb 2, 2022, at 09:30, Nai-te J Watson <NJW2@ntrs.com> wrote:

Hi Seth,

Please let me know when you anticipate sending in the interest payment for the 670k note. The figure
Terry Burrows provided ($3,813.57) anticipated the payment being received prior to 1/31/22. We will
need to adjust the amount of the interest payment.

Thanks,
Nai-te



**NORTHERN TRUST**

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-
8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If
you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn**
more about how to safelist messages from Northern Trust.

LEAVITT0000215

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, January 31, 2022 8:25 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: 670K promissory note extension

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Hi Nai-te,

Thank you for this detail. I will send payment of $3,813.57.

Letter of execution by Terry is attached.

Let me know what else we need to finalize.

Best regards,

Seth


Seth Casden
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P.  +1.888.721.1545
M. +1.310.600.3673
E.  seth@celliant.com
17383 W Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is
strictly forbidden to share any part of this message with any third party, without a written consent of the
sender. If you received this message by mistake, please reply to this message and follow with its deletion,
so that we can ensure such a mistake does not occur in the future.


**From:** Nai-te Watson <NJW2@ntrs.com>
**Date:** Friday, January 28, 2022 at 12:05 PM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** RE: 670K promissory note extension

Hi Seth,

Terry Burrows has confirmed the interest on the current $670k note is paid up through 10/26/21. We
noticed the transaction on 1/21/22 states it is paid to 1/21/22, however, that is incorrect. We will have
this corrected. As you can see, the following transactions pay the 8/1/20 pmt, 8/1/21 pmt, 9/1/21 pmt,

LEAVITT0000216

10/1/21 pmt and the $1000 paid interest to 10/26/21 as this was a partial payment towards the 11/1/21 interest payment. If we are missing payments somewhere please be sure to let me know.



This paid interest from 10/1/21 – 10/26/21.



The interest due from 10/26/21 – 1/31/22 = **$3,813.57**.

Also, I have attached a letter of direction for Terry's signature. The LOD directed NTDE to remove the 670k old note from our records and add the new 670k note.

Please let me know if you have any questions.

Best regards,
Nai-te

🏴 NORTHERN
TRUST

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, January 26, 2022 2:21 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] 670K promissory note extension

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Please see attached.

To secure the January AFR of .44%, this document needs to be executed in January 2022. Also, the date to which interest has been paid in January 2022 needs to be inserted in the third "WHEREAS" paragraph on page 1.

If you can provide the amount of interest owed as of a set date (Jan. 31)? I can send and we can complete?

Let me know if you have a different preference.

Best regards,

Seth


**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000218

Message

| | |
|---|---|
| From: | Nai-te J Watson [NJW2@ntrs.com] |
| on behalf of | Nai-te J Watson <NJW2@ntrs.com> [NJW2@ntrs.com] |
| Sent: | 2/2/2022 5:30:33 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Ronnett Roach [RR249@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: 670K promissory note extension |

Hi Seth,

Please let me know when you anticipate sending in the interest payment for the 670k note. The figure Terry Burrows provided ($3,813.57) anticipated the payment being received prior to 1/31/22. We will need to adjust the amount of the interest payment.

Thanks,
Nai-te

 **NORTHERN TRUST**

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, January 31, 2022 8:25 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: 670K promissory note extension

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Thank you for this detail. I will send payment of $3,813.57.

Letter of execution by Terry is attached.

Let me know what else we need to finalize.

Best regards,

Seth

Seth Casden
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

LEAVITT0000219

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Nai-te Watson <NJW2@ntrs.com>
**Date:** Friday, January 28, 2022 at 12:05 PM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** RE: 670K promissory note extension

Hi Seth,

Terry Burrows has confirmed the interest on the current $670k note is paid up through 10/26/21. We noticed the transaction on 1/21/22 states it is paid to 1/21/22, however, that is incorrect. We will have this corrected. As you can see, the following transactions pay the 8/1/20 pmt, 8/1/21 pmt, 9/1/21 pmt, 10/1/21 pmt and the $1000 paid interest to 10/26/21 as this was a partial payment towards the 11/1/21 interest payment. If we are missing payments somewhere please be sure to let me know.

| #1/20.2022 | 146 | 144 | | Income | $10,946.78 |

Narrative: SETH CASDEN $670,000 UNS NOTE DTD 8/1/15 @ 2.12% MATURES 8/1/2021. RECEIVED LOAN INTEREST DUE 08/01/2020 FROM CASDEN SETH

| 01/21/2022 | 146 | 144 | | Income | $14,411.78 |

Narrative: SETH CASDEN $670,000 UNS NOTE DTD 8/1/15 @ 2.12% MATURES 8/1/2021. RECEIVED LOAN INTEREST DUE 08/01/2021 FROM CASDEN SETH

| 01/21/2022 | 146 | 144 | | Income | $1,105.12 |

Narrative: SETH CASDEN $670,000 UNS NOTE DTD 8/1/15 @ 2.12% MATURES 8/1/2021. RECEIVED LOAN INTEREST DUE 09/01/2021 FROM CASDEN SETH

| 01/21/2022 | 146 | 144 | | Income | $1,185.47 |

Narrative: SETH CASDEN $670,000 UNS NOTE DTD 8/1/15 @ 2.12% MATURES 8/1/2021. RECEIVED LOAN INTEREST DUE 10/01/2021 FROM CASDEN SETH

This paid interest from 10/1/21 – 10/26/21.

| 01/21/2022 | 146 | 144 | | Income | $1,000.00 |

Narrative: SETH CASDEN $670,000 UNS NOTE DTD 8/1/15 @ 2.12% MATURES 8/1/2021. RECEIVED LOAN INTEREST DUE 01/21/2022 FROM CASDEN SETH

The interest due from 10/26/21 – 1/31/22 = **$3,813.57**.

Also, I have attached a letter of direction for Terry's signature. The LOD directed NTDE to remove the 670k old note from our records and add the new 670k note.

LEAVITT0000220

Please let me know if you have any questions.

Best regards,

Nai-te

 **NORTHERN TRUST**

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email
njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, January 26, 2022 2:21 PM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] 670K promissory note extension

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Hi Nai-te,

Please see attached.

To secure the January AFR of .44%, this document needs to be executed in January 2022. Also, the date to which interest has been paid in January 2022 needs to be inserted in the third "WHEREAS" paragraph on page 1.

If you can provide the amount of interest owed as of a set date (Jan. 31)? I can send and we can complete?

Let me know if you have a different preference.

Best regards,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000221

LEAVITT0000222

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 1/18/2022 5:24:53 PM |
| **To:** | Nai-te J Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com], Ronnett Roach [RR249@ntrs.com] |
| **Subject:** | Re: Letter of direction for $300,000 |
| **Attachments:** | Direction Letter for Distribution 1.18.2022.pdf |

Hi Nai-te,

Thank you for the prompt reply and updated financial cash position post-distribution.

Please find the executed letter attached.

Hope you have a great rest of your day.

Cheers,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to
share any part of this message with any third party, without a written consent of the sender. If you received this message
by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not
occur in the future.

**From:** Nai-te Watson <NJW2@ntrs.com>
**Date:** Tuesday, January 18, 2022 at 9:00 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>, Ronnett Roach <RR249@ntrs.com>
**Subject:** RE: Letter of direction for $300,000

Hi Seth,

Attached is a letter of direction prepared for Terry's signature. Please note that after the $300,000 distribution the cash
balance is $400,170.

Best regards,
Nai-te

LEAVITT0000223



## NORTHERN TRUST

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email
njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our
latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages
from Northern Trust.

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, January 18, 2022 10:32 AM
**To:** Nai-te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction for $300,000

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Dear Nai-te,

Will you kindly prepare a letter of direction for $300,000 for Terry to execute?

Please let me know if you have any questions.

Best regards,

Seth


Seth Casden
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to
share any part of this message with any third party, without a written consent of the sender. If you received this message
by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not
occur in the future.

LEAVITT0000224

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 18, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $300,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

        Bank Name: Wells Fargo
        Bank Location: Reno, NV
        Bank ABA Number: 121000248
        Account Name: Seth Casden
        Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:25E-18

NTAC:3NS-25

LEAVITT0000225

Message

| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 1/18/2022 3:32:27 PM |
| To: | Nai-te Watson [NJW2@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com] |
| Subject | Letter of direction for $300,000 |

Dear Nai-te,

Will you kindly prepare a letter of direction for $300,000 for Terry to execute?

Please let me know if you have any questions.

Best regards,

Seth

Seth Casden
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000226

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 2/10/2022 6:22:10 PM |
| **To:** | Nai-te Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com], Ronnett Roach [RR249@ntrs.com] |
| **Subject:** | Letter of direction |
| **Attachments:** | Direction Letter for Distribution 2.10.2022.pdf |

Dear Nai-te,

Please find attached the letter of direction executed by Terry.

Kindly let me know if you have any questions.

Best regards,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion. so that we can ensure such a mistake does not occur in the future.

LEAVITT0000227

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

February 10, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I
am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee
("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written
directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth
Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section
3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing
instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in
accordance with such a direction, then except in cases of willful misconduct, the trustee shall not
be liable for any loss resulting from any such act.

Very truly yours,
*Alan Terry Leavitt*
Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

NTAC:2SE-18

NTAC:3NS-FS

LEAVITT0000228

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 7/29/2022 4:50:58 PM |
| **To:** | Nai-te Watson [NJW2@ntrs.com] |
| **CC:** | Ronnett Roach [RR249@ntrs.com], Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction |
| **Attachments:** | Direction Letter for Distribution_2022_07_29.pdf |

Hi Nai-te,

The funds to close the Green Rock transaction should be arriving/have arrived. I believe there will be three wires in total.

If you would please repay the $500,000 loan from LSG and any interest due and then distribute $500,000 to my checking account per the letter executed by Terry and attached.

Kindly let me know if you have any questions or confirm once completed.

Have a great weekend.

Cheers,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000229

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

July 29, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

### Re: The Seth Casden Resulting Trust
### (known as the 2046 Trust fbo Seth Casden)

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $500,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000230

Message

| | |
|---|---|
| **From:** | Ronnett Roach [RR249@ntrs.com] |
| **on behalf of** | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| **Sent:** | 10/18/2022 3:13:11 PM |
| **To:** | Seth Casden [seth@celliant.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | RE: Letter of direction for distribution |

Hi Terry and Seth,

Per your letter of direction dated October 17, 2022, we will arrange for the $200k distribution to Seth.

Kind regards, Ronnett


**NORTHERN TRUST**

**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8058 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our
latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages
from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you
are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC 3NS 20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, October 18, 2022 1:43 AM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Letter of direction for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Dear Nai-te,

Please see the attached letter of direction executed by Terry.

Kindly let us know if anything further is required.

Best regards,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**

LEAVITT0000231

Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000232

Message

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 10/18/2022 5:42:43 AM |
| **To:** | Nai-te Watson [NJW2@ntrs.com] |
| **CC:** | Ronnett Roach [RR249@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Letter of direction for distribution |
| **Attachments:** | Direction Letter for Distribution_2022_10_17.pdf |

Dear Nai-te,

Please see the attached letter of direction executed by Terry.

Kindly let us know if anything further is required.

Best regards,

Seth

**Seth Casden**
Chief Executive Officer

**Hologenix**
Inventors of CELLIANT®

P. +1.888.721.1545
M. +1.310.600.3673
E. seth@celliant.com
17383 W. Sunset Boulevard, Suite A420
Pacific Palisades, CA 90272

www.celliant.com | @celliant | LinkedIn

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion. so that we can ensure such a mistake does not occur in the future.

LEAVITT0000233

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

October 17, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $200,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

    Bank Name: Wells Fargo
    Bank Location: Reno, NV
    Bank ABA Number: 121000248
    Account Name: Seth Casden
    Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000234

Message
---

| From: | Nai-Te J Watson [NJW2@ntrs.com] |
|---|---|
| on behalf of | Nai-Te J Watson <NJW2@ntrs.com> [NJW2@ntrs.com] |
| Sent: | 1/11/2023 9:32:06 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| Subject: | RE: Letter of Direction |

Hi Seth,

Happy New Years!

We will process the distribution.

Best regards,
Nai-te



**NORTHERN TRUST**

**Nai-te J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
Please visit us at northerntrust.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, January 11, 2023 4:01 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Letter of Direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

I hope that 2023 is off to a good start.

Please see attached the letter of direction executed by Terry.

Let us know if you have any questions.

Thank you for your help.

Cheers,

Seth

LEAVITT0000235



**Seth Casden**
**CEO and Co-Founder**

 

310-600-3673    www.celliant.com    seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000236

Message
_____

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 1/11/2023 9:00:53 PM |
| **To:** | Nai-te Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| **Subject:** | Letter of Direction |
| **Attachments:** | Direction Letter for Distribution_2023_01_11.pdf |

Dear Nai-te,

I hope that 2023 is off to a good start.

Please see attached the letter of direction executed by Terry.

Let us know if you have any questions.

Thank you for your help.

Cheers,

Seth



## Seth Casden
**CEO and Co-Founder**

 

☐ 310-600-3673   ☐ www.celliant.com   ☐ seth@celliant.com

☐ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 11, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

### Re: The Seth Casden Resulting Trust
### (known as the 2046 Trust fbo Seth Casden)

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $500,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000238

Message
_____

| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 1/11/2023 9:47:16 PM |
| **To:** | Nai-Te J Watson [NJW2@ntrs.com] |
| **CC:** | Terry Leavitt [lionofzion477@cs.com]; Ronnett Roach [RR249@ntrs.com] |
| **Subject:** | Re: Letter of Direction |

Happy New Year!

Thank you, indeed.

Appreciate your help.

Cheers,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

> On Jan 11, 2023, at 13:32, Nai-Te J Watson <NJW2@ntrs.com> wrote:
>
> Hi Seth,
>
> Happy New Years!
>
> We will process the distribution.
>
> Best regards,
> Nai-te
>
>
> <image009.png>
>
> **Nai-Ie J. Watson | Senior Vice President | The Northern Trust Company of Delaware**
> 1313 N. Market Street, Suite 5300 Wilmington, Delaware 19801 | phone (302) 428-8720 | fax (302) 428-8722 | email njw2@ntrs.com
> Please visit us at northerntrust.com
>
> Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safelist messages from Northern Trust.
>
> NTAC:3NS-20

LEAVITT0000239

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, January 11, 2023 4:01 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Terry Leavitt <lionofzion477@cs.com>; Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Letter of Direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

I hope that 2023 is off to a good start.

Please see attached the letter of direction executed by Terry.

Let us know if you have any questions.

Thank you for your help.

Cheers,

Seth

<image010.png> **Seth Casden**
**CEO and Co-Founder**

<image011.png> <image012.png>

<image013.png>
310-600-3673
<image014.png>
www.celliant.com
<image015.png>
seth@celliant.com

<image016.png>
17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The portion of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

<image017.png>

LEAVITT0000240

Message

| | |
|---|---|
| From: | Ronnett Roach [RR249@ntrs.com] |
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 3/8/2023 3:11:24 PM |
| To: | Seth Casden [seth@celliant.com]; Nai-Te J Watson [NJW2@ntrs.com] |
| CC: | Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Distribution request |

Hi Terry,

Per your letter of direction dated March 7, 2023, we will arrange for the $550k distribution to Seth. Please let us know if you need anything additional.

Thank you and have a great rest of the day!

Ronnett

 **NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Tuesday, March 7, 2023 4:55 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Distribution request

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Please find attached a letter of direction executed by Terry for $550,000.

Thank you for your assistance.

Best regards,

Seth

LEAVITT0000241



## Seth Casden
**CEO and Co-Founder**

 

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000242

Message
| | |
|---|---|
| **From:** | Seth Casden [seth@celliant.com] |
| **on behalf of** | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| **Sent:** | 3/7/2023 9:54:49 PM |
| **To:** | Nai-te Watson [NJW2@ntrs.com] |
| **CC:** | Ronnett Roach [RR249@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | Distribution request |
| **Attachments:** | Direction Letter for Distribution_2023_03_07.pdf |

Dear Nai-te,

Please find attached a letter of direction executed by Terry for $550,000.

Thank you for your assistance.

Best regards,

Seth



## Seth Casden
**CEO and Co-Founder**

 

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000243

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

March 7, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

> **Re: The Seth Casden Resulting Trust**
> **(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $550,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

> Bank Name: Wells Fargo
> Bank Location: Reno, NV
> Bank ABA Number: 121000248
> Account Name: Seth Casden
> Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000244

Message

| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 3/23/2023 3:30:31 PM |
| To: | Ronnett Roach [RR249@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com] |
| Subject: | Re: Letter of direction |

Thank you, Ronnett, for your help.

Funds received, have a great day.

Cheers,

Seth



### Seth Casden
**CEO and Co-Founder**



📱 310-600-3673    🌐 www.celliant.com    ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

---

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Thursday, March 23, 2023 at 7:59 AM
**To:** Terry Leavitt <lionofzion477@cs.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Seth Casden <seth@celliant.com>
**Subject:** RE: Letter of direction

Terry, good morning.

Per your letter of direction dated March 22, 2023, we will arrange for the $100k distribution to Seth.

Please let me know if you have any questions.

Kind regards, Ronnett



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5100, Wilmington, DE 19801 USA
Phone+1 302 428 8710 | Fax +1 866-451-8658 | rr249@ntrs.com

LEAVITT0000245

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, March 22, 2023 6:36 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Letter of direction

> This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Per the attached letter of direction executed by Terry, please transfer $100,000.

Kindly let me know if you have any questions.

Hope all is well and thank you for your help.

Best regards,

Seth



### Seth Casden
**CEO and Co-Founder**

☐ 310-600-3673    ☐ www.celliant.com    ☐ seth@celliant.com

⚲ 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



LEAVITT0000246

Message

| | |
|---|---|
| From: | Ronnett Roach [RR249@ntrs.com] |
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 3/23/2023 2:59:12 PM |
| To: | Terry Leavitt [lionofzion477@cs.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Seth Casden [seth@celliant.com] |
| Subject: | RE: Letter of direction |

Terry, good morning,

Per your letter of direction dated March 22, 2023, we will arrange for the $100k distribution to Seth.

Please let me know if you have any questions.

Kind regards, Ronnett



Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a ntrs@northerntrust.com to your contacts. Learn more about how to subscribe/receive messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Wednesday, March 22, 2023 6:36 PM
**To:** Nai-Te J Watson <NJW2@ntrs.com>
**Cc:** Ronnett Roach <RR249@ntrs.com>
**Subject:** [EXT] Letter of direction

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Nai-te,

Per the attached letter of direction executed by Terry, please transfer $100,000.

Kindly let me know if you have any questions.

Hope all is well and thank you for your help.

Best regards,

Seth

LEAVITT0000247



## Seth Casden
**CEO and Co-Founder**



310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272



LEAVITT0000248

Message
| | |
|---|---|
| From: | Seth Casden [seth@celliant.com] |
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 5/3/2023 10:48:42 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-Te l Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | Re: Direction letter for distribution |

Hi Ronnett.

Thank you for your email and support. Well noted.

Please be advised I wired $28,000 today to cover the interest payment due.

Let me know if you need anything further from me.

Cheers.

Seth

### Seth Casden
#### CEO and Co-Founder

📱 310-600-3673    🖥 www.celliant.com    ✉ seth@celliant.com

📍 17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

**From:** Ronnett Roach <RR249@ntrs.com>
**Date:** Tuesday, May 2, 2023 at 10:06 AM
**To:** Seth Casden <seth@celliant.com>
**Cc:** Nai-te Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
**Subject:** RE: Direction letter for distribution

Hi Seth,

We have updated your protected profile confirming new banking account information. Please note going forward, no authentication will be needed unless there is a change to the instructions. Thank you so for verifying.

Take care, Ronnett

LEAVITT0000249



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 12:52 PM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Good afternoon Ronnett,

Thank you for the reply and understood.

They can call me at (310) 600-3673 at their convenience.

Best regards,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

via wireless device

> On May 1, 2023, at 09:31, Ronnett Roach <RR249@ntrs.com> wrote:
>
> Good afternoon, Seth and Terry.
>
> Please be advised we received your request.
> In order to process the transfer we will need to verbally confirm the information with Seth. Our back office will authenticate **your new bank account** information, please let me know when it is a good time to call?
>
> Thanks, Ronnett

LEAVITT0000250

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-6719 | Fax +1 866-451-6858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 10:13 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth

<image010.png> **Seth Casden**                                    <image011.png> <image012.png>
**CEO and Co-Founder**

<image013.png>
310-600-3673
<image014.png>
www.celliant.com
<image015.png>
seth@celliant.com

<image016.png>
17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

LEAVITT0000251

&lt;image017.png&gt;

LEAVITT0000252

Message

| From: | Ronnett Roach [RR249@ntrs.com] |
|---|---|
| on behalf of | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| Sent: | 5/2/2023 5:06:39 PM |
| To: | Seth Casden [seth@celliant.com] |
| CC: | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| Subject: | RE: Direction letter for distribution |

Hi Seth,

We have updated your protected profile confirming new banking account information. Please note going forward, no
authentication will be needed unless there is a change to the instructions. Thank you so for verifying.

Take care, Ronnett



**NORTHERN
TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8858 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our
latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages
from Nothern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you
are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC 3N5-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 12:52 PM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Re: Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless
you have verified this email is legitimate.

Good afternoon Ronnett,

Thank you for the reply and understood.

They can call me at (310) 600-3673 at their convenience.

Best regards,

Seth Casden

seth@celliant.com
www.celliant.com
+13106003673

LEAVITT0000253

via wireless device

On May 1, 2023, at 09:31, Ronnett Roach <RR249@ntrs.com> wrote:

Good afternoon, Seth and Terry.

Please be advised we received your request.
In order to process the transfer we will need to verbally confirm the information with Seth. Our back
office will authenticate **your new bank account** information, please let me know when it is a good time
to call?

Thanks, Ronnett

<image009.png>
Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone+1 302-428-8719 | Fax +1 866-451-8855 | rr249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If
you would like our latest insights, including Cyber Security topics, add e.northerntrust.com) to your contacts. Learn
more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the
intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from
your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 10:13 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have
verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth

LEAVITT0000254

<image010.png> **Seth Casden**            <image011.png> <image012.png>
**CEO and Co-Founder**

<image013.png>
310-600-3673
<image014.png>
www.celliant.com
<image015.png>
seth@celliant.com

<image016.png>
17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

<image017.png>

LEAVITT0000255

Message

| | |
|---|---|
| From: | ALAN LEAVITT [lionofzion477@cs.com] |
| on behalf of | ALAN LEAVITT <lionofzion477@cs.com> [lionofzion477@cs.com] |
| Sent: | 5/1/2023 4:34:44 PM |
| To: | lionofzion477@cs.com |
| Subject: | Fwd: Direction letter for distribution |

Sent from my iPhone

Begin forwarded message:

> **From:** Ronnett Roach <RR249@ntrs.com>
> **Date:** May 1, 2023 at 11:31:50 AM CDT
> **To:** Seth Casden <seth@celliant.com>
> **Cc:** Nai-Te J Watson <NJW2@ntrs.com>, Terry Leavitt <lionofzion477@cs.com>
> **Subject: RE: Direction letter for distribution**

Good afternoon, Seth and Terry.

Please be advised we received your request.
In order to process the transfer we will need to verbally confirm the information with Seth. Our back office will authenticate **your new bank account** information, please let me know when it is a good time to call?

Thanks, Ronnett



**NORTHERN TRUST**

Ronnett Roach
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8710 | Fax +1 866-451-6658 | n249@ntrs.com

Please read our Privacy Notice to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add a.northerntrust.com to your contacts. Learn more about how to safelist messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 10:13 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Direction letter for distribution

LEAVITT0000256

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth



**Seth Casden**
**CEO and Co-Founder**



310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000257

Message

| | |
|---|---|
| **From:** | Ronnett Roach [RR249@ntrs.com] |
| **on behalf of** | Ronnett Roach <RR249@ntrs.com> [RR249@ntrs.com] |
| **Sent:** | 5/1/2023 4:31:35 PM |
| **To:** | Seth Casden [seth@celliant.com] |
| **CC:** | Nai-Te J Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com] |
| **Subject:** | RE: Direction letter for distribution |

Good afternoon, Seth and Terry.

Please be advised we received your request.
In order to process the transfer we will need to verbally confirm the information with Seth. Our back office will authenticate **your new bank account** information, please let me know when it is a good time to call?

Thanks, Ronnett



**NORTHERN TRUST**

**Ronnett Roach**
Senior Account Manager | Officer | The Northern Trust Company of Delaware
1313 N. Market Street, Suite 5300, Wilmington, DE 19801 USA
Phone +1 302-428-8719 | Fax +1 866-451-8658 | rr249@ntrs.com

Please read our **Privacy Notice** to learn how we use the personal information you provide and your related rights. If you would like our latest insights, including Cyber Security topics, add e.northerntrust.com to your contacts. **Learn** more about how to safekt messages from Northern Trust.

CONFIDENTIALITY NOTICE: This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender ASAP and delete this message from your system.

NTAC:3NS-20

**From:** Seth Casden <seth@celliant.com>
**Sent:** Monday, May 1, 2023 10:13 AM
**To:** Ronnett Roach <RR249@ntrs.com>
**Cc:** Nai-Te J Watson <NJW2@ntrs.com>; Terry Leavitt <lionofzion477@cs.com>
**Subject:** [EXT] Direction letter for distribution

This email originated from outside the organization. Do not click links or open attachments unless you have verified this email is legitimate.

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth

LEAVITT0000258



**Seth Casden**
**CEO and Co-Founder**

 

310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

LEAVITT0000259

Message

| From: | Seth Casden [seth@celliant.com] |
|---|---|
| on behalf of | Seth Casden <seth@celliant.com> [seth@celliant.com] |
| Sent: | 5/1/2023 2:13:06 PM |
| To: | Ronnett Roach [RR249@ntrs.com] |
| CC: | Nai-te Watson [NJW2@ntrs.com]; Terry Leavitt [lionofzion477@cs.com[ |
| Subject: | Direction letter for distribution |
| Attachments: | Direction Letter for Distribution_2023_05_01.pdf |

Dear Ronnett,

Please find attached a letter of direction executed by Terry for a distribution in the amount of $250,000.

Kindly note the updated bank account.

Let us know if any additional information is required.

Hope your week is off to a great start.

Cheers,

Seth



**Seth Casden**
**CEO and Co-Founder**



310-600-3673   www.celliant.com   seth@celliant.com

17383 W Sunset Boulevard, Suite A420, Pacific Palisades, CA 90272

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure a mistake is made and delivered would be the future.

LEAVITT0000260

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

May 1, 2023

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust
(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $250,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX2372

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,

*Alan Terry Leavitt*

Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000261

**Alan Terry Leavitt**
**470 Deming Place**
**Chicago, IL 60614**

January 18, 2022

The Northern Trust Company of Delaware
Nai-te Watson, Vice President
1313 N. Market Street, Suite 5300
Wilmington, DE 19801

**Re: The Seth Casden Resulting Trust**
**(known as the 2046 Trust fbo Seth Casden)**

Dear Nai-te,

Pursuant to Article Second, paragraph 1 of the above-referenced Trust Agreement (the "Trust"), I am the Adviser for the Trust and can direct The Northern Trust Company of Delaware as Trustee ("NTDE") on distribution of the assets of the Trust. NTDE is required to follow my written directions as Adviser with respect to all distributions.

In my capacity as Adviser, I direct NTDE to send $300,000 from principal for the benefit of Seth Casden. Send the funds via wire using the following wire instructions:

Bank Name: Wells Fargo
Bank Location: Reno, NV
Bank ABA Number: 121000248
Account Name: Seth Casden
Account Number: XXXXX3319

The directions contained in this letter are intended by me to be directions described in section 3313 of Title 12 of the Delaware Code. Section 3313 states, in relevant part, that if a governing instrument provides that a trustee is to follow the direction of an adviser, and the trustee acts in accordance with such a direction, then except in cases of willful misconduct, the trustee shall not be liable for any loss resulting from any such act.

Very truly yours,
*Alan Terry Leavitt*
Alan Terry Leavitt
As Adviser to the 2046 Trust fbo Seth Casden dated 7/8/2016

LEAVITT0000262

# EXHIBIT L

Message

| | |
|---|---|
| **From:** | ALAN LEAVITT [lionofzion477@cs.com] |
| **on behalf of** | ALAN LEAVITT <lionofzion477@cs.com> [lionofzion477@cs.com] |
| **Sent:** | 1/26/2024 6:29:27 PM |
| **To:** | Natalie Schiavone [ns543@ntrs.com] |
| **Subject:** | The trust paying Seth portion of expenses for Pine Rock |

Natalie

When the time comes and I give the ok, the trust has to pay the 25% of Seth's expenses for his share of the property. I'm forwarding my attorney Jocelyn suggestion on how it to be titled.

> Seth, my advice to Terry would be to refrain from making any discretionary distributions to you at this point. However, Terry could direct the trustee to make the investment and the trust would be the owner of that slice of equity in Pine Rock.
>
> Jocelyn

Please let me know if there's any problems or questions. Have a good weekends
Thank you
Alan leavitt
773-5078130
Sent from my iPhone

LEAVITT0000134

# EXHIBIT M

Case 2:23-cv-01149-BRM Doc 366-1 Filed 10/08/25 Page 10 of 30 PageID 946
Case 2:21-cv-01149-ODW-RAO Document 259 Entered 10/08/25 14:39:07 Desc
Declaration of Nicole A. Sullivan    Page 1057 of 1079

**O**

# United States District Court
# Central District of California

MULTIPLE ENERGY
TECHNOLOGIES, LLC,

              Plaintiff,

    v.

SETH CASDEN,

              Defendant.

Case № 2:21-cv-01149-ODW (RAOx)

**POST-TRIAL ORDER**

## I.    INTRODUCTION

Plaintiff Multiple Energy Technologies, LLC ("MET") brought this action against Defendant Seth Casden for false advertising under the Lanham Act and California Business & Professions Code section 17500, unfair competition under California Business & Professions Code section 17200, and tortious interference with contractual relations. (First Am. Compl. ("FAC"), ECF No. 24.) After the close of evidence following a four-day jury trial, the Court granted in part MET's Federal Rule of Civil Procedure ("Rule") 50(a) motion, with respect to its claim for tortious interference with contractual relations. (*See* Mins. Trial, ECF Nos. 177–80.) The jury subsequently returned a verdict in MET's favor on its false advertising claim and awarded MET $1 in nominal damages. (Verdict 1–2, ECF No. 190.) The jury also

returned an advisory verdict in MET's favor on Casden's agency immunity defense to MET's tortious interference with contractual relations claim.  (*Id.* at 3–4.)

Several issues remain for the Court's resolution.  (*See* Joint Resp. Re: Issues Remaining for Court's Resolution ("Joint Resp."), ECF No. 194.)   The Court addresses the issues the parties raise below.

## II.    BACKGROUND[1]

MET developed a patented bioceramic infrared material branded as "Redwave." Casden is the co-founder and CEO of Hologenix, which manufactures, markets, and licenses a patented bioceramic material branded as "Celliant."

Prior to this case, in February 2019, MET sued Hologenix for allegedly engaging in false advertising of Celliant.  *See Multiple Energy Technologies, LLC v. Hologenix, LLC*, No. 2:19-cv-01483-PA (RAOx) (C.D. Cal.) ("*MET v. Hologenix*"). On March 6, 2020, MET and Hologenix entered into a Settlement Agreement and General Release ("Settlement Agreement"), which settled MET's claims in *MET v. Hologenix*.  (Ex. 5.[2])  Casden negotiated and signed the Settlement Agreement on behalf of Hologenix.

In the Settlement Agreement, Hologenix agreed to pay MET a total of $2,500,000 according to a schedule whereby Hologenix would pay $100,000 within one business day of executing the Settlement Agreement, $1,400,000 on or before April 23, 2020, and the remaining $1,000,000 in 2021.  (*Id.* at 1-2.)  As part of the Settlement Agreement, Hologenix and MET also agreed to request that the Court enter a permanent injunction enjoining Hologenix from "stat[ing] or suggest[ing]" that the Food and Drug Administration ("FDA") "approved" Celliant or "made a 'determination'" that Celliant promoted any benefits.  (*Id.* at 3.)  On March 10, 2020, the court in *MET v. Hologenix* entered the requested permanent injunction.  (Ex. 27.)

---

[1] The background facts provided here are either stipulated or uncontested.
[2] The Court's exhibit citations refer to the parties' admitted trial exhibits.

Following entry of the permanent injunction, Casden made or approved statements about Celliant that violated the permanent injunction. Additionally, on April 22, 2020—the day before Hologenix was scheduled to pay $1,400,000 to MET pursuant to the Settlement Agreement—Hologenix filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. As a result of the bankruptcy proceedings, MET returned the only payment that it had received from Hologenix under the Settlement Agreement—the initial $100,000 payment.

On February 8, 2021, MET filed this civil suit against Casden. (Compl., ECF No. 1.) In the operative First Amended Complaint, MET asserts four causes of action: (1) violation of the Lanham Act, 15 U.S.C. § 1125(A)(1)(B); (2) false advertising under California Business & Professions Code section 17500; (3) unfair competition under California Business & Professions Code section 17200; and (4) tortious interference with contractual relations. (FAC ¶¶ 76–108.)

On June 20 to 23, 2023, MET tried its claims before a jury. (*See* Mins. Trial.) After the close of evidence, the Court granted in part MET's Rule 50(a) motion, with respect to its claim for tortious interference with contractual relations. (June 22, 2023 Trial Tr. ("June 22 Tr.").[3]) In doing so, the Court found that Casden acted to advance his personal interests when he tortiously interfered with the Settlement Agreement, thus foreclosing any agency immunity defense. Nonetheless, at Casden's request, the Court submitted to the jury for advisory findings two questions related to Casden's agency immunity defense. (*Id.*; Verdict 4.) Consistent with the Court's finding, the jury issued an advisory finding that Casden acted to advance his own personal interests. (Verdict 4.) Relatedly, the jury found that MET's damages for the tortious interference claim were $1 in nominal damages. (*Id.*) The jury also returned a verdict

---

[3] The Court carefully reviewed the rough trial transcripts, which comport with the Court's notes and recollection of trial. Because only the rough trial transcripts are available at this time, throughout this Order, the Court refers to testimony and argument from the trial according to the day on which they occurred and omits any pin cites to the transcripts.

1  in MET's favor on its false advertising claim and awarded MET $1 in nominal
2  damages.  (*Id.* at 1–2.)

3  ### III.    DISCUSSION

4  The Court (1) reviews the factual and legal basis for its order granting in part
5  MET's Rule 50(a) motion, as to the claim for tortious interference, and addresses
6  MET's resulting damages; (2) finds that MET is entitled to disgorgement of Casden's
7  profits, treble damages, and attorneys' fees under the Lanham Act; and (3) finds
8  Casden is liable for violations of California's false advertising and unfair competition
9  laws and issues a permanent injunction.

10 **A.    Tortious Interference Claim**

11 After the close of evidence at trial, the Court granted in part MET's Rule 50(a)
12 motion, with respect to its claim for tortious interference with contractual relations.
13 The Court indicated then that it would issue a written order addressing the factual
14 basis for its order and the applicability of Casden's asserted agency immunity defense.

15 Rule 50(a) permits a party to move for judgment as a matter of law prior to the
16 submission of the case to the jury.  Fed. R. Civ. P. 50(a).  Under Rule 50(a), "a court
17 should render judgment as a matter of law when 'a party has been fully heard on an
18 issue and there is no legally sufficient evidentiary basis for a reasonable jury to find
19 for that party on that issue.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
20 133, 149 (2000); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) ("[Rule
21 50(a)] allows the trial court to remove cases or issues from the jury's consideration
22 'when the facts are sufficiently clear that the law requires a particular result.'"
23 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521, p. 240
24 (2d ed.1995))).  "In doing so, however, the court must draw all reasonable inferences
25 in favor of the nonmoving party, and it may not make credibility determinations or
26 weigh the evidence."  *Reeves*, 530 U.S. at 150.

27
28

*1.    Elements of Tortious Interference*

Applying this standard to MET's Rule 50(a) motion, the Court concluded that MET was entitled to judgment as a matter of law on its intentional interference with contractual relations claim.  Under California law, a claim for intentional interference with contractual relations requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (en banc).  "The third element incorporates a causation requirement that the intentional acts be a substantial factor in causing the breach."  *Mossimo Holdings, LLC v. Haralambus*, No. 2:14-cv-05912-DDP (JEx), 2017 WL 1240739, at *5 (C.D. Cal. Apr. 4, 2017) (citing *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008)), *aff'd on other grounds*, 735 F. App'x 383 (9th Cir. 2018).

To begin with, MET presented undisputed evidence satisfying the first and second elements of intentional interference with a contract.  First, it is undisputed that MET and Hologenix entered into a valid contract—the Settlement Agreement.  (Ex. 5.)  And second, it is undisputed that Casden, who negotiated and signed the Settlement Agreement on behalf of Hologenix, (*Id.* at 6; June 21, 2023 Trial Tr. ("June 21 Tr.")), knew of the contract and its terms, including the permanent injunction that the court entered pursuant to parties' request in the Settlement Agreement, (Exs. 5 at 3, 27).    The permanent injunction enjoined Hologenix, "whether acting directly or through any affiliate, subsidiary, agent, heir, or representative," from "stat[ing] or suggest[ing]" that the FDA "approved" Celliant or "made a 'determination'" that Celliant promoted any benefits.  (Ex. 27 at 2.)

Turning to the third element of intentional interference, the evidence at trial was overwhelming that Casden intended to induce a breach or disruption of the Settlement Agreement.    MET's evidence demonstrated that Casden made and approved

statements that caused Hologenix to violate the permanent injunction.  For example, on March 11, 2020, the very next day after the court entered the parties' requested permanent injunction, Casden authored an article in which he stated, "Celliant has been determined by the [FDA] to be a medical device and general wellness product." (Ex. 24 at 2.)  In another example, in an interview dated March 31, 2021, Casden explained that Hologenix previously claimed it was FDA approved because "we got a determination . . . [w]e're determined as a medical device," but "it's just easier to say 'approval.'"  (Ex. 72 at 6.)  These statements clearly violated the permanent injunction's prohibition on statements or suggestions that the FDA "made a 'determination' as to whether Celliant provides any benefits."  (Ex. 27 at 2.)  Taken together, the evidence at trial demonstrated that Casden understood which statements about Celliant were prohibited by the permanent injunction, but he made them anyways, intentionally causing Hologenix to breach the Settlement Agreement.

Additionally, the evidence showed that Casden, as a Hologenix board member, voted in favor of Hologenix's filing for bankruptcy.  (June 21 Tr.)  As a result, Hologenix filed for bankruptcy about one month after entering into the Settlement Agreement and the day before Hologenix was due to pay MET $1,400,000 under the Settlement Agreement.  (Exs. 5, 122.)  Because of the bankruptcy proceedings, MET was required to return the only payment that it received from Hologenix of $100,000, and Hologenix has in effect avoided making any payments to MET under the Settlement Agreement.  (June 21 Tr.)  This evidence, including the timing of Casden's actions, made clear that Casden's actions were designed to induce a breach or disruption of the Settlement Agreement.

Finally, MET presented evidence satisfying the fourth and fifth elements of intentional interference.  Hologenix breached the Settlement Agreement in making statements that violated the terms of the permanent injunction and in failing to pay MET pursuant to the Settlement Agreement.  Casden's conduct—both in making and approving statements that violated the permanent injunction and in pursuing

Hologenix's bankruptcy, thereby avoiding making any payments under the Settlement Agreement[4]—was a substantial factor in causing Hologenix's breach, which ultimately damaged MET by depriving MET of the value of the Settlement Agreement.

Viewing the evidence in the light most favorable to Casden, the Court concluded that no reasonable jury could find for Casden on MET's tortious interference claim.

### 2. Agency Immunity Defense

After the Court issued its tentative ruling, the Court provided the parties with an opportunity to further argue their Rule 50(a) motions. For the first time, Casden conceded that MET had met all of the elements for its tortious interference claim, but maintained that Casden cannot be held liable due to the agency immunity defense. (June 22 Tr.)

In its original form, the agent's immunity rule provides that "[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Wise v. S. Pac. Co.*, 223 Cal. App. 2d 50, 72 (1963). "This rule derives from the principle that ordinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged." *Id.* From this, courts have held that only a "stranger" to a contract may intentionally interfere with it, and a stranger is "a defendant who is not a party to the contract or an agent of a party to the contract." *See, e.g.*, *Caliber Paving Co., Inc. v. Rexford Indus. Realty & Mgmt., Inc.*, 54 Cal. App. 5th 175, 180, 187 (2020). However, this rule "is in a state

---

[4] Casden's actions provide at least two independent bases for tortious interference with the Settlement Agreement: first, Casden's actions with regards to making and approving statements that violated the permanent injunction and, second, Casden's actions with regards to pursuing Hologenix's filing for bankruptcy.

of flux," *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1127 (9th Cir. 2014), and the Ninth Circuit has recognized its potential for "perverse" results: "[S]hield[ing] parties with an economic interest in the contract from potential liability . . . create[s] an undesirable lacuna in the law between the respective domains of tort and contract," *United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1007 (9th Cir. 2014).

This case demonstrates the reality of that concern. Cognizant of this, the Court found that the agency immunity defense did not apply here because, in interfering with the Settlement Agreement, Casden acted in his personal interest, undercutting any immunity conferred by agency. (June 22 Tr.) Casden argued that such an order "den[ies] him the ability to vote in favor of bankruptcy [because] there's no set of circumstances under which [he] would be justified in voting for bankruptcy without resulting in liability." (*Id.*) The Court disagrees. To begin with, Casden's argument incorrectly assumes that Casden's tortious conduct is limited to his support for Hologenix's bankruptcy. As addressed above, Casden also made or approved false statements that caused Hologenix to violate the permanent injunction. (*See supra* 5–7.)

Moreover, the Court's finding that the agency immunity defense is inapplicable is tied to the exceptional facts of this case. The evidence at trial was overwhelming that Casden not only interfered with the Settlement Agreement, but he simultaneously ensured that his interference served his personal interests. For example, Casden was eligible for a bonus of up to fifty percent of his base salary per year based on Hologenix's business performance. (June 21 Tr.) Thus, by falsely promoting Celliant, Casden positioned himself to gain personally. In addition, shortly after MET sued Hologenix in the previous case, Casden entered into an employment contract with Hologenix, thereby ensuring his position as a secured creditor in Hologenix's subsequent bankruptcy. (*Id.*) As such, Casden simultaneously negotiated the Settlement Agreement with MET and prepared Hologenix for bankruptcy with the

knowledge that Hologenix filing for bankruptcy would cause Hologenix to breach the Settlement Agreement, all while protecting his personal interests in his employment and salary.  For these reasons, and pursuant to the Rule 50(a) standard, the Court found that Casden acted for his individual advantage.  The jury agreed, rendering an advisory finding that Casden acted to advance his own personal interests at the time he interfered with the Settlement Agreement.  (Verdict 4.)  Under the exceptional facts of this case, the Court finds that Casden tortiously interfered with the Settlement Agreement for his own personal benefit such that the agency immunity defense does not apply.

### 3. *Damages*

MET now asks the Court to determine the amount of damages to award MET for its tortious interference claim, arguing that the jury's damages award for $1 in nominal damages was advisory.  (Joint Resp. 1–2.)  Casden responds that the jury made a final determination as to damages.  (*Id.*)

Here, on its Rule 50(a) motion, MET argued that it was entitled to judgment as a matter of law as to the entirety of its tortious interference claim.  (June 22 Tr.)  On the element of harm, MET argued that Casden's tortious conduct deprived MET of the $2,500,000 to which it was entitled under the Settlement Agreement.  (*Id.*)  Moreover, Casden conceded that, with the exception of the agency defense, MET satisfied all of the elements for tortious interference, including the element of harm.  (*Id.*)  Based on this record, the Court granted MET's motion for judgment as a matter of law on MET's tortious interference claim.  (*Id.*)

Nonetheless, upon Casden's request, the Court permitted the jury to issue an advisory finding on the issue of the agency immunity defense.  (*Id.*)  Thus, in preparing the verdict form for the jury, in addition to leaving the two questions relating to the agency immunity defense blank, the Court also left blank the amount of damages for MET's tortious interference claim.  (Verdict 4 (Questions 15 through 17).)  The verdict form instructed the jury to address damages only if the jury found

Casden acted to advance his own personal interests at the time he interfered with the contract. (*Id.*) Accordingly, it was necessary to leave the amount of damages blank on the verdict form to avoid signaling to the jury that the Court had already found that Casden acted to advance his own personal interests and was liable. The Court's decision to permit the jury to issue an advisory finding on the agency immunity defense does not deprive the Court of its ability to issue a damages award on this cause of action for which it found MET was entitled to judgment as a matter of law.

MET also asks the Court to award punitive damages. (Joint Resp. 2.) However, MET did not argue for punitive damages in making its Rule 50(a) motion. Moreover, the parties did not provide the Court with any proposed jury instructions on punitive damages, (*see* Proposed Jury Instrs., ECF Nos. 119, 120, 126), or include a question touching on punitive damages on the verdict form, (*see* Verdict). Accordingly, MET waived any claim for punitive damages.

Consistent with the record and pursuant to the Court's order granting in part MET's Rule 50(a) as to the tortious interference claim, the Court awards MET $2,500,000 in damages.

## B. Relief Pursuant to the Lanham Act

The jury returned a verdict in MET's favor on its false advertising claim under the Lanham Act and awarded MET $1 in nominal damages. (Verdict 1–2.) In relation to its Lanham Act claim, MET now asks the Court to determine (1) whether the financial benefit Casden and Hologenix derived from the false advertising should be disgorged, and if so, the amount of that financial benefit; (2) whether an award of treble damages is warranted; and (3) whether an award of attorneys' fees is warranted. (Joint Resp. 1–3.) The Court addresses each of these questions in turn.

### 1. Disgorgement

Under 15 U.S.C. § 1117(a), "the plaintiff shall be entitled . . . subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117(a). In assessing profits, it is the "[plaintiff's] burden to show with reasonable certainty [the

defendant's] gross sales from [the infringing activity]." *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999). "Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016). "The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*

The Court finds MET is entitled to Casden's profits. MET argues that a court may disgorge from a defendant who committed false advertising the financial benefit that flows from the false advertising, including any financial benefit that flows to a third-party company. (June 22 Tr.) However, contrary to that position, the plain language of the Lanham Act limits a plaintiff's recovery to "defendant's profits." 15 U.S.C. § 1117(a). Hologenix is not a defendant here and, as a practical matter, the Court is unable to disgorge profits from a third-party entity presently in bankruptcy. Accordingly, the Court limits disgorgement to Casden's profits.

MET presented evidence at trial that, since 2019, Casden has received an annual salary of $300,000 as CEO of Hologenix, whose only product is Celliant. (June 21 Tr.) Accordingly, applying the principles of equity, the Court considers Casden's salary as his profits from engaging in false advertising of Celliant. The Court finds it is appropriate to disgorge Casden's salary from March 11, 2020, the day after the court entered the injunction, through June 20, 2023, the start of trial, as Casden's profits derived from Casden's false advertising of Celliant. The Court calculates Casden's salary for that period of time to be $983,171.

### 2. Attorneys' Fees and Treble Damages

Under the Lanham Act, "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any

significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "Exceptional cases" include those in which a defendant's conduct is "fraudulent, deliberate, or willful." *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1039 (9th Cir. 2007). In awarding attorneys' fees, the court exercises equitable discretion to determine whether a case is exceptional based on the "totality of the circumstances" using a preponderance of the evidence standard. *SunEarth*, 839 F.3d at 1181.

In addition to awarding attorneys' fees, "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a); *see also  A & M Recs., Inc. v. Abdallah*, 948 F. Supp. 1449, 1458 (C.D. Cal. 1996), *as amended* (Nov. 21, 1996) ("[T]he Court has the discretion to award up to treble damages for a Lanham Act violation.").

Here, the Court finds the deliberate and willful nature of Casden's conduct entitles MET to its attorneys' fees and treble damages. To begin with, although the jury awarded MET with only nominal damages, MET is nonetheless a "prevailing party" for attorneys' fees purposes because MET proved at trial that Casden violated the Lanham Act. (Verdict 1–2.) In addition, the jury found that Casden's false statements were "deliberately or intentionally false." (Verdict 1.) At trial, there was substantial evidence of the willful and deliberate nature of Casden's false advertising. In particular, because of litigation that preceded the instant matter, Hologenix and its employees were enjoined by a permanent injunction from making the very false statements at issue in this litigation. (Ex. 27.) Casden negotiated the Settlement Agreement by which the parties requested entry of the permanent injunction and, thus, he was well aware of its specific terms. (June 21 Tr.) Even so, immediately after entry of the permanent injunction, Casden continued to make false statements that not only constituted false advertising, but also violated the terms of the permanent injunction. MET also presented evidence that Casden provided guidance to

1  Hologenix's brand partners regarding the statements they were and were not allowed
2  to make about Celliant; yet, contrary to that guidance, Casden himself made false
3  advertising statements about Celliant. (*See* Ex. 13; June 21 Tr.)  In light of the jury's
4  verdict and the evidence presented at trial, the Court finds Casden's conduct was
5  deliberate and willful, rendering this an exceptional case for which MET is entitled to
6  attorneys' fees and treble damages.  Any motion for attorneys' fees shall be filed in
7  accordance with Rule 54(d).

8  **C.    State Law Claims for Unfair Competition and False Advertising**

9      At trial, MET submitted that the Court, not the jury, would resolve MET's state
10  law claims for unfair competition and false advertising under California Business &
11  Professions Code sections 17200 and 17500, respectively.  MET now requests a
12  determination as to Casden's liability on these claims and any relief. (Joint Resp. 1.)

13      California's unfair competition law ("UCL") prohibits "any unlawful, unfair or
14  fraudulent business act or practice and unfair, deceptive, untrue or misleading
15  advertising."  Cal. Bus. & Prof. Code § 17200.  In addition, California's false
16  advertising law prohibits any "untrue or misleading" statements in connection with
17  advertising. Cal. Bus. & Prof. Code § 17500.  "Any violation of the false advertising
18  law . . . necessarily violates the unfair competition law."  *Comm. on Children's*
19  *Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 210 (1983) (en banc).
20  Moreover, these claims are "substantially congruent" to claims made under the
21  Lanham Act.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) ("This
22  Circuit has consistently held that state common law claims of unfair competition and
23  actions pursuant to California Business and Professions Code § 17200 are
24  'substantially congruent' to claims made under the Lanham Act."); *see also Biolase,*
25  *Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*, No. 8:14-cv-00248-AG
26  (ANx), 2014 WL 12577153, at *2 (C.D. Cal. Sept. 15, 2014) (same as to false
27  advertising claims under California Business and Professions Code section 17500).

28

Here, consistent with the evidence at trial, the jury found Casden liable for false advertising under the Lanham Act.  (Verdict 1–2.)  The Court also finds that MET suffered injury in fact as a result of Casden's false advertising conduct.  *See Hall v. Time Inc.*, 158 Cal. App. 4th 847, 854, *as modified* (Jan. 28, 2008) ("[A] plaintiff suffers an injury in fact for purposes of standing under the UCL when he or she has: (1) expended money due to the defendant's acts of unfair competition; (2) lost money or property; or (3) been denied money to which he or she has a cognizable claim." (internal citations omitted)).  Among other things, MET introduced evidence that, as a result of Casden's false advertising of Celliant, MET performed additional studies to demonstrate the viability of its product and spent more time trying to close contracts. (June 21 Tr.); *see S. Cal. Hous. Rts. Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1069 (C.D. Cal. 2005) (finding injury in fact based on loss of financial resources and diversion of staff time).  Accordingly, because MET's state law claims for false advertising and unfair competition are substantially congruent to and rest upon the same factual basis as MET's claim for false advertising under the Lanham Act, the Court finds Casden liable for false advertising and unfair competition under California Business & Professions Code sections 17500 and 17200, respectively.

As such, MET is entitled to an appropriate remedy.  Under California Business & Professions Code section 17203, "the primary form of relief . . . is an injunction, along with ancillary relief in the form of such restitution 'as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.'"  *In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009) (quoting Cal. Bus. & Prof. Code § 17203).  "A court's discretion in fashioning a remedy under Section 17203 'is very broad.'"  *Kivett v. Flagstar Bank, FSB*, 506 F. Supp. 3d 749, 762 (N.D. Cal. 2020) (quoting *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 180 (2000), *aff'd*, No. 21-15667, 2022 WL 1553266 (9th Cir. May 17, 2022).

### 1. Injunctive Relief

Here, as part of the Settlement Agreement resolving substantially similar false advertising claims, MET and Hologenix, via Casden, requested that the court enter a permanent injunction enjoining Hologenix and its agents from making certain false advertising statements. (*See* Exs. 5, 27.)  The Court finds that it is an appropriate remedy to enter a substantially similar permanent injunction here.  The Court enters an injunction as set forth in the Conclusion below.  (*See infra* Part IV.)

### 2. Restitution

However, the Court finds that MET has not demonstrated that it is entitled to restitution.  Restitution under the UCL is only available when a sum can "clearly be traced to particular funds or property in the defendant's possession." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 699 (2006) (explaining restitution must be "based on a specific amount found owing").  The plaintiff must have a "vested interest" in the money or property at issue. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003).  Here, MET has not demonstrated that it is entitled to specific funds or property in Casden's possession.

## IV.    CONCLUSION

For the reasons discussed above, the Court **ORDERS** as follows:

The Court **GRANTS IN PART** MET's Rule 50(a) motion as to its claim for tortious interference and **AWARDS** MET **$2,500,000** in damages for this claim.  The Court **DENIES** MET's request for punitive damages.

In light of the evidence at trial and the jury's verdict in MET's favor on its false advertising claim under the Lanham Act, the Court finds MET is entitled to (1) Casden's profits; (2) treble damages; and (2) attorneys' fees.  As such, the Court **AWARDS** MET **$2,949,513** (three times Casden's profits).  Any motion for attorneys' fees shall be filed in accordance with Rule 54(d).

///

///

The Court **FINDS** Casden is liable for false advertising and unfair competition under California Business & Professions Code sections 17500 and 17200, respectively, and **ISSUES** a permanent injunction as follows:

IT IS HEREBY ORDERED that Defendant Seth Casden is enjoined from making any statement in any forum or communication including but not limited to statements 1) on any website; 2) on an social media platform; or 3) to any member of the press or persons attempting to influence the opinions or decisions of others, that a) states or suggests that the Food and Drug Administration ("FDA") has "approved" Hologenix's product Celliant for any use or any reason; b) states or suggests that the FDA has made a "determination" as to whether Celliant provides any benefits, whether those benefits are categorized as medical benefits or "general wellness" benefits; or c) states or suggests that Celliant products are better than products containing Plaintiff Multiple Energy Technologies, LLC's bioceramics because of any approval given by or determination made by the FDA.

If Celliant is cleared, authorized or approved by the FDA as reflected in the appropriate FDA databases, true and accurate statements to this effect would not be violations of this injunction.

The following statement authorized by the FDA in its June 8, 2017 letter when restated in its entirety is not a violation of this injunction: "The FDA has determined that Celliant products are medical devices as defined in section 201(h) of the Federal Food, Drug and Cosmetic Act and are general wellness products."

///
///
///
///
///
///
///

16

1    The Court will enter Judgment in accordance with the Jury's Verdict and this

2  Order.

3

4    **IT IS SO ORDERED.**

5

6    September 21, 2023

7

8    _____

9    **OTIS D. WRIGHT, II**
     **UNITED STATES DISTRICT JUDGE**

10

# EXHIBIT N

Case 2:23-bk-09042-BBR Doc 366-1 Filed 01/06/25 Entered 01/06/25 14:33:07 Desc
Declaration of Nicole A. Sullivan Page 40 of 1075 of 1079

Case 2:21-cv-01149-ODW-RAO   Document 199   Filed 09/26/23   Page 1 of 3   Page ID #:6963

1
2
3
4
5
6
7

**O**
**JS-6**

8
9
10

# 𝔘nited 𝔖tates 𝔇istrict 𝔆ourt
# 𝔆entral 𝔇istrict of 𝔆alifornia

11  MULTIPLE ENERGY
12  TECHNOLOGIES, LLC,

                        Plaintiff,
13
14              v.
15  SETH CASDEN,

                        Defendant.
16

Case № 2:21-cv-01149-ODW (RAOx)

**FINAL JUDGMENT**

17
18
19
20
21
22
23
24
25
26
27
28

Case 2:23-cv-09042-PBR Document 66-1 Filed 11/26/24 Entered 11/26/24 16:43:07 Desc
Declaration of Mark Nicolenti Sullivan Page 42 of 56 of 1079

Case 2:21-cv-01149-ODW-RAO   Document 199   Filed 09/26/23   Page 2 of 3   Page ID #:6964

1      Pursuant to the jury's verdict, (ECF No. 190), and the Court's Post-Trial Order,

2   (ECF No. 198), it is therefore **ORDERED, ADJUDGED, and DECREED** as

3   follows:

4      1. Plaintiff shall have **JUDGMENT** in its favor on all claims asserted in the First

5         Amended Complaint, (ECF No. 24);

6      2. The Court **AWARDS** Plaintiff $2,500,000 in damages on its tortious

7         interference claim against Defendant;

8      3. The Court **AWARDS** Plaintiff $2,949,513 in damages and finds Plaintiff is

9         entitled to reasonable attorneys' fees on its Lanham Act claim against

10        Defendant; and

11     4. The Court **PERMANENTLY ENJOINS** Defendant as follows:

12

13         IT IS HEREBY ORDERED that Defendant Seth Casden is

14     enjoined from making any statement in any forum or communication

15     including but not limited to statements 1) on any website; 2) on an social

16     media platform; or 3) to any member of the press or persons attempting

17     to influence the opinions or decisions of others, that a) states or suggests

18     that the Food and Drug Administration ("FDA") has "approved"

19     Hologenix's product Celliant for any use or any reason; b) states or

20     suggests that the FDA has made a "determination" as to whether Celliant

21     provides any benefits, whether those benefits are categorized as medical

22     benefits or "general wellness" benefits; or c) states or suggests that

23     Celliant products are better than products containing Plaintiff Multiple

24     Energy Technologies, LLC's bioceramics because of any approval given

25     by or determination made by the FDA.

26

27

28

**Exhibit "B"**
**Page 41**

Case 2:24-kap-09042-PBR Doc 86-1 Filed 11/26/24 Entered 11/26/24 14:33:07 Desc
Declaration of Nicole Ann Sullivan Page 42 of 1057 of 1079

Case 2:21-cv-01149-ODW-RAO   Document 199   Filed 09/26/23   Page 3 of 3   Page ID #:6965

<div style="margin-left:2em">

1         If Celliant is cleared, authorized or approved by the FDA as

2   reflected in the appropriate FDA databases, true and accurate statements

3   to this effect would not be violations of this injunction.

4

5         The following statement authorized by the FDA in its June 8, 2017

6   letter when restated in its entirety is not a violation of this injunction:

7   "The FDA has determined that Celliant products are medical devices as

8   defined in section 201(h) of the Federal Food, Drug and Cosmetic Act

9   and are general wellness products."

10

11  The Clerk of the Court shall close the case.

12

13  **IT IS SO ORDERED.**

14

15  September 26, 2023

16

17  _____

18      **OTIS D. WRIGHT, II**
      **UNITED STATES DISTRICT JUDGE**

</div>

3

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10345 W. Olympic Blvd., Los Angeles, CA 90064

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF NICOLE A. SULLIVAN IN SUPPORT OF MULTIPLE ENERGY TECHNOLOGIES, LLC'S MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, CONVERSION TO CHAPTER 7** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 8, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) October 8, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Barry Russell                                      Theodora Oringher PC
United States Bankruptcy Court                          55 Anton Blvd 9th Flr
Edward R. Roybal Federal Building and Courthouse   Costa Mesa, CA 92626
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 8, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 8, 2025 | Lauren B. Wageman | */s/ Lauren B. Wageman* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **Shraddha Bharatia**    notices@becket-lee.com
- **Joseph Boufadel**    jboufadel@salvatoboufadel.com,
  Gsalvato@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- **Thomas E Butler**    butlert@whiteandwilliams.com,
  sullivann@whiteandwilliams.com;millnamowm@whiteandwilliams.com;panchavatis@whiteandwilliams.com
- **Aaron E. De Leest**    adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com
- **John-Patrick M Fritz**    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
- **Matthew Grimshaw**    mgrimshaw@marshackhays.com,
  mgrimshaw@ecf.courtdrive.com;alinares@ecf.courtdrive.com
- **Jeff D Kahane**    jkahane@skarzynski.com, dahn@ecf.courtdrive.com
- **Sweeney Kelly**    kelly@ksgklaw.com
- **Wendy A Locke**    ecfcacb@aldridgepite.com, wlocke@ecf.inforuptcy.com
- **Betty Luu**    bluu@duanemorris.com
- **Ron Maroko**    ron.maroko@usdoj.gov
- **Allison C. Murray**    acmurray@swlaw.com, kcollins@swlaw.com
- **William M Noall**    wnoall@gtg.legal, bknotices@gtg.legal
- **Kurt Ramlo**    RamloLegal@gmail.com, kr@ecf.courtdrive.com,ramlo@recap.email
- **Arjun P Rao**    arjun.rao@morganlewis.com, kathleen.rosello@morganlewis.com
- **Michael B Reynolds**    mreynolds@swlaw.com, kcollins@swlaw.com
- **Gregory M Salvato**    gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- **Nicole Sullivan**    sullivann@whiteandwilliams.com,
  vulpioa@whiteandwilliams.com,arthura@whiteandwilliams.com
- **John N Tedford**    JNT@LNBYG.com, jnt@ecf.courtdrive.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **David Wood**    dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alinares@ecf.courtdrive.com
- **Roye Zur**    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                    **F 9013-3.1.PROOF.SERVICE**